Nicholas Woodall

po box 194

Temperance Mi 48182

stewartj402000@gmail.com

771-241-4590

# United States Appeals Court for the

# District Court of the

# District of Columbia

| | |
|---|---|
| NICHOLAS WOODALL | No. 25-5259 |
| Appellant | D.C. 1:25-CV-112 |
| v. | APPEALANT SUPPLEMENT |
| Donald J. Trump, President, et al., | TO APPENDIX FOR APPEAL |
| Appellees | FROM FINAL DECISION |
| | 12/04/2025 |

## APPEALANT APPENDIX
SUPPLEMENT

## HISTORICAL TEXTS

Nicholas Woodall

po box 194

Temperance Mi 48182

stewartj402000@gmail.com

771-241-4590

United States Appeals court for the

District Court of the District of Columbia

| | |
|---|---|
| NICHOLAS WOODALL | No. 25-5259 |
| Appellant | D.C. 1:25-cv-112 |
| v. | APPEALANT SUPPLEMENT |
| Donald J. Trump, President, et al., | TO APPENDIX FOR APPEAL |
| Appellees | FROM FINAL DECISION |
| | 12/04/2025 |

## APPEALANT APPENDIX SUPPLEMENT

## HISTORICAL TEXTS

[1 ANNALS of Congress]: can be found at [ https://perma.cc/EJG4-S3TQ ] or

[ https://press-pubs.uchicago.edu/founders/documents/amendI_assemblys17.htm

Annals of Congress.

The Debates and Proceedings in the Congress of the United States.

"History of Congress." 42 vols. Washington, D.C.: Gales & Seaton, 1834--56.

11 PAGES...PAGE 4

1

1    https://founders.archives.gov/documents/Madison/01-11-02-0218

2    "James Madisons letter to Thomas Jefferson 17 of October of 1778"

3    7 PAGES ........ PAGE 15

4

5    https://founders.archives.gov/documents/Madison/01-12-02-0126

6    Amendments to the Constitution, [8 June] 1789

7    15 PAGES.......PAGE 22

8

9    "Joseph Story, Commentaries on the Constitution 3:§§ 1874-1888

10    https://upload.wikimedia.org/wikipedia/commons/d/d4/Joseph_Story%

11    2C_Commentaries_on_the_Constitution_of_the_United_States_%281st_ed

12    %2C_1833%2C_vol_III%29.pdf

13    17 PAGES.......PAGE 37

14

15    Regan Library on petitioning: https://www.reaganlibrary.gov/

16    constitutional-amendments-amendment-1-freedom-speech

17    4 PAGES..........PAGE 54

18

19    " Vices of the Political System of the United States, April 1787  #11 "

20    https://founders.archives.gov/documents/Madison/01-09-02-0187

     4 PAGES............... PAGE 58

21

22    SUBMITTED BY NICHOLAS WOODALL    ON 12/04/2025

23

2

CITATION

Footnotes referenced from [1 ANNALS of Congress]: can be found at
[ https://perma.cc/EJG4-S3TQ ] or
[ https://press-pubs.uchicago.edu/founders/documents/amendI_assemblys17.html ]

The Founders' Constitution

Volume 5, Amendment I (Petition and Assembly), Document 17

http://press-pubs.uchicago.edu/founders/documents/amendI_assemblys17.html

The University of Chicago Press

Annals of Congress. The Debates and Proceedings in the Congress of the United
States. "History of Congress." 42 vols. Washington, D.C.: Gales & Seaton, 1834--56

TEXT COPIED FROM WEB

11 PAGES INCLUDING THIS COVER

Amendment I (Petition and Assembly)

Document 17

House of Representatives, Amendments to the Constitution

15 Aug. 1789Annals 1:731--45

The next clause of the fourth proposition was taken into consideration, and was as follows: "The freedom of speech and of the press, and the right of the people peaceably to assemble and consult for their common good, and to apply to the Government for redress of grievances, shall not be infringed.

Mr. Sedgwick submitted to those gentlemen who had contemplated the subject, what effect such an amendment as this would have; he feared it would tend to make them appear trifling in the eyes of their constituents; what, said he, shall we secure the freedom of speech, and think it necessary, at the same time, to allow the right of assembling? If people freely converse together, they must assemble for that purpose; it is a self-evident, unalienable right which the people possess; it is certainly a thing that never would be called in question; it is derogatory to the dignity of the House to descend to such minutiae; he therefore moved to strike out "assemble and."

Mr. Benson.--The committee who framed this report proceeded on the principle that these rights belonged to the people; they conceived them to be inherent; and all that they meant to provide against was their being infringed by the Government.

Mr. Sedgwick replied, that if the committee were governed by that general principle, they might have gone into a very lengthy enumeration of rights; they might have declared that a man should have a right to wear his hat if he pleased; that he might get up when he pleased, and go to bed when he thought proper; but he would ask the gentleman whether he thought it necessary to enter these trifles in a declaration of rights, in a Government where none of them were intended to be infringed.

Mr. Tucker hoped the words would not be struck out, for he considered them of importance; besides, they were recommended by the States of Virginia and North Carolina, though he noticed that the most material part proposed by those States was omitted, which was, a declaration that the people should have a right to instruct their representatives. He would move to have those words inserted as soon as the motion for striking out was decided.

Mr. Gerry was also against the words being struck out, because he conceived it to be an essential right; it was inserted in the constitutions of several States; and though it had been abused in the year 1786 in Massachusetts, yet that abuse ought not to operate as an argument against the use of it. The people ought to be secure in the peaceable enjoyment of this privilege, and that can only be done by making a declaration to that effect in the constitution.

Mr. Page.--The gentleman from Massachusetts, (Mr. Sedgwick,) who made this motion, objects to the clause, because the right is of so trivial a nature. He supposes it no more essential than whether a man has a right to wear his hat or not; but let me observe to him that such rights have been opposed, and a man has been obliged to pull off his hat when he appeared before the face of authority; people have also been prevented from assembling together on their lawful occasions, therefore it is well to guard against such stretches of authority, by inserting the privilege in the declaration of rights. If the people could be deprived of the power of assembling under any pretext whatsoever, they might be deprived of every other privilege contained in the clause.

Mr. Vining said, if the thing was harmless, and it would tend to gratify the States that had proposed amendments, he should agree to it.

Mr. Hartley observed, that it had been asserted in the convention of Pennsylvania, by the friends of the constitution, that all the rights and powers that were not given to the Government were retained by the States and the people thereof. This was also his own opinion; but as four or five States had required to be secured in those rights by an express declaration in the constitution, he was disposed to gratify them; he thought every thing that was not incompatible with the general good ought to be granted, if it would tend to obtain the confidence of the people in the Government; and, upon the whole, he thought these words were as necessary to be inserted in the declaration of rights as most in the clause.

Mr. Gerry said, that his colleague contended for nothing, if he supposed that the people had a right to consult for the common good, because they could not consult unless they met for the purpose.

Mr. Sedgwick replied that if they were understood or implied in the word consult, they were utterly unnecessary, and upon that ground he moved to have them struck out.

The question was now put upon Mr. Sedgwick's motion, and lost by a considerable majority.

Mr. Tucker then moved to insert these words, "to instruct their Representatives."

Mr. Hartley wished the motion had not been made, for gentlemen acquainted with the circumstances of this country, and the history of the country from which we separated, differed exceedingly on this point. The members of the House of Representatives, said he, are chosen for two years, the members of the Senate for six.

According to the principles laid down in the Constitution, it is presumable that the persons elected know the interests and the circumstances of their constituents, and being checked in their determinations by a division of the Legislative power into two branches, there is little danger of error. At least it ought to be supposed that they have the confidence of the people during the period for which they are elected; and if, by misconduct, they forfeit it, their constituents have the power of leaving them out at the expiration of that time--thus they are answerable for the part they have taken in measures that may be contrary to the general wish.

Representation is the principle of our Government; the people ought to have confidence in the honor and integrity of those they send forward to transact their business; their right to instruct them is a problematical subject. We have seen it attended with bad consequences, both in England and America. When the passions of the people are excited, instructions have been resorted to and obtained, to answer party purposes; and although the public opinion is generally respectable, yet at such moments it has been known to be often wrong; and happy is that Government composed of men of firmness and wisdom to discover, and resist popular error.

If, in a small community, where the interests, habits, and manners are neither so numerous or diversified, instructions bind not, what shall we say of instructions to this body? Can it be supposed that the inhabitants of a single district in a State, are better informed with respect to the general interests of the Union, than a select body assembled from every part? Can it be supposed that a part will be more desirous of promoting the good of the whole than the whole will of the part? I apprehend, sir, that Congress will be the best judges of proper measures, and that instructions will never be resorted to but for party purposes, when they will generally contain the prejudices and acrimony of the party, rather than the dictates of honest reason and sound policy.

In England, this question has been considerably agitated. The representatives of some towns in Parliament have acknowledged, and submitted to the binding force of instructions, while the majority have thrown off the shackles with disdain. I would not have this precedent influence our decision; but let the doctrine be tried upon its own merits, and stand or fall as it shall be found to deserve.

It appears to my mind, that the principle of representation is distinct from an agency, which may require written instructions. The great end of meeting is to consult for the common good; but can the common good be discerned without the object is reflected and shown in every light. A local or partial view does not necessarily enable any man to comprehend it clearly; this can only result from an inspection into the aggregate. Instructions viewed in this light will be found to embarrass the best and wisest men. And were all the members to take their seats in order to obey instructions, and those instructions were as various as it is probable they would be, what possibility would there exist of so accommodating each to the other as to produce any act whatever? Perhaps a majority of the whole might not be instructed to agree to any one point, and is it thus the people of the United States propose to form a more perfect union, provide for the common defence, and promote the general welfare?

Sir, I have known within my own time so many inconveniences and real evils arise from adopting the popular opinions on the moment, that although I respect them as much as any man, I hope this Government will particularly guard against them, at least that they will not bind themselves by a constitutional act, and by oath, to submit to their influence; if they do, the great object which this Government has been established to attain, will inevitably elude our grasp on the uncertain and veering winds of popular commotion.

Mr. Page.--The gentleman from Pennsylvania tells you, that in England this principle is doubted; how far this is consonant with the nature of the Government I will not pretend to say; but I am not astonished to find that the administrators of a monarchical Government are unassailable by the weak voice of the people; but under a democracy, whose great end is to form a code of laws congenial with the public sentiment, the popular opinion ought to be collected and attended to. Our present object is, I presume, to secure to our constituents and to posterity these inestimable rights. Our Government is derived from the people, of consequence the people have a right to consult for the common good; but to what end will this be done, if they have not the power of instructing their representatives? Instruction and representation in a republic appear to me to be inseparably connected; but were I the subject of a monarch, I should doubt whether the public good did not depend more upon the prince's will than the will of the people. I should dread a popular assembly consulting for the public good, because, under its influence, commotions and tumults might arise that would shake the foundation of the monarch's throne, and make the empire tremble in expectation. The people of England have submitted the crown to the Hanover family, and have rejected the Stuarts. If instructions upon such a revolution were considered binding, it is difficult to know what would have been the effects. It might be well, therefore, to have the doctrine exploded from that kingdom; but it will not be advanced as a substantial reason in favor of our treading in the same steps.

The honorable gentleman has said, that when once the people have chosen a representative, they must rely on his integrity and judgment during the period for which he is elected. I think, sir, to doubt the authority of the people to instruct their representatives, will give them just cause to be alarmed for their fate. I look upon it as a dangerous doctrine, subversive of the great end for which the United States have confederated. Every friend of mankind, every well-wisher of his country, will be desirous of obtaining the sense of the people on every occasion of magnitude; but how can this be so well expressed as in instructions to their representatives? I hope, therefore, that gentlemen will not oppose the insertion of it in this part of the report.

Mr. Clymer.--I hope the amendment will not be adopted; but if our constituents choose to instruct us, that they may be left at liberty to do so. Do gentlemen foresee the extent of these words? If they have a constitutional right to instruct us, it infers that we are bound by those instructions; and as we ought not to decide constitutional questions by implication, I presume we shall be called upon to go further, and expressly declare the members of the Legislature bound by the instruction of their constituents. This is a most dangerous principle, utterly destructive of all ideas of an independent and deliberative body, which are essential requisites in the Legislatures of free Governments; they prevent men of abilities and experience from rendering those services to the community that are in their power, destroying the object contemplated by establishing an efficient General Government, and rendering Congress a mere passive machine.

Mr. Sherman.--It appears to me, that the words are calculated to mislead the people, by conveying an idea that they have a right to control the debates of the Legislature. This cannot be admitted to be just, because it would destroy the object of their meeting. I think, when the people have chosen a representative, it is his duty to meet others from the different parts of the Union, and consult, and agree with them to such acts as are for the general benefit of the whole community. If they were to be guided by instructions, there would be no use in deliberation; all that a man would have to do, would be to produce his instructions, and lay them on the table, and let them speak for him. From hence I think it may be fairly inferred, that the right of the people to consult for the common good can go no further than to petition the Legislature, or apply for a redress of grievances. It is the duty of a good representative to inquire what measures are most likely to promote the general welfare, and, after he has discovered them, to give them his support. Should his instructions, therefore, coincide with his ideas on any measure, they would be unnecessary; if they were contrary to the conviction of his own mind, he must be bound by every principle of justice to disregard them.

4

Mr. Jackson was in favor of the right of the people to assemble and consult for the common good; it had been used in this country as one of the best checks on the British Legislature in their unjustifiable attempts to tax the colonies without their consent. America had no representatives in the British Parliament, therefore they could instruct none, yet they exercised the power of consultation to a good effect. He begged gentlemen to consider the dangerous tendency of establishing such a doctrine; it would necessarily drive the house into a number of factions. There might be different instructions from every State, and the representation from each State would be a faction to support its own measures.

If we establish this as a right, we shall be bound by those instructions; now, I am willing to leave both the people and representatives to their own discretion on this subject. Let the people consult and give their opinion; let the representative judge of it; and if it is just, let him govern himself by it as a good member ought to do; but if it is otherwise, let him have it in his power to reject their advice.

What may be the consequence of binding a man to vote in all cases according to the will of others? He is to decide upon a constitutional point, and on this question his conscience is bound by the obligation of a solemn oath; you now involve him in a serious dilemma. If he votes according to his conscience, he decides against his instructions; but in deciding against his instructions, he commits a breach of the constitution, by infringing the prerogative of the people, secured to them by this declaration. In short, it will give rise to such a variety of absurdities and inconsistencies, as no prudent Legislature would wish to involve themselves in.

Mr. Gerry.--By the checks provided in the constitution, we have good grounds to believe that the very framers of it conceived that the Government would be liable to maladministration, and I presume that the gentlemen of this House do not mean to arrogate to themselves more perfection than human nature has as yet been found to be capable of; if they do not, they will admit an additional check against abuses which this, like every other Government, is subject to. Instruction from the people will furnish this in a considerable degree.

It has been said that the amendment proposed by the honorable gentleman from South Carolina (Mr. Tucker) determines this point, "that the people can bind their representatives to follow their instructions." I do not conceive that this necessarily follows. I think the representative, notwithstanding the insertion of these words, would be at liberty to act as he pleased; if he declined to pursue such measures as he was directed to attain, the people would have a right to refuse him their suffrages at a future election.

Now, though I do not believe the amendment would bind the representatives to obey the instructions, yet I think the people have a right both to instruct and bind them. Do gentlemen conceive that on any occasion instructions would be so general as to proceed from all our constituents? If they do, it is the sovereign will; for gentlemen will not contend that the sovereign will resides in the Legislature. The friends and patrons of this constitution have always declared that the sovereignty resides in the people, and that they do not part with it on any occasion; to say the sovereignty vests in the people, and that they have not a right to instruct and control their representatives, is absurd to the last degree. They must either give up their principle, or grant that the people have a right to exercise their sovereignty to control the whole Government, as well as this branch of it. But the amendment does not carry the principle to such an extent, it only declares the right of the people to send instructions; the representative will, if he thinks proper, communicate his instructions to the House, but how far they shall operate on his conduct, he will judge for himself.

The honorable gentleman from Georgia (Mr. Jackson) supposes that instructions will tend to generate factions in this House; but he did not see how it could have that effect, any more than the freedom of debate had. If the representative entertains the same opinion with his constituents, he will decide with them in favor of the measure; if other gentlemen, who are not instructed on this point, are convinced by argument that the measure is proper, they will also vote with them; consequently, the influence of debate and of instruction is the same.

The gentleman says further, that the people have the right of instructing their representatives; if so, why not declare it? Does he mean that it shall lie dormant and never be exercised? If so, it will be a right of no utility. But much good may result from a declaration in the constitution that they possess this privilege; the people will be encouraged to come forward with their instructions, which will form a fund of useful information for the Legislature. We cannot, I apprehend, be too well informed of the true state, condition, and sentiment of our constituents, and perhaps this is the best mode in our power of obtaining information. I hope we shall never shut our ears against that information which is to be derived from the petitions and instructions of our constituents. I hope we shall never presume to think that all the wisdom of this country is concentred within the walls of this House. Men, unambitious of distinctions from their fellow-citizens, remain within their own domestic walk, unheard of and unseen, possessing all the advantages resulting from a watchful observance of public men and public measures, whose voice, if we would descend to listen to it, would give us knowledge superior to what could be acquired amidst the cares and bustles of a public life; let us then adopt the amendment, and encourage the diffident to enrich our stock of knowledge with the treasure of their remarks and observations.

Mr. Madison.--I think the committee acted prudently in omitting to insert these words in the report they have brought forward; if, unfortunately, the attempt of proposing amendments should prove abortive, it will not arise from the want of a disposition in the friends of the constitution to do what is right with respect to securing the rights and privileges of the people of America, but from the difficulties arising from discussing and proposing abstract propositions, of which the judgment may not be convinced. I venture to say, that if we confine ourselves to an enumeration of simple, acknowledged principles, the ratification will meet with but little difficulty. Amendments of a doubtful nature will have a tendency to prejudice the whole system; the proposition now suggested partakes highly of this nature. It is doubted by many gentlemen here; it has been objected to in intelligent publications throughout the Union; it is doubted by many members of the State Legislatures. In one sense this declaration is true, in many others it is certainly not true; in the sense in which it is true, we have asserted the right sufficiently in what we have done; if we mean nothing more than this, that the people have a right to express and communicate their sentiments and wishes, we have provided for it already. The right of freedom of speech is secured; the liberty of the press is expressly declared to be beyond the reach of this Government; the people may therefore publicly address their representatives, may privately advise them, or declare their sentiments by petition to the whole body; in all these ways they may communicate their will. If gentlemen mean to go further, and to say that the people have a right to instruct their representatives in such a sense as that the delegates are obliged to conform to those instructions, the declaration is not true. Suppose they instruct a representative, by his vote, to violate the constitution; is he at liberty to obey such instructions? Suppose he is instructed to patronize certain measures, and from circumstances known to him, but not to his constituents, he is convinced that they will endanger the public good; is he obliged to sacrifice his own judgment to them? Is he absolutely bound to perform what he is instructed to do? Suppose he refuses, will his vote be the less valid, or the community be disengaged from that obedience which is due to the laws of the Union? If his vote must inevitably have the same effect, what sort of a right is this in the constitution, to instruct a representative who has a right to disregard the order, if he pleases? In this sense the right does not exist, in the other sense it does exist, and is provided largely for.

The honorable gentleman from Massachusetts asks if the sovereignty is not with the people at large. Does he infer that the people can, in detached bodies, contravene an act established by the whole people? My idea of the sovereignty of the people is, that the people can change the constitution if they please; but while the constitution exists, they must conform themselves to its dictates. But I do not believe that the inhabitants of any district can speak the voice of the people; so far from it, their ideas may contradict the sense of the whole people; hence the consequence that instructions are binding on the representative is of a doubtful, if not of a dangerous nature. I do not conceive, therefore, that it is necessary to agree to the proposition now made; so far as any real good is to arise from it, so far that real good is provided for; so far as it is of a doubtful nature, so far it obliges us to run the risk of losing the whole system.

Mr. Smith, of South Carolina.--I am opposed to this motion, because I conceive it will operate as a partial inconvenience to the more distant States. If every member is to be bound by instructions how to vote, what are gentlemen from the extremities of the continent to do? Members from the neighboring States can obtain their instructions earlier than those from the Southern ones, and I presume that particular instructions will be necessary for particular measures; of consequence, we vote perhaps against instructions on their way to us, or we must decline voting at all. But what is the necessity of having a numerous representation? One member from a State can receive the instructions, and by his vote answer all the purposes of many, provided his vote is allowed to count for the proportion the State ought to send; in this way the business might be done at a less expense than having one or two hundred members in the House, which had been strongly contended for yesterday.

Mr. Stone.--I think the clause would change the Government entirely; instead of being a Government founded upon representation, it would be a democracy of singular properties.

I differ from the gentleman from Virginia, (Mr. Madison,) if he thinks this clause would not bind the representative; in my opinion, it would bind him effectually, and I venture to assert, without diffidence, that any law passed by the Legislature would be of no force, if a majority of the members of this House were instructed to the contrary, provided the amendment became part of the constitution. What would follow from this? Instead of looking in the code of laws passed by Congress, your Judiciary would have to collect and examine the instructions from the various parts of the Union. It follows very clearly from hence, that the Government would be altered from a representative one to a democracy, wherein all laws are made immediately by the voice of the people.

This is a power not to be found in any part of the earth except among the Swiss cantons; there the body of the people vote upon the laws, and give instructions to their delegates. But here we have a different form of Government; the people at large are not authorized under it to vote upon the law, nor did I ever hear that any man required it. Why, then, are we called upon to propose amendments subversive of the principles of the constitution, which were never desired?

Several members now called for the question, and the Chairman being about to put the same:

Mr. Gerry.--Gentlemen seem in a great hurry to get this business through. I think, Mr. Chairman, it requires a further discussion; for my part, I had rather do less business and do it well, than precipitate measures before they are fully understood.

The honorable gentleman from Virginia (Mr. Madison) stated, that if the proposed amendments are defeated, it will be by the delay attending the discussion of doubtful propositions; and he declares this to partake of that quality. It is natural, sir, for us to be fond of our own work. We do not like to see it disfigured by other hands. That honorable gentleman brought forward a string of propositions; among them was the clause now proposed to be amended: he is no doubt ready for the question, and determined not to admit what we think an improvement. The gentlemen who were on the committee, and brought in the report, have considered the subject, and are also ripe for a decision. But other gentlemen may crave a like indulgence. Is not the report before us for deliberation and discussion, and to obtain the sense of the House upon it; and will not gentlemen allow us a day or two for these purposes, after they have forced us to proceed upon them at this time? I appeal to their candor and good sense on the occasion, and am sure not to be refused; and I must inform them now, that they may not be surprised hereafter, that I wish all the amendments proposed by the respective States to be considered. Gentlemen say it is necessary to finish the subject, in order to reconcile a number of our fellow-citizens to the Government. If this is their principle, they ought to consider the wishes and intentions which the convention has expressed for them; if they do this, they will find that they expect and wish for the declaration proposed by the honorable gentleman over the way, (Mr. Tucker,) and, of consequence, they ought to agree to it; and why it, with others recommended in the same way, were not reported, I cannot pretend to say; the committee know this best themselves.

The honorable gentleman near me (Mr. Stone) says, that the laws passed contrary to instruction will be nugatory. And other gentlemen ask, if their constituents instruct them to violate the constitution, whether they must do it, Sir, does not the constitution declare that all laws passed by Congress are paramount to the laws and constitutions of the several States; if our decrees are of such force as to set aside the State laws and constitutions, certainly they may be repugnant to any instructions whatever, without being injured thereby. But can we conceive that our constituents would be so absurd as to instruct us to violate our oath, and act directly contrary to the principles of a Government ordained by themselves? We must look upon them to be absolutely abandoned and false to their own interests, to suppose them capable of giving such instructions.

If this amendment is introduced into the constitution, I do not think we shall be much troubled with instructions; a knowledge of the right will operate to check a spirit that would render instruction necessary.

The honorable gentleman from Virginia asked, will not the affirmative of a member who votes repugnant to his instructions bind the community as much as the votes of those who conform? There is no doubt, sir, but it will; but does this tend to show that the constituent has no right to instruct? Surely not. I admit, sir, that instructions contrary to the constitution ought not to bind, though the sovereignty resides in the people. The honorable gentleman acknowledges that the sovereignty vests there; if so, it may exercise its will in any case not inconsistent with a previous contract. The same gentleman asks if we are to give the power to the people in detached bodies to contravene the Government while it exists. Certainly not; nor does the proposed proposition extend to that point; it is only intended to open for them a convenient mode in which they may convey their sense to their agents. The gentleman therefore takes for granted what is inadmissible, that Congress will always be doing illegal things, and make it necessary for the sovereign to declare its pleasure.

He says the people have a right to alter the constitution, but they have no right to oppose the Government. If, while the Government exists, they have no right to control it, it appears they have divested themselves of the sovereignty over the constitution. Therefore, our language, with our principles, must change, and we ought to say that the sovereignty existed in the people previous to the establishment of this Government. This will be ground for alarm indeed, if it is true; but I trust, sir, too much to the good sense of my fellow-citizens ever to believe that the doctrine will generally obtain in this country of freedom.

Mr. Vining.--If, Mr. Chairman, there appears on one side too great an urgency to despatch this business, there appears on the other an unnecessary delay and procrastination equally improper and unpardonable. I think this business has been already well considered by the House, and every gentleman in it; however, I am not for an unseemly expedition.

The gentleman last up has insinuated a reflection upon the committee for not reporting all the amendments proposed by some of the State conventions. I can assign a reason for this. The committee conceived some of them superfluous or dangerous, and found many of them so contradictory that it was impossible to make any thing of them; and this is a circumstance the gentleman cannot pretend ignorance of.

Is it not inconsistent in that honorable member to complain of hurry, when he comes day after day reiterating the same train of arguments, and demanding the attention of this body by rising six or seven times on a question? I wish, sir, this subject discussed coolly and dispassionately, but hope we shall have no more reiterations or tedious discussions; let gentlemen try to expedite public business, and their arguments will be conducted in a laconic and consistent manner. As to the business of instruction, I look upon it inconsistent with the general good. Suppose our constituents were to instruct us to make paper money; no gentleman pretends to say it would be unconstitutional, yet every honest mind must shudder at the thought. How can we then assert that instructions ought to bind us in all cases not contrary to the constitution?

Mr. Livermore was not very anxious whether the words were inserted or not, but he had a great deal of doubt on the meaning of this whole amendment; it provides that the people may meet and consult for the common good. Does this mean a part of the people in a township or district, or does it mean the representatives in the State Legislatures? If it means the latter, there is no occasion for a provision that the Legislature may instruct the members of this body.

In some States the representatives are chosen by districts. In such case, perhaps, the instructions may be considered as coming from the district; but in other States, each representative is chosen by the whole people. In New Hampshire it is the case; the instructions of any particular place would have but little weight, but a legislative instruction would have considerable influence upon each representative. If, therefore, the words mean that the Legislature may instruct, he presumed it would have considerable effect, though he did not believe it binding. Indeed, he was inclined to pay a deference to any information he might receive from any number of gentlemen, even by a private letter; but as for full binding force, no instructions contained that quality. They could not, nor ought not to have it, because different parties pursue different measures; and it might be expedient, nay, absolutely necessary, to sacrifice them in mutual concessions.

The doctrine of instructions would hold better in England than here, because the boroughs and corporations might have an interest to pursue totally immaterial to the rest of the kingdom: in that case, it would be prudent to instruct their members in Parliament.

Mr. Gerry wished the constitution amended without his having any hand in it; but if he must interfere, he would do his duty. The honorable gentleman from Delaware had given him an example of moderation and laconic and consistent debate that he meant to follow; and would just observe to the worthy gentleman last up, that several States had proposed the amendment, and among the rest New Hampshire.

There was one remark which escaped him, when he was up before. The gentleman from Maryland (Mr. Stone) had said that the amendment would change the nature of the Government, and make it a democracy. Now he had always heard that it was a democracy; but perhaps he was misled, and the honorable gentleman was right in distinguishing it by some other appellation; perhaps an aristocracy was a term better adapted to it.

9

Mr. Sedgwick opposed the idea of the gentleman from New Hampshire, that the State Legislature had the power of instructing the members of this House; he looked upon it as a subornation of the rights of the people to admit such an authority. We stand not here, said he, the representatives of the State Legislatures, as under the former Congress, but as the representatives of the great body of the people. The sovereignty, the independence, and the rights of the States are intended to be guarded by the Senate; if we are to be viewed in any other light, the greatest security the people have for their rights and privileges is destroyed.

But with respect to instructions, it is well worthy of consideration how they are to be procured. It is not the opinion of an individual that is to control my conduct; I consider myself as the representative of the whole Union. An individual may give me information, but his sentiments may be in opposition to the sense of the majority of the people. If instructions are to be of any efficacy, they must speak the sense of the majority of the people, at least of a State. In a State so large as Massachusetts it will behoove gentlemen to consider how the sense of the majority of the freemen is to be obtained and communicated. Let us take care to avoid the insertion of crude and indigested propositions, more likely to produce acrimony than that spirit of harmony which we ought to cultivate.

Mr. Livermore said that he did not understand the honorable gentleman, or was not understood by him; he did not presume peremptorily to say what degree of influence the legislative instructions would have on a representative. He knew it was not the thing in contemplation here; and what he had said respected only the influence it would have on his private judgment.

Mr. Ames said there would be a very great inconvenience attending the establishment of the doctrine contended for by his colleague. Those States which had selected their members by districts would have no right to give them instructions, consequently the members ought to withdraw; in which case the House might be reduced below a majority, and not be able, according to the constitution, to do any business at all.

According to the doctrine of the gentleman from New Hampshire, one part of the Government would be annihilated; for of what avail is it that the people have the appointment of a representative, if he is to pay obedience to the dictates of another body?

Several members now rose, and called for the question.

Mr. Page was sorry to see gentlemen so impatient; the more so, as he saw there was very little attention paid to any thing that was said; but he would express his sentiments if he was only heard by the Chair. He discovered clearly, notwithstanding what had been observed by the most ingenious supporters of the opposition, that there was an absolute necessity for adopting the amendment. It was strictly compatible with the spirit and the nature of the Government; all power vests in the people of the United States; it is, therefore, a Government of the people, a democracy. If it were consistent with the peace and tranquillity of the inhabitants, every freeman would have a right to come and give his vote upon the law; but, inasmuch as this cannot be done, by reason of the extent of territory, and some other causes, the people have agreed that their representatives shall exercise a part of their authority. To pretend to refuse them the power of instructing their agents, appears to me to deny them a right. One gentleman asks how the instructions are to be collected. Many parts of this country have been in the practice of instructing their representatives; they found no difficulty in communicating their sense. Another gentleman asks if they were to instruct us to make paper money, what we would do. I would tell them, said he, it was unconstitutional; alter that, and we will consider on the point. Unless laws are made satisfactory to the people, they will lose their support, they will be abused or done away; this tends to destroy the efficiency of the Government.

It is the sense of several of the conventions that this amendment should take place; I think it my duty to support it, and fear it will spread an alarm among our constituents if we decline to do it.

Mr. Wadsworth.--Instructions have frequently been given to the representatives of the United States; but the people did not claim as a right that they should have any obligation upon the representatives; it is not right that they should. In troublesome times, designing men have drawn the people to instruct the representatives to their harm; the representatives have, on such occasions, refused to comply with their instructions. I have known, myself, that they have been disobeyed, and yet the representative was not brought to account for it; on the contrary, he was caressed and reelected, while those who have obeyed them, contrary to their private sentiments, have ever after been despised for it. Now, if people considered it an inherent right in them to instruct their representatives, they would have undoubtedly punished the violation of them. I have no idea of instructions, unless they are obeyed; a discretional power is incompatible with them.

The honorable gentleman who was up last says, if he were instructed to make paper money, he would tell his constituents it was unconstitutional. I believe that is not the case, for this body would have a right to make paper money; but if my constituents were to instruct me to vote for such a measure, I would disobey them, let the consequence be what it would.

Mr. Sumter.--The honorable gentlemen who are opposed to the motion of my colleague, do not treat it fairly. They suppose that it is meant to bind the representative to conform to his instructions. The mover of this question, I presume to say, has no such thing in idea. That they shall notice them and obey them, as far as is consistent and proper, may be very just; perhaps they ought to produce them to the House, and let them have as much influence as they deserve; nothing further, I believe, is contended for.


The Founders' Constitution
Volume 5, Amendment I (Petition and Assembly), Document 17
http://press-pubs.uchicago.edu/founders/documents/amendI_assemblys17.html
The University of Chicago Press

Annals of Congress. The Debates and Proceedings in the Congress of the United States. "History of Congress." 42 vols. Washington, D.C.: Gales & Seaton, 1834--56.

CITATION

"James Madisons letter to Thomas Jefferson 17 of October of 1778"


https://founders.archives.gov/documents/Madison/01-11-02-0218

7 PAGES INCLUDING THIS COVER

James Madison to Thomas Jefferson, 17 October 1788
To Thomas Jefferson
New York Ocr. 17. 1788

Dear Sir

I have written a number of letters to you since my return here, and shall add this by another casual opportunity just notified to me by Mr St. John. Your favor of July 31. came to hand the day before yesterday. The pamphlets of the Marquis Condorcet & Mr. Dupont referred to in it have also been received. Your other letters inclosed to the Delegation have been and will be disposed of as you wish; particularly those to Mr. Eppes & Col. Lewis.

Nothing has been done on the subject of the outfit: there not having been a Congress of nine States for some time, nor even of seven for the last week. It is pretty certain that there will not again be a quorum of either number within the present year; and by no means certain that there will be one at all under the old Confederation. The Committee finding that nothing could be done have neglected to make a report as yet. I have spoken with a member of it in order to get one made, that the case may fall of course and in a favorable shape within the attention of the new Government. The fear of a precedent will probably lead to an allowance for a limited time, of the salary as enjoyed originally by foreign ministers in preference to a separate allowance for outfit. One of the members of the treasury board who ought, if certain facts have not escaped his memory to witness the reasonableness of your calculations, takes occasion I find to impress a contrary idea. Fortunately his influence will not be a very formidable obstacle to right.1

The States which have adopted the new Constitution are all proceeding to the arrangements for putting it into action in March next. Pennsylva. alone has as yet actually appointed deputies, & that only for the Senate. My last mentioned that these were Mr. R. Morris & a Mr. McClay. How the other elections there & elsewhere will run is matter of uncertainty. The Presidency alone unites the conjectures of the public. The vice president is not at all marked out by the general voice. As the President will be from a Southern State, it falls almost of course for the other part of the Continent to supply the next in rank. South Carolina may however think of Mr. Rutlidge unless it should be previously discovered that votes will be wasted on him. The only candidates in the Northern States brought forward with their known consent are Hancock and Adams and

2

between these it seems probable the question will lie. Both of them are objectionable and would I think be postponed by the general suffrage to several others if they would accept the place. Hancock is weak ambitious a courtier of popularity given to low intrigue and lately reunited by a factious friendship with S. Adams—J. Adams has made himself obnoxious to many particularly in the Southern states by the political principles avowed in his book. Others recollecting his cabal during the war against General Washington knowing his extravagant self importance and considering his preference of an unprofitable dignity to some place of emolument better adapted to private fortune as a proof of his having an eye to the presidency conclude that he would not be a very cordial second to the general and that an impatient ambition might even intrigue for a premature advancement. The danger would be the greater if particular factious characters as may be the case, should get into the public councils. Adams it appears, is not unaware of some of the obstacles to his wish: and thro a letter to Smith has thrown out popular sentiments as to the proposed president.

The little pamphlet herewith inclosed will give you a collective view of the alterations which have been proposed for the new Constitution.2 Various and numerous as they appear they certainly omit many of the true grounds of opposition. The articles relating to Treaties—to paper money, and to contracts, created more enemies than all the errors in the System positive & negative put together. It is true nevertheless that not a few, particularly in Virginia have contended for the proposed alterations from the most honorable & patriotic motives; and that

among the advocates for the Constitution, there are some who wish for further guards to public liberty & individual rights. As far as these may consist of a constitutional declaration of the most essential rights, it is probable they will be added; though there are many who think such addition unnecessary, and not a few who think it misplaced in such a Constitution. There is scarce any point on which the party in opposition is so much divided as to its importance and its propriety. My own opinion has always been in favor of a bill of rights; provided it be so framed as not to imply powers not meant to be included in the enumeration. At the same time I have never thought the omission a material defect, nor been anxious to supply it even by subsequent3 amendment, for any other reason than that it is anxiously desired by others. I have favored it because I supposed it might be of use, and if properly executed could not be of disservice. I have not viewed it in an important light 1. because I conceive that in a certain degree, though not in the extent argued by Mr. Wilson,4 the rights in question are reserved by the manner in which the federal powers are granted. 2 because there is great reason to fear that a positive declaration of some of the most essential rights could not be obtained in the requisite latitude. I am sure that the rights of Conscience in particular, if submitted to public definition would be narrowed much more than they are likely ever to be by an assumed power. One of the objections in New England was that the Constitution by prohibiting religious tests opened a door for Jews Turks & infidels. 3. because the limited powers of the federal Government and the jealousy of the subordinate Governments, afford a security which has not existed in the case of the State Governments, and exists in no other. 4 because experience proves the inefficacy of a bill of rights on those occasions when its controul is most needed. Repeated violations of these parchment barriers have been committed by overbearing majorities in every State. In Virginia I have seen the bill of rights violated in every instance where it has been opposed to a popular current. Notwithstanding the explicit provision contained in that instrument for the rights of Conscience it is well known that a religious establishment wd. have taken place in that State, if the legislative majority had found as they expected, a majority of the people in favor of the measure; and I am persuaded that if a majority

4

of the people were now of one sect, the measure would still take place and on narrower ground than was then proposed, notwithstanding the additional obstacle which the law has since created. Wherever the real power in a Government lies, there is the danger of oppression. In our Governments the real power lies in the majority of the Community, and the invasion of private rights is cheifly5 to be apprehended, not from acts of Government contrary to the sense of its constituents, but from acts in which the Government is the mere instrument of the major number of the constituents. This is a truth of great importance, but not yet sufficiently attended to: and is probably more strongly impressed on my mind by facts, and reflections suggested by them, than on yours which has contemplated abuses of power issuing from a very different quarter. Wherever there is an interest and power to do wrong, wrong will generally be done, and not less readily by a powerful & interested party than by a powerful and interested prince. The difference, so far as it relates to the superiority of republics over monarchies, lies in the less degree of probability that interest may prompt abuses of power in the former than in the latter; and in the security in the former agst. oppression of more than the smaller part of the society, whereas in the former6 it may be extended in a manner to the whole. The difference so far as it relates to the point in question—the efficacy of a bill of rights in controuling abuses of power—lies in this, that in a monarchy the latent force of the nation is superior to that of the sovereign, and a solemn charter of popular rights must have a great effect, as a standard for trying the validity of public acts, and a signal for rousing & uniting the superior force of the community; whereas in a popular Government, the political and physical power may be considered as vested in the same hands, that is in a majority of the people, and consequently the tyrannical will of the sovereign is not [to] be controuled by the dread of an appeal to any other force within the community. What use then it may be asked can a bill of rights serve in popular Governments? I answer the two following which though less essential than in other Governments, sufficiently recommend the precaution. 1. The political truths declared in that solemn manner acquire by degrees the character of fundamental maxims of free Government, and as they become incorporated with the national sentiment, counteract the impulses of interest and passion. 2. Altho' it be generally true as above stated that the danger of oppression lies in the interested majorities of the people rather than in usurped acts

of the Government, yet there may be occasions on which the evil may spring from the latter sources; and on such, a bill of rights will be a good ground for an appeal to the sense of the community. Perhaps too there may be a certain degree of danger, that a succession of artful and ambitious rulers, may by gradual & well-timed advances, finally erect an independent Government on the subversion of liberty. Should this danger exist at all, it is prudent to guard agst. it, especially when the precaution can do no injury. At the same time I must own that I see no tendency in our governments to danger on that side. It has been remarked that there is a tendency in all Governments to an augmentation of power at the expence of liberty. But the remark as usually understood does not appear to me well founded. Power when it has attained a certain degree of energy and independence goes on generally to further degrees. But when below that degree, the direct tendency is to further degrees of relaxation, until the abuses of liberty beget a sudden transition to an undue degree of power. With this explanation the remark may be true; and in the latter sense only is it in my opinion applicable to the Governments in America. It is a melancholy reflection that liberty should be equally exposed to danger whether the Government have too much or too little power, and that the line which divides these extremes should be so inaccurately defined by experience.

Supposing a bill of rights to be proper the articles which ought to compose it, admit of much discussion. I am inclined to think that absolute7 restrictions in cases that are doubtful, or where emergencies may overrule them, ought to be avoided. The restrictions however strongly marked on paper will never be regarded when opposed to the decided sense of the public; and after repeated violations in extraordinary cases, they will lose even their ordinary efficacy. Should a Rebellion or insurrection alarm the people as well as the Government, and a suspension of the Hab. Corp. be dictated by the alarm, no written prohibitions on earth would prevent the measure.

6

Should an army in time of peace be gradually established in our neighbourhood by Britn: or Spain, declarations on paper would have as little effect in preventing a standing force for the public safety. The best security agst. these evils is to remove the pretext for them. With regard to monopolies they are justly classed among the greatest nusances in Government. But is it clear that as encouragements to literary works and ingenious discoveries, they are not too valuable to be wholly renounced? Would it not suffice to reserve in all cases a right to the Public to abolish the privilege at a price to be specified in the grant of it? Is there not also infinitely less danger of this abuse in our Governments, than in most others? Monopolies are sacrifices of the many to the few. Where the power is in the few it is natural for them to sacrifice the many to their own partialities and corruptions. Where the power, as with us, is in the many not in the few, the danger can not be very great that the few will be thus favored. It is much more to be dreaded that the few will be unnecessarily sacrificed to the many.

I inclose a paper containing the late proceedings in Kentucky.8 I wish the ensuing Convention may take no step injurious to the character of the district, and favorable to the views of those who wish ill to the U. States. One of my late letters communicated some circumstances which will not fail to occur on perusing the objects of the proposed Convention in next month. Perhaps however there may be less connection between the two cases than at first one is ready to conjecture.

I am Dr Sir with the sincerst esteem & Affectn Yours

Js. Madison Jr

RC (DLC). Docketed by Jefferson. Italicized words, unless otherwise noted, are those encoded by JM using the code Jefferson sent him on 11 May 1785. Decoded interlinearly by Jefferson. Enclosures not found.

1. JM was referring to Arthur Lee.

2. The Ratifications of the New Fœderal Constitution, Together with the Amendments, Proposed by the Several States (Richmond, 1788). This pamphlet omitted the ratifications of those states that did not propose amendments (Connecticut, New Jersey, Delaware, Pennsylvania, and Georgia). There is a copy in the Madison collection of pamphlets, Rare Book Division, Library of Congress. Another copy, containing JM's signature and marginal notations, was owned by Charles M. Storey, Boston, Massachusetts, in 1961.

3. Underlined by JM.

4. The reference is to James Wilson's public speech of 6 Oct. 1787. Jefferson had criticized Wilson's argument that a bill of rights was unnecessary (PJM, X, 336, 339 n. 2).

5. Underlined by JM.

6. JM should have written "latter."

7. Underlined by JM.

8. Probably the N.Y. Daily Advertiser of 10 Oct. 1788 (JM to Brown, 12 Oct. 1788 and n. 1).

7

CITATION

https://founders.archives.gov/documents/Madison/01-12-02-0126

Amendments to the Constitution, [8 June] 1789

"Amendments to the Constitution, [8 June] 1789," Founders

Online, National Archives, https://founders.archives.gov/

documents/Madison/01-12-02-0126. [Original source: The Papers

of James Madison, vol. 12, 2 March 1789–20 January 1790 and

supplement 24 October 1775–24 January 1789, ed. Charles F.

Hobson and Robert A. Rutland. Charlottesville: University Press

of Virginia, 1979, pp. 196–210.]

15 PAGES INCLUDING THIS COVER

Amendments to the Constitution, [8 June] 1789

Amendments to the Constitution

[8 June 1789]

On 25 May, the day assigned to take up amendments, JM moved to postpone the subject for two weeks (Gazette of the U.S., 27 May 1789). On 8 June he moved to refer the business to a Committee of the Whole. Jackson opposed amendments at this time as premature, and suggested a postponement until March 1790. Others objected that Congress had more pressing business to complete before amendments could be considered.

Mr. Madison. The gentleman from Georgia (Mr. Jackson) is certainly right in his opposition to my motion for going into a committee of the whole, because he is unfriendly to the object I have in contemplation; but I cannot see that the gentlemen, who wish for amendments being proposed at the present session, stand on good ground when they object to the house going into committee on this business.

When I first hinted to the house my intention of calling their deliberations to this object, I mentioned the pressure of other important subjects, and submitted the propriety of postponing this till the more urgent business was dispatched; but finding that business not dispatched, when the order of the day for considering amendments arrived, I thought it a good reason for a farther delay, I moved the postponement accordingly. I am sorry the same reason still exists in some degree; but operates with less force when it is considered, that it is not now proposed to enter into

2

a full and minute discussion of every part of the subject, but merely to bring it before the house, that our constituents may see we pay a proper attention to a subject they have much at heart; and if it does not give that full gratification which is to be wished, they will discover that it proceeds from the urgency of business of a very important nature. But if we continue to postpone from time to time, and refuse to let the subject come into view, it may occasion suspicions, which, though not well founded, may tend to inflame or prejudice the public mind, against our decisions: they may think we are not sincere in our desire to incorporate such amendments in the constitution as will secure those rights, which they consider as not sufficiently guarded. The applications for amendments come from a very respectable number of our constituents, and it is certainly proper for congress to consider the subject, in order to quiet that anxiety which prevails in the public mind: Indeed I think it would have been of advantage to the government, if it had been practicable to have made some propositions for amendments the first business we entered upon; it would stifle the voice of complaint, and make friends of many who doubted its merits. Our future measures would then have been more universally agreeable and better supported; but the justifiable anxiety to put the government in operation prevented that; it therefore remains for us to take it up as soon as possible. I wish then to commence the consideration at the present moment; I hold it to be my duty to unfold my ideas, and explain myself to the house in some form or other without delay. I only wish to introduce the great work, and as I said before I do not expect it will be decided immediately; but if some step is taken in the business it will give reason to believe that we may come at a final result. This will inspire a reasonable hope in the advocates for amendments, that full justice will be done to the important subject; and I have reason to believe their expectation will not be defeated. I hope the house will not decline my motion for going into a committee.

Cong. Register, I, 418–19 (also reported in Gazette of the U.S., 10 June 1789).

[8 June 1789]

Several members continued to speak against going into a Committee of the Whole.

Mr. Madison. I am sorry to be accessary to the loss of a single moment of time by the house. If I had been indulged in my motion, and we had gone into a committee of the whole, I think we might have rose, and resumed the consideration of other business before this time; that is, so far as it depended on what I proposed to bring forward. As that mode seems not to give satisfaction, I will withdraw the motion, and move you, sir, that a select committee be appointed to consider and report such amendments as are proper for Congress to propose to the legislatures of the several States, conformably to the 5th article of the constitution. I will state my reasons why I think it proper to propose amendments; and state the amendments themselves, so far as I think they ought to be proposed. If I thought I could fulfil the duty which I owe to myself and my constituents, to let the subject pass over in silence, I most certainly should not trespass upon the indulgence of this house. But I cannot do this; and am therefore compelled to beg a patient hearing to what I have to lay before you. And I do most sincerely believe that if congress will devote but one day to this subject, so far as to satisfy the public that we do not disregard their wishes, it will have a salutary influence on the public councils, and prepare the way for a favorable reception of our future measures. It appears to me that this house is bound by every motive of prudence, not to let the first session pass over without proposing to the state legislatures some things to be incorporated into the constitution, as will render it as acceptable to the whole people of the United States, as it has been found acceptable to a majority of them. I wish, among other reasons why something should be done, that those who have been friendly to the adoption of this constitution, may have the opportunity of proving to those who were opposed to it, that they were as sincerely devoted to liberty and a republican government, as those who charged them with wishing the adoption of this constitution in order to lay the foundation of an aristocracy or despotism. It will be a desirable thing to extinguish from the bosom of every member of the community any apprehensions, that there are those among his countrymen who wish to deprive them of the liberty for which they valiantly fought and honorably bled. And if there are amendments desired, of such a nature as will not injure the constitution, and they can be ingrafted so as to give satisfaction to the doubting part of our fellow citizens; the friends of the federal government will evince that spirit of deference and concession for which they have hitherto been distinguished.

4

It cannot be a secret to the gentlemen in this house, that, notwithstanding the ratification of this system of government by eleven of the thirteen United States, in some cases unanimously, in others by large majorities; yet still there is a great number of our constituents who are dissatisfied with it; among whom are many respectable for their talents, their patriotism, and respectable for the jealousy they have for their liberty, which, though mistaken in its object, is laudable in its motive. There is a great body of the people falling under this description, who at present feel much inclined to join their support to the cause of federalism, if they were satisfied in this one point: We ought not to disregard their inclination, but, on principles of amity and moderation, conform to their wishes, and expressly declare the great rights of mankind secured under this constitution. The acquiescence which our fellow citizens shew under the government, calls upon us for a like return of moderation. But perhaps there is a stronger motive than this for our going into a consideration of the subject; it is to provide those securities for liberty which are required by a part of the community. I allude in a particular manner to those two states who have not thought fit to throw themselves into the bosom of the confederacy: it is a desirable thing, on our part as well as theirs, that a re-union should take place as soon as possible. I have no doubt, if we proceed to take those steps which would be prudent and requisite at this juncture, that in a short time we should see that disposition prevailing in those states that are not come in, that we have seen prevailing [in] those states which are.

But I will candidly acknowledge, that, over and above all these considerations, I do conceive that the constitution may be amended; that is to say, if all power is subject to abuse, that then it is possible the abuse of the powers of the general government may be guarded against in a more secure manner than is now done, while no one advantage, arising from the exercise of that power, shall be damaged or endangered by it. We have in this way something to gain, and, if we proceed with caution, nothing to lose; and in this case it is necessary to proceed with caution; for while we feel all these inducements to go into a revisal of the constitution, we must feel for the constitution itself, and make that revisal a moderate one. I should be unwilling to see a door opened for a re-consideration of the whole structure of the government, for a re-consideration of the principles and the substance of the powers given; because I doubt, if such a door was opened, if we should be very likely to stop at that point which would be safe to the government itself: But I do wish to see a door opened to consider, so far as to incorporate those provisions for the security of rights, against which I believe no serious objection has been made by any class of our constituents, such as would be likely to meet with the concurrence of two-thirds of both houses, and the approbation of three-fourths of the state legislatures. I will not propose a single alteration which I do not wish to see take place, as intrinsically proper in itself, or proper because it is wished for by a respectable number of my fellow citizens; and therefore I shall not propose a single alteration but is likely to meet the concurrence required by the constitution.

5

There have been objections of various kinds made against the constitution: Some were levelled against its structure, because the president was without a council; because the senate, which is a legislative body, had judicial powers in trials on impeachments; and because the powers of that body were compounded in other respects, in a manner that did not correspond with a particular theory; because it grants more power than is supposed to be necessary for every good purpose; and controuls the ordinary powers of the state governments. I know some respectable characters who opposed this government on these grounds; but I believe that the great mass of the people who opposed it, disliked it because it did not contain effectual provision against encroachments on particular rights, and those safeguards which they have been long accustomed to have interposed between them and the magistrate who exercised the sovereign power: nor ought we to consider them safe, while a great number of our fellow citizens think these securities necessary.

It has been a fortunate thing that the objection to the government has been made on the ground I stated; because it will be practicable on that ground to obviate the objection, so far as to satisfy the public mind that their liberties will be perpetual, and this without endangering any part of the constitution, which is considered as essential to the existence of the government by those who promoted its adoption.

The amendments which have occurred to me, proper to be recommended by congress to the state legislatures, are these:1

First. That there be prefixed to the constitution a declaration—That all power is originally vested in, and consequently derived from the people.

That government is instituted, and ought to be exercised for the benefit of the people; which consists in the enjoyment of life and liberty, with the right of acquiring and using property, and generally of pursuing and obtaining happiness and safety.

That the people have an indubitable, unalienable, and indefeasible right to reform or change their government, whenever it be found adverse or inadequate to the purposes of its institution.

Secondly. That in article 1st. section 2, clause 3, these words be struck out, to wit, "The number of representatives shall not exceed one for every thirty thousand, but each state shall have at least one representative, and until such enumeration shall be made." And that in place thereof be inserted these words, to wit, "After the first actual enumeration, there shall be one representative for every thirty thousand, until the number amount to  after which the proportion shall be so regulated by congress, that the number shall never be less than  nor more than  but each state shall after the first enumeration, have at least two representatives; and prior thereto."

Thirdly. That in article 1st, section 6, clause 1, there be added to the end of the first sentence, these words, to wit, "But no law varying the compensation last ascertained shall operate before the next ensuing election of representatives."

Fourthly. That in article 1st, section 9, between clauses 3 and 4, be inserted these clauses, to wit, The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext infringed.

The people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments; and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable.

The people shall not be restrained from peaceably assembling and consulting for their common good; nor from applying to the legislature by petitions, or remonstrances for redress of their grievances.

The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person.

No soldier shall in time of peace be quartered in any house without the consent of the owner; nor at any time, but in a manner warranted by law.

No person shall be subject, except in cases of impeachment, to more than one punishment, or one trial for the same offence; nor shall be compelled to be a witness against himself; nor be deprived of life, liberty, or property without due process of law; nor be obliged to relinquish his property, where it may be necessary for public use, without a just compensation.

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

The rights of the people to be secured in their persons, their houses, their papers, and their other property from all unreasonable searches and seizures, shall not be violated by warrants issued without probable cause, supported by oath or affirmation, or not particularly describing the places to be searched, or the persons or things to be seized.

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, to be informed of the cause and nature of the accusation, to be confronted with his accusers, and the witnesses against him; to have a compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defence.

The exceptions here or elsewhere in the constitution, made in favor of particular rights, shall not be so construed as to diminish the just importance of other rights retained by the people; or as to enlarge the powers delegated by the constitution; but either as actual limitations of such powers, or as inserted merely for greater caution.

Fifthly. That in article 1st, section 10, between clauses 1 and 2, be inserted this clause, to wit:

No state shall violate the equal rights of conscience, or the freedom of the press, or the trial by jury in criminal cases.

Sixthly. That article 3d, section 2, be annexed to the end of clause 2d, these words to wit: but no appeal to such court shall be allowed where the value in controversy shall not amount to   dollars: nor shall any fact triable by jury, according to the course of common law, be otherwise re-examinable than may consist with the principles of common law.

Seventhly. That in article 3d, section 2, the third clause be struck out, and in its place be inserted the clauses following, to wit:

The trial of all crimes (except in cases of impeachments, and cases arising in the land or naval forces, or the militia when on actual service in time of war or public danger) shall be by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites; and in all crimes punishable with loss of life or member, presentment or indictment by a grand jury, shall be an essential preliminary, provided that in cases of crimes committed within any county which may be in possession of an enemy, or in which a general insurrection may prevail, the trial may by law be authorised in some other county of the same state, as near as may be to the seat of the offence.

In cases of crimes committed not within any county, the trial may by law be in such county as the laws shall have prescribed. In suits at common law, between man and man, the trial by jury, as one of the best securities to the rights of the people, ought to remain inviolate.

Eighthly. That immediately after article 6th, be inserted, as article 7th, the clauses following, to wit:
The powers delegated by this constitution, are appropriated to the departments to which they are respectively distributed: so that the legislative department shall never exercise the powers vested in the executive or judicial; nor the executive exercise the powers vested in the legislative or judicial; nor the judicial exercise the powers vested in the legislative or executive departments.

The powers not delegated by this constitution, nor prohibited by it to the states, are reserved to the States respectively.

Ninthly. That article 7th, be numbered as article 8th.
The first of these amendments, relates to what may be called a bill of rights; I will own that I never considered this provision so essential to the federal constitution, as to make it improper to ratify it, until such an amendment was added; at the same time, I always conceived, that in a certain form and to a certain extent, such a provision was neither improper nor altogether useless. I am aware, that a great number of the most respectable friends to the government and champions for republican liberty, have thought such a provision, not only unnecessary, but even improper, nay, I believe some have gone so far as to think it even dangerous. Some policy has been made use of perhaps by gentlemen on both sides of the question: I acknowledge the ingenuity of those arguments which were drawn against the constitution, by a comparison with the policy of Great-Britain, in establishing a declaration of rights; but there is too great a difference in the case to warrant the comparison: therefore the arguments drawn from that source, were in a great measure inapplicable. In the declaration of rights which that country has established, the truth is, they have gone no farther, than to raise a barrier against the power of the crown; the power of the legislature is left altogether indefinite. Altho' I know whenever the great rights, the trial by jury, freedom of the press, or liberty of conscience, came in question in that body, the invasion of them is resisted by able advocates, yet their Magna Charta does not contain any one provision for the security of those rights, respecting which, the people of America are most alarmed. The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British constitution.

But altho' the case may be widely different, and it may not be thought necessary to provide limits for the legislative power in that country, yet a different opinion prevails in the United States. The people of many states, have thought it necessary to raise barriers against power in all forms and departments of government, and I am inclined to believe, if once bills of rights are established in all the states as well as the federal constitution, we shall find that altho' some of them are rather unimportant, yet, upon the whole, they will have a salutary tendency.

It may be said, in some instances they do no more than state the perfect equality of mankind; this to be sure is an absolute truth, yet it is not absolutely necessary to be inserted at the head of a constitution.

In some instances they assert those rights which are exercised by the people in forming and establishing a plan of government. In other instances, they specify those rights which are retained when particular powers are given up to be exercised by the legislature. In other instances, they specify positive rights, which may seem to result from the nature of the compact. Trial by jury cannot be considered as a natural right, but a right resulting from the social compact which regulates the action of the community, but is as essential to secure the liberty of the people as any one of the pre-existent rights of nature. In other instances they lay down dogmatic maxims with respect to the construction of the government; declaring, that the legislative, executive, and judicial branches shall be kept separate and distinct: Perhaps the best way of securing this in practice is to provide such checks, as will prevent the encroachment of the one upon the other.

But whatever may be [the] form which the several states have adopted in making declarations in favor of particular rights, the great object in view is to limit and qualify the powers of government, by excepting out of the grant of power those cases in which the government ought not to act, or to act only in a particular mode. They point these exceptions sometimes against the abuse of the executive power, sometimes against the legislative, and, in some cases, against the community itself; or, in other words, against the majority in favor of the minority.

In our government it is, perhaps, less necessary to guard against the abuse in the executive department than any other; because it is not the stronger branch of the system, but the weaker: It therefore must be levelled against the legislative, for it is the most powerful, and most likely to be abused, because it is under the least controul; hence, so far as a declaration of rights can tend to prevent the exercise of undue power, it cannot be doubted but such declaration is proper. But I confess that I do conceive, that in a government modified like this of the United States, the great danger lies rather in the abuse of the community than in the legislative body. The prescriptions in favor of liberty, ought to be levelled against that quarter where the greatest danger lies, namely, that which possesses the highest prerogative of power: But this [is] not found in either the executive or legislative departments of government, but in the body of the people, operating by the majority against the minority.

It may be thought all paper barriers against the power of the community, are too weak to be worthy of attention. I am sensible they are not so strong as to satisfy gentlemen of every description who have seen and examined thoroughly the texture of such a defence; yet, as they have a tendency to impress some degree of respect for them, to establish the public opinion in their favor, and rouse the attention of the whole community, it may be one mean to controul the majority from those acts to which they might be otherwise inclined.

It has been said by way of objection to a bill of rights, by many respectable gentlemen out of doors, and I find opposition on the same principles likely to be made by gentlemen on this floor, that they are unnecessary articles of a republican government, upon the presumption that the people have those rights in their own hands, and that is the proper place for them to rest. It would be a sufficient answer to say that this objection lies against such provisions under the state governments as well as under the general government; and there are, I believe, but few gentlemen who are inclined to push their theory so far as to say that a declaration of rights in those cases is either ineffectual or improper. It has been said that in the federal government they are unnecessary, because the powers are enumerated, and it follows that all that are not granted by the constitution are retained: that the constitution is a bill of powers, the great residuum being the rights of the people; and therefore a bill of rights cannot be so necessary as if the residuum was thrown into the hands of the government. I admit that these arguments are not entirely without

foundation; but they are not conclusive to the extent which has been supposed. It is true the powers of the general government are circumscribed; they are directed to particular objects; but even if government keeps within those limits, it has certain discretionary powers with respect to the means, which may admit of abuse to a certain extent, in the same manner as the powers of the state governments under their constitutions may to an indefinite extent; because in the constitution of the United States there is a clause granting to Congress the power to make all laws which shall be necessary and proper for carrying into execution all the powers vested in the government of the United States, or in any department or officer thereof; this enables them to fulfil every purpose for which the government was established. Now, may not laws be considered necessary and proper by Congress, for it is them who are to judge of the necessity and propriety to accomplish those special purposes which they may have in contemplation, which laws in themselves are neither necessary or proper; as well as improper laws could be enacted by the state legislatures, for fulfilling the more extended objects of those governments. I will state an instance which I think in point, and proves that this might be the case. The general government has a right to pass all laws which shall be necessary to collect its revenue; the means for enforcing the collection are within the direction of the legislature: may not general warrants be considered necessary for this purpose, as well as for some purposes which it was supposed at the framing of their constitutions the state governments had in view. If there was reason for restraining the state governments from exercising this power, there is like reason for restraining the federal government.

It may be said, because it has been said, that a bill of rights is not necessary, because the establishment of this government has not repealed those declarations of rights which are added to the several state constitutions: that those rights of the people, which had been established by the most solemn act, could not be annihilated by a subsequent act of that people, who meant, and declared at the head of the instrument, that they ordained and established a new system, for the express purpose of securing to themselves and posterity the liberties they had gained by an arduous conflict.

I admit the force of this observation, but I do not look upon it to be conclusive. In the first place, it is too uncertain ground to leave this provision upon, if a provision is at all necessary to secure rights so important as many of those I have mentioned are conceived to be, by the public in general, as well as those in particular who opposed the adoption of this constitution. Beside some states have no bills of rights, there are others provided with very defective ones, and there are others whose bills of rights are not only defective, but absolutely improper; instead of securing some in the full extent which republican principles would require, they limit them too much to agree with the common ideas of liberty.

It has been objected also against a bill of rights, that, by enumerating particular exceptions to the grant of power, it would disparage those rights which were not placed in that enumeration, and it might follow by implication, that those rights which were not singled out, were intended to be assigned into the hands of the general government, and were consequently insecure. This is one of the most plausible arguments I have ever heard urged against the admission of a bill of rights into this system; but, I conceive, that may be guarded against. I have attempted it, as gentlemen may see by turning to the last clause of the 4th resolution.

It has been said, that it is unnecessary to load the constitution with this provision, because it was not found effectual in the constitution of the particular states. It is true, there are a few particular states in which some of the most valuable articles have not, at one time or other, been violated; but does it not follow but they may have, to a certain degree, a salutary effect against the abuse of power. If they are incorporated into the constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the legislative or executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the constitution by the declaration of rights. Beside this security, there is a great probability that such a declaration in the federal system would be inforced; because the state legislatures will jealously and closely watch the operations of this government, and be able to resist with more effect every assumption of power than any other power on earth can do; and the greatest opponents to a federal government admit the state legislatures to be sure guardians of the people's liberty. I conclude from this view of the subject, that it will be proper in itself, and highly politic, for the tranquility of the public mind, and the stability of the government, that we should offer something, in the form I have proposed, to be incorporated in the system of government, as a declaration of the rights of the people.

In the next place I wish to see that part of the constitution revised which declares, that the number of representatives shall not exceed the proportion of one for every thirty thousand persons, and allows one representative to every state which rates below that proportion. If we attend to the discussion of this subject, which has taken place in the state conventions, and even in the opinion of the friends to the constitution, an alteration here is proper. It is the sense of the people of America, that the number of representatives ought to be encreased, but particularly that it should not be left in the discretion of the government to diminish them, below that proportion which certainly is in the power of the legislature as the constitution now stands; and they may, as the population of the country encreases, increase the house of representatives to a very unwieldy degree. I confess I always thought this part of the constitution defective, though not dangerous; and that it ought to be particularly attended to whenever congress should go into the consideration of amendments.

13

There are several lesser cases enumerated in my proposition, in which I wish also to see some alteration take place. That article which leaves it in the power of the legislature to ascertain its own emolument is one to which I allude. I do not believe this is a power which, in the ordinary course of government, is likely to be abused, perhaps of all the powers granted, it is least likely to abuse; but there is a seeming impropriety in leaving any set of men without controul to put their hand into the public coffers, to take out money to put in their pockets; there is a seeming indecorum in such power, which leads me to propose a change. We have a guide to this alteration in several of the amendments which the different conventions have proposed. I have gone therefore so far as to fix it, that no law, varying the compensation, shall operate until there is a change in the legislature; in which case it cannot be for the particular benefit of those who are concerned in determining the value of the service.

I wish also, in revising the constitution, we may throw into that section, which interdicts the abuse of certain powers in the state legislatures, some other provisions of equal if not greater importance than those already made. The words, "No state shall pass any bill of attainder, ex post facto law, &c." were wise and proper restrictions in the constitution. I think there is more danger of those powers being abused by the state governments than by the government of the United States. The same may be said of other powers which they possess, if not controuled by the general principle, that laws are unconstitutional which infringe the rights of the community. I should therefore wish to extend this interdiction, and add, as I have stated in the 5th resolution, that no state shall violate the equal right of conscience, freedom of the press, or trial by jury in criminal cases; because it is proper that every government should be disarmed of powers which trench upon those particular rights. I know in some of the state constitutions the power of the government is controuled by such a declaration, but others are not. I cannot see any reason against obtaining even a double security on those points; and nothing can give a more sincere proof of the attachment of those who opposed this constitution to these great and important rights, than to see them join in obtaining the security I have now proposed; because it must be admitted, on all hands, that the state governments are as liable to attack these invaluable privileges as the general government is, and therefore ought to be as cautiously guarded against.

I think it will be proper, with respect to the judiciary powers, to satisfy the public mind on those points which I have mentioned. Great inconvenience has been apprehended to suitors from the distance they would be dragged to obtain justice in the supreme court of the United States, upon an appeal on an action for a small debt. To remedy this, declare, that no appeal shall be made unless the matter in controversy amounts to a particular sum: This, with the regulations respecting jury trials in criminal cases, and suits at common law, it is to be hoped will quiet and reconcile the minds of the people to that part of the constitution.

I find, from looking into the amendments proposed by the state conventions, that several are particularly anxious that it should be declared in the constitution, that the powers not therein delegated, should be reserved to the several states. Perhaps words which may define this more precisely, than the whole of the instrument now does, may be considered as superfluous. I admit they may be deemed unnecessary; but there can be no harm in making such a declaration, if gentlemen will allow that the fact is as stated. I am sure I understand it so, and do therefore propose it.

These are the points on which I wish to see a revision of the constitution take place. How far they will accord with the sense of this body, I cannot take upon me absolutely to determine; but I believe every gentleman will readily admit that nothing is in contemplation, so far as I have mentioned, that can endanger the beauty of the government in any one important feature, even in the eyes of its most sanguine admirers. I have proposed nothing that does not appear to me as proper in itself, or eligible as patronised by a respectable number of our fellow citizens; and if we can make the constitution better in the opinion of those who are opposed to it, without weakening its frame, or abridging its usefulness, in the judgment of those who are attached to it, we act the part of wise and liberal men to make such alterations as shall produce that effect.

Having done what I conceived was my duty, in bringing before this house the subject of amendments, and also stated such as I wish for and approve, and offered the reasons which occurred to me in their support; I shall content myself for the present with moving, that a committee be appointed to consider of and report such amendments as ought to be proposed by congress to the legislatures of the states, to become, if ratified by three-fourths thereof, part of the constitution of the United States. By agreeing to this motion, the subject may be going on in the committee, while other important business is proceeding to a conclusion in the house. I should advocate greater dispatch in the business of amendments, if I was not convinced of the absolute necessity there is of pursuing the organization of the government; because I think we should obtain the confidence of our fellow citizens, in proportion as we fortify the rights of the people against the encroachments of the government.[2]

Cong. Register, I, 423–37 (also reported in Gazette of the U.S., 10 and 13 June 1789).

1. For a table showing the sources of JM's proposed amendments and the subsequent action taken on them by Congress and the states, see Dumbauld, Bill of Rights, pp. 160–63.

2. After further debate, the House agreed to refer JM's propositions to a Committee of the Whole, as he originally intended.

CITATION

Joseph Story, Commentaries on the Constitution 3:§§ 1874-1888

https://upload.wikimedia.org/wikipedia/commons/d/d4/Joseph_Story%
2C_Commentaries_on_the_Constitution_of_the_United_States_%281st_ed%2C_1833%
2C_vol_III%29.pdf

17 PAGES INCLUDING THIS COVER

equally proclaimed the policy, as well as the necessity of such an exclusion. In some of the states, episcopalians constituted the predominant sect; in others, presbyterians; in others, congregationalists; in others, quakers; and in others again, there was a close numerical rivalry among contending sects. It was impossible, that there should not arise perpetual strife and perpetual jealousy on the subject of ecclesiastical ascendancy, if the national government were left free to create a religious establishment. The only security was in extirpating the power. But this alone would have been an imperfect security, if it had not been followed up by a declaration of the right of the free exercise of religion, and a prohibition (as we have seen) of all religious tests. Thus, the whole power over the subject of religion is left exclusively to the state governments, to be acted upon according to their own sense of justice, and the state constitutions; and the Catholic and the Protestant, the Calvinist and the Arminian, the Jew and the Infidel, may sit down at the common table of the national councils, without any inquisition into their faith, or mode of worship.[1]

§ 1874. The next clause of the amendment respects the liberty of the press. "Congress shall make no law abridging the freedom of speech, or of the press."[2] That this amendment was intended to secure to every citizen an absolute right to speak, or write, or print, whatever he might please, without any responsibility, public or private, therefor, is a supposition too wild to

[1] See 2 Kent's Comm. Lect. 24, (2d edition, p. 35 to 37); Rawle on Const. ch. 10, p. 121, 122; 2 Lloyd's Deb. 195. See also Vol. II. § 621.

[2] In the convention a proposition was moved to insert in the constitution a clause, that "the liberty of the press shall be inviolably preserved;" but it was negatived by a vote of six states against five. Journal of Convention, p. 377.

be indulged by any rational man.   This would be to allow to every citizen a right to destroy, at his pleasure, the reputation, the peace, the property, and even the personal safety of every other citizen.   A man might, out of mere malice and revenge, accuse another of the most infamous crimes; might excite against him the indignation of all his fellow citizens by the most atrocious calumnies; might disturb, nay, overturn all his domestic peace, and embitter his parental affections; might inflict the most distressing punishments upon the weak, the timid, and the innocent; might prejudice all a man's civil, and political, and private rights; and might stir up sedition, rebellion, and treason even against the government itself, in the wantonness of his passions, or the corruption of his heart.   Civil society could not go on under such circumstances.   Men would then be obliged to resort to private vengeance, to make up for the deficiencies of the law; and assassinations, and savage cruelties, would be perpetrated with all the frequency belonging to barbarous and brutal communities.   It is plain, then, that the language of this amendment imports no more, than that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so always, that he does not injure any other person in his rights, person, property, or reputation;[1] and so always, that he does not thereby disturb the public peace, or attempt to subvert the government.[2]   It is neither more nor less, than an expansion of the great doctrine, recently

[1] 1 Tuck. Black. Comm. App. 297 to 299; 2 Tuck. Black. Comm. App. 11; 2 Kent's Comm. Lect. 24, p. 16 to 26.

[2] Rawle on Const. ch. 10, p. 123, 124; 2 Kent's Comm. Lect. 24, p. 16 to 26; De Lolme, B. 2, ch. 12, 13; 2 Lloyd's Deb. 197, 198.

brought into operation in the law of libel, that every man shall be at liberty to publish what is true, with good motives and for justifiable ends. And with this reasonable limitation it is not only right in itself, but it is an inestimable privilege in a free government. Without such a limitation, it might become the scourge of the republic, first denouncing the principles of liberty, and then, by rendering the most virtuous patriots odious through the terrors of the press, introducing despotism in its worst form.

§ 1875. A little attention to the history of other countries in other ages will teach us the vast importance of this right. It is notorious, that, even to this day, in some foreign countries it is a crime to speak on any subject, religious, philosophical, or political, what is contrary to the received opinions of the government, or the institutions of the country, however laudable may be the design, and however virtuous may be the motive. Even to animadvert upon the conduct of public men, of rulers, or representatives, in terms of the strictest truth and courtesy, has been, and is deemed, a scandal upon the supposed sanctity of their stations and characters, subjecting the party to grievous punishment. In some countries no works can be printed at all, whether of science, or literature, or philosophy, without the previous approbation of the government; and the press has been shackled, and compelled to speak only in the timid language, which the cringing courtier, or the capricious inquisitor, should license for publication. The Bible itself, the common inheritance not merely of Christendom, but of the world, has been put exclusively under the control of government; and not allowed to be seen, or heard, except in a language unknown to the common inhabitants of the country.

**734**   CONSTITUTION OF THE U. STATES.   [BOOK III.

To publish a translation in the vernacular tongue, has been in former times a flagrant offence.

§ 1876. The history of the jurisprudence of England, (the most free and enlightened of all monarchies,) on this subject, will abundantly justify this statement. The art of printing, soon after its introduction, (we are told,) was looked upon, as well in England, as in other countries, as merely a matter of state, and subject to the coercion of the crown.   It was therefore regulated in England by the king's proclamations, prohibitions, charters of privilege, and licenses, and finally by the decrees of the court of Star Chamber; which limited the number of printers, and of presses, which each should employ, and prohibited new publications, unless previously approved by proper licensers.   On the demolition of this odious jurisdiction, in 1641, the long parliament of Charles the First, after their rupture with that prince, assumed the same powers, which the Star Chamber exercised, with respect to licensing books; and during the commonwealth, (such is human frailty, and the love of power, even in republics!) they issued their ordinances for that purpose, founded principally upon a Star Chamber decree, in 1637.   After the restoration of Charles the Second, a statute on the same subject was passed, copied, with some few alterations, from the parliamentary ordinances.   The act expired in 1679, and was revived and continued for a few years after the revolution of 1688.   Many attempts were made by the government to keep it in force; but it was so strongly resisted by parliament, that it expired in 1694, and has never since been revived.[1]   To this

---

[1] 4 Black. Comm. 152, note ; 2 Tucker's Black. Comm. App. Note G. p. 12, 13; De Lolme, B. 2, ch. 12, 13 ; 2 Kent's Comm. Lect. 24, (2d edition, p. 17, 18, 19.)

very hour the liberty of the press in England stands upon this negative foundation. The power to restrain it is dormant, not dead. It has never constituted an article of any of her numerous bills of rights; and that of the revolution of 1688, after securing other civil and political privileges, left this without notice, as unworthy of care, or fit for restraint.

§ 1877. This short review exhibits, in a striking light, the gradual progress of opinion in favour of the liberty of publishing and printing opinions in England, and the frail and uncertain tenure, by which it has been held. Down to this very day it is a contempt of parliament, and a high breach of privilege, to publish the speech of any member of either house, without its consent.[1] It is true, that it is now silently established by the course of popular opinion to be innocent in practice, though not in law. But it is notorious, that within the last fifty years the publication was connived at, rather than allowed; and that for a considerable time the reports were given in a stealthy manner, covered up under the garb of speeches in a fictitious assembly.

§ 1878. There is a good deal of loose reasoning on the subject of the liberty of the press, as if its inviolability were constitutionally such, that, like the king of England, it could do no wrong, and was free from every inquiry, and afforded a perfect sanctuary for every abuse; that, in short, it implied a despotic sovereignty to do every sort of wrong, without the slightest accountability to private or public justice. Such a notion is too extravagant to be held by any sound constitutional lawyer, with regard to the rights and duties belonging to governments generally, or to the state gov-

---

[1] See Comyn's Dig. *Parliament*, G. 9.

ernments in particular. If it were admitted to be correct, it might be justly affirmed, that the liberty of the press was incompatible with the permanent existence of any free government. Mr. Justice Blackstone has remarked, that the liberty of the press, properly understood, is essential to the nature of a free state; but that this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter, when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press. But, if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity. To subject the press to the restrictive power of a licenser, as was formerly done before, and since the revolution (of 1688), is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government. But to punish any dangerous or offensive writings, which, when published, shall, on a fair and impartial trial, be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion, the only solid foundations of civil liberty. Thus, the will of individuals is still left free; the abuse only of that free will is the object of legal punishment. Neither is any restraint hereby laid upon freedom of thought or inquiry; liberty of private sentiment is still left; the disseminating, or making public of bad sentiments, destructive of the ends of society, is the crime, which society corrects. A man may be allowed to keep poisons in his closet; but not publicly to vend them as cordials. And after some additional reflections, he concludes with this memorable

sentence: "So true will it be found, that to censure the licentiousness, is to maintain the liberty of the press." [1]

§ 1879. De Lolme states the same view of the subject; and, indeed, the liberty of the press, as understood by all England, is the right to publish without any previous restraint, or license; so, that neither the courts of justice, nor other persons, are authorized to take notice of writings intended for the press; but are confined to those, which are printed. And, in such cases, if their character is questioned, whether they are lawful, or libellous, is to be tried by a jury, according to due proceedings at law.[2] The noblest patriots of England, and the most distinguished friends of liberty, both in parliament, and at the bar, have never contended for a total exemption from responsibility, but have asked only, that the guilt or innocence of the publication should be ascertained by a trial by jury.[3]

---

[1] 1 Black. Comm. 152, 153; *Rex* v. *Burdett*, 4 Barn. & Ald. R. 95. — Mr. Justice Best in *Rex* v. *Burdett*, (4 Barn. & Ald. R. 95, 132,) said "my opinion of the liberty of the press is, that every man ought to be permitted to instruct his fellow subjects; that every man may fearlessly advance any new doctrines, provided he does so with proper respect to the religion and government of the country; that he may point out errors in the measures of public men; but, he must not impute criminal conduct to them. The liberty of the press cannot be carried to this extent, without violating another equally sacred right, the right of character. This right can only be attacked in a court of justice, where the party attacked has a fair opportunity of defending himself. Where vituperation begins, the liberty of the press ends."

[2] De Lolme, B. 2, ch. 12, 291 to 297.

[3] See also *Rex* v. *Burdett*, 4 Barn. & Ald. 95. — The celebrated act of parliament of Mr. Fox, giving the right to the jury, in trials for libels, to judge of the whole matter of the charge, and to return a general verdict, did not affect to go farther. The celebrated defence of Mr. Erskine, on the trial of the Dean of St. Asaph, took the same ground. Even Junius, with his severe and bitter assaults upon established au-

Digitized by Google

8

§ 1880. It would seem, that a very different view of the subject was taken by a learned American commentator, though it is not, perhaps, very easy to ascertain the exact extent of his opinions. In one part of his disquisitions, he seems broadly to contend, that the security of the freedom of the press requires, that it should be exempt, not only from previous restraint by the executive, as in Great Britain ; but, from legislative restraint also; and that this exemption, to be effectual, must be an exemption, not only from the previous inspection of licensers, but from the subsequent penalty of laws.[1]  In other places, he seems as explicitly to admit, that the liberty of the press does not include the right to do injury to the reputation of another, or to take from him the enjoyment of his rights or property, or to justify slander and calumny upon him, as a private or public man.  And yet it is added, that every individual certainly has a right to speak, or publish his sentiments on the measures of government.  To do this without restraint,

---

thority and doctrines, stopped here.  "The liberty of the press," (said he,) "is the palladium of all the civil, political, and religious *rights* of an Englishman, and the right of juries to return a general verdict in all cases whatsoever, is an essential part of our constitution."  "The laws of England, provide as effectually, as any human laws can do, for the protection of the subject in his reputation, as well as in his person and property.  If the characters of private men are insulted, or injured, a double remedy is open to them, by action and by indictment."——"With regard to strictures upon the characters of men in office, and the measures of government, the case is a *little* different.  A *considerable* latitude must be allowed in the discussion of public affairs, or the liberty of the press will be of no benefit to society."  But he no where contends for the right to publish seditious libels ; and, on the contrary, through his whole reasoning he admits the duty to punish those, which are really so.

[1] 2 Tuck. Black. Comm. App. 20;  1 Tuck. Black. Comm. App. 298, 299.

control, or *fear of punishment for so doing*, is that
which constitutes the genuine freedom of the press.[1]
Perhaps the apparent contrariety of these opinions
may arise from mixing up, in the same disquisitions,
a discussion of the right of the state governments,
with that of the national government, to interfere
in cases of this sort, which may stand upon very dif-
ferent foundations.   Or, perhaps, it is meant to be
contended, that the liberty of the press, in all cases,
excludes public punishment for public wrongs; but
not civil redress for private wrongs, by calumny and
libels.

§ 1881. The true mode of considering the subject
is, to examine the case with reference to a state
government, whose constitution, like that, for instance,
of Massachusetts, declares, that " the liberty of the
press is essential to the security of freedom in a
state; it ought not, therefore, to be restrained in this
commonwealth."   What is the true interpretation of
this clause?  Does it prohibit the legislature from
passing any laws, which shall control the licentious-
ness of the press, or afford adequate protection to
individuals, whose private comfort, or good reputa-
tions are assailed, and violated by the press?  Does
it stop the legislature from passing any laws to punish
libels and inflammatory publications, the object of
which is to excite sedition against the government,
to stir up resistance to its laws, to urge on conspira-
cies to destroy it, to create odium and indignation
against virtuous citizens, to compel them to yield up
their rights, or to make them the objects of popular

---

[1] 2 Tuck. Black. Comm. App. 28 to 30; 1 Tuck. Black. Comm.
App. 298, 299.

vengeance? Would such a declaration in Virginia
(for she has, on more than one occasion, boldly pro-
claimed, that the liberty of the press ought not to be
restrained,) prohibit the legislature from passing laws
to punish a man, who should publish, and circulate
writings, the design of which avowedly is to excite
the slaves to general insurrection against their mas-
ters, or to inculcate upon them the policy of secretly
poisoning, or murdering them? In short, is it con-
tended, that the liberty of the press is so much more
valuable, than all other rights in society, that the pub-
lic safety, nay the existence of the government itself
is to yield to it? Is private redress for libels and
calumny more important, or more valuable, than the
maintenance of the good order, peace, and safety of
society? It would be difficult to answer these ques-
tions in favour of the liberty of the press, without
at the same time declaring, that such a licentiousness
belonged, and could belong only to a despotism; and
was utterly incompatible with the principles of a free
government.

§ 1882. Besides:—What is meant by restraint
of the press, or an abridgment of its liberty? If to
publish without control, or responsibility be its genuine
meaning; is not that equally violated by allowing a
private compensation for damages, as by a public fine?
Is not a man as much restrained from doing a thing
by the fear of heavy damages, as by public punish-
ment? Is he not often as severely punished by
one, as by the other? Surely, it can make no diffe-
rence in the case, what is the nature or extent of the
restraint, if all restraint is prohibited. The legislative
power is just as much prohibited from one mode, as
from another. And it may be asked, where is the

Digitized by Google

ground for distinguishing between public and private amesnability for the wrong? The prohibition itself states no distinction. It is general; it is universal. Why, then, is the distinction attempted to be made? Plainly, because of the monstrous consequences flowing from such a doctrine. It would prostrate all personal liberty, all private peace, all enjoyment of property, and good reputation. These are the great objects, for which government is instituted; and, if the licentiousness of the press must endanger, not only these, but all public rights and public liberties, is it not as plain, that the right of government to punish the violators of them (the only mode of redress, which it can pursue) flows from the primary duty of self-preservation? No one can doubt the importance, in a free government, of a right to canvass the acts of public men, and the tendency of public measures, to censure boldly the conduct of rulers, and to scrutinize closely the policy, and plans of the government. This is the great security of a free government. If we would preserve it, public opinion must be enlightened; political vigilance must be inculcated; free, but not licentious, discussion must be encouraged. But the exercise of a right is essentially different from an abuse of it. The one is no legitimate inference from the other. Common sense here promulgates the broad doctrine, *sic utere tuo, ut non alienum lædas ;* so exercise your own freedom, as not to infringe the rights of others, or the public peace and safety.

§ 1883. The doctrine laid down by Mr. Justice Blackstone, respecting the liberty of the press, has not been repudiated (as far as is known) by any solemn decision of any of the state courts, in respect to their own municipal jurisprudence. On the contrary,

it has been repeatedly affirmed in several of the states, notwithstanding their constitutions, or laws recognize, that "the liberty of the press ought not to be restrained," or more emphatically, that "the liberty of the press shall be inviolably maintained." This is especially true in regard to Massachusetts, South-Carolina, and Louisiana.[1] Nay; it has farther been held, that the truth of the facts is not alone sufficient to justify the publication, unless it is done from good motives, and for justifiable purposes, or, in other words, on an occasion, (as upon the canvass of candidates for public office,) when public duty, or private right requires it.[2] And the very circumstance, that, in the constitutions of several other states, provision is made for giving the truth in evidence, in prosecutions for libels for official conduct, when the matter published is proper for public information, is exceedingly strong to show, how the general law is understood. The exception establishes in all other cases the propriety of the doctrine. And Mr. Chancellor Kent, upon a large survey of the whole subject, has not scrupled to declare, that "it has become a constitutional principle in this country, that every citizen may freely speak, write, and publish his sentiments on all subjects, *being responsible for the abuse of that right;* and, that no law can rightfully be passed, to restrain, or abridge the freedom of the press."[3]

§ 1884. Even with these reasonable limitations, it is not an uncommon opinion among European states-

---

[1] *Commonwealth* v. *Clap*, 4 Mass. R. 163; *Commonwealth* v. *Blanding*, 3 Pick. R. 304: The *State* v. *Lehre*, 2 Rep. Const. Court, 809; 2 Kent's Comm. Lect. 24, (2d edition, p. 17 to 24.)     [2] Ibid.

[3] 1 Kent's Comm. Lect. 24, (2d edition, p. 17 to 24.) See also Rawle on Const. ch. 10, p. 123, 124.

men of high character and extensive attainments, that the liberty of the press is incompatible with the permanent existence of any free government; nay, of any government at all. That, if it be true, that free governments cannot exist without it, it is quite as certain, that they cannot exist with it. In short, that the press is a new element in modern society; and likely, in a great measure, to control the power of armies, and the sovereignty of the people. That it works with a silence, a cheapness, a suddenness, and a force, which may break up, in an instant, all the foundations of society, and move public opinion, like a mountain torrent, to a general desolation of every thing within its reach.

§ 1885. Whether the national government possesses a power to pass any law, not restraining the liberty of the press, but punishing the licentiousness of the press, is a question of a very different nature, upon which the commentator abstains from expressing any opinion. In 1798, Congress, believing that they possessed a constitutional authority for that purpose, passed an act, punishing all unlawful combinations, and conspiracies, to oppose the measures of the government, or to impede the operation of the laws, or to intimidate and prevent any officer of the United States from undertaking, or executing his duty. The same act further provided, for a public presentation, and punishment by fine, and imprisonment, of all persons, who should write, print, utter, or publish any false, scandalous, and malicious writing, or writings against the government of the United States, or of either house of congress, or of the president, with an intent to defame them, or bring them into contempt, or disrepute, or to excite against them the hatred of the good people of the United States; or to excite them to oppose any

law, or act of the president, in pursuance of law of his constitutional powers; or to resist, or oppose, or defeat any law; or to aid, encourage, or abet any hostile designs of any foreign nation against the United States. And the same act authorized the truth to be given in evidence on any such prosecution; and the jury, upon the trial, to determine the law and the fact, as in other cases.[1]

§ 1886. This act was immediately assailed, as unconstitutional, both in the state legislatures, and the courts of law, where prosecutions were pending. Its constitutionality was deliberately affirmed by the courts of law; and in a report made by a committee of congress. It was denied by a considerable number of the states; but affirmed by a majority. It became one of the most prominent points of attack upon the existing administration; and the appeal thus made was, probably, more successful with the people, and more consonant with the feelings of the times, than any other made upon that occasion. The act, being limited to a short period, expired by its own limitation, in March, 1801; and has never been renewed. It has continued, down to this very day, to be a theme of reproach with many of those, who have since succeeded to power.[2]

---

[1] Act of 14th July, 1798, ch. 91.

[2] The learned reader will find the subject discussed at large in many of the pamphlets of that day, and especially in the Virginia Report, and Resolutions of the Virginia Legislature, in December, 1798, and January, 1800; in the Report of a Committee of congress on the Alien and Sedition laws, on the 25th of February, 1799; in the Resolutions of the legislatures of Massachusetts and Kentucky, in 1799; in Bayard's Speech on the Judiciary act, in 1802; in Addison's charges to the grand jury, in Pennsylvania, printed with his Reports; in 2 Tucker's Black. Comm. App. note G. p. 11 to 30. It is surprising, with what facility men

Digitized by Google

§ 1886. The remaining clause secures " the right of " the people peaceably to assemble and to petition the " government for a redress of grievances."

§ 1887. This would seem unnecessary to be expressly provided for in a republican government, since it results from the very nature of its structure and institutions. It is impossible, that it could be practically denied, until the spirit of liberty had wholly disappeared, and the people had become so servile and debased, as to be unfit to exercise any of the privileges of freemen.[1]

§ 1888. The provision was probably borrowed from the declaration of rights in England, on the revolution of 1688, in which the right to petition the king for a redress of grievances was insisted on; and the right to petition parliament in the like manner has been provided for, and guarded by statutes passed before, as well as since that period.[2] Mr. Tucker has indulged himself in a disparaging criticism upon the phraseology of this clause, as savouring too much of that style of condescension, in which favours are supposed to be

---

glide into the opinion, that a measure is universally deemed unconstitutional, because it is so in their own opinion, especially if it has become unpopular. It has been often asserted, by public men, as the universal sense of the nation, that this act was unconstitutional; and that opinion has been promulgated recently, with much emphasis, by distinguished statesmen; as we have already had occasion to notice. What the state of public and professional opinion on this subject now is, it is, perhaps, difficult to determine. But it is well known, that the opinions then deliberately given by many professional men, and judges, and legislatures, in favour of the constitutionality of the law, have never been retracted. See Vol. III. § 1288, 1289, and note.

[1] See 2 Lloyd's Debates, 197, 198, 199.

[2] See 1 Black. Comm. 143; 5 Cobbett's Parl'y. Hist. p. 109, 110; Rawle on Const. ch. 10, p. 124; 3 Amer. Museum, 420; 2 Kent's Comm. Lect. 24, p. 7, 8.

granted.[1]  But this seems to be quite overstrained; since it speaks the voice of the people in the language of prohibition, and not in that of affirmance of a right, supposed to be unquestionable, and inherent.

§ 1889.  The next amendment is: "A well regulated "militia being necessary to the security of a free state, "the right of the people to keep and bear arms shall "not be infringed."

§ 1890.  The importance of this article will scarcely be doubted by any persons, who have duly reflected upon the subject.  The militia is the natural defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rulers.  It is against sound policy for a free people to keep up large military establishments and standing armies in time of peace, both from the enormous expenses, with which they are attended, and the facile means, which they afford to ambitious and unprincipled rulers, to subvert the government, or trample upon the rights of the people.   The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them.[2]  And yet, though this truth would seem so clear, and the importance of a well regulated militia would seem so undeniable, it cannot be disguised, that among the American people there is a growing indifference to any system of militia discipline, and a strong disposition, from a sense of its burthens, to be rid

---

[1]  1 Tucker's Black. Comm. App. 299.

[2]  1 Tucker's Black. Comm. App. 300; Rawle on Const. ch. 10, p. 125; 2 Lloyd's Debates, 219, 220.

CITATION

Regan Library on petitioning: https://www.reaganlibrary.gov/constitutional-amendments-amendment-1-freedom-speech

4 PAGES INCLUDING THIS COVER

Constitutional Amendments - Amendment 1 – "The Freedom of Speech"

Amendment One to the Constitution was ratified on December 15, 1791. It is most commonly recognized for its protection of the freedom of speech, religion, the press, and making complaints and requests to the government. The official text of the amendment is written as such:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

As was the case with the rest of the Bill of Rights, the key stipulations of the amendment were influenced in part by the various political, religious, and social elements of colonial America. The settlers living in the various colonies were from several different religious groups. The New England colonies were largely defined by Puritans and Separatists, the Southern colonies were predominantly Anglican, while Quakers, Lutherans, and some Presbyterians were largely centered in the middle colonies, especially Pennsylvania. Some Roman Catholic settlements were set up in Maryland and northern Virginia, while Jewish communities began to emerge in some select cities. At this point in colonial history, religious leaders often carried political influence rivaling that of appointed government officials. Members of the Anglican clergy, for instance, were tasked with collecting taxes from local colonists to be paid to their local governments. Those who refused to pay these taxes, as well as those who preached without a license to practice, were often criminally charged by the authorities. By the time the United States declared independence in 1776, the Continental Congress generally agreed that forcing the public to worship beneath a state-run church was antithetical to the freedoms they were working to establish. When the First Amendment to the Constitution was created, the Establishment Clause made it clear that the federal government was not allowed to create an established religion.

Although this only specifically restricted the federal government, the state governments also removed the establishment of state-run religious institutions in their own constitutions by 1833, and local governments followed soon thereafter. In addition to the government establishment of a religion, the First Amendment also protects the free expression of faith for all Americans. Aside from hailing from different religious backgrounds, some of the colonists had also fled to the New World to escape discrimination and persecution they experienced across continental Europe. The freedom of religion, composed in part by the right to free expression, had become a pivotal tenet of the American Revolution, and was extensively defended as such by James Madison, the lead author of the First Amendment. More recent Supreme Court decisions have gone back and forth regarding the protection of individuals or groups from complying with policies that may run contrary to their specific religious tenets.

The original writing of the Constitution says that Congress can not interfere with the First Amendment right to speech and the press. This has long since been interpreted by the Supreme Court to mean that all American speech can not be infringed upon by any branch or section of the federal, state, or local governments. Private organizations however, such as businesses, colleges, and religious groups, are not bound by the same Constitutional obligation. The First Amendment experienced a surge in support and expansion in the 20th century, as Gitlow v. New York (1925) determined that the freedoms promised in it are applicable to local, state, and the federal governments. Further, subsequent Supreme Court decisions from the 20th century to the early-21st century have determined that the First Amendment protects more recent and advanced forms of art and communication, including radio, film, television, video games, and the Internet. Presently, the few forms of expression that have little to no First Amendment protection include commercial advertising, defamation, obscenity, and interpersonal threats to life and limb.

The right to assembly and petition is one that has been interpreted by modern Supreme Courts as an expansion of the core freedom of expression. Assembly extends the freedom of speech to groups, rather than simply individuals as the phrasing of "freedom of speech" originally implied in the First Amendment. The right to assemble is most commonly manifested in the form of protest, which in of itself has a history as long as that of the country itself. Political party advocacy, abolition of slavery, women's suffrage, labor movements, and civil rights organizations have all used the right to assemble in the course of their public actions. It was in 1937 that the unanimous De Jonge v. Oregon determined that the right to assembly is protected by all levels and forms of government in the United States. Petition is a right that has been considered by some to be either obsolete or irrelevant, although its historical significance is arguably the oldest in all modern legal scripture. Some of the earliest references to petitioning a government dates back to the Magna Carta in 1215, as well as the English Bill of Rights in 1689, one-hundred years before the U.S. Constitution was enacted. In American history, the Declaration of Independence made extensive note of the Continental Congress' repeated attempts to petition King George III, only for them to be ignored. Responding to this precedent, the first few American legislatures concluded that reading and responding to petitions was a vital function of a republic. The specific purpose of the right to petition is to give political leaders a constant influx of petitions from the general public. By doing this, the framers believed that it would prevent elected officials from favoring arguments and requests from only a select few. Despite this, a gag rule on petitions was imposed after President John Quincy Adams presented petitions by slaves calling for their emancipation. The rule was considered unconstitutional and was subsequently lifted in 1844, but the right to petition has since been treated as little more than an extension of the Free Speech Clause, rather than having the specific purpose that it was meant for.//

CITATION

" Vices of the Political System of the United States, April 1787     #11 "

https://founders.archives.gov/documents/Madison/01-09-02-0187

TEXT COPIED FROM WEB

4 PAGES INCLUDING THIS COVER

11. Injustice of the laws of States.        11. If the multiplicity and mutability of laws prove a want of wisdom, their injustice betrays a defect still more alarming: more alarming not merely because it is a greater evil in itself, but because it brings more into question the fundamental principle of republican Government, that the majority who rule in such Governments, are the safest Guardians both of public Good and of private rights. To what causes is this evil to be ascribed?

These causes lie        1. in the Representative bodies.        2. in the people themselves.

1. Representative appointments are sought from 3 motives.    1. ambition    2. personal interest.    3. public good. Unhappily the two first are proved by experience to be most prevalent. Hence the candidates who feel them, particularly, the second, are most industrious, and most successful in pursuing their object: and forming often a majority in the legislative Councils, with interested views, contrary to the interest, and views, of their Constituents, join in a perfidious sacrifice of the latter to the former. A succeeding election it might be supposed, would displace the offenders, and repair the mischief. But how easily are base and selfish measures, masked by pretexts of public good and apparent expediency? How frequently will a repetition of the same arts and industry which succeeded in the first instance, again prevail on the unwary to misplace their confidence?

How frequently too will the honest but unenligh[t]ened representative be the dupe of a favorite leader, veiling his selfish views under the professions of public good, and varnishing his sophistical arguments with the glowing colours of popular eloquence?

2. A still more fatal if not more frequent cause lies among the people themselves. All civilized societies are divided into different interests and factions, as they happen to be creditors or debtors—Rich or poor—husbandmen, merchants or manufacturers—members of different religious sects—followers of different political leaders—inhabitants of different districts—owners of different kinds of property &c &c. In republican Government the majority however composed, ultimately give the law. Whenever therefore an apparent interest or common passion unites a majority what is to restrain them from unjust violations of the rights and interests of the minority, or of individuals? Three motives only 1. a prudent regard to their own good as involved in the general and permanent good of the Community. This consideration although of decisive weight in itself, is found by experience to be too often unheeded. It is too often forgotten, by nations as well as by individuals that honesty is the best policy.

2dly. respect for character. However strong this motive may be in individuals, it is considered as very insufficient to restrain them from injustice. In a multitude its efficacy is diminished in proportion to the number which is to share the praise or the blame. Besides, as it has reference to public opinion, which within a particular Society, is the opinion of the majority, the standard is fixed by those whose conduct is to be measured by it. The public opinion without the Society, will be little respected by the people at large of any Country. Individuals of extended views, and of national pride, may bring the public proceedings to this standard, but the example will never be followed by the multitude. Is it to be imagined that an ordinary citizen or even an assembly-man of R. Island in estimating the policy of paper money, ever considered or cared in what light the measure would be viewed in France or Holland; or even in Massts or Connect.? It was a sufficient temptation to both that it was for their interest: it was a sufficient sanction to the latter that it was popular in the State; to the former that it was so in the neighbourhood.

3dly. will Religion the only remaining motive be a sufficient restraint? It is not pretended to be such on men individually considered. Will its effect be greater on them considered in an aggregate view? quite the reverse. The conduct of every popular assembly acting on oath, the strongest of religious Ties, proves that individuals join without remorse in acts, against which their consciences would revolt if proposed to them under the like sanction, separately in their closets. When indeed Religion is kindled into enthusiasm, its force like that of other passions, is increased by the sympathy of a multitude. But enthusiasm is only a temporary state of religion, and while it lasts will hardly be seen with pleasure at the helm of Government. Besides as religion in its coolest state, is not infallible, it may become a motive to oppression as well as a restraint from injustice. Place three individuals in a situation wherein the interest of each depends on the voice of the others, and give to two of them an interest opposed to the rights of the third? Will the latter be secure?

3

The prudence of every man would shun the danger. The rules & forms of justice suppose & guard against it. Will two thousand in a like situation be less likely to encroach on the rights of one thousand? The contrary is witnessed by the notorious factions & oppressions which take place in corporate towns limited as the opportunities are, and in little republics when uncontrouled by apprehensions of external danger. If an enlargement of the sphere is found to lessen the insecurity of private rights, it is not because the impulse of a common interest or passion is less predominant in this case with the majority; but because a common interest or passion is less apt to be felt and the requisite combinations less easy to be formed by a great than by a small number. The Society becomes broken into a greater variety9 of interests, of pursuits, of passions, which check each other, whilst those who may feel a common sentiment have less opportunity of communication and concert. It may be inferred that the inconveniences of popular States contrary to the prevailing Theory, are in proportion not to the extent, but to the narrowness of their limits.10

The great desideratum in Government is such a modification of the Sovereignty11 as will render it sufficiently neutral between the different interests and factions, to controul one part of the Society from invading the rights of another, and at the same time sufficiently controuled itself, from setting up an interest adverse to that of the whole Society. In absolute Monarchies, the prince is sufficiently, neutral towards his subjects, but frequently sacrifices their happiness to his ambition or his avarice. In small Republics, the sovereign will is sufficiently controuled from such a Sacrifice of the entire Society, but is not sufficiently neutral towards the parts composing it. As a limited Monarchy tempers the evils of an absolute one; so an extensive Republic meliorates the administration of a small Republic.

An auxiliary desideratum for the melioration of the Republican form is such a process of elections as will most certainly extract from the mass of the Society the purest and noblest characters which it contains; such as will at once feel most strongly the proper motives to pursue the end of their appointment, and be most capable to devise the proper means of attaining it.

12. Impotence of the laws of the States12

Nicholas Woodall

po box 194

Temperance Mi 48182

stewartj402000@gmail.com

771-241-4590

# United States Appeals Court for the

# District Court of the

# District of Columbia

| | |
|---|---|
| NICHOLAS WOODALL | No. 25-5259 |
| Appellant | D.C. 1:25-CV-112 |
| v. | APPEALANT SUPPLEMENT |
| Donald J. Trump, President, et al., | TO EXHIBITS FOR APPEAL |
| Appellees | FROM FINAL DECISION |
| | 12/04/2025 |

## APPEALANT EXHIBIT
## SUPPLEMENT

Nicholas Woodall

po box 194

Temperance Mi 48182

stewartj402000@gmail.com

771-241-4590

United States Appeals court for the

District Court of the District of Columbia

| | |
|---|---|
| NICHOLAS WOODALL | No. 25-5259 |
| Appellant | D.C. 1:25-cv-112 |
| v. | APPEALANT SUPPLEMENT |
| Donald J. Trump, President, et al., | TO EXHIBITS FOR APPEAL |
| Appellees | FROM FINAL DECISION |
| | 12/ 04/2025 |

APPEALANT EXHIBIT SUPPLEMENT

EXHIBITS CONTINUED

1

EXHIBIT Y

THE FOLLOWING EMAILS RECIEVED A PDF AT THE
LEGAL SENATE ADDRESS OF THE EXHIBIT PAGES
ALL FOR  CASE # 2025-CAB-258 IN THE DC SUPERIOR COURT NO REPLIES WERE
RECIEVED.

ABOUT 35 CALLS WERE MADE TO SEVERAL OFFICES NOT JUST THE RECIPIENTS WHO
ARE SENATE JUDICIARY MEMBERS
TO WHICH THEY WERE PROVIDED THE CASE NUMBER FOR THE STATED AND THE
FEDERAL CASE NUMBER AND ASKED TO REPLY; NO REPLYS.

 THE JUDICIAL COMMITTEES OF THE HOUSE AND SENATE WERE CONTACTED AND
NO REPLIES.

THE SENATE WAS HANDED A COPY IN PERSON IN JAN. 2025 AND OHIO HOUSE REP
JIM JORDANS DOOR BOY (NOT AN INSULT JUST VERY YOUNG ) ACCEPTED A COPY
FOR THE HOUSE JUDICIARY COMMITTEE BECAUSE IT WAS CLOSED AT THE SAME
DATE OF MY VISIT.

REPEATED VOICE MAILS TO THE HOUSE AND SENATE COMMITTESS HAVE BEEN
UNRESPONDED TO.

FURTHER SHOWING CAUSE TO PLACE THE DUTY OF RECORDING PETITIONS IN THE
HANDS OF THE COURTS TO ENSURE THE INTEGRITY OF GOVERNMENT AND HOLD
THEM ACCOUNTABLE. TO WHICH AVOIDANCE PREVENTS AND HINDERS.
 SHOWING A PRACTICE NO DIFFERENT THAN THEIR GENERIC REPLYS.

The following are the emails sent to the mailbox@legal.senate.gov email, received from a general staffer whos name is in a huge stack of notes.... a conversation confirmed they could and would forward the emails.

I called aproximately an hour after sending the emails and...

They were confirmed received by a reading of the body text and a confirmation the pdfs existed with a verbal they opened.

The follow up call weeks later resulted in a new staffer purporting to be the head of the office (refusing to allow me to talk to any superviser) telling me they could not confirm the emails were forwarded, but the tone of their voice lead me to believe the office had caught some heat over it. So Im confident they were forwarded despite the change of posturing.

The emails text is as following

EMAIL 1
---------------------------------------------------------------
from:    Jason Stewart <stewartj4022000@gmail.com>
to:        mailbox@legal.senate.gov
date:    Mar 5
subject:        1 of 4 emails containing documents of service

Attachments
Mar 5, 2025, 9:52  PM
to mailbox

The following email contains a notice of service, a petition (similar to the Olive Branch Petition), Exhibits and a Motion for

The Vice President ( His Senate office) and the Senate Judiciary Committee

If you have any questions or the files do not open to forward please let me know.

Thank you
Nicholas Woodall
771-241-4590
---------------------------------------------------------------

2 ATTACHEMENTS WERE INCLUDED 1 TO THE VICE PRESIDENTS SENATE OFFICE

AND 1 TO THE SENATE JUDICIARY COMMITTEE: INCLUDING THE HEAD PAGES

PROVIDED FOLLWING AND THE CONTENTS OF THE FILINGS IN THE DC

SUPERIOR COURT

EMAIL 2 -----------------------------------

Subject: 2 of 4 emails containing documents of service

Jason Stewart <stewartj4022000@gmail.com>

Attachments

Wed, Mar 5, 9:55  PM

to mailbox

The following email contains a notice of service, a petition (similar to the Olive Branch Petition),

Exhibits and a Motion for

John Thune of SD and Dick Durban of IL


If you have any questions or the files do not open to forward please let me know.

Thank you

Nicholas Woodall

771-241-4590

---------------------------------------------------------

2 ATTACHEMENTS WERE INCLUDED 1 TO John Thune of SD AND 1 TODick Durban of

IL : INCLUDING THE HEAD PAGES PROVIDED FOLLWING AND THE CONTENTS OF

THE FILINGS IN THE DC SUPERIOR COURT

--------------------

EMAIL 3

---------------

Subject: 3 of 4 emails containing documents of service

Jason Stewart <stewartj4022000@gmail.com>

Attachments

Wed, Mar 5, 9:57 PM

to mailbox

The following email contains a notice of service, a petition (similar to the Olive Branch Petition), Exhibits and a

Motion for

Chuck Grassley of IA and Charles Schumer of NY

If you have any questions or the files do not open to forward please let me know.

Thank you

Nicholas Woodall

771-241-4590

----------------------------

2 ATTACHEMENTS WERE INCLUDED 1 TO Chuck Grassley of IA AND 1 TO Charles Schumer of NY :

INCLUDING THE HEAD PAGES PROVIDED FOLLWING AND THE CONTENTS OF THE FILINGS IN

THE DC SUPERIOR COURT

----------------------------

EMAIL 4
---------------------
Subject: 4 of 4 emails containing documents of service

Jason Stewart <stewartj4022000@gmail.com>
Attachments
Wed, Mar 5, 9:59  PM
to mailbox

The following email contains a notice of service, a petition (similar to the Olive Branch Petition), Exhibits and a Motion for

Bill Cassidy of LA and Bernard Sanders of VT

If you have any questions or the files do not open to forward please let me know.

Thank you
Nicholas Woodall
771-241-4590
----------------------------------------

2 ATTACHEMENTS WERE INCLUDED 1 TO Bill Cassidy of LA AND 1 TO Bernard Sanders of VT:

INCLUDING THE HEAD PAGES PROVIDED FOLLWING AND THE CONTENTS OF THE

FILINGS IN THE DC SUPERIOR COURT
----------------------------------------

EXHIBIT Y

16 PAGES

2 PAGES OF: AKNOWLEDGEMENT OF SERVICE AND GENERAL NOTICE OF INTENT TO THE FOLLOWING; ALSO INCLUDED WERE THE 133 PAGES OF THE ISSUES PRESENTED SENT TO THE FOLLOWING:


The Vice President ( His Senate office)

the Senate Judiciary Committee

John Thune of SD

Dick Durban of IL

Chuck Grassley of IA

Charles Schumer of NY

Bill Cassidy of LA

Bernard Sanders of VT

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*

    in Petition for Redressing of Grievances
      for US CONGRESS (HOUSE AND SENATE)

Case No: 2025-CAB-258

**Vice President J.D. Vance   Room (S-214)**

*The Petitioned*

To (insert name and address of the party to be served):

sent to: mailbox@legal.senate.gov____
Vice President     Room (S-214)
United States Senate
Washington, D.C. 20510

**NOTICE AND ACKNOWLEDGMENT OF SERVICE**

    The enclosed Complaint and Exhibit(s), are served in a petition requesting redressing grievances in the Superior Court of the District of Columbia.

    Please sign and date the acknowledgment at the bottom of the page. If you are accepting service as a member or employee of an Executive Office, Congressional Committee or Office sign your name and indicate your relationship to that entity in the space beside your signature. If you are accepting service on behalf of an Office and not a member or employee of that Office please indicate your authority to do so in the space beside your signature.

    You are not required by law to accept this service, but failure to do so, file this form and reply in a reasonable time will respectfully; be cause for notice of your "refusal" to "accept", "file" and "reply" in the congressional district(s) you serve in and the D.C. area with your colleagues and the general public.

    If you do complete and return this form E-Filing can be done at https://efiledcsuperiorcourt.gov/   registration takes 3 minutes it requires a name, phone number, email address and a credit or debit card as pay method.
    Alternatively  you can mail it to:

                Clerk of the D.C. Superior Court
                500 Indiana Ave. NW, Suite 5000
                Washington, DC 20001

This Notice and Acknowledgment of Receipt of Complaint and Exhibit(s) was e-mailed on (insert

    date): 3/5/2025_____.

    _____
    *Signature*

3/5/2025
_____
*Date of Signature*

**ACKNOWLEDGMENT OF RECEIPT OF**
**COMPLAINT, EXHIBITS, AND MOTIONS**

I (print name) _____ received a copy of the complaint, exhibits and motion(s)
    in the above captioned matter at (insert address): _____

                           _____
                           _____

_____     _____     _____
*Signature*                                    *Relationship to Defendant/Authority*          *Date of Signature*

                        *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828          如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction
Để có một bài dịch, hãy gọi (202) 879-4828          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ          번역을 원하시면, (202) 879-4828 로 전화주십시오

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

NICHOLAS WOODALL

*Petitioner*
   *in Petition for Redressing of Grievances*
   *for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

## GENERAL NOTICE OF INTENT AND PURPOSE

You are being served this "Notice" or "Petition" For Redressing of Grievances in the fashion similar to the "*Olive Branch Petition of 1775*" because of several deprivations of justice that exists in all or several of the Federal and State courts of this nation. CWC communication was rejected (*opting to spend funds on other expenses*) for a "public" forum , asking your replies be posted to the docket. This is done because it facilitates clarification of any confusions and any debate necessary. Additionally I have computer and phone problems that IC3.GOV has not the funds nor resource lists to ensure healthy communication.

You're encouraged to disseminate this "petition" among the congressional committee members if you are served as a member of a committee, The Vice President should reasonably inform and provide copy to the President.

It is not written boldly, thou its approach may be. It requires minimal understanding of the legal systems workings and you may have questions of specifics in some instances. In these instances you are requested to ask them.

These issues or problems and lack of services dissuade use of the civil courts, result in complications, denial of compensation and justice in the civil (*and criminal*) courts and even victims being responsible for their injurers legal fees; *the latter is not the focus*, The focus is to start the process with an open forum acknowledging and promising to increase civility and justice in regards to these matters in the way research best determines. If by some reason you feel some of these issues  are the judiciary's responsibility, their practice has created the deprivation(s), And they do not make change as swiftly as you can, but  in consideration of that please provide contacts and letters of support. Thank you

*Lastly dont get scared by the poor handwriting on the civil sheets, it was written against a wall; Secondly the dismissal does not prevent posting to the docket, at least for the time being. Please see the motion to reconsider. Your answers will still be recorded and communications still facilitated. (A courtesy phone call and email would be appreciated as you can imagine, there is a world of trouble that could come along.)*

If you believe these issues to not be as impactful as claimed, say so and attempt will be made to show you otherwise.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

NICHOLAS WOODALL

*Petitioner*

  *in Petition for Redressing of Grievances*
  *for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

Senate Committee on the Judiciary;

*The Petitioned*

**NOTICE AND ACKNOWLEDGMENT OF SERVICE**

To (insert name and address of the party to be served):

sent to: mailbox@legal.senate.gov
224 Dirksen Senate Office Building
Washington, DC 20510
(202) 224-5225

  The enclosed Complaint and Exhibit(s), are served in a petition requesting redressing grievances in the Superior Court of the District of Columbia.

  Please sign and date the acknowledgment at the bottom of the page. If you are accepting service as a member or employee of an Executive Office, Congressional Committee or Office sign your name and indicate your relationship to that entity in the space beside your signature. If you are accepting service on behalf of an Office and not a member or employee of that Office please indicate your authority to do so in the space beside your signature.

  You are not required by law to accept this service, but failure to do so, file this form and reply in a reasonable time will respectfully; be cause for notice of your "refusal" to "accept", "file" and "reply" in the congressional district(s) you serve in and the D.C. area with your colleagues and the general public.

  If you do complete and return this form E-Filing can be done at https://efiledcsuperiorcourt.gov/  registration takes 3 minutes it requires a name, phone number, email address and a credit or debit card as pay method.

  Alternatively you can mail it to:

          Clerk of the D.C. Superior Court
          500 Indiana Ave. NW, Suite 5000
          Washington, DC 20001

This Notice and Acknowledgment of Receipt of Complaint and Exhibit(s) was e-mailed on (insert

  date):  3/5/2025

_____
*Signature*

3/5/2025
*Date of Signature*

**ACKNOWLEDGMENT OF RECEIPT OF**
**COMPLAINT, EXHIBITS, AND MOTIONS**

  I (print name) _____ received a copy of the complaint, exhibits and motion(s) in
  the above captioned matter at (insert address):

_____
_____
_____

_____         _____         _____
*Signature*                     *Relationship to Defendant/Authority*      *Date of Signature*
                                *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828
Để có một bài dịch, hãy gọi (202) 879-4828

如需翻译,请打电话 (202) 879-4828
የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

Veuillez appeler au (202) 879-4828 pour une traduction
번역을 원하시면, (202) 879-4828 로 전화주십시오

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*
   *in Petition for Redressing of Grievances*
   *for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

## GENERAL NOTICE OF INTENT AND PURPOUSE

You are being served this "Notice" or "Petition" For Redressing of Grievances in the fashion similar to the "*Olive Branch Petition of 1775*" because of several deprivations of justice that exists in all or several of the Federal and State courts of this nation. CWC communication was rejected (*opting to spend funds on other expenses*) for a "public" forum , asking your replies be posted to the docket. This is done because it facilitates clarification of any confusions and any debate necessary. Additionally I have computer and phone problems that IC3.GOV has not the funds nor resource lists to ensure healthy communication.

   You're encouraged to disseminate this "petition" among the congressional committee members if you are served as a member of a committee, The Vice President should reasonably inform and provide copy to the President.

   It is not written boldly, thou its approach may be.  It requires minimal understanding of the legal systems workings and you may have questions of specifics in some instances. In these instances you are requested to ask them.

   These issues or problems and lack of services dissuade use of the civil courts, result in complications, denial of compensation and justice in the civil (*and criminal*) courts and even victims being responsible for their injurers legal fees; *the latter is not the focus*, The focus is to start the process with an open forum acknowledging and promising to increase civility and justice in regards to these matters in the way research best determines. If by some reason you feel some of these issues  are the judiciary's responsibility, their practice has created the deprivation(s), And they do not make change as swiftly as you can,  but  in consideration of that please provide contacts and letters of support. Thank you

   *Lastly dont get scared by the poor handwriting on the civil sheets, it was written against a wall; Secondly the dismissal does not prevent posting to the docket, at least for the time being. Please see the motion to reconsider. Your answers will still be recorded and communications still facilitated. (A courtesy phone call and email would be appreciated as you can imagine, there is a world of trouble that could come along.)*

&mdash;

If you believe these issues to not be as impactful as claimed, say so and attempt will be made to show you otherwise.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*
        *in Petition for Redressing of Grievances*
        *for US CONGRESS (HOUSE AND SENATE)*          Case No: 2025-CAB-258

**John Thune (R-SD) Senate Majority Leader**
*The Petitioned*

To (insert name and address of the party to be served):
Sent to: mailbox@legal.senate.gov
United States Senate SD-511          **NOTICE AND ACKNOWLEDGMENT OF SERVICE**
Washington, DC 20510
Phone: (202) 224-2321

        The enclosed Complaint and Exhibit(s), are served in a petition requesting redressing grievances in the Superior Court of the District of Columbia.
        Please sign and date the acknowledgment at the bottom of the page. If you are accepting service as a member or employee of an Executive Office, Congressional Committee or Office sign your name and indicate your relationship to that entity in the space beside your signature. If you are accepting service on behalf of an Office and not a member or employee of that Office please indicate your authority to do so in the space beside your signature.
        You are not required by law to accept this service, but failure to do so, file this form and reply in a reasonable time will respectfully; be cause for notice of your "refusal" to "accept", "file" and "reply" in the congressional district(s) you serve in and the D.C. area with your colleagues and the general public.
        If you do complete and return this form E-Filing can be done at https://efiledcsuperiorcourt.gov/  registration takes 3 minutes it requires a name, phone number, email address and a credit or debit card as pay method.
        Alternatively you can mail it to:

                Clerk of the D.C. Superior Court
                500 Indiana Ave. NW, Suite 5000
                Washington, DC 20001

This Notice and Acknowledgment of Receipt of Complaint and Exhibit(s) was e-mailed on (insert

date): 3/5/2025

_____                          3/5/2025
*Signature*                                      *Date of Signature*

**ACKNOWLEDGMENT OF RECEIPT OF**
**COMPLAINT, EXHIBITS, AND MOTIONS**

I (print name) _____ received a copy of the complaint, exhibits and motion(s) in
the above captioned matter at (insert address):          _____
                                                         _____
                                                         _____

_____     _____          _____
*Signature*                 *Relationship to Defendant/Authority*     *Date of Signature*
                            *to Receive Service*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*
*in Petition for Redressing of Grievances*
*for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

## GENERAL NOTICE OF INTENT AND PURPOUSE

You are being served this "Notice" or "Petition" For Redressing of Grievances in the fashion similar to the "*Olive Branch Petition of 1775*" because of several deprivations of justice that exists in all or several of the Federal and State courts of this nation. CWC communication was rejected (*opting to spend funds on other expenses*) for a "public" forum , asking your replies be posted to the docket. This is done because it facilitates clarification of any confusions and any debate necessary. Additionally I have computer and phone problems that IC3.GOV has not the funds nor resource lists to ensure healthy communication.

You're encouraged to disseminate this "petition" among the congressional committee members if you are served as a member of a committee, The Vice President should reasonably inform and provide copy to the President.

It is not written boldly, thou its approach may be.  It requires minimal understanding of the legal systems workings and you may have questions of specifics in some instances. In these instances you are requested to ask them.

These issues or problems and lack of services dissuade use of the civil courts, result in complications, denial of compensation and justice in the civil (*and criminal*) courts and even victims being responsible for their injurers legal fees; *the latter is not the focus*, The focus is to start the process with an open forum acknowledging and promising to increase civility and justice in regards to these matters in the way research best determines. If by some reason you feel some of these issues  are the judiciary's responsibility, their practice has created the deprivation(s), And they do not make change as swiftly as you can, but in consideration of that please provide contacts and letters of support. Thank you

*Lastly dont get scared by the poor handwriting on the civil sheets, it was written against a wall; Secondly the dismissal does not prevent posting to the docket, at least for the time being. Please see the motion to reconsider. Your answers will still be recorded and communications still facilitated. (A courtesy phone call and email would be appreciated as you can imagine, there is a world of trouble that could come along.)*

—

If you believe these issues to not be as impactful as claimed, say so and attempt will be made to show you otherwise.



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*"Petitioner"*

in Petition for Redressing of Grievances for US
*CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

**Charles E. Schumer,(NY)**
**Democratic Leader Chair of the Conference**
**of US Senate**

**NOTICE AND ACKNOWLEDGMENT OF SERVICE**

*"The Petitioned"*

To (insert name and address of the party to be served):
Sent to: mailbox@legal.senate.gov
322 Hart Senate Office Building
Washington, D.C. 20510
Phone: (202) 224-6542

The enclosed Complaint and Exhibit(s), are served in a petition requesting redressing grievances in the Superior Court of the District of Columbia.

Please sign and date the acknowledgment at the bottom of the page. If you are accepting service as a member or employee of an Executive Office, Congressional Committee or Office sign your name and indicate your relationship to that entity in the space beside your signature. If you are accepting service on behalf of an Office and not a member or employee of that Office please indicate your authority to do so in the space beside your signature.

You are not required by law to accept this service, but failure to do so, file this form and reply in a reasonable time will respectfully; be cause for notice of your "refusal" to "accept", "file" and "reply" in the congressional district(s) you serve in and the D.C. area with your colleagues and the general public.

If you do complete and return this form E-Filing can be done at https://efiledcsuperiorcourt.gov/ registration takes 3 minutes it requires a name, phone number, email address and a credit or debit card as pay method.

Alternatively you can mail it to:

Clerk of the D.C. Superior Court
500 Indiana Ave. NW, Suite 5000
Washington, DC 20001

This Notice and Acknowledgment of Receipt of Complaint and Exhibit(s) was e-mailed on (insert

date): 3/5/2025

*Signature*

3/5/2025
*Date of Signature*

**ACKNOWLEDGMENT OF RECEIPT OF**
**COMPLAINT, EXHIBITS, AND MOTIONS**

I (print name) _____ received a copy of the complaint, exhibits and motion(s) in the above captioned matter at (insert address): _____
_____
_____

_____    _____    _____
*Signature*              *Relationship to Defendant/Authority*    *Date of Signature*
                         *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828          如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction
Để có một bản dịch, hãy gọi (202) 879-4828          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ          번역을 원하시면, (202) 879-4828 로 전화주십시오

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*
   *in Petition for Redressing of Grievances*
   *for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

## GENERAL NOTICE OF INTENT AND PURPOSE

You are being served this "Notice" or "Petition" For Redressing of Grievances in the fashion similar to the "*Olive Branch Petition of 1775*" because of several deprivations of justice that exists in all or several of the Federal and State courts of this nation. CWC communication was rejected (*opting to spend funds on other expenses*) for a "public" forum , asking your replies be posted to the docket. This is done because it facilitates clarification of any confusions and any debate necessary. Additionally I have computer and phone problems that IC3.GOV has not the funds nor resource lists to ensure healthy communication.

You're encouraged to disseminate this "petition" among the congressional committee members if you are served as a member of a committee, The Vice President should reasonably inform and provide copy to the President.

It is not written boldly, thou its approach may be.  It requires minimal understanding of the legal systems workings and you may have questions of specifics in some instances. In these instances you are requested to ask them.

These issues or problems and lack of services dissuade use of the civil courts, result in complications, denial of compensation and justice in the civil (*and criminal*) courts and even victims being responsible for their injurers legal fees; *the latter is not the focus*, The focus is to start the process with an open forum acknowledging and promising to increase civility and justice in regards to these matters in the way research best determines. If by some reason you feel some of these issues  are the judiciary's responsibility, their practice has created the deprivation(s), And they do not make change as swiftly as you can,  but  in consideration of that please provide contacts and letters of support. Thank you

*Lastly dont get scared by the poor handwriting on the civil sheets, it was written against a wall; Secondly the dismissal does not prevent posting to the docket, at least for the time being. Please see the motion to reconsider. Your answers will still be recorded and communications still facilitated. (A courtesy phone call and email would be appreciated as you can imagine, there is a world of trouble that could come along.)*

–

If you believe these issues to not be as impactful as claimed, say so and attempt will be made to show you otherwise.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

NICHOLAS WOODALL

*Petitioner*
       *in Petition for Redressing of Grievances*
          *for US CONGRESS (HOUSE AND SENATE)*          Case No: 2025-CAB-258

Bernard Sanders (VT), Ranking Member **of Senate Committee on**
**Health, Education, Labor, and Pensions** *and* **Chair of Outreach**
*The Petitioned*

To (insert name and address of the party to be served):
Sent to:  mailbox@legal.senate.gov
332 Dirksen Building,                          **NOTICE AND ACKNOWLEDGMENT OF SERVICE**
Washington, D.C. 20510
Phone: 202-224-5141

       The enclosed Complaint and Exhibit(s), are served in a petition requesting redressing grievances in the Superior Court of the District of Columbia.
       Please sign and date the acknowledgment at the bottom of the page. If you are accepting service as a member or employee of an Executive Office, Congressional Committee or Office sign your name and indicate your relationship to that entity in the space beside your signature. If you are accepting service on behalf of an Office and not a member or employee of that Office please indicate your authority to do so in the space beside your signature.
       You are not required by law to accept this service, but failure to do so, file this form and reply in a reasonable time will respectfully; be cause for notice of your "refusal" to "accept", "file" and "reply" in the congressional district(s) you serve in and the D.C. area with your colleagues and the general public.
       If you do complete and return this form E-Filing can be done at https://efiledcsuperiorcourt.gov/  registration takes 3 minutes it requires a name, phone number, email address and a credit or debit card as pay method.
              Alternatively you can mail it to:

                     Clerk of the D.C. Superior Court
                     500 Indiana Ave. NW, Suite 5000
                     Washington, DC 20001

This Notice and Acknowledgment of Receipt of Complaint and Exhibit(s) was e-mailed on (insert

   date): 3/5/2025
                                                          3/5/2025
   *Signature*                                            *Date of Signature*

**ACKNOWLEDGMENT OF RECEIPT OF**
**COMPLAINT, EXHIBITS, AND MOTIONS**

   I (print name) _____ received a copy of the complaint, exhibits and motion(s) in
   the above captioned matter at (insert address): _____
                                                   _____
                                                   _____

_____   _____   _____
*Signature*                   *Relationship to Defendant/Authority*   *Date of Signature*
                              *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction
Để có một bài dịch, hãy gọi (202) 879-4828          如需翻译,请打电话 (202) 879-4828          번역을 원하시면, (202) 879-4828 로 전화주십시요
                              የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*
  *in Petition for Redressing of Grievances*
  *for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

## GENERAL NOTICE OF INTENT AND PURPOUSE

You are being served this "Notice" or "Petition" For Redressing of Grievances in the fashion similar to the "*Olive Branch Petition of 1775*" because of several deprivations of justice that exists in all or several of the Federal and State courts of this nation. CWC communication was rejected (*opting to spend funds on other expenses*) for a "public" forum , asking your replies be posted to the docket. This is done because it facilitates clarification of any confusions and any debate necessary. Additionally I have computer and phone problems that IC3.GOV has not the funds nor resource lists to ensure healthy communication.

You're encouraged to disseminate this "petition" among the congressional committee members if you are served as a member of a committee, The Vice President should reasonably inform and provide copy to the President.

It is not written boldly, thou its approach may be.  It requires minimal understanding of the legal systems workings and you may have questions of specifics in some instances. In these instances you are requested to ask them.

These issues or problems and lack of services dissuade use of the civil courts, result in complications, denial of compensation and justice in the civil (*and criminal*) courts and even victims being responsible for their injurers legal fees; *the latter is not the focus*, The focus is to start the process with an open forum acknowledging and promising to increase civility and justice in regards to these matters in the way research best determines. If by some reason you feel some of these issues  are the judiciary's responsibility, their practice has created the deprivation(s), And they do not make change as swiftly as you can, but  in consideration of that please provide contacts and letters of support. Thank you

*Lastly dont get scared by the poor handwriting on the civil sheets, it was written against a wall; Secondly the dismissal does not prevent posting to the docket, at least for the time being. Please see the motion to reconsider. Your answers will still be recorded and communications still facilitated. (A courtesy phone call and email would be appreciated as you can imagine, there is a world of trouble that could come along.)*

—

If you believe these issues to not be as impactful as claimed, say so and attempt will be made to show you otherwise.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*

*in Petition for Redressing of Grievances*
*for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

Durbin, Richard J. (IL),

Ranking Minority Member **of Senate Committee on Judiciary**

*The Petitioned*

To (insert name and address of the party to be served):

Sent to:  mailbox@legal.senate.gov
711 Hart Senate Office Building
Washington DC 20510
(202) 224-2152

**NOTICE AND ACKNOWLEDGMENT OF SERVICE**

The enclosed Complaint and Exhibit(s), are served in a petition requesting redressing grievances in the Superior Court of the District of Columbia.

Please sign and date the acknowledgment at the bottom of the page. If you are accepting service as a member or employee of an Executive Office, Congressional Committee or Office sign your name and indicate your relationship to that entity in the space beside your signature. If you are accepting service on behalf of an Office and not a member or employee of that Office please indicate your authority to do so in the space beside your signature.

You are not required by law to accept this service, but failure to do so, file this form and reply in a reasonable time will respectfully; be cause for notice of your "refusal" to "accept", "file" and "reply" in the congressional district(s) you serve in and the D.C. area with your colleagues and the general public.

If you do complete and return this form E-Filing can be done at https://efiledcsuperiorcourt.gov/  registration takes 3 minutes it requires a name, phone number, email address and a credit or debit card as pay method.

Alternatively you can mail it to:

Clerk of the D.C. Superior Court
500 Indiana Ave. NW, Suite 5000
Washington, DC 20001

This Notice and Acknowledgment of Receipt of Complaint and Exhibit(s) was e-mailed on (insert

date): 3/5/2025

_____
*Signature*

3/5/2025
*Date of Signature*

**ACKNOWLEDGMENT OF RECEIPT OF**
**COMPLAINT, EXHIBITS, AND MOTIONS**

I (print name) _____ received a copy of the complaint, exhibits and motion(s) in
the above captioned matter at (insert address):

_____
_____
_____

_____         _____         _____
*Signature*                              *Relationship to Defendant/Authority*         *Date of Signature*
                                        *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828          如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-1828 pour une traduction
Để có một bài dịch, hãy gọi (202) 879-4828          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ          번역을 원하시면, (202) 879-4828 로 전화주십시오

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*
*in Petition for Redressing of Grievances*
*for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

## GENERAL NOTICE OF INTENT AND PURPOUSE

You are being served this "Notice" or "Petition" For Redressing of Grievances in the fashion similar to the "*Olive Branch Petition of 1775*" because of several deprivations of justice that exists in all or several of the Federal and State courts of this nation. CWC communication was rejected (*opting to spend funds on other expenses*) for a "public" forum , asking your replies be posted to the docket. This is done because it facilitates clarification of any confusions and any debate necessary. Additionally I have computer and phone problems that IC3.GOV has not the funds nor resource lists to ensure healthy communication.

You're encouraged to disseminate this "petition" among the congressional committee members if you are served as a member of a committee, The Vice President should reasonably inform and provide copy to the President.

It is not written boldly, thou its approach may be.  It requires minimal understanding of the legal systems workings and you may have questions of specifics in some instances. In these instances you are requested to ask them.

These issues or problems and lack of services dissuade use of the civil courts, result in complications, denial of compensation and justice in the civil (*and criminal*) courts and even victims being responsible for their injurers legal fees; *the latter is not the focus*, The focus is to start the process with an open forum acknowledging and promising to increase civility and justice in regards to these matters in the way research best determines. If by some reason you feel some of these issues  are the judiciary's responsibility, their practice has created the deprivation(s), And they do not make change as swiftly as you can,  but  in consideration of that please provide contacts and letters of support. Thank you

*Lastly dont get scared by the poor handwriting on the civil sheets, it was written against a wall; Secondly the dismissal does not prevent posting to the docket, at least for the time being. Please see the motion to reconsider. Your answers will still be recorded and communications still facilitated. (A courtesy phone call and email would be appreciated as you can imagine, there is a world of trouble that could come along.)*

If you believe these issues to not be as impactful as claimed, say so and attempt will be made to show you otherwise.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*

*in Petition for Redressing of Grievances*
*for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

Grassley, Chuck (IA), Chairman Member **of**
**Senate Committee on Judiciary**
*The Petitioned*

To (insert name and address of the party to be served):
Sent to:  mailbox@legal.senate.gov
135 Hart Senate Office Building
Washington, D.C. 20510
PHONE: (202) 224-3744

## NOTICE AND ACKNOWLEDGMENT OF SERVICE

The enclosed Complaint and Exhibit(s), are served in a petition requesting redressing grievances in the Superior Court of the District of Columbia.

Please sign and date the acknowledgment at the bottom of the page. If you are accepting service as a member or employee of an Executive Office, Congressional Committee or Office sign your name and indicate your relationship to that entity in the space beside your signature. If you are accepting service on behalf of an Office and not a member or employee of that Office please indicate your authority to do so in the space beside your signature.

You are not required by law to accept this service, but failure to do so, file this form and reply in a reasonable time will respectfully; be cause for notice of your "refusal" to "accept", "file" and "reply" in the congressional district(s) you serve in and the D.C. area with your colleagues and the general public.

If you do complete and return this form E-Filing can be done at https://efiledcsuperiorcourt.gov/  registration takes 3 minutes it requires a name, phone number, email address and a credit or debit card as pay method.
                    Alternatively you can mail it to:

Clerk of the D.C. Superior Court
500 Indiana Ave. NW, Suite 5000
Washington, DC 20001

This Notice and Acknowledgment of Receipt of Complaint and Exhibit(s) was e-mailed on (insert

date): 3/5/2025

_____
*Signature*

3/5/2025
*Date of Signature*

### ACKNOWLEDGMENT OF RECEIPT OF
### COMPLAINT, EXHIBITS, AND MOTIONS

I (print name) _____ received a copy of the complaint, exhibits and motion(s) in
the above captioned matter at (insert address):   _____
_____
_____

_____
*Signature*

_____
*Relationship to Defendant/Authority*
*to Receive Service*

_____
*Date of Signature*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

NICHOLAS WOODALL

*Petitioner*
 *in Petition for Redressing of Grievances*
 *for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

## GENERAL NOTICE OF INTENT AND PURPOUSE

You are being served this "Notice" or "Petition" For Redressing of Grievances in the fashion similar to the "*Olive Branch Petition of 1775*" because of several deprivations of justice that exists in all or several of the Federal and State courts of this nation. CWC communication was rejected (*opting to spend funds on other expenses*) for a "public" forum , asking your replies be posted to the docket. This is done because it facilitates clarification of any confusions and any debate necessary. Additionally I have computer and phone problems that IC3.GOV has not the funds nor resource lists to ensure healthy communication.

   You're encouraged to disseminate this "petition" among the congressional committee members if you are served as a member of a committee, The Vice President should reasonably inform and provide copy to the President.

   It is not written boldly, thou its approach may be.  It requires minimal understanding of the legal systems workings and you may have questions of specifics in some instances. In these instances you are requested to ask them.

   These issues or problems and lack of services dissuade use of the civil courts, result in complications, denial of compensation and justice in the civil (*and criminal*) courts and even victims being responsible for their injurers legal fees; *the latter is not the focus*, The focus is to start the process with an open forum acknowledging and promising to increase civility and justice in regards to these matters in the way research best determines. If by some reason you feel some of these issues  are the judiciary's responsibility, their practice has created the deprivation(s), And they do not make change as swiftly as you can,  but  in consideration of that please provide contacts and letters of support. Thank you

   *Lastly dont get scared by the poor handwriting on the civil sheets, it was written against a wall; Secondly the dismissal does not prevent posting to the docket, at least for the time being. Please see the motion to reconsider. Your answers will still be recorded and communications still facilitated. (A courtesy phone call and email would be appreciated as you can imagine, there is a world of trouble that could come along.)*

If you believe these issues to not be as impactful as claimed, say so and attempt will be made to show you otherwise.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

NICHOLAS WOODALL

*Petitioner*
*in Petition for Redressing of Grievances*
*for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025-CAB-258

Bill Cassidy, ( aka William Morgan Cassidy) (LA), Chairman **of**
**Senate Committee on Health, Education, Labor, and Pensions**
*The Petitioned*

To (insert name and address of the party to be served):
Sent to: mailbox@legal.senate.gov
455 Dirksen Senate Office Building
Washington, D.C. 20510
Phone: (202) 224-5824

**NOTICE AND ACKNOWLEDGMENT OF SERVICE**

The enclosed Complaint and Exhibit(s), are served in a petition requesting redressing grievances in the Superior Court of the District of Columbia.

Please sign and date the acknowledgment at the bottom of the page. If you are accepting service as a member or employee of an Executive Office, Congressional Committee or Office sign your name and indicate your relationship to that entity in the space beside your signature. If you are accepting service on behalf of an Office and not a member or employee of that Office please indicate your authority to do so in the space beside your signature.

You are not required by law to accept this service, but failure to do so, file this form and reply in a reasonable time will respectfully; be cause for notice of your "refusal" to "accept", "file" and "reply" in the congressional district(s) you serve in and the D.C. area with your colleagues and the general public.

If you do complete and return this form E-Filing can be done at https://efiledcsuperiorcourt.gov/  registration takes 3 minutes it requires a name, phone number, email address and a credit or debit card as pay method.
Alternatively you can mail it to:

Clerk of the D.C. Superior Court
500 Indiana Ave. NW, Suite 5000
Washington, DC 20001

This Notice and Acknowledgment of Receipt of Complaint and Exhibit(s) was e-mailed on (insert

date): 3/5/2025

*Signature*

3/5/2025
*Date of Signature*

**ACKNOWLEDGMENT OF RECEIPT OF**
**COMPLAINT, EXHIBITS, AND MOTIONS**

I (print name) _____ received a copy of the complaint, exhibits and motion(s) in
the above captioned matter at (insert address):

_____          _____          _____
*Signature*                      *Relationship to Defendant/Authority*        *Date of Signature*
                                 *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828          如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction
Để có một bài dịch, hãy gọi (202) 879-4828          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ          번역을 원하시면, (202) 879-4828 로 전화주십시오

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

NICHOLAS WOODALL

*Petitioner*
  *in Petition for Redressing of Grievances*
  *for US CONGRESS (HOUSE AND SENATE)*

Case No: 2025 - CAB - 258

## GENERAL NOTICE OF INTENT AND PURPOUSE

You are being served this "Notice" or "Petition" For Redressing of Grievances in the fashion similar to the "*Olive Branch Petition of 1775*" because of several deprivations of justice that exists in all or several of the Federal and State courts of this nation. CWC communication was rejected (*opting to spend funds on other expenses*) for a "public" forum , asking your replies be posted to the docket. This is done because it facilitates clarification of any confusions and any debate necessary. Additionally I have computer and phone problems that IC3.GOV has not the funds nor resource lists to ensure healthy communication.

You're encouraged to disseminate this "petition" among the congressional committee members if you are served as a member of a committee, The Vice President should reasonably inform and provide copy to the President.

It is not written boldly, thou its approach may be.  It requires minimal understanding of the legal systems workings and you may have questions of specifics in some instances. In these instances you are requested to ask them.

These issues or problems and lack of services dissuade use of the civil courts, result in complications, denial of compensation and justice in the civil (*and criminal*) courts and even victims being responsible for their injurers legal fees; *the latter is not the focus*, The focus is to start the process with an open forum acknowledging and promising to increase civility and justice in regards to these matters in the way research best determines. If by some reason you feel some of these issues  are the judiciary's responsibility, their practice has created the deprivation(s), And they do not make change as swiftly as you can,  but  in consideration of that please provide contacts and letters of support. Thank you

*Lastly dont get scared by the poor handwriting on the civil sheets, it was written against a wall; Secondly the dismissal does not prevent posting to the docket, at least for the time being. Please see the motion to reconsider. Your answers will still be recorded and communications still facilitated. (A courtesy phone call and email would be appreciated as you can imagine, there is a world of trouble that could come along.)*

–

If you believe these issues to not be as impactful as claimed, say so and attempt will be made to show you otherwise.

**THE FOLLOWING IS AN INDEX OF THE SEVERAL FILINGS INCLUDED IN THIS PDF.**

**PETITION**                                           **BEGINS ON PAGE 8**

**INDEX OF PETITION FOLLOWS THIS PAGE AND IS LOCATED ON**
                                           **PAGES 9 AND 10**

**EXHIBIT FOR ISSUE I.** FEDERAL LIBRARY ACCESS RESTRICTIONS
                                           **BEGINS ON PAGE 32**

**EXHIBIT FOR ISSUE IV.**   INFORMA POPERUS FORM EXAMPLE
                                           **BEGINS ON PAGE 40**

EXHIBIT XXX   DOES NOT NEED REVIEW, ITS A SCRAP DRAFT OF
COMPLAINT FOR FAILURE TO PROVIDE ADAQUET LAW LIBRARY ACCESS
                                           **BEGINS ON PAGE 47**

**EXHIBIT FJC (FEDERAL JUDICIARY COMMITTEE) SURVEY
SUPPORT FOR ISSUE I.**                     **BEGINS ON PAGE 67**

**JUDICIAL ORDER      HEARING MUST BE REQUESTED FROM CHIEF
JUDGE**                                    **BEGINS ON PAGE 118**

**RECONSIDERATION MOTION BY PETITIONER    BEGINS ON PAGE 121**

**NOTES:        PAGES OF THIS DOCUMENT CONSISTING
OF THE SEVERAL FILINGS ARE NUMBERED IN THE
TOP RIGHT CORNERS**

**The original petition was handed to a pair of Senate Judiciary
staffers on aprox. Jan. 26th and a staffer of Jim Jordan on the
27th with promise to provide it to the House Judiciary.**

**INDEX OF THE SEVERAL FILINGS INCLUDED IN THIS PDF.**

**ISSUES**

**I.**    COURT LAW LIBRARY INACCESSABILITY PREVENTING AND

HINDERING LAW RESEARCH AND LITIGATION. (FEDERAL AND STATE)

[asking access be an entitlement of law]

**II.**    RESTRICTED DOCKET ACCESS PREVENTING LAW RESEARCH AND

LITIGATION. (FEDERAL AND STATE) [ asking for waivers of fees preventing the

poor from effective litigation.]

**III.**    LACK OF A STANDARD AND PROVIDED EDUCATIONAL MATERIALS

TO FACILITATE LITIGATION PRACTICE BY PRO SE LITIGANTS.

(FEDERAL AND STATE) [asking for creation of a standard and required holdings of

legal texts for all federal and state court jurisdictions, to ensure fair effective litigation.]

**IV.**    DEPOSITION ACCESS FOR PRO SE LITIGANTS. (FEDERAL) Fed. civil

rules have made deposing a costly matter inaccessible to poor pro-se litigants.

[asking for court rule changes to ensure depositions are an accessible litigation tool.]

**V.**    THE UNSEALED INFORMA POPERUS FORM.

A demeaning endangering exposure of private personal info. Bank Accounts, Amounts,

Credits, Debts, property owned by pro-se litigants and their work / private affairs.

(FEDERAL AND STATE) [asking these forms are required to be filed under seal]

**VI.**    VICTIMS SERVICES: Current shortfalls to heal the injured and future

possibilities. (FEDERAL AND STATE) [ Explaining to the public, that victims

services doesn't assist at a set level of standards or provide civil representation.]

**VII.**    LACK OF REPRESENTATION FOR CIVIL LITIGANTS OF SEVERE

INJURY AND MENTAL\ DISABILITY. (FEDERAL AND STATE)

[asking for research and law to establish a right to justice for those who are ill beyond

ability to protect themselves and obtain compensation when injured.]

**VIII.** QUALIFIED IMMUNITY WITHOUT INSURANCE:

Easing burdens, repairing injury, retaining respect.

[asking for research to determine what areas of law enforcement insurance can be offered

to repair injuries and damages occuring during the performance of duty.]

**IX.**   A LACK OF PUBLIC FORUM TO DISCUSS AND RESOLVE ISSUES OF

PUBLIC WORRY AND CRIME OVERFLOW UNADDRESSED.

(FEDERAL, STATE, LOCAL)

[asking for consideration that research be considered, for government or private entities

to create an orderly open public forum for people to address issues of government, crime,

need and wishes.]

       **X.**     PERCEPTIONS , INJURIES, and INTENT
              [a few brief statements]

       **XI.**    ELECT AND PUBLIC: HOW TO REPLY
              [a detailing of the preferred reply method]

       **XII.**   CONTACT INFO

12 POINTS IN TOTAL //

//

//

EXHIBIT Z

One of three letter replies from the US Supreme Court:

Stating in generic reply that the document was not drafted or submitted properly to facilitate communication; showing the Supreme Court does not (or in these instances) consider responding to or have a practice of replying to redressing of grievances in an informal manner. Where every document sent was a clear request for docketed reply to the grievances, but did not result in any undocketed responses either.

2 PAGES INCLUDING THIS COVER

### SUPREME COURT OF THE UNITED STATES
### OFFICE OF THE CLERK
### WASHINGTON, DC  20543-0001

August 15, 2025

Nicholas Woodall
P.O. Box 194
Temperance, MI 48182

      RE: Misc. Documents
         DC Superior Court No. 2025-CAB-258

Dear Mr. Woodall:

  The enclosed documents were received on July 18, 2025.  These papers fail to comply with the Rules of this Court and are herewith returned.

  You may seek review of a decision only by filing a timely petition for writ of certiorari. The papers you submitted are not construed to be a petition for writ of certiorari. Should you choose to file a petition for writ of certiorari, you must submit the petition within the 90 day time limit allowed under Rule 13 of the Rules of this Court.

  Your case must first be reviewed by a United States court of appeals or by the highest state court in which a decision could be had. 28 USC 1254 and 1257.

                  Sincerely,
                  Scott S. Harris, Clerk
                  By:

                  Rashonda Garner
                  (202) 479-3025

Enclosures