Nicholas Woodall
Po Box 194
Temperance Mi 48182
771-241-4590
stewartj4022000@gmail.com

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

RECEIVED

MAR 25 2026

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

NICHOLAS WOODALL,

Appellant,

v.

DONALD J. TRUMP, PRESIDENT, et al.,

Case No. 25-5259

## MOTION TO LEAVE TO AMEND MOTION FOR

## RECONSIDERATION 40a and 40b EN BANC

I request this amending for two instances of confusion:

1) on page 1 the following was corrected: lines 13-14: [but there is no appellant to prejudice] was changed to appellee

2) On page 20: lines 11-14 : (No sufficient justification has been offered, and its not questioned but considered why this court has no duty to make public the publics petitions regarding current and future rules and procedures.) was corrected to: (No sufficient justification has been offered, and its questioned why this court has no duty to make public the publics petitions regarding current and future rules and procedures changes of the court, the petition clearly fits rules changes in regards to depositions and most matters.)

Respectfully submitted by Nicholas Woodall on 3/22/2026

Nicholas Woodall
Po Box 194
Temperance Mi 48182
771-241-4590
stewartj4022000@gmail.com

IN THE UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

NICHOLAS WOODALL,

Appellant,

v.

DONALD J. TRUMP, PRESIDENT, et al.,

Case No. 25-5259

Amended   MOTION FOR RECONSIDERATION

40a and 40b EN BANC

RECEIVED

MAR 25 2026

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

This filing runs over the page limit at 20, its filed a day late, but there is no appellee to prejudice, only the entire American people in denial of merits of this case that is assuredly qualifying of 40 (b)(2) exceptional importance and I beg you allow up to two weeks for me to provide the appendix of historical citings and exhibits, for the same reason, that the novelty of the constitutional claim and very principles and practices of this nation (and its courts) have been found to be in a clear deviation of their clearly historical and intended practice (though full correction considerations by me is impossible); It warrants court correction on the merits and as dutied to this judiciary to ensure the promises and benefits bestowed upon us by our founders are not further distorted or usurped where correctable.

forgive any inappropriate assertions or footnotes I have not excluded, I find them in some measure relevant to the petition right.

This reconsideration and en banc review is requested because the panel denied without substance the right to one of the most important rights in our nation, the right to petition for redressing of grievances, There was no fully formed opinion, no application of any historical tests or standards to show why the courts were abridging the petition clause What was offered was a singular art. 3 sec. 2 reference recontexting stating the courts are restricted to only "actual cases and controversies".

Because they did not apply any test or explain where the petition right is denied. I now request rehearing to determine the courts duty in presentments of grievance petitions to the elect by filing them in the courts miscellaneous dockets, allowing the elect to respond back in those same dockets. Where I believe the courts denial would abridge the right as the Nation intended. This right of English common law tradition is foundational to our nation and one of the most sacred rights of our form of government, If en banc review is warranted in matters of importance, In matters of constitutional rights of the current time you will rarely if ever come across a more influential and impactfull case and it demands a full opinion explaining the peoples rights or limits.

The very matters I petitioned the US electorate and Supreme court about were the extreme deviations from what the early nations courts considered access to justice, Access to federal (and state) law libraries, Discovery rules that make litigation impossible for the middle and lower class, putting compensation out of reach for uncounted victims and other instances I hope will start a change back to the hybrid adversarial/inquisitorial/merit system our nation used to practice in civil courts, where the vicitm count is no longer just the parties of faults, the judiciary now maintains a victim count in their technical dismissals and the pricey cost of discovery preventing correction of injuries.. So I have done my best present an argument but the very nature of lack of federal resources has hindered me along with the short filing window.

2

Two reasonings are provided to assist the court in making this determination of the courts duty to record and facilitate to petitioning in the courts between the petitioner and the petitioned government.

First a historical right, that was offered as info in the original appeal, now formed to the historical tests I could find, absent the library access. Second, my understanding of where the courts unformed statement of a denial because of some article 3 sec.2 scenario has been argued against, where its believed the historical practice of the petition right combined with the aknowledgment of the Tutun test for what "a case is", Shows grounds that are favorable if not clearly asserting the right in absence of my legal knowledge.

The 1st amendment historical and societally significant practice of petitionings being a duty placed upon the court is applied to the Tutun test and be they seperate or in whole reviewed the constitutional duty of the petition clause created a duty the same way congress created a naturalization duty for the courts.

That just as the colonists and founders repeatedly filed formal petitions for redressing with the King of Brittan and the privy councils of parliamentary being public records asking for remedy, humanity and civility of fair rule of laws; by right of the English bill of rights 1689 "without punishment"... The founders intended and did create the same and broader entitlement to accountability for the elect, judges, officials and entities of the government of this nation and its several states.

That while the obligation to respond in these matters is not contested, A duty to create and maintain the mechanisms or functions to facilitate the public presentment of the peoples grievances was mandated but never formalized. That the petition clause has been abridged removing the safeguards it was intended for; facilitating a usurpation of the power and rights of this government of the people.

I realize I ask alot of you in doing your duty; But If you are unable or unwilling to perform this duty I ask you seek assistance from the supreme court or confirm an en banc review despite the loose nature of the assertions, where the novelty of constitutional rights has no guidance and neither do I without a full and informative ruling, You call it the Iron rule "IRONS v. DIAMOND 1981".

Where more fundamentally its also professed, Marbury v. Madison, 5 U.S. 137, 177 (1803) demands of the judiciary 'a remedy for every injury" and a ruling that can stand, something the panel very clearly did not give, regardless of reason for doing so. Which not only deprived me of a fair opportunity at a rehearing pleading, it acted to frustrate all future pleadings and possibly was intended to hinder me specifically if not the American people also.

4

PART I

THE HISTORICAL PRACTICE TEST ESTABLISHES THAT THE FIRST AMENDMENT PETITION CLAUSE PROTECTS THE RIGHT TO FORMAL GOVERNMENTAL RECEIPT AND PUBLIC RECORDING OF PETITIONS FOR REDRESS (ABSENCE OF ANY OTHER ADEQUATE RECORDING MECHANISM)

I. THE GOVERNING FRAMEWORK: WASHINGTON v. GLUCKSBERG

In Washington v. Glucksberg, 521 U.S. 702 (1997), the Supreme Court held a claimed constitutional right must be (1) carefully described at the appropriate level of specificity, and then shown to be (2)(a) deeply rooted in the Nation's history and tradition, and (2)(b) implicit in the concept of ordered liberty. 521 U.S. at 720-21.

The right asserted here is precisely this: the right of a citizen to file a petition for the redress of grievances with the federal government and to have that petition formally received, assigned a docket entry, the docket kept open to facilitate responses and replies, and preserved in a permanent public record, so that the government's receipt cannot be denied and the government's response or non-response is publicly recorded, to do otherwise would abridge the petition right and prevent abolishment or modification requests from being historically recorded and tracked. This is not a claim that the government must respond or grant relief. It is a claim that formal receipt and public recording is itself constitutionally mandated — the act that makes the petition clause constitutionally complete in these regards and government entities publicly accountable.

A. Step One — Careful Description of the Right Asserted

The right is narrow and historically precise. It is the peoples right and governments duty to provide an official, permanent, publicly accessible record of petitions received by the government — specifically, a docket entry in this Court's civil miscellaneous docket (a redressing filing), which is the only such record that satisfies

the historical requirement. It is not argued as a right to compel any branch to respond, act, or change policy. It is the right to proof of receipt in a form the government cannot disavow, allowing the people to alter their government and actors as they see necessary. [It is the very definition of our republic.]

B. Step Two, Element One — Deeply Rooted in History and Tradition

1. The Historical Practice: One Uniform Obligation Across All Institutions of Government From the English Privy Council through the founding of this Republic, every institution that received petitions for redress under Britan law maintained a formal public record of their receipt. The English Privy Council Registers, published as the Acts of the Privy Council of England and available in continuous series from 1386, record the receipt, referral, and disposition of petitions to the Crown by name of petitioner and subject matter. The Journals of the House of Commons, maintained since 1547 and published by the House of Commons, record the same for parliamentary petitions. [Historical source documents to be appended.]

The colonial American assemblies continued this practice without exception: The Journals of the Virginia House of Burgesses, the Journals of the Massachusetts General Court, and the journals of the several colonial assemblies each document the formal entry of petitions upon receipt. [Historical source documents to be appended.] The First US Congress institutionalized the practice in the Annals of Congress (and Debates and Proceedings in the Congress of the United States, 1789-1824, published by Gales and Seaton[2]), which document by petitioner name, subject matter, and date the receipt and referral of every petition received during the founding era. The significance of this practice is not that institutions recorded petitions.

2.    U.S. Constitution Article I, Section 5, Clause 3: "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy."

It is that the founding generation continued, a principle held in the Anglo tradition, even if it was unformed, later neglected, usurped, misunderstood, and ignored for prioritize of matters of imminent natures (like keeping the new nation alive to bring to fruition the intent of the founders and dealing with the inherent nature of humanities dangers: Absence of morality/education. Comforts people are quick to find; absent reasoning and information in their selfish/primal/cowardly nature.). The spirit and foundation of the petition right was first and permanently abridged and violated by the gag rule [see apendix]J.Q. Adams said "I hold the Resolution to be in direct violation of the Constitution of the United States, of the Rules of this House, and of the rights of my constituents"; [see apendix] Mr. Cushings of the House in debate against the gag of petitions citing Joseph Story as I did in the original appeal (see footnote 3) The "gag rules" inception and their eventual ending establishes the CLEAR DUTY intended and understood by this nations peoples and their servants. [The historical citings to be appended show], (A duty imposed, that the government has not just a duty to accept the petitions, they have a duty to respond, but only recording is requested of the courts)... But I continue, the gag rule defeat shows; The petition right is constitutionally complete only when entered into a permanent public record (and discussed, not at argue here). I am not arguing the congresses deficiency, its clearly a defunct performance. What is argued is the historical duty of the courts to perform their duty in regards to the historical practice, where the separation of powers did not foreclose the duty of government accountability, The clauses maximum ensured its undeniable duty upon all government.

Where here the most reasonable question is placed upon you: If a petitioner had filed a petition not heard in congress, in the court docket and requested, not commanded response during the gag rule, what would the courts response been.

3. "It (the right of petition )results from the very nature of the structure and institutions of a republican government; it is impossible that it should be practically denied until the spirit of liberty had wholly disappeared,and the People had become so servile and debased as to be unfit to exercise any of the privileges of freemen."

Would it be driven by party agendas, later rendering it moot, such as dred scott (1857) or would it have been sound, an affirmation of the RECORDATION DUTY (ignoring congress' duty) historically practiced and explained by Madison in 1789 to be [1788 and] recognized, on principle standing of the oppressions and subversions of liberty the 1st amendment stood against. I say this question, ignoring the speech and debate clause is where you might find the answer Marbury en-duties... In the historical practice of the petition right, A petition not recorded was a violation of the petition right "J. Adams" "Mr. Cushings" [see apendix]. The Declaration of Independence being cited, the history of courts admittance being cited and the courts duty to record is present if the legislative is in fault; the established standard against which the King's and Parliaments conduct was measured. The practice requiring transparency and accountability to the people, and that IS our form of government, regardless of the disruptions to administrative convenience, a ministerial duty.

2. The Petition Clause Codified a Government-Wide Obligation, Not a Branch-Specific One

The critical legal consequence of the historical practice of petitioning is established not by the history itself but by the Supreme Court's interpretation of the Petition Clause in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972), by its several precedents and the first point assertions. The Court held that the right of petition "extends to all departments of the Government." 404 U.S. at 510. It runs to all departments of state and federal, all servants and entities subject to the peoples petitions, and the transparency of grievances is entitled by the clause if the petitioner chooses. Courts are departments of the Government, the petition clause in principle and history of transparency and accountability would be abridged by denial of the right to public recording in the courts that satisfies government accountability to the public for failure

the current political divides have been so narrow in this country for as long as i can remeber that the wins of US elect is in many offices repeatedly only a few percent win; if this alone does not profess the two parties who have seated every judge of this nation are only serving a slim majority at the frustrations of the 49% of the nation and if you have never written in to a congressional office about an issue that is of the 49% you do not possess the experience, which is why i offered a fraction of the generic responses I have recieved over the years. THe petition clause and its historical practice is for this exact scenario, where the englishmen said , we can no longer allow the king to ignore and hide our causes and from it they at the worry of death for the monarchy repeatedly enlarged their rights, even still the monarchy persisted in its acts from generation to generation... No different than an elect professing they are the representative of the people when their win was by but a slim margin.

8

to recognize issues of deemed importance, that being the publics notice their representatives may not be of sound mind and body fit to represent. It would establish the secrecy and suppression of discontent of this nation until like slavery the conflicts of rights deprivations and law enactment requests go unheard and distorted causing another rift between the peoples, or the notice of dangers present, reason for the clause.

The Petition Clause therefore runs to this Court directly, and this Court is a proper recipient of any petition for redress wished filed to government. California Motor Transport establishes that the Petition Clause obligation is government-wide. The history and historical practice establishes that the obligation is to record formally and publicly. The combination of these two propositions establishes that when a government entity is petitioned in the court, the court bears the recording obligation. This is the legal foundation of the court's duty: not an analogy to congressional practice, not a residual gap-filling function, but a direct constitutional obligation of presentment arising from the Petition Clause as interpreted by the Supreme Court (and Joseph Story) and argued affirmed in this appeal.

3. This Petition Was Addressed to All Three Branches: The Recording Obligation Falls on This Court (regardless the recipient)

My petition was directed simultaneously to the Supreme Court, the President and Vice, members and committees of the United States Congress, requesting that each respond to the grievances and remedies identified. No single branch was the sole recipient and it was hoped they would converse amongst each other to resolve the deprivations. The petition invoked all departments of the Government within the meaning. Where each party was made aware of the public filing, That they were not

the only parties petitioned and request for docketed response was made in multiple emails, informal and formal summons and calls. The question of which institution bears the recording obligation for a multi-branch petition that requests public accountability in transparency is answered by the act of filing. I filed in the federal district court. Under the uniform historical practice documented in Section I.B.1 ,the recording obligation attaches to the institution where the petition is placed.

The colonial courts received and recorded petitions and when necessary directed to the governor or legislature when those petitions were placed in the court's custody [ to be supplemented with an exhibit].

The English Privy Council recorded petitions addressed to the King and referred those requiring parliamentary action to Parliament — the recording function followed the act of filing, not the identity of the ultimate recipient, a unified responsive government. When I filed this petition in the federal court's civil miscellaneous docket, the court became the institution of receipt, and the recording obligation attached to it.

At this point I see the courts duty as affirming the right, or showing the founders intended to diminish the public practice of petition and had no intent on allowing and demanding public accountability by recording of grievances in the courts, I believe you can not show this,only that the founders rushed to put together the Constitution and government as best they could while holding to the principle practice and spirit of the petition clause as described by [appendix] Story: *"it speaks the voice of the people in the language of prohibition, and not in that of affirmance of a right, supposed to be unquestionable, and inherent."* Government shall not infringe on the natural right to petition, when the court is asked to facilitate debate between government and citizen, its at no right to deny and abridge the right. It must perform its duty of constitutionally mandated recording of petitions as a venue of public record keeping and redressing.

### 4. No Other Branch Maintains a Record Adequate to Satisfy the Constitutional Requirement

The constitutional requirement established by the historical practice is specific: a permanent, public, legally cognizable record that the petition was received. No branch of the federal government other than the courts presently maintains such a record for petitions of this character.

The House and Senate Journals, which historically recorded petitions by petitioner name and subject matter in the Anglo English tradition, no longer do so.

The federal rules petition process — through which proposed amendments to the Federal Rules of Civil Procedure and related rules are submitted — receives public comment but routes that comment through the rule making docket of the Judicial Conference, not through the public dockets of the courts, and does not create a publicly disputable record of individual petitions for redress (rule changes).

There is no public mechanism preserving in any format that creates the permanent public accountability the Petition Clause and practice historically required.

This Court's civil miscellaneous docket is the only mechanism in the federal government that produces what Petitioning historically demands: a permanent entry, publicly accessible to facilitate control of government and track long and repeated instances of grievances and the parties and entities of the governments response. Hiding them creates an abridgment of the right and endangers every right we posses.

The denial of docketing (as was done in the appeals panel previous decision) therefore does not redirect Appellant to an adequate alternative. It eliminates the right entirely; in so far as a petition is owed a public and historical accountability.

Under Boddie v. Connecticut, 401 U.S. 371, 380-82 (1971), denial of the only mechanism capable of satisfying a fundamental constitutional right cannot be justified by administrative inconvenience. Under Borough of Duryea v. Guarnieri, 564 U.S. 379, 388 (2011), barriers that effectively chill or foreclose the practical exercise of the Petition Clause right constitute abridgment. Elimination of the only adequate recording mechanism is abridgment per se.

C. Step Two, Element One — The State Constitutions Confirm Government-Wide Recording as a Founding Obligation and Expectation Of them

The constitutions of the original states confirm that the recording obligation was understood in a bare minimum, but the lack of articulation and thinking\agreements of the state drafters clearly are at question in their earliest legislative acts and draftings, but not in this sense of what they understood to be a federal government that was one of transparency and accountability with permanent public redress. Maryland's Constitution of 1776, Art. XI, declared every man's right to petition for redress. North Carolina's Constitution of 1776, Art. XVIII, and Pennsylvania's Constitution of 1776, Art. XVI, also asserting the principles. Vermont's Constitution of 1777 declared in Art. XLIII that the Declaration of Rights "ought never to be violated, on any presence whatsoever." Virginia's Declaration of Rights of June 12, 1776, Art. XV (and other states including Arizona), declare "a frequent recurrence to fundamental principles is absolutely necessary, to preserve the blessings of liberty." New York's Constitution of 1777 grounded the founding moment explicitly in the Crown's refusal to answer the petitions of the colonies, confirming that the Petition Clause was written to guarantee the practice the Crown had dismissed (or they expected to ask forgiveness later), formal governmental accountability by receipt and recording. Its by no means an exhaustive list.

note (for discovery access a seperate claim being drafted, the court can disregard this note in determination of this appeal) griffin also speaks to the deprivation of access to discovery tools, a fundamental need in several pro se litigants litigation and where the evolution of the adversarial system of our nation with expert requirements and deposition needs to circumvent defendant summary judgments; as well as bring swift justice without delay... have in our adversarial systems evolution of precedent, been surpassed by the majority of nations who actually do give justice for all in principle (though they may have issues of judicial perversions as Americans do.) by their inquisitorial system of assignment of experts and guiding of discovery and depositions, practices not needed by early citizens in the laws simplicity and judicial courage while doing more to guide cases than the current docket clearer's do, dont forgive my assertions, rule on this cases merits as duty requires, and refute them when you must.

But these provisions are significant not merely as historical evidence but as proof that the founding generation understood the right to petition as imposing obligations on all levels of government to redress grievances. The language being further refined in the US Constitution petition clause as a right to petition the "government" in its entirety " a right that "ought never to be violated on any presence whatsoever" — confirming California Motor Transport's holding that the Clause runs to all departments.

D. Step Two, Element Two — Implicit in the Concept of Ordered Liberty

The formal receipt and public recording of petitions for redress is implicit in ordered liberty for one reason that is practical rather than philosophical: without it, the Petition Clause is a right the government can nullify at will. A government that receives petitions privately and disposes of them privately faces no public accountability for its responses or its silences, but only upon great inconveniences of finance and cost to the petitioners and their supporters and communities. The founding generation understood this. The Declaration of Independence identified the King's failure to attend to petitions not as a failure of courtesy but as an inhuman act: it deprived the people of the accountability mechanism through which government is made answerable for its acts. A government that cannot be held publicly accountable for receiving or ignoring a grievance is a government that has effectively abridged the right to petition regardless of whether it has technically accepted the document. The docketing function is the constitutional minimum that separates a functioning right from a formal nullity.

**II. THE NOEL CANNING HISTORICAL-PRACTICE DOCTRINE: THE RECORDING OBLIGATION IS CONSTITUTIONAL GLOSS**

In NLRB v. Noel Canning, 573 U.S. 513 (2014), the Supreme Court held longstanding historical practice — accepted by the founding generation, consistently followed by early Congresses, and treated as constitutionally obligatory — constitutes critical evidence of constitutional meaning and cannot be set aside without compelling reason. 573 U.S. at 524-26-.... Each of the three criteria is satisfied.

Criterion One: Accepted by the Founding Generation — The formal receipt and public recording of petitions was the established constitutional practice of every institution the founding generation built or inherited, documented in the Privy Council Registers, Journals of the House of Commons, colonial assembly journals, and Annals of Congress, cited in Section I.B.1. The Founders did not create this practice. They codified it.      Criterion Two: Consistently Followed by Early Congresses — The Annals of Congress (1789-1824) document without interruption the receipt, entry by petitioner name and subject, referral, and archiving of citizen petitions by the First and subsequent Congresse, all seemingly debated. The departure from this practice — the gag rule of 1836, House Resolution of May 26, 1836, 24th Cong., 1st Sess. — was immediately contested as a constitutional violation by members of Congress, most prominently by John Quincy Adams across multiple sessions, and was repealed on December 3, 1844. The declination was not constitutional, it was a usurpation of power and avoidance for convenience that I challenge this entire courts judiciary to disprove.      Criterion Three: Treated as Obligatory, Not Discretionary — The gag rule debates is the decisive proof of this criterion. The debates surrounding it all profess to an encroachment, that is as horrendous as the acts of Britan prior to the Declaration [ to be supplemented with exhibits].That the right of petition is the sign of a free people and a government of the people. Adams's and Cushings constitutional objections, sustained by the eventual repeal, was for a dutied

petition right. The founding-era state constitutions' declarations that the right "ought never to be violated, on any presence whatsoever" confirm the mandatory character of the obligation.

The petition-recording practice satisfies all three Noel Canning criteria. It constitutes constitutional gloss on the Petition Clause. "Shall not be abridged" means, at minimum, that the government must formally receive and publicly record a petition directed to it. This is the operative meaning of the Clause, not an extension of it.

III. SYNTHESIS: WHY THIS COURT SPECIFICALLY BEARS THE DUTY

Three propositions, each independently established, converge to fix the recording obligation on this Court.

First, under California Motor Transport, 404 U.S. at 510, the Petition Clause runs to "all departments of the Government." This Court is a department of the Government. The obligation is therefore this Court's as a matter of direct constitutional command, not analogy.

Second, this petition was addressed to all three branches simultaneously. No single branch was the sole recipient, and no single branch bears the recording obligation. The recording obligation attached to the institution of filing, this Court upon the act of filing, consistent with the historical practice in which the recording function followed custody of the document.

Third, this Court's civil miscellaneous docket is the only mechanism in the federal government that produces the permanent, public record that the Petition Clause historically and presently demands and that satisfies the constitutional minimum. Every other branch's petition-handling process operates outside public docketing and produces no record of the character the Clause demands. Denial of an open docket does not

redirect me to an adequate alternative. It eliminates the right. Elimination of the only adequate mechanism for the exercise of a fundamental constitutional right is abridgment (not just by congress) under Boddie, 401 U.S. at 380-82, and Duryea, 564 U.S. at 388, without any sufficient justification having been offered.

PART II

ARTICLE III, SECTION 2 PRESENTS NO BARRIER: NON-CONTENTIOUS JURISDICTION, LEGISLATIVE-DUTY ANALOGIES, AND THE FOUNDING HISTORICAL DUTY ESTABLISH THIS COURT'S OBLIGATION TO DOCKET

I. THE TUTUN FRAMEWORK FOR NON-CONTENTIOUS ARTICLE III JURISDICTION

The panel's dismissal rested on a single citation to Article III, Section 2 without explanation. The invocation assumes that the absence of an adjudication determination is fatal to jurisdiction. That assumption has been incorrect since before Tutun v. United States, 270 U.S. 568 (1926), which established that a non-contentious, ex parte proceeding is a proper Article III case when: (1) a petitioner invokes a right secured by federal law; (2) the court is required to receive the petition and follow regular procedure; (3) the court's act is final and not subject to revision by another branch; and (4) the proceeding requires a judicial act even without adversarial contest. 270 U.S. at 576-77. "The proceeding is not a suit inter partes. It is a proceeding ex parte ... But it is none the less a judicial proceeding and a case within the meaning of the Constitution." Id. at 577. The finality criterion derives from Hayburn's Case, 2 U.S. (2 Dall.) 409 (1792), United States v. Ferreira, 54 U.S. 40 (1851), and Gordon v. United States, 69 U.S. 561 (1865): the determinative question

is whether the court's act is final and unrevisable by another branch, not whether an adversary is present or the courts judiciary function is assigned by law.

A. The Tutun Test Applied to the Docketing Proceeding

Element One — Appellant invokes the First Amendment Petition Clause — a right secured by the supreme law of the land. The constitutional history demanding accountability and transparency of governmental acts cuts in favor of jurisdiction, not against it.

Element Two — The proceeding requires the court to accept the filing, assign a docket number, keep an open docket and preserve the documents. This is regular judicial procedure. It requires no adversarial briefing, no contested hearing, and no ruling on the underlying grievance. It is the same legally mandated administrative function ministerial act the courts perform when receiving any other petition: naturalization, habeas corpus, or probate duty assigned by congress or constitutional law. (though they do vary in duty)

Element Three — A docket entry is final and irrevisable. Once assigned, a docket number is permanent. The official record of receipt cannot be revised, overwritten, or rescinded in known circumstances. This satisfies the finality criterion more simply than the naturalization order in Tutun.

Element Four — The assignment of a docket number and creation of a permanent official record is a judicial act in the Tutun sense: the exercise of the court's institutional authority to create a publicly accessible, and binding record of a constitutional event. It is not advisory. It does not recommend a course of action to another branch. It is specific, final, and argued binding by the historical duty imposed on the courts by the Constitution, the same way the court was dutied with naturalization proceedings by later legislative acts.

All four elements being satisfied. The proceeding is a proper Article III case; even if the Tutun test is only persuasive, it is a clear showing of the duty that the judiciary possesses beyond what is simply and clearly mandated by Consititution and law.

## II. LEGISLATIVE-DUTY ANALOGIES: NATURALIZATION, MARRIAGE, DIVORCE, TESTIMONY PRESERVATION AND PROBATE

Tutun is the capstone of a well-established category of proceedings in which courts perform ministerial duties to facilitate the exercise of fundamental rights. Each of the titled analogizes to illustrate a legislative or constitutional assignment of a ministerial court function that maps directly onto the docketing obligation created by the petition clause in historical practice.

### A. Naturalization, Marriage and Probate Wills

A petitioner invokes a statutory right. The court administers the proceeding, makes a formal determination, or simply the clerk enters the result\documents in the public record. They are nevertheless a proper Article III case under Tutun, a duty under Obergefell v. Hodges, 576 U.S. 644 (2015). The docketing of a Petition Clause filing is structurally identical: constitutional right invoked, ministerial act performed, result entered in the public record. Tutun controls or guides.

## III. THE HISTORICAL DUTY CLOSES THE ARGUMENT

### A. The Duty Attaches to the Institution of Filing

The historical practice established in Part I confirms that the recording obligation attached to the courts. The colonial courts received and recorded petitions directed to the governor or legislature when those petitions were placed in the court's custody. The English Privy Council recorded petitions in the public accountability the oppressed Englishmen had demanded. When I filed this petition in the federal

district court, the court became the institution of receipt. The recording and open docket facilitation obligation attached at that moment, as it has attached to every institution of government that has received a petition for redress in the Anglo-American tradition.

B. The Gag Rule Establishes That the Right Belongs to the Petitioner

The gag rule episode — House Resolution of May 26, 1836; John Quincy Adams's objections across the 24th through 28th Congresses; repeal of December 3, 1844 — establishes the essential structural point. The constitutional condemnation of the gag rule was not that Congress violated its own recording procedure. It was that Congress abridged a right belonging to the petitioner. This is confirmed by the First Amendment itself: the Clause does not say Congress shall maintain its own recording practices. It says Congress shall make no law abridging the right of the people to petition. The right belongs to the people. The recording obligation belongs to the government as its constitutional duty to the people. When Congress refused to perform it, the right did not transfer to the petitioner to enforce elsewhere — the government's refusal became the abridgment. The same analysis applies here: this Court's refusal to reopen the docket is not a redirection to another branch. It is the abridgment. Further, The courts have no right to argue a facilitation of the duty because of administrative or financial burdens: The duty of the courts can not be denied for administrative convenience:Bounds v. Smith, 430 U.S. 817 (1977); Boddie v. Connecticut, 401 U.S. 371 (1971) Johnson v. Avery, 393 U.S. 483 (1969);"Administrative convenience cannot justify the total denial of the right to petition for redress of grievances."; Tennessee v. Lane, 541 U.S. 509 (2004);]

B. Denial of Docketing Is Abridgment Without Sufficient Justification

The First Amendment states that Congress "shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances." Under the

constitutional gloss established by the historical practice — confirmed by Glucksberg's tradition test and Noel Canning's practice doctrine — the right includes formal public receipt and recording. Refusal to docket eliminates the only recording mechanism adequate to satisfy that right. Administrative burden cannot justify this under Boddie, 401 U.S. at 380-82. The absence of adversarial controversy does not defeat jurisdiction under Tutun, 270 U.S. at 577. The absence of a compelling governmental interest[4] means the abridgment cannot stand under McDonald v. Smith, 472 U.S. 479, 482-83 (1985), and Borough of Duryea v. Guarnieri, 564 U.S. 379, 388 (2011) and United States v. Cruikshank, 92 U.S. 542, 552 (1875) defining our republican government as public, When petitions are not publicly recorded it preempts republican government corrections by reducing visibility and accountability.

C.      Arizona,Virginia's and others Principle of Recurrence Is the Constitutional understanding further warranting this court's correction: Virginia's Declaration of Rights of June 12, 1776, Art. XV, declared: "a frequent recurrence to fundamental principles is absolutely necessary, to preserve the blessings of liberty." This is not rhetorical. It is the founding generation's identification of the mechanism by which constitutional practice is corrected when it has drifted from constitutional obligation. The erosion of formal petition recording across two centuries of institutional convenience is precisely the drift this principle was written to correct, supporting the (9th Amendment) retention of the right. This Court's recognition of the docketing duty is the recurrence the Constitution itself commands.

CONCLUSION

This Court bears the docketing obligation for three independent and converging reasons. First, under California Motor Transport, 404 U.S. at 510, the Petition Clause

4. Ensuring party wins and government control to seat judges and pass laws, that are issues of narrow majorities is not a compelling intrest. Neither is any result that shows the actual number of citizens and lawyers unsatisfied with their judiciary or anyother branch of government or its members.

runs to all departments of the Government including this Court. Second, this petition was addressed to all three branches simultaneously; the recording obligation attached to the institution of filing upon the act of filing, consistent with the uniform historical practice in which the recording function followed the document. Third, this Court's civil miscellaneous docket is the only mechanism in the federal government that produces the permanent, public, legally cognizable record that the Petition Clause and its 3/4 millennium of practice historically required. Denial of docketing and a closed docket eliminates the right, in the sharing of duty this court has to ensure no abridgment occurs and public accountability exists, this court must accept its duty to facilitate, It can not claim to be separate from duty . No sufficient justification has been offered, and its questioned why this court has no duty to make public the publics petitions regarding current and future rules and procedures changes of the court, the petition clearly fits rules changes in regards to depositions and most matters.

Under or with Tutuns guidance, the proceeding is a proper Article III case. Under Boddie, administrative burden cannot justify denial. Under Marbury v. Madison, 5 U.S. 137, 177 (1803), the duty to define clearly what the law is does not expire because the question is difficult. This Court should grant reconsideration, do so en banc to ensure a proper review and response, affirm docketing of petitions as a constitutional right in the courts and order the case reopened, to remain open to facilitate any responses, and issue a written opinion addressing the constitutional question presented, under Marbury it is this courts duty to do so.

Respectfully submitted by Nicholas Woodall on 3/22/2026

Nicholas Woodall
Po Box 194
Temperance Mi 48182
771-241-4590
stewartj4022000@gmail.com

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

## NICHOLAS WOODALL,

Appellant,

v.

### DONALD J. TRUMP, PRESIDENT, et al.,

Case No. 25-5259

## EXHIBITS SUPPLEMENT TO (AMENDED) MOTION FOR RECONSIDERATION 40a and 40b EN BANC

RECEIVED MAR 25 2026

UNITED STATES COURT OF APPEALS FOR DISTRICT OF COLUMBIA CIRCUIT

CITING: JAMES MADISON on page 2 and 3 of this document

CITING: JOSEPH STORY on page 3 of this document

EXHIBIT: JOHN QUINCY ADAMS MOTION: 1 page on page: 6

EXHIBIT: LETTERS FROM JOHN QUINCY ADAMS: 23 pages on page: 7

EXHIBIT: MR CUSHINGS SPEECH IN THE 1836 CONGRESS: 10 pages on page: 30

EXHIBIT: 28TH CONGRESS 1ST SESSION, THE CONGRESSIONAL GLOBE: 63 pages on page 40

EXHIBIT: PETITION TRANSFER PROTOCOL North Carolina Petition Submissions: 4 pages page:103

STATEMENT OF NICHOLAS WOODALL 3 pages on page 107

Respectfully submitted by Nicholas Woodall on 3/22/2026

PAGE 6 of Appeal rehearing: [The Britan documents could not be found, The historical practice was one of simplicity, all government was communicative, receptive to the issues and higher authorities and these were responsive, yes some and no some.)], [The Journals of the Virginia House of Burgesses, the Journals of the Massachusetts General Court- I could not find the petitions I have once seen, the specific documents showing the practice], what was found was: [The colonial courts received and recorded petitions and when necessary directed laterally or up to the governor or legislature when those petitions were placed in the court's custody- North Carolina continued this Practice after statehood, See Exhibit: [Petition transfer protocol, North Carolina petition submissions]], [The First US Congress institutionalized the practice in the Annals of Congress (and Debates and Proceedings in the Congress of the United States, 1789-1824, published by Gales and Seaton2.)nd, This is clearly known knowledge.]

PAGE 7 of Appeal rehearing: see Exhibit [J.Q. Adams said "I hold the Resolution to be in direct violation of the Constitution of the United States, of the Rules of this House, and of the rights of my constituents"], See Exhibit [LETTERS FROM JOHN QUINCY ADAMS TO HIS CONSTITUENTS FEBRURARY 9 1837], see Exhibit [SPEECH OF MR. CUSHINGS OF MASSACHUSETTS, ON THE RIGHT OF PETITION- 1836], ["the gag rule defeat shows; The petition right is constitutionally complete only when entered into a permanent public record -See Exhibit [FOR THE 28TH CONGRESS 1ST SESSION, THE CONGRESSIONAL GLOBE]]

PAGE 8 of Appeal rehearing:
Madison in 1789 to be recognized, on principle standing of the oppressions and subversions of liberty the 1st amendment stood against- https://founders.archives.gov/documents/Madison/01-11-02-0218 : [2. *Altho' it be generally true as above stated that the danger of oppression lies in the interested majorities of the people rather than in*

*usurped acts of the Government, yet there may be occasions on which the evil may spring from the latter sources ; and on such, a bill of rights will be a good ground for an appeal to the sense of the community. Perhaps too there may be a certain degree of danger, that a succession of artful and ambitious rulers, may by gradual & well-timed advances, finally erect an independent Government on the subversion of liberty. Should this danger exist at all, it is prudent to guard agst. it, especially when the precaution can do no injury.*]

also- [ https://founders.archives.gov/documents/Madison/01-12-02-0126 Document #2149630 page 22- 36: *"That the people have an indubitable, unalienable, and indefeasible right to reform or change their government, whenever it be found adverse or inadequate to the purposes of its institution."* This simple reasoning says, the duty is on all branches of government to record petitions and responses, anything less is abridgment and submits the people to the power of the 51% majority of the ruling party or majority of the greater number of people and creates a danger of trading the peoples power for the necessities the majority offer while denying the people transparency and accountability and then liberty!]

[STORY REFERENCE: *"it speaks the voice of the people in the language of prohibition, and not in that of affirmance of a right, supposed to be unquestionable, and inherent."* -  See: Document #2149630 of this appeal, page 52],

[A petition not recorded was a violation of the petition right "J. Adams". See Exhibit [Representative John Quincy Adams's motion denouncing the "gag rule" as unconstitutional, May 27, 1836], See Exhibit [FOR THE 28TH CONGRESS 1ST SESSION, THE CONGRESSIONAL GLOBE], See Exhibit [LETTERS FROM JOHN QUINCY ADAMS TO HIS CONSTITUENTS FEBRURARY 9 1837], see Exhibit

3

[SPEECH OF MR. CUSHINGS OF MASSACHUSETTS, ON THE RIGHT OF PETITION- 1836]

PAGE 9 of Appeal rehearing: [parties petitioned and request for docketed response was made in multiple emails, informal and formal summons and calls- D.C. federal case 1:25-cv-00112 Doc. 1 page 1 shows the three branches were petitioned and despite the clerk filing it as civil, it was requested as miscellaneous, pages 4 and 5 shows the issues requested remedied. In this Appeal; Document #2149630 pages 64-90 show the three branches were petitioned. ], [The colonial courts received and recorded petitions and when necessary directed to the governor or legislature when those petitions were placed in the court's custody- North Carolina continued this Practice, See Exhibit: [Petition transfer protocol, North Carolina petition submissions]

PAGE 10 of Appeal rehearing:
[STORY REFERENCE: "it speaks the voice of the people in the language of prohibition, and not in that of affirmance of a right, supposed to be unquestionable, and inherent." - See: Document #2149630 of this appeal, page 52],

PAGE 18 of Appeal rehearing:
[The colonial courts received and recorded petitions directed to the governor or legislature when those petitions were placed in the court's custody: see Exhibit: [Petition transfer protocol, North Carolina petition submissions]Virginia and Pennsylvania are also believed to have held the practice after the American revolution, but these will be submitted no later than April 3rd if they can be refound, The same for the pre revolution, though this court should know this in generally known information. I doubt time to find them and even the singular should require you do the research, if it alone does not support a link

4

sufficient between Tutan and the petition clause.] ,

[The English Privy Council recorded petitions addressed to the King and referred those requiring parliamentary action to Parliament- I could not re-find the petitions I have seen over several years of general pleasures of historical document review, I read thru documents and historical American government texts as a general entertainment and curiosity, finding instances I thought curious and out of current practice, such as the absence of petition recording by congress and other oddities where I had suspicions the courts used to ensure all had justice (like states of New York, North Carolina and others offering IFP litigants legal counsel for civil cases) but the research was stored on lost or damaged hard drives.],

5

https://www.visitthecapitol.gov/artifact/representative-john-quincy-adamss-motion-denouncing-gag-rule-unconstituti onal-may-27-1836

Representative John Quincy Adams's motion denouncing the "gag rule" as unconstitutional, May 27, 1836
The Gag Rule

### THE WORDS AS I HAVE READ THEM ARE:
I hold the Resolution to be in direct violation of the Constitution of the United States, of the Rules of this House and of the rights of my Constituents. - and sent his answer in [?writing- or ???] to the Chair."



# EXHIBIT

## LETTERS FROM JOHN QUINCY ADAMS TO HIS CONSTITUENTS

## FEBRURARY 9 1837

https://www.loc.gov/resource/gdcmassbookdig.lettersfromjohnq00lcadam/?st=gallery

The same practices are applied as to the previous exhibits, The text extracted out of form but in verbatim, [ALL CAPS IS A COMMENTARY BY ME] <u>UNDERLINE IS EMPHASIS</u> AND Pages and paragraphs are numbered in the same form, (a page indention is a new paragraph)

Its early portions discussing the distortions of the press and the attempts by the Democrat house members to distort J Q Adams actions to censure and bring other false pretext assertions of improper behavior... These arguments are met with explanations of Adams side of the story and giving brief on the acts of the House members being akin to the acts of Britan in tyranny, supporting the petition clauses absolute interpertation that all petitions are public [AND NOT JUST THIS COURT, BUT NUMEROUS BODIES OF GOVERNMENT OF THIS NATION ARE DEFICIENT IN PUBLIC PRESENTMENT]

7

PAGE 21 OF THE BOOK, PAGE 27 OF THE PDF, PARAGRAPH 2 3RD SENTENCE: "To cover their retreat, Mr. Bynum, of North Carolina, one of the warmest champions of the South, after a long and bitter speech, moved, as a substitute for Mr. Waddy Thompson's third modification of his resolutions, the following :— " Resolved,

That any attempt to present any petition or memorial, from any slave or slaves, negro or free negroes, from any part of the Union, is a contempt of the House, calculated to embroil in strife and confusion, incompatible with the dignity of the body; and any member guilty of the same justly subjects himself to the censure of the House. "

Resolved, further, That a committee be appointed to inquire into the fact whether any such attempt has been made by any member of the House, and report the same as soon as practicable." The whole doctrine of contempts, as borrowed from the practice of the British Parliament, is a law of tyranny, in which the House is at once accuser, party, judge, and executioner. Mr. Bynum's resolutions improve upon this system, by adding to these complicated attributes of the House, that of a retrospective legislator. Mr. Bynum dropped all mention of direct censure upon

me, but he proposed, ex post facto, to declare to be a contempt of the House, that which no one before had even dreampt to be such. To attempt to present a petition not only from any slave, but from any free negro in any part of the Union...

THIS BEING THE SIDE WHO I IMAGINE YOU WILL EXAMINE FOR REASOINING AND CONSTITUTIONALITY TO DENY THE CONSTITUTIONAL RIGHT TO PETITION IN PUBLIC RECORD AS A HISTORICAL PRACTICE OF THE COURTS AND ENTITLED BY THE PETITION CLAUSE WORDING OF GOVERNMENT AND THE EXTENT. RESOLVE AFTER RESOLVE SUBMITTED BY THE SOUTH IN OPOSITION OF THE RIGHT BEING ILLOGICAL IRATIONAL ASSERTIONS IN VIOLATION OF THE RIGHTS OF THE AMERICAN PEOPLE AND SO RESEMBLING TYRANY, THAT ITS NO WONDER THE SOUTH FAILED TO RATIONALIZE SLAVERY, LOST THE WAR AND TO THIS DAY ARE ADMONISHED BY REPUBLICANS AS THE PARTY OF ABSURD SHAMEFULL PRACTICES OF IRATIONALITY.

PAGE 22 OF BOOK, PAGE 28 OF PDF, PARAGRAPH 2 : The Constitution of the United States prohibits Congress from passing any law abridging the right of petition; and here, Mr. Bynum proposes, without law,by a mere resolution of the House, to abridge the right of petition, by declaring it a contempt of the House to attempt to present one—and then he institutes a court of inquiry, with himself at its head, and associates appointed by the master-Speaker, to ascertain and report whether such am attempt had been made by any member. By the propositions of Mr. Bynum,

the House, by resolution, would have made a law constituting a crime ex post facto; and then raised a Committee to ascertain and report whether any member had broken the law before it was made. At this new turn of the debate, Mr. Graves, of Kentucky, following the example of Mr. Robertson, declared himself explicitly opposed to any resolution of censure upon me. PAGE 26 BOOK, PAGE 32 PDF 1ST PARAGRAPH (AFFIRMING THE RIGHT OF THE PETITION CLAUSE AND THE DECLERATION OF INDEPENDENCE AND THE CHARACTER OF THE CONSTITUTIONAL DOCUMENTS AS BINDING) :

The rights of the South, then, here mean the rights of the masters of slaves, which, to describe them by an inoffensive word, f will call 'the rights of mastery. 'These, by the Constitution of the United States, are recognized, not directly, but by implication; and protection is stipulated for them, by that instrument, to a certain extent. But they are rights incompatible with the inalienable rights of all mankind, as set forth in the Declaration of Independence; incompatible with the fundamental principles of the constitutions of all the free states of the Union, and therefore, when provided for in the Constitution of the United States, are indicated by expressions which must receive the narrowest and most restricted construction, and never be enlarged by implication. There is, I repeat, not one word, not one syllable in the Constitution of the United States, which interdicts to Congress the reception of petitions from slaves; and as there is express interdiction to Congress to abridge, by law, the right of petition,that right, upon every principle of fair construction, is as much the right of the South as of the North, as much the right of the slave as of the master; and the presentation of a petition from slaves, for a legitimate object, respectful in its language, and in its tone and character submissive to the decision which the House may pass upon it, far from disregarding the rights of the South, is a mark of signal homage to those rights. An enemy to the Union! for presenting a petition! an enemy to the Union! I have shown that the presentation of petitions is among the most

imperious duties of a member of Congress. I trust I have shown that the right to petition, guarantied to the people of the United States, without exception of slaves, express or implied, cannot be abridged by any act of both Houses, with the approbation of the President of the United States;

ON PAGE 33 BOOK, PAGE 27 PDF, PARAGRAPH 4: MR. ADAMS THEN BEGINS IN AFFIRMING THE SPEECH OF MR. CUSHINGS: In the debate which ensued, and which consumed the remainder of the day, Mr. Cushing, in a very eloquent speech,proved it to be utterly untenable, and that the right of petition was a primitive, inalienable right, recognized by the Constitution of the United States as pre existing to itself, and guarded from abridgment, in express terms, by one of its articles.

PAGE 38 BOOK, PAGE 44PDF, PARAGRAPH 2: ADAMS EQUATES THE IMPLICATIONS OF ABRIDGING THE PETITION RIGHT IN MATTERS OF SLAVERY TO THE USURPATION OF POWER OF THE PEOPLE BY A MAJORITY:

If this refusal to receive petitions, and to hear deliberative argument upon any question relating to slavery, could be confined to that subject alone, I might have spared myself the reluctant labor, and you the weary perusal-of these addresses—but if coming events cast their shadows before them, we shall soon be hurried into the midst of a revolution more formidable than any collision between the coordinate departments of the government for patronage, any transitory tampering with the currency, any scramble between rival usurers and stock-jobbers for deposits of the public money, any swindling Indian treaties, or more swindling Indian wars, or any deep dissension between the cotton-gin of the planter and the spinning-jenny of the factory. All these may be compromised—all these may be occasionally used as ladders to power, and ascended or overleaped, according to the shrewdness or the impetuosity of the aspirants, to reach the summit of ambition.

PAGE 40 BOOK, PAGE 46 PDF, PARAGRAPH 3: ADAMS RESOLVES THE PETITION RIGHT NOT BELONGING TO THE SLAVE AS SIMPLY AN ACT TO REMOVE THE RIGHT FROM THE PEOPLE FROM FANATICAL SOUTHERNS WHO HE EQUATED TO THE POLISH GOVERNING BODY IN CHASING DOWN AND KILLING THOSE WHO QUESTION THEIR STANDINGS, EVEN WHEN IT WAS A RIGHT: The question whether slaves possess the right of petition, is of no practical importance, except as the denial of the right is an abridgment of the right itself. ... " But the resolution that the House cannot receive a petition from them, is an abridgment not only of their right of petition, but of the constitutional power of the House ; and the precedent of that abridgment of power in one case yields a principle that may be applied in numberless others, till the whole right of petition shall, like the attainment of office, be numbered among the spoils of victory—the exclusive possession of the dominant party of the day."

THE STATEMENT AFFIRMING THE VERY REASON FOR PETITIONG, WHERE THE TWO PARTIES HAVE CONTROLLED THIS GOVERNMENT AND SEATED EVERY JUDGE SINCE THEIR CREATIONS, THE CAUSES THAT DO NOT GET CHAMPIONED BY THEM ON NATIONAL PLATFORMS, DO NOT GET CONSIDERATION. THEY HAVE EXCLUSIVE CONTROLL OF WHAT THE PEOPLES COMPLAINTS ARE BY THEIR SELECTIVE PRACTICES AND THEY DISPOSE OF THE REST, AND QUESTIONABLY WITHOUT PUBLIC PRESENTMENT, POSSES AN ABILITY THRU THEIR PARTIES TO DISPOSE OF THE PETITIONERS AS WELL... BEFORE THEY EVER ARE HELD TO RESPOND, THE PANELS ATTEMPT AT THIS NOT ONLY FORCLOSES ON GENERAL PETITIONS, IT WOULD FORCLOSE ON RULE CHANGES AND GENERAL COMPLAINTS OF PRACTICE AND PRECEDENT.

PAGE 41, PAGE 47 NEAR END OF PAGE 1ST PARAGRAPH: the presentation of several hundreds of petitions was suppressed; and, among the rest, several relating to subjects in no wise connected with slavery or its abolition.

PAGE 48 PAGE 52 PARAGRAPH 2 : WHERE ADAMS GIVES THE SPECIFIC ARGUEMENTS FOR PETITION RIGHT HE ARGUESS TO THE HOUSE: I beg leave to explain my views of the argument on the right of petition. One of my colleagues (Mr. Cushing) has justly said, that the right of petition is not a right derived from the Constitution, but a pre existing right of man, secured by a direct prohibition in the Constitution to Congress to pass any law to impair or abridge it. Sir, the framers of the Constitution would have repudiated the idea that they were giving to the people the right of petition. No, sir. That right God gave to the whole human race, when he made them men,—the right of prayer, by asking a favor of another. My doctrine is, that this right belongs to humanity,—that the right of petition is the right of prayer, not depending on the condition of the petitioner; and I say, if you attempt to fix any limit to it, you lay the foundation for restriction to any extent that the madness of party spirit may carry it. This is my belief, and if the House decide that the paper I have described comes within the resolution, I will present it, and, in so doing, shall feel that I am performing a solemn duty. What, sir! place the right of petition on the character and condition of the petitioner, or base it upon a mere political privilege! Such a decision would present this country to all the civilized world as more despotic than the worst of barbarian nations. 'The sultan of Turkey cannot walk the streets of Constantinople and refuse to receive a petition from the vilest slave, who stands to meet him as he passes by. The right of petition contests no power; it admits the power. It is supplication; it is prayer; it is the cry of distress, asking for relief; and, sir, sad will be the day when it is entered on the Journals of this House, that we will, under no circumstances, receive the petition of slaves.- When you begin to limit the right, where shall it stop?

FOR THIS PANEL APPARENTLY IT IS IN THE BALD ASSERTION, LIKE THE SOUTH AND MONSTROUS TYRANTS WHO IN MORE RESPECABLE TIMES WERE VILIFIED.

PAGE 50;56;PAR.6: *Here, then, is another limitation to the right of petition. First, it is denied to slaves, then to free persons of color, and then to persons of notoriously bad character. Now, sir, if you begin by limiting this right as to slaves, you next limit it as to all persons of color, and then you go into inquiries as to the character of petitioners before you will receive petitions. 'There is but one step more, and that is to inquire into the political faith of petitioners.*

PAGE 51;57;PAR. 2: *'The want of power to grant the prayer of a petition is a very sufficient reason for rejecting that prayer, but it cannot impair the right of the petitioner to pray. "The question of power applies to the authority to grant the petition, but not to the right of the petitioner to present his petition. The power to grant it is often one of the most mooted questions in the world.*

PAGE 52;58;PAR. 2: *It would reduce the right of petition to nothing more than the right of the predominant party, for the time being, to petition. It would exclude all petitions from those who held with a minority in Congress, as to the right to exercise any given power; and the right of petition would be hedged in, until it would be reduced to a mere nullity as to its essential characteristic—a supplication from one man in distress to another, who, he believes, has the power to relieve him.*

PAGE 56;62;PAR. 2: *Sir, the only answer I make to such a threat from that gentleman, is to invite him, when he returns home to his constituents, to study a little the first principles of civil liberty! 'That gentleman appears here the representative of slaveholders ; and I should like to be informed, how many there are of such representatives on this*

*floor, ....NEXT PAGE: If that is the doctrine of the slaveholding representatives on this floor, let it, in God's name, go forth, and let us see what the people of this nation think of such a sentiment, and of those who make such an avowal.*

The document goes on arguing against the gag rule provisions that would label a petitioner an enemy of the union. I find them not explicit enough to be relevant to petition right assertion , but detail the tyranny that oppresses petitioning of government and free speech of the people.

It ends on 65 of the book and is followed by poems

11684
5130-I

Hon'l

# LETTERS

FROM

# JOHN QUINCY ADAMS

TO

## HIS CONSTITUENTS

OF THE

### TWELFTH CONGRESSIONAL DISTRICT
### IN MASSACHUSETTS.

TO WHICH IS ADDED

## HIS SPEECH IN CONGRESS,

DELIVERED

### FEBRUARY 9, 1837.



### BOSTON:
## PUBLISHED BY ISAAC KNAPP,
No. 25 Cornhill.

1837.

forlorn. Mr. Thompson complained of the instability of his brother slaveholders in the House, but yesterday so fiercely bent upon punishment, that they had spurred him on, and thought his resolutions not severe enough, now dropping off one by one, and flinching even from a vote of disapprobation against me. He, however, was not to be found so pliable. He would adhere inflexibly to his resolutions, though he should be left to vote for them alone, and would comfort himself with the reflection that the smaller the number who should support him, the greater the honor.

This was the last flickering of the flame which had burnt so intensely for nearly two days. Mr. Robertson's speech had broken the spell of slaveholding unanimity into which they had been constantly spiriting and lashing one another against me, and against the abolitionists, and against the North. To cover their retreat, Mr. Bynum, of North Carolina, one of the warmest champions of the South, after a long and bitter speech, moved, as a substitute for Mr. Waddy Thompson's third modification of his resolutions, the following :—

" *Resolved*, That any attempt to present any petition or memorial, from any slave or slaves, negro or free negroes, from any part of the Union, is a contempt of the House, calculated to embroil it in strife and confusion, incompatible with the dignity of the body ; and any member guilty of the same justly subjects himself to the censure of the House.

" *Resolved*, further, That a committee be appointed to inquire into the fact whether any such attempt has been made by any member of the House, and report the same as soon as practicable."

The whole doctrine of *contempts*, as borrowed from the practice of the British Parliament, is a law of tyranny, in which the House is at once accuser, party, judge, and executioner. Mr. Bynum's resolutions improve upon this system, by adding to these complicated attributes of the House, that of a retrospective legislator. Mr. Bynum dropped all mention of direct censure upon me, but he proposed, ex post facto, to declare to be a contempt of the House, that which no one before had even dreampt to be such. To *attempt* to present a petition not only from any slave, but from any free negro in any part of the Union,

was, by Mr. Bynum's resolutions, not made a contempt for the future, but declared to be so already; and his second resolution proposed the appointment of a committee to inquire and report to the House whether such an *attempt* had been made by any member of the House.

Now, the Journals of the House bear record of repeated instances of petitions from free negroes and people of color, received, referred to committees, and reported upon, like others, without question of the right of the petitioners. The Constitution of the United States prohibits Congress from passing any *law* abridging the right of petition; and here, Mr. Bynum proposes, without law, by a mere resolution of the House, to abridge the right of petition, by declaring it a contempt of the House to attempt to present one—and then he institutes a court of inquiry, with himself at its head, and associates appointed by the master-Speaker, to ascertain and report whether such an attempt had been made by any member.

By the propositions of Mr. Bynum, the House, by resolution, would have made a law constituting a crime ex post facto; and then raised a Committee to ascertain and report whether any member had broken the law before it was made.

At this new turn of the debate, Mr. Graves, of Kentucky, following the example of Mr. Robertson, declared himself explicitly opposed to any resolution of censure upon me. He went further, and avowed the opinion that Congress have *power* to abolish slavery in the District of Columbia, though well aware that by this avowal he hazarded the displeasure of a great part of the slave representation in the House, and of many of his own constituents. Mr. Graves, like Mr. Robertson, was severe in his animadversions upon my course as a presenter of abolition petitions; and I should have felt with deep mortification the reproof of men so intelligent, fair-minded, and honorable, as I know them to be, had I not acted throughout the whole of these transactions under an impulse of a higher duty than it is in the competency of human approbation to command or to reward. They hazarded much in the land of

in the presentation of a petition from them. The very essence of the crime consists in an alleged *undue* regard for their rights; in not denying them the rights of human nature; in not classing them with horses, and dogs, and cats. Neither could the rights of the free people, without slaves, whether white, black, or colored, be disregarded by the presentation of a petition from slaves. Their rights could not be affected by it at all. The rights of the South, then, here mean the rights of the masters of slaves, which, to describe them by an inoffensive word, I will call the rights of *mastery*. These, by the Constitution of the United States, are recognized, not directly, but by implication; and protection is stipulated for them, by that instrument, to a certain extent. But they are rights incompatible with the inalienable rights of all mankind, as set forth in the Declaration of Independence; incompatible with the fundamental principles of the constitutions of all the free states of the Union, and therefore, when provided for in the Constitution of the United States, are indicated by expressions which must receive the narrowest and most restricted construction, and never be enlarged by implication. There is, I repeat, not one word, not one syllable in the Constitution of the United States, which interdicts to Congress the reception of petitions from slaves; and as there is express interdiction to Congress to abridge, by law, the right of petition, that right, upon every principle of fair construction, is as much the right of the South as of the North, as much the right of the slave as of the master; and the presentation of a petition from slaves, for a legitimate object, respectful in its language, and in its tone and character submissive to the decision which the House may pass upon it, far from disregarding the rights of the South, is a mark of signal homage to those rights.

An enemy to the Union! for presenting a petition! an enemy to the Union! I have shown that the presentation of petitions is among the most imperious duties of a member of Congress. I trust I have shown that the right to petition, guaranteed to the people of the United States, without exception of slaves, express or implied, cannot be

direct expressions of unqualified contempt, without even being called to order.    Like the saints in Hudibras—

> " The saints may do the same thing by
> The Spirit in sincerity,
> Which other men are prompted to,
> And at the devil's instance do ;
> And yet the actions be contrary,
> Just as the saints and wicked vary."

So it was with the gentlemen of the South.    While Mr. Pickens could openly call the resolution of the 18th of January a miserable and contemptible resolution; while Mr. Thompson could say it was fit only to be burnt by the hands of the hangman, without rebuke or reproof,—I was to be censured by the House for casting ridicule upon them, by asking the question whether the resolution included petitions from slaves.

They were dissatisfied with the result of their crusade against me, in the vindictive pursuit of which they had not only forgotten to answer my question, but even to obtain from the House a declaration denying the right of slaves to petition.    On Friday morning, several of them were absent from their seats in the House, and mysterious givings out were circulated that a caucus meeting of the South had been held, in which grave proposals had been made that they should secede in a body and go home. This was an old expedient tried before, some years since, and not without some effect upon the simple good nature of the North.    Whether it was really brought forward at this time, I cannot absolutely say; but the rumors were, that a first and second meeting were held, at which the opinions expressed were found so discordant, that it was finally concluded to be the wisest course to return to their seats in the House, and negotiate with the free representation for a *reconsideration* of one of the rejected resolutions. The interposition of the President elect of the United States was also said to have been solicited and obtained; and there is authority from his southern adherents for the assurance that it was exercised in a manner altogether satisfactory to them.    The sympathies of the whig members from the free states were likewise invoked, by their

House will be called to resolve a formal exclusion and refusal to receive any petition relating to slavery or the abolition of slavery—and with the right of petition on this subject, the freedom of speech in the House will be in like manner abridged. That the freedom of the press in this city will share the same fate, you have premonitory symptoms in the pledge already extorted from the National Intelligencer, immediately after the publication of Mr. Slade's letter, containing the argument which he intended to address to the House on the right of slaves to petition, but which was cut off by the previous question.

If this refusal to receive petitions, and to hear deliberative argument upon any question relating to slavery, could be confined to that subject alone, I might have spared myself the reluctant labor, and you the weary perusal of these addresses—but if coming events cast their shadows before them, we shall soon be hurried into the midst of a revolution more formidable than any collision between the coordinate departments of the government for patronage, any transitory tampering with the currency, any scramble between rival usurers and stock-jobbers for deposits of the public money, any swindling Indian treaties, or more swindling Indian wars, or any deep dissension between the cotton-gin of the planter and the spinning-jenny of the factory. All these may be compromised—all these may be occasionally used as ladders to power, and ascended or overleaped, according to the shrewdness or the impetuosity of the aspirants, to reach the summit of ambition. On all these lines of separation and opposition between the different portions of the Union, the counteracting impulses of popular leaders may balance each other, and the result is nothing worse than fluctuations of public policy, and perhaps shortened presidential terms. But the conflict of interests, and of principles involved in the jarring elements of freedom and slavery implanted in the physical, moral, intellectual nature of our institutions, must sooner or later come to an issue, and must control the destinies not merely of this nation, but of this hemisphere, and of man upon this planet. The abolition of slavery in the

Speaker Polk's distinctions, the offer to present such petition. The resolution of Mr. Ingersoll *gave color to their idea*, and furnished them with a precedent for the future refusal of *any* petition relating to the abolition of slavery.

Both the resolutions are mere opinions of a majority of the House, reversible at any day when the majority of the House shall entertain a contrary opinion. It is not competent for the House of Representatives to adjudicate what are or are not the rights secured to the citizens of the United States by the Constitution: but if Mr. Taylor's resolution is true, a citizen of the United States, enslaved at Algiers, Tunis, or Tripoli, would possess no right to petition Congress for his redemption, or for any measures to effect it.

The question whether slaves possess the right of petition, is of no practical importance, except as the denial of the right is an abridgment of the right itself. Their masters will take care to keep the redressing of all their grievances in their own hands, and will redress them in their own way. But the resolution that the House cannot *receive* a petition from them, is an abridgment not only of their right of petition, but of the constitutional power of the House; and the precedent of that abridgment of power in one case yields a principle that may be applied in numberless others, till the whole right of petition shall, like the attainment of office, be numbered among the *spoils of victory*—the exclusive possession of the dominant party of the day.

Both the resolutions were adopted by yeas and nays—that of Mr. Ingersoll, by a vote of 160 to 35; that of Mr. Taylor, by 162 to 18.

The vote of the House, on both the resolutions, indicates, with much precision, the *temper of the House* upon the subject of the abolition of slavery. I believe further, that the comparative numbers on both sides fairly represented the numbers, as well as the opinions of the constituent body, the people of the United States. I have no reason to think there was one member of the House who

would have voted for the immediate abolition of slavery in the District of Columbia. The majority were very averse to receiving any petitions for that object; nor was there opportunity afforded me of presenting any more, of the multitudes which I received and was requested to present. On Monday, the 13th of February, the order of receiving petitions was reversed; commencing with the territories. and proceeding from South to North; and upon the state of Massachusetts being called, the House adjourned at the motion of Mr. Cave Johnson, a Van Buren member, from Tennessee. On the 20th and 27th of February, days when, by the rules of the House, petitions should have been received, the rules were suspended to give preference to other business. In the mean time, an average of eight or ten petitions every day, were coming to me, with requests that I would present them. On the last day of the session, I had two hundred of them in my hands, from the states of Massachusetts, Maine, New Hampshire, Vermont, New York, Pennsylvania, Ohio, Indiana, and North Carolina. It had been customary to allow members having petitions, which they had not had the opportunity to present. to leave them, at the close of the session, with the clerk, and they were entered upon the journals. This the Speaker now declined to allow, without a special order of the House. Mr. Lawrence, who had also a number of petitions to present, moved for such an order; but objection was made to the reception of his resolution, and the presentation of several hundreds of petitions was suppressed; and, among the rest, several relating to subjects in no wise connected with slavery or its abolition. Sons of the Plymouth Pilgrims! I have given you a statement, faithful and accurate, of the condition of your right of petition, in the House of Representatives of the United States, at the close of the twenty-fourth Congress. In the Senate, the same right was equally prostrated, though with less resistance, and by the means of other forms.

Since then, the inauguration of Mr. Van Buren has placed a new chief magistrate at the head of this Union. To those of you who have petitioned for the abolition of

4*

a question entirely different from that put by the Speaker to the House, and which I yet hope the House will answer, whether, under *any* circumstances, they will receive a petition from slaves!

I beg leave to explain my views of the argument on the right of petition. One of my colleagues (Mr. Cushing) has justly said, that the right of petition is not a right derived from the Constitution, but a preëxisting right of man, secured by a direct prohibition in the Constitution to Congress to pass any law to impair or abridge it. Sir, the framers of the Constitution would have repudiated the idea that they were giving to the people the right of petition. No, sir. That right God gave to the whole human race, when he made them *men*,—the right of prayer, by asking a favor of another. My doctrine is, that this right belongs to humanity,—that the right of petition is the right of prayer, not depending on the condition of the petitioner; and I say, if you attempt to fix any limit to it, you lay the foundation for restriction to any extent that the madness of party spirit may carry it. This is my belief, and if the House decide that the paper I have described comes within the resolution, I will present it, and, in so doing, shall feel that I am performing a solemn duty.

What, sir! place the right of petition on the character and condition of the petitioner, or base it upon a mere political privilege! Such a decision would present this country to all the civilized world as more despotic than the worst of barbarian nations. The sultan of Turkey cannot walk the streets of Constantinople and refuse to receive a petition from the vilest slave, who stands to meet him as he passes by. The right of petition contests no power; it admits the power. It is supplication: it is prayer; it is the cry of distress, asking for relief; and, sir, sad will be the day when it is entered on the Journals of this House, that we will, under no circumstances, receive the petition of slaves. When you begin to limit the right, where shall it stop? The gentleman on my left (Mr. Patton, of Virginia) objected to another petition, which I did present, from women of Fredericksburg, because it

says he knows these women, and that they are infamous. *How* does the gentleman know it? [A laugh.]

[Mr. PATTON. I did not say that I knew the women, personally. I knew from others that the character of one of them was notoriously bad.]

Mr. ADAMS. I am glad the gentleman now says he does not know these women, for if he had not disclaimed that knowledge, I might have asked *who* it was that made these women infamous,—whether it was those of their own color or their masters. I have understood that there are those among the colored population of slaveholding states, who bear the image of their masters. [Great sensation.]

Mr. GLASCOCK, of Georgia, here went across the hall to the seat of Mr. Adams, and, amidst cries of " Order," held up to him the petition of the women of Fredericksburg, and said, " Is not that your hand-writing, endorsed ' From ladies of Fredericksburg'?"

Mr. ADAMS. Mr. Speaker, I did not designate them as ladies when I presented the petition. That is my hand-writing; but when I endorsed it, and sent it to the table, I did not know or suspect that the petitioners were colored people.

Here, then, is another limitation to the right of petition. First, it is denied to slaves, then to free persons of color, and then to persons of notoriously bad character. Now, sir, if you begin by limiting this right as to slaves, you next limit it as to all persons of color, and then you go into inquiries as to the character of petitioners before you will receive petitions. There is but one step more, and that is to inquire into the political faith of petitioners. Each side will represent their opponents as being infamous; and what becomes of the right of petition? Where and how will the right of petition exist at all, if you put it on these grounds?

A gentleman from Virginia, (Mr. Robertson,) to whose candor and generosity on this occasion I offer my tribute of thanks, as it contrasts with the treatment I experience from others,—though disapproving, in the strongest terms, the pertinacity of zeal which I have so often manifested

in behalf of this right of petition,—is unwilling to pass a vote of formal censure upon me, because he sees how manifestly incompatible that would be with *any* freedom of speech in this House. He says—and he is a distinguished lawyer—that there can be no right to petition, where there is no power to grant the prayer. This is ingenious and plausible; but that gentleman, even whose disapprobation is more painful to me than would be the formal censure of others, might excuse me, if I cannot assent to the correctness of his argument. The want of power to grant the prayer of a petition is a very sufficient reason for rejecting that prayer, but it cannot impair the right of the petitioner to pray.

The question of power applies to the authority to grant the petition, but not to the right of the petitioner to present his petition. The power to grant it is often one of the most mooted questions in the world. In relation to this very matter of slavery, the power to grant the prayer of those who ask for its abolition in the District of Columbia, is the question that divides this House. Ask the gentlemen from slaveholding states, in this House, whether Congress has that power. Not one of them will say they have.

[Mr. GRAVES, of Kentucky, who was sitting near Mr. Adams, and who had declared, in this debate, that he held Congress had that power, reminded him of the fact.]

Mr. ADAMS. Yes, one gentleman from Kentucky has affirmed that Congress has the power to abolish slavery in this District, but very few from slaveholding states will say so; and I do not know what it may cost that gentleman for having uttered such an opinion on this floor. Ask two of the representatives from Maine, ask the members from Vermont, from Massachusetts, from Rhode Island, from Connecticut, from—no, I will not go to New Hampshire nor New York, until I see how they vote on the question before the House. Ask the representatives of none but freemen on this floor, and their answer will be that Congress has the power.

The ground of the gentleman from Virginia, who denies the right of petition without the power to grant, is

perfectly consistent with his doctrine that Congress has no power to abolish slavery in the District of Columbia; but, sir, that is not the opinion of this House, and this House is anti-abolition, by an overwhelming majority. I am so myself; but, upon the single question of the power of Congress to abolish slavery within the District, there is a great majority of this House in favor of the power.

The gentleman from Virginia (Mr. Robertson) believes that Congress has no such power, and here he denies the right of petition for the exercise of a power which Congress does not possess. Well, sir, for the sake of the argument, I might grant him his premises, and then deny his conclusion. It would reduce the right of petition to nothing more than the right of the predominant party, for the time being, to petition. It would exclude all petitions from those who held with a minority in Congress, as to the right to exercise any given power; and the right of petition would be hedged in, until it would be reduced to a mere nullity as to its essential characteristic—a supplication from one man in distress to another, who, he believes, has the power to relieve him. I wish it was in my power to illustrate this principle further, without taking up more of the time of the House than I intend to do; but I forbear. This, sir, is the ground of my doctrine—that the right of petition cannot be limited, by any act of this House, so as to deny the right to supplicate to the slave.

In the course of the argument on the right of petition, I should say *debate*, sir, during three days, the real question before the House has been changed to an almost countless series of resolutions, bearing down upon me, all intended, directly or indirectly, to censure me for asking a question of the Speaker, which he referred to the House, and which the House has not yet answered. I will not go through a detail of all these resolutions, with which gentlemen from the South pounced down upon me like so many eagles upon a dove. I make no account of the cries heard all around, when I asked that question, " Expel him, expel him!" They are not in the resolutions. The first resolution to censure me came from the gentleman from Georgia, (Mr. Haynes.) That was not strong enough,

[Mr. WADDY THOMPSON was now permitted to explain. He stated he had thought there was not a human being who believed that slaves had a right to petition, until he heard, with astonishment, that gentleman avow that he held that slaves had a right to petition.   As to the other portion of what the gentleman had read, at the time the remark was made, he (Mr. T.) understood that the paper the gentleman called the attention of the House to, was a petition from slaves for the abolition of slavery.   I did characterize it as an incendiary act, the presenting of such a petition; and any person, in my judgment as a lawyer, is amenable to the laws, who will present a petition from slaves for the abolition of slavery.   Had I known the character of the petition, I certainly should not have made those remarks.   I take the responsibility, personally and direct, of every one of those epithets, so far as they apply to a petition from slaves for the abolition of slavery.   I do not now apply it to the gentleman from Massachusetts.]

Mr. ADAMS.   The House may take the explanation of the gentleman as they please.   There, sir, stands the sentiment—there is the printed language, in which the gentleman threatened me with indictment by a grand jury of the District, as a felon and an incendiary, *for words spoken in this House!*   The gentleman has again avowed it, and declares that, if the petition had been for abolition, and I had presented it, he would not only have brought me to the bar to be censured by this House, or have voted to expel me, but he would have invoked upon my head the vengeance of the grand jury of this District!   Yes, sir, he would make a member of this House, for words spoken in this House, amenable to the grand and petit juries of the District of Columbia!   Sir, the only answer I make to such a threat from that gentleman, is to invite him, when he returns home to his constituents, to *study a little the first principles of civil liberty!*   That gentleman appears here the representative of slaveholders; and I should like to be informed, how many there are of such representatives on this floor, who

endorse that sentiment. ["I do not," exclaimed Mr. UNDERWOOD, of Kentucky. "I do not," was heard from several other voices.] Is it to be tolerated, that, for any thing a member says on this floor, though it were blasphemy or treason, he is to be held accountable and punished by a grand and petit jury of the District, and not by this House? If that is the doctrine of the slaveholding representatives on this floor, let it, in God's name, go forth, and let us see what the people of this nation think of such a sentiment, and of those who make such an avowal.

Mr. WISE, of Virginia, rose.—Does any man say he will endorse that sentiment for the South?

Mr. ADAMS. I only say, let those of the South who will endorse it, avow it. I want the country should know who they are.

Mr. WISE. I will *not* endorse it. If I believed that the members of this House were amenable in any way, as such, to the juries of this District, I would not hold a seat here for one moment. Sir, this petty tribunal of the District, to which, it is suggested, the people of the United States, in the persons of their representatives, are to be held amenable, is notoriously under the dictation of the President, and is selected by an officer of his appointment. Have we not seen the Executive dictating to the Senate and to this House, and calling upon members to purge themselves of contempt?

[Mr. WADDY THOMPSON was brought up again. He referred, he said, to the laws of South Carolina, and, by those laws, if any member of the Legislature should present a petition from slaves, he would be liable to indictment by a grand jury.]

Mr. ADAMS. That may do for a Southern Legislature, to help out the gentleman; and if it is the law of South Carolina, that the members of her Legislature are held amenable to petit and grand juries, for words spoken in debate, God Almighty receive my thanks that I am not a citizen of South Carolina! [Great sensation. Mr. Pickens, of South Carolina, rose, apparently to explain this subject.]

# EXHIBIT

## MR CUSHINGS SPEECH IN THE 1836 CONGRESS

THE LINK TO THE BOOK ON LIBRARY OF CONGRESS

https://tile.loc.gov/storage-services/public/gdc/lhbcb-34654/lhbcb-34654.pdf

The following are his statements, That the Petition Right is in 1)Reciept, 2)Review(debate and decision), 3)Recording (The duty of government to make public the matters of the peoples grivances for public review of the governments work)
Creating the duty of all government to publicly document grivances. This right extending to the courts in the practice of ABSOLUTE. Even abolishment of government must be recorded for the public, for its ultimately their republic to do with as they wish, not their servants. Non recording of petition and response would violate the right in an abridgment that prevents honesty and accountability, Where this panel would act just as the South and say We dont care what the people think of the rules of the court or the resulting costs it places on the poor, they are the new slaves of this nation and they should have no right, they are as slaves whos petitions we will not hear, It will only result in division. That would be tyranny and abridgment in the very same thinking of the south and the very reason that petition request for court presentment of response to facilitate debate is commanded in the clauses wording.

There is no getting around it, there is only abridgment and tyranny or there is recordation and review or not review (not reviewing being an ipso facto denial, it allows government to perform their prioritize and if the people see error in their prioritizations, and workload, to correct by removal if neccessary).

[[[ In this book paragraphs and sentences are not numbered, to facilitate quick review of what I find most relevant to the clearly shown right.
Paragraphs are counted from the start of the page sentence as one and when a tab or shift of text occurs on the left of the page, this creates the next paragraph. They are copy pasted out of form of the pages where tabs, sentence starts and ends dont match the page sizes, but verbatim. ALL CAPS INDICATES PAGES AND NOTES OF REVIEW BY ME. Underlined for emphasis.]]]

30

*Print other side* Dun! oo

MR CUSHINGS SPEECH IN THE 1st CONGRESS

THE LINK TO THE BOOK ON LIBRARY OF CONGRESS

https://tile.loc.gov/storage-services/public/gdc/lhbcb-34654/lhbcb-34654.pdf

2)Review(debate and decision), 3)Recording (The duty of government to make public the matters of the peoples grivances for public review of the governments work)

Creating the duty of all government to publicly document grivances. This right government must be recorded for the public, for its ultimately their republic to response would violate the right in an abridgment that prevents honesty and accountability. Where this panel would act just as the South and say We dont care what the people think of the rules of the court or the resulting costs it places on the poor, they are the new slaves of this nation and they should have division. That would be tyranny and abridgment in the very same thinking of the south and the very reason that petition request for censi presentment of response to facilitate debate is commanded in the clauses wording.

recordation and review or not review (not reviewing being an ipso facto denial, it allows government to perform their prioritize and if the people see error in their prioritizations, and workload, to correct by removal if necessary).

review of what I find most relevant to the clearly shown right.
Paragraphs are counted from the start of the pare sentence as one and when a tab or shift of text occurs on the left of the page, this creates the next paragraph. They are copy pasted out of form of the pages where tabs, sentence

INDICATES PAGES AND NOTES OF REVIEW BY ME. Underlined for

EXHIBIT

PAGE 6: 4TH PARAGRAPH: , "what I propose to examine is the single naked question of the constitutional right of petition, as involved in the disposition of these petitions.... Looking into the Constitution I find, among the amendments proposed by the Congress of 1789, and the very first of the number, the following article : " Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press; or the right of the People peaceably to assemble and for petition the Government for a redress of grievances."

Long before I had imagined that such a right would ever be called in question, I remember to have read the remark of a distinguished jurist and magistrate of the State of Virginia, (Tucker's Notes on Blackstone,)~ complaining that the concluding words of the clause I have cited from the Constitution did not so strongly guard the great right of petition, as. the liberties of the People demanded. [THIS A POSSIBLE REFERENCE TO THE FACT THE FOUNDERS HAD NOT HIRED VERBATIM RECORDERS]

On the other hand, a still more distinguished jurist and magistrate, of my own State, (Story's Commentaries, ) in remarking upon the same article, expresses the opinion that it is ample in terms; because, he adds,

"It (the right of petition ) results from the very nature of the structure and institutions of a republican government; it is impossible that it should be practically denied until the spirit of liberty had wholly disappeared, and the People had become so servile and debased as to be unfit to exercise any of the privileges of freemen."

These eminent constitutional lawyers agreed in opinion of the import...


HE BEGINS HIS ARGUEMENT OF THE RIGHT ON PAGE 7 1ST PARAGRAPH: The words applicable to our subject are, "Congress shalt make no law abridging the right of the People to petition the Government for a redress of grievances."

The right of petition, therefore, is not a privilege conferred by the Constitution. It is recognised as a pre-existing right, already possessed by the People, which they still reserve to themselves, and which Congress shall not so much as touch with the weight of a finger. The People, in their constitution, say to Congress,—We place in your hands our right and power of collecting a revenue to provide for the common defence and general welfare of the Union ; our right and power to regulate commerce, to coin money, to declare war, and to raise and support armies and navies for its prosecution.

Upon these and other subjects you may exercise the discretion, which we repose in you by virtue of our constitution. But this you shall not do :—you shall not, until after the expiration of twenty years, prohibit the migration or importation of such persons as we think proper to admit; you shall not pass any bill of attainder, you shall not lay any tax or duty on exports ; and -you shall make no law prohibiting the free exercise of religion, or abridging the freedom of speech or of the press; or the right of the People peaceably to assemble and petition the government for a redress of grievances.

'These our great natural rights we keep to ourselves; we will not have them tampered with; respecting them we give to you no commission whatsoever.  And rights which Congress itself, the entire Legislature, consisting of the President, the Senate, and the House, acting in their combined functions in the enactment of a law, is forbidden to abridge,—can this House alone undertake, by a mere resolution or vote, practically to deny, abolish, and destroy? Sir, if we can successfully do it, I have greatly misconceived the democratic ancestry, the democratic principles, and the democratic energy of the People, whom we are appointed to serve in this House... The right of petition, I have said, was not conferred on the People by the Constitution, but was a pre-existing right, reserved by the People out of the grants of power made to Congress. To understand its nature and extent we must, therefore look beyond and behind the Constitution, into the anterior political history of the country.

And, in the first place, I beg of the House, and especially of the gentlemen who so ably represent Virginia on this floor, to remember how this article found its way into the Constitution. You well know, sir, that when the Constitution was submitted to the People of the respective States for their adoption or rejection, it awakened the warmest debates of the several State conventions. Some of them, in accepting the proposed plan of government, coupled their acceptance with a recommendation of various additions to the Constitution, which they deemed essential to the preservation of the rights of the States, or of the People. [THESE BEING THE WORKS OF MADISON AND BEFORE HIM ANTI FEDERALIST...] The Commonwealth of Massachusetts insisted, among other things, on the adoption of that memorable amendment, to the effect, "that it be explicitly declared that all powers not expressly...

THE ARGUMENT FORTHE RIGHT THE SAME THAT ENDUTIES THIS COURT IN ITS SACRED DUTY BY ITS SERVANTS CONTINUES FOR SEVERAL PAGES.  ALL RELEVANT BUT SUMMARIZED WHERE A REITERATION IS SOLIDIFYING IN GIVING THOSE OF YOU WHO INTEND TO DEPRIVE THE PEOPLE THEIR ANCIENT RIGHT A STARTING POINT TO "PROVE IT WRONG" OR AFFIRM THIS RIGHT OF YOUR MASTERS THE PEOPLE.

PAGE 10 PARAGRAPH 6: Mr. Mills, of Massachusetts, said that "the right of petition was a sacred one, and belonged equally to the meanest and the greatest citizen in the nation; and if such a petition as this, implicating the conduct of the Executive, had been presented from the meanest citizen, he would receive it; and if it complained of grievances without pointing out redress, [THIS DUTY TO FIND REDRESS (ACROSS BRANCHES), IS THE PRINCIPLE THAT AFFIRMS THE COURTS DUTY TO RECORD] it would be the duty of the House to give the proper redress ; but it was to our own citizens only he would turn this listening ear.

PAGE 10 PARAGRAPH 7: Sir, I have incidentally touched upon the argument of precedents , and shown how untenable it is; but I care not if there were a thousand precedents of refusal to receive petitions. Such a fact, if it existed, would not abate my zeal on this point, or shift, in the minutest degree, my position. Upon the Constitution, upon the pre-existing legal rights of the People,as understood in this country and in England, I have argued that this House is bound to receive the Petition under debate. It is impossible, in my mind, to distinguish between the refusal to receive a petition, or its summary rejection by some general order, and the denial of the 'right of petition. [THIS THE EQUATION OF THE PETITION CLAUSE PLACING A DUTY ON THE COURTS JUST AS TUTUN EXPLAINS HOW NATURALIZATION IS A CASE UNDER THE JURIOSDICTION OF THE COURTS ART.3 SEC.2]

PAGE 11 PARAGRAPH 1: I should regard the exclusion of petitions from the consideration of the House as a highhanded invasion of the imprescriptible rights of the Constituency of the country, of whom we are the representatives, not the dictators ; and it is for that reason I take my stand against it on the very threshold.

# SPEECH

OF

# MR. CUSHING, OF MASSACHUSETTS,

ON THE

# RIGHT OF PETITION,

AS CONNECTED WITH PETITIONS FOR THE

# ABOLITION OF SLAVERY AND THE SLAVE TRADE

IN THE

# DISTRICT OF COLUMBIA:

IN THE HOUSE OF REPRESENTATIVES, JANUARY 25, 1836,

---

WASHINGTON:

PRINTED BY GALES AND SEATON.

1836.

and extraordinary question of reception, going to the unconstitutional abridgment, as I conceive, of the great right of petition inherent in the People of the United States.

[The question, Shall this petition be received? was then, at the motion of a gentleman from South Carolina, (Mr. HAMMOND,) laid on the table; when Mr. CUSHING resumed the floor and said:]

I now present to the House a Petition signed by inhabitants of Amesbury, in the State of Massachusetts, among the subscribers to which are persons whom I know and avouch to be citizens of the United States. They pray for the abolition of slavery and the slave trade in the District of Columbia, and in the Territories under the jurisdiction of the United States. I make the preliminary motion that it be received; and, upon that motion, I proceed to express my views to the House.

Steering clear of all the inflammable matter intruded into these debates, gauging myself to the standard of the most absolute moderation, and resolutely tying down my thoughts to the real point in issue, what I propose to examine is the single naked question of the constitutional right of petition, as involved in the disposition of these petitions.

Looking into the Constitution I find, among the amendments proposed by the Congress of 1789, and the very first of the number, the following article:

" Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press; or *the right of the People* peaceably to assemble and *to petition the Government for a redress of grievances.*"

Long before I had imagined that such a right would ever be called in question, I remember to have read the remark of a distinguished jurist and magistrate of the State of Virginia, (Tucker's Notes on Blackstone,) complaining that the concluding words of the clause I have cited from the Constitution did not so strongly guard the great right of petition, as the liberties of the People demanded. On the other hand, a still more distinguished jurist and magistrate, of my own State, (Story's Commentaries,) in remarking upon the same article, expresses the opinion that it is ample in terms; because, he adds, "It (the right of petition) results from the very nature of the structure and institutions of a republican government; it is impossible that it should be practically denied until the spirit of liberty had wholly disappeared, and the People had become so servile and debased as to be unfit to exercise any of the privileges of freemen." These eminent constitutional lawyers agreed in opinion of the importance of the provision: they differed only in thinking, the one, that the right of petition could not be too clearly defined; the other, that whether defectively defined or not in the letter, the People would take care that it should in spirit be faithfully observed. While the first entertained a wise jealousy of the encroachments of the People's representatives, the other looked for the protection of the public rights to the People themselves, the masters of the People's representatives. And as the fears of the former have been verified too speedily, I trust that the hopes of the latter will be not less truly realized.

There are some things in the context and phraseology of this article of the Constitution, which may deserve attention. It speaks of " *grievances*" in the general; not " *their* grievances," the *personal* grievances

of the individuals petitioning, but anything, public or personal, which they deem to be a grievance. It is the same article, which allows to us the free exercise of our religion, and the liberty of speech and of the press. With these primary and fundamental rights of a free people, it associates the right of petition. But there is this peculiarity in the language of this clause of the Constitution. The words applicable to our subject are, " Congress shall make no law abridging the right of the People to petition the Government for a redress of grievances." The right of petition, therefore, is not a privilege conferred by the Constitution. It is recognised as a pre-existing right, already possessed by the People, which they still reserve to themselves, and which Congress shall not so much as touch with the weight of a finger. The People, in their constitution, say to Congress,—We place in your hands our right and power of collecting a revenue to provide for the common defence and general welfare of the Union ; our right and power to regulate commerce, to coin money, to declare war, and to raise and support armies and navies for its prosecution. Upon these and other subjects you may exercise the discretion, which we repose in you by virtue of our constitution. But this you shall not do :—you shall not, until after the expiration of twenty years, prohibit the migration or importation of such persons as we think proper to admit ; you shall not pass any bill of attainder ; you shall not lay any tax or duty on exports ; and you shall make no law prohibiting the free exercise of religion, or abridging the freedom of speech or of the press ; or the right of the People peaceably to assemble and petition the government for a redress of grievances. These our great natural rights we keep to ourselves ; we will not have them tampered with ; respecting them we give to you no commission whatsoever. And rights which Congress itself, the entire Legislature, consisting of the President, the Senate, and the House, acting in their combined functions in the enactment of a law, is forbidden to abridge,—can this House alone undertake, by a mere resolution or vote, practically to deny, abolish, and destroy ? Sir, if we can successfully do it, I have greatly misconceived the democratic ancestry, the democratic principles, and the democratic energy of the People, whom we are appointed to serve in this House.

The right of petition, I have said, was not conferred on the People by the Constitution, but was a pre-existing right, reserved by the People out of the grants of power made to Congress. To understand its nature and extent we must, therefore, look beyond and behind the Constitution, into the anterior political history of the country.

And, in the first place, I beg of the House, and especially of the gentlemen who so ably represent Virginia on this floor, to remember how this article found its way into the Constitution.

You well know, sir, that when the Constitution was submitted to the People of the respective States for their adoption or rejection, it awakened the warmest debates of the several State conventions. Some of them, in accepting the proposed plan of government, coupled their acceptance with a recommendation of various additions to the Constitution, which they deemed essential to the preservation of the rights of the States, or of the People. The Commonwealth of Massachusetts insisted, among other things, on the adoption of that memorable amendment, to the effect, " that it be explicitly declared that all powers not expressly

to do that which they may freely do in the monarchy of England, having no guaranties for the public liberty except laws and prescriptive usages, all of them confessedly at the will of an omnipotent Parliament? Forbid it, reason! Forbid it, justice! Forbid it, liberty! Forbid it the beatified spirits of the revolutionary sages, who watch in heaven over the destinies of the Republic!

Aye, but, say gentlemen, if such things are not done by the representatives of the People in monarchical England, they have been done by their representatives in democratic America. We are told of precedents at home. What are those precedents?

To begin, I throw aside, as wholly inapplicable to the question, or at least as evasive of it, the case of petitions refused on account of disrespectful language towards the persons or the body petitioned. Those constitute a standing exception, independent of the merits of the subject.

The proceedings of this House in 1790, in reference to petititions on the matter of the slave trade, and of slavery in the States, have been cited. It has been said that those petitions were not received. That is a mistake, as any gentleman may satisfy himself by recurrence to the journals of the House. The petitions were received, committed, and debated on report, as I shall have occasion hereafter to state at length.

One other case is cited, that of the petition of Vicente Pazos, agent of New Granada, which, in the year 1818, the House refused to receive. But the printed debates of that day show clearly the ground of rejection. Mr. Forsyth moved that it be not received. "He stated that, as the petitioner was the agent of a foreign power, and applied to Congress as an appellate power over the Executive, he thought it improper that he should be thus heard." And the question was decided upon this single point. I heartily approve the remarks then made by a distinguished statesman, now no more, who at that time represented Massachusetts on this floor.

Mr. Mills, of Massachusetts, said that "the right of petition was a sacred one, and belonged equally to the meanest and the greatest citizen in the nation; and if such a petition as this, implicating the conduct of the Executive, had been presented from the meanest citizen, he would receive it; and if it complained of grievances without pointing out redress, it would be the duty of the House to give the proper redress; but it was to our own citizens only he would turn this listening ear. What right had a foreign subject to petition this House?"

Sir, I have incidentally touched upon the argument of precedents, and shown how untenable it is; but I care not if there were a thousand precedents of refusal to receive petitions. Such a fact, if it existed, would not abate my zeal on this point, or shift, in the minutest degree, my position. Upon the Constitution, upon the pre-existing legal rights of the People, as understood in this country and in England, I have argued that this House is bound to receive the Petition under debate. It is impossible, in my mind, to distinguish between the refusal to receive a petition, or its summary rejection by some general order, and the denial of the right of petition. I have no such microscopic eye as to enable me to discern the point of difference between the two things. This procedure may be keeping the word to the ear, but it is breaking it to the sense: and I go upon general, abstract, original, fundamental principle, the

great principle of democratic liberty, which is the foundation stone of this Republic. It is for the sacred and inalienable rights of the People that I here contend. I should regard the exclusion of petitions from the consideration of the House as a highhanded invasion of the imprescriptible rights of the Constituency of the country, of whom we are the representatives, not the dictators; and it is for that reason I take my stand against it on the very threshold.

Sir, I am a republican; and I desire to see this House observe the principles of that democracy which is ever on the lips of its members, and which, I hope, is in their hearts, as I know and feel it is in mine, and mean it shall be in my conduct. This Republic was called into being, organized, and is upheld, by a great political doctrine. That doctrine is, that the People alone are supreme; that they are the fountains of power; that all magistrates are the delegated agents of the People, for the purposes limited and prescribed in their letters of appointment, and the general laws of the land; that the constituents of a member of this House have the right to give instructions to him individually; and that every individual one of the People has a right to be heard by petition on the floor of this House. These are among the things which I understand to constitute the principles of democracy: those general principles, which I learned in my boyhood with my catechism, in the bill of rights prefixed to the constitution of my own State; which, on maturer study, I have seen to be avowed more or less distinctly, in all the constitutions of this Republic, and of each of its constituent Republics; which I perceive to be defended and applauded in the writings of the great text authors of political science in modern times; and which, after being for the first time practically exemplified in our own institutions, have gone forth over the universe, toppling down thrones, and raising up freemen, through all the nations of Christendom.

And whilst I feel impelled by such convictions to resist the summary rejection of this Petition upon principle, I am irresistibly led to the same conclusion by considerations of policy and expediency. I deny that such considerations should decide the question; but seeing they have been urged into it, I shall concede to them all due respect.

We have been told that the prayer of the Petition is for a thing which the Constitution does not permit to Congress, and so the petition itself should not be received. I ask of the House how it appears that we have no right by the Constitution to legislate upon the subject-matter of the Petition? It may be so; and it may not. One member of the House has earnestly averred that it is; another that it is not. Which of them is right? I confess, for myself, that I cannot think it becomes the House to decide either way, upon the mere *ipse dixit* of individual members. Besides, the Petition calls in question not only slavery, but also the *commerce in slaves*. And will any gentleman affirm that the slave trade of the District is among those holy things which Congress may not constitutionally handle? Is this District set apart by the Constitution, under whatever changes of opinion or fact the progress of civilization may introduce, to be unchangeably and forever a general slave market for the rest of the Union? I confess that I, again, am disappointed in that, among all the confident things said in denial of the con-

39

# EXHIBIT

**FOR THE 28TH CONGRESS 1ST SESSION, THE CONGRESSIONAL GLOBE:**

The following pages reference the discussions of the petition right and they are intermingled with a large amount of deviation that argues not about the gag rules but about the south and their tyrannical idiocies of debased threats without an ability to present an argument against the petition right.

The pages of reference I think relevant are following:

65 contains an argument that starts a form and then deviates from it to argue against abolishment of slavery.

66 references the checks and balances of our government (black lined), to which a petition not recorded is no check mechanism nor a recording mechanism of the people to balance the deficiency (the power of speech and press, are no proper or permanent recording mechanism of the government, the petition right in permanent recording is that system)

67 a reiteration of the gags of past and a continuance of redirects while professing the petition right has not been infringed, because the subject has been responded to: affirming the duty that petitions are entitled to responses...

The arguments against abolishment petitions continue untill page 74 all failing to recognize that the purpose of recorded petitioning is to show a reasoning and support for an assertion, that without the recording, the petitioning right is abridged...

81 The issue is again brought .. Mr. Wright also fails to comprehend the previous stated purpose of the petition clause in recording the grievances to show the intent of the people and prevent any subversion of the power of the people to see the grievances of their fellow American and seat representatives who will redress the grievances they deem important.. The difference between a totalitarianism of party rule over the people and a true democratic republic.

83 Mr. Wright recognizes the purpose and says he has mixed feelings.

In one of the speeches from a democrat, They assert that every member but Adams voted for a gag rule in the previous session, in 27th regular and special I could not find it in voter rolls or speeches, I believe the instance is another of southerner perversions of truth and principles, a tactic to what ends I can not say.

40

83 Mr. Saunders also attempts confusion of the republican principle of transparency and accountability (checks and balances) the petition clause and how repeated recording serves the peoples review of the works of their representatives. Ends on 86

95 Mr. Johnson continues to page 98 again never showing any arguement against the principle duty of recording a petition to create the checks and balances of republican government in transparency and accountability

113 Mr. Bidlack talks of reasonableness and states only questions and considerations while stating that some restrain on petition rights duties imposed is the question, he does not give argument to show the recording mechanism of petition admittance to the records is not a historical practice to create transparency and accountability, he ends on 115..

117 Mr. Payne acknowledges the great right of petitioning and then states how he believes it exists, where the south again equates the remedy ability of the petition: can they make a remedy, if the constitution does not allow the federal to say what a state can do, they can not abolish slavery and there is no remedy.. This point errors because the purpose of our government is to create remedies and the federal did abolish slavery (This would be like if the judiciary said we can not record your rules recommendations nor petitions asking change because we can see no ability to remedy your complaints that; we designed and implement rules and procedures and precedent that completely eliminates the ability of the poor and middle class to use the tools of discovery to litigate, where a filing cost $400+, a pair of depositions can cost $1000 or more, making the tool inaccessible... litigation impossible... But not only can this court change its rules like slavery was abolished, its petition duty falls under the same principle, recordation to facilitate the transparency and accountability a republican government of the people demands.) second he argues inexpedient, the duty of recordation is all that is argued of the courts duties.. Third he expects as the southerners did that the petition be respectful, which abridges the right by ignoring the petitioner is only responsible for illegal acts in petitioning.(Mr Cushing exhibit says even the offensive petitioner has a right.)

4)

118 he mentions the laws regarding slavery and Supreme Court Tanney the DredScott Chief, and attempts to equate the inability of the constitution to effect the right of slavery, and no petition right exists where no remedy can be given, clearly he was wrong. So too is the courts duty in recording.

172 Mr. McCauslen: The power rests in the people and they cloth congress in it. Let the facts lie with the people and they will act right... The representative draws from info I dont have, he questions the right to limit petitioning and asks both sides to determine where the best good is done while questioning the constitutionality of their acts, I find only affirmative of the duty of government (this court) to record petitions.

174 Mr. Rhett: Fails to understand that the very Historical instances he and the scholars he quotes, are recorded by a liberty, That the petition right of hundreds of years was a duty of formal recording of grievances, in courts who referred to privy counsels when they could not act, and petitions to the king... all acts of petitioning the founders understood as dutied to be recorded. Or the history of the good and bad of the government could not be measured in a reliable practice... That the very formal duty their fathers understood and J.Q. Adams and Cushing understood seems unknown to the man.. He attributes a petition to a bill or resolution (which demands recording) and then goes on to do as the other southerns do and denounces the authority of the right to abolish or the right to petition as a control mechanism of the people to remedy grivances outside the governments control..

179 Mr. Johnson again and on 180 if I understand correct, the gag rule is discontinued

240 Mr. Campbell: Cites the very tyrannical acts of Britan as reason why the Congress should be allowed to limit what form of petitioning is permitted, stating the dangers of recording the peoples petitions by show of other nations, always failing to understand the connection between the petition clause and the accountability the people demand, the public record as the historical again being overlooked as the only permanent mass distributed accounting of the peoples grievances, media then and now is prone to opinion and omission and distortion and greed and cowardice. The assertions of these politicians reiterate perspectives, but fail to consider the purpose of the mechanism of recording.

42

258 Mr. Stiles: also equates nonsensical attestations that the gag rule is necessary, and professes the right to own slaves, but fails to argue against the purposes of the petition clause. Ends 262

290 Mr. Winthrop: Makes assertions that Habeas corpus is not a right if petitioning is not a right and that if habeas is not to be decided upon it is not a right.. Then he goes on to argue for the petition right seemingly and on page 291 third tract states clearly the importance of recording in order to ensure a recounting (where memory of men...) and furthers the agreement of the recording duty, stating the founders would never have denied review of a petition and By far he is the best democrat argument that a petition can not be denied in its recording. It shows the courts duty, That the presentment place and time is not relevant because that would also abridge the recognition and the duty, That the duty of congress has not been upheld in their recording duty (the generic reply a mockery of an Americans rights, how to resolve the massive amount of petitions is not here argued but this court can expect that as I live I am drafting a civil claim to require the congress to reinstate presentment duties. respectfully).

315 Mr. Rogers: at 318 continuing for the petition right argues that the government [as this courts function as a recording and redressing service of the people,] it is not capable of denying the right to petition, for the very reason the founders made their deceleration of independence, that no such deprivation of the petition right would be considered or it would be abridgement.

591 Mr. Severance: Discusses slavery abolishment not the gag rule.

652. Mr. Giddings: argues for slavery as a right of the constitution and barely touches the gag rule.

This ends the 28th 1st session and on Dec. 3rd 2nd session the Gag rule is officially ended.

# APPENDIX

TO

# THE CONGRESSIONAL GLOBE,

FOR THE

## FIRST SESSION, TWENTY-EIGHTH CONGRESS:

CONTAINING

## SPEECHES AND IMPORTANT STATE PAPERS.

### VOLUME XIII.—PART 2.



BLAIR AND RIVES, EDITORS.

CITY OF WASHINGTON:
PRINTED AT THE GLOBE OFFICE, FOR THE EDITORS.
1844.

64        APPENDIX TO THE CONGRESSIONAL GLOBE.        Jan. 1844.

28TH CONG.....1ST SESS.        *Abolition Petitions—Mr. Belser.*        H. of Reps.

which rejects abolition petitions; and on the amendment offered by Mr. BLACK, of Georgia, to recommit the said report to the committee, with instructions to reinstate the rule in their report.

TWENTY-FIRST RULE.

"No petition, memorial, resolution, or other paper, praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave-trade between the States or Territories of the United States in which it now exists, shall be received by this House, or entertained in any way whatever.

"January 28, 1840."

Mr. BELSER rose, he said, to address the House on a subject which, in his opinion, was by far the most important that had been submitted for its consideration during the present Congress. He trusted that he should be able so to govern himself as to discuss it deliberately, and with reference to the great interests which were at stake. He desired, then, before he proceeded further, to state the question precisely as it was, that he might be able to take a correct view of it.

He understood, then, that the Select Committee on the Rules of this House, had introduced a report, in which the rule on the subject of abolition petitions, heretofore called "the 21st rule," was omitted. He also understood that, after the report was presented to this House, there was a proposition made by the gentleman from Virginia, [Mr. DROMGOOLE,] to recommit that report back to the committee, that a more full attendance might be had, and another report be made. The gentleman from Georgia [Mr. BLACK] had gone one step farther, and had proposed so to amend the motion of the gentleman from Virginia, [Mr. DROMGOOLE,] as to instruct the committee to report back to the House the rule which had been stricken out. That was just what he desired; and to those gentlemen who talked about economizing the time of the House by sending the report back to the committee without instructions, he would say that there was not one member on that floor that was not now as well prepared to vote on this momentous question as he would be when they had obtained a *second* report from the committee.

The gentleman from North Carolina, [Mr. CLINGMAN,] in the course of his remarks, which he made a few days ago, seemed to be of opinion that the correct course for the South to pursue was to receive these petitions, and to do nothing more with them. If he was not greatly mistaken, this House had, years ago, vainly attempted to make such a disposition of them; and the plan which the gentleman suggested would be but to resort again to that remedy which had been tried, and found ineffectual. He would tell the gentleman from North Carolina that, in his opinion, there was but one plain course to be pursued; and, as a Southern Representative on this floor, the question with him was, *the* rule, or *no* rule. That was his idea on this subject. If they could not have constitutional guaranties—if it was once admitted that these petitioners had the right to have their petitions brought into this hall—he would say, let us have no rule. Did gentlemen suppose that abolitionists would be content with having their petitions laid upon the table, without further action on them? No. Whenever they could thus triumph, they would next insist that they be referred, reported on, and debated; and thus, step by step, this House would be driven, like so many mariners on a tempestuous ocean, without either chart or compass. There was but one security for Southern gentlemen; and that was, to contend for the rule which was now in force; for, from the moment they surrendered to these people the right to have such petitions recognised here, from that moment they could place *no limitation* on their acts. If the rule rejecting these petitions is to be abolished, this House had better have no rule at all in regard to them. If they are to be received, let a majority control them; and, by this means, we would rid their authors of one of their principal elements of agitation—to wit, "the right of petition"—and, for the future, have presented by them only the *isolated* question of the abolition of slavery.

He was satisfied that he should be able to show, by authorities which could not be controverted on this floor—by English and American precedents—that this thing called "the right of petition," which gentlemen held so sacred, existed, in a great degree, in their own imagination. That they might arrive at correct conclusions, they must go back to that period when the Constitution of the United States was adopted; they must look at matters as they then stood; they must look to the mischief

which was to be guarded against, and to the remedy provided for it. He read to the House a clause of the Constitution, being the first article of the amendments to that instrument:

"Congress shall make *no law* respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the Government for a redress of grievances."

How came this amendment to be made to the Constitution? was the first inquiry to which the attention of this House should be directed. Mr. Story, in his Commentaries on the Constitution, says: "the provision was probably borrowed from the declaration of rights in England, on the revolution of 1688, in which the right to petition the King for a redress of grievances was insisted on; and the right to petition Parliament, in the like manner, has been provided for, and guarded by statutes, passed before as well as since that period."—(See Story's Commentaries, abridgment, page 707, sec. 999.)

He would now commence the examination of English history; for he wished to bring the attention of the House to the reasons which induced the framers of the Constitution to introduce this provision into that instrument. The gentleman from South Carolina [Mr. RHETT] had yesterday enumerated some of the cases which gave rise to that particular clause in the Constitution. The learned gentleman had read from Hawkins's Pleas of the Crown, in regard to the "riot act," and cited case after case, and precedent after precedent, in order to fortify the position he had assumed before this honorable body. This "riot act" was in force at the time of the American Revolution, and hundreds had been maimed and murdered under the sanction of that very act; and it was this, in connexion with other outrages, which induced the framers of the Constitution to incorporate this clause, respecting "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

He would now read to the House, from a very able report of the Senate of New York, made in 1839, to show what it was that led to the adoption of the English bill of rights in 1688, and which, he contended, gave rise, also, to the first amendment of the Federal Constitution.

The report states: "To prevent the people from assembling and discussing these grievances, severe laws were made against what the minions of power might deem a 'riot,' 'rout,' or 'unlawful assembly.' Even at common law, where a number of persons, from three to eleven, are concerned, fine, imprisonment, and the pillory are awarded."—(Hawk. P. C. 159.)

"By the Stat. 13, Hen. IV, c. 7, any two justices, together with the sheriff, may come with the *posse comitatus*, and suppress any such riot, assembly, or rout, arrest the rioters, record on the spot the circumstances, and which record alone shall be a sufficient conviction of the offenders. And any murdering or killing of the offenders was held to be justifiable."

"The riotous assembling of twelve person, or more, and not dispersing upon proclamation, was made high treason.by Stat. 3 and 4, Edw. VI, c. 5; but repealed Stat. 1 M., c. 1. But this offence was again made felony by 1 M., stat. 2, c. 12, and by 1 Eliz., c. 16, at the termination of whose reign the law expired. It was, however, revived and made perpetual by 1 Geo. I, c. 5, which enacts, that if any twelve persons are unlawfully assembled to the disturbance of the peace, and any one justice of the peace, sheriff, under sheriff, or mayor, shall think proper to command them, by proclamation, to disperse, if they contemn his orders and continue together for one hour afterwards, such contempt shall be felony, without the benefit of clergy. And if the reading of the proclamation be by force opposed, or in any manner wilfully hindered, such opposers and hinderers are felons without the benefit of clergy; and all persons concerned, knowing of such hindrance, and not dispersing, are felons without the benefit of clergy. And the act indemnifies the officers and their assistants, if they kill any of the assemblage in endeavoring to disperse them. Thus a king's officer, if he adjudged his Majesty's peace would be disturbed by a discussion of public grievances, might, 'if he should think proper,' read the proclamation, and order the assemblage to disperse; and, if they did not obey the mandate in one hour, they were felons, and the officer and his assistants, or soldiers, might resort to

the *ultima ratio regum*—the regal logic of balls and bayonets."

"For a long period in English history, individuals were liable to be arrested, imprisoned, and severely punished, for having signed their names to a petition.

"To subscribe a petition to the King, to induce him to change his measures, intimating that, if denied, many thousands of his subjects will be discontented, &c., is included among the contempts against the King's person and government, and is punishable by fine and imprisonment."—(Hawk. P. C. 60.)

"By the stat. 13, Charles II., stat. 1, c. 5, no petition to the King, or either House of Parliament, for any alteration in church or state, shall be signed by above twenty persons, unless the matter thereof be approved by three justices of the peace, &c.; nor shall any petition be presented by more than ten persons at a time, on pain, in either case, of incurring a penalty not exceeding £100 and three months' imprisonment."

"In 1641 a petition, or protestation, was drawn up and signed by twelve bishops, addressed to the King and House of Lords, which set forth that, though they had an undoubted right to sit and vote in Parliament, yet, in coming thither, they had been menaced, assaulted, and affronted; and could no longer, with safety, attend their duty in the House; and they protested against all laws, votes, and resolutions, which should pass during their constrained absence from the House. For having sent this petition, or protest, they were sequestered from Parliament and committed to prison, and tried for high treason."

"After the popular current had turned strongly against Charles the 1st, in 1642, 'all petitions,' says Hume, 'which favored the church or monarchy, from whatever hand they came, were discouraged, and the petitioners were sent sent for, imprisoned, and prosecuted as delinquents.' "—(3d vol. p. 567 see also Clarendon, vol. 2, p. 449.)

"But the most violent persecutions were carried on against individuals of all descriptions, high and low, for having dared to put their names to petitions during the reign of James II. In 1688, this monarch published a declaration of indulgence, as it was called, and subjoined an order that, immediately after Divine service, it should be read by the clergy in all the churches. Six prelates however, with the primate, presented a petition to the King, beseeching that he would not insist on their reading the declaration. 'The King,' says Hume, 'was incapable of yielding, not only to the greatest opposition, but of allowing the slightest and most respectful contradiction to pass uncensured. He caused the bishops to be committed to the tower; and the crown lawyers received orders to prosecute them for the seditious libel, which it was pretended they had composed and uttered. They were tried, and, against all the influence of the court, were acquitted by the jury. When the wished-for verdict, *not guilty*, was pronounced, the intelligence was echoed through the hall, was conveyed to the crowd without, was carried into the city, and was propagated with infinite joy throughout the kingdom.' "—(Hume's Hist. Eng. chap. 70. Consult, also, the State trials and proceedings in star chamber.)

These (Mr. B. contended) were the cases of oppression which gave rise to the bill of rights in England in 1688; and by that bill of rights, and the statutes enforcing it, no further "prosecutions" were allowed against those "who petitioned the King." All these acts of tyranny above enumerated were pronounced to be unjust towards the subjects of that country; and the *remedial* act of Parliament further declared "that it is the right of the subject to petition the King; and all commitments and prosecutions for such petitioning are illegal." This act, then, only exempts petitioners from "all commitments and prosecutions for such petitioning." It does not say that, when they petition, their petitions are to be received.

He would now show, from other authorities cited in the same report, that, before and after the adoption of the English bill of rights, petitions were rejected by Parliament; and this he would do in support of the view already advanced—that the English bill of rights was intended only to do away with "commitments and prosecutions," and not to vest any authority in those who might see fit to petition Parliament, to have their petitions considered. And he would then cite the House to certain precedents in the legislation of this Government, wherein petitions have been rejected by each branch of the Na-

Jan. 1844.                    APPENDIX TO THE CONGRESSIONAL GLOBE.                    65

28th Cong.....1st Sess.                    *Abolition Petitions—Mr. Belser.*                    H. of Reps.

tional Legislature, since the adoption of the first article of the amendments of the Constitution of the United States—the American bill of rights.

"1643. The assembly of divines presented a petition to the Lords, setting forth 'the daily increase and growth of all manner of outrages and intolerable abominations—such as drunkenness, swearing, uncleanliness, and other crying sins;' and praying for the speedy appointment of some able, godly, and prudent magistrates." No notice was taken of the petition.

"1643. The University of Cambridge petitions the Lords and Commons, setting forth, 'how, in our colleges, our numbers grow thin, and our revenues short; how, frightened by the neighboring noise of war, our students either quit their gowns or abandon their studies; how our degrees be disesteemed,'" &c.; and praying for some relief. No notice was taken of the petition.

"1648. A petition to the Commons from 'thousands of well-affected persons inhabiting the city of London, Westminster,' &c., praying that 'laws should be made for the election of representatives yearly; that trade should be freed from monopolizing or engrossing, by companies or otherwise,' &c. No notice taken of the petition. Subsequently, there was a petition from the same petitioners, asking for an answer to their first petition. This, also, not noticed in any manner."

These cases of the rejection of petitions (Mr. B. said) occurred in England prior to the bill of rights in 1688. Now, what took place in regard to the same matter, in that country, after the granting of the said bill of rights?

"1694, April 9. A petition was tendered to the House, relating to the bill granting duties upon the tonnage of ships; and the question being put, that the petition be received, it passed in the negative."

"1698, April 28. The same vote, on a petition against a bill laying a duty on pit coal."

"The same year, 29th and 30th of June, similar votes on other petitions, relating to duties upon Scotch linen and whale fins."

"1703. A vote not to receive the petition of the maltsters."

"1706, 21st December. *Resolved,* That this House will receive no petition for any sum of money, relating to public service, but what is recommended from the Crown."

"1713, June 11. The above is declared to be a standing order of the House."

Mr. B. then commenced citing the American authorities:

"A petition, or remonstrance, of the citizens of York, Pennsylvania, approving the removal of the deposites by the President, was presented to the Senate; and, on its being read, Mr. Clay objected to its reception; and on the question, 'Shall it be received?' it was determined in the negative.

"On motion of Mr. Preston, the yeas and nays being desired by one-fifth of the members—

"Those who voted in the affirmative were—

"Messrs. Benton, Brown, Forsyth, Grundy, Hendricks, Hill, Kane, King of Alabama, King of Ga., Lyon, McKean, Mangum, Morris, Robinson, Shepley, Tallmadge, Tipton, White, Wilkins, and Wright—20.

"Those who voted in the negative were—

"Messrs. Bell, Black, Calhoun, Clay, Clayton, Ewing, Frelinghuysen, Kent, Leigh, Moore, Naudain, Poindexter, Porter, Prentiss, Preston, Robbins, Silsbee, Smith, Southard, Sprague, Swift, Tomlinson, Waggaman, and Webster—24."

He would next institute an inquiry into the action of this House on the subject. He said that the Pinckney, the Patton, and the Atherton resolutions, had all been before the House; but that the standing rule to reject abolition petitions, now in force, must out weigh all of them, on the ground *"that later rules repeal all former ones."* He further stated that he had shown a standing order in England, not to receive any petition "for any sum of money relating to public service, but what is recommended from the Crown," long after the bill of rights was had in that Government; that, in connexion with this, he had produced a precedent from the American Senate, the most august legislative tribunal on earth, and also a "standing rule" of this House, now in force, rejecting petitions; and to show how these precedents should be considered, he would read from Story's Commentaries on the Constitution, (Abridgment,) page 137, sec. 185:

"And, after all, (says the learned author) the most unexceptionable source of collateral interpretation is from the practical expositions of the Government

itself, in its various departments upon particular questions, discussed and settled upon their own single merits. These approach the nearest, in their own nature, to judicial expositions; and have the same general recommendation that belongs to the latter. They are decided upon solemn argument, *pro re nata,* upon a doubt raised—upon a *lis mota,* upon a deep sense of their importance and difficulty in the face of the nation, with a view to present action, in the midst of jealous interests, and by men capable of urging or repelling the grounds of argument, from their exquisite genius, their comprehensive learning, or their deep meditation upon the absorbing topic."

[Here he was cut off by the morning hour.]

On the ensuing day—to wit, the 13th instant—Mr. BELSER again took the floor and concluded his argument, which he commenced on yesterday. After a brief recapitulation of what he had already stated to the House, he said that the next question which he wished to bring to its attention was, as to what was the matter contained in the English bill of rights; because, if, by comparing it with the first amendment of the Constitution of the United States, it was found that they were nearly identical—that the reasons which induced the granting of the bill of rights in England, and that which caused the adoption of the amendment of the American Constitution, were the same—then the same reasoning must govern in this case. Mr. B. read from the grievances which were complained of, and showed that it was by *"prosecuting* those who petitioned the King," and also from the act of Parliament, in aid of the bill of rights, "that it is the right of the subject to petition the King, and all commitments and prosecutions for such petitioning are illegal." He contended that the object in adopting the bill of rights, was to keep the subject "from commitment and prosecution." And if gentlemen would take the trouble to examine authorities on this point, they would find, that there was not one solitary loop to hang a doubt on. The right of petition, which was secured to these parties, was not what gentlemen contended for; it did not authorize them to have petitions received, independent of the will of Parliament. Mr. B. again read from that amendment of the Constitution providing that "Congress shall make no law abridging the right of the people *peaceably* to *assemble* and to petition the Government for a redress of grievances," &c. The object of the amendment was to secure the people of this country in *assembling together,* to petition for the redress of grievances; and no other object had been intended by it. It was to put down everything like the "riot act," and scrupulously to guard against such unmitigated oppression in this free Government. And by way of strengthening this position, he would further state, that, when the Constitution of the United States was under consideration, a bill of rights was strongly contended for at that time, and that it drew forth from Mr. Hamilton, in the 84th No. of the Federalist, page 393, the following cogent observations:

"It has been (said Mr. H.) truly remarked that, bills of rights are, in their origin, stipulations between Kings and their subjects, abridgments of prerogative in favor of privilege, reservations of rights not surrendered to the prince. Such was the *Magna Charta* obtained by the barons, sword in hand, from King John. Such was the subsequent confirmation of that charter by succeeding princes. Such was the *petition of right* assented to by Charles 1, in the beginning of his reign. Such, also, was the declaration of rights presented by the Lords and Commons to the prince of Orange in 1688, and afterwards thrown into an act of Parliament, called the bill of rights. *It is evident, therefore, that, according to their primitive signification, they have no application to constitutions professedly founded upon the power of the people, and executed by their immediate representatives and servants. Here, in strictness, the people surrender nothing; and, as they retain every thing, they have no need of particular reservations.* We, the people of the United States, to secure the blessings of liberty to ourselves and our posterity, do *ordain* and *establish* this Constitution of the United States of America. This is a better recognition of popular rights than volumes of those aphorisms which make the principal figure in several of our State bills of rights, and which would sound much better in a treatise of ethics than in a constitution of government."

The prohibition in the Constitution is, "Congress shall make no law abridging the rights of the people peaceably to assemble," &c. In what tribunal was the law-making power *vested* in this country?

He again quoted from the Constitution—article 1, sec. 1:

"All legislative powers herein granted, shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

Again: "Every bill which shall have passed the House of Representatives and the Senate, shall, before it become a law, be presented to the President of the United States; if he approve it, he shall sign it; but, if not, he shall return it, with his objections, to that House in which it shall have originated, who shall enter the objections at large, and proceed to reconsider it," &c. (See Constitution, 1st article, section 7.)

This House, then, of itself, could make no "law." It had to pass both branches of the National Legislature, and be approved by the President, to become a "law;" unless, in case of refusal on the part of the President to sign it, two-thirds of each House shall agree to pass the bill. The "21st rule" of this House, then, is not a "law" of Congress, but a "rule" of one branch of it. There was another clause of the Constitution, which says, that "each House may determine the rules of its proceedings." When this House adopted this "rule," did it not "determine the rule of its proceedings?" and was not the power more clearly given than the right to send petitions into this hall against the will of its members? But, independent of this constitutional provision, it was inherent in this body to protect itself in such a manner as to expedite the public business of the country. As to this right of petition, the thing depended upon volition; in the language of another: *"The right to petition on the subject of abolitionism is no more sacred than the right to petition on any other subject. The right to refuse to petition on any subject, is as sacred as the right to petition; the right to deny what is solicited by petition, as the right to petition; the right to refuse to read a petition, as the right to request its reading—the right to refuse to print, to refer, to debate, or to discuss a petition, as the right to solicit such printing, reference, or discussion."* The people out of this hall may petition; but their Representatives on this floor have just as much right to reject their petitions as they have to present them.

Mr. B. further said that there was another clause in the Constitution which guarantied every State in this Union from "domestic violence;" and that the daily agitation of the abolition of slavery in this hall had a tendency to excite "domestic violence" in the States, which was a flagrant and unjustifiable infringement upon that instrument; and that this House ought not, in good faith to the South, (which came into the Union under the broad mantle of the compromises of the Constitution,) to receive, or even entertain these abolition petitions. As a Southern man, he would have the "21st rule," or no rule at all. The Constitution gave this House the power to receive or reject petitions; and, no matter with him how other Southern gentlemen acted, his demand was, *the* rule or *no* rule—not a rule to *receive,* but a rule to *reject,* such petitions.

Mr. B. said he never listened to the venerable gentleman from Massachusetts [Mr. ADAMS] but with the most profound respect for his learning and his public character. He hoped he should always feel inclined to pay a proper respect to the gentleman's high standing in this Government. He was not so politically intolerant as to deny to him the free and unrestrained exercise of his opinions in this hall. When on the subject of abolition, he listened to him "more in sorrow than in anger." There was running in his veins some of the best revolutionary blood; and when Mr. B. had heard the venerable gentleman ask, a few days ago, whether or not the Declaration of Independence had left this hall, he had been forcibly struck with the idea that the gentleman's renowned ancestor was one of the men who spoke that memorable instrument into existence. He thought to himself, can the son, whose father took such a part in the history of those times, longer persist in the course which he is pursuing, and thus blot out a name which stood so pre-eminent in the galaxy of American statesmen? He appealed to him to desist from the course he was pursuing, which is fast hastening this Government to a crisis, and which will end in its dissolution. And, with all kindness towards the venerable gentleman, he (Mr. B.) would say, that he occupied the same position in relation to slavery in the plantation States, that his father did at the time he signed the Declaration of Independence, in the closest bond of union with slaveholders. Does the gentleman call that a grievance,

66 APPENDIX TO THE CONGRESSIONAL GLOBE. Jan. 1844.

28TH CONG......1ST SESS. *Abolition Petitions—Mr. Belser.* H. of Reps.

which was assented to by all the parties to the compact. It seemed to him that good faith on the part of the contracting parties requires them to carry out this compact of government in its *spirit* and *letter*. Suppose, said he, that the people of the South were to pour in their petitions into this hall, asking Congress to pass a law forcing slavery on the people of the non-slaveholding States: what, he would ask, would the abolitionists think of it? Would they say that the slaveholders had such a right? Would they declare the right to *beseech* on such a subject *inalienable*? No! he would venture to say, that the petitioners would be told that they had no right to ask for the passage of such a law; and yet the same compact which would prevent Congress from establishing slavery among the people of the North, guaranties slavery to the people of the South.

He heard the gentleman from New York, [Mr. BEARDSLEY,] a short time since, proclaim on this floor that slavery was "a great moral and political evil;" and that, by virtue of the power given in the Constitution of the United States to amend that instrument, in his opinion slavery could be abolished in this Government, and still the *integrity* of this Union be preserved. Hear the language of the gentleman:

"The Constitution (said Mr. BEARDSLEY) authorizes its own change and amendment, and declares the mode in which amendments may be made. This is not all: It also declares, in most explicit and emphatic terms, that amendments, when thus made, become valid, to all intents and purposes, as part of the Constitution. There is no limit to this power of amendment, which in any degree bears upon this question. Each and every part, with a few specified exceptions, may thus be changed and modified; and still the Constitution will exist, in all its plenitude of obligation and of power."

He would do the gentleman from New York the justice to say that he was opposed to the exercise of any such power *at present*. He would, however, tell the gentleman to "lay not the flattering unction to his soul" that slavery could be got rid of in this *peaceable* way; that, whenever the period arrived when a bill of that kind should pass the Congress of the United States, if Southern men remained on this floor after it, they would have to call "on the rocks and the mountains to hide them" from the indignation of their people. Yes, they would put a mark on that Representative who would remain in this hall after such an event, as *indelible* as that, which, in the *beginning* of the world, was placed on the *brow* of the *first murderer*. There was but one way of abolishing slavery; that was, by *disunion*—a word which comprehends within itself all our dangers. They could not get rid of it, or of the slave representation on this floor, except by the right of revolution; and whenever they attempted to exercise that extra-constitutional right to the destruction of Southern institutions, the hills which divide the slaveholding from the non-slaveholding States of this Union will soon become "*the dark hills of death; and the streams which flow between, like the waters of Egypt, will be crimsoned with blood.*"

He had recently understood that each of the two great parties in the State of New York were trying, by their papers in Albany, to see that their friends on this floor should have the credit of defeating this rule in the House of Representatives. What did this mean? Was it possible that those from the "Empire State" who had heretofore stood shoulder to shoulder with the South on this question, in this the hour of trial, were about to abandon her? He would not believe it as long as he could think otherwise. Were those papers of which he had spoken *catering* for the abolition vote? Was it essential to party success that these *incendiaries* should be courted? It really would seem so.

He proceeded to refer to some of the arguments of another gentleman from New York, [Mr. DAVIS;] with one portion of which he agreed, and with another portion he differed. He had understood the gentleman to say that he was opposed to the immediate abolition of slavery in this country, because, as soon as such an emancipation took place, his State would be overrun with a worthless population; but, at the same time, he [Mr. DAVIS] thought that Congress had the constitutional power to abolish slavery in the District of Columbia, because it did not rightfully exist here, as it did in the States.

[Mr. DAVIS here rose to explain, and stated that, in his opinion, slavery could not legally exist in the District of Columbia, or in any Territory of the United States; and he stated that opinion merely

that his votes on slavery in the District or any Territory might not be misunderstood. He held that slavery can only exist in a State, and by the laws of a State; but that Congress has no power to make or unmake slavery, in the States or out of the States; that the Constitution gave Congress no power to make or maintain slavery; that when the District of Columbia was ceded and accepted, slavery ceased by that act, by operation of law within it—because the Constitution gives no power to continue it; and Congress has no more right to make a slave, than to make a king, within the District. And so of the Territories. When ceded, all in them, however legal beforehand, ceased on the cession, that was inconsistent with the Constitution—the same as royal authority, and the like. All such things ceased to exist by operation of law; and, until Territories become States, they cannot have or make slaves. I hold [said Mr. D.] that the General Government has no power over slavery, in the States nor out of them, except as to runaways, &c.; and that it cannot make, or permit, in its districts or territories, one man to be a slave of one or many men, or one or many men to be slaves of one or many other persons."]

Mr. BELSER continued. He differed with the gentleman from New York [Mr. DAVIS] as to his construction of the Constitution. He believed that slavery, by virtue of the cessions from the States of Maryland and Virginia, had a constitutional existence in the District of Columbia. At the time of the adoption of the Constitution, the District of Columbia did not exist as a permanent seat of government, but it was a component part of the States of Maryland and Virginia. The Constitution authorized Congress to accept of these States territory not exceeding ten miles square, in which was to be located the Capitol of the Union; and, in the cessions from Virginia and Maryland, it was agreed that *their regulations should be and remain in full effect, until Congress should otherwise determine.* These laws have never been changed; they still remain operative; and Congress has continued to recognise them, as essential to the maintenance of the compromises of the Constitution.

He agreed with the gentleman, [Mr. DAVIS,] that no greater evil could befall the non-slaveholding States of the North than an immediate emancipation. And he went farther than the gentleman from New York; for he believed that neither *immediate* nor *prospective* liberation would benefit that portion of the Union. He asked gentlemen who were in favor of *immediate emancipation*, what was to become of this degraded population? Were they to remain in the South, and be a plague upon them, worse than the locusts of Egypt—or was there to be amalgamation laws passed in this country, and the two races be united? One or the other race must prevail. And would gentlemen receive our slaves at the North? The gentleman [Mr. DAVIS] had already said he should consider it as the greatest calamity that could come on that section, to have it flooded with these blacks; and well had he observed it.

While discoursing on this subject, he would ask other honorable gentlemen what had become of the *two thousand millions* of dollars raised from the great staple of the South, the product of slave labor? But a small portion of it had found its way into the national treasury, in payment for the public lands, while the increase of the slaves had added nothing to its wealth, *in the aggregate.* It did not remain in the South. If it did, they would be the richest people on the face of the globe; but, instead of being the richest, they were the poorest. By the silent operation of the tariff, of the banking system, and the system of exchanges, it had gone to build up the great cities of New York, Philadelphia, and Boston, and other large commercial places. What, then, he would ask gentlemen, was to be gained by abolishing slavery in the Southern States?

But (said Mr. B.) the principles laid down by the gentleman from New York [Mr. BEARDSLEY] in regard to the District of Columbia, goes further than Birney, or Gerrit Smith, or any other avowed abolitionist has ever gone, because, with emancipation, they are willing to pay for the slaves in the District; but the gentleman from New York claims the right for Congress to do it when disposed, without pay.

[Mr. BEARDSLEY explained, and said he did not say pay, but legislate on the subject.]

Mr. BELSER then turned his attention to the speech of the gentleman from New York, and read from it as follows:

"I shall not stop here [said Mr. BEARDSLEY] to inquire whether the States could abolish it, (slavery,) without providing remuneration to the slaveholder; that is a different question. That they have the power to do it, either with or without, is as plain as words can make it. And why should they not? Cannot they pass a law to do it? They may pay the master or not; but cannot they take the slave compulsorily from the master? Surely they can; *and that is enough to give Congress jurisdiction of the subject in this District.*"

He thought that this language of Mr. BEARDSLEY was without limitation; that it asserted everything which he was contending for, when the gentleman from New York explained to the House.

But, said he, if you have the right to legislate, you have the right to pay; there is no difference. And he took him on that ground. Where is the money to come from to pay? Out of the public treasury—from the revenue of the customs? There is where it must come from, if you pay at all, as the British Government has done. Are the people to be taxed to gratify the abolition fanatics?

But the gentleman contended for "exclusive jurisdiction" of Congress over the District of Columbia. There was a difference (said Mr. B.) between "exclusive jurisdiction" and "unlimited power;" and that was the error into which the gentleman had fallen. There were powers *forbidden*, and powers *not delegated*, in the Constitution; neither of which Congress could exercise. "Exclusive jurisdiction" could only be exercised by Congress within the *delegated* powers; and Congress could go no further than these limits, because the powers *not delegated* by the Constitution had been *reserved* to the respective States, and to the people. The Constitution says what Congress *may* do, and it says what it *shall not* do. It says Congress "shall pass no law granting a title of nobility, no *ex post facto* law, no bill of attainder," &c.; but if the gentleman's doctrine of "exclusive jurisdiction" is true to the extent for which he contends for it, Congress can perform all these functions within the District of Columbia.

The gentleman had also, in opposition to the decision of the honorable Speaker of this House, contended for the doctrine that, where a petition was presented, embracing matter which was legal and right, and other matter illegal and incorrect, this House was bound to receive it. By the way of testing the principle, let him suppose that a man wanted a deed of trust executed to him, and that he incorporated in it, with that which was fair, that which was fraudulent also: the rule of law was, that the penalty of the act should be the forfeiture of the whole of the right accruing under the instrument. This *principle* ran through all legal proceedings; and he defied gentlemen to point to a single authority to the contrary in the pages of the law.

They had been told that there were but few abolitionists in the non-slaveholding States. Mr. B. had been "a looker-on in Vienna" at some of their meetings, and he had made up his mind that the greater portion of the North considered slavery as a great moral and political evil. They of the South viewed it as justified by the laws of God and man; and when their preachers were excluded from the temples of the North—when they had recently seen, not a movement of a few scattered abolitionists, but the Legislature of Massachusetts—that renowned Commonwealth—desiring to have the basis of representation changed on this floor, he asked, (and he put the question emphatically to the Southern portion of this House,) what they were to expect upon this subject. The tempest was raging among them; and the abolitionists would never be satisfied until they had wrapped this Union in flames, and converted it into one vast Golgotha. He told gentlemen who were disposed to maintain the integrity of the Union, that there was but one way to do it, and that was to stand up and resist these incendiaries. "Nero fiddled while Rome was burning," but these abolitionists are more demoniac than Nero—they would *revel* while applying the torch to the temple.

Mr. B. said, as our forefathers formed it, he admired the Union. It was a Government, as it came from their hands, of compromises, of checks and balances—*one which had no model on the globe.* He had never yet seen the day when he was prepared "to calculate its value;" and he still, from his heart, desired that the time was far distant when it would fall into its original elements. It was instituted to preserve "life, liberty, and property;" to furnish an asylum for the oppressed of all nations; and, if let alone, well would it perform its office,

Jan. 1843.  APPENDIX TO THE CONGRESSIONAL GLOBE.  67

28TH CONG.....1ST SESS.  *Improvement of the Western waters—Mr. T. Smith.*  H. of Reps.

He belonged not to that number who scented danger in every breeze; still he would not be lulled into a fatal security, from the assurance given by gentlemen, that all they desired was to maintain the *inalienable* right of petition. For one, he could not stand on this floor and declare that "all's well." In *his* opinion, the dove had left the ark, *soon* to return without finding any resting place for the sole of her foot.

In conclusion, he admonished the House to beware of its action on this subject; and stated that if the crisis ever should come when the compromises of the Constitution as to slavery should be disregarded, the Potomac, on whose shores they now stood, might still continue to roll its waters to the ocean, but it would only be that the *spiritless* American might walk around the tomb of Washington, and mourn in sorrow over the last vestige of human liberty.

## APPENDIX.

### PINCKNEY RESOLUTIONS.
Offered Thursday, February 4, 1836.

*Resolved,* That all memorials which have been offered, or may hereafter be presented to this House, praying for the abolition of slavery in the District of Columbia; and also the resolutions offered by an honorable member from Maine, [Mr. Jarvis,] with the amendment thereto, proposed by an honorable member from Virginia, [Mr. Wise,] and every other paper or proposition that may be submitted in relation to that object, be referred to a select committee, with instructions to report:

That Congress possesses no constitutional authority to interfere in any way with the institution of slavery in any of the States of this confederacy; and that, in the opinion of this House, Congress ought not to interfere in any way with slavery in the District of Columbia, because it would be a violation of the public faith, unwise, impolitic, and dangerous to the Union; assigning such reasons for these conclusions as, in the judgment of the committee, may be best calculated to enlighten the public mind, to repress agitation, to allay excitement, to sustain and preserve the just rights of the slaveholding States, and of the people of this District, and to re-establish harmony and tranquillity among the various sections of the Union.

### PATTON RESOLUTION.
Offered December 21, 1837.

*Resolved,* That all petitions, memorials, and papers touching the abolition of slavery, or the buying, selling, or transferring of slaves in any State, District, or Territory of the United States, be laid upon the table, without being debated, printed, read, or referred; and that no further action whatever be had thereon.

### ATHERTON RESOLUTIONS.
Offered December 11, 1838.

1. *Resolved,* That this Government is a Government of limited powers; and that, by the Constitution of the United States, Congress has no jurisdiction whatever over the institution of slavery in the several States of the confederacy.

2. *Resolved,* That petitions for the abolition of slavery in the District of Columbia and the Territories of the United States, and against the removal of slaves from one State to another, are a part of the plan of operations set on foot to affect the institution of slavery in the several States, and thus indirectly to destroy that institution within their limits.

3. *Resolved,* That Congress has no right to do that indirectly which it cannot do directly; and that the agitation of the subject of slavery in the District of Columbia or Territories, as a means and with a view of disturbing or overthrowing that institution in the several States, is against the true spirit and meaning of the Constitution; an infringement of the rights of the States affected; and a breach of the public faith on which they entered into this confederacy.

4. *Resolved,* That the Constitution rests on the broad principle of equality among the members of this confederacy; and that Congress, in the exercise of its acknowledged powers, has no right to discriminate between the institutions of one portion of the States and another, with a view of abolishing the one and promoting the other.

5. *Resolved, therefore,* That all attempts, on the part of Congress, to abolish slavery in the District of Columbia or the Territories, or to prohibit the removal of slaves from State to State, or to discriminate between the institutions of one portion of the country and another, with the views aforesaid, are in violation of the Constitution, destructive of the fundamental principles on which the union of these States rests, and beyond the jurisdiction of Congress; and that every petition, memorial, resolution, proposition, or paper, touching or relating, in any way, or to any extent whatever, to slavery, as aforesaid, or the abolition thereof, shall, on the presentation thereof, without any farther action thereon, be laid on the table, without being debated, printed, or referred.

---

## SPEECH OF MR. THOMAS SMITH,
### OF INDIANA.
*In the House of Representatives, January 17, 1844—On the improvement of the western waters.*

Mr. Speaker: The question under debate has taken a wide range, and the anxiety expressed by some gentlemen around me to bring it to a close, almost deters me from the attempt to address you at this time. Sir, I would forego the opportunity your kindness has afforded me, if this was not a western question, and that I claim, emphatically, to be a western man. I voted for the previous question to bring this debate to a close; but it has just been voted down, and the question is again open. Under these circumstances, I hope to have the indulgence of the House, for a short time, to express my approbation of the proposition submitted by the honorable member from the Louisville district, Kentucky, [Mr. Thomasson.]

Sir, it is a proposition that I approve, and it is presented in that shape that I approve. It is presented to the House and this nation in the following words:

*Resolved,* That the Committee of Ways and Means be instructed to inquire what sum of money will be required to keep all the boats now in use, and those in the process of preparation, designed to be employed in removing obstructions to the navigation of the Mississippi river and its tributaries, in constant active employment for the national fiscal year commencing on the first day of July next, and that they report to this House the sum for that purpose in the appropriate appropriation bill.

Sir, this is a specific resolution, plain and to the point; it says what it means, and means what it says. I like it for what others may dislike it—I like it because it is specific and imperative. It assumes to stand upon its own merits, and upon its own merits it *should* stand; and, sir, that is the point of view in which I intend, for myself, to look upon all measures, and in no other way entertain any proposition asking the appropriation of public money. Objects of importance, sufficiently meritorious in themselves to commend them to public regard, are, perhaps, the only objects on which we should make appropriations of public money; and these should be specific and definite. I take it for granted that the constitutional question of power in Congress to appropriate money from the national treasury to improve the great western rivers, is a settled question. The Ohio, Mississippi, Missouri, and Arkansas, are looked upon as great national highways, that commend themselves, in the fullest sense of the term, to the care of the nation; and at which the strictest constructionist does not balk when called on to make appropriations. I apprehend that no other consideration weighs against appropriations on these rivers than the means out of which to appropriate. Sir, the tone of the speeches we have heard (and they have been many) would indicate a unanimous vote to appropriate money, and liberally, too, for the improvement of those great national thoroughfares. No man has spoken against them. No man has stated in his place that he would not go for them. No, sir; not one!

The effort of each has been to excel all others in celebrating them, their magnificence, their beauty, their length, their width, the country they water, its extent, its fertility, its productions—agricultural and commercial—and the character of the people that inhabit the mighty West. All these have shared largely in the eulogy from every tongue. Sir, such has been the character of this debate; and, strange as it may appear, while yet these honeyed accents are trembling upon their lips, the vote has been taken! Yes, sir, just now, not ten minutes since, upon the call of the yeas and nays, and the resolution adopted yesterday, without opposition, upon the motion of

the gentleman from Kentucky, is *reconsidered by a* decisive vote, and our fondly-cherished hope of success is again blown to the winds! But, sir, why is this so? This consideration I will pass for the present, and call the attention of gentlemen to the main point I had in view in rising to address the House on this occasion. I desire to obviate an objection to the adoption of the resolution, that I have heard made to it by some in the vicinity of my seat. It is objected, that it is imperative; that is, it *requires* the committee to report a bill. The only answer I have for this objection is, the friends of the proposition desire that it *shall* be imperative; and that the committee *shall* report a bill; and that this measure shall stand upon its own merits, believing it has merits to stand upon. We believe this proposition, like the great rivers we wish to improve, stands out in bold relief, and, on its merits alone, should commend itself to the whole House and the whole country.

The strongest and most plausible objection to the adoption of the resolution, as I conceive, is, that the resolution proposes no particular amount to be appropriated, but requires the committee to bring in a bill for a sufficient sum to keep the boats and force now in readiness, and in a state of preparation, actively employed operating on those rivers during the next "national" fiscal year. This seems to be an objection, as they say it may require a million, and perhaps more, to do what the proposition requires, and may compel the committee to report more than a due proportion of the money proposed to be expended under this head of appropriation, and largely exceeding the ability of the country, or state of the treasury, to supply. Sir, though I allow the resolution may admit of such a construction, and afford gentlemen a pretext to withhold their support, the objection is not real; and it could not exist if they had been attentive to the examination of the facts in relation to the actual amount required by this resolution. And for the purpose of setting gentlemen right upon this point, I call their attention to the reports of those officers in charge of these identical rivers referred to in the pending proposition. And, sir, allow me to remark, that I regretted, during the progress of this debate, that those reports were not referred to; and now regret they had not been brought to the notice of the House by others more capable of presenting them in all their force.

But, sir, as this has not been done by another, I beg to call the attention of the House to these reports. Doc. No. 2, 28th Congress, 1st session, page 214. In 1842, $100,000 was appropriated by Congress for building and repairing the necessary boats, and for carrying on the improvements of the Missouri, Mississippi, Ohio, and Arkansas rivers. Additional appropriations were made by Congress during their last session, viz: for the half year commencing on the 1st of January, and ending on the 30th of June, 1843, $50,000; and, for the new fiscal year, commencing on the 1st July, 1843, and ending on the 30th June, 1844, $100,000; making an aggregate of $250,000, appropriated for the entire period, beginning August 23d, 1842, and ending June 30th, 1844. Of the above amount, $50,000 was set apart for improvements on the Ohio river above the falls. Then, sir, the above amount of $250,000 has been expended, and is in process of being expended, on the rivers indicated by the resolution on your table. And, sir, it may not be uninteresting to notice how, and to what purposes, the money expended has been applied. The amount expended, up to the 30th of June, 1843, is $152,942 15. The amount expended on the rivers below the falls is $87,942 15; of which amount $15,374 95 was for removing snags in the Mississippi river, and the sum of $53,050 25 was expended in repairing two old snag boats at Paducah, and in constructing and fitting out two new snag boats to operate on these rivers. From the above, it appears that a large proportion of the foregoing appropriation has been expended in preparing and fitting out for the ensuing season; and, though it appears but little has been expended in actual operations, and in direct application to the purposes of the appropriation, in removing snags, yet much has been done; 4,783 snags have been removed, 11,119 trees felled, and one or two wrecks removed.

This brief and condensed statement, taken from the report of the officer in charge of this work, shows something of what has been done, and the preparations to do, if money shall be appropriated to push them on. There are now at least four good, well fitted out boats operating, and ready to operate, under the direction of Congress; and it also appears their construction and repairs have been made at

68     APPENDIX TO THE CONGRESSIONAL GLOBE.     Jan. 1844.

28TH CONG.....1ST SESS.     *Improvement of the Western waters—Mr. T. Smith.*     H. of Reps.

great expense to the nation, and the object of the present resolution is to keep them *in service.* Then, sir, what amount of money will it require to keep them operating for one year? And what is the sum that the committee, under the direction of this resolution, have to report to this House? You will see, sir, by referring to another page of this report, that we are furnished with the data—ay, sir, the *precise amount required.* And, sir, the amount is not startling. It is not calculated to shock the nerves of the most sensitive on the subject of appropriation. It is, sir, in round numbers, and without going into detail, only $223,000. See doc. No. 2, 1st. sess. 28th Cong. p. 218. The report and estimates referred to give in detail, the work to be done, how, and where; I will not trouble you with a recapitulation.

We do not feel as much interest about the details as we do about the *amount* asked. Sir, $223,000 is the sum total of all that is asked, or required, for the improvement of those mighty rivers. And yet I am sure, sir, I have heard gentlemen say they would, at a proper time, vote this amount, whom I am sorry to find voting against this proposition. I hope those gentlemen will now see that the amount contemplated by the pending motion does not go beyond their will to give, and will therefore now vote with me for the adoption of the original resolution. Yes, sir, direct and specific as it is—imperative as it may be on the committee to report—sir, you see they have data, by reports, to fix the amount; and as the committee have been charged with hostility to the measure, of which I know nothing, it is not to be presumed they will report overmuch.

Sir, this estimate only provides for the rivers below the falls of the Ohio. I regret that nothing is presented for the improvement of the Ohio above the falls. But, sir, this proposition alone interests, directly and indirectly, more than one-third of the entire population of the United States. Yes, sir, directly one third, and all indirectly, in a personal and pecuniary point of view; personally, all who trade or travel on those rivers, expose themselves to loss of life; and those who do not, are frequently called to mourn the loss of a relative or some dear friend who has perished and fallen a victim to our cold debates, and our protracted and tardy efforts to pluck death from the stream of those deadly rivers. As to the pecuniary interest all have in the improvement of those rivers, no man can estimate it; their waters irrigate a continent; the extent of their navigation is many thousand miles; and we can only approximate, in a very unsatisfactory manner, the value of the commerce floated on their waves, the loss of a tithe on which would be immense; injurious to all, and to some total ruin. Sir, the losses of human life on steamboat wrecks, on these rivers, have been narrated to you by gentlemen that have preceded me in this debate, in tones of eloquence, and in terms of thrilling interest; in a manner, and with an ability, that I cannot pretend to imitate. Sir, as on the present occasion, (by the account of the loss of the Shepherdess, near St. Louis, on the Mississippi,) our feelings are often shocked, our sympathies warmly aroused, by running our eye over the horrid accounts of death and suffering occasioned by the destruction of steamboats on the Mississippi and other western rivers. But, sir, appalling and heart-rending as these recitals are, they do not tell half the tale of wo. Sir, these steamboat disasters are the only ones that reach our ears; they are heralded through the medium of the public press, and the disaster is heard in every part of the Union. But, sir, the common flat-boatman's fate is not thus celebrated in song and story; they belong to another strata of society; and, if not so ornamental as those that navigate these waters in steamboats, they are yet quite as useful in their sphere, and, in many cases, quite as respectable, and are entitled to at least a portion of our sympathy. Every steamboat that is lost we hear of it. But the flat-boat, built and navigated by the poor man or farmer, is not heard of; their disasters are not heralded to the country, although there are many such; and many too, that commend themselves strongly to our sympathy, and to the sympathy of this nation. Sir, one-half the loss of life and property on these rivers are of this latter description.

The farmer and his sons build this description of boat; their labor raises from the farm the produce that freights it, and the father, without any nautical skill, compass, or chart to direct him, puts himself at the helm, and his sons to the side oars, and, impelled, not so much by interest, as by necessity, risks the dangers of those rivers in a voyage to *New Orleans:* if they escape destruction, it is well; if

their boat is transfixed on these snags complained of, often, with the boat, all are lost; lives, property, and all go to the bottom together. But little account is taken of it; their sad fate seldom or never finds its way into a newspaper, and all the public ever know about it (if it is ever known at all) is this —*"A flat boat was lost;"* though the calamity, as far as it extends, is total and irretrievable ruin, and the consequence, nine cases out of ten, to the surviving relatives, is poverty and destitution; for all they had, and all their hopes, were wrecked together.

Such cases are frequent; and they should have their weight in bringing this House to a favorable and speedy action on this important question.

Sir, I will no longer detain you with considerations like these. Nearly all the members of this House, and all the people of this great nation, are familiar with the manner of our river and inland navigation, and by whom our western commerce is mostly carried on; and Congress must also know, when they are doing something for the improvement of our internal navigation, that they are doing something for the *real people*—those that labor and produce; that portion of our political hive that are busy, industrious, and no *drones;* a people that provide their own subsistence, and also a surplus for those that are "arrayed like the lily, and toil not."

Sir, as I pass, I must be permitted to take some notice of the speech and remarks of the honorable member from the western district of Pennsylvania, [Mr. A. STEWART.] I hail from that gentleman's county; I believe old Fayette county, Pennsylvania, is the birth-place of us both. I name this circumstance, not surely for the purpose of reflecting credit on that gentleman, but rather for the purpose of brightening up my own obscurity by the rays of his more extensive and established reputation as a statesman and politician; for he was a politician and a lawyer when I was an apprentice boy.

Sir, the time was when I would not have thought of maintaining a difference with that honorable gentleman; and with reluctance I feel myself bound to do it now. That gentleman is, I am sure, a friend of the pending measure before this House; but I fear his zeal for this measure, and all kindred measures, has eaten him up; and it would eat us up, root and branch, if indulged.

Sir, what does the honorable gentleman say? Why, sir, he complains that the veto on the Maysville road bill has ruined the country; in his own words, "it struck down the prosperity of the nation, and, in consequence, the country is a century behind in improvement, what it would have been if it had not been for the veto;" and he also goes on to inform us what was the policy of the party to which he belonged in 1832—that party which, he says, is the whig party now. He says at that time it was distinctly foreseen that, by the operation of the then tariff, the national debt would soon be paid off; for, during the administration of Mr. John Q. Adams, forty-five millions had been paid, and that it was in a rapid state of liquidation; and, when that was done, what was to be done? What was to become of the accumulating surplus? The tariff must be reduced, or the surplus disposed of in some way. Then, sir, he distinctly avows it was the policy of the party to which he belonged then, (and he says it is the whig party now,) to keep up the tariff for protection, and throw the surplus off on a general system of internal improvement by the general government for the improvement of all the country; and this, he contended, was the only way that the interior could be benefited by the disbursements from the national treasury.

Sir, I am glad to hear that honorable member make these plain and distinct avowals, as they may be regarded as official; for I am aware, and always have been, that that gentleman is the thorough friend of internal improvement, and always in the confidence of Mr. Clay, and may be regarded as his confidential exponent on that subject. But, sir, I must be permitted to differ with the honorable gentleman on this subject of a general system of internal improvement; which I do *toto cœlo,* in the broadest sense of the term. And, sir, I believe, and do here in my place pronounce, a general system of internal improvement by the general government, or by a state government, a general system of *corruption!* Sir, I stated in the outset of my remarks that I was in favor of the proposition of the gentleman from Kentucky, [Mr. THOMASSON,] because it was a distinct proposition, presented to this House and this country on its merits; and on its merits I desire to

let it stand or fall. But, sir, if it is designed by any, or intended by any, as I think it is, by intimations in this debate, to vote against it, *as an independent proposition,* for the very purpose of log-rolling it into a general system bill, and to compel it, with its greater merits, to carry meritless, useless, and worthless measures along with it,—much as I may desire to see it become a law, it is possible to so amend the bill—yea, it is probable it will be so amended as to compel me to vote against it. It is due to every proposition that it should be tried upon its merits.

This course my constituents would expect of me. They would have a *right* to expect it of me; for, sir, it is known, when this wild spirit of extravagance and corruption swept over the land, especially the States, that I stood up in my legislature, almost alone, in a meagre minority, and voted against it. The minority vote against the Indiana system of internal improvement was only eighteen in the popular branch of our legislature! Sir, the gentleman [Mr. STEWART] is in favor of a general system of internal improvement. Well, sir, the States have tried it; and the consequence, to nearly all of them, is disgrace and bankruptcy; and I insist upon it, a State can prosecute works of that kind as prudently and as economically as the general government; and, sir, the greater probability of prudence and economy is in favor of the States. Sir, if you will look around among the States, and see the little that is done, and see the immense amount they are in debt, and apply their action as a rule to the general government, you will, at a glance, be able to determine the point of total and irretrievable bankruptcy this government would be plunged into by it, and that speedily, hopelessly, and forever; for the ability of the people never could redeem it. Taxation, endless and boundless, would be the consequence; and heavy taxation and slavery are synonomous terms.

The gentleman [Mr. STEWART] says the veto "struck down the prosperity" of the country, and *especially the West;* for only by appropriations for internal improvements can the West expect to be benefited by disbursements from the national treasury. I will not stop here to inquire what benefit it is to any people, as a general principle or as an established practice, to be taxed for the sake of the disbursement, after collection by the process of taxation. That question I will leave for any man of common sense to answer. But, as the burden of the gentleman's complaint is against "the veto of the Maysville road bill," I desire to ask of him if the veto power had not been exerted, what proportion of the money then appropriated, and about to be appropriated for internal improvements, would have fallen to the share of the West? The gentleman should be able to answer this question, as he says it was especially injurious to the West. The gentleman, I apprehend, is not prepared to answer. General Jackson states, if I mistake not, that at that time (the time of the veto) there was appropriated, and in process of appropriation, about $100,000,000! Now I venture to say, as the gentleman has frequently said, in the course of his remarks, that since that time—the veto—there has not been appropriated, to all the interior of this vast country, within a line drawn round the circumference within five miles of tidewater, as much money as was required to build this Capitol in which we stand.

Now, sir, I say, and venture it as an opinion that will be found true upon examination, that of the vast sum of $100,000,000, cut off by the veto, the West, the *"Great West,"* would not have got as much as was required to build the Capitol in which we deliberate.

Has it come to this, that we are to have this exploded policy revived? The complaint is, that the veto on the Maysville road bill "struck down the prosperity of the country." What, and where, was this Maysville road? It was a company turnpike road, in the State of Kentucky; a company concern. A, B, and C, desired "to raise the *wind,*" and got themselves incorporated as stockholders in a company to build a turnpike road, and petitioned Congress to compel *Uncle Sam* to take a portion of the stock, as he had money at that time, for which A, B, and C, had an itching palm. *Uncle Sam's* boat, at that time, was commanded by General Jackson, and he vetoed their bill. This is the ground of complaint; and this is the head and front of his offending. Sir, can any man desire to see such a state of things again, such a system of corruption revived? I hope not.

But I have stated, that a general system of internal

Jan. 1844.  APPENDIX TO THE CONGRESSIONAL GLOBE.  69

28TH CONG.....1ST SESS.  *Abolition Petitions—Mr. Cobb.*  H. of Reps.

improvement was a system of corruption. I reiterate the assertion, and I appeal to the calendar of legislation of Congress, and of all the States, to prove that no general system of the kind has been adopted *without combining works without merit.* In framing general systems, (as they are fancifully called by their friends,) works are combined for the very purpose of gaining votes; although many of the works thus combined are notoriously without merit! and money is appropriated upon them, and expended, with the full knowledge that they will not be used, nor useful when made. Such legislation is corrupt and indefensible. I wish, sir, to avoid the dilemma that some of us may be placed in, by having our proposition purposely jumbled up with such works, for the purpose of making it the vehicle to carry them through. We wish to be exempted from a necessity to vote against our own measures. I desire, most anxiously desire, that our bills may pass upon their own merits. Why not? I have heard no gentleman declare that he would vote gainst an appropriation for those rivers, except my colleague, [Mr. KENNEDY,] who says he will vote against it, if it is to be log-rolled through, and if the money is to be borrowed for the expenditure.

The *West* complains—and with what justice, I will not pretend to say; for if I did, I could but repeat what has been said, and well said, by others—that they have not been duly regarded by Congress the appropriating power of this nation.

But, sir, I will venture the statement, by way of comparison, that if the improvements under consideration—the western rivers—shall be compared in point of importance with improvements in any other portion of this Union, and the appropriations made upon them compared with other appropriations, the disproportion against them will appear strikingly great. And so with all other interests of the West.

To prove this great disproportion of expenditure, I will invite your attention to a single fact, to a single work on the eastern or Atlantic coast—the Delaware breakwater—and it is by no means an extreme one for expenditure. The original estimate for that work, (I quote from the official report of the proper officer,) was - - - $2,216,951
The revised estimate in 1836, was - 3,030,909
And the appropriations at various times
have amounted to the sum of - - 1,921,000

The last appropriation was in 1838; since the expending of which, it may be said that the work has received but little *attention.* If it be not intended to complete this work, in conformity with the original and revised estimates, it seems to me unnecessary that it should continue to form an item in the annual report. I shall, therefore, with the approbation of the department, merely state that one hundred thousand dollars is the least that can be required for its commencement and further prosecution. But even this amount need not be appropriated, unless it be contemplated to grant the further appropriations that will be necessary.

The above is taken from the report of the chief engineer; and it shows an expenditure on that single work, of more—infinitely more money than has been made on all the western rivers; and that it is a useless expenditure of money. The original estimate was immense; the revised estimate in 1836 increased it nearly $1,000,000, and there has been nearly the amount of the first estimate expended upon the work. And now, what does the chief engineer tell us? Why, sir, that since the last appropriation, in 1838, it has received very little *attention!* But, with the approbation of the head of the department, he would ask $100,000, the *least* sum necessary to the commencement and further prosecution of the work. But even *this* appropriation need not be made, unless it is contemplated to make *still further* appropriations. From this report, I infer, after the expenditure on that single work of $2,000,000, it is useless, and about being abandoned, and may as well be abandoned now as not, provided annual and perpetual appropriations are not contemplated!

[Here Mr. MORRIS, of Pennsylvania, explained that it was not useless, and not abandoned, nor contemplated so to be.]

Mr. SMITH. I am happy to be corrected by the gentleman. If I am in error, I have been led into it by the official report; and I think my deduction is a fair and legitimate inference from the language used. But in one thing, I am sure I am not mistaken; that single work has cost near $2,000,000 already, (nearly the full amount of the original estimate,) and an indefinite sum is still asked for. Although yet in an unfinished state, it has cost the common treasury of the nation more, much more, than has been expended on all the western rivers, and more than is required to improve them.

This case is bad enough, and shows you how the public treasury is leeched. This case of wasteful expenditure should admonish us to carefully scan the justice and propriety of appropriations asked for, and also to pay but little attention to estimates, and to put little faith in their accuracy.

I will only refer you, Mr. Speaker, to one other case, to show you with what profligacy public expenditures are made. I will again quote the report; for the case is so ridiculous, and so nearly incredible, that I fear to trust to a statement, lest I should not be believed! It is from the report of Capt. W. H. Swift, in relation to the construction of a beacon at the Black Rock harbor, Connecticut:

"When the beacon (says the report) was first built, a large quantity of rubble-stone was carried in vessels to the proposed site, and was thrown into the water around a single rock called the 'Old Huncher,' and upon which there had been an iron spindle in former years. This rock was conical in shape, about four feet in diameter at top, and bare at very low water. Upon this loose stone, thus deposited, the superstructure was reared; and when the beacon was blown down, the materials of which it was composed were, of course, added to the rubble-stone bed; and they, in turn, became the foundation for the beacon."

I do not refer to such statements as this with pleasure, but with pain. I have to notice them to impress upon this House the propriety of placing every proposition demanding appropriations of public money on its intrinsic merits.

Nor can we well repress the indignation at such foolish and profligate extravagance, ignorance, and stupidity. The beacon built on the rubble-rock, loosely thrown round the "Old Huncher," cost the government $21,000, which was a total loss. The idea of building a costly superstructure on a foundation composed of loose stone *thrown into the sea,* is too ridiculous to deserve serious comment.

And this was done by the general government, under the direction of the engineer department, where everything is done, or supposed to be done, on scientific principles!

But, sir, in the West, without the aid of science, we will do better, and act more wisely, with money, if you will give it to us. The money, and a little common sense, are all we want to pluck the snags from the Mississippi. The latter we have; and a small portion of the former, which we have given you, is all we require at your hands. Much that is done on the Atlantic seaboard is of doubtful utility; much is done, and abandoned when done. But we propose a work the utility of which cannot be questioned, because it has mathematical certainty about it. The object is to save the lives and property of our fellow-citizens; and every snag removed from the bed of that stream is one less, and to that extent diminishes the risk of life and property.

Another consideration has been brought, incidentally, to bear upon this question, which lies properly at the very base of the whole matter—the means out of which to appropriate; in other words, the state of the treasury. This was referred to, first, by the honorable member from St. Louis, [Mr. BOWLIN.] His mode to furnish means, if I understood him, would be, so to arrange the tariff laws that they should not be so highly protective, less prohibitory, and more productive of revenue; and a falling back upon the compromise ground of 1833, he [Mr. B.] thought, would have that effect.

The honorable member from Pennsylvania [Mr. STEWART] who replied to the member from Missouri, [Mr. BOWLIN,] relies on the present tariff to furnish ample means. His positions and statements I desire to restate and examine, with great deference, however, to that honorable gentleman's opinions.

I understood that honorable member to say that the member from Missouri had had his revenue tariff in operation in 1841, and it showed a beggarly account of empty boxes; and that the present whig protective tariff showed an increase of four or five millions of dollars the first year; and that he maintained, if the present tariff was let alone, it would furnish the means for improving the country, replenish the treasury, and revive the business of the country—would give life, spring, and elasticity to every kind of enterprise. All this is finely said, and a great deal of good is comprised in a few words.

But, sir, I fear it is not all true; for, if I have heard the gentleman right, and read the Secretary of the Treasury right, one or the other must be egregiously wrong.

The Secretary's report on the state of the finances, (doc. No. 3, 28th Congress, statement I.) exhibiting the value of merchandise imported from 1821 to 1842, and also the amount of duties which accrued annually upon said imports during the said period, shows that the gross amount of duties on merchandise imported in 1841 was $19,919,492 17, and in 1842 only $16,622,746 84. Statement L shows the *net* revenue received in the year 1841 to be $15,516,589 36, and in 1842 to be $12,780,173 64.

This is the official statement of the Secretary of the Treasury, and shows a falling off in the revenue, in the year 1842, of nearly or quite $3,000,000. If the gentleman relies on such an increase of revenue as *this,* from the operation of his whig tariff, I fear he will be sadly disappointed in his efforts to obtain funds with which to carry on his splendid system of internal improvements.

I presume the honorable member was led into the error from another statement of the Secretary, overlooking the explanation which the Secretary gives himself.

The Secretary says (statement A, p. 22) the receipts into the treasury during the year 1842 were as follows: From customs (aggregate) $18,187,908 76.

This is the statement which I apprehend misled the honorable member from Pennsylvania, and here I beg leave to subjoin the explanation by the Secretary, in his own words:

"Sec. 7. Those now presented have been made from the best information that could be obtained, and from a comparison with the receipts of former years.

"The large amount of $18,000,000, received in 1842 from customs, is not to be wholly credited to the business of that year. It includes $4,808,666 11, the amount of duties which had accrued in 1841, and was secured by bonds that were paid in 1842, and also $567,000 of treasury notes, redeemed by the collectors in the former year, but which were credited in 1842; thus leaving the actual receipts from the duties of the year at less than thirteen millions," ($12,780,173 64, as per statement L.) The Secretary goes on to state that there is a decided improvement in the duties from customs in 1843, and, with the receipts, known and estimated, this calender year will give sixteen millions. Such being the fruits of the present high tariff, I think it cannot be relied upon to do all the good the honorable member anticipates. If it affords ordinary revenue, we must retrench greatly, and then have nothing from that source for the splendid system of internal improvement that he would revive and build up on the basis laid by the party to which he belonged in 1832, "which," he says, "is the whig party now." Sir, there is another peculiarity about this *whig* tariff, which the gentleman may have overlooked; and that is, it never can be made to yield any more revenue, for it will admit of no increase and yield revenue. The Secretary says:

"But the undersigned feels *bound* to say, that, from the examination of reports he has caused to be made from the principal ports, and from a general view of our commerce, after the best consideration which he could give the subject, he has not been able to discover any of the existing duties which can be *increased with any reasonable prospect of augmenting the revenue.*"

So, sir, we have got to the highest point at last; and what is to be done, let those that made this tariff tell.

Mr. Speaker, I have much more to say on this subject, and intended saying more at present; but my friend, the honorable member from Illinois, [Mr. R. SMITH,] has anticipated my time a little by rising; and, as he is on the floor, I will take my seat for the present.

---

## REMARKS OF MR. COBB,
### OF GEORGIA.

*In the House of Representatives, January 14 and 18, 1844.*—On the motion of Mr. BLACK, of Georgia, to amend the motion of Mr. DROMGOOLE, of Virginia, to recommit the report of the Select Committee on the Rules, by instructing them to report to the House the following rule, viz:

"No petition, memorial, resolution, or other paper praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave-trade between the States or Territories of the United

70 | APPENDIX TO THE CONGRESSIONAL GLOBE. | Jan. 1844.

28TH CONG.....1ST SESS. | *Abolition Petitions—Mr. Cobb.* | H. of Reps.

Absurd Editors opinion

These arguments touch the petition right and then revert not to argue against the petition right, but to infer slaves have no right to petition and petitions that are dangerous to the peace and tranquility are reprehensible to the dignity and respect of reasonable men...

States in which it now exists, shall be received by this House, or entertained in any way whatever."

Mr. COBB rose and said—

Mr. SPEAKER: When the amendment now under consideration was first offered by my colleague, [Mr. BLACK,] I regretted that he had done so, believing that the object contemplated by the friends of the measure could be better effected after the second report of the committee, if the motion of the gentleman from Virginia, [Mr. DROMGOOLE,] to recommit the report, should prevail. But as it is now evident that the vote about to be given by the House upon the proposed instructions to the committee will finally settle the question as to the continuance of the present rule of the House, familiarly known as the 21st rule, I must ask the indulgence of the House whilst I present some of the reasons which induce the vote I am about to record.

I cannot agree with some gentlemen who have preceded me in the discussion of this subject, that we are to abandon all hope of retaining a rule, from the salutary influences of which the country has derived so many advantages, and which has heretofore received the sanction of this House on more than one occasion. I will at least indulge the fond hope that the South is still to continue in the enjoyment of those benefits which the existence of this rule is so well calculated to guaranty to her.

Whilst I agree in the main with the arguments presented with so much ability by the gentleman from South Carolina, [Mr. RHETT,] and the gentleman who has just taken his seat, [Mr. BELSER,] I cannot but express the deep regret with which I listened to the concluding remark of the former gentleman, when he expressed the conviction resting upon his mind, that there now existed in the southern States, and was rapidly growing, an increasing disaffection to the Union. Sir, I disavow the sentiment for the State I have the honor in part to represent upon this floor. So far as I have been enabled to form an opinion to the feeling which pervades the southern people—the people of Georgia more particularly—their attachment and devotion to the Union of their fathers "grows with their growth, and strengthens with their strength." That attachment is based upon a conviction upon their part that the whole of this Union—the North, the East, and the West—will continue to guaranty to them those rights and privileges which they have so long enjoyed under the constitution and its compromises; and I sincerely trust that there never may be any just cause to destroyed this conviction, or weaken this confidence.

We are asked to repeal this rule, upon the ground that it conflicts with the right of petition as recognised in the first article of the amendments to the constitution, and upon this ground alone—the advocates of the measure here disclaiming any sympathy of feeling with the petitioners and their prayers, and avowing that they are prepared, and even anxious for an opportunity to place the seal of their condemnation upon the unholy and revolutionary prayers of these wild fanatics. Surely, then, if their judgments can be conceived that a refusal on the part of this House to receive these petitions does not infringe upon the right of petition, as secured to the people of the United States by the constitution, we may confidently rely upon their co-operation in continuing a rule to the existence of which we attach the utmost importance.

One of the fundamental rules for the construction of statutes, as recognised in our law books—to wit: to consider the old law, the mischief, and the remedy—will often aid us in arriving at a proper construction of our constitution, and peculiarly so the provision now under consideration. Having taken much of the model and many of the principles of our government from that of the mother country, our minds are almost involuntarily directed to the grievances endured by our fathers under the English government, to account for some of the peculiarities of our own; and thus it is, when we come to consider the necessity for incorporating in our constitution a prohibition for the passage of any law that shall interfere with "the right of the people peaceably to assemble, and to petition the government for a redress of grievances," we are irresistibly drawn to a contemplation of the famous and odious "riot act," which so long disgraced the statue books of England.

Under its provisions, the people were not permitted to assemble together for the purpose of counselling with each other about the heavy burdens and oppressions under which they might be suffering, but were liable to be dispersed at a moment's warning, under certain and severe penalties. Nor were they allowed the humble privilege of incorporating their sufferings in the form of a remonstrance or petition to the sovereign or legislative powers, without incurring the risk of being subjected to punishments inflicted only upon malefactors and felons.

These truths had been witnessed and realized by our fathers; and their wisdom and foresight induced them, in the formation, or rather in completing the formation of our constitution, to throw around these inestimable rights of the people such guards as would forever protect them from similar invasions. They have done so in the clause of the constitution which we are now considering. Our people peaceably and quietly assemble, whenever and wherever they please, and "there is none to molest or make them afraid." If suffering under the weight of wrongs, or afflicted with grievances, they embody the result of their reflections and deliberations in remonstrances or petitions, as to them may seem fit; not apprehending, nor having cause to apprehend, prosecutions and punishment for this free and unbiased exercise of their constitutional rights.

I will not, Mr. Speaker, longer consume the time of the House upon this branch of the subject, after the very lucid and elaborate argument of the gentleman from South Carolina, [Mr. RHETT,] upon this point, a day or two since.

Now, sir, I cannot yield my assent to the doctrine contended for by gentlemen, that this great right of petition, which was held so dear and sacred by our wise and patriotic fathers as to require an express guaranty of its uninterrupted enjoyment in the constitution, is to be construed into the poor and pitiful boon of asking this or the other branch of the national legislature simply to receive the petitions of the people. No, sir; the feelings which filled their bosoms and actuated their conduct were "higher, purer, nobler." It was to wrest from the government the power, in anticipation of its assumption, of passing any law by which the people should be prevented from meeting together in their deliberative assemblies, freely and fearly discussing the conduct and action of their representatives and agents, and, if necessary, presenting the result of their deliberations, in the form of a petition or remonstrance, to any department of their government.

Viewing the right of petition in this light—in connexion with the plain and palpable causes which led to its constitutional recognition—and I can contemplate it with pride and gratitude; and to its maintenance and perpetuity, I am prepared freely and cheerfully to pledge whatever of energy and ability I may possess. But, sir, when you attempt to force it down from this high and lofty eminence, to the humiliating privilege of requesting this House to receive a petition, lay it upon your table, and there, unnoticed, to moulder and ruin, I repudiate it as utterly worthless, and beneath the regard of freemen.

When the people had thus assembled, and embodied their sentiments in a petition, and had presented such petition, their rights as petitioners ceased; and the same constitution, under which they had exercised their rights, imposed an equally solemn duty upon another body of men—I mean, sir, the House of Representatives or the Senate, as the case may be—a duty the responsibility of which could not be thrown off upon the petitioners, but must be assumed and discharged by the proper tribunal. And now, sir, what is that duty? And what is the first step to be taken in the exercise of it? Will gentlemen still insist that the rights of the petitioners require its reception? Or will they not agree with us in saying that this is the first question to be determined? Otherwise, and there would be no mode of avoiding the reception of any and all petitions, no matter how disrespectful or uncourteous in language, or condemnatory in the object proposed to be accomplished. Let me not be told that the self-respect of members would be a protection against such an abuse; for if the right existed to the extent here contended for, individual members would be no more authorized to refuse the application of their constituents to present their petitions, than the House would be to refuse their reception. Besides, sir, the experience of the past admonishes us that this would be a frail reliance. The practical effect of the doctrine thus carried out, ought to be a sufficient exposition of its fallacy, and should carry conviction to every mind brought to its investigation, relieved of the prejudices and improper influences thrown around it by an unwise disposition on the part of gentlemen to yield to the claims of rabid fanaticism.

The course of argument pursued by some of those who have addressed the House against the proposed instructions to the committee, induces me to believe that they have not looked sufficiently far into the future to a correct understanding of this question in all its bearings. They are unwittingly deceiving themselves, and are thereby falling into an error, from which they can only retrieve themselves by a formal surrender of the entire ground heretofore occupied by the friends of the South. And let me invite to the candid consideration of this branch of the subject the careful attention of that portion of the northern democracy—more particularly those who have heretofore stood by us in the hour of trial, and manfully breasted the storm that was raging around them, with a devotion and firmness which has commended them to our warmest gratitude and admiration. It is a part of the argument that I approach with reluctance, as it may, perchance, be considered as putting into the mouths of the abolitionists an argument sanctioned by our approval, to be handled by them against our friends, when they shall have returned to their constituency, after having rescinded this rule, (should such be the unfortunate result of our action,) and having adopted in its stead some other regulation, less efficacious in the protection of our peculiar interest, and not more acceptable to the clamorous advocates of the right of petition. But a sense of duty requires that we should leave no effort untried, no argument unheard, that may tend to awaken proper reflection upon the many difficulties which must inevitably meet us upon the repeal of this much abused rule.

What, then, is the proposition of our friends, as contained in their arguments, though not reduced to any regular form? It is, in substance, that we shall receive these petitions which are now excluded by the operation of the rule and lay them upon the table, without being read, considered, referred, or in any wise acted upon; thus satisfying the demands of the constitution, and forever afterwards separating the question of abolition from the right of petition. Will such be the effect of your action? I fear not. When gentlemen shall have repealed this rule, and adopted in its place such a one as I have just referred to, and returned from this hall to their constituents, they will in vain seek for that approving welcome which they are now so fondly anticipating for themselves at the hands of those whose great regard for the constitutional right of petition is now driving them to this unwise course of action. Deceive not yourselves, gentlemen, with the belief that the proposed substitution of your rule for the one now sought to be repealed will satisfy those whose demands you are now submitting. On the contrary, you will be met with one response from all sections of the country where this feeling exits: "It is true you have granted us the form of our rights, but at the same time denied us the substance; you receive our petitions, but your ears are closed against them—you will not listen to our grievances; we present to you arguments for you reflection and consideration, but they are silently and wrongfully laid on your table, as unworthy of your notice and attention." Where is your answer? What is to be your reply to these new complaints, which will rise up against you upon the repeal of this rule, as certainly as the setting of the sun succeeds the rising thereof? You have yielded your first and only true position, that the right of petition has never yet been violated, or in the least infringed; and having done so, you must necessarily be placed at the mercy of these men, to be driven by them to whatever point they may think proper to require you to go. And it is to this view of the subject that I desire more particularly to direct the attention of the House.

The proposed alteration of the rule, so far from allaying, will have the effect of increasing the excitement which now agitates the public mind. These disturbers of the public peace and quiet will be inspired with a new zeal, derived from the partial success attendant upon their previous efforts, which have heretofore proved so powerless and unavailing; you will attach to them and their cause an importance of which you admit they are utterly undeserving; you give to them additional strength in the efforts to destroy and annihilate their influence; their anxiety in the prosecution of their hellish work will be doubly and trebly enhanced; and what must the inevitable result? At the opening of the next Congress their voice will again be heard through their mouthpieces in this hall, demanding at your hands another concession: "You have received our petitions, but with that we are not content; you must read them, and at least hear what we have to

Jan. 1844. **APPENDIX TO THE CONGRESSIONAL GLOBE.** 71

28TH CONG.....1ST SESS. *Abolition Petitions—Mr. A. V. Brown.* H. of Reps.

Examples of opportunism over principle of constitutional laws. A right can only exist when it does not burden the rights of others, a false argument that petitioning seeks to end the tyranny of past, that which is uncomfortable to the rules and questions their comforts, is not a right, a concept that is incongruent with our republican form of government which allows abolitionism and lawyers action to resolve all issues... again these avoid the issue and push threats and attempt to invoke public worry.

complain of." The same course of argument now adopted, the same feeling now controlling the conduct of members, will induce, yea, compel the grant of this additional demand; and thus, sir, will the matter continue to proceed—each concession followed in more rapid succession by another, until the whole ground, now so gallantly won and nobly occupied by the true friends of the South, will be surrendered to the increasing requisitions of our worst and bitterest enemies. But a few sessions will have transpired, and abolition petitions will be regarded with the same respect, and be carried through the same forms, as those of the most respectable and honorable character. Hence, sir, the South considers, and correctly, too, that the time has now arrived when a choice must be made between these two extremes: the entire rejection of all such petitions on the one hand, and, on the other, not merely their formal reception, but also their reference, consideration, and final action thereon. And can she for a moment hesitate in making her selection? Gentlemen will attempt in vain to place this question upon compromise ground. It cannot be done. There is no neutral ground, no half-way house, that can be long occupied with either credit or safety to the parties interested.

I am aware that the argument I am attempting to present will not reach the judgment of those who have always opposed, not only this, but every other rule which has been adopted by Congress for the protection of southern feeling and southern interest. I had not flattered myself with the least hope of altering their long-settled decision. My object is, if possible, to retain the aid of those who have heretofore co-operated with us, and whose devotion to our interest I feel confident yet remains unimpaired. To them I trust the appeal will not be in vain.

Let me then ask the gentleman from Pennsylvania, [Mr. BIDLACK,] who addressed the House a day or two since on this subject, and others who, like him, have always been our friends on former occasions, and who have even at this session voted with us against the repeal of the 21st rule, if they are now prepared to sacrifice all the advantages of a long and eventful struggle over this subject, and ally themselves with the advocates of the opposite extreme to which I have just alluded, merely for the purpose of avoiding the effects of a false issue—known and amitted to be such? I can safely answer for these gentlemen in the negative; and if so, may we not successfully ask of you to reconsider the reasons which have induced you to favor this dangerous concession? Sooner or later you will be compelled to choose between the extremes placed before us for our selection, and the present moment presents the most favorable opportunity of making the decision. It is rejection on the one hand—action on the other.

The South has not been an indifferent observer of the movements in the non-slaveholding States on the subject of the right of petition. She has noticed with regret the effort (but too successfully made) to connect it with abolition, and thereby cause it to subserve the purpose of these fanatical spirits, in creating a false issue before the people, from which they are seeking to gain additional strength and factitious importance; and if there was any mode by which she could relieve her Northern friends from its effects, consistently with her own honor and safety, most cheerfully would she do it.

But our northern friends must perceive at a moment's glance that false issues upon this, as upon every other subject, must be met and overcome where they are found to exist. It is a duty which they owe, not only to the South, but to themselves, to rise above these, by exposing to the honest and enlightened portion of their constituents, this unjustifiable effort to prostitute a great constitutional right to the worst and vilest purposes. Such has been the course pursued by others; and the result is as creditable to the honesty and intelligence of the people, as it is gratifying to the feelings of the South. For the purpose of illustrating this truth, I will refer to facts which are familiar in part to the House, and in which, if I am wrong, I can be easily corrected. My friend on my left [Mr. WELLER] is the representative of a district in the non-slaveholding State of Ohio; from the first inception of this subject he has met it with a manly and noble spirit, which reflects upon him the greatest credit, and which, I am proud to say, is duly appreciated by those whose interest he has thus guarded and protected with such disinterested devotion; not only in this Hall, but before his constituents, has he grappled with the false spirit, in every shape and form

in which it might present itself. On my right is another gentleman from the same State, [Mr. GIDDINGS,] who has always given a cheerful response to every requisition of the abolitionist, and in whom they have ever found a sympathizing representative, as scrupulously conscientious about the right of petition as the wildest and most visionary fanatic could desire. Now, sir, what has been the necessary consequence in their respective districts? Whilst the district represented with so much honesty and ability by my friend is almost pure and untainted by this foul infection, the district represented by the gentleman upon my right is rotten to the core. Permit me, then, to commend to our northern friends the praiseworthy example of my friend from Ohio; and I hesitate not to promise them that the same happy results will attend similar exertions on their part.

The gentleman from North Carolina [Mr. CLINGMAN] seemed to think we had placed our northern friends in a false position, and that it was the duty of a wise general, when he found his men falling, one by one, under the fire of the enemy, to withdraw them from their exposed location to a place of greater security. Now, sir, I am not sure that I understood correctly the allusion of the gentleman. If, however, he referred to *his* political friends, I have only to say to him that he will meet with some difficulty in finding *any of them* in the list of killed and wounded. The devotion of northern whigs to southern interest has never yet induced them to occupy this dangerous and exposed position. That honor has been reserved for the democracy, and the democracy alone. If the gentleman alluded to the northern democrats, who had evinced, by their votes and conduct upon this subject, their sincere friendship for the South, then I must be permitted to say to our northern friends, hearken not to the voice of the gentleman from North Carolina; and as you would not heed his counsel upon other great and important subjects of a political and national character, so, also, reject the proffered advice upon this equally vital and interesting question. Had the gentleman from North Carolina, and southern members generally, listened to the remarks of the gentleman from Pennsylvania? [Mr. BIDLACK,] one who has heretofore been with us, through evil as well as through good report, but now felt that he was no longer bound to stand by an unpopular measure for the benefit of the South alone, when the South herself was manifesting a disposition to abandon the rule. Thus it is, that the defection of our northern friends is attributable to our own divisions. Let the fact, then, be published to the country, that the responsibility of this measure may rest upon those who justly deserve it; upon whom an indignant and outraged people may place the seal of their condemnation. I trust, however, that no such division will be found to exist; no southern democrat, I am sure, will abandon his post; and but few, if any, of the southern whigs will be found following in the wake of the gentleman from North Carolina. It has been said that the abandonment of this rule was growing in favor with the South. Where is the evidence of it? How many southern representatives, who have heretofore voted with the gentleman from Massachusetts [Mr. ADAMS] and the gentleman from Ohio [Mr. GIDDINGS] on this delicate and all-absorbing question, had been returned again by their constituents as members of this House? Let those who are laboring under this false delusion answer me the question. No, sir, votes given in that connexion will not answer the demands of the South; the South is unwilling to trust her rights in that quarter; she would fear the result, as well she might.

The gentleman from North Carolina, in the course of his remarks, had alluded to the times when Adams and Hancock, and their compeers, from every section of the country, had met together, and, as brethren, counselled one with another, having but one object in view—the best interests of their common country. There is no difficulty in returning to those happy days of union and harmony, if we will only permit the same spirit which pervaded the bosoms of the venerated dead to enter into our deliberations, and control our actions. They, sir, maintained their respective rights with an unflinching energy, and an unyielding firmness, that was only surpassed by the magnanimity with which they accorded to others the same boon they claimed for themselves. No gentleman would be more gratified than myself to see that feeling manifesting itself in every portion of this House, upon this and all other interesting and important subjects; nor would it long be confined within the narrow limits of these

walls; but, breaking over every barrier, through a thousand different channels it would penetrate every portion of the Union, scattering in its train all the blessings attendant upon union, harmony, and brotherly love. Whilst such are the ardent aspirations of my soul, yet a sense of duty, and the deep responsibility resting upon me as one of the representatives upon this floor of the peculiar interest of the South, require me to say to our northern friends, that we cannot overleap the boundary of this commendable example of our fathers; in our anxiety to do justice to others, we cannot, we dare not, forget what is due to ourselves.

---

## SPEECH OF MR. A. V. BROWN,
### OF TENNESSEE.

*In the House of Representatives, January 10, 1844—Against receiving, referring, or reporting on abolition petitions.*

The unfinished business of the morning hour being the report of the Select Committee on the Rules, and Mr. DROMGOOLE's motion to recommit the report to the Select Committee—

Which motion Mr. BLACK, of Georgia, had moved to amend, by adding instructions to the committee to report the rule commonly known as the 21st: (i. e. which excludes abolition petitions)—

Mr. A. V. BROWN, who was entitled to the floor, resumed his remarks of a preceding day, and continued them during the remainder of his hour.

The Committee on Rules had reported to this House, (he said,) and in that report they had furnished no rule whatsoever for its government in relation to abolition petitions. He had already, in his remarks on Saturday last, offered every complaint upon this subject which he had to offer. But, having reported no rule at all, what would be the condition of this House with reference to this matter? There were three courses, one of which must be adopted. The first was, according to one motion now pending, that the 21st rule should be reported by the committee; that was, in other words, that these abolition petitions should not be received. Another course, provided for by the instructions which had been offered, was, that they should be received, but laid on the table without reference, without report, without debate, or any other action whatever. The third proposition was, according to the report of the committee, that these petitions should not only be received, but be referred, reported, and acted on, like the ordinary business of legislation. Now, some one of these three modes must be embraced by this House, and be decided on by the question now pending before the House.

Mr. B. did not hesitate to be in favor of the 21st rule. He had often voted for that rule; he was prepared to vote for it again; and not only was he prepared to vote for it, but he was ready here in his place to stand up in vindication of that rule against the arguments by which it had been assailed. What had they heard against the 21st rule? Everybody knew what they had heard from the gentleman from Massachusetts [Mr. ADAMS] and the gentleman from Ohio [Mr. GIDDINGS.] He asked not what they had heard from them, for they knew it well. Nor did he ask what they had heard against that rule from the raving fanatics of the day. He would rather inquire what they had heard from gentlemen in this House during this session. What had they heard from gentlemen here in their places, and especially from the gentleman from New York, [Mr. BEARDSLEY?] Why, they had been told that the 21st rule was a violation of the great constitutional right of petition. The gentleman from New York had told them so; the gentleman from North Carolina, [Mr. CLINGMAN,] coming from a region greatly interested in the subject, had told them so. Mr. B. denied it. The gentleman said that it not only violated the great constitutional right of petition, but had driven the petitioners out of this hall; that it had driven them from their door with scorn and contempt. Mr. B. denied it, and defied gentlemen—(the word "defy" seemed well understood on on the other side of the House, but its use, a few days since, had not seemed so well understood on this side of the House)—he defied these gentlemen, one and all, to the proof. Where was the proof upon the subject? It was on their journal, and lying on their tables; and he defied gentlemen to the proof upon this subject. They might take what petition they pleased; they might take the one said to have

72  APPENDIX TO THE CONGRESSIONAL GLOBE.  Jan. 1844.

28th Cong.....1st Sess.  *Abolition Petitions—Mr. A. V. Brown.*  H. of Reps.

been signed by fifty thousand petitioners, presented some sessions since by the gentleman from Massachusetts, [Mr. Adams,] or that other one which had, at the last session, been brought in on a great reel and set upon the table of the gentleman from Massachusetts for ornament to it; or they might take the one presented by him for the dissolution of the Union, or that one presented at this session of Congress from citizens of New York, asking to be forever separated from the institution of slavery. They might take any one or all of these petitions, and he would appeal to the record to settle the question whether, in any of these cases we had violated the great constitutional right of petition; whether we had turned the petitioners out of this hall; whether we had driven them with scorn and contempt from our doors. ———

What has been the proceedings on these and similar cases? What had been the practice under the 21st rule? The petitioners in any and in all those cases had "peaceably assembled." Had the 21st rule prevented that? When they had assembled, they had petitioned this House. Did the 21st rule prevent that? They had, as the next step, sent their petitions to their chosen and selected agent. Did we prevent that by the 21st rule? We did not. What was next? That agent, in every one of these cases, had brought their petitions here within these walls. Did the 21st rule prevent that? No. What next? The gentleman from Massachusetts rose in his place; all eyes were fixed upon him, and all ears were opened to his voice. What did he do? He presented these petitions: he stated distinctly to the House what they contained, where the petitioners resided, what were the grievances complained of, how they reasoned upon the subject, and, finally, made known to this House what was the redress they prayed for. That was the precise process. The record showed the fact. And now the question was, whether we had abridged or in anywise violated the great right of petition in this course of proceeding? The petitioners had been heard. By themselves? No; for they had not come here to be heard; they had been heard by their own selected agent, who came within these walls, presented their petitions, and made known their prayers. Would it, then, be pretended that we had violated their rights, or treated them with scorn when we had heard their own agent speaking for them, and stating what grievances they prayed to have redressed?

The question now which he wished to put to the gentleman from New York and others who seemed disposed to object to this 21st rule was, whether, in fact, under that rule, we had ever violated the great right of petition? There could be no difficulty in understanding the subject. He could bring illustrations of it from every domestic circle, and from the scenes of every-day life. A parent was bound to hear the complaints of her offspring; but, pausing and hearing them, she might promptly repel them. Although the child might say that the parent was precipitate, or even unkind, yet it could never say that the parent had refused to hear its complaints. Now, here was the great principle of petition. Mr. B. admitted the right in its broadest and fullest extent; and he admitted further the duty of this House to hear these petitioners. After these petitioners were heard, (as they did hear them under this 21st rule,) the right of the people was perfect. The duty of the House then began, and that duty was to dispose of the petitions promptly or slowly, as they deemed proper.

It was a great issue, not only elsewhere but here, whether the argument was true, so often used by the gentleman from Ohio and the gentleman from Massachusetts, and now sustained by the gentleman from New York and the gentleman from North Carolina, who had come forward and endorsed the arguments used in former times upon this subject, whether, by this 21st rule, the great constitutional right of petition was violated, as they affirmed it was. Mr. B. denied that this right was violated, and he appealed to the record, relying upon the known practice of the House, (for what he had told them with regard to the practice upon these petitions was known to be true by every member of the House.)

But by what sort of an argument was it that the gentleman from New York maintained that the 21st rule ought to be abandoned? The gentleman told them that this was the very best way in the world to put down abolition. His great object was to put down abolition; and the best way to do so, he told them, was to receive, to refer, and to report upon these petitions. The gentleman might as well tell

him that the best way to save a city was to surrender its fortifications; or that the best way to repel an invasion was to give up all the mountain passes and strongholds where the enemy might be most readily and effectually met and overcome. Put down the spirit of abolitionists, defeat their object, by doing what? By granting them four out of five of the very things they desired. What did they ask for? To have their petitions received. Well, said the gentleman from New York, "Oh, yes, let us receive them; that is the way to put them down." What was the next thing they asked for? To have their petitions referred to the committees of the House. The gentleman from New York and the gentleman from North Carolina also said, "Oh, yes, let us put down these abolitionists by sending their petitions to a committee to be examined and reported upon." They asked more—that they should debate these petitions. And gentlemen professing to be opposed to abolition (and Mr. B. doubted not sincerely professing) still tried to persuade the House that the best way was to yield every inch of ground, and refuse nothing but the solitary principle of relief for which they finally prayed. Now, it was impossible for Mr. B., as a southern man, or as a statesman who had watched the progress of this abolition question, to believe that this could be safely done. ———

[Mr. Beardsley (Mr. Brown yielding for explanation) inquired if the gentleman said that he (Mr. Beardsley) advised debate upon the subject. Surely he had never taken this position. His course was well known. It was in favor of taking the final vote upon the whole matter; and gentlemen well knew what that would be.]

Mr. Brown resumed. But did not the gentleman perceive that, if they referred these petitions, they must report upon them; and, if they reported, they must debate the subject? If they began, on what principle would they avoid carrying out the regular process, involving reference, report, and debate? But why would gentlemen agree to refer these petitions at all? They all said they were as much opposed to abolition as any one; and yet they proposed to refer the petitions to a committee which should collect facts, examine laws, and consider the subject, and see if some plan could not be devised for carrying out the views of the petitioners. If this was not the object, they could have no object at all. Why, then, would they refer, why report upon, why debate these petitions, if they did not mean finally to grant their prayer?

[Mr. Clingman (Mr. B. yielding for explanation) said the gentleman had misunderstood him (Mr. C.) if he had understood him as being in favor of debating these petitions. He was averse to it. He was willing to see this rule debated, and to see the report of a committee debated; but he thought it beneath the dignity of the House to debate any petition. They had enough to do to debate bills, resolutions, and reports from committees. After reference, if a committee reported for or against the prayer, if any gentleman chose, he might then, with propriety, discuss the matter.]

Mr. Brown continued. He was glad the gentleman from North Carolina had had an opportunity for explanation. But did not the gentleman see that the only way to get along with this subject with safety to the South, with safety to the gentleman's own State, with safety to the portions of North Carolina bordering on the rivers of that State where the heaviest slave population was to be found, was not to go beyond the great question of the right of petition, but there to stop? to take no jurisdiction, by reference, by report, or debate, over the subject? There was comparatively safe ground; and, from the explanation of the gentleman from North Carolina, Mr. B. indulged strongly the hope that, when they came finally to act upon the subject, he [Mr. C.] would not be found going beyond that. Mr. B. admitted, notwithstanding their rule was so plain, and notwithstanding their practice under it had been so plain, that there might be extensive misrepresentations and misconstructions of the rule in the country. Now, he asked of the gentleman from New York and of the gentleman from North Carolina, why they did not stop at that point? Why they did not propose, in the report of this committee, to clear up, to elucidate this subject, and make it manifest in its true light to all the people of the country, and remove all doubts and difficulties, by going on, according to their views, to perfect the great right of petition? What was requisite for that? Why, simply to declare that the petitions should be received; that would perfect the great right of petition in a manner safe to the North, and which would be safe to the

South in a great degree, and it would have saved the democracy of the North from the suspicion of their enemies of a disposition to form alliances with, or to propitiate at least, the fell spirit of abolitionism. Why did not the gentlemen pause at the point of reception, and go no further, if their object was to clear up the misconception on the public mind?

It might seem strange to the gentlemen to whom Mr. B. had referred—to the gentleman from New York, to the gentleman from North Carolina, as well as others—that he had laid so much stress upon not referring, not reporting, and not debating these petitions. Why, it was evident, if these petitions were received and laid upon the Speaker's table, that there, under the rule, they would lie forever. No great harm or mischief perhaps would grow out of this practice. But the very moment they referred them to a committee, that moment they took jurisdiction over them—jurisdiction in such a way as to alarm the whole country. He was opposed to an action which might result in such consequences.

The argument had been used, that if they would receive, refer, and report upon these petitions, as in ordinary cases, this would allay the excitement which now existed on this subject. Mr. B. had one conclusive answer, one irresistible argument, in his humble judgment, against this proposition: They already tried it. Many gentlemen were here discussing this question, as though the experiment had never been made, of receiving these petitions, and of referring and reporting upon them. Why, the very speech the gentleman from New York had made, if not word for word, yet argument for argument, had led to the adoption of the celebrated Pinckney resolution. Under this they had been received, referred and reported on; a dignified, manly, respectful report had been made, and the decision of this House had been had upon the question. Now, had that allayed excitement? Had that had the tendency to put down the spirit of abolition? So far from it, the gentleman from Massachusetts, at the next session, had come within this hall with fifty thousand petitioners at his heels. So far from it, the very moment they had adopted the Pinckney resolution, and determined to receive, refer, and report upon these petitions as they did upon all others, the abolitionists all over the country said: "Now is the time to make your effort; send men to Congress able to be the speakers of that body—able to serve upon the committee—able to speak and vindicate the abolition question. The doors of Congress are wide open; they may not long remain so. Therefore, now is the time, and put all your machinery in motion to effect your object." And abolition had grown and flourished, and they were now reaping a rich harvest from the seeds which had then been sown under the Pinckney resolution.

[Mr. Adams (Mr. Brown yielding the floor) said he wished simply to ask the gentleman whether the report of Mr. Pinckney was in favor of receiving these petitions? That was what he had understood the gentleman to assert.

Mr. Brown. Certainly it was not in favor of granting their prayer.

Mr. Adams said it was not in favor of receiving the petitions, and that fact had been the occasion of the multitude of petitions which had been presented to the next legislature. The refusal of the House, under that very resolution, to receive these petitions, had been the reason for the multitude of them that had been offered since that time.]

Mr. Brown continued. With regard to the Pinckney resolution, it had been a long time since Mr. B. had examined it, but it had always been pointed to as being in a degree liberal, and that very resolution the abolitionists themselves would now prefer, a thousand times prefer, to the 21st rule. His impression was that it did receive these petitions, but laid them on the table.

Mr. B. relied, then, on the clear, manifest experience of this House for demonstration that, if they received these petitions—if they referred and reported upon them—if they gave, in other words, a respectful response to these petitions, he relied upon the practice of the House and the experience of the country that such results as gentlemen anticipated would not grow out of this course of proceeding. Why did gentlemen insist so strongly upon referring these petitions? Why would they refer them? Did they mean to grant their prayer? No. Why, then, did they profess that they were about to do so, by referring the petitions to a committee? Was it done in hypocrisy? He did not charge it, and he would not think it. Why, then, would they refer them? Was it in order to manifest respect to the peti-

Jan. 1844. APPENDIX TO THE CONGRESSIONAL GLOBE. 77

28TH CONG.....1ST SESS.     *Abolition Petitions—Mr. A. V. Brown.*     H. of Reps.

tioners? If that were the reason, Mr. B. would not show it, for he did not feel it.

Mr. B. wished now to state some reasons why he was so much opposed to the reference of and the report upon these petitions? The first was, that if, at every session of Congress, their title to their property was to be brought in question upon this floor, it must of necessity diminish, if not destroy the value of that property. He wanted gentlemen to consider this: that every year, session after session, if they had no rule upon this subject, their title to this description of property (which title they admitted, and which he believed everybody was prepared to admit, except abolitionists) would annually be brought into question in this hall. Would not this finally destroy its value? Suppose a member of this House to have a good and indefeasible title to a tract of land, but yet to be sued for it every year, and that he was able to effect recovery in every litigation: would it not be very natural for him finally to be compelled to say, that although he knew there was no outstanding title, yet, if he was to be sued every year for it, it would be better to give it up to the man who asked for it, although he knew that he had no title to it. If they had the practice of referring these petitions at every session of Congress, the question would be, "How does that committee stand? How many of its members are favorable to abolition, and how many opposed to it? How many will stay here all the time? Will not some go home, and, by an accidental meeting of the committee, may there not be found a majority favorable to the purpose of abolition?" The veriest accident in the world might extract from the committee a report favorable to the petitioners. Alarm and excitement under such a state of things would pervade the whole South; our whole southern population would be tossed to and fro, like the waves of the ocean, at every vibration and change of parties upon this floor. That was one reason why Mr. B. would not begin to take jurisdiction of this question, by reference to a committee.

But there was another reason which actuated Mr. B. in his course upon this subject. Gentlemen surely did not know what was going on in the South. In the spirit of liberality, and just humanity too, they had taught many of their slaves to read; they had relaxed the rigors of their fetters; and with their children they had learned to read, and some to write. Did they not see in a moment the danger, under this state of things, of the debates here annually—not now and then, once in four or five years, but annually—being thrown out upon our slave population? The abolitionists had already sent missives to that region of country. They had first addressed the owners of slaves, and had afterwards sent their addresses to the slaves themselves. They were there now, and were read by their slaves by the flickering lamp at midnight; and so their reports and debates, if they were to be made here annually, would be read by them in like manner.

But in these addresses, and particularly in the addresses of the abolitionists themselves, what had their slaves been told? They had told them to shed no blood, but that they might steal their masters' property of any description necessary to expedite their flight to the free States; and they were assured that their friends were standing with open arms ready to receive them and conduct them to Canada. That was what they were reading now, and no man could tell what the result of that reading would be, much less could they tell what dreadful results might ensue when they read the celebrated Pittsburg letter. In this letter a new idea was brought forward and presented to their view. The opinion was advanced in it that emancipation would come; that the abolition of slavery would be effected in some way or other—whether peaceably, or by blood, it was not known; but, in whatever way it should come, the writer of that letter was in favor of it. When that should be read by their slaves, no mortal man could tell what the consequences would be. Where had the idea of blood been taken from? (asked Mr. B.) The gentleman from Massachusetts had snatched it from the incendiary fires and massacres of St. Domingo. There they shed the blood of the sleeping infant, and piercing its yet warm and writhing body with a stake, marched under it as their banner, with the sword in one hand and the faggot in the other. Who could tell, when these things were read at midnight by the very slaves whom they had favored and taught to read for another and better purpose, what would be the re-

sult? No man could predict. Hence it was that they of the South stood here asking their real friends of the North never—if they could not go with them for the exclusion of these petitions; if they thought that was too strong a proposition, and insisted upon their reception—never to go beyond the reception, or make these petitions the subject of reference, report, and debate in this hall. Our safety (said Mr. B.) depends upon it: the safety of the bright and glorious Union depends upon it. And he wished to say to gentlemen of the North, "You understand what is the intimation of your people upon this subject; you know better how this 21st rule has been mystified, if not misrepresented. If your safety depends upon the relaxation or explanation of the rule, why, give it; but when you have done that, be satisfied. When you have secured the great constitutional principle of petition, there stop. There your principles stop. Beyond that, you are not bound to go; beyond that, you ought not to go; beyond that, you cannot go, in my humble judgment, consistently with the great compromises contained in the constitution."

Now, this was the position of southern gentlemen here. They were of course prepared to vote the strongest measure; they were prepared to exclude these petitions. They did vote to exclude them. The question was, whether this House had any constitutional jurisdiction over this subject. Everybody knew they had not. But *they* of the South—many of them—thought the reception of these petitions was taking the first step in the assumption of jurisdiction. I (said Mr. B.) go for the strongest rule; but if that is too strong either for your judgment, or for that of the people you represent, then give us another rule which will not violate the opinion of your constituents, but which will insure comparative safety and repose to the South. Southern gentlemen could not so much object to that. If they could not get the strongest and best rule, then they had a right to the next strongest and next best. That rule might admit of the clear reception of petitions, but not of their reference to a committee, or of report, or debate upon them, as would occur if there were to be no rule upon the subject; not occasionally, once in five or six years, but every year. Session after session, they would come up to be debated here, which, in his humble judgment, could not be done consistently with the great principles of the constitution; and let him again ask gentlemen, who not mean finally ever to give the redress asked for by the petitioners, why they should be debated, or reported on, or referred? To do so would be but an idle mockery, or a hypocritical pretension.

Mr. BROWN said, so far he had spoken to those who were sensitive on the right of petition. He had attempted to show that this right was not violated in the slightest degree by the 21st rule. He had often sustained this opinion by his votes, and he meant now and forever so to sustain it. He hoped that no man, either in the South or in the North, who entertained the same opinion, would falter or hesitate one moment on the subject. But he could not be insensible to what was passing around him. He saw, or feared he saw, in the already recorded votes of this House, in the report now under discussion, in the speeches of the gentleman from New York, [Mr. BEARDSLEY,] and in that of the gentleman from North Carolina, [Mr. CLINGMAN,] and, more than all, in the exulting shout of the gentleman from Massachusetts, [Mr. ADAMS,] that this 21st rule was doomed to fall. Hence it was, that he had made an appeal, not to him of Massachusetts—not to him of Ohio—but to all those who professed only to be desirous of preserving the right of petition, to go that far, but no farther. All beyond that was concession to the fell spirit of abolition; and no man could be held guiltless who pandered to its wickedness and its folly. The South will hold no man guiltless who shall go one inch beyond the right of petition. He must answer for every fire that may be kindled, and for every drop of blood that may be shed. Yes, sir, I will say to the gentleman from New York, and from North Carolina, if this House shall go one inch beyond that, they may have to stand answerable for the shattered and broken fragments of the Union itself. Going beyond that, the highest hopes and the blackest designs of abolition may find at last their accomplishment:—no, (said Mr. B.,) I am wrong in that. These designs, whatever else may happen, can never be accomplished in any of the ways now proposed. All the efforts now making by them only

rivet the chains of slavery more securely, or make their weight more galling and oppressive. In God's own time, and by means of his selection, these chains may fall, and the bondsman go free. Left to these means, unprecipitated by the officiousness of fanaticism,—the enlightened humanity of the age, the diffusion of religious knowledge, and even the better-estimated self-interest of the master, will soften the rigors of bondage, and render the slave (as he now is in many cases) but little inferior, in the great elements of happiness, to the master he serves. Give slavery but scope and compass—let it dilate itself over ample space—and it loses much of that oppression which even a morbid humanity could deplore. In much of Tennessee, of Kentucky, of North Carolina, and other States of the South, where slavery is not too much *condensed*, I hesitate not to say that, in point of care and anxiety, in point of abundance of food and raiment, of healthful but humble habitation, the slave is but little distinguished from the master. They labor in the same fields, partake of the same food, repose during the same period, and often participate in the same amusements. All ancient barbarity of punishment has disappeared; and the criminal code of the master has kept pace with the amelioration of the criminal code of all civilized nations. This cheering picture, I admit, assumes a darker coloring as you approach the more densely populated regions of the South. But even there, hundreds and thousands of our slaves, were they to visit (as some of them have done) the free States in the North, and scan with an eye of intelligence the condition of their colored brethren, would turn revolting from the spectacle, and cling with gratitude and joy to the protective care and enlightened humanity of their masters. Mr. B. would repeat his solemn convictions, that the means now used by abolitionists could never bring anything to the colored man of the South but an increase of discontent with his present condition. That discontent may bring to him death and destruction. It may lead him to revolt against his master. Without arms, without ammunition, without discipline, without numbers compared with the whites, what could he do? He is hung up on the gibbet, or shot down by his pursuers in the fields which he once contentedly cultivated, or in the forest where so often he pursued his game, the more joyous companion of his master. If the injudicious and really inhuman projects of the abolitionists were to induce our slaves to run away from the South, and seek the aid of their supposed friends in the North, what would be their condition? *Would* the abolitionists prove to be their friends then? No. They would be refused a settlement among them. They would be forced away to the cold and frozen regions of Canada, to perish or to starve; or be driven away like beasts among the Indian tribes of the West, to be enslaved by them, or butchered by the Camanche or other savage nations of the forest. Sir, it is impossible to tell the precise manner of their expulsion and destruction; but expelled and destroyed they would be, whilst true religion and humanity would long weep over their unhappy destiny. Sir, they are comparatively happy now; let them alone. They are fed well, they are clothed well, they are housed well; they do not labor more or harder than the poor of our own color, whose necessities require that they should labor for their subsistence. Let them alone. They are ours by purchase. You of the North (some of you) first kidnapped them, and then brought and sold them to us. Were we to liberate them to-morrow, you would not receive them. You would treat them with a thousand-fold more barbarity than ever they were treated with by us. Then let them alone; your benevolence, false, and often hypocritical as it is, would but kill and destroy them. Let them alone. God in his love, and religion in her holiness, will do more and better for them than you ever can or will do. But I forget (said Mr. B.) that I speak to a bigotry that has no heart, and to a fanaticism that has no ears. I turn, therefore, from them to the men and patriots who belong to these halls—the successors of those illustrious men who reared this temple, and consecrated it forever to the Union and the constitution. If thy people shall lift up their eyes to this temple, and pray thee for what it is lawful to grant them under that constitution, hear thou and answer them. But if they ask thee for what will rend that constitution, and sunder forever that bright and glorious Union, be thou as deaf and insensible as the marble pillars which surround you,

These arguings show exactly what the petition right was designed for, for, When the peoples grievances are repeatedly stated (and proof of these grievances stated and recorded repeatedly) The people have informed this government of what they expect of their representatives, The matter of a narrow majority is the issue, not the right, The avoidance of recording, only allows its citizens & the civil matters of their republican form of government to misguide its citizens

Jan. 1844.   APPENDIX TO THE CONGRESSIONAL GLOBE.   81

28TH CONG.....1ST SESS.          *Abolition Petitions—Mr. J. A. Wright.*          H. of Reps.

the immense burden, the load after load that has been placed upon us; and you have before you, at one view, what we have been required by the government to do, on the one hand, and, on the other, how little, in return, that government has done for us. And I will here remark, if Congress is disposed to aid us, that these appropriations, to have the desired effect, should be regular and annual; for the bottom banks of the Missouri, and the Mississippi below the mouth of the Missouri, are alluvial, bedded on sand, formed out of the sediment of the Missouri river, and constantly falling in, and taking with them quantities of very large timber, which produces a constant accumulation of snags. And here I will observe, that all we ask of the government is, the protection of our commerce—an equal protection with the balance of the Union. Protect our commerce, and let free the trade. Do not trammel us; do not make us "hewers of wood and drawers of water;" do not make us pay a portion of our earnings into the pockets of others; and do not make us pay tribute, or what amounts to it, to any people, here or elsewhere. These things only we ask; and justice, fairness, equality, the constitution, and the principles upon which our Government are based, all demand that we should have them. But, Mr. Chairman, I have learned with great regret—for I know the weight that that committee generally has in this House on subjects of this kind—that the Committee of Ways and Means have stricken out the estimates sent to this House by the Secretary of the Treasury for the improvement of the western waters. I learned, too, that some of them voted in committee for striking them out, because they thought it unconstitutional to appropriate money to protect commerce on these waters. Yes, sir, notwithstanding the constitution expressly gives the power to Congress to regulate foreign commerce, and the commerce between the States, and had given it the power to pass all laws necessary to carry any substantive power granted into effect, and in pursuance to which Congress, by the act of 1804, declared that these waters should be public highways, and should forever be free for navigation to all the States, and to all the people of the United States; thereby taking them out of State jurisdiction, and retaining exclusive national jurisdiction;—yet these gentlemen contend that all this means that Congress can only protect commerce on salt water, not on fresh water—not on the western lakes, or these great public highways.

Sir, the constitution is based upon no such principle; it is not exclusively a salt-water constitution; it is broad enough to cover the whole Union—broad enough to protect inland, as well as external or foreign commerce. It had been adopted by this free government with a view to its acting equally and impartially on the interests of all who were beneath the shield of its protection. And if not, we had better give it up and have one that would. We had, it seemed, in modern times, more able expounders of the constitution than Jefferson, Madison, and Jackson. Jefferson, in 1803, recommended the construction of the Cumberland road; he signed and approved appropriation bills for that purpose; so did Madison, Monroe, Adams, and Jackson. It had gone on until it was stopped by the 25th Congress. It was very constitutional until it had got through the old States; but so soon as it was about to enter the new States it became unconstitutional. But more on this subject when it shall come up for action; for I have not time to dwell upon it now. Jackson, too, let it be remembered, signed and approved bills for the improvement of these western waters. He thought it was as constitutional to protect commerce in the West as it was in the East—on fresh water as it was on salt water. And I would rather, Mr. Chairman, take such men as Jackson and Jefferson as my guide, as to the powers conferred on Congress by the constitution, than the opinion of men who cannot find out that it grants to Congress the power of doing any thing outside of their own neighborhood.

Before I close, Mr. Chairman, I must notice the remarks of the gentleman from New York, [Mr. Hunt,] which were intended for the country, and to bear on the next presidency. And although I regret that any allusion to party politics should have been introduced into debate on such a subject as the improvement of the navigation of the western waters—believing that the people should be let alone, and permitted to make their own President without our interfering with it here—yet the firebrand had been thrown into this hall; the gentleman had thrown the gauntlet; and I, for one, am not afraid to take it up.

And moreover, it is a duty which I owe to myself and to the country, to reply to the gentleman's slang. He said that all this neglect of the interests of the West, was no fault of Congress, but was all chargeable to Mr. Van Buren; he was the sole cause of it; he had been so busy electioneering, that he had no time to take into consideration the improvement of the western waters, or the continuation of the Cumberland road. This is that same old slang that was spread forth thousands of times in 1840. And the gentleman, after it has gone through so many filthy processes, has taken it in—memorized it—digested it, and has now brought forth the filthy stuff again on this floor. Sir, the people, in their sober second thought, have looked into it, and have ascertained it to be, and pronounced what it is—false. Sir, when did Mr. Van Buren oppose the interests of the West? When did he refuse to sign and approve a bill passed by Congress, making appropriations either for the Cumberland road or for the improvement of the western waters? Never. When did he recommend that no appropriations be made for these works? Never. And yet the gentleman, in the face of all these facts, has the hardihood to say that Mr. Van Buren stopped them. Does not the gentleman know that a President cannot enact an appropriation law, or any other law? If not, it was time he was learning the fact that he can only approve or disprove an act passed by Congress; and that Congress has the sole power of passing laws for the general government. And does he not know that Mr. Van Buren signed and approved every act passed by Congress for these works while he was President? And does he not know that, when he came into the presidency, through the Secretary of the Treasury, he furnished the estimates for these works; and that Congress, notwithstanding these facts, like the Committee of Ways and Means now, struck out these estimates, and refused to make the necessary appropriations? If he does know all these facts, then the gentleman has no excuse for what he has said; and, if he does not, it is time he was learning them. Sir, I say (and I defy the gentleman to show otherwise, for the record bears me out) that Mr. Van Buren had nothing to do, in any way, shape, or form, in stopping these works; for, until Congress abandoned them, he recommended appropriations for them. And, sir, if Congress should fail now to make the necessary appropriations for these western waters, you could, with the same propriety, charge Mr. Tyler, who has recommended them, and furnished the estimates, through the Secretary of the Treasury, with having put a stop to these works, as to make the same charge against Mr. Van Buren while he was President: for I have yet to learn that, under our frame of government, the president is responsible for the action or omission of Congress; or that Congress is responsible for the action or omission of the President. The constitution has prescribed the sphere and limits within which each has to move. The same gentleman [Mr. Hunt] was very desirous to know what the democratic creed was. He wanted them to define their position, so that he might know what their principles were, and what they were for. I presume the gentleman has inquired for information. If so, one would presume that the gentleman did not know, until very recently, (probably not until he became a candidate for a seat here, and felt their weight,) that there was such a party as the democratic party in this nation; and that he has now more particularly found it out since he has been here, and is about to enter into battle with them at random; and therefore desires—as he wishes to know how to conduct the battle, and where to strike—that they shall define their position. Well, as I suppose the gentleman is in good earnest, and if he will read, or employ somebody to read for him, I will furnish him the data—the documents by which he will be enabled to arrive at that fact. And I will start upon such political works as Jefferson's; and I will next present him with the hundreds of addresses from the beginning, issued and published to the world by democratic State conventions; next, I will furnish him, down to the last one, the addresses issued and published to the world by all the democratic national conventions that have been held; and, lastly, the actions, the speeches, and the votes, of the democratic members of Congress. And let me inform the gentleman, if he did not know it before, that the principles of the democratic party, from the beginning, were for the public eye; they never espoused a principle that they were ashamed of, or wished to hide from *the public eye;* there had been

no duplicity or double-dealing in their course of action; they never had one set of principles for the private, and another set for *the public eye;* they always knew that their principles were right, and essential to the permanency of our institutions, and to free government; and were, at all times, determined to stand or fall by them; and therefore, knowing they were correct, and, if successful, and carried out, would work the greatest good to the greatest number, were ever anxious to spread them before the world, that the world, seeing and examining them, might be won by them, and embrace them. And now let us turn the leaf; for one who lives in a glass house ought never to throw stones. The gentleman ought to have recollected that he belonged to that famous party who, in 1840, had no principles for *the public eye*—whose principles were different in different quarters of the Union, as would best suit their purposes—who met in national convention at Harrisburg, nominated their candidates for President and Vice President, and, for the first time in the history of political conventions in our government, failed to promulgate to the country the principles upon which they, and their candidates would act if successful, for the purpose of drawing into their fold, until they get into power, all the odd and fag ends of factions, and parties. Their leader obeyed the mandate of this convention. He refused, when called upon, to promulgate any principles for *the public eye.* It is true he wrote some letters touching upon some of the great questions which then agitated the country, but with an express injunction that they were not for *the public eye.* Thus this party, to which the gentleman belonged, instead of being at that time the same thing to all men, were all things to all men—they were bank men or anti-bank, according to the region where they happened to be. Protective tariff men or anti-protective tariff men; abolitionists or anti-abolitionists, as circumstances might require. In a word, their great principles was to have no principles at all. The gentleman seems to have forgotten all this. His memory is short—not three years long. He seems to have forgotten too, that this same party, in 1840, substituted coonery for principles—that is, coons, coonskins, gourds, badges, hard-cider, cider barrels, canoes, carousals, &c. &c.; and, although they had no principles, made a great many general promises—such as, that they would reform the currency; make money more plenty, and make it better; raise the wages of labor, and the price of produce; reform and retrench the expenditures of the government, so as to bring down the annual expenditures of the government to thirteen millions of dollars, &c. &c.; and thus, by this coonery, and these fair promises, they rode into power; and when seated, as they supposed, safely in power, and while yet these promises were warm and fresh in the mind of every one, they turned about and violated every promise and pledge they had made; and commenced a system of extravagance hitherto unknown to the country, and a system of odious measures which they knew were obnoxious to the people, and which they dare not run upon in the canvass. For these reasons, and being bound together by no principle, but bound only with a rope of sand, the people repudiated them; they tumbled to pieces, and are now left with a fragment of what the party then was. The people weighed them in the balance, and found them wanting. Yet some of them contend that their principles were known. How known, when they were different in different parts of the Union? Did they, through the Harrisburg convention, or any other authorized medium, declare themselves or their candidates to be in favor of a national bank? in favor of the distribution of the proceeds of the public lands? in favor of a high protective tariff? in favor of the bankrupt law? and in favor of the mandamus act? No, sir; not one. They did not dare to do it. They very well knew, if they had, they would have been defeated; and yet they passed all these measures through Congress! It is true, the President stopped one of them; and another was so obnoxious to the people that they were forced to repeal it themselves, before their power expired. Besides these, they passed other acts which the people have condemned; but, as my time is about to expire, I shall not have time to enumerate them.

## REMARKS OF MR. J. A. WRIGHT,
### OF INDIANA.

*In the House of Representatives, January 27, 1844.—* On the report of the Select Committee on Rules, proposing to abolish what is usually known as the

82      APPENDIX TO THE CONGRESSIONAL GLOBE.      Jan. 1844.

28TH CONG.....1ST SESS.      *Abolition Petitions—Mr. J. A. Wright.*      H. OF REPS.

21st rule, which rejects certain petitions, and on the amendment offered by Mr. BLACK, of Georgia, to recommit, with instructions to reinstate said rule in the report:

Mr. WRIGHT rose, and said to the House, that he came here prepared to vote on this question, and was desirous that the vote should be taken, and that no debate or excitement should grow out of the same; but, contrary to his expectation, the debate had been prolonged, excitement had been raised, and numerous arguments set forth, to such an extent that he was inclined to say a few words in justification of the vote he should give. This rule, which gentlemen are so anxious to have made a part of the rules for the government of the House, is in the following words, viz:

"No petition, memorial, resolution, or other paper, praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave-trade between the States or Territories of the United States in which it now exists, shall be received by this House, or entertain in any way whatever."

Would any man suppose, taking the history of this government for the last sixty years into consideration, that the House of Representatives, a branch of the highest legislative body of this Union, would at this day be called upon to define what petitions from the people shall be received and what shall not be received?

If this rule is as important as it is said to be, it should exist in some more durable shape than a mere rule of this House, liable to be changed every year or two, and when in existence, depending upon the construction to be given it by the Speaker of the House, upon a paper presented for consideration.

The rule is wrong, whether it is regarded as a question of expediency or one of right. It is presenting to the people a wrong issue; and he would now say to southern gentlemen, in all candor, that it is a false issue—that the issue is not abolitionism, for if they will present that question, they will find the great mass of the people right; and they will find the entire delegation from the West, with, I hope, not one exception, on one side—that is, for the constitution, the whole constitution, and nothing but the constitution, and the compromises thereof.

But you are presenting to the people, by not receiving petitions, the great primary *right of petition*—you are denying to the American citizens the right to be heard. You do, by the construction that certain gentlemen give to the constitution of the United States, say to the people, that they may peaceably assemble and express their opinions, and that the constitution so far guards them in this right, and there it ceases.

You say a member of this House may rise in his place, and state, in a brief manner, the contents of the petition that he wishes to offer, and that this is not injurious. I should be inclined to think that, if the mere reception of a petition is injurious, so is the stating the contents. You say that the receiving of a petition is an incipient act of legislation. Well, what will you call the act of members rising and stating the contents of petitions? I wish to know where gentlemen will stop with these rules; they must go farther than this one to be consistent. A member must not rise and state the contents of the petition that he wishes to offer, and it must be made a penal offence to talk on certain subjects. This rule is a small affair in itself, it is true, but the principle is vitally important; and we should be careful in making encroachments on popular rights; when we are about to establish a new precedent, we should look well to the consequences. There is not now a department of our government, from the smallest county court up to the highest stations, throughout all the ramifications of society, where the people are prevented from being heard by petition; and we are about engrafting a novel principle upon our institutions, and we should look to the results that will follow. It is said, however, that the petitioners *are* heard, and that the House decides upon their petition. I take issue here. You cannot, in a legislative sense, know the contents of a petition until you receive that petition. By taking the *brief statements* of the member who offers to present a petition, you substitute his remarks for those of the petitioners; and the people of this country have a right to the judgments of their representatives, as well upon the fact of what is said to be in their petitions, as they have upon the subject-matter itself. The rule is truly singular in deciding legisla-

tively upon a subject or subjects that, perhaps, the pen is not yet put to paper to which the attention of the House is to be called.

But what does the rule amount to? Does it prevent petitioning on the subjects that were intended to be prohibited by the rule? By no means. You receive, under this rule, petitions asking for the repeal of the rule itself; you receive petitions concerning the independence of Hayti, and numerous other kindred subjects. And suppose you should say that petitions asking for the repeal of the 21st rule should not be received; then, as a matter of course, we should have petitions presented for the repeal of the last prohibitory rule, for some name or number would be given to it. Thus it will be seen how perfectly foolish all such restrictions are; and that the making of these rules is calculated to give consequence to a thing that would be lost sight of, and would not deserve or receive a passing notice, if it was not for the importance that is given to the same in this hall; and in this way we are placing in the hands of those miserable fanatics a weapon, without which all their efforts would be unavailing.

But, strange to say, we are told that there is high precedent for this rule; and the first American authority cited is the one referred to by the gentleman from Alabama, [Mr. BELSER;] that is, the petition presented in the United States Senate in 1834, on the subject of the removal of the deposites; and on the question of receiving the petition, it was decided in the negative. This proves nothing, as gentlemen will see, if they look into the debates; for the disputed point in that case was not the question of the right of *receiving* petitions, but the decision was made upon the ground that the petition was an insult to the Senate—that its language and matter were *offensive*. Now no person contends that it is not the duty of this House to preserve its dignity and character, by rejecting all papers that are vulgar and obscene. But this case proves nothing, for another reason: that the vote was a mere party vote, and that the question was no other than a party question, growing out of the removal of the deposites; but, above all, it proves nothing, because the American Senate represents the *States* of this Union, and the House represents the PEOPLE of this confederacy.

I undertake to say that there is not an American precedent for this rule in the annals of our legislation.

[Here Mr. BELSER, of Alabama, asked permission to make a remark.]

Mr. WRIGHT yielded the floor.

[Mr. BELSER stated that the case presented to the Senate, as he was informed, was on the presentation of the petition; the question of reception was raised, and that was laid on the table.]

Mr. WRIGHT proceeded. He had intended to allude to this very question. The difference in the course pursued by the Senate and House is, that in the Senate a petition goes to the Clerk's desk, and is under the control of the Senate, and the question of reception is waived; in this House, the American citizen has the extreme pleasure of walking out of these walls, with his paper or petition, knowing that the contents of the same are not legislatively understood by the House; but, by an arbitrary and tyrannical rule, made before he committed his thoughts to paper, he is refused a hearing: judgment is pronounced long prior to the date of his offence.

It will be recollected that, by the constitution of the United States, adopted in 1787, Congress is expressly prohibited from interfering with the slave-trade, which might be carried on by the citizens of the different States for the space of twenty-one years; yet in 1790, three years after the adoption of the constitution, the Society of Friends of Pennsylvania forwarded their petition to Congress, praying their interference upon that subject. The petition was received, although in direct opposition to the constitution, and a motion was made to refer it to a committee. This was opposed; and a proposition to lay on the table was made. Mr. Madison, from Virginia, a slave State, and who is justly called the father of the constitution, used the following language, to which I respectfully call the attention of gentlemen who are looking so anxiously for precedents:

"Mr. Madison thought the question before the committee was no otherwise important than as gentlemen made it so by their serious opposition. Had they permitted the commitment of the memorial as a matter of course, no notice would have been taken of it out of doors; it could never have

been blown up into a decision of the question respecting the discouragement of the African slave-trade, nor alarm the owners with an apprehension that the general government was about to abolish slavery in all the States. Such things are not contemplated by any gentleman; but they excite alarm by their extended objections to committing the memorials. Gentlemen may vote for the commitment of the petition without any intention of supporting the prayer of it."

Thus spoke James Madison three years after the adoption of the federal constitution; and on a subsequent day, the debate still continuing, he used the following language on the same subject:

"The debate has taken a serious turn; and it will be owing to this alone if an alarm is created; for, had the memorial been treated in the usual way, it would have been considered as a matter of course, and a report might have been made so as to have given general satisfaction. * * * * * The petition prayed, in general terms, for the interference of Congress, so far as they were constitutionally authorized; but even if its prayer was in some degree unconstitutional, it might be committed, as was in the case of Mr. Churchman's petition, one part of which was supposed to apply for an unconstitutional interference by the general government."

And it must not be forgotten that this language was used on the question of commitment. Not one word is said in any of the debates on that occasion as to the question of reception. The question of rejecting petitions was left for this day; and gentlemen will see, if they look at the vote taken on commitment, that it was about six to one, Mr. Madison voting in the affirmative; and this is as good authority to me as an *ex parte* decision of the House of Commons or Lords of England, made without debate, and nothing to show, in all the cases cited that I have examined, that the question of reception was ever raised.

But I would call the attention of gentlemen to the arguments of another distinguished member of Congress, who was from a slave State; one whom I always admired, and whose public life I have watched from my earliest days. He is no more. I allude to the remarks of Felix Grundy, from Tennessee, in the Senate of the United States, March 3d, 1836, on this question:

"Therefore, if there were no constitutional doubts existing, he would, as a matter of expediency, vote to receive the petitions, to be followed up with a vote to reject their prayer. But he confessed that the constitutional right to refuse to receive a petition was very far from being clear. The right of petition existed before the formation of the constitution. It was well understood by the framers of that instrument; and although it only declares that Congress shall pass no law to prevent citizens from peaceably assembling and petitioning for a redress of grievances, it never could have entered into their minds, that those to whom the petitions were addressed would refuse to receive them. Of what value is the right of petition, if those to whom petitions are addressed will not receive them, and act upon them? The framers of the constitution remembered that the Parliament of Great Britain had passed laws prohibiting citizens from assembling, consulting, and petitioning for a redress of grievances. They recollected the acts commonly called the riot acts, and therefore they inserted the provision contained in the constitution. But it never entered into their minds that petitions, when signed, would not be received by those to whom they were addressed. It was a matter of very little consequence to citizens that they are permitted to assemble and petition for a redress of grievances, if, after they have done so, their petitions are not to be received or considered by those who have the power to act upon the subject-matter of the petition. To his mind these arguments were too strong to be disregarded; and he was unwilling to give the abolitionists the benefit of them. At present, they have no foundation on which to stand. They are giving way to the pressure of the public intelligence in the non-slaveholding States. But if we shall enable them to blend the right of petition with their abolition schemes, they may raise a storm which will shake the very foundation of this government. From the year 1790 down to the present day, all petitions have been received by this body which were respectful and decorous, whatever the subject-matter of the petition might be; and at every session, the petition of the Society of Friends, clothed in similar language with the present one, has been received.

Jan. 1844. APPENDIX TO THE CONGRESSIONAL GLOBE. 83

28th Cong.....1st Sess. *Abolition Petitions—Mr. Saunders.* H. of Reps.

Mr. G. would not depart now from the established usage. He considered the reception of the petition and the rejection of its prayer as the strongest course against abolition that could be adopted. It would unite more voices, and convey a clearer expression of the sentiments of the Senate, than any other mode that could be proposed, and would therefore operate as a greater discouragement to those who were engaged in this wild and unconstitutional scheme of abolishing slavery in the United States."

It would be difficult to find a more correct history of the times, though spoken six years ago; and almost every prediction has been fulfilled. You now see, since the adoption of this rule in 1840, these miserable fanatics and enthusiasts going through the country, setting up their *notices* and *placards*, large as life, and in all of these announcements, they are for lectures to be given on *the right of petition—the right of petition*. Thus we have an issue made wholly different from that of abolitionism. And I now ask gentlemen to say whether they insist on this false issue? Will they press the question in this shape? I ask them to change it, and to meet the question in some other way—either, as Mr. Grundy says, by rejecting the prayer of the petition, after the reception, or by some direct vote putting the matter to rest. For one, I am determined to vote so as to give this question its true appearance. I have a sovereign contempt for these wild, deluded, enthusiastic abolitionists; yet I cannot vote for the rule. I want to take this weapon out of their hands, and let them stand forth on their own principles; and if they had not this rule, or question of the right of petition, (connected as it is with their movements,) they would not be worth, in a short time, a passing notice.

It has been asked in this debate by gentlemen, whence comes this right? and others talk about this being a constitutional right. I do not look upon the right of petition as a constitutional right. It is guarded by that wise instrument, not created by it; no more than the freedom of the press, the liberty of speech, or the right to worship God.

These rights man does not trace to any act of Parliament—to any revolution. They are not to be regarded as grants, gifts, or privileges; but they belong to man inherently—are things that appertain to him as an individual, and which he has the authority to exercise in the social state, where the mind is not fettered by human legislation.

Our forefathers did not place the provision that is in our constitution in the first constitution that was adopted; it was inserted in the amendments, at the suggestion of the State of Virginia herself; and gentlemen pay but a poor compliment to the wisdom of those patriots and sages, when they assert that the provision was incorporated *because* the mother country had an act against tumultuous petitioning, and what is known as the "riot act." These things may have had their influence; yet they were conscious that Anglo-Saxon blood was in their veins: and we find this true Saxon feeling exhibiting itself long before the adoption of a written constitution, and that was in the right of the people to participate in the popular administration of the laws; and this feeling was regarded, acknowledged, and cherished, as one of the paramount, primary rights of republican government.

I would not vote to disturb the institution of slavery in the District of Columbia; for all men must see that the subject of slavery here is so intimately connected with slavery in the States, that you cannot strike here without disastrous consequences there. Slavery is an evil, but an evil that ought not to be interfered with in this District, without the consent of the slave States themselves.

We are anxiously asked what we would do if these petitions were received? I should be governed by circumstances. If they were received—as that alone would admit the right of petition—then I would pursue that course best calculated to allay all excitement and restore peace and harmony. I have ever been taught to regard slavery as an evil; yet we of the North and West have nothing to do with slavery in the South. The remedy is in their own hands. We have nothing to do with their rights on this subject; and I would be the last man on earth that would disturb them in the possession of what the constitution unequivocally has guarantied to them.

Those who contend that we have the power, and that it is right to exercise it, by prescribing to the people what shall not be received, certainly admit that the converse of the proposition is true, that we should say what shall be received; and when the time comes that we shall, by rules or otherwise, prescribe to the sovereign States of this Union what they shall present from their sovereignty, then, I apprehend, we shall not be much troubled with the name of State rights, State sovereignty, &c.

In regard to the constitutional right of Congress to abolish slavery in this District, Mr. Madison, and other distinguished men, from his day down to the present time, have conceded that this power belongs to the Congress of these United States. But I wish gentlemen to keep out of their minds the question of slavery; and to look at this rule as it stands, and where we shall end if we proceed on in this track. Suppose we incorporate this principle upon our institutions, that whenever a subject is calculated, by any course that might be taken on the same, to produce discussion, excitement, and, in the language of gentlemen, "insurrection itself," and should, by some rule like the present, attempt to prevent anything from being said on the subject, or from hearing the people by petitions, joint resolutions of the States, or what not:—Well, the restrictive system is kept up until the industry of the South is destroyed, until her fair fields and sunny hills no more present that smiling appearance that is peculiar to the "land of the orange and vine;" the system is continued until the many are robbed for the benefit of the few, and the South presents her petitions and joint resolutions, and they set forth that the system itself is unconstitutional; then we shall hear from the North —from the old Bay State—the language that now comes from the South, from the Carolinas. We shall be told by New England of vested rights, and even of the emaciated mother weeping over the cradle of her hungering child in some manufactory, and that the reception of those petitions are calculated to paralyze the industry of the North; to break down her interests; to ruin her society. So we must make a rule on that subject. Thus it may be said of the bank question, of free trade, of distribution, &c.; all of which, in the language of some gentlemen, are inhibited by the constitution. Thus we may go on with these restrictive movements, and dangerous encroachments upon popular rights, until we shall lose sight of those great questions which lie at the very foundation of our republican institutions. I do not approve of the course that is pursued by certain members on this floor, (pointing to Messrs. Adams and Giddings;) I do not like the spirit and temper with which they press this question. I could not be made the instrument of presenting, or attempting from time to time to offer petitions in violation of this rule. I shall give my vote to abolish that rule; but if this House determines to retain it as a part of their regulations, it will be my duty to yield, and not to wage war from day to day against it; but, on the contrary, as one of the representatives of a law-abiding people, to do all in my power to allay excitement and bitter feeling.

I would say, in all sincerity, to those who appear to be so anxious to effect the emancipation of slavery—who look at causes rather than effects that will flow from the course they are pursuing—that this question should be surrendered to the influence of time, of truth, and the progress of civilization. Man has been left by his Creator to learn from experience. Time, as an element, enters into almost everything that is valuable. Christianity itself, with all its light and Divine origin, has been left by its author to work its way by moral means and moral force; and now, at the end of the eighteenth century, unrestricted by law and unshackled by governmental establishments, it presents itself in its most beautiful form. Civil liberty has been struggling in all ages; and after the lapse of a thousand years and more it has obtained an unquestionable ascendency. From all this we might learn a valuable lesson—that the influence of truth, acting on the human heart, will have its way; that the question of slavery, and all other questions of this character, should be left to be governed by the American mind; that the two hundred millions of freemen who are to inhabit this nation a century hence, should exercise their judgment upon it, and let it stand or fall by the retrograde or advancing march of free principles.

I hope that gentlemen see this question as understood by the people; that it is not regarded as one of abolitionism, but one of petition. And it becomes the duty of this House to change the issue. It is *now* regarded by the great mass of the people of the free States as a blow struck at what they consider the right of every citizen in this country—the RIGHT *to be heard.*

Let this government move on its own appropriate sphere, and not attempt by restriction and encroachment to fetter the American mind, or trammel the principle of free inquiry. Then the mind of this people will rise up to a point that will expand, invigorate, and cultivate their whole mental powers. And in this great movement for the advancement of man, "the virtue of earth and the holiness of heaven" are pledged in his support. Then will the day come when the mind of man shall govern man, and the nations of the earth be glad.

# SPEECH OF MR. SAUNDERS,
### OF NORTH CAROLINA,

*In the House of Representatives, January 19 and 23, 1844*—On the motion of Mr. Black of Georgia to amend the motion of Mr. Dromgoole of Virginia to recommit the report of the Select Committee on the Rules, by instructing them to report to the House the following rule, viz:

"No petition, memorial, resolution, or other paper praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave-trade between the States or Territories of the United States in which it now exists, shall be received by this House, or entertained in any way whatever."

Mr. SAUNDERS rose and spoke to the following effect:

It is my purpose, Mr. Speaker, to vindicate the 21st rule, and to answer such of the recent prominent objections as have been urged against it. Whilst I have manifested some anxiety to obtain the floor at an earlier day, I had not desired, at the outset, any discussion on the subject whatever. Hence my votes to lay on the table, and for the previous question. Not that I felt unwilling to meet the opponents of the rule in debate, but that I supposed discussion on the subject would do no good here, and might produce mischief elsewhere. In saying this, I beg to be understood as not complaining of my colleague, [Mr. Clingman,] who addressed the House some days since; because, from his situation—his unfortunate situation, as I consider it, (separated from the delegation of his own State, and the entire delegation of the South)—explanation on his part was both proper and becoming. But he will pardon me for saying, however well satisfied he may be with his own course, and however much he may feel flattered by the manner in which his remarks may have been received in certain parts of the House and of the country, I doubt if they will prove equally satisfactory to the section of the country from whence we come.

But, sir, I am admonished, by the limits of my hour, to proceed at once to the points which have been made in the debate. It is said, in the first place, as I understand the objections, that the rule violates the right of petition; that it is wrong in itself, having been productive of no good, but much mischief; and that it should be revoked, in obedience to the public sentiment at the North, in order to save those friends and allies who have stood so manfully by us in support of the rule. These, I believe, cover the whole ground of objection, and these I hope to meet and answer in a satisfactory way.

First: It is said the rule violates the sacred and constitutional right of petition. It has been distinctly asked, and I repeat the question, What is it gentlemen mean by the right of petition? We desire some precise and definite answer—not the vague and general answer which has been given, that it means the same thing in regard to abolition petitions that it does in regard to all other petitions. This, with due submission, is no answer at all. We desire to know where the right begins, and where it ends. If it be, as is contended, a constitutional right, which the House is bound to respect, then most certainly it is susceptible of some precise definition. If gentlemen mean merely to say that the people have the right peaceably to assemble, and to petition Congress for a redress of grievances, then it was not necessary to travel back to Magna Charta to establish what none will question. And I go further, and admit not merely the right of the people thus to assemble and petition for a redress of grievances, whether real or imaginary; but that they have a right to expect from their representatives an answer to their petitions. But if I am to understand these advocates of the right of petition as denying to Congress the right of deciding as to the manner and mode of giving this answer, as well as the time when, then I am prepared to contest the existence of any such right. The constitution declares: "Congress shall make no law abridging the

84                     APPENDIX TO THE CONGRESSIONAL GLOBE.                     Jan. 1844.

28TH CONG.....1ST SESS.              *Abolition Petitions—Mr. Saunders.*              H. OF REPS.

freedom of speech, or of the press, or of the right of the people peaceably to assemble and to petition the government for a redress of grievances."

Now, sir, I doubt not the cause suggested by my friend from South Carolina, [Mr. RHETT,]—the riot and sedition acts, as they existed in the mother country—was the true cause of inserting this prohibitory article in the amendments to the constitution. But, whatever may have been its origin, we find it in the constitution, and as intended to guard the personal privileges of the citizen, and as such it commands our respect. You shall make no law (and the rules of this House, as I admit, are laws, so far as this matter is concerned) abridging the freedom of speech. Yet, at the last Congress, you adopted the one-hour rule, and have again adopted it, thus limiting every member in his right of speech to one hour. Again, you have a rule authorizing a call for the previous question, which, when sustained by a majority, closes all debate, and even cuts off debate at the outset, if then put and carried.

These rules most clearly abridge the freedom of speech; yet they rest on the power of the House—a power which belongs to all parliamentary bodies—of regulating its own proceedings. Your one-hour rule presupposes the indulgence of unlimited debate as retarding the business of the House; and your previous question is founded on the belief that any debate is injurious to the public interest. Hence, whilst many have, and still question the propriety of these rules, none can deny your power to enact them, as a means of regulating abuses.

Again: Congress shall make no law abridging the freedom of the press; and though I be no advocate for sedition laws, and would sooner see it run into licentiousness than have it curtailed in its privileges, yet I suppose none can doubt the power of Congress to make it an indictable offence for any press here to libel a member by a false charge of bribery. But to the matter in debate.

It is asserted that the rule violates the right of petition. How? Because it excludes the petition from being received, heard, and acted on. By the parliamentary law, no petition is receivable unless on leave; and, as modified by the rules of the House, any member may object, and raise the question of reception—determinable by a majority. This is the principle on which the rule for excluding abolition petitions rests. A majority desire to save the time of the House by avoiding this question of reception on every petition which is debatable, and because they believe Congress possesses no power to legislate on such matters; or if they have the power to legislate, they ought not to do so; and hence the rule for excluding such subjects altogether. It is the solemn judgment of a majority, adopted after argument and deliberation. It is the very question we are now considering, whether this rule shall stand as the judgment of the House.

But it is said, you do not give the petition a hearing, and, says my colleague, [Mr. CLINGMAN,] you cannot know that the petition asks for that which is unconstitutional, without a hearing. And herein, Mr. Speaker, consists the fallacy of the argument, because it is not true in point of fact. Your rule declares "that no petition or other paper, praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave-trade between the States, shall be received by the House." Now, sir, unless the prayer of the petition asks for one of these four things, the rule has no effect. The rule does not attach, nor is the Speaker authorized to put it in force until he learns from the member, or by reading it himself, that its prayer embraces one of these objects. The member is heard, and, through him, the petitioner speaks, in a "brief statement" of the contents of the petition; not by giving the argument, but the facts, and what it is the petition asks to be done. It is on this statement that the Speaker pronounces the decision of the House, as declared by the majority in the adoption of the rules, that they will not legislate on the subject of abolishing slavery in the States, the District, the Territories, or the slave trade between the States; and therefore it is they will not receive any petition touching these matters.

I admit, whenever a majority are prepared for legislation on any one of these subjects, the rule should be so modified or rescinded. But unless the majority are thus prepared for action, the rule should stand; as I think I have succeeded in showing it neither abridges any right of the people peaceably to assemble, nor does it exclude them from a hearing. They certainly do not claim to be heard at our bar, or to have their petitions read and printed, unless it be the pleasure of the House to grant it, as a matter of respect, or with a view to its own information. This is a favor which the House extends at its own discretion. These abolition petitioners are heard as all other petitioners, and are answered by the rule. The journals of the House show the names of those who vote for the rule, and thus declare to the petitioners, who are in favor and who are against their petitions.

I repeat, then, according to our rules of proceeding, the petition is heard and considered, and the result is made known by the presiding officer of the House, when he is called on to execute the rule. The answer is, then, as distinctly given as if a vote was had on each and every petition. I ask, then, why receive, debate, and consider each petition separately, when the judgment of the House has been formed and taken against them collectively? Such is not the course of proceeding in our courts, where the rights of person and of property are involved. *Res judicata* is a rule of jurisprudence, not only from its fitness and propriety, but because, without it, an end could never be had to litigation. I do not mean to say the present Congress should refuse to grant what has been refused by its predecessors; but I do say, common respect for ourselves requires that we should adhere to and maintain our own judgments.

But it is demanded that we should treat these abolition petitions with the same respect we do all others; and that we dare not thus treat the petition of the revolutionary soldier. I will not stop to inquire whether the abolitionist be entitled to the same respect as the soldier of the revolution, whose work he seeks to destroy. But how stands the case of the soldier? Your law has declared your soldier shall only be entitled to a pension on showing six months' service, or more; and his widow, on proof of marriage prior to the year 1794. Now, would you receive and consider the petition of the soldier, if he only claimed a service of three months? or that of his widow, if married subsequent to the period fixed by law? If you did, it would be from mere courtesy, or with the view of changing the law—considerations which do not operate in favor of abolition petitions. In the case of the soldier, the law answers the petition; in the case of the abolitionist, the rule of the House gives the answer. In either case, the reception and consideration of the petition would be a useless consumption of time.

This brings me to the question, whether the rule be in itself right and proper? I understood the gentleman from New York [Mr. BEARDSLEY] to admit, if the petition asked Congress to interfere with the institutions of slavery within the States, it was what we could not constitutionally do, and therefore such petitions should not be received; but if it asked the abolition of slavery within the District of Columbia, it then became a question of expediency, and such petitions should be received. Now, sir, this is the very question I desire to meet and to answer. It is admitted it is not constitutionally competent for Congress to interfere with slavery as it exists in the States; so I deny that Congress possesses any rightful power to abolish slavery within this District. The constitution contains no grant or power to appropriate the public money for any such purposes. The gentleman from New York admits the master's right of property in the services of his slave. It is an admission any one, not a maniac, or infected with the mania of abolitionism, is forced to make. This right of property existed both in Virginia and Maryland at the time of their deeds of cession to the United States of this District. As early as 1715, Maryland, then a colony, declared all persons of color within its jurisdiction, or who might be brought there, and their descendants, should be slaves for life. Such was the statute law in Maryland; and the same principle prevailed in Virginia. The act of cession contains the following *proviso:*

"That nothing herein contained shall be construed to vest in the United States any right of property in the soil, or to affect the rights of individuals therein."

And although it has been contended that this condition only applied to the rights of individuals in the soil, it will be found from the scope of the whole act, that this is too narrow a construction; and that it is intended to guard and protect personal rights generally. But however that may be, I do not rest my argument on that ground. I say this protection of individuals in their property is secured by a much higher power: it is to be found in the constitution itself. The fifth article of the amendments declares, "Nor shall private property be taken for public use without just compensation." This direct recognition of private property, and that it can only be taken for "public use," excludes the idea of its being taken for any other purpose. I had supposed the gentleman from New York [Mr. BEARDSLEY] and myself belonged to the same political school, so far at least as the constitutional powers of Congress were involved; that we both drew our test and rules of construction from the same high source; that, whilst discarding the modern doctrine of the general welfare, which substituted the will of the majority for the constitution, we adhered to the good old republican principles of 1798, as established by Madison and Jefferson, and as carried out by honest George Clinton, when, as Vice President, he gave the casting vote for the rejection of a renewal of the charter of the United States Bank. But I fear, with the gentleman, as with others who claim to be within the republican fold, what was then deemed sound in principle is now to be taken as southern abstractions. Will the gentleman turn to the eighth section of the first article of the constitution, and tell me if he finds there any power to appropriate the public money to the purchase of slaves? Yet in that section is to be found an enumeration of your constitutional powers. In that section I read that Congress shall have power, *inter alia,* "to lay and collect taxes; to pay debts; to borrow money; to regulate commerce; to establish post offices and post roads; to declare war." Does the gentleman concur with that political class who derive the power to carry on a general system of internal improvements from the power to regulate commerce? or does he derive it from the power to establish post offices and post roads? or will he seek it in the war power? No, says the gentleman; he subscribes to no such political heresies. But within this District you possess unlimited jurisdiction; here your powers are as omnipotent as that of Parliament itself, because here you have the right "to exclusive legislation in all cases whatsoever." I shall not question the right of Congress to legislation within this District, to the exclusion of all other legislative bodies; but still it does not follow that your powers, even here, are without limit or restriction. If so, what becomes of the prohibition against an order of nobility, or of an established religion, and the free exercise thereof? Can you have an order of nobility and an established church within the limits of these ten miles square? And why not? Because of the injunctions of the constitution. And is not the injunction that private property shall not be taken but for *public use,* and that on compensation, just as obligatory in the one case as in the other? The same article of the constitution gives to Congress the power to erect forts, magazines, and arsenals, and grants it the "like authority" as within the District. And am I to be told the land ceded by North Carolina for an arsenal may be made the receptacle for slaves, and that Congress possesses the power of declaring that every slave who may enter its limits shall be free? If so, cannot you go farther, and say they shall be armed and received into your military ranks, and thus give us here (what are to be found elsewhere) regiments of blacks? Can gentlemen be surprised that every southern man should feel startled at such a claim of power? And to this end must it lead, if not met and resisted at the threshold. I know the gentleman from New York said, while he claimed the right of emancipation, he waived the question of compensation. Now, with due submission, he must allow me to say this was dodging the question. Your right to emancipate depends upon your power to compensate. I say you have no constitutional competency to appropriate the public money to any such object; and therefore you cannot emancipate. I do not question your right to pass laws authorizing their owners themselves to manumit, either by will or deed. What I deny is, your power to raise by taxes, levied on the thirteen slaveholding States, the means of purchasing from their owners, within this District, their slaves, with or without their consent. I will not say, Whenever you exercise this power of emancipation within this District, the Union is dissolved: I use no such threat. But this I will say, When you shall be so reckless of consequences as to do such an act, it will be no longer a debatable question; but every man who is not faithless to his own household will stand to his arms.

And now, Mr. Speaker, allow me to notice the personal allusion of the gentleman from Massachusetts, [Mr. HUDSON.] That gentleman has thought fit to ask me (for what purpose I know not) if I did not myself, years ago, introduce an abolition petition. The same matter has been repeatedly brought

Jan. 1844.    APPENDIX TO THE CONGRESSIONAL GLOBE.    85

28TH CONG.....1ST SESS.    *Abolition Petitions—Mr. Saunders.*    H. of Reps.

before the people of my own State, where, I believe, it has been explained to the satisfaction of such as have heard me. I was in Congress for the first time in the years 1821-'22, when I received a petition from a Society of Friends, highly respectable persons, asking for the abolition of slavery and for the suppression of the African slave-trade. The President (Mr. Monroe) had called the attention of Congress specially to the latter subject; and a select committee (at the head of which was a gentleman from South Carolina) was created on the part of the message. The petition was presented by me, received, and referred to that committee. Thus far the subject was a legitimate one, and there was nothing wrong in the matter. This might be a sufficient answer to the question. But I desire not to take refuge under such a technical cover. At the time I offered that petition, all was quiet; the fell spirit of abolitionism had not then sought to disturb the harmony of our proceedings in this hall, nor to poison the public feeling in regard to this distracting question. What was innocent then would be criminal now. What I then did, without reflection, I would not do now after reflection. The question of jurisdiction in regard to slavery had not then been made, at least not to my knowledge. I trust this answer will satisfy the gentleman; and that, instead of seeking to find a precedent to justify his own conduct, he and his friends will follow my example, and promise in this particular to sin no more.

I return to the next point in the argument, (the 21st rule. Was it, as has been asserted, wrong in itself, effecting mischief, rather than good? By what process of reasoning are gentlemen brought to this conclusion? It is said a majority may grant leave to any member to introduce a bill abolishing slavery within the District, and pass it in defiance of the rule. Grant it: and what does that prove? That the rule is either useless or mischievous? Most certainly not. On the contrary, it establishes that the right, which is so zealously insisted on, is in itself useless. If the majority have the right of action, as I admit they have, then why trouble ourselves with receiving, hearing, and referring these petitions? It is because the majority say they are not disposed to act, that I insist on the utility of the rule. My colleague says he is opposed to abolishing slavery, and a majority concur in that opinion. Then, I ask, for what end receive and consider these petitions? Does he desire to bring this out-door sentiment to operate in the House, so as to change our present majority into a minority? I hope not. I have no disposition to disturb the relation between the constituent and his representative. I admit confidence, mutual and endearing, which should subsist between the representative and constituent, to constitute the brightest gem in the diadem of a representative government. I desire not to tarnish its lustre; but still I cannot consent to see the bad feeling out of the House brought to operate here, in order to change what all should admit to be right. Gentlemen deceive themselves when they say discussion on this subject can do no mischief. It is one of the very ends resorted to, in order to render the slave discontented with his condition. And I doubt not the triumph which the gentleman from Massachusetts [Mr. ADAMS] says he has gained within these walls, has already been sounded elsewhere. I beg not to be misunderstood. Whilst the South does not fear the slave, and believes them contented if not excited into mischief, none are so hardy as not to dread the awful consequences of insurrection. It has not been the fortune of my colleague, nor of other members on this floor, as it has been mine, after these threatened insurrections, to stand by the anxious mother as she watched over the sweet slumbers of her innocent babe, when the smallest whisper, like the fire-bell at midnight, beats alarm to a thousand fears. I say, then, to gentlemen, unless they are prepared to act, to pause, and to silence forever these mad disturbers of our peace and repose.

I cannot now, Mr. Speaker, to the last point which has been made in this discussion, and that is, the call upon the South to surrender this rule, in order to propitiate the public sentiment of the North, and to save those friends who have stood so manfully by us on this question. So far as my colleague is concerned, his appeal has but little effect. He has acknowledged his opposition to the rule—that he thinks it wrong, and ought to be given up; and his political friends at the North have voted against it. Yes, sir; if the gentleman will take the trouble to examine, he will find but a single whig

vote in favor of the rule north of Mason and Dixon's line, and the head of that individual has, within a few days, fallen a victim to the guillotine in the other end of the Capitol. So to the gentleman from Massachusetts, [Mr. ADAMS,] who seeks to propitiate high Heaven as a reward for his exertions, and claims the applauding *vox Dei*, to cheer him on in his heedless course, I turn with a deaf ear. The gentleman from New York [Mr. BEARDSLEY] come in a still more questionable shape. He claims not the approbation of Heaven, but the plaudits of *vox populi*; and from the signs of the times, and the billing and cooing in certain quarters, it is not difficult to divine whose favor he seeks to gain. Let me, then, say to gentlemen, in all candor, if the democracy of the South are to be thrown off for these abolition allies, all we desire is, to know it, that we may take our discharge without asking. The call coming from such quarters as these, I regard not. But those who have hitherto acted with us in good faith, and whose sincerity we cannot now question, for one, I am prepared to treat with the utmost kindness and respect. To such I beg to say, they greatly deceive themselves if they can possibly suppose any modification, or even the repeal of this rule, will silence this out-door clamor about the right of petition. No, sir. And I beg to invite for a moment the attention of my northern friends to the legislative history in regard to this matter. These abolition petitions had been received, and referred generally to the Committee on the District of Columbia, where they remained without action. This course was not satisfactory to the petitioners, and they became clamorous, that, in 1836, they were referred to a select committee, of which Mr. Pinckney, of South Carolina, was chairman. That committee reported three resolutions: 1st, That Congress possessed no constitutional power to interfere with the institution of slavery in the States; 2d, That they ought not to abolish slavery within the District; and, 3d, That all abolition petitions should be laid upon the table without debate. These resolutions were adopted by large majorities. Still the abolitionists were not satisfied, and these petitions continued to multiply and disturb the proceedings of this House. Next came the Atherton resolutions in the year 1838, which declared, in substance, that it was not competent for Congress to interfere with the question of slavery in the States; that any interference with the matter within the District of Columbia, with intent to abolish slavery within the States, was against the spirit of the Constitution, and in violation of the public faith; and that all petitions touching the question of slavery should be laid upon the table without debate. These resolutions were adopted at a period of great excitement; and as they admitted the reception of the petitions, it was hoped the matter might end. Not so, when the House was driven into the adoption of the 21st rule, which forbids their reception. With these recorded facts before their eyes, I ask gentlemen, in all candor, how it is possible for them to suppose the mere reception of these petitions will silence their clamors about the right of petition. They might as soon expect to extinguish the conflagration, by adding fuel to the flames. I repeat, then, there is but one alternative—rejection without action, or reception and action. There is no middle-ground that can satisfy those who are resolved to press this matter, whatever its consequences. You would not listen to the petition of him who calls upon you to fire the splendid edifice in which we now sit. Why, then, encourage these new incendiaries, who seek to destroy the very temple of liberty, and involve in its ruins all that we hold dear on earth. [Here the morning hour expired, and Mr. S. was forced to take his seat.]

Mr. Speaker, allow me to devote the short time I have left of my hour, in a reference to some other matters in support of what I said on a former day, that nothing short of action will satisfy these abolition petitioners. I beg, in the first place, to refer the gentleman from Massachusetts, [Mr. ADAMS,] and those who think with him that Congress is bound to receive these petitions, to the report of the Committee on Rules, consisting of a majority of his political friends, and the chairman his own colleague, made at the first session of the last Congress. He will there find that the committee recommend a modification of the rule, so far as to provide that the question of reception shall be considered as made on the presentation of any abolition petition, and that question shall be laid on the table without debate; thus yielding the ques-

tion of reception, and avoiding that of jurisdiction, against which the South contends. I again call the attention of my northern friends to what is transpiring on this floor, to satisfy them that nothing but mischief can follow the repeal of this rule. You will have a discussion of the whole matter on the question of reception of each petition. How much better, then, even so far as time is concerned, that the question should be met at once, by excluding such petitions altogether. You have seen the character of the petitions introduced on yesterday by the gentleman from Ohio [Mr. GIDDINGS] and New York [Mr. BEARDSLEY.] The constitution directs that all fugitive slaves "shall be delivered up," whenever they may escape from one State into another, on the claim of their master. And Congress, by the act passed as early as 1793, has provided the legal mode of asserting this claim, and of recovering the fugitive. The Supreme Court, by a recent decision, has said this power of legislation belongs to Congress, independent of the States; and yet these petitioners call on Congress to revoke this injunction of the constitution, and to protect the runaway slaves from their masters. Such an application, one would have supposed, could have found no countenance here. I desire further to call the attention of gentlemen to another proceeding in this House—to the resolution coming from the legislature of Massachusetts, which has been received and referred to a select committee; which resolution, the gentleman [Mr. ADAMS] informed us, came from a democratic majority of that legislature. I beg to refer the gentleman to a different paternity for the origin of his resolution, as well as to a different source for its revival. The House had not forgotten the petition of George Latimer, backed by fifty-odd thousand persons from the gentleman's own State. Let me tell gentlemen, and my own colleague, who this George Latimer was: a runaway slave from the State of Virginia—a slave who had been pronounced as the property of his owner by one of the judges of our own supreme court; and still that law-abiding people were unwilling that this man should recover his property, and had forced him to dispose of it at a mere nominal price. And yet my colleague is willing to throw open the door of this House to receive the petitions of runaway negroes. And are we to sit here, receive, hear, and consider petitions coming from slaves, painting in all the horrors of their imagination their former condition, and slandering and abusing the people of the South? This may accord with what the gentleman may consider as due to the South; but it does not accord with my notions, or that of the people I represent. Let me, Mr. Speaker, trace this petition a little farther. Not having received a favorable hearing here, we next hear of it in the legislature of Massachusetts. It there met a more favorable reception, being referred to a select committee, the chairman of which was the son of the gentleman, [Mr. ADAMS;] and in his report we find the same arguments we have often heard from the lips of his father. Such had been the revival. Now, sir, for the origin of this proposition. The House had not forgotten some of the memorable occurrences of the late war—that this same State of Massachusetts had then called a convention, which afterwards sat at Hartford, in Connecticut. Yes, sir; during the darkest period of that war, the persons there assembled, (as appears from Niles's Register, which I hold in my hand,) had agreed on this very proposition to amend the constitution, by uprooting and destroying the very basis upon which the constitution rests, by depriving the southern portion of the Union of that representation on which is founded the only surety for their slave property. Yes, our labor is to be taxed, in order that its proceeds may be appropriated to our own destruction. Gentlemen deceive themselves if they suppose a free people can or will submit to such an act of self-destruction. But, Mr. Speaker, you have not forgotten the reception of those who came here to submit such a proposition as this to a republican Congress. The country had then been delivered from war; the bosom of every lover of his country beat with gratitude for this deliverance; the war had just closed in a blaze of glory; the star-spangled banner floated on the mountain wave; and the American eagle flapped his wings in triumph on the plains of New Orleans. It was at a period like this that the emissaries arrived. Did they come within these walls and ask this House to receive their message? No, sir; they skulked away in darkness, fit objects for the slow unmoving finger of scorn to be pointed at. And this was the proposition, conceived in disaffection and brought forth in

86     APPENDIX TO THE CONGRESSIONAL GLOBE.     Jan. 1844.

28TH CONG.....1ST SESS.     *Oregon Territory—Mr. Owen.*     H. OF REPS.

treason, which had, at this day, been received and honored with a select committee.

In conclusion, as I have but a minute or two remaining, let me once more appeal to my northern friends. I ask the gentleman from Maine, if there be any here who have hitherto stood by us, why should they now give way? I turn to our friends from Connecticut, and ask them, why should they yield? If I appeal in vain, I turn to those by whom I know the appeal will be answered—to patriotic New Hampshire, whose sons, like her granite basis, had hitherto breasted the storm;—they, I know, will not give way. So I call upon our friends from the Keystone State, not to surrender because a single soldier in the South has deserted us on this trying occasion. To the few, but Spartan band from the great State of New York, though threatened with the public sentiment of this new-born democracy, I would say, be firm, and the day was not distant when they, too, would be honored, like those who had stood by the constitution and the country in the dark days of the Missouri question. But if these invocations were all in vain, then would I turn with pleasure and delight to the gallant and patriotic West. Here Mr. S. was forced to conclude from the expiration of his hour.

## SPEECH OF MR. OWEN,

### OF INDIANA.

*In the House of Representatives, January 23 and 24, 1844—On the question of the joint occupancy by Great Britain with the United States, of the Territory of Oregon.*

On the 4th January, 1844, Mr. OWEN introduced a joint resolution, requesting the President of the United States to give notice of twelve months to the government of Great Britain, in conformity with the provision of an existing treaty; that, from and after the expiration of that term, the occupation of Oregon by Great Britain, conjointly with the United States, should cease. The joint resolution was referred to the Committee on Foreign Affairs; and that committee reported it back on January 23, accompanied by a resolution, to the effect, that "it is inexpedient for Congress, at this time, to act in any manner upon the subject." The question being on the adoption of that resolution—

Mr. OWEN said: I am aware of the effect which the adverse report just made from a committee of a character so high as that on foreign affairs, in regard to the joint resolution which I submitted to this House, is likely to produce. I regret it. I do not understand the committee, however, as expressing an opinion that the resolution should not pass at all; but only that, for the present, it should be delayed. They are disposed, we may presume, to await the action of time and of certain expected contingencies, before they adopt this measure. I differ from them in regard to the expediency of delay. I think we ought to act now. The views of those who hold to the opposite opinion are entitled to much consideration; I shall always receive their opinions with respect, and examine them with attention; yet, with the lights now before me, I must adhere to my own.

He is but a hot-headed politician, who seeks to urge on a favorite measure that may be just in itself, rashly, prematurely, in a hasty manner, at an improper time. But there is such a thing as temporizing weakness, as well as rash haste. To put off the evil day, is bad policy, in public as in private affairs. That which is surely impending—that which we must meet to-day or to-morrow, self-respect and wisdom bid us meet to-day.

If these be correct views, let us inquire how far they apply to the subject before us. The effect of the joint resolution in question, and which a majority of the committee recommend to postpone, is, to terminate a treaty or convention with Great Britain. By that treaty, Great Britain and the United States may, for the present, jointly occupy Oregon; with a provision that a year's notice from either nation shall terminate the joint occupancy. The resolution provides for giving that notice; and the question to be decided is, whether it be expedient to give that notice at the present time?

To a proper understanding of this question, and a just estimate of its importance, we should distinctly bear in mind what, and how large, this Territory of Oregon is. Its southern boundary, fixed by the Florida treaty of 1819, is the parallel of 42° north latitude. Its northern limit, determined by the Petersburg treaty of 1824, is the parallel of fifty-four degrees and forty minutes. Its front, then, on the Pacific, is about twelve degrees and a half, or upwards of eight hundred and fifty miles. Its average depth to the Rocky mountains is some five hundred and fifty miles. It contains nearly half a million of square miles, or more than three hundred millions of acres, of territory—one-fourth more (let us remember that) than the territory of the thirteen original States, when they asserted their independence. This stock farm of ours, therefore, in the far West, is no paltry possession. The greatest revolution the world ever saw, was kindled in defence of a territory of smaller extent, and, if recent accounts may be trusted, of scarcely more intrinsic value.

The subject is of an importance such as demands a careful investigation. Permit me, then, sir, to ask your attention, and that of the House, to a brief review of the negotiations that have passed, and the measures that have been proposed, relative to this rich and extensive country.

In October of the year 1818, before we had acquired the Spanish title to this portion of the continent, a convention was signed at London, providing that any country on the northwest coast of America, westward of the Stony mountains, which may be claimed by Great Britain or the United States, shall, for ten years thenceforward, be free and open to the citizens and subjects of both powers, without prejudice to the title, in whomsoever residing.

Six years later, in 1824, about the time we agreed with Russia on our northern boundary, the venerable gentleman from Massachusetts, [Mr. ADAMS,] then Secretary of State, set on foot a negotiation for the final adjustment of the boundary question; authorizing Mr. Rush, our minister at the court of St. James, to propose, first, the latitude of fifty-one; and, if Great Britain persisted in refusing that, then the latitude of *forty-nine*, as the dividing line between the territories of the two countries.

The offers were made in succession, and the British ministers refused them both. They expressed their willingness to run the forty-ninth degree to where it strikes the northeasternmost branch of the Columbia, and thence down the middle of that river to the Pacific, into which the Columbia falls about latitude forty-six.

Mr. HOLMES. In forty-five and a half.

Mr. OWEN. My impression is, that it is a little north of forty-six; but, if it be forty-five and a half, the proposition of Great Britain was but the more unfavorable to us.

This proposal, from which Great Britain declared the United States must not expect her to depart, was at once rejected, and the negotiations were broken off.

Two years afterwards, they were renewed—Mr. Clay being then Secretary of State.

The official papers connected with this second negotiation should be read by every American statesman, who believes we have anything to gain by promised negotiations for Oregon, or anything to lose by passing this resolution, and thus indicating to Great Britain a determination to assert our rights. Allow me, in proof of this opinion, to give you a few extracts from the documents themselves.

Here is the first letter of instruction from Henry Clay to Albert Gallatin, under date of June 19, 1826. After alluding to the instructions formerly sent to Mr. Rush, Mr. Clay adds:

"Nor is it conceived that Great Britain has, or can make out, *even a colorable title to any portion of the* northwest coast."

I pray you, sir, to observe this expression of Mr. Clay. It is not that Great Britain's title is weak, is imperfect, is questionable; it is that she has not even *a color* of title. It is not that her title is defective to the southern portion of this territory; but good, or at least plausible, north of the latitude of forty-nine. No, sir, nothing of that sort. But it is, that from north to south, from east to west, over the entire territory, Great Britain has not a pretence, not a shadow of a title. It is, that to every part and parcel of Oregon, from the Spanish line on the south, to the Russian boundary on the north; from the summits of the Rocky mountains across to the waters of the Pacific, the United States are the true, rightful, legitimate owners.

That is the broad, unqualified assertion; and it is true. I pledge myself to this House, if the matter be called in question, before we have done with the subject—to prove, by the tenor of those very treaties to which England appeals, by the admissions of her own statesmen and historians, that to this vast territory, regarding which, for a quarter of a century, we have been tamely negotiating, our title is as clear, distinct, indisputable, as that of any gentleman on this floor to the farm he owns, or the plantation that is his, and was his father's before him.

Such is the truth; and such was Henry Clay's assertion. And yet, ere ever the ink was dry on that honest statement of our rights—before the letter was closed, in which an American Secretary of State declares to an American minister that Oregon is, and of right ought to be, ours, that same Secretary empowers that same minister to trade off—oh no, sir, that is not diplomatic language—to *negotiate away* nearly one-half the territory; meekly to cede to Great Britain that to which she has not even a color of title—nearly four hundred miles on the Pacific coast, with all the country thence to the Rocky mountains. Here is the paragraph, from the same letter:

"You are authorized to propose the annulment of the third article of the convention of 1818, and the extension of the line on the parallel of forty-nine degrees, from the eastern side of the Rocky mountains, where it now terminates, to the Pacific ocean, as the permanent boundary between the territories of the two powers in that quarter. This is our *ultimatum*, and you may so announce it. We can consent to no other line more favorable to Great Britain."

This offer is made (so Mr. Clay writes in the same letter to Mr. Gallatin) "in a spirit of concession and compromise, which Great Britain should not hesitate to reciprocate."

Concession is a good thing in its place; and if a right be of doubtful validity, prudence sometimes bids us compromise, for the sake of peace. But thus to cede, at the first offer, to a nation that has, avowedly, not a color of title to it, a district of country one-half as large as were the thirteen United States at the date of the Revolution,—this strikes me as pushing somewhat further than justice demands, or national honor warrants, the principles of charity and good neighborship. I may treat a neighbor kindly and courteously, without being called upon to give him up half my grazing farm, merely because he happens to have taken a fancy to it. I know we are told, that, if a man smite us on the one cheek, we should turn the other; and if he take our coat, we are to give him our cloak also. Interpreted in its spirit, (not in its letter,) this is an admirable injunction. Kindness wins its way, where harsh violence fails; and we can best overcome evil by doing good. Yet, assuredly, we should have a strange time of it, in this world, if, in literal obedience to the precept, we were to resent no injury, and resist no encroachment. The spirit of concession and compromise, especially towards the powerful and the imperious, may be carried too far. It is out of place when it meets no corresponding spirit, and provokes only arrogant pretension in return.

Such was the return which Henry Clay's proposal met from Great Britain. He offered her territory enough, out of our possessions, to cut up into half a dozen good-sized States; and she, presuming, it would seem, on our easy good nature, declared we must give her sufficient for two or three more, before she closed the bargain. Her plenipotentiaries repeated the offer they had previously made, that the Columbia should be the boundary; adding, however, that, as they must confess there is not a single good harbor from latitude forty-two to the mouth of the Columbia, they would cede to the United States the harbor of Port Discovery, in Fuca's inlet, together with a small rocky isthmus, lying southeast from Cape Flattery. I know not whether the name of the cape suggested the selection of this particular spot; but Captain Wilkes (commander of the late exploring expedition) informs me the whole tract is of very trifling value. It excludes Admiralty inlet and Puget sound, one of the best harbors in the world, and not unlikely, some day, to be the principal port of entry for the Columbia valley.

The offer of Great Britain was, of course, refused; and so terminated the second attempt at negotiation. Do you find in its details, or in its result, much encouragement to engage in a third?

This negotiating about what already belongs to us, is not only an unprofitable but a dangerous affair. We offer to concede and to compromise; we forbear to claim our just due: and straightway our concessions and forbearance are set up as foundation for a title, which has no other ground to rest upon. I know that, in strictness of law, a valid title is not prejudiced by an offer to compromise, made for the sake of peace. I am aware that the permission granted by treaty to Great Britain, jointly with us, to occupy this territory, cannot ripen into title. Yet, in point of fact, a concession ever weakens a claim.

Jan. 1844.    APPENDIX TO THE CONGRESSIONAL GLOBE.    95

28TH CONG.....1ST SESS.    *Abolition Petitions—Mr. A. Johnson.*    H. OF REPS.

| Arkansas river | - | - | - | - | 40,000 |
| Mouth of Red river | - | - | - | - | 30,000 |

Here, then, I have shown, by the official documents, that this assertion is wholly unfounded. I have not the charity to suppose that the industrious member from Pennsylvania was ignorant of these facts. In his anxiety to injure Mr. Van Buren, and prejudice his cause amongst western gentlemen, he has done this violence to truth in the hope that his speech would be suffered to go to the country uncontradicted. I have therefore proved, by incontrovertible evidence, that estimates were sent in for the Cumberland road during the "second year" of Mr. Van Buren's administration; and this makes No. 6. I have also proved that estimates were sent in for the western rivers in the same year; thus convicting him of No. 7. I said, the other day, that the member was an economizer of truth, and had made declarations wholly unsustained by the records.

Mr. E. JOY MORRIS. Does the gentleman from Ohio say that my colleague has asserted a deliberate falsehood?

Mr. STEWART. I return the epithets.

Mr. WELLER. One at a time, gentlemen. Whether his colleague was *deliberate*, or not, I do not undertake to say. My language is clear and explicit, and I mean what I have said. If the gentleman [Mr. MORRIS] desires a controversy with me, he, too, may be accommodated.

I now proceed to the next charge; for these interruptions shall not prevent me from fixing the brand upon the member. He says:

"He (Mr. Van Buren) told his Secretary of War not to send in estimates for the continuation of that [Cumberland] road; if he did, and Congress made the appropriation, he must veto it."

When did Mr. Van Buren give these instructions to the Secretary of War to withhold these estimates? This document shows that, in December, 1837, estimates were sent to Congress for the road and rivers, for the year 1838; and on the 25th May, 1838, as I before stated, Van Buren signed a bill for the continuation of the Cumberland road. By turning to the documents accompanying the report of the Secretary of War, under date 30th November, 1839, I find, from the Topographical department, estimates for the continuation of the Cumberland road in Ohio, for the years 1840, 1841, and 1842; also, estimates for the year 1840, in Indiana and Illinois. (See document 2, page 214.) How, then, came the member from Pennsylvania to assert that Mr. Van Buren "had instructed the Secretary of War to withhold the estimates," in the face of these facts? By turning to document 3, page 105, from the Treasury department, in the estimates for 1840, items for the Cumberland road, west of Zanesville, in Ohio, and also for Illinois, will be found. With these documents in my hand, in the discharge of my duty, I fasten brand No. 8 on his forehead.

There are other egregious mistakes into which the member has fallen, particularly in relation to the expenditures of the government, to which I designed to call the attention of the committee; but I find my hour is nearly out. Let me say here, however, that the journal of the Senate, now in my hand, at page 285, shows that on the 6th April, 1840, on the question, Shall the bill for the continuation of the Cumberland road in Ohio, Indiana, and Illinois, be engrossed? the vote stood—yeas 20, nays 22. Among the nays he will find his great champion, Henry Clay. Yes, sir, the man who is here held up as the especial friend of the West, and western measures.

I have not courted this controversy with the member; but when he announced to the House on yesterday that he would fix the brand on me, I was not at liberty to decline. I said I would establish the falsity of many of his allegations, or take the brand. To-day I have produced the proof; and no human ingenuity can extricate him from the position in which these facts place him. I have made out and established, as I hold, to the satisfaction o the world, eight distinct charges, which authorize me to mark the member, as a warning to all economizers of truth. Yes, sir, (said Mr. W.,) turning to Mr. STEWART, take the brand which you sought to fasten on my brow. Wear it, and fret till your proud heart breaks. Go to your master——

Mr. WINTHROP. The Chair cannot allow these personalities and insults to a member.

Mr. DOUGLASS of Illinois. Sir, I heard the member from Pennsylvania say, on yesterday, he would put the brand of falsehood on the gentleman from Ohio's forehead.

Several voices. "So he did—so he did. Certainly he did."

Mr. WINTHROP. The Chair did not hear the gentleman from Pennsylvania indulge in such language.

Mr. WELLER. Sir, it is very remarkable you did not hear what was said on the other side of the House. Sir——

Mr. WINTHROP. The Chair will not allow itself to be insulted.

Mr. WELLER. You are one of the last men in this House whom I would willingly insult. If you did not hear, (and I am bound to take your assertion,) let it pass. It is the farthest from my thoughts to give you offence.

Mr. WINTHROP. The Chair never heard any gentleman address the other in the second person, instead of "Mr. Chairman," till the gentleman from Ohio did so; and such a course is unparliamentary.

Mr. WELLER. Well, sir, I have fixed the brand on the member from Pennsylvania. Let him wear it. Let him go to his master, who hissed him on; and perhaps his *blushing* honors will commend him to his favorable notice. Tell him that the marks, broad and deep, were fastened on your forehead in the presence of the representatives of the American people.

Mr. Chairman, standing here, as I do, in a triumphant majority, I have felt no disposition to trample upon the rights of the minority. There are many gentlemen on the other side of the House, who differ with me upon every question which arises, for whom I cherish the warmest feelings of friendship and respect. To them I am willing to extend every courtesy within my power. But when a member commits an outrage upon the feelings of the majority; when he tramples upon the truth, in order to assail his opponents; when he forgets what is due from one gentleman to another, and says he will fix a brand of falsehood on me,—he must not expect any courtesy at my hands. He could not believe that I would tamely submit to such imputations, however much I may deprecate these personal discussions. I would be unworthy of a seat in this hall, if I sat down quietly under such a charge, or permitted a member, by drawing on his fancy for his facts, to place the western democrats in a false position before their constituents. In the discharge of my duty, I may be denounced, here and elsewhere; but these denunciations shall pass by me as the idle wind. I heed them not. At the bar of an enlightened public opinion, let the question be decided between the member from Pennsylvania and myself. With the verdict I will rest contented.

## SPEECH OF MR. A. JOHNSON,

### OF TENNESSEE.

*In the House of Representatives, January 31, 1844.*—Upon Mr. DROMGOOLE's motion to recommit the report of the Select Committee on Rules; which Mr. BLACK of Georgia moved to amend, by instructing the committee to report the rule commonly called the 21st rule, which prohibits the House from entertaining abolition petitions in any way whatever.

The SPEAKER announced the order of the morning hour to be the report of the Committee on Rules, on which the gentleman from Tennessee [Mr. A. JOHNSON] had the floor.

Mr. JOHNSON proceeded to address the House on the pending question. He said, if he understood the question before the House, it was the motion to recommit the report of the Committee on Rules, with instructions to report the 21st rule, (now the 25th,) which the committee had erased from the rules for the government of this House; and, in presenting the few crude and desultory remarks which he had to offer on this subject, he did not wish to turn utopian. In debating a question which he considered one of the first magnitude, he felt no disposition to become a mere idle talker; and, as time was precious, under the one-hour rule, he should at once march right up to some one or two points on this subject, which he deemed the most important. It was true, there had been some positions discussed here that were not legitimately before the House for its consideration; but which had grown incidentally out of other questions; and if he should be a little irrelevant in meeting and in attempting to answer some arguments made on those points, he trusted it would not be considered irrelevancy in him.

It had been gravely contended, before the House

and before the country, that the Congress of the United States had power to abolish slavery in the District of Columbia; and, on this point, although his opinion might be unimportant, and his argument might be as weak as his opinion was valueless; he begged leave to differ from some able men who had occupied the floor before him. They were told, he repeated, that the Congress of the United States had power to abolish slavery in the District of Columbia. But whence did Congress derive this power? All the power that the Congress of the United States can exercise over the District of Columbia, was derived from the States of Virginia and Maryland; and the question which first presented itself to the mind was this: had the States of Virginia and Maryland, when they exercised jurisdiction over the District of Columbia, power to abolish slavery in this territory, now called the District of Columbia? He thought, when they examined this question with deliberate minds, they could not resist the conclusion that the legislatures of Maryland and of Virginia could exercise no such power; and if the legislatures of Maryland and Virginia could exercise no such power, how could they delegate the greater power to a creature which was brought into existence by those sovereign States? How, he asked, could they delegate a greater power to a creature of those States, than those States themselves possessed? When they turned to the bill of rights of the States of Virginia and Maryland, they found that to the citizens of those States was secured the right of property. They found that private property could not be taken and appropriated to the public use without just compensation made therefor, much less to take private property, and appropriate it to no use at all. But he should not dwell on this point, for it was conclusive. There was no citizen of either Virginia or Maryland that would pretend that the legislatures of those States, anterior to the cession, had power to abolish slavery within their chartered limits. But suppose there were no guaranties—admit, for the sake of argument, that they had such power: there was other ground to rely upon, of equal magnitude to his mind. What was it? The constitution of the United States secured and guarantied to every individual in this confederacy the right to private property, and it said that private property should not be taken by the general government for the public use, without just compensation. This ground, then, aside from the want of power in the State legislatures to delegate such power to the general government, was sufficient, and might be securely relied on, in his humble opinion. But, to make himself understood on this point, he proposed to state a case; and he desired to be understood, and he desired the position which he occupied on this subject to be understood. For instance, then: there were two citizens residing in what is called the District of Columbia, previous to the acts of cession of the States of Maryland and Virginia. One of those individuals had a negro, which is made, by the constitution of the country, one of the forms of property—a negro slave worth $500; this individual sells that slave to the other citizen for that sum of $500; the contract is made, and is to be completed some time thereafter. But, before the completion of the contract, Virginia and Maryland make the acts of cession, ceding this District to the general government. Now, in what position did they stand? Previous to the act of cession, neither of the States could pass a law impairing the obligation of contracts; and, if this *bona fide* contract was entered into previous to the act of cession, he asked every member on that floor, if those States could not pass a law impairing the obligation of contracts, if the general government, deriving its power from the States over this District, after it had passed under its jurisdiction, could pass any act impairing the obligation of such a contract? Was there any one on that floor that would maintain such a doctrine? Then the conclusion is as clear as the sun at noonday, if neither the ceding States nor the general government could pass a law, impairing the obligation of the contract that had been formed in the case just stated, that Congress could pass no law to abolish the right to property, that had obviously arisen from the creation of such *bona fide* obligation. He was willing to admit that the legislatures of those State could legislate, not to impair the obligation of contracts, but to make contracts more perfect; and thus far Congress could go after this District passed under its jurisdiction. Congress could pass a law to cure defect in legislation, but no law impairing the obligation of contracts; and on this position he defied opposition.

96        APPENDIX TO THE CONGRESSIONAL GLOBE.        Jan. 1844.

28TH CONG.....1ST SESS.        *Abolition Petitions—Mr. A. Johnson.*        H. OF REPS.

But (Mr. J. said) he had a few plain inquiries to make of the abolitionists of the country, and their organs in this House. One was, if they had it in their power to abolish slavery now, were they prepared to turn over two million of negroes loose upon the country to become a terror and burden to society, producing disaffection between them and their former masters, finally to be fanned into a flame, wearing into a servile war, resulting in the entire extirpation of their race in the United States, besides shedding much of the white man's blood? But, as you have no right to abolish slavery in the United States, or any where else, are you prepared to tax the owners near ten hundred millions of dollars, and then give it back to them for their negroes, in the shape of purchase money? This would be legalized robbery. Are you prepared to tax the slaveholder and the non-slaveholder indiscriminately, ten hundred millions of dollars, to buy the slaves and send them to Africa, or anywhere else? This would be plundering one portion of the community to remunerate another. These inquiries are made for the purpose of bringing the minds of those wild enthusiasts to bear upon the immense importance of this subject. He, however, must necessarily be brief, as his time was short; and he should, therefore, not dwell longer on that point. He had neither the time nor the disposition to discuss the question involved, in detail. He merely desired to be understood on some principal points. He had no wish to discuss what was called the evil of slavery, or the origin of slavery. He had no intention to go back to the year 1442, and take up the introduction of slavery; nor to the year 1620, when it was introduced into the State of Virginia; nor to trace its progress from that time to the present. It was sufficient for him to know, on the present occasion, that slavery had existed for five thousand years. They read that some of the servants of the Lord had slaves; and, when Joshua went to take possession of the land of Canaan, he had divine authority to make the inhabitants thereof "hewers of wood and drawers of water." In short, slavery had existed ever since man formed a community; and he defied any, even the most intelligent, to put his finger on any spot in the habitable globe where slavery had not existed at some period in the stream of time. It appeared that slavery (either white or black) had existed, in some form or other, ever since communities were formed; and if it was to be continued, either voluntarily or by force—if there were to be inferiors and superiors—if one portion of the community were to be masters and another menials—if the existence of civilization was dependent on this state of things,—he had no hesitancy in bringing his mind to a conclusion upon the subject, believing and knowing, as he did, that the black race of Africa were inferior to the white man in point of intellect—better calculated in physical structure to undergo drudgery and hardship—standing, as they do, many degrees lower in the scale of gradation that expresses the relative relation between God and all that he has created than the white man: hence the conclusion against the black man and in favor of the white man.

The attempt, however, had been to make a false issue before the country on the sacred right of petition. They were asked, "what, will you debar the freemen of this country of the poor privilege of coming here as petitioners?" Now, he wished the House to understand this point. He did not assume the attitude of petitioners and of humble suppliants for his constituents, asking for mercy at the foot of power. No; they were freemen, and they had the right to speak to the Congress of the United States authoritatively, and not in the humble attitude of petitioners; they had the right to speak by the ballot-box, and the majority had the right to command. His constituents need not approach him—their representative, their servant—in the humble attitude of petitioners, but as his masters; and command him to do what they desired to be done. What did they mean by the right of petition? Why, it was said, it was a great inherent right. Now, he understood that the order of things had been reversed in this government. He knew the time had been when the people were only tolerated in the exercise of certain privileges, all power being in the Crown. But he repeated, the order of things had been reversed, and now all power was in the people; now the people were the sovereigns in this country: and would they place the sovereigns in the strange and extraordinary position of petitioners to their servants? The people, as the sovereigns, had the right to demand authoritatively, through the ballot-boxes, or to instruct the members on that floor

what they should do. But it was said that the adoption of the 21st rule was an infringement of, and an encroachment on, the great right of petition. One of the gentlemen who had taken part in this discussion, [Mr. WRIGHT of Indiana,] had said that it was a rejection of the petitions of their constituents at the door; and he made the inquiry—and it was one of some consideration—how the House was to know, legislatively, what the petitioners asked for; and how they were to know, in their legislative capacity, whether they could or could not grant the prayer of the petition, if it were rejected before it was received. But was that the state of things? Was that all that was required? Whenever a member on that floor rose to present a petition, what was required of him? That he should state the substance of the petition to the House. Were they not informed, then, in their legislative capacity? He thought they were. But, said another gentleman, [Mr. WINTHROP,]—and he brought a philosophic figure from Mr. Burke to show the error they had got in—it was true they knew the difference between fair midday and deep midnight, but they could not tell the precise point where the day terminated and the night commenced; and so it was with the right of petition and of legislation. Now he (Mr. J.) wanted to make an application of this, if he could. The gentleman from Massachusetts [Mr. WINTHROP] said that Mr. Hatsell had laid down the true doctrine; and what was it? That all petitions were to be received and heard and considered, with two exceptions—the one when the petition was not presented decently, and the other when the language in which it was couched was not respectful to the House. Now he (Mr. J.) ound little difference between these two grounds of exception: but where, he would ask the gentleman from Massachusetts, [Mr. WINTHROP,] was the precise point at which decency terminated and indecency commenced? Where was the point at which respect stopped and disrespect began? Would that gentleman inform the House how he discovered the difference? According to that gentleman's notion, he could meet his constituents at the door, and say that their language was not so respectful as he had a right to expect, and therefore he had the power, under the constitution, to turn them out of doors; but would the gentleman say where disrespect, which gave him the power to reject the petition, began? Some gentlemen had great tact, when they could not march up to a point and meet it by irresistible argument, in getting up a fog, and leaving the whole thing in doubt and uncertainty. But he (Mr. J.) thought the point where the right of petition stopped and legislation began, was just as clear as the difference between midday and midnight. The petitioners could exercise all the functions conferred on them by the constitution, and then they came to the door of the representative hall, and there, through their representative, the petition was brought up. The representative got up, and, in accordance with the rule of the House, stated its substance, and offered it for the consideration of the representative body; and from that moment the right of petition ceased, and at that very same instant the right of legislation began. That was the stopping point; there was a distinction between the right of petition and of legislation, and they were not like two liquids running into each other, so as to defy the defining of distinction. The petitioners had the right to exercise all the powers conferred on them by the constitution; but had the representative body no powers? It was a thinking, intelligent body, and must exercise some discrimination. Had that body not the power to say to the petitioners at the door, as well as after they got a little further in, what disposition should be made of their petitions? The petitioners were met by the 21st rule, as it was commonly called. When a member rose and stated the substance of a petition, he was met by that rule as the recorded consideration of the House on that subject, and hearing on the case. The subject had been considered, and the petitioners were thus told that they were asking for a thing to be done which the House had considered, and that that rule stood as the recorded judgment of the House thereon. Were the petitioners turned out of the House, then, without consideration? He thought not.

But what had been the course of the Senate on this subject? The honorable gentleman here quoted the rule of the Senate requiring a motion to be made for the reception of such petitions; which motion, for a series of years, the Senate had laid on the table, thus recognising the principle that these petitions could be rejected.

Again: some gentlemen had said we have the right to petition for the abolition of slavery in the District of Columbia. Let us (said Mr. J.) examine this subject for a few moments. Congress, say those gentlemen, has the exclusive right of legislation within the District. Well, admit this; yet, let me tell them, that when Congress is acting upon the business of the District, it is, to all intents and purposes—what? The legislature of the District; and while acting as such legislature, and passing laws in relation to the affairs of the District, the people of the District stand in the same relation to Congress, as the people of any State do to the legislature of that State; and e converso, Congress stands in relation to the District precisely as the legislature of a State to the people of that State. And while Congress is so acting as the legislature of this District, no individual living out of the District has any more right to petition Congress for the abolition of slavery within the District, than the people of one State have to petition the legislature of another State for the abolition of slavery within such State. But a position that was taken yesterday, with which I was very much pleased, was this: Oh! say the gentlemen, we should reject these petitions because they are not couched in respectful language. In reply to this, it was truly and forcibly remarked, yesterday, by the gentleman from Georgia: Oh! yes, when petitions come here that are disrespectful to our noble selves, we are to kick them out of the House; but when petitions are presented speaking disrespectfully of our masters—those from whom we derive the little power we possess, we are bound to give them a respectful consideration! When petitions come here asking us to do that which would drench this land with blood, we must receive and consider them, because, forsooth, they are not disrespectful to ourselves. There is agitation, say the gentlemen; and the continuance of this rule has produced it: abrogate this rule, and all will be calm and quiet. But we were told by the distinguished gentleman from Massachusetts that a mere repeal of the rule would not do; it would not satisfy the abolitionists: nor have we any reason to believe that it would. Do we not see the strife that is carried on to see who shall have the honor of achieving this important step in procuring the repeal of the rule? Strike out that rule, and you will hear the shouts of victory resounding from one end of the Union to the other. Strike that rule from existence, and they will then be able to make another advance.

The gentleman from Massachusetts, in his speech, laid down the rule that we ought to consider every petition in proportion to its importance. Let us examine this a little. Suppose a petition comes here proposing to destroy the basis of representation in the eleven slaveholding States, with a view of excluding from this House a portion of its members: how much consideration would such a petition deserve? There was a petition offered yesterday from a man who wanted to be divorced from his wife, and to be remunerated for loss of time while he had been married, &c. There was a petition the other day from an individual who wanted the State of New York ceded to Canada. How much consideration would the gentleman be disposed to give to these petitions? I want the rule laid down, how much consideration we shall give to each; how much our sympathies shall be excited in each case I merely wish to show the fallacy of the gentleman's position. But sometimes the consistency of these great champions of the rights of petition and of the rights of the people should be examined. Which is the more important to freemen, the privilege of coming to the ballot-box and of exercising that right, so peculiarly the right of freemen, giving their suffrages according to their inclination, or the privilege of petitioning? Would you believe it, Mr. Speaker, one or two of these great champions of the right of petition have recorded their votes against—what? Against allowing to free white men the poor privilege of voting. Upon the passage of a bill for the incorporation of the town of Alexandria, we find—and it seems to me somewhat strange that it should be so—we find these champions of the people's rights standing up and voting against a proposition to permit white men to vote. We find the distinguished gentleman from Massachusetts refusing to allow free white men the privilege of voting; and, on travelling a little further upon the record, I find the name of Mr. CHARLES HUDSON in opposition to giving the right of voting to white freemen—a gentleman who has expressed so much sympathy for the great right of petition, as he calls it. But

Jan. 1844.　APPENDIX TO THE CONGRESSIONAL GLOBE.　97

28TH CONG.....1ST SESS.　*Abolition Petitions—Mr. A. Johnson.*　H. OF REPS.

when a freeman comes forward and asks the poor privilege of voting at the ballot-box, the gentleman folds his arms, and treats him with contempt. Yet these are the champions of freedom—champions of the right of petition—champions of the people's rights. A little further on, I find a motion, made by the venerable gentleman from Massachusetts, that the bill be recommitted, with instructions to the committee to strike out the word "white," so that, if the bill passed with the amendment, it would place every splay-footed, bandy-shanked, hump-backed, thick-lipped, flat-nosed, woolly-headed, ebon-colored negro in the country upon an equality with the poor white man. Such is the course taken by the great advocates of the right of petition, when called on to record their votes in favor of allowing a privilege to free white men: such is their consistency.

Mr. J. here read from Mr. Adams's annual message of 1825, in which he declared that the representative should not be "palsied by the will of the constituents," and showed the perfect consistency of the doctrine laid down in his message of that day, with his recent vote denying freemen the privilege of exercising the elective franchise at the ballot-box; and said the great difference between the venerable gentleman from Massachusetts, his colleagues, and himself, was this; they were in favor of the people being servants, instead of their being masters; they were in favor of the people being humble petitioners, suppliants at the foot of power, instead of stepping forward and exercising all the functions pertaining to sovereigns, either at the ballot-box, or by instructing their representatives what they shall do and what they shall not do. For himself, he assumed no such humiliating attitude for those he had the honor to represent on that floor. They had two ways to approach that body—one was through the ballot-box, the glorious Franklin-rod that conducted the thunder of tyranny from the people's heads; the other was in the form of instruction, commanding their representatives to bring forward and advocate whatever measure they believed calculated in itself to promote the public good—not humbly petitioning their representative, but commanding him.

Perhaps it will be considered uncharitable in me to come to the conclusion I have upon this subject; but the conviction fixes itself upon my mind irresistibly, and I will speak my sentiments, let the consequences be what they may. I do believe, and have believed for some time, that there is a deliberate design on the part of some gentlemen to effect, if possible, a dissolution of the Union. But when we of the South, who represent the interests of the slave States, contend for our rights, gentlemen say, Oh! you are too much excited—too much heated; your passion outruns your judgment; anything that you may say is not entitled to so much weight as that which proceeds from our calm and sober judgment. Excitement! what is it which occasions that excitement? Is not the treatment which this question receives a sufficient cause for excitement? It becomes, in the hands of gentlemen on this floor, a question of dissolution—of Union or no Union;—a question in which eleven States of this Union are vitally interested; States which possess upwards of $100,000,000 of property in slaves; yet when you are striking a blow which is to destroy that amount of property at once, to expel or exclude 21 of the 93 representatives of the eleven slave States from this House—nearly one-fourth of their entire delegation—and thereby destroying the great compromise of the constitution, agreed upon by the sages and patriots of the revolution—we are told, if we exhibit any feeling on this subject, it is southern heat. Oh! no; we must not speak upon the subject, unless we are perfectly calm and passionless. Let me tell the agitators, the more they press this question, the greater will be the excitement. It is worse than nonsense to talk of making a calm, deliberate appeal to them; it will not do; but when we come to examine the subject, I am forced to come to the conclusion that there is a deliberate design to dissolve the Union.

Mr. J. here referred to an opinion formerly expressed by Mr. J. Q. Adams's father, and read from the 4th volume of Mr. Jefferson's works, as follows: "December the 13th, 1803. The Reverend Mr. Coffin, of New England, who is now here soliciting donations for a college in Greene county, Tennessee, tells me that when he first determined to engage in this enterprise, he wrote a paper recommendatory of the enterprise, which he meant to get signed by clergymen, and a similar one for persons in a civil character; at the head of which he wished Mr. Adams to put his name—he being the President of the United States, and the application going only for his name, and not for a donation. Mr. Adams, after reading the paper and considering, said, he saw no possibility of continuing the union of the States; that their dissolution must necessarily take place; that he, therefore, saw no propriety in recommending to New England men to promote a literary institution in the South; that it was, in fact, giving strength to those who were to be their enemies; and, therefore, he would have nothing to do with it."

He said he had referred to this merely as a starting point at which to date the opposition of New England men to the union of the States, and their hostility to the institutions of the South. He passed on to the Hartford convention, spoke of its opposition to Mr. Madison's administration, asking a dissolution of the Union, throwing every obstacle in the way of a successful prosecution of the war—Massachusetts even refusing to let her militia go beyond the chartered limits of the State to meet the invading foe. Now, in this House, the same spirit of opposition is followed up by J. Q. Adams, endeavoring to destroy the Union and the institutions of the South by the introduction of abolition petitions and resolutions from the legislature of Massachusetts, asking an alteration of the constitution that amounts to a dismemberment of the northern and southern States. Mr. J. Q. Adams's son is now in the legislature of Massachusetts, engaged in making reports and procuring the passage of disorganizing resolutions, both endeavoring to split the Union in twain, thereby proving the father and grandfather to be true prophets. Mr. J. next referred to the Haverhill petition; also one from the State of Ohio, asking a dissolution of the Union. He then read an extract from Mr. Adams's speech, made at the extra session of the 27th Congress, upon the 21st rule, prohibiting the reception of abolition petitions, to-wit:

*　　*　　*　　*　　"He would say that, if the free portion of this Union were called upon to expend their blood and their treasure to support that cause which had the curse and the displeasure of the Almighty upon it,—he would say that this same Congress would sanction an expediture of blood and of treasure, for that cause itself would come within the constitutional action of Congress; that there would be no longer any pretension that Congress had not the right to interfere with the institutions of the South, inasmuch as the very fact of the people of a free portion of the Union marching to the support of the masters, would be an interference with those institutions; and that, in the event of a war, (the result of which no man could tell,) the treaty-making power become to be equivalent to universal emancipation. This was what he had then said, and he would add to it now, that, in his opinion, if the decision of this House, taken two days ago, should be reversed, and a rule established that the House would receive no petition on this subject, the people of the North would be *ipso facto* absolved from all obligation to obey any call from Congress."

He asked, what the paragraph he had just read meant; what effect was it calculated to have upon the abolitionist of the North, and the slaves of the South? It is a stimulant to the one, a lure thrown out to the other! Is it not saying to the abolitionist of the North, Persist in your fiendish purpose; to the incendiary, who is standing with his torch ready lighted, prepared only for the destruction of the South, Proceed; touch the match; wrap the dwellings of your masters in flames; produce a servile war; make it necessary, for the preservation of your masters, to call upon the non-slaveholding States for assistance, "and under the treaty-making power" you all shall be emancipated? Gracious God! are we prepared for scenes like these? are we prepared to surrender our homes and our firesides? are we prepared to see our fields, that now in due season yield luxurious crops, relapse into their original state, or be converted into fields of carnage? are we prepared to see the black hands of the negro wreaking in the blood of the white man? are we prepared to see innocent women and children, virtue and beauty, all fall a helpless prey? are we prepared to see the land that gave a brother birth, drenched with a brother's blood? in fine, are we prepared to see peace, prosperity, contentment, and happiness, converted into discord, desolation, cries the most heart-rending, lamentations (producing, to use the language of the poet) shrieks—

"So wild, so loud, so clear,
"Even listening angels stooped from heaven to hear;"
and yet to be calm and deliberate?

Mr. J., said he wished to call the attention of the South to a single sentence in a letter recently written by Mr. Adams to the abolitionists of Pittsburg, (to wit:)

"On the subject of abolition, abolition societies, anti-slavery societies, or the liberty party, I have never been a member of any of them. But in opposition to slavery, I go as far as any of those; my sentiments, I believe, very nearly accord with theirs. That slavery will be abolished in this country, and throughout the world, I firmly believe. Whether it shall be done peaceably or by blood, God only knows; but it shall be accomplished, I have no doubt; and, by whatever way, I say let it come."

In the sentence he had just read, Mr. Adams says he is no abolitionist; but in opposition to slavery, he goes as far as any of them; and if the emancipation of the negroes in the South has to be effected by the shedding of blood, he says, "let it come." Can the South be mistaken as to the meaning of language like this? Is it not time to be on the alert? Is it not time they were aroused from their apathy? He said this was a question that the South should unite upon: the whole 93 members from the eleven slaveholding States should come up on this question as a band of brothers, joining in one fraternal hug, heart responding to heart; turning their faces towards heaven, and swearing, by their altars and their God, that they will all sink in the dust together before they will yield the great compromise contained in the constitution of their fathers.

In a speech made by the gentleman from Massachusetts, a short time ago, he says he thinks the consummation of the Christian religion will not take place until the emancipation of the negroes is effected. And then, I suppose, we have the commencement of that glorious millenium which has been so long prophesied. I wish that day would come; but I do not wish to attain it by means of bloodshed and the sacrifice of thousands of lives. If I thought it would come in my day and generation, I would now be found standing on tiptoe, stretching my ken to the utmost tension, anxiously endeavoring to descry in the eastern horizon the first streaks of the glorious morning. How gratifying it would be to me to have it in my power to proclaim that the voice of the turtle was heard in the land; that the winter was past and gone; that the lion and the lamb had lain down together; when all could unite in that heartfelt chorus of glory to God in the highest, and peace on earth, and good will among men. But while thus indulging this pleasing illusion, while thus enjoying this happy aberration of the mind, (at this moment Mr. J. turned his face to Mr. Adams,) what ill omen is that obtruding itself so abruptly upon our view? What evil genius is this hovering around this hall? Is it some demon, or a mortal man? What frightful spectre do I behold, sending forth such unnatural sounds, predicting disunion, dissevered States, and the shedding of human blood! Frightful vision, this!

"Black he stands, as night;
Fierce as ten furies; terrible as hell;
And shakes a dreadful dart."

My time is passing rapidly on; and I must turn from these fearful forebodings.

The gentleman from Massachusetts has declared that the institution of slavery has the curse of heaven upon it; and that, in the course of time, Providence will bring about emancipation; and in this opinion Great Britain and Mr. Adams appear to concur. They both have great sympathy for suffering humanity abroad, but forget the wretchedness and oppression that exist at their own doors. One overlooks the white slavery that exists from necessity, from poverty, resulting from the manufacturing establishments in the New England States; the other seems to have taken out a roving commission in search of grievances abroad, over which to exercise her tender mercies. In her East India possessions, thousands, both white and black, are reduced to the most abject slavery; at home, she stands with the mailed heel of power and oppression upon the necks of over 20,000,000 of white subjects: yet Providence, according to this new school of philanthropy, is against slavery everywhere, except in New England and Old England; and all other nations or people that tolerate slavery, are to be rebuked by direct interpositions of Divine Providence. The ways of Providence are mysterious and incomprehensible to short-sighted and erring man. I trust and hope that this people

98       APPENDIX TO THE CONGRESSIONAL GLOBE.       Jan. 1844.

28TH CONG.....1ST SESS.      *Debate on the Oregon Territory.*      Senate.

will not so far depart from the great principles of right laid down by a just God for the government of the universe as to incur the withering displeasure of Heaven. It is true, in ancient times there were many manifestations of this kind. The holy Scriptures furnish us with many striking instances of Divine interposition. The case of Saul; when journeying from Jerusalem to Damascus: he was struck blind, as was supposed, for his persecution of the Christians; and, upon recovering, he inquired of his Lord what he would have him to do. The case of Herod, when he became so presumptuous: "And upon a set day, Herod, arrayed in royal apparel, sat upon his throne, and made an oration to them." "And the people gave a shout, saying it is the voice of a God, not of a man." "And immediately the angel the Lord smote him, because he gave not God the glory; and he was eaten of worms, and gave up the ghost." I might go on multiplying cases from the sacred volume, in aid of those already referred to. We may consult our own observation and senses; sometimes we see his power displayed in the agitation of the winds, in the heaving and contending billows of the mighty deep; sometimes we have the mutterings of his discontent in the threatening peal of thunder; sometimes he exhibits the brilliancy and awful grandeur of his countenance in the forked lightning's glare; sometimes he lets loose the baleful comet, passing from one extreme of the universe to the other, emitting, from its fiery tail, pestilence and death. This idea is more forcibly carried out in the lines of the poet, that there are—

"Signs sent by God to mark the will of heaven,
Signs which bid nations weep and be forgiven."

I might refer to instances in modern times; I might refer to the occurrences of 1840, when a most extraordinary excitement pervaded the community; when reason was dethroned, and confusion and profanity reigned paramount; when hard cider and coon skins were substituted as the very emblems to be used with all the sacred rites of the holy communion; when men were diverted from the worship of the true and living God, to honor him whom they had succeeded in elevating to the highest pinnacle of human ambition, and whom the Almighty, in the display of his power, struck as a star from its sphere, down to the level of the tomb. I give this as an instance of Divine interposition. May we not trace it somewhat further? Who knows what might have been the result of his administration of the government? Who knows but God expressly interposed to set an obstacle in the way of the accomplishment of those mighty calamities which would, peradventure, have been produced under his administration of the government—the abolition of slavery, and the dissolution of the Union? No, sir; I am not superstitious, but——

The expiration of the morning hour was announced by the Speaker.

## DEBATE ON THE OREGON TERRITORY.

### IN SENATE.

MONDAY, January 8, 1844.

The following resolution, (submitted by Mr ALLEN, some time ago,) being under consideration:

*Resolved,* That the President be requested to lay before the Senate (if in his judgment that may be done without prejudice to the public interests) a copy of any instructions which may have been given by the Executive to the American Minister in England, on the subject of the title to, and occupation of, Oregon, since the 4th day of March, 1841; also, a copy of any correspondence which may have passed between this Government and that of Great Britain in relation to that subject since that time;

Mr. ALLEN said: Mr. President, I take this the first opportunity to correct an error I committed, some days since, in my remarks upon this resolution.

In speaking of the debate in the British Parliament upon the late treaty, I ascribed to the present first minister of England—Sir Robert Peel—the declaration that, had the Oregon bill which passed the Senate at our last session, become a law, it would have been a declaration of war. Upon after reflection, it occured to me, that having previously seen only fragments of the debate, carelessly scattered through the public papers, I might have been mistaken as to the author of that declaration. I therefore immediately had recourse to the most authentic

source—Hansard's Parliamentary Debates, which I found in our library. I now hold the volume in my hand. The whole debate is here given at large, and in its corrected form; and I find that the declaration to which I alluded, was made, not indeed, by Sir Robert Peel, but by Lord Palmerston. I will read it in his own language, as found in his speech, delivered in the House of Commons, on the 21st of March, 1843. He said:

"Then there is another boundary question, still unsettled, relative to what is called the Oregon Territory, on the banks of the Columbia river, on the west coast of North America: what has happened lately about that question? Why, the Senate have actually passed a bill for immediately taking forcible possession of the whole of that territory; and the senator who brought in that bill expressed his conviction that the American claim to this territory would immediately be acquiesced in by Great Britain, if it was only urged in what he was pleased to call a proper manner. It is IMPOSSIBLE, I conceive, that this bill should pass the other branches of the legislature; but, IF IT WERE TO PASS, AND TO BE ACTED UPON, IT WOULD BE A DECLARATION OF WAR."

Such, then, was the declaration in full Parliament, if not by the minister, yet by one who stood but lately at the head of the foreign department; by one who, from his political and family associations—from his abilities, his experience, and consequent influence in public affairs—speaks with a moral authority less only, perhaps, than that of the minister himself. And what does this declaration import? For what was it made? Is it without meaning? Was it made without object? Would such a declaration, in reference to a great measure pending before the legislature of another country, have been made by such a man—by one so long accustomed to gauging the exact effect of words in such affairs—would it have been made without meaning or object? No, sir; it imports that, had the Oregon bill become a law, England would have resisted its execution by arms. It was made to test the efficacy of the terrors of war in arresting the future action of Congress on the subject, and of reconciling this nation to the surrender of its territory.

But, sir, as I may be told that the *unofficial* language of Lord Palmerston expresses not the temper of the British government, or its purposes, and is, therefore, to be disregarded, I will read an extract from the *official* speech of the first minister, delivered to the British Commons on the same day. Sir Robert Peel said:

"The question of the Oregon Territory, no doubt, is not adjusted; but on that it is not necessary that I should address the House at any length. With respect to the course which the American government has taken, the noble lord makes no allowance for the position of *a government so open to popular influence as that of America.* We, however, *deal with the executive government, and not with the Senate. We have proposed to that government to consider the means of effecting a conciliatory adjustment respecting the Oregon Territory, and we have met with no repulse, but have received assurances, in reply to our proposition,* that the executive government of the United States *is anxious to come to an adjustment of that question; and we have every reason to hope that, unless we revive the former animosity, and embitter the feelings between the two countries, an attempt to settle that question by negotiation will be SATISFACTORY.* The noble lord says that the Senate has passed a bill which I believe it has not passed. I think the votes are equally divided; *but whatever the Senate may do,* IT IS IMPOSSIBLE FOR THE EXECUTIVE GOVERNMENT TO APPROVE OF SUCH A BILL, *after having expressed a desire to negotiate. The noble lord says the adoption of that bill would be a case of war. I will not discuss hypothetical cases of war, when, as I have said, the executive government has signified to us its desire to maintain peace, and to effect a satisfactory adjustment of the question of the Oregon Territory. I trust in the* ASSURANCES *of the executive government; and I* WILL NOT BELIEVE THAT IT WILL GIVE ITS CONSENT *to a legislative measure at* VARIANCE *with* THOSE ASSURANCES."

Thus spoke the minister; and his, sir, is the language of sovereignty; because, spoken in the name and by the authority of the crown, it becomes as significant as if uttered in the speech from the throne itself. It is the language of a man whose will commits his government to the policy of peace or of war, and puts in requisition, if need be, the military resources of the empire. The President is here told

that he has already so far pledged this government to that of England, on the Oregon question, as to render it impossible for him to sanction such a bill as that which passed the Senate. Congress is here told that its action will be unavailing, as the President stands pledged to Great Britain to interpose the veto power. Now, sir, this declaration of the English minister is either true, or the contrary; and, in either case, and for equal reasons, the President should inform Congress of the actual state of the facts; because, whether true or the contrary, it equally relates to the action of Congress. If it be true, Congress should know it, that we may consider how far, if at all, we will allow an anticipated veto to trammel our action. If it be otherwise, Congress should know it, that our action may be freed from the possible embarrassments of such an anticipation. In either view, therefore, this resolution should pass; and, especially so, as it refers the propriety of giving publicity to a state of the facts expressly to the judgment of the President himself.

I am aware, sir, that these are matters which, in their very nature, are the subjects of negotiation alone. I know, too, that the public welfare may sometimes require such negotiation to be veiled from the world's eye until after consummated. But the Oregon question has *already* become the subject as well of legislative action as of negotiation. It is a subject of a character too momentous to be confided to the unaided discussion of a single man, acting invisibly, not only to the nation, but likewise to the Senate—a co-ordinate agency of the treaty-making power. It is a matter of boundary—of territory—and therefore affects our internal organization. And when, sir, such a matter is, at the same instant, the subject of both the legislative and the treaty-making power, does it become the Senate, which, by the constitution, is entrusted with a part of the former, and divides, co-equally with the President, the latter of these powers—does it become such a body to remain in wilful ignorance of the actual state of the facts, until, perhaps, it may be too late for us, in either our executive or legislative character, to avert the evil which, by possibility, may result to the country from the unadvised action of the President alone?

And here, sir, I shall take the occasion to say, and to call the attention of the country to the fact, that the hitherto tolerated practice of the executive, in concluding the most important treaties, before consulting the Senate as to a single provision, or even informing this body that negotiations are pending, is a practical and dangerous departure from the letter and spirit of the constitution. By the constitution the President has the "power, *by and with the advice and consent of the Senate,* to make treaties, *provided* two-thirds of the Senators present *concur.*" Thus is the Senate made co-equal and co-ordinate with the President, in the exercise of this power. But, by the existing practice, he dispenses with the *advice* of the Senate, exercises the *whole* power himself, and *then* demands the *consent* of the Senate to what he has done. By this the Senate is left with the veto power only upon his act; and even this negative check is rendered nugatory by the fact that, although the signature of a treaty by the President may have placed the interests of the country in a condition far worse than they were before, yet the *rejection* of the treaty by the Senate might place those interests in a condition still worse than that in which the President had placed them, *for the very reason* that he *had* placed them in that condition.

How, sir, was it in the case of the late treaty with England? But a year or two previously to its ratification, this body had, by an unanimous vote, solemnly declared our right to be clear and perfect to every inch of the territory within the line of our claim. To this we stood committed before the world. Yet three millions and a half acres of that territory have been severed from the republic, and now forms a part of the British empire. Other sacrifices have, without equivalent, been made, and obligations contracted, deeply prejudicial to our interests. And why was this? By what means were these things effected—these humiliations incurred? In the first place, the ear of the nation was filled with lugubrious bewailings about the anticipated horrors of war. The harmony of the two countries was in danger, we were told, of being disturbed by the clash of arms, and that nothing but negotiation could save us from the baleful consequences of mortal strife. Such were the forebodings to prepare the way for what was to follow. Then came the announcement

Jan. 1844.  APPENDIX TO THE CONGRESSIONAL GLOBE.  113

28TH CONG.....1ST SESS.  *Abolition Petitions—Mr. Bidlack.*  H. OF REPS.

into service, and the places of the unharnessed horses were filled by a draft from the heated and admiring multitude. Hurried along thus, General Jackson saw at once the extremes into which passion and excitement might too soon betray a clamorous and devoted populace; and rising—as he was well capable of doing—above his own offended pride, and the force of his feelings, he composed himself and calmed his irritated audience. In a speech which overshadows all the green and verdant laurels he had then so lately won in battle, and which still comes to us mellowed and sanctified by its patriotism, its justice, truth, and moderation, he nobly vindicated the supremacy of the law, and soothed the angry passions of the crowd by virtually exculpating the judge under whose decree he was smarting. With a true Roman firmness, "he implored them to run into no excesses," and begged that they would assent, "as he most freely did, to the decision which had just been pronounced against him." "In the arduous necessity imposed upon me," he exclaimed, "of defending this important and interesting city, imperious circumstances compelled me either to jeopard those important interests that were confided to me, or to take upon myself the responsibility of those measures which have been termed *high-handed*—but which I thought absolutely essential for defence. Thus situated, I did not hesitate—I could not; I risked all consequences, and you have seen me meet the penalty of my aggression, and bow with submission to the sentence of the law. * * * * If the offence with which I am now charged had not been committed, the laws by which I have been punished would not now exist. Sincerely do I rejoice in their maintenance and safety, although the first vindication of their violated supremacy has been evinced in the punishment of myself."

In all this there is no equivocation or evasion. General Jackson speaks of the "penalty" and the "sentence" of the law; and he rejoices in their "supremacy" at a moment when they had just been "vindicated" by which he chose to call his individual "punishment."

It will not do to say that the "menacing" disposition of the multitude, who thronged and caressed him whilst they threatened violence to the person of his judge, induced General Jackson to conceal his feelings, the better to soothe and avert their indignation. He was never wont to treat his injuries, real or supposed, on any such system of refined forbearance. Nor did he doubt his easy ability to command his followers, and inspire them with his sentiments and purposes in whatever channel he might wish to direct them. If he did not, therefore, spare his own faults, though they were the faults of "necessity," he would have been less likely, from the natural impetuosity of his temper, to spare the tyranny and oppression of another, under whatever cloak of authority they might have been veiled; and Judge Hall owes it to the honest convictions and the virtuous submission of a conqueror, more than to his supposed clemency, that the voice which stayed the arm of popular fury, did not proclaim his judicial guilt and his wanton oppression. Even the faithful biographer, who notes these memorable events with more than his ordinary zeal and eloquence, and who could not have been ignorant of General Jackson's bad opinions of any one, or indifferent to his wrongs, avoids all historical censure, and contents himself by recording, in a very few words, a public "impression," which ascribed the conduct of Judge Hall more to his "spleen than anything else."

What then—let me ask in sincere deference and condescension—what becomes of the fears and the virtuous apprehensions that prompted the committee to digest and report the amendment we are now discussing? I make the inquiry without intending to blame or impugn the motives that governed the honorable gentlemen who compose that committee. All necessity, I answer, is obviated, when we stop to examine a witness whose testimony puts to flight forever all shadow of doubt, leaving the unoffending dead to the quiet possession of the peaceful grave, and the living to that voluntary bounty which a nation is free to give. The clamor and the condemnation of partisan friends, nor the misguided sensibilities of those who sit in higher places, and who fastidiously refuse a favor they are the first to solicit, unless it be bestowed on their own terms and in their own chosen words, will not deter me from placing my seal on the bill in the form it now possesses. There is in its reading nothing to defile the record of our country, and I cannot agree to expend more public time, by helping to add an amendment,

which may cause the rejection of the bill, and the future renewal of a controversy that has already cost the country more than five times the amount of money staked upon the approaching decision of the Senate.

Mr. President, I do not desire to say much about the motives of some of those who suggested the introduction and discussion of this bill. I was far away from here when a knowledge of the measure first reached my ears; and I had not, at that time, a voice in the deliberation of this body. But I was not long in forming my opinion on the subject; and aside from my convictions of the strict propriety of restoring the fine the moment it was solicited by General Jackson's friends, I could not help thinking how wise it would be in my political associates at the Capitol to give the *coup de grace* to the whole stratagem, by freely assenting to the passage of the law. Gentlemen on the other side of the chamber may smile at these remarks if they please. They know how much weight they are entitled to; and I imagine some of them believed, with me, that a dead lion was not without its terrors; and that some political capital might be made by the bill, if it were opposed or rejected by a whig Congress. Let it go now, sir. I have seen enough of it, and have no objection. I shall satisfy myself, if I do not gratify the friends of the measure, by voting to keep down all immaterial obstructions, facilitating the passage of the law, and relieving the country forever from the agitation it has produced.

---

## REMARKS OF MR. BIDLACK,
### OF PENNSYLVANIA;

*In the House of Representatives, January 11 and 12, 1844.*—On the subject of abolition petitions; the question being the motion of Mr. A. V. Brown to recommit the report of the Select Committee on the Rules to the said committee; which motion Mr. BLACK of Georgia had moved to amend by adding thereto instructions to the said committee to report back to the House the rule commonly known as the 21st rule, (i. e. that which excludes abolition petitions.) Mr. RHETT of South Carolina having concluded—

Mr. BIDLACK next obtained the floor, and spoke as follows: Sir, (said Mr. B.) I have risen from the impulse of the moment, to express my concurrence in many of the views of the gentleman from South Carolina, and, at the same time, to protest most earnestly against some of the positions which he has taken, and, above all, against that want of forbearance and moderation which he seemed to inculcate. Mr. B. did not believe there was that growing and manifest hostility to the Union which had been represented. Nothing but an imperious sense of duty could have induced him to offer himself to the attention of the House at this moment; especially, as he felt in a great measure undecided in his own mind as to the course it would be proper for him to take. He had listened to the gentleman who had just resumed his seat, in the hope of hearing some argument sufficiently strong to justify him in continuing to go with the South as he had done in the last, and thus far in the present Congress. His object at this time was, not so much to debate the merits of a question which seemed likely to become one of vital importance, as to make a public declaration of what would probably be his future course, and to present some of the reasons which would induce him to pursue it; and he did this chiefly to avoid the necessity of many private and some public explanations hereafter.

It was well known that he had uniformly voted in favor of the rule which excluded abolition memorials from the House; and he should still continue to do so, could he be convinced that he could continue to have the approbation of his own conscience, and be assured of the *undivided* support of the South. But, sir, (said Mr. B.,) I am not assured of either. Who could say the continuance of the rule was a measure that met the hearty concurrence of *all* those who represented themselves as parties most interested in the matter? That they claimed to feel so deep an interest in it, none could question who had listened to the gentleman who had just addressed the House; for that gentleman considered the question as of such deep importance that on it hung in a great measure the continuance of the Union. One would suppose, from his remarks, that the existence of the Republic turned on the question now under consideration. This seemed to be the feeling not only from the course of remark indulged in here, but from indications which

began to appear in a portion of the public press. He regretted having met in a paper of much celebrity in this city (the Spectator) with an article from the pen of a gentleman who did not usually look merely on the surface of things, in which he found language very similar to that which had just fallen from the gentleman from South Carolina, [Mr. RHETT.] After an eloquent description of the 8th January, the article went on as follows: [Mr. B. here quoted from the article, alternately reading and commenting as he proceeded:] The article in question says, "but will the Union endure?" To this, Mr. B. would answer, with full confidence in the patriotism of the great mass of the people, both South and North, yes, sir, yes; it will endure!! But the same article goes on to say: "Perhaps our minds have become morbid, by hearing the eternal questioning of its continuance in the House of Representatives during this Congress. Perhaps we are low in spirits, or perhaps too high; but now, whilst nature is all calm, and would seem to 'rise up and bless us,' the doubt of the long continuance of our united Government presses upon our heart. The tongues and the hands of men are now busy, where hitherto it was supposed sacrilege to touch." Mr. Speaker, has it come to this! have we fallen upon such perilous times that the Representatives of the people in this hall cannot differ on a question of expediency, as to the adoption of rules for their own Government without endangering the Union? No, sir, no; it is not in the power of politicians thus to put this glorious Republic in danger. But sir, the article I am commenting on does not stop here; it goes on to say: "Members of Congress seem colder to each other. They sit in silence, watching, apparently, in stern eagerness. No cordiality—no friendliness—no confidence. But suspicion and dissatisfaction seem resting on their brows, whilst cold disdain and sarcastic smiles often settle around their lips. They do not appear to us to be brethren of the same political family, but rather discontented and jealous foes." I appeal (said Mr. B.) to the members of this House, to know if this representation of their manners and feelings be correct: if it be, I, for one, have been in happy ignorance of it. I say in happy ignorance; for, as Sir Walter Scott has remarked of the French revolution, when all is dark in a state, and behind the present evils nothing of hope is to be cherished, then "ignorance is bliss, and it is folly to be wise." The article concludes by representing the setting sun as a type of our Union; and with the prayer, "thus too, when it sinks, may our glorious confederacy go down." The gentleman from South Carolina, who has addressed us so eloquently, closes by saying, "Union or no Union, the South will be free." I beg the gentleman to pause and reflect what kind of freedom he can promise to himself or to others, after the sun of our glorious confederacy shall have gone down in darkness. When the stars and the stripes of the Republic are torn in fragments, under what banner will the gentleman go forth to victory? Ay, sir, suppose he should find a banner, and victory should perch upon it: over whom will he obtain that victory? Gentlemen cannot flatter themselves with dissolution and freedom without all the horrors of a civil war. Mr. B. dwelt on the danger of thus, on all occasions, lightly calling in question the continuance of the Union. He referred to the good old times, of which his father (who had served seven years with Washington) often spoke to him, when it would have been held sacrilege even to broach such an idea. Sir, said he, I invoke gentlemen to come up to the consideration of this question in a spirit very different from that which has been exhibited here, and commented upon with such high-wrought coloring out of doors. I beg members to act under the influence of the noble and patriotic feelings which actuated the bosoms of those who made us a nation. If it be true, that the compromises of the Constitution—nay, the Constitution and the Union itself—are in danger, will not the people inquire why, in such an extremity, the Union and the Constitution could not be preserved by that spirit of concession and compromise in which they were formed? Why shall not this question be met with the feelings in which Hancock and Adams met Washington, Madison, and Jefferson?

As one of the humble Representatives of the "unpretending" State of Pennsylvania, which some of you are pleased to term the "Keystone" of this splendid arch of empires, I can say for myself, and I doubt not for my colleagues, that we have no desire or wish in this matter but to preserve our true position, standing erect in the centre, without bias

114     APPENDIX TO THE CONGRESSIONAL GLOBE.     Jan. 1844.

28th Cong.....1st Sess.     *Abolition Petitions—Mr. Bidlack.*     H. of Reps.

on either side of this proud confederation of States. We disclaim any other desire than to hold an even scale between our Northern and Southern brethren?

In what condition do we find ourselves? A sovereign State at the North has sent her solemn resolve upon a delicate question, affecting the interests of several States at the South. Certain citizens of other States at the North and West have sent to us, as the national council, their petitions, which the Representatives of the South—some of them—say shall not be received, save at the hazard of the Union. It is not for us to call in question the motives of our brethren on either side; but we have a right to arrest the hand that would write "dissolution" upon all the proud monuments of our present glory as a nation.

While I am up, sir, I will venture to submit a word of inquiry to both parties. First, then, to the North: What have the abolitionists done to loosen the bonds of the slave? or what have they accomplished towards ameliorating the condition of the free man of color? Nothing, sir—worse than nothing. And of the Southern members he would inquire whether they had not injudiciously blended abolition and the right of petition in one cause, and thereby gained to the former numerous adherents, who would otherwise be found with the South? Would it not be a wiser policy to strip abolition of this cloak of the right of petition, and let it stand forth in what they termed its own black and hideous deformity? Mr. B. was clearly of that opinion. He believed this very thing multiplied abolitionists by scores and hundreds. As to the assertion that the abolitionists were doing nothing to ameliorate the condition of the slaves, it can be shown—

[Here the morning hour having expired, Mr. Bidlack was cut off. He remarked that the expiration of the hour had stopped him in the middle of a sentence. He would proceed then, or conclude next day, according to the pleasure of the House; whereupon the House went into Committee of the Whole.]

The next day, the House proceeded to the consideration of the unfinished business of the morning hour, being the report of the Select Committee on the Rules, together with the several pending questions.

Mr. Bidlack, who was entitled to the floor, resumed his remarks, and continued them to the close of his hour.

He was in favor, he said, of the recommitment of the report, but without instructions. He had not only heretofore uniformly voted in favor of rules of this description, but on all questions upon motions to lay this whole subject on the table, he had voted for them also. He had been willing to abide by the rules of the last House, as amended at this session, rather than have this subject further agitated or discussed; and he regretted that he did not find more unanimity among Southern gentlemen upon motions to lay the whole subject upon the table. He was anxious to avoid all discussion; but since the South, or a portion of its members, appeared to be disposed to have this question discussed, he thought it to be his duty to review the grounds on which, at the last Congress, he had gone with them in support of that rule. When he had the honor of addressing the House yesterday, he expressed his regret at the manner in which this subject had been discussed, and the manner in which these discussions had been spoken of out of doors, and in the public prints.

What was the situation of the subject now before the House and before the country? From the North they were told that they must receive these petitions; that in refusing it they were refusing a constitutional right; and that, if persisted in, it must result in a dissolution of the Union. On the other hand, they had heard intimations from several Southern gentlemen upon this floor, and especially from the gentleman from South Carolina [Mr. Rhett] yesterday, that the reception of these petitions, Union or no Union, must be resisted. Now, when such declarations were made by gentlemen of ultra feeling on both sides, what was the proper course to pursue? It would seem that the Union was to be dissolved, right or wrong—gentlemen on each side seeming determined to carry out their propositions without compromise, even at the expense of the Union, and professing at the same time to be actuated by a regard for the Constitution. This would seem to be killing the Constitution with kindness. It was time, in this state of the case, to pause, and see if this matter could not be compromised.

Mr. B., when interrupted yesterday, had been going on to say to Northern gentlemen that he truly

believed, however honest might have been the intentions of the abolitionists, or a portion of them, that they had effected nothing towards carrying out those intentions, and that before they had arrested the constitutional action of the States, the States had been going on in the work of emancipation. They had done nothing to ameliorate the condition of the free man of color. Indeed, in proof of this, he need only refer to one fact with reference to his own district. Since he had been in public life (and he was yet but a young man) free men of color in his district had exercised the most enlarged privileges which any freeman could enjoy; to wit, the right of suffrage. Yes, many men of color had he seen go to the polls in the town in which he resided, and deposite their votes against him. He had doubted their right to do so; and they exercised their right to vote against him for doubting their right; but these abolition movements had created such a reaction on that subject, that the constitution of his State was so amended that the right of suffrage was denied to them. Previous to that amendment of the constitution, they exercised the right of suffrage; and in some instances, where the judges and inspectors of the elections refused it to them, they prosecuted these officers, and the courts convicted them.

The question was carried to the Supreme Court; but before a decision was finally had, it was settled by the amendment of the constitution he had just stated. He would not, however, stop to refer to any more facts on this subject, his desire being principally to have the ear of Southern gentlemen on one point. He desired to have them to understand, that, though he had acted with them heretofore, it was not from a full conviction that it was the best policy; and experience had since convinced him that it was not. Previous to the adoption of the 21st rule, there was very little countenance given to abolition in the State of Pennsylvania; and he might refer to abundant evidence in proof of that fact. Why, before that time there was, so far as he was informed, but one abolitionist in the place in which he resided—he knew of no other—and that one was unable to make any converts. For the purpose of endeavoring to do so, he sent into a neighboring State for a celebrated lecturer on abolition; and when he arrived at the town in which he (Mr. B.) resided, the people not only refused to hear him, but provided for his passage in the stage, and sent him out of the county. He felt bound, in order that the people of the South might know the true state of feeling on the subject of abolition in his section of the country, to mention another fact, which, under other circumstances, he would be unwilling to refer to. They not only bundled this abolitionist, unheard, out of the county, but the man who sent for him—a man of standing and influence in the county—was actually ridden through the streets, at midday, on a rail.

Mr. Speaker, it pains me to be obliged to bring forward evidence that Northern men are willing to surrender their laws to the jurisdiction of Judge Lynch, rather than listen to any proposed infringements of Southern rights, at the same time that Southern members are looking upon us with distrust. He wished to hurt no man's feelings, and he referred to nothing that was done in a corner. If gentlemen still wanted further proof, could they not see it in the conflagrations which had lighted the streets of the commercial emporium of his State? Was not the *burning* evidence to be found in the destruction of the abolition hall in Philadelphia, some little assurance to the South that they had friends in Pennsylvania who were willing, at all reasonable hazards, to stand by them before the adoption of this rule?

But, as he said yesterday, this rule, which enables the abolitionists to come under the cloak of the sacred right of petition, aided them more effectually than anything else in making converts.

The abolition lecturers, under the pretence of a meeting called to hear the right of petition discussed, lectured on the subject of the abolition of slavery; and they were, by this means, making many converts, which they would not otherwise be able to make; and, unless this pretext was taken from them by the repeal of the 21st rule, they would continue to increase the number of their followers. He always had doubts of the propriety of this rule; and his doubts extended not only to the merits of it, but to its expediency, as he told Southern gentlemen at the last Congress. He would not now, however, discuss the merits of the question, as to the right of Congress to adopt this rule; his only object was to have the ear of Southern gentlemen as to its ex-

pediency. He voted for it at the last Congress with some reluctance; but voted for it because he was appealed to by Southern gentlemen to do so, on the ground that this was a subject on which they were all united; and that it was a subject the agitation of which was not only endangering their right to the property secured to them by the Constitution, but was endangering the safety of those who surrounded their firesides. These appeals overcame his scruples, both as to the merits of the question and as to the expediency of the measure; and he voted to sustain the rules as they stood. He had before observed that, in the votes he then gave, he was not sustained by the united voice of the South; and he remarked that the subject was kept in agitation, and the motions of the gentleman from Massachusetts on the subject were frequently supported, not only by the casting votes of a Southern Speaker, but by the casting votes of Southern members. It was these casting votes by which the subject was kept in agitation, and the time of the House taken up in excited and unprofitable discussion.

Mr. Wise asked the gentleman from Pennsylvania to permit him to interrupt him for a moment. He felt called upon to make one remark in relation to one of the gentleman's observations.

Mr. Bidlack (looking anxiously at the clock, his hour having nearly expired) said he would yield if the gentleman would not speak long. [laughter.]

Mr. Wise said the gentleman from Pennsylvania made some remarks which were very just and very proper. The gentleman had said that Northern men, who were willing to stand by and protect the rights of the South on this question, would continue to do so in one event that it was made a *sine qui non*—a condition precedent—that the Southern members should be united among themselves. He, (Mr. W.,) approving of that sentiment—would ask the gentleman from Pennsylvania to state specifically who from the South had not united on this question? He made this request in order that it might not be supposed that he (Mr. W.) had not united and voted with the South on this question.

Mr. Bidlack would return the compliment of the gentleman from Virginia, by saying that his remarks were very sensible and his requests very reasonable; but he did not know that it would be parliamentary for him to refer by name to members of the last Congress who were members of the present, and had changed their ground on this subject. He would, however, remark that the gentleman from Virginia would find that there were some coming from his own State, Virginia; that there were others from Kentucky; and that there were others from North Carolina; and the gentleman from Virginia could ascertain who they were by a reference to the journals of the House.

Sir, said Mr. B. you will remember that I remonstrated against it at the time. We had a position which the gentleman from North Carolina, in his simile of a battle, has well represented as an exposed one for Northern men; it was a position on the field in which they were sometimes exposed to two fires—one in which they were doing violence to the feelings of some of their best friends at home. Standing thus in the place of allies to the South, had they not a right to expect that no portion of the main line should either retreat or reserve their fire? And, above all, might they not demand that there should be no going over to the enemy? If you have a right to claim that we shall not surrender a post admitted to be a disadvantageous one, and an exposed one, certainly we may demand that none of you shall join the ranks of the enemy, and give them the victory. This had been done on some occasions, as the journals of the last Congress would show. Mr. B. must say that he felt sore upon this subject, and that they had more cause of complaint against Southern men in this Congress than in the last. So long as he had been told, when he came here, that those Southern men who would not unite with the great mass of the South upon this subject had been left at home, he had been disposed still to go with the South. But he found, if these gentlemen had been left at home, others had been sent here to supply their places and give the same votes. These were facts sufficient to make Northern men stop and examine the ground, and see if, in a doubtful case, they had not a right to judge for themselves, and act strictly in accordance with the dictates of their own conscience. Other motives had been presented before him. He had been told by his constituents, when they had seen the results of the election of 1840, inasmuch as a majority of the citizens of a majority of the Southern States had fought under

Feb. 1844. APPENDIX TO THE CONGRESSIONAL GLOBE. 115

28th Cong.....1st Sess. *Report of the Committee of Elections—Mr. Dillingham.* H. of Reps.

the banner of a man who said he had joined an abolition society in his youth, and had acted in concert with the abolitionists and thrown themselves into their embraces, that they should be left there until they had seen the error of their ways, and brought forth works meet for repentance. But such considerations had not influenced him. He had taken the course which he had pursued, influenced by the appeals of Southern men, not so much in regard to their rights of property, but to interests which they held more dear, in regard to their homes, their families, and their hearth-stones.

But it had occurred in this Congress not only that Southern men were found voting against this rule, but that the gentleman from North Carolina was found addressing the House in many and almost unanswerable arguments against further sustaining it. Now, for one, Mr. B. was disposed to take into consideration whether it was not best to take the gentleman at his word, and, if there were responsibility, to let it rest with the gentleman himself. And in doing so, Mr. B. went no further, at present, than to say that he was disposed to recommit this subject to the committee; having had some intimation that, in that event, one member of the committee would ask to be excused from serving upon it, and that his place would be substituted, and the committee would examine the whole subject and see whether they could not report a rule upon which all moderate men could unite and put an end to this question. But when he did this, after the facts he had referred to, let no man charge him or his constituents with being identified with the abolitionists; let no man charge that he was disposed to abandon the compromises of the Constitution. He was but acting under the solemnity of his oath, and with no other motive than the good of the whole country, and for the protection of the rights of all in what he considered the best manner.

The question presented itself under the form of a mere question of expediency. If the South, as the gentleman from Virginia had said, will agree upon any manner of fighting this battle—if battle they are determined to call it—and will come up to the work and fire when we fire, (said Mr. B.,) and not retreat, (ay, *retreat* did I say?) not go over to the enemy and fire upon us, then I will maintain my position in that battle, and fight to the last. But if this was not done, was Mr. B. to be obliged to stand in a position on the field which he was thoroughly convinced was not the best position in which he could serve his country? When those who said they were most interested in the subject would not come up and sustain him in that position, was he not at liberty to take another position? And if he did take another position, would gentlemen shoot him down as a deserter? or would they not (which was all he asked) give him an honorable discharge?

Mr. HARALSON interposed, and inquired of Mr. BIDLACK who of the South had divided from the mass of Southern gentlemen upon this subject?

Mr. BIDLACK replied that when the motion had been made, no longer ago than day before yesterday, to lay the subject on the table, many gentlemen had voted against it, when, if it had been done, he thought he was correct in saying that they would have acted under the rules as adopted at the commencement of this session, and "the 21st rule" (or the 25th rule, as it now stood) would have been re-enacted. For one, he was willing to abide by the rules as they had been adopted, rather than submit to this continued excitement and waste of time in debate. He had, therefore, voted to lay the report on rules, and all the questions connected with it, on the table. If Southern members had been at their posts, and had voted with him, the matter would have been thus disposed of. But, sir, the journals will show that some of them did not vote at all on the question, and eight or ten of them voted against us!! Sir, when gentlemen call upon Hercules, they should put their own shoulder to the wheel. For one, sir, I feel at liberty now to pursue my own course, and shall do it fearlessly. There had been an opportunity presented to give this agitation a *quietus*, at least for the present, and several members from Virginia, North Carolina, South Carolina, Georgia, Kentucky, and Tennessee, had refused to embrace it.

Mr. HARALSON was understood to say that the question of laying the subject on the table was a very different thing from the direct question on the 21st rule.

Mr. BIDLACK rejoined that if the establishment of this rule was what gentlemen were really at, their object would have been accomplished by laying this subject upon the table.

Mr. BLACK requested the floor, stating that he had voted against laying on the table, and he was desirous to give his reasons therefor.

Mr. BIDLACK declined to yield the floor, remarking that he had but little time remaining, and that the gentleman undoubtedly would have an opportunity to state his reasons hereafter.

As he had remarked, he was in favor of recommitting the subject to the committee without instructions; and in this course he contended there was nothing so new or preposterous as gentlemen seemed to intimate. Had gentlemen recently read the report of Mr. Pinckney on this point? In that report Mr. P. spoke (and Mr. B. believed he was a Southern man) of having heard with surprise that some Southern gentlemen were offended at having the subject sent to a committee which should examine precedents in the case. This subject, said Mr. B., had been before Congress in 1805; and at that time, on the question of a resolution in relation to the abolition of slavery in this District, the votes had been as 47 to 65.

It would appear, from this, that it was not true, as some seemed to suppose, that the South was losing ground. Nothing like such an equality of vote would now be given. It has been well said that the peaceable adoption of this Government, under all the circumstances which attended it, presented the case of an effort of deliberation, combined with a spirit of amity and of mutual concession, which was without example. I ask gentlemen to profit by that exhibition.

The gentleman from South Carolina has referred to our situation as one of mutual danger. Will not this, if nothing else, enable us to overcome the impulsive force of local interests, and the want of confidence, to which so much allusion has been made? Can nothing impress upon us the importance of moderation in our deliberations? The question of the extent of the right of right of petition was one worthy of grave consideration. It was admitted that the abridgment of the right to assemble and petition in England had led to the adoption of the provision in our Constitution upon that subject. At the same time, it was contended that the right in this country was not as valuable as in the old country, because the people here have a right to command, where the representatives are their servants. A plain, unsophisticated mind will not readily see why the larger does not include the lesser right. If you may command your servant, why may you not request, or petition? For one, when I have made up my mind that the abolitionists, or any other portion of the community, are asking me to do what cannot be done without a violation of the Constitution which you, sir, have sworn me to support, I, for myself, do not wish to put a committee to the trouble of investigating and determining whether I should do it or not; but, if there are other members that have not decided in their own minds, I am willing to give them the assistance of a committee. No five members out of any nine that can be found in this House will report against the compromises of the Constitution, as the South itself understands them. Then where is the danger? It was a maxim of the illustrious Jefferson, that "error of opinion might be safely tolerated, while reason was left free to combat it."

Admitting that we may refuse to legislate upon petitions asking for a violation of the Constitution, does it follow, as a necessary consequence, that we may refuse to receive the application? Is it clear that reception is an act of legislation? If so, where is it to stop? The party in power for the time being may reject petitions according to their construction of the Constitution as they understand it. At one time it will result in the rejection of the reception of petitions for the establishment of a national bank; for appropriations for objects of internal improvement; the West Point Academy, and perhaps other objects. There is a strong argument in favor of receiving all respectful petitions, and determining upon what should be done with them afterwards, arising out of the occurrence which we had witnessed yesterday. It appeared unsafe to depend upon the "brief verbal statement" of the member presenting them. I will not say the member might misrepresent the contents of the petition, but he may easily mistake it himself, and other members may mistake or misunderstand his representation of it. This, in fact, was alleged to have occurred according to the report of the committee made yesterday upon the petition presented by the gentleman from Ohio.

Mr. B. concluded by imploring gentlemen to look upon this subject in a common sense view, and

neither to speak or to act upon it with excited feelings. There was no necessity for it. Let them depend upon it, if the South would unite upon any course of action on this question at all consonant with the principles of the Constitution—if they would refer this subject to a committee, and let that committee and let this Congress say they believed in the doctrines of the report of Mr. Pinckney, the Legislature of his State, now in session, would unanimously pass a resolution seconding the doctrines of that report, and so far as his State was concerned, she would be found standing erect as the "Keystone," determined, if possible, to sustain this arch of confederated States in all time to come.

## SPEECH OF MR. DILLINGHAM,
### OF VERMONT,

*In the House of Representatives, February 7, 1844—On the right to hold their seats of those members elected by general ticket.*

Mr. SPEAKER: The question before the House is a great and grave one; yet, as I am called upon, in connexion with other members, to determine it, I feel at liberty to discuss it; and though I do not expect to do this *ably*, yet I will do it freely and fearlessly, and I trust, at the same time, decorously.

It is necessary, first, to ascertain what powers are conferred by the constitution of the United States upon Congress, and what upon the legislatures of the several States, touching the representation of the States in Congress.

The second section of the constitution gives to Congress the *sole* power of determining, once in ten years, the number of representatives each State is entitled to. In the determination of that question, the States have no voice, no power, given or reserved. No State ever denied the possession, or challenged the exercise, of this power by Congress. Under this provision, Congress has always faithfully determined, and speedily made known to the several States the number of representatives to which they are entitled. This provision is in these words:

"Representatives and direct taxes shall be apportioned among the several States which may be included in this Union, according to their respective numbers; which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons. The actual enumeration shall be made within three years after the first meeting of the Congress of the United States, and within every subsequent term of ten years, in such manner as they shall by law direct. The number of representatives shall not exceed one for every thirty thousand, but each State shall have at least one representative."

And in the same section, the qualifications of voters are thus prescribed:

"The House of Representatives shall be composed of members chosen every second year by the people of the several States, and the electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislature."

Under this clause, the qualifications of voters, or electors, are left with the several States, each regulating the subject as it sees fit; and Congress cannot interfere in the matter.

The next inquiry is, where does the constitution vest the power to prescribe the regulations; or, in other words, to make the laws necessary to enable the electors of the States to elect the representatives to Congress to which each is entitled? Another branch of the constitution (Sec. 4) furnishes the answer, as follows: "The times, places, and manner of holding elections for senators and representatives, shall be prescribed in each State by the legislature thereof; but the Congress may at any time, by law, make or alter such regulations, except as to the place of choosing senators."

It might have been supposed, that when this imperative command had been given to the States to do this duty, nothing more would have been necessary; but it seems that the framers of the constitution entertained the opinion that some of the States, either from negligence or contumacy, or some other motive, might fail to have themselves represented in Congress; that if one State did so, another might; and that, consequently, there might be a failure of the government established for the Union.

I cannot, for a moment, think that the framers of the constitution contemplated that Congress would ever exercise the power of prescribing the time,

116      APPENDIX TO THE CONGRESSIONAL GLOBE.      Feb. 1844.

28th Cong.....1st Sess.     *Report of the Committee of Elections—Mr. Dillingham.*     H. of Reps.

place, and manner of holding these elections, if the States themselves acted. They supposed it to be a high and delicate power, reserved to be used only in case of necessity—that necessity to be demonstrated only when it was apparent that the States themselves, from some cause or other, failed to carry out their powers so as to be represented here.

In 1842, Congress passed a law entitled "an act for the apportionment of representatives among the several States, according to the sixth census." The first section of this act contains a full and perfect apportionment of representatives to each State, and nothing more. They then add a second section in these words:

"*And be it further enacted*, That in every case where a State is entitled to more than one representative, the number to which each State shall be entitled under this apportionment, shall be elected by districts, composed of contiguous territory, equal in number to the number of representatives to which said State may be entitled, no one district electing more than one representative."

Under this section, pretended to be bottomed on the 4th section of the constitution above quoted, this unhappy conflict between the Congress and the State legislatures has arisen.

That every member here holds his seat by an election under State laws that prescribed time, place, and manner in full, is not denied. The objection, and the only one, to the right of members from New Hampshire, Georgia, Mississippi, and Missouri, to hold their seats here, is, that the legislatures of those States, in their laws prescribing the time, place, and manner of electing *their* representatives, disregarded the requirements of that 2d section of the act of Congress of 1842, by which they were required to elect by single districts.

We shall soon see that the framers of the constitution never intended, or expected, that Congress should, or would, exercise the power over this subject than amply given to them, but in those cases where some State or States neglected, refused, or were unable, to comply with the duty imposed upon them of prescribing all necessary laws on this subject. The constitution made it the *duty* of the States to exercise this power. It also reserved to Congress the right to exercise it, in their discretion. The government of this Union, which was then being brought into existence by the energies of that constitution, would depend much, perhaps entirely, for its safety and perpetuity, on the constant and unbroken representation from each State in the Congress of the United States. And if the States did not, or would not, do their duty in this respect, the Union would be dissolved, unless the same power was lodged elsewhere. And where else could it be lodged so safely as with Congress, inasmuch as their existence depended on this great avenue of representation being always kept open? Consequently, this high and delicate trust was committed to them. It was hoped and expected that they never would use it but to preserve the Union, when it was likely to fail through the faithlessness of its several members. That this power *might be abused by Congress*, was well known: that *it has been*, is now equally true.

Congress, without the existence of one single cause or contingency which the framers of the constitution supposed would ever call forth its exercise, have at least *attempted* its exercise; and if they have failed, it is because the fear that attends the perpetration of a wrong rendered them too timid to effectuate their purpose.

This power of prescribing time, place, and manner of elections for members of Congress, by the constitution, is not bestowed in moieties upon the States and Congress, but the entire power is given to each.

If either exercise the power, they must exercise the full, entire power, or their legislation is void. When representatives are elected, the voters look to but one code of laws, and that code must be furnished by the State, or by Congress.

In each State, and in Congress, this power is equal; it is plenary; neither lacks anything that the other can supply; and when either acts, it must do all that the constitution requires to be done. This power, having by the constitution been thus conferred entirely upon the States and upon Congress, it may be asked what will be the consequence, should a State legislature and Congress both act with regard to that State, each by its laws, prescribing, in all needful particulars, the times, places, and manner of the elections? Sir, I concede that the election in that case must be made in conformity with the laws of

Congress, just as it would had the State done nothing. But if, in its code of legislation on this subject, Congress fails to make it so perfect that an election can be made under it, that is a perfect *non user* of the power by Congress; and the State legislation, if entire and perfect, is as legal as though Congress had not attempted to act. Suppose a State legislature should, in prescribing the laws for a congressional election, fix times, places, and so much of the manner as to enact that the representatives must be elected by districts, but fails entirely to create the districts: here would be inextricable confusion; no election could be made under the law, and it would remain inoperative. In such case, the State cannot be represented in Congress; and, if the State legislature acts no further, Congress must. How shall they do it? Certainly by making entire and full provisions. Should they enact that A and B should be a district, and C and D another, and stop there, there could be no election under their law, because there was no time, place, or residue of the manner prescribed by it. True, they might, by their enactment, adopt the State law in all these particulars, *as their own*, and thus make their system complete, so that an election could be held under it. When Congress began its legislation in the District of Columbia, in an act of six lines it adopted all the State laws of Virginia and Maryland, then in force, as the laws of the District. Those laws then ceased to be State laws, and became the laws of Congress, as much as though enacted word by word at length.

There are clauses in the constitution where State action, and State legislation are required, in connexion with the power and legislation of Congress. The provision relating to the militia is one of these; then Congress and each State must legislate upon different branches of the same subject, in order to effectuate the provision of the constitution on that subject. These cases furnish no authority against the position I am contending for. On this subject there can be no patch-work legislation—Congress furnishing the black, and the States the white, red, and blue. Sir, am I right? Let us look back and see what those who framed the constitution, and those who adopted it, thought on this subject.

When the draft of the constitution, as it came from the convention which framed it, was presented for adoption to the States, this particular feature of it was everywhere productive of great heart-burnings. So strong was the objection to it in Virginia, that it took all the powers, all the coolness, and all the personal influence of Mr. Madison to reconcile the objections in any degree to this article; and the ground he took was, that it was a power which never would be abused by Congress. Mr. Monroe inquired the reasons which could have induced him to give his assent to such a provision; and his answer was that it was impossible the constitution should have prescribed the time, place, and manner of holding congressional elections in all the States; and that, should the States neglect to do it, there might be a total failure of representation, and thus the Union, which they were endeavoring to form, might be totally overthrown. For this reason they had reserved in the hands of Congress this high power.

On this subject, he said: "were they (meaning the time, place, and manner of holding elections) *exclusively* under the control of the State governments, the general government might easily be dissolved. But if they be regulated properly by the State legislatures, the congressional control *will very properly never be exercised.*"

Mr. Nicholas, another member of the convention, on this same subject, said: "It is absurd to suppose that Congress will exert this power, or change the time, place, or manner established by the States, if the States will regulate them in a proper manner, or so as not to defeat the purposes of the Union." On another day, when this subject was pressed upon him by Patrick Henry, who was also a member of the convention, Mr. Madison (his own pure heart dictating the answer) replied in substance, that no Congress would ever be found so corrupt, or lost to patriotic feelings, as to abuse this sacred power, thus intrusted to their hands; and, as if clothed with the spirit of prophecy, he uttered the prediction that, should such a thing happen, they would be marked by the reprobation of the country, and other men would be put in their places. And when I look round and see that almost the whole of this House of Representatives are new men, I almost fancy that the spirit of the prophets rested upon him when he uttered that prediction.

In the Massachusetts convention this same grant

of power to Congress was stoutly opposed, on the ground that it would be abused. The friends of that grant of power to Congress placed the necessity for retaining it in the constitution on four distinct grounds. There was, at that time, a great apprehension generally prevailing of collisions arising between the two Houses of Congress, and fears were entertained lest the Senate should insist on such regulations in the States, in reference to elections, as would operate unduly to control the action of the people in freely choosing their representatives in the other body. Hence it was argued that Congress, as a whole, should have control over the subject. Another ground taken was, that the States might neglect to make the necessary provisions as to the time, place, and manner of holding elections, either from its being inconvenient to do so, or from their negligence and carelessness on the subject. Another ground was, that the States might be sullen and contumacious, and abstain from acting, with an express purpose of defeating and destroying the federal government. And the last reason given was, that it might happen, in time of war or invasion by a foreign enemy, that, the State capitals being in possession of the foe, the legislature might be physically prevented from acting.

In all the debates in Virginia, Massachusetts, New York, and some other State conventions, that I have looked into, I have not found a single man who held, or even seemed to dream, that there ever would be such a thing *thought of* as joint legislation between the Congress and any State or States, in the exercise of this power—Congress contributing the salt, and a State the pepper, to this legislative hotch-potch. On the other hand, all the friends of the provision advocated it on the ground that its use by Congress would only be in cases of necessity; that necessity could only exist when a State (or States) *neglected, refused*, or *was unable to act*; or, if acting at all, acting with a view to destroy the Union. Hence every supposed case, when it was anticipated that Congress would exercise this power, was one in which the State *could not* or *would not* aid the general government by any legislation of its own. And now, sir, what do we see? From the adoption of the constitution down to this day, every State has constantly and continually provided full and ample legislative provisions for the full and proper use of this elective franchise; yet sir, we are now, on this very subject, in the midst of conflict and confusion. And why? Has Congress passed any law, either altering any State laws, or making new ones, so that by virtue of congressional legislation, any member could have been elected from any State? No—nothing of the kind. No one pretends it; all the members here are elected under State laws that have prescribed the time, place and manner of such elections. The friends of the second section of the act of 1842, can but concede *now*, that it amounts only to a direction or mandate, from Congress to the States, *commanding* them how to exercise the power rested in them, not by Congress, but by the *constitution*. Sir, this mandate was not only unconstitutional, but irritating and insulting to the States. Congress is not master and they servants in this matter. The States see, in the constitution, ample, unstinted power given to them to regulate, as they see fit, the subject of time, place and manner of elections of members to Congress. The power granted to Congress, and the only one, is, that when they are dissatisfied with State provisions on this subject, they may take the whole matter from the States, by the enactment of laws of their own, ample and sufficient in themselves to enable the electors to choose and return here the representatives to which they are entitled. If Congress neglect or *fail* to do this, then the power remained with the States; and it was their duty, as they have done, to send their representatives here in such manner as they chose to prescribe.

Thus this second section of the law of 1842, lacking amplitude and provisions which could guide the electors of any State in the Union to the election of a single member, dwindles down into a command; and, being a command from a body having no power to give it, is *null and void*. It is a dead-letter—a body that never was quickened with a soul.

Mr. Speaker, I have heard it asserted, in this House and elsewhere, that this act of Congress of 1842, as it contained an apportionment of representatives *must be* constitutional; as though, because the first section was constitutional, the second must be so too.

This argument is too full of fallacy to deceive the weakest mind. We all grant that the first sec-

Jan. 1844.  APPENDIX TO THE CONGRESSIONAL GLOBE.  117

28TH CONG.....1ST SESS.  *Abolition Petitions—Mr. Payne.*  H. of Reps.

tion of that law is constitutional. Now suppose, instead of the second section *as it is*, Congress had added a second section establishing an order of nobility, or setting up an established religion: would that have been constitutional? Certainly not. The salt of the constitutional section could not have savored the last, neither would the corruption of the last have tainted the former. Here, then, was a great and conservative power of the constitution, vested in Congress as a place of sanctuary, to be brought out and used when there would otherwise be unrepresented States in Congress, through the faithlessness or want of power to act in State legislatures. With Congress, that power rested and slumbered for more than half a century; and then, without cause, and seemingly from a mere love of mischief, it is waked up, and used only to taunt and insult the States, in a manner likely to arouse their State pride, and bring them, ere long, into determined conflict with Congress.

Let me submit this matter to a practical test. This full and entire control over the prescribing the rules for the election of representatives is given to Congress, so that neglect or contumacy on the part of one or all of the State legislatures should never be able to cut off their representation, and thereby endanger or destroy the Union. Now, under this second section, or *mandamus* clause of the apportionment law, suppose that a few of the other States had acted with these four, and, by giving the same general-ticket system the preference, representatives had been elected to this Congress to the number of 112, one more than half of the whole number, (223.) If one of these is not entitled to a seat, the whole 112 would be in the same condition; and there being but 111 duly elected members, (less than a quorum,) *they could do nothing.* They could not legislate, either to repeal the law thus working out destruction, or to amend it, so that representatives could be chosen under it, independent of State legislation. Had such a state of things happened, then, sir, in that *hour*, this government would have been *dissolved!* There would *not be a Congress* for any purpose, because one branch of it would be extinct—palsied to death by its own sting. No appropriations could be made, or other legislative act done. Treaty stipulations with foreign nations would go unfulfilled; the officers of the general government must retire to private life; our pensioners go to the poor-houses; our army must disband and beg, or turn bandits, and rob; our navy, too, must rot, or turn pirates, and, vampire-like, destroy and live upon that commerce it was created to protect. What a picture! and all done by the action of the Congress to whom was committed the high and holy trust of preserving the Union from this danger. Sir, the world, looking upon the ruin of our government, would say it *"died as a fool dieth."* That Congress, which was sworn to protect, had put fire to the temple, and perished in the flames.

It is in vain to tell us, Mr. Speaker, that this second section found favor with some States. A great majority elected by districts before this enactment; and if any have changed since, out of comity, or from a wish of their people to adopt that mode as the best, it is all very well. But the question is, does it bind those States who think the general-ticket system better, and have followed it? The friends of this section admit that it was not addressed to the voters, prescribing to them how to elect representatives, but was a law to the States, requiring them to prescribe to the electors a mode which Congress thought was the best. Here, sir, is the difficulty. The command was addressed to an equal, not to an inferior. These States properly replied, "No; we shall not do it. You have the privilege of legislating for our voters in this matter, if you choose; and if you do legislate, you may prescribe what regulations you please as to time, place, and manner. You have power to do this yourselves, but no power to compel us to do it for you. If you do not exercise the power, it is made our duty to do it; and the constitution gives us the power to do it as we see fit." These States have acted on their high responsibilities of what they thought was the best mode. In doing this, they have not transcended the powers given them by the constitution; and their acts must stand.

In continuation, Mr. D. said he had always supposed it to have been the intention of the framers of the constitution to keep the powers of the federal and the State governments entirely separate from each other; and if, in any part of their work, that effort was manifest, it was evident in this very matter. He had been educated in a profound reverence

for the power of Congress as conferred by the national charter; but he had been also taught to cherish an equal degree of reverence for State legislative power, when it also was exercised in conformity with the constitution. While, therefore, he could never lightly pass over or set aside the authority of a law of Congress, he was just as fearless in forming and in declaring a judgment as to the constitutionality of such a law, as of a law passed by State and authority only. In the present case, they were called, on the one hand, to examine the expressed will of the Congress of the United States; and on the other, the expressed will of four sovereign States of this Union; and to say which of these wills was in conformity with the constitution. He had no hesitation in declaring it as his deliberate judgment, that, as Congress had failed to furnish a law according to which the people of the States might be represented in the House of Representatives, the power conferred on the States to do this for themselves remained with these four States, and that, therefore, their representatives had been constitutionally elected.

Mr. D. observed, in conclusion, that he should have said nothing on the present occasion, had not some of the gentlemen claiming to be protestors, at the opening of the session, advanced grave charges against those who happened to differ from them in opinion: they had intimated that such gentlemen had "dipped their souls in perjury while the kiss of the Evangelists yet trembled upon their lips." The only possible excuse of palliation he could conceive of for the use of language like this, was, that men conscious of their own personal frailty and corruption were naturally disposed to judge of the conduct of others as having a like origin.

---

## SPEECH OF MR. PAYNE,
### OF ALABAMA,

*In the House of Representatives, January 24, 1844—* On the motion of Mr. BLACK of Georgia to amend the motion of Mr. DROMGOOLE of Virginia to recommit the report of the Select Committee on the Rules, by instructing them to report to the House the following rule, viz:

"No petition, memorial, resolution, or other paper praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave-trade between the States or Territories of the United States in which it now exists, shall be received by this House, or entertained in any way whatever."

Mr. PAYNE rose and spoke to the following effect:

Mr. SPEAKER: The character of this debate, its duration and the consequences which must result from our action after it, forces me, much against my will, to ask the attention of the House for a few moments.

Sir, throughout this discussion, gentlemen upon the opposite side have sudiously avoided the true question at issue; and have maintained that it is the deliberate design of those who oppose the adoption of this report, to abridge, or to deny to the people of the United States the right of peaceably assembling to petition Congress for a redress of grievances. Nothing is further from the truth. I now state, in view of the nation, it is not so. No man from the South, or from any other section of the Union, so far as I know or believe, would, if he had the power, abridge, or interfere otherwise, with the right of petition. The constitution of the United States, in the first article of the amendments, declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition Congress for a redress of grievances." These are limitations imposed by the constitution upon the legislative power of Congress. When—at what time did the South ever seek to destroy or diminish one single *limitation* imposed upon the legislation of Congress. The truth is, all of our complaints have been, and are now, founded upon the well known fact that the limitations of the constitution have been broken down by federal legislation, against our will, and without our co-operation.

The gentleman from South Carolina [Mr. RHETT] has said that the right to petition Congress is a *personal* right, of which Congress cannot, by law, deprive the citizen. In this opinion I fully concur. Why, then, the continued howling from the advocates of this report upon the right of petition. I

will impugn the motives of no man; but I ask the question, Can it be that those gentlemen, conscious of the want of those high moral and intellectual attributes necessary to command the confidence of their fellow men, and, by that confidence, power and place, are now seeking to raise a storm in the public mind, that they may "ride upon the whirlwind and direct it?" Be that as it may, there is a species of fraud, deception, and demagoguism in such a course, alike incompatible with the dignity of this House and the best interests of our common country.

Sir, I take this occasion to repeat, that we of the South not only admit the right of the people to petition Congress to be illimitable, but we also admit the right of the people to determine upon what subjects they will petition Congress to be *coextensive* with the right of petition; and, although I believe Congress may refuse to receive a petition, for any one of three reasons—viz: 1st, if the prayer of the petition is unconstitutional; 2d, inexpedient; 3dly, disrespectful in language—nevertheless, for the purposes of this argument, I shall concede it to be the duty of Congress to receive petitions upon all subjects upon which we can constitutionally legislate, but no farther—not an inch beyond this point.

Sir, it may be supposed that, by refusing to *receive*, we refuse to *hear* the petitions of the abolitionists. Nothing is further from the truth. There never was a petition of this character presented, the contents of which were not known and fully understood by the House, either by being read at the table of the Clerk, or by a succinct statement of the contents, made by the member who presents the petition. And when the question is submitted, "Shall the petition be received?" the vote upon that question proclaims the judgment of the House upon the propriety or impropriety of granting the prayer of the petitioners. This consideration and action by the House, upon the petition, are all the petitioners have a right to demand, unless the right of the people to petition implies the duty of Congress to grant the prayer of the petitioners, expedient or inexpedient, constitutional or unconstitutional.

Sir, it is not for the right of petition the advocates of this report are contending upon this floor. That right has never been assailed. To *suppose* that it has been, is an error; to *pretend* that it has been, is a hypocritical deception, intended to deceive the people for the accomplishment of selfish ends or party purposes.

The object of the advocates of this report, is the abolition of slavery. *That is*, the abolition of the *rights* of private property in this District. And let me warn gentlemen who are cooperating with the abolitionists, that they are asserting, by their action, the legitimacy of this dangerous and despotic power.

Has Congress the power to deprive the citizen of his private property within this District? That is the question upon the decision of which the duty of Congress to receive, or refuse to receive, these petitions, depends.

As a preliminary question, it would possibly not be amiss to settle the fact whether the people of this District have or have not property in their slaves. I shall not advert to original principles for this purpose. I may be permitted to remark, however, that slavery has existed, in some form or other, from the earliest history of the world down to the present hour. It is the attendant of civilization and knowledge, and necessarily results from the dependence of the ignorant and weak upon the more powerful and intelligent of their neighbors. Man, in his half civilized condition, imperiously needs a variety of articles necessary to his comfort and subsistence. If he has not the intelligence to procure these articles of necessity himself, he must look to others to procure them for him. Again: he needs protection against lawless violence, from which he is too ignorant or too weak to protect himself. Can he expect to procure all of these necessaries and this protection gratuitously? If not, what compensation can he make? Personal service only: the performance of those necessary menial duties which his protector or master does not wish to perform himself. Hence it is, the more civilized and enlightened a people become, the more certainly slavery exists among them. Whether this fact is to be attributed to a wise preordination of God to have the weaker portion of his race securely protected and properly provided for, or whether it results solely from the power of mind over matter, it is not necessary for me to inquire; nor shall I repine at that economy of Providence which is as imperative as it is universal.

118      APPENDIX TO THE CONGRESSIONAL GLOBE.      Jan. 1844.

28TH CONG.....1ST SESS.     *Abolition Petitions—Mr. Payne.*     H. OF REPS.

Sir, I have digressed from the subject. My object is to inquire how the people of this District acquired property in slaves. This District is composed of territory taken from the States of Maryland and Virginia; and their right to this species of property was acquired before the surrender. Did Maryland and Virginia engage in a crusade against liberty to establish slavery? Did the people of those States, in some disastrous battle, strike down a whole race, and, by arms, reduce a nation of freemen to slavery? Far from it; the title to this property was acquired peaceably, by purchase from previous owners for a valuable consideration, and precisely as all other property is acquired, with this single exception—the purchase was not voluntary. Many of the American colonies were, at that day, opposed to slavery; but England was then the most extensive "slave-trader" upon earth. The same feeling of avarice which led to that inhuman traffic, induced her to widen the market for slaves, by forcing each colonist to purchase four slaves for each one hundred acres of land owned by him; and this very nation which forced slavery upon the then colonies, against their consent, now affects a sentimental horror at the existence of slavery.

Sir, why this affected horror at the existence of slavery? Can it be because *now* the moral sense of the world is against the "traffic," and it is to her no longer a source of revenue, that she wishes to atone for her own guilt and degraded avarice, by leading the crusade against the existence of slavery in its mildest form, in those countries in which had been planted by her own hands? If she is moved by true repentance and real philanthropy, let her turn to the crimes she is daily perpetrating upon her own people. Let her lighten the burdens and exactions wrung from squalid poverty, to pamper an aristocracy as contemptible as it is expensive; let her free herself from the guilt of her own infamous policy; let her feed and clothe her naked and starved millions,—and she will be much better and more profitably employed, and will subserve the cause of humanity vastly more than she can possibly do by interfering in the domestic policy of other nations.

Sir, I have said the right of property in slaves was acquired by purchase. Did existing laws recognise the right of property in slaves? As proof upon this point, I call the attention of the House to the reading of the Maryland statute of 1715, the title to which is as follows: "Be it enacted by the King's most excellent Majesty, by and with the consent of his Majesty's governor, council, and assembly," &c. Then comes the law:

"Chapter 44, Sec. 22. *Be it also enacted by the authority aforesaid,* That all negroes, and other slaves, already imported, or hereafter to be imported, into this province, and all children now born, or hereafter to be born, of such negroes and slaves, shall be slaves during their natural life."

Thus, you perceive, the law of 1715 vested an absolute right of property in slaves, a right of which the master could not divest himself, except by sale or gift. He could not free them, because, by law, they were made slaves for life. So far as I have been enabled to examine the subject, I can find no alteration of this statute until 1796, when it was so far modified as to allow the master to free his slaves under certain circumstances, viz: If they were healthy, able to earn a support by labor, and not over 45 years of age. The law of 1796 is now in force in this District, and fully reaffirms the right of property in slaves. It is worthy of remark that the law of 1715 was passed years before the constitution of Maryland was adopted—sixty-one years before the declaration of American independence; and remained in full force, without change or modification, 81 years.

But, sir, this is not the only recognition, by law, of the right of property in slaves. The books are filled with such *recognition* from 1715 up to the present day. The law of Congress, approved February 12, 1793, is as follows:

"Sec. 3. *And be it further enacted,* That when a person, held to labor, in any of the United States, or either of the Territories, on the northwest, or south of the Ohio river, under the laws thereof, shall escape into any other of the said States or Territories, the person to whom such labor may be due, his agent or attorney, is hereby empowered to arrest or seize such fugitive from labor," &c.

The 4th section of the same act imposes a fine of five hundred dollars upon any person or persons who shall obstruct the *owner* of the refugee slave in seizing his property, as it does, also, if he secretes or harbors him, knowing him to be a slave.

Sir, it is difficult to conceive a more thorough recognition of the right of property in slaves than is afforded by this law. It is a right not confined to the State in which a party resides, but attaches to the property, no matter where found, within the jurisdiction of the United States; and was so decided by the Supreme Court of the United States in the case of Prigg against the Commonwealth of Pennsylvania. 16 Peters. p. 559.

But, sir, the organic law, the constitution of the United States, secures the right of property in slaves, and places it beyond the reach of legislation. The 2d section of the 4th article of that instrument is in these words: "No person held to *service* or labor in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up, upon the claim of the party, to whom such service or labor may be due.

Now, sir, what are the expositions of the constitution by the highest legal tribunal of the country? In the case of Prigg against the Commonwealth of Pennsylvania, already referred to, Judge Story holds the following doctrine, in reference to the clause of the constitution just quoted:

"The clause manifestly contemplates the existence of a positive, unqualified *right,* on the part of the owner of a slave, which no State law or regulation can in any way qualify, regulate, control, or restrain."

Judge Taney says:

"I agree entirely in all that is said (by Judge Story) in relation to the *rights* of the master, by virtue of the 3d clause of the 2d article of the constitution. The *rights of the master* being given *by the constitution* of the United States, *neither Congress nor a State legislature can,* by any law or regulation, *impair it, or restrict it.*"

This sir, settles the question as to the right of property in slaves; and I respectfully submit that all of the rights of property belonging to the people of this District before the surrender thereof to this government, by the States of Maryland and Virginia, followed them after the transfer, and adhere to them *now.* This I shall prove, before I take my seat.

Sir, the question again recurs, Has Congress the power to abolish the title to private property within this District? Those who maintain the affirmative of this proposition contend that whatever power the legislatures of Maryland and Virginia had over the rights of private property within their respective jurisdictions was transferred to this government by the act of cession. Now, sir, I deny that this government has any power not conferred upon it by the constitution. I, however, waive my own views upon this point, and admit the position assumed; and then I deny that the *legislature* of either Maryland or Virginia could abolish the right of property within their respective jurisdictions.

Sir, I have already shown you that property in slaves existed and was recognised by existing laws, long before the constitution of Maryland was adopted, before the legislature of that State had an existence; and I defy the wit of man to show in what clause of that instrument the people conferred upon the *legislature* the power to divest them of this property. If no such power appears, it is but a fair rule of construction to assume that the power does not exist. But we are not left to feel our way in the dark, upon the great and important principles involving individual rights of property. The people of Maryland and Virginia were jealous of this right; and, by the very same authority which created the constitution, drew and adopted a bill of rights, declaring the principles upon which governments should be founded. The bill of rights of Virginia declares that *private property* shall not be taken without the *consent of the owners;* and it is worthy of remark that the judicial tribunals of that good old Commonwealth have decided that the bill of rights is as obligatory and controlling upon the legislative power of the State, as is the constitution itself. Maryland was not less cautious upon this subject; and, by her bill of rights, declared "that no person ought to be taken, or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, *or property,* but by the judgment of his peers, or by the law of the land."

Thus, you perceive, the three great personal rights of life, liberty, and property, are connected in the same sentence; have equal sanctity and security against the power of legislation. Who will contend that the legislature of Maryland could deprive a

citizen of life or liberty? No one, I presume. Who, then, will maintain that the rights of property are not equally secure? who can draw a distinction as to the security afforded to either? I confess I cannot. If, then, the legislature of Maryland had not the power to deprive a citizen of his life or liberty, neither could he be deprived of his property.

Sir, I wish to be understood. I do not maintain that the citizen might not, by the commission of crime, or violation of law, forfeit either life, liberty, or property; nor do I deny that the sovereign power of the State—*the people*—might confer upon the legislature the power to deprive the citizen of either life, liberty, or property; all that I do deny is, that the mere legislature had the power, at the time the surrender was made, to deprive the citizen of either life, liberty, or property. If I am correct in this view of the subject, it follows, as a necessary consequence, that, by the simple act of cession, Congress derives no power to abolish the rights of property within this District, unless it be contended that, by the act of cession, the grantee derived legislative powers vastly greater than those possessed by the grantor, a proposition too absurd to be argued by me.

Again, it is maintained, that the 8th section of the first article of the constitution, which confers upon Congress the power "to exercise exclusive legislation in all cases whatsoever over this District, authorizes Congress to abolish the right of private property therein. With due respect to the opinion of others, I hold that this error of construction results from a misconception of the meaning of the clause of the constitution now under consideration. That the power of exclusive legislation over this District belongs to Congress, no one doubts; and that no other legislative body can be established within this District, we all agree. It was solely for the purpose of excluding from this District all other legislative bodies, and to afford to the national legislature the power to protect itself, that the power of exclusive legislation over this District was conferred upon Congress. But it was never intended to confer, nor does it confer, any extraordinary legislative or despotic power over the life, liberty, or individual property of the citizen therein; all the protection and security afforded to the personal rights of the citizen, are as obligatory, and placed as far beyond the reach of the power of legislation within this District, as within the States.

Can Congress create an established church, or abridge the freedom of speech or of the press, suspend the writ of habeas corpus, or annihilate the sacred right of trial by jury within this District? If not, why? because the power which is necessary to execute these despotic measures belongs not to the ordinary powers of legislation. But if the doctrine contended for should prevail, and it be finally settled that, within the enchanted circle of this District, the legislative power of Congress is omnipotent, it follows that any—nay, all of these measures, may be effected by the legislation of Congress. When General Harrison remarked that the people of this District were not, and should not be treated as slaves, I considered the remark extremely simple. But if Congress has despotic power over the District, the citizens thereof are slaves in the worst possible condition; for Congress may rob them of their labor and property, without incurring the responsibility of the master to provide for them in sickness or old age. Who believes that the framers of the constitution ever intended to create a *petty despotism* over this ten miles square? No one, I am sure, except those who, under the pretence of maintaining the sacred right of petition, maintain that Congress can abolish the still more sacred right of individual property within this District.

But, sir, Congress has no such power. The clause of the constitution conferring upon Congress exclusive legislation over this District in all cases whatsoever, 1st, excludes all other legislative bodies; and, 2ndly, authorizes Congress to legislate upon all the *ordinary subjects* of legislation, and nothing more—leaving to the citizen ample security in the possession of all his personal rights, as secured by the constitution. If I am correct in this view of the subject, then the grounds assumed by the friends of this report are erroneous, and, consequently, their conclusions are wrong.

Mr. Speaker, I now propose to show that Congress is prohibited not only from abolishing the title to private property within this District, upon just principles of reason, but specifically by the act of cession, and by the constitution itself. The acts of cession of Virginia and Maryland are precisely

Feb. 1844.    APPENDIX TO THE CONGRESSIONAL GLOBE.    119

28th Cong.....1st Sess.        *Report of the Committee of Elections—Mr. Belser.*        H. of Reps.

similar in every particular; and I now respectfully call your attention to the reading of the act of the Virginia legislature upon this subject:

"*Be it enacted,* That a tract of country not exceeding ten miles square, or any lesser quantity, to be located within the limits of this State, and in any part thereof, as Congress may by law direct, shall be, and the same is hereby, for ever ceded and relinquished to the Congress and government of the United States; in full and absolute right and exclusive jurisdiction, as well of soil as of persons residing or to reside therein, pursuant to the tenor and effect of the eighth section of the first article of the constitution of the government of the United States. *Provided,* That nothing herein contained shall be construed to vest in the United States any right of property in the soil, *or to effect the rights of individuals therein,*" &c.

Now, sir, I hold that the *proviso* to this act of cession not only debars Congress from exercising any right of property in the soil of this District, but places the "rights of property therein," (that is, within the district or territory so ceded) beyond the power of legislation. The gentleman from Massachusetts [Mr. HUDSON] contends that the whole proviso applies to the rights of soil only. If so, the latter paragraph thereof is superfluous, and only reaffirms the meaning of the first. Why this superfluity of language? Is it fair to presume that the framers of this act of cession did not understand the power of language, or that they would be guilty of such unmeaning tautology. The proper rule of construction to be observed in the interpretation of written instruments, is to give to all the parts, if possible, a definite and concurrent meaning. We can only do that, in this instance, by supposing that the first paragraph of the *proviso* applies to the right of property in the soil, and that the second part thereof refers *solely* to the rights of property within the territory ceded, &c.

In this construction I am fortified by the opinion of a gentleman whose political position cannot fail to command the respect of the whig members upon this floor, and the spotless purity of whose private character, exalted talents, and deep legal learning, equally entitles his opinion to the respect of the republican members of this body. I mean Benjamin Watkins Leigh; to the reading of whose opinion upon this point I respectfully ask the attention of the House:

"It may be thought that the word 'therein' refers to the word 'soil,' in the preceding member of the sentence, as its antecedent; so as to secure the rights of individuals in the soil only, and not in other kind of property. But a little attention will show that the word 'thereon' has reference to the tract of country ceded; for, first, the previous cession is 'as well of soil as of persons residing, or to reside therein;' that the proviso was intended as a qualification of the whole grant, and must be construed not only to secure the rights of property in the soil ceded, but the rights of individuals resident therein, over whom exclusive jurisdiction is also ceded. Secondly, as 'rights of property in the soil' could be none other than the rights of individuals to property in the soil, if they alone were intended to be secured, the other members of the sentence, securing 'the rights of individuals therein,' would be wholly inoperative and nugatory. Thirdly, the word 'therein,' in truth, belongs to both members of the sentence; though, according to the idiom of the language, it is inserted only after the last. The sense is the same as if it had been written 'any right of property in the soil therein,' or to affect the rights of individuals therein, i. e. in the tract of country before ceded."

Now, sir, you perceive here is an express stipulation, contained in the acts of cession, securing to the citizens of this District all of the rights of property possessed by them before the surrender, and denying to Congress the power to deprive them of this property. It is a part of the contract entered into between this government upon the one side, and of the States of Maryland and Virginia upon the other side; and I presume that it will scarcely be contended that, in utter violation of that contract, against one of the fundamental principles for which government is established, in disregard of all the limitations of the constitution, against our whole system of jurisprudence, that Congress can abolish the rights of property within this District.

Sir, I have already said that the rights of property were as fully secured within this District as within the States. I go further: I maintain that Congress is expressly prohibited by the constitution from abolishing the title to individual property. I call your attention to the last clause of the 5th amendment of that instrument. "Nor shall *private property* be taken for public use, without just compensation." It is impossible to find a clearer prohibition upon the power of Congress to deprive the citizen of private property, except for a specific object. It may be taken for public use, I admit, but for no other purpose: to wrench from the legitimate owner, his property in slaves, and to manumit *them*, cannot, upon any conceivable grounds, be for the public use; and hence Congress is expressly prohibited from doing so.

Sir, I have showed you that Congress has not the constitutional power to abolish the rights of property in this District. Are we bound to receive or entertain a proposition to do so? I hold that it would be dishonorable. We dare not do it. And here, sir, I have a few words to address to those good, but misguided men who we are told oppose the ultimate designs, but co-operate with the abolitionists in resisting the supposed encroachments upon the right of petition. What do you ask us to do? to violate the constitution, which we have sworn to support; and thereby bring the guilt of perjury upon our own souls. Is this honorable in you? If we were to appeal to you for advice in the premises, could you, as honorable men, advise us to receive and deliberate upon the expediency or inexpediency of violating our official oaths? If not, why do you continue to urge us, by your petitions, to do so? Have you ever reflected upon the crime which attaches to him who is guilty of subornation of perjury? If not, would it not be wise to turn your thoughts to that point? I am still persuaded, that you would dissolve your connexion with the abolitionists, in whose moral or political honesty I have no confidence, and to whom I would scorn to make an appeal.

Here Mr. PAYNE was interrupted by Mr. GIDDINGS.

Mr. PAYNE. Is the gentleman himself an abolitionist?

Mr. GIDDINGS. I am an abolitionist.

Then, (said Mr. PAYNE,) we have a practical illustration, in the character of the member from Ohio, that all of the abolitionists are not honorable men.[*]

Here Mr. PAYNE was called to order by the Speaker.

Mr. PAYNE. Sir, I was about to ask those patriotic and good men, who we are told act in concert with the abolitionists upon the right of petition, why agitate the country? We admit the right of petition to be illimitable; we admit that your right to select the subjects of petition is coextensive with the right itself;—all of this we admit; but we deny, and ever will deny, that we are bound to receive or deliberate upon the expediency of violating the constitution and our official oaths. If a proposition was made to a private gentleman to violate his *oath*, he would resent it as a direct personal insult, an atonement for which could not be made by apology. This House is composed, I hope, of public, if not of private gentlemen; and I have yet to learn that, by assuming a public character, we should forget the respect due to ourselves, or cease to be gentlemen. Congress is bound to resent a dishonorable proposition with the same promptness which an individual would exercise under similar circumstances. The rule is imperative in its operation upon all honorable men, either in private or public life.

Mr. Speaker, I have now a word or two to say to my Northern friends—those by whose side we have fought and won many well-contested battles. To the gentleman from Ohio [Mr. DUNCAN] I appeal. I understand him to be opposed to the schemes of the abolitionists, and yet in favor of this report. Had you not better stand firmly upon the battlements of the constitution? If it be the post of danger, it is also the post of honor. It is the only tenable ground. Suppose you recede, and admit our obligation to receive petitions asking Congress to abolish the rights of private property in this District: will this satisfy the abolitionists? No, sir, never. They will next demand that their propositions shall be considered. This attained, the prayer itself must then be granted. Every inch of ground you surrender will be occupied by the aggressor.

And you, gentlemen, will drift down the stream of time until you are buried in the sea of oblivion. You never can command the support of the abolitionists. Too long have you, as a party, resisted their wicked and malignant designs. After you have yielded all they ask, and by your aid they shall have accomplished all their ends, they will cast you from them, or allow you to perform manual service in their ranks—nothing more. Then, and not till then, will you find that the only means to check aggression is to resist it upon the confines.

Here Mr. DUNCAN explained, and maintained that the people of this District had a right to petition Congress upon the subject of abolishing slavery therein; and that Congress had the inherent right to abolish slavery in this District if a majority of the people instructed us to do so. Would the gentleman from Alabama abolish slavery in this District if a majority of the people thereof instructed Congress to do so?

Mr. PAYNE. I would not; the people of this District have no right to instruct Congress; the right of instruction belongs to a constituency, and implies a power upon the part of that constituency, through the ballot-box, to force the obedience of the representative: no such power belongs to the people of this District. Moreover, I have endeavored to show that Congress has no right or power to abolish the rights of *private property*. If I am correct in this position, the instructions of the people of this District, nor of the whole Union, could confer that power without altering the constitution. This is my answer to the gentleman from Ohio. The consequences which must result from any action of Congress upon the subject of the abolition of slavery in this District have been fully discussed by others; I therefore have nothing more to say.

## SPEECH OF MR. BELSER,

### OF ALABAMA,

*In the House of Representatives, February 7, 1844*—On the report of the majority of the Committee of Elections, which concluded with submitting the following resolutions for the adoption of the House:

"*Resolved,* That the second section of 'An act for the apportionment of representatives among the several States according to the sixth census,' approved June 25, 1842, is not a *law* made in pursuance of the constitution of the United States, and valid, operative and binding upon the States.

"*Resolved,* That all the members of this House (excepting the contested cases from Virginia, upon which no opinion is hereby expressed) have been elected in conformity with the constitution and laws, and are entitled to their seats in this House."

Mr. BELSER having obtained the floor, rose and said:

Mr. SPEAKER: The adoption of the first resolution reported by the majority of the committee, would be for this House to declare that the representatives from the States of New Hampshire, Missouri, Mississippi, and Georgia, elected to the 28th Congress by the general ticket, were entitled to their seats. He approached the investigation of the subject with feelings of the utmost respect for those gentlemen, and with every desire to discuss the question with fairness and candor. He was anxious to deliver his views upon it, because of the fact that he should probably differ in his vote from a large portion of that party with which it was his pride and pleasure, when he could act with them, so to act upon that floor. It was, in his judgment, a grave constitutional question, elevated above all party considerations; it was one which most forcibly addressed itself to the conscience and understanding of every representative upon that floor—one which had already employed the first intellect of the nation—one which was to operate on its welfare, perhaps for ages to come; and he called on gentlemen belonging to either of the great political parties on this floor, to pause and well consider the magnitude of the question, and the interests involved in this discussion.

When, at the commencement of this Congress, he had the honor to submit a few observations to the House, in regard to the protest of the minority, he then stated that he was not prepared to say with some others, who had preceded him in debate, that this law of Congress was a *nullity.* His objection to placing that paper upon the journal (and which he now wished to explain) was, that it had never been read to the House, and he could not consent that the Clerk should be the *exclusive* judge of what was to go upon its records. The constitu-

---

[*] "Mr. PAYNE here had reference to the fact, as published in the papers, that Mr. GIDDINGS, during his canvass for a seat in Congress, had read on the stand from which he spoke a letter from Cassius M. Clay, avowing abolition doctrines, which he induced his abolition friends to believe was from Henry Clay, and thereby to induce them to vote for Mr. Clay for the presidency."

120                    APPENDIX TO THE CONGRESSIONAL GLOBE.                    Feb. 1844.

28TH CONG...1ST SESS.          Report of the Committee of Elections—Mr. Belser.          H. OF REPS.

tion said, that "each House shall keep a journal of its proceedings;" and thereby had, in the most solemn manner, invested the right to judge of their correctness, in its members; and, for one, he was not prepared to substitute the judgment of the Clerk for the judgment of the majority. He could not permit that officer, even when actuated by a sense of duty, where a question of that importance was pending in this body, to put a protest upon the journals, in defiance of the House itself. The object of this clause of the constitution "was to insure publicity to the proceedings of the legislature, and a correspondent responsibility of the members to their respective constituents."

The honorable gentleman from New York, [Mr. BARNARD,] in his argument on the protest, had said that those elected by general ticket came into this hall without color of title; that they stood on this floor as so many men who might think proper to step out of that gallery and usurp seats here. If the gentleman entertained that view of the subject, he was correct in demanding to have his protest spread upon the journal; but Mr. B. differed with him in opinion. He thought they had presented a prima facie case of right, when they came here, under the seal and authority of their respective States, and that such prima facie right existed, until it was controverted by better testimony. From his researches on this subject, he had been led to the conclusion that the sitting members upon this floor, who came here with the seals of their States, although elected by the general ticket, had, by virtue of their representative capacity, the right not only to sit here, but to vote upon every question, until this House should determine to deprive them of their seats. In declaring his opinion that they were entitled thus to vote, he was apprized of the rule of this House, which says "No member shall vote on any question in the event of which he is immediately and particularly interested;" and he also knew that the construction which had been put upon it contemplated a "direct personal or pecuniary interest." He considered a member's per diem and mileage just such an interest; but still he thought the rule must be made subservient to that clause of the constitution which declares that "each House shall be the judge of the elections, returns, and qualifications of its own members." And he would fortify this opinion by that of one of the most enlightened writers on that instrument, who had emphatically said that "the sitting member must either hold his seat during the whole period of the investigation, or he must be suspended during the same period. The uniform practice has been to allow the member who is returned to hold his seat, and vote until he is displaced by the order of the House, after full investigation."—[See Story's Commentaries on the Constitution. Abridgment, p. 228.

There was another reason why he could not consent to give that protest a place on the journals. Each member of this House was interested in preserving its judicial purity; and what kind of judges were those who had deliberately made up their minds to the prejudgment of the question, when they were to sit here and determine, in the last resort, the qualifications of members on this floor? In a regularly-constituted tribunal, it would be a just cause for challenge. To the language used in the paper he (Mr. B.) did not object. It was strong, firm, and decided. When the members whose seats are contested were spoken of as "several persons," it was only used to distinguish them from "representatives;" and when the term "legal fraud" was mentioned, it implied no criminality of motive, but merely imputed to the majority an error of judgment.

Mr. B. had, in Alabama, voted for the general-ticket law of that State, and had sustained it as far as he could. As a question of expediency, addressed to him under the constitution of that State, he could give no other vote. The representation in the legislature of that State, by its constitution, was based on the free white population; and, in this, it was unlike the constitutions of Virginia, South Carolina, and Georgia, which, to some extent, partook of the colonial charters. His course in that State had been to get rid of every distinction founded on property, between its citizens, who had arrived at the age of maturity, and who were possessed of those qualifications required by her constitution, to make them legal voters. It had been with him but a question of policy in preferring the general ticket; but this policy had passed by. According to his view, the aspect of the matter had been entirely changed. It was no longer a question of poli-

cy, but it was one of resistance to a law of Congress, passed, as he thought, according to the forms of the constitution. He had ever believed that either the district or general-ticket system was constitutional. There were advantages and disadvantages attending both; but Congress had deemed it proper, for the sake of uniformity, to adopt the district system; and the States should have conformed to it. In fact, if the law of Congress was constitutional, it was no longer an open question; for, in the second section of the sixth article of the constitution, it was declared that "this constitution, and the laws of the United States, which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding."

The constitution also having declared that "each House shall be the judge of the elections, returns, and qualifications of its own members," this House was now organized into a judicial tribunal, for the purpose of determining the validity of the law of Congress, declared by the majority of the committee to be no law; and to see whether or not those elected by the general ticket are its proper members; and according to the uniform practice of England and America, this power of judging has always been vested in the legislative body itself.

There were two clauses of the constitution which were said to bear upon the law; and before he proceeded to examine them, he would ask what was the rule which was to govern the House in the adjudication of this matter? They were here sitting as so many judges, to pronounce on the validity of a law of Congress; and from whose judgment there was no appeal, but to the people. We are, then, required to decide for ourselves; and our decision cannot be re-examined elsewhere. The measure which we are about to act on is exclusively political; and no other tribunal, save the people, can review our opinion. What rule, in such a case, was to prevail? They were bound to look, as in other cases, to the doctrine of "stare decisis." What would be the rule which Chief Justice Marshall, if he were here, sitting as a judge, would lay down for our government? He would say, whenever a judge was asked to pronounce a law of the national legislature void for its repugnancy to the constitution, that it is "at all times a question of much delicacy, which ought seldom, if ever, to be decided in a doubtful case;" and, further, that "it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts be considered void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."—(See 6th Cranch, p. 87.)

Again: "The presumption must always be in favor of the validity of laws, if the contrary is not clearly demonstrated."—(See 4th Dallas, p. 14.)

What is the law of Congress which it is proposed to annul? The first section "makes the apportionment directed by the constitution;" and in the language of the minority of the committee, "exhausts the entire authority vested in Congress by the constitution, in regard to the apportionment of representatives among the several States." The second section is in these words:

"And be it further enacted, That, in each case where a State is entitled to more than one representative, the number to which each State shall be entitled, under this apportionment, shall be elected by districts composed of contiguous territory, equal in number to the number of representatives to which said State shall be entitled; no one district electing more than one representative."

This is the section which the majority of the committee assert "is not a law made in pursuance of the constitution of the United States, and valid, operative, and binding upon the States."

The first clause of the constitution which he would advert to, was the second section of the first article of that instrument, containing "the structure and organization of the House of Representatives." It reads as follows:

"The House of Representatives shall be composed of members chosen every second year, by the people of the several States; and the electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislature,"

It had been asserted by high authority, in reference to this provision, that, when they spoke of the people of Charleston, Boston, or New York, they spoke of the whole people of those respective cities; and the argument was attempted to be drawn from these familiar examples, that there was no election of representatives on this floor which was constitutional, save that where the election was by the whole people of the State; that the election of a member to this House by the people in a district of a State, was not an election by the people of the State. He denied such a doctrine in toto. Who were the people of the States, in the meaning of the constitution of the United States? They are those who, in the States, have "the qualifications requisite for electors of the most numerous branch of the State legislature." These are the persons designated by the constitution to select representatives to Congress. The people of the States, literally speaking, are the successors of the parties to the compact. They are those in whom is lodged the power of altering the government. They embrace not only free white males and females, of age, but also minors, male and female, not of age. These, in strictness, are the people of the States. He contended before this House that the power to choose representatives might be exercised by a portion of the people of the States, and still the representatives would be elected by people of the States. It was purely a right to be exercised alone by the States, and over which Congress had no control.

In the Federalist, page 253, Mr. Madison, says: "It is a fundamental principle of the proposed constitution, that, as the aggregate number of representatives, allotted to the several States is to be designated by a federal rule, founded on the aggregate number of inhabitants, so the right of choosing this allotted number in each State is to be exercised by such part of the inhabitants as the State itself may designate." Here Mr. Madison has most forcibly illustrated two of the provisions of the constitution. In the apportionment, in the first section of the act of Congress, is to be governed by a federal rule, such as is embraced in the compromise of the constitution, in regard to the basis of representation; but the right to choose the members, after this federal rule is enforced, entirely appertains to the States, subject to the limitation in the constitution, as to who shall be voters in the states, and to the controlling power of Congress, over the "times, places, and manner" of holding elections.

But, if gentlemen desired later authority on this subject, they would find it in the Senate documents of the first session of the twenty-second Congress, the report of the select committee, which consisted of the ablest men, from different portions of the Union, with Mr. Webster at their head. They declare, in reporting "an act for the apportionment of representatives among the several States, according to the fifth census," that "the constitution contemplates no integer or any common number for the constituents of a member of the House of Representatives. It goes not at all into the subdivisions of the population of a State. It provides for the apportionment of representatives among the several States, according to their respective numbers, and stops there. It makes no provision for the representation of districts of States, or for the representation of any portion of the people of a State, less than the whole. It says nothing of ratios, or of constituent numbers. All these things it leaves to State legislation. The right which each State possesses to its own portion of the representative power, is a State right strictly; and is to be used and exercised as the State may see fit, subject only to the constitutional qualification of electors."

Again say the committee: "Whether the subdivisions of the representative power within any State, if there be a subdivision, be equal or unequal, or fairly or unfairly made, Congress cannot know, and has no authority to inquire. It is enough that the State presents her own representation on the floor of Congress in the mode she chooses to present it. If a State were to give to one portion of her territory a representative for every twenty-five thousand persons, and to the rest a representative only for every fifty thousand, it would be an act of unjust legislation, doubtless, but it would be wholly beyond redress by any power in Congress; because the constitution has left all this to the State itself. These considerations, it is thought, may show that the constitution has not, by any implication or necessary construction, enjoined that which it certainly has not ordained in terms, viz: that every member of the House shall be supposed to represent the same

172        APPENDIX TO THE CONGRESSIONAL GLOBE.        Feb. 1844.

28TH CONG.....1ST SESS.        *Abolition Petitions—Mr. McCauslen.*        H. OF REPS.

port on the case. When might that be? Look at the New Jersey case; the Naylor and Ingersoll case; at the Florida case, and others, and tell me if this might not be at the end of the Congress? That bill was a most flagitious outrage on the rights of this House. It brought you, impotent and powerless, at the feet of your own Clerk. But that bill passed; and nothing saved you from its operation but the noble conduct of the President, in not returning it within the time required by the constitution, it being the very close of the session. Taking, then, these two laws together, and they exhibit the deepest laid scheme for the perpetuation of power ever laid since the formation of this government.

Mr. Speaker, there is one point of view in which the passage of this second section should be peculiarly obnoxious to the American people. The adoption of the federal constitution, after it had been made, was of vast importance, and of painful solicitude. Many of the illustrious men who framed it were extremely doubtful of its ratification. The State conventions, to whom it was referred, participated fully and deeply in this solicitude. They found many things in it which they did not really approve; but rather than hazard the whole of that sacred instrument, they concluded to let them pass, and trust to the future wisdom of Congress not to abuse the powers which they had conferred. The clause of the constitution which declared that Congress might make or alter the regulations of the States, as to the times, places, and manner of holding elections, is a most apt and striking illustration. The power was too broad in its language. They desired Congress to have the power only in the single case where the States *would not, or could not,* make such regulations; but the terms seemed to extend beyond that. What should they do? Reject the constitution, and trust to the formation of another? The difficulties they had encountered in the formation of this, and the incalculable mischief growing out of the want of a constitution, induced them at last to ratify it as it was; but to leave on their records, for the guide and instruction of their posterity, the most solemn instructions that they should never take advantage of the defeat. It was a known, declared, admitted defect. But they appealed to their posterity to appreciate the trying circumstances by which they were surrounded, and never to take advantage of it. That appeal sunk deep in the heart of every American bosom, and was never disregarded till 1842.

Sir, let us go back to the records of that ancient time, and read the very words of exhortation and instruction that were uttered by those immortal patriots who ratified the constitution. I begin with Massachusetts. What did she say as to this very clause under discussion? She placed upon her records the following declaration:

"The convention do therefore recommend that the following alterations and provisions be introduced into the said constitution: Section 3, That Congress do not exercise the powers vested in them by the fourth section of the first article, but in a case when a State shall *neglect or refuse* to make the regulations therein mentioned, or shall make regulations *subversive* of the rights of the people to a free and equal representation in Congress, agreeable to the constitution. And this Convention do, in the name and in behalf of this commonwealth, enjoin it upon their representatives in Congress *at all times,* until the alterations and provisions aforesaid shall have been considered agreeably to the fifth article of said constitution, *to exert all their influence,* and use all reasonable and legal methods to obtain a ratification of said alterations and provisions; in such manner as is provided in said article."

Sir, had any State *failed* or *refused* to provide for the election of members to Congress? Not one. Did the representatives of that ancient Commonwealth "exert all their influence" against the exercise of this power in any other case? They did not; but voted for this section, in disregard to the most solemn injunctions of their fathers.

I next advert to the State of South Carolina—the Palmetto State—so proud, and so justly proud, of those illustrious patriots who adorn her revolutionary history. Her convention declared that the power to make regulations for the election of members of Congress should be forever inseparably annexed to the sovereignty of the States, except in the single case of *refusal or neglect* by the States; and they adopted the following resolution:

"And whereas it is essential to the preservation of the rights reserved to the several States, and the freedom of the people, under the operations of a general government, that the right of prescribing the manner, time, and places of holding the elections to the federal legislature, should be inseparably annexed to the sovereignty of the several States: This convention doth declare, that the same ought to remain to all prosperity, a perpetual and fundamental right in the local, exclusive of the interference of the general government, except in cases where the legislatures of the States shall refuse or neglect to perform and fulfil the same, according to the tenor of the said constitution."

"*Resolved,* That it is a *standing instruction* to all such delegates as may hereafter be elected to represent this State in the general government, to exert their utmost abilities and influence to effect an alteration of the constitution conformably to the foregoing resolution."

Need I pause to inquire whether, in the adoption of this second section the representatives of that gallant State did exert their utmost abilities and influence in obedience to these *standing instructions?* I have already told you that two of them felt at liberty wholly to disregard them: solemn and time-honored as they were, these gentlemen felt at liberty to disregard them.

The State of New Hampshire comes next in order—the Granite State—granite in her democracy as she is in her geology. The declaration of her convention is in nearly the very words of Massachusetts; limiting the exercise of this power to a single case of neglect and refusal, and enjoining at all times on her representatives to make such limitation an express and positive provision of the constitution.

"The convention do therefore recommend that the following alterations and provisions be introduced into the said constitution:

"III. That Congress do not exercise the powers vested in them by the fourth section of the first article, but in cases when a State shall neglect or refuse to make the regulations therein mentioned, or shall make regulations subversive of the rights of the people to a free and equal representation in Congress; nor shall Congress in any case make regulations contrary to a free and equal representation."

"And the convention do, in the name and in behalf of the people of this State, enjoin it upon their representatives in Congress, *at all times,* until the alterations and provisions aforesaid have been considered agreeably to the fifth article of the said constitution, to exert all their influence, and to use all reasonable and legal methods, to obtain a ratification of the said alterations and provisions, in such manner as is provided in the said article."

Virginia (next in order) went farther than all this. She not only declared in favor of an amendment limiting the power to the case of refusal or neglect, but she expressly enjoined it upon her representatives, until such alteration of the constitution shall be made, "to conform to the *spirit* of the amendments as far as the said constitution will admit."

"XVI. The Congress shall not alter, modify, or interfere in the times, places, or manner of holding elections for senators and representatives, or either of them, except when the legislature of any State shall neglect or refuse, or be disabled by invasion or rebellion, to prescribe the same."

"And the convention do, in the name and behalf of this Commonwealth, enjoin it upon their representatives in Congress to exert all their influence, and use all reasonable and legal methods, to obtain a ratification of the foregoing alterations and provisions, in the manner provided by the fifth article of the said constitution; and in all congressional laws to be passed in the mean time, to *conform to the spirit* of these amendments, as far as the said constitution will admit."

The State of New York was peculiarly guarded and cautious in *her* ratification of the constitution. Among other limitations and conventional constructions of that instrument, she declares "her adoption of this clause, under the expectation that Congress will not make or alter any regulation in this State respecting the time, place, and manner of holding elections for senators and representatives, unless the legislature of this State shall *neglect* or *refuse* to make laws or regulations for the purpose, or, from any cause, be *incapable* of making the same; and in those cases such power will only be exercised while the legislature of this State shall make provision in the premises." But the New York convention did not stop even here; they adopted the very words of Virginia, and in the name and in behalf of the people, *instructed* their representatives that until this clause should be amended, "all laws to be passed by Congress in the mean time to conform to the spirit of such amendments, as far as the constitution will admit."

I come now to the State of North Carolina. She gives a most emphatic expression of her views and wishes in relation to the extent of this power in Congress over the "time, place, and manner of electing representatives to Congress." Her seventeenth amendment provides "that Congress shall not alter, modify, or interfere in the times, places, or manner of holding elections of senators and representatives, or either of them, except when the legislature of any State shall *neglect* or *refuse,* or be *disabled* by invasion or rebellion, to prescribe the same."

When Rhode Island, soon after the rest, came in, it was under a ratification, declaring the same purpose to amend the constitution on this point; and until it was done, her positive injunctions to her representatives were, like those of New York and Virginia, that they should conform to the spirit of such amendments.

Thus, sir, I have given you seven out of the old thirteen States, who contended against a literal construction of the constitution as it was worded; seven out of the thirteen who declared that its wording must changed; seven out of thirteen who declared that, until it was so altered, their members of Congress must conform to the *spirit* of that clause as they expounded it. What a sacred, what a holy injunction was here! They did not like the *words* of this section, but they approved the balance of the constitution. They believed the future glory and prosperity of their country depended on its *immediate* adoption. They were unwilling to risk losing all for the sake of some few amendments to it. In this great emergency they ratified it as it was; but called on their posterity to the remotest generation, not to take advantage of its specified defects, but to conform *to its spirit* with fidelity and honor.

Sir, I will not speak for others; but I will say for myself, that I would tear the seals from a father's will; I would disregard his last dying request, as soon as I would have disregarded the consecrated instructions of these great benefactors of their country. Sir, let us restore these instructions—let us re-establish their will, by repealing the second section of the apportionment act. Let us, moreover, reaffirm the invalidity of this section, by continuing a full representation of all the States on this floor. There is not a warmer friend to the district plan of electing members of Congress than I am. But let it be done freely and voluntarily by the States themselves, and not be forced on them by the strong arm of federal power. Almost every State in the Union is now electing by districts. Repeal this section of the law—withdraw your unconstitutional mandamus, as some regard it—remove those pains and penalties which you have suspended over the States, and I do not doubt that, in less than two years, scarce a single State will be found electing by the general ticket.

## REMARKS OF MR. McCAUSLEN,
### OF OHIO.

*In the House of Representatives, February 1, 1844.*—On the report of the Select Committee on Rules. Mr. McCAUSLEN, who was entitled to the floor, said:

That, for a few days past, he had looked with more than an ordinary degree of interest on this discussion. He had been astonished to hear the opinions expressed by gentlemen on the other side of the House, in relation to this question, as to the extent of the powers of this government. It appeared to him that gentlemen were entirely mistaken as to the character and powers of Congress; as to the manner in which the legislative department stands connected with the other departments of government. Some gentlemen seemed to think that Congress possesses an omnipotent power, not only absolutely controlling all the other departments possessing a co-ordinate power, but drawing even the States into its vortex. But he had been so fortunate (or, as some gentlemen, perhaps, might say, so unfortunate) as to have been taught in a different school of politics. Where, then, is the great central power which directs the different departments of the government of the country? Is it here in this Capitol? No, sir; no. This power rests in the people of this country, and in them alone; they direct the des-

Feb. 1844.  APPENDIX TO THE CONGRESSIONAL GLOBE.  173

28th Cong.....1st Sess.  *Abolition Petitions—Mr. McCauslen.*  H. of Reps.

tinies of the republic; they have clothed Congress with all the powers it possesses, and wisely drew the lines between that power and the power possessed by the other co-ordinate branches of the government. The power of Congress is, then, specific, prescribed, and limited by the constitution. This power being derived from the States, or from the people in their State capacities, Congress is bound by the limits thus set by the States.

He was aware that, on this question of the 21st rule, he occupied different ground from gentlemen who have spoken on either side of the question. He had never found so much difficulty as some other gentlemen, in a constitutional point of view. He had viewed the passage of this rule as fully settling, for the time being, all petitions of a peculiar class; and the final action on the passage of the rule, as prospective action on such petitions as come within the rule. He, therefore, viewed this question as one of expediency only; and, at the opening of the present Congress, voted to retain the rule, not wishing to touch this exciting question during the excitement of an organization of the House, the importance of which was of more interest to the country than any other question. And now, when this question is up, in the regular order of business, it ought to be considered calmly and dispassionately, laying aside all sectional prejudice, and decided for the common interest of the whole Union. He was of the opinion that the general good required that the rule should not be retained. And, while he took this position, he did it with great deference to the opinions of other gentlemen, who honestly differed with him in their opinions on this point. It has been said that the operation of the rule excludes all abolition petitions—that is, all petitions adjudged by the Speaker to come within the rule are laid on the table, without further debate. This was adopted for the purpose of saving the time of the House; and its operation, for a time, seemed to answer the purpose intended; but now the attempts to evade the rule seem to be the greatest evil, and cause the greater consumption of the time of the House. He said, as he before remarked, the action on the passage of the rule was prospective action on all petitions embraced within the rule.

But, he remarked, let us examine how far the power of Congress extends over the citizens of the country—over the liberties and property of the people. And, as this District is more directly in question than the States, let us examine how far the power of Congress extends over the property of the ten miles square. The fifth article of the amendments to the constitution prohibits Congress and all the other departments of government from depriving the people "of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation." But, it is said that Congress shall "exercise exclusive legislation in all cases whatsoever over such district, not exceeding ten miles square, as may, by cession of particular States, and the acceptance of Congress, become the seat of government of the United States."

Mr. M. inquired, what is property in this District? No one will deny that slaves are held, under the constitution and laws, as property, both here and elsewhere; and your superior courts throughout the Union have so decided; and the fifth article of the constitution, which every member of Congress has taken a solemn oath to support, declares that no citizen shall be deprived of that "property without due course of law." But our friends on the other side of the House say, that Congress shall have "exclusive legislation in all cases whatsoever." And the gentleman from Massachusetts drew a figure the other day to prove that Congress had a right to abolish slavery here at once. But the gentleman's figure was unfortunate; he said, suppose he [Mr. Hudson] should buy a farm, would he not have the entire control of that farm, to dispose of it as he pleased? True, if he held the fee, such would be the case; but, unfortunately for the gentleman, Congress never did purchase the fee to the District; nor a title to the soil, men, or property; no private rights were transferred. Congress only became possessed of the right to the exclusive legislation for the District; not jurisdiction—that comprehends something more. That is divided among all the departments—the legislative, the judicial, and executive; and the private rights of the most humble individual cannot be infringed "without due course of law;" that is, without a speedy and public trial by jury. Therefore, to say that Congress can usurp the rights of

all the other departments of the government, and wrest property from all the legal owners, without a trial, would be to make the legislative department a perfect despotism; and would virtually abolish our well-balanced form of government. But, gentlemen inquire, cannot a law be passed, taking property for public use? The constitution itself answers the question: never, without a compensation be paid the owners. But, it is asked, cannot slavery be abolished prospectively? It may, if the people think best. Public opinion can do much; but it is *always* led. It does its work willingly. It is never forced into measures. Hence the impolicy of the modern plan of abolition, which strikes alike at the constitution, at private rights, and the best interests of the whole country.

Here Mr. M. read an extract from the Baltimore Sun, copied from the Liberator, an abolition paper:

"COMMENTARY.—William Lloyd Garrison, in the last Liberator, says: 'Morally speaking, I am more and more convinced, by inquiry and conversation, that the liberty party, as such, in New England, is utterly unprincipled, and the most dangerous foe with which genuine anti-slavery has to contend.'"

Here (Mr. M. remarked) was to be seen something of the nature of this new philanthropy, which seems peculiarly designed for these United States. The extract just quoted shows the view in which the great leader of the northern abolitionists views this question. Mr. Garrison has become alarmed at the monster which he has been so instrumental in rearing into existence, "morally speaking, the most dangerous foe" genuine anti-slavery men have to contend with. And why so dangerous? Why has the policy, until so very lately lauded as the conservative principle of the republic, all at once become so obnoxious to this champion in the cause of abolition? Is it because these liberty men are too bold in developing their principles so soon?—before the pillars of the government are sufficiently undermined, before the compromises of the constitution are sufficiently weakened, so as to permit the machinery to be broken in pieces by the enemies of our republican form of government? If not, what so alarming in the progress of sentiments once so orthodox with the editor of that paper?

Mr. M. remarked, if I may be permitted to judge of the cause of the holy horror manifested by Mr. Garrison, it will be traced to the proceedings of imprudent friends within the walls of this Capitol. Take a calm and dispassionate view of the course of certain gentlemen on this floor, and listen to the cool and settled efforts to introduce into Congress the very measures once introduced into the Hartford convention. And if the representations of the gentleman from Massachusetts [Mr. Adams] are to be relied upon, those measures were not of a very patriotic origin, nor were they intended to cement the union of these States; but, on the contrary, to divide this blood-bought republic, and establish a northern confederacy, under the special protection of our then open enemy, with which we were at war.

And, Mr. Speaker, these celebrated Massachusetts resolutions, asking to unsettle the compromises of the constitution, are said to be an exact copy of resolutions introduced into the Hartford convention. Then, are not measures so bold and daring as these, enough to alarm the friends of original abolition, if a single spark of love of country be left?

Mr. M. remarked, let us examine what kind of a thing is this abolition hobby-horse is; this political liberty party, that has so frightened the sensitive nerves of the editor of the Liberator. In the first place, it is political, and a common donkey of every political aspirant, of easy political virtue, to mount, in order to accomplish his end. Hence, it has been no uncommon thing to see whigs and abolitionists at once mounted and speeding on to political preferment. But since the passage of the twenty-first rule, the animal has improved in flesh and spirits, and has thrown whigery from the saddle, to the great discomfiture and chagrin of that party. And this liberty party has, of late, assumed the form which I have just described, to the great alarm of its foster-mother, the "genuine anti-slavery party."

On what does this "dangerous party" base its political action? My reply is, this twenty-first rule. Without it, it never would have existed; that rule became the hobby-horse on which it mounted in turn, (as all parties without principle must have some hobby to ride,) and made a false issue with the people. It is the sacredness of the right of petition on which it relies for success. The right of petition is almost entirely the beginning and the end of every question presented by it. Now, sir, I am unwilling that, by any act of ours, we should furnish the instrument to designing men to strike a death-blow to our free institutions—the only free government in the world. But gentlemen object to a reference of abolition petitions, because the discussions arising on them would occupy much time of the House. Why, sir, if any other state of things than the present would occupy more time of the House than is now occupied, it would be bad enough indeed; but my opinion is, that much less time would be occupied by referring them than is now spent on this question. Almost all your petitions now evade the rule; or at least the effort to evade it gives rise to much more debate than otherwise would arise.

But the gentleman from Tennessee [Mr. M. Brown] is of opinion that, if the rule is sustained, it will completely cure all feeling in the South on this question. Suppose it does: what good will that do? It is not the South that is diseased; and it is worse than useless to apply medicine to a person that is not sick. No, sir; the disease is in the North and West, and it is there you must apply the restorative; and this rule, as I have said, is doing more to foster this party there than everything else. Strike it from your rules and you prostrate that party, by preventing it from making a false issue before the people.

But, it was asked, what would be done with these petitions? Why, sir, the course is marked out by the business orders of the House: refer them, if courteous and reasonable; if not, reject them at the threshhold—at their entrance into Congress. But do not afford grounds for misconstruction. Let the people know all the facts, and, my word for it, they will act right. But permit designing men to misconstrue your motive, and once permit them to make the impression that your object is to stifle public sentiment, and I tell you, sir, you cannot resist the effect that will be produced by such a course.

But, sir, from whence came this spirit of abolition? The answer is, from over the water—from that country from which we sprang into existence as a nation; from that country which once claimed this country as her own: yes, sir, from England, who always measures her philanthropy by dollars and cents, comes this paternal care over what she terms slaves, but who are better fed, better clothed, and enjoy more happiness than a majority of her own starving, freezing, and (he might add) dying population;—when he said dying, he meant starving to death for the want of the common necessaries of life. It was from thence that this plant found its way into this republican soil. And why was it thus introduced, while her starving millions were suffering at home? Were there no subjects there for this spirit of philanthropy to operate upon? Yes, sir, yes; there was an open field, but that field was subject to an aristocracy; although starving, they were subjects of the king, and that was enough. But America had no king; she has no starving population; therefore the labor of this country must be subject to the crown. And he feared that this was the object at the bottom of this whole matter. The South was deemed the most vulnerable point, and, of course, was the point of attack.

He remarked, that, when he said this as to the origin of the abolition excitement, he did not mean to convey the opinion that all now engaged in promoting the abolition cause were governed by this spirit; indeed, he knew that such was not the case; many were honest and (he might say) patriotic in their zeal on this question.

What was the cause or causes which have made the people of England a nation of lords and paupers? which has placed the power in the hands of the few, and made the mass beggars? It is monopolies; monopolies of land, of wealth of every description; yes, and of the price of labor. And how is that accomplished? By what policy is such a state of things brought about? The answer is matter of history—a national bank, a funded debt, and a high protective tariff. These are the potent engines of oppression in that country, which have prostrated that once boasted land of freedom before the shrine of kingly powers. And what is the spectacle which we see here on this floor? Nothing less than the champions for liberty—yes, the new-fangled libertymen, who shed so many tears over the black population of the South—all equally devoted advocates of the British system of oppression: a national bank, a high protective tariff, and a funded debt, by

174 APPENDIX TO THE CONGRESSIONAL GLOBE. Jan. 1844.

28TH CONG.....1ST SESS. *Abolition Petitions—Mr. Rhett.* H. of Reps.

the assumption of the debts of the States; and added to this, the advocates of the identical, or at least a copy of the identical, resolutions for unsettling the compromises of the constitution, once offered in the Hartford convention. Then, with all these facts before us, ought not every friend of his country to look with suspicion on any policy which combines all the stratagems of the monarchies of the old world, to unsettle the glorious principles on which this government is based?

He concluded by exhorting gentlemen on both sides of the House, abolitionists, and those who are not abolitionists, to consider these facts, which cannot help casting their shadows before, and decide all those exciting questions for the interest of our common country; and not permit their minds to be carried away with the excitement of the moment on either side; let them shun the rocks of Scylla, while they escaped the whirlpool of Charybdis, and decide all questions with an eye to the greatest good to the greatest number.

## SPEECH OF MR. RHETT,
### OF SOUTH CAROLINA.
*In the House of Representatives, January 11, 1844—On the right of petition.*

Mr. Speaker: I rise to debate the right of petition, so often described on this floor as a great unalienable and constitutional right. The fate of the fate of the rule which gentlemen contend infringes it, I know is sealed. The twenty-first rule is to be repealed. Not, therefore, to affect the present action of this House, but for the sake of the past—to vindicate the conduct of those who originated it, and have enforced it in Congress for the last six years—the South, and the democratic party,—I rise to debate the right of petition. I propose to show that they have infringed no rights of the people, and violated no mandate of the constitution, in the course they have pursued.

Sir, I have listened, with the utmost effort and attention, to gentlemen who have preceded me, to understand, if possible, what they meant by the right of petition. A right, to be a right at all, must be of value. It must confer a positive benefit, or prevent a positive evil; and to be a great popular, constitutional right, it must do more—affect vitally the liberties of the people, and stand out on the pages of the constitution. Neither the benefit of the right, nor its existence, can be doubtful or questionable. Now, I have endeavored in vain to understand in what this right consists, or in what it has been impugned in the action of Congress. Some say that the 21st rule infringes the right of petition in refusing to *receive* petitions; and that if they are received, and are laid on the table, or disposed of in any other summary way, the right is satisfied. Others say that is too slight a consideration; the right is invaded if you do not give the petition a more solemn consideration; it should be referred to a committee, and the right is satisfied. Others go further, and say the right involves a report from a committee, and free debate. None have yet marched up to the proposition that the right of petition involves the granting of its prayers by the legislature, although just as good an inference in logic as any of the other stages of legislation at which they stop. All, however, agree that some control over the legislation of Congress is involved in the right of petition. To make this control a right at all, it must be effectual for something. To receive a petition, and immediately lay it on the table, or reject its prayer, or postpone it indefinitely, differs not at all, in its result, from refusing to receive it. All are different methods of rejecting it; nor will even referring the petition be of any avail, unless it is referred to a committee, a majority of whose members are in favor of its demands. To this extent, at least, it appears to me, those who talk of the right of petition, when mingled with legislation, must go, to make it a right at all. I am prepared, sir, to show that, neither in this extreme, nor in any other of the stages of legislation adverted to, does the right of petition exist; and that, if it does exist in these various acts of legislation, it is not only unsupported by the constitution, but is hostile to its very existence.

Our fathers were neither ignorant nor unmindful of the right of petition. They knew its inestimable value in a government like ours, for the great purposes of popular information and popular control; and they stamped into the constitution the proof of the consideration in which they held it, and of their wisdom in protecting it. In the first amended article of the constitution, it is provided that "Congress shall *make no law* respecting the establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press; or *the right of the people peaceably to assemble, and to petition the government for a redress of grievances.*" In looking down the whole page of amendments, as well as in this article, it will be seen that they all relate to *personal* rights of the people. The right in the people to bear arms, "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures;" to "a presentment of a grand jury, before trial for crimes," are all personal rights. So, in this article, Congress is restrained from *passing laws* which prohibit the people from the free exercise of religion, freedom of speech, or the press," or "the right of the people peaceably to assemble and to petition the government for a redress of grievances." These, sir, are all personal rights of the people, which our ancestors did not enjoy under the dominion of the British crown; and they determined that Congress should have no power to violate them. The act of George I, s. 2, c. 5, commonly called the riot act, constituted the grievance at which the provision in favor of the people "peaceably to assemble" aimed. That act provides "that if any twelve persons are unlawfully assembled to the disturbance of the peace, and any one justice of the peace, sheriff, under-sheriff, or mayor of a town, shall think proper to command them, by proclamation, to disperse; if they contemn his orders, and continue together for one hour afterwards, such contempt shall be felony, without benefit of clergy. And further, "if the reading of the proclamation be by force opposed, or the reader be in any manner wilfully hindered from reading it, such opposers and hinderers *are felons, without benefit of clergy*: and all persons, to whom such proclamation *ought to have been made*, and knowing of such hindrance, and not dispersing, are felons, without benefit of clergy." Such are the provisions of this celebrated act, originating in the minority of Edward IV, repealed in the reign of James I, and amongst the first acts passed at the commencement of the reign of the house of Hanover. Its arbitrary nature is obvious. It virtually deterred the people from assembling and petitioning for a redress of grievances, except at the volition of the government. It was in force over our ancestors. It is in force in Great Britain now. Its incompatibility with a free popular government, such as they established by this constitution, our ancestors saw and felt. This act, is placed amongst the three great instruments of power, which Sir William Blackstone considers as more than compensating the crown in Great Britian for all its lost prerogatives since the feudal ages. The army, the public debt, and the riot act, he enumerates as its three great sources of power over the people; and of these the riot act is not the least potent, for it prevents discussion and concert amongst the people; and, without discussion and concert, no effectual resistance can ever be made to government. Why, sir, think of the thousands of popular meetings held every year, and every month in every year, and the thousands of speeches made to the people in our country on their public affairs, and suppose such an act as this passed by Congress to prevent them. Would it not be a grievance unendurable? Yet this act existed over our fathers, and they determined that it should not exist over their posterity by the legislation of Congress. Nor was this the sole abridgment on the "right of the people peaceably to assemble and petition for a redress of grievances." By the act of Charles II, s. 1, c. 5, of force at this day in England, it is provided, "that no petition to the King, or either House of Parliament, for any alteration in church or state, shall be signed by above *twenty* persons, unless the matter therefor be approved by three justices of the peace, or the major part of the grand jury in the county; and in London, by the lord mayor, aldermen, and common council; nor shall any petition be presented by more than ten persons at a time, on pain, in either case, of incurring a penalty not exceeding one hundred pounds, and three months' imprisonment." Here is an act which put the people regularly into keeping. Three magistrates, or a grand jury, or the lord mayor of London, are wiser than they; and as the magistrates and grand juries are appointed by the Crown, of course all petitions to Parliament, out of London, must virtually obtain its sanction before it could exist. Put the riot act and this act together, and, it is clear, they do most effectually put it in the power of government to hinder the people from "peaceably assembling and petitioning for a redress of grievances." The clause in our constitution refers to the grievances these laws established, and put it out of the power of Congress, forever, to pass such laws. It guaranties to the people a great *personal*, not a *legislative* privilege—to be exercised out of this hall, not *within* it—in their primary assemblies, to meet, hear, discuss, and petition on all matters affecting their public affairs; and thus, by expressing their will, and concerting their power, control their public servants, and the legislation of the country; and direct, reform, or upturn, at their high discretion, their whole system of government. Liberty could not exist, without this great privilege with the people; and hence the provision in the constitution, that "*Congress shall pass no laws* abridging the right of the people peaceably to assemble, and to petition for a redress of grievances."

You will perceive, Mr. Speaker, if these views be correct, what force there is in the argument of those who deduce from this clause of the constitution, a prohibition on this House to refuse to receive petitions. The clause in the constitution looks to legislation, and to legislation by the whole Congress—"*Congress shall pass no law*"—not to the action of either House of Congress in regulating its proceedings. It respects the *people*—"the right of the people peaceably to assemble and petition"—not the action of their representative or legislative bodies. It is a *personal privilege* of the people—not an intermediate or legislative right. In a word, the clause in the constitution has nothing to do with the action of this House on the subject of petitions.

But here it may be asked, have the people no right to send up their petitions to Congress? Assuredly they have; but it is not by any express clause of the constitution; for they can send them where this constitution does not operate. They can send their petitions wherever representation operates, and as an incident to representation. The very nature of representation implies the right of those represented to speak, both through their representatives, and individually, by petition, to the representative body. The people can petition their State executives, their State legislatures, their city authorities, Congress, or the President of the United States, as to all matters within the disposition and control of these their various agents. It is their right, then, not only that Congress shall pass no law prohibiting the people peaceably to assemble and petition, but that they may send their petitions to their agents—State or federal—who are competent to grant relief. I yield to none in desiring the freest and closest intercourse between the people and their representatives. But, when they enter the halls of legislation, and, through their representatives, have their petitions presented, there is an end to their action; and the action of the legislature has commenced. All that could be done by their separate will has been performed. They have assembled, prepared their petition, and presented their petition. They now appeal to the will of others. A part of the people, they now come in contact with the people, and submit their request to the judgment of all. If they had been competent to accomplish their request, they would not have petitioned. In petitioning, therefore, they appealed to the power, as well as judgment, of all the people represented in the legislature: and must not the power and discretion of the legislature prevail? The presentation of the petition itself is nothing but a legislative act—the first stage in legislation. It differs in nothing from presenting a bill or resolution. A member rises and says: "I beg leave to present to the House *a bill* for the abolition of slavery in the District of Columbia;" and again, he says, "I beg leave to *present a petition* for the abolition of slavery in the District of Columbia." What is the difference? None whatever. The same motions to receive, refer, or lay on the table, are competent to both. They are both acts of legislation, and call for the action and judgment of the legislative power. The moment the will or judgment of the legislature is to act, that moment it must be supreme; for, if it is not, and the will or judgment of the petitioner is to prevail, the petitioner usurps the power of legislation. They who are the few, dictate to the many; they who are a part of the people command the whole. They who have no legislative power, engross the entire power of the whole legislature; and if they can do this on any one act of legislation, why can they not do it in all? If they can say to the whole legislative body, you shall receive—why may they not say you shall refer—you shall report—you shall grant? The petitioners either have the power of the legislature, or they have it not. If they have it, they can exercise and

Feb. 1844.     APPENDIX TO THE CONGRESSIONAL GLOBE.     175

28TH CONG.....1ST SESS.     *Report of the Committee of Elections—Mr. Lumpkin.*     H. OF REPS.

coerce all the powers of legislation. If they have it not, their power and right must end so soon as the action of the legislature is called into exercise. As long as the separate will of the petitioners controls the petition, their right prevails; but as soon as they cast their petition under the will and judgment of the legislature, that will and judgment must prevail, or the legislature is abolished.

Now, sir, permit me to ask, with whom has the constitution entrusted the legislative power of Congress? Is it vested in any petitioners, a part of the people only, who may come here with their prayers' or in a single member of Congress, who may present them, and make his legislative motions with respect to them? The constitution says, "all legislative powers herein granted shall be vested in the Congress of the United States;" all the people, by all their representatives in Congress, are to exercise the legislative powers granted to the constitution. And this must be so, or not only the constitution would be violated, but legislation itself would be impracticable. Why, if a part of the people can come in here, and dictate the course of legislation, so may another; and the scramble for power by inconsistent and opposing interests, would soon bring the whole legislature to a halt, and produce its dissolution. This is inevitable, if petitioners, or their representatives, acting for them in Congress, can control the will and power of legislation.

But not only is the right and power of petitioners limited to acts to which they are competent; but Congress is limited also in its power of acting on their prayers. It is bound to act; but to act within the powers the constitution confers. Congress is controlled in its legislation both by the grants and limitations of the constitution. Is there any grant in the constitution which may affect the disposition of petitions? The constitution expressly prescribes that "each House may determine the rules of its proceedings." Whether it will proceed, or not proceed, in all matters of business and legislation; and how the House will proceed, by rules prescribed, is absolutely within its constitutional competency. Whenever, therefore, the House, in its discretion, makes any rules for the order of its business and legislation, they are obligatory on all petitioners, who propose subjects of legislation for its consideration. And Congress, too, is restrained, by the limitations of power in the constitution. These have been most carefully defined, and no jurisdiction can be entertained over subjects, which the constitution has not submitted to the legislation of Congress. On all such subjects, Congress has neither the moral nor constitutional power to act; and petitioners, therefore, cannot ask Congress to act. I go one step further: I contend that Congress, even within its admitted powers, is limited by a sound discretion—looking to the interests and welfare of the people of the whole Union, it is bound to protect and promote. If, in the opinion of Congress, any subject of legislation invited by petitions, or by any other method of legislation, ought not to be considered or discussed, it is their right and duty to preclude them from consideration and discussion. The responsibility of action is theirs; and they, and they only, must determine what mode of action will promote the welfare of all. I have heard its suggested—I believe the gentleman from North Carolina suggested it—that the right of petition was unlimited; that it was like prayer to God, whom we could ask for anything. Sir, with reverence be it spoken, the Almighty himself is limited by his attributes of purity, holiness, and justice. He could not *receive* petitions to do that which is evil and wrong. His ear must be turned from implorations which violated faith, and assailed the rights of others. Nor can men, in their assembled or individual capacities, any more than the Deity, regard or hold under consideration any requests which moral duty forbids them to grant.

Under these limitations, what course should Congress pursue with respect to the abolition petitions, which have raised this debate? Take the strongest of them—those praying the abolition of slavery in the District of Columbia and the Territories. Admit that Congress has the power of abolishing slavery in both of these regions; will this justify Congress in entertaining petitions for this purpose? If this is really the purpose of the petitions—if the object really is really the extinction of slavery in this District or the Territories—then the power being conceded, Congress ought to consider petitions proposing its exercise. But what if this not the purpose or object?—that the petitioners would not abolish slavery in this District if they could; and care nothing for its

existence in the only Territory we have where it does exist; and that the purpose and object of these petitions really are, to affect and overthrow slavery in the States, over which Congress has no constitutional or moral control—should these petitions be then received? If the petitions prayed Congress to interfere with, or abolish slavery in the States, all will concede that the matter is beyond its jurisdiction. Shall we, then, be blinded by forms, and be deceived by a veil so thin, that all can see the dark features lurking behind it. Every one in and out of Congress knows, that slavery *in the States* is the real object they design to assail. They propose, by continual agitations, through the instrumentality of these petitions, to propagate their fanaticism, and produce the alternative of the interference by Congress in the slave institutions of the South, or a dissolution of the Union. Now, sir, is it constitutional for Congress to lend itself to this unconstitutional end? Can Congress do that indirectly, which it cannot do directly? Admit the absolute power of Congress over the District and the Territories: constitutionally can it, under the pretext of slavery here, use its power to affect slavery in the States, over which it has no jurisdiction? I have heard of a man who fired his own fields to burn down his neighbor's fences and barn.

We have no right to use what is undoubtedly ours, to work an injury to another. And it was upon this high moral and constitutional ground, that the South and the democratic party acted in Atherton's resolutions, and refused entertaining or considering such petitions. Sir, we acted on things as they really were—as they are now. The abolition petitions before us are as truly petitions to abolish slavery in the States, as if this purpose was declared on their faces; and Congress can have no right to receive or consider them. Not only the constitution, but a regard to the safety and welfare of the people of the Union, in the sound discretion of Congress, forbids it to entertain the subject of slavery. But I know, Mr. Speaker, how subtle is the human mind, and how difficult it is for reason to prevail, when such motives are in operation as actuate those who thrust this subject into the debates of Congress. Yet who can doubt, from the very excitements and contests on this floor, that we are in an unconstitutional position? The constitution was designed for the regulation and protection of our foreign relations only—of matters in which all portions of the Union had an equal interest; and thus the selfishness of all portions of the Union would protect against the abuse of any. But here, sir, is a sectional question—the most delicate of all which can enter into legislative consideration or action—a question which, not merely by implication, but by plain provisions of the constitution, is withheld from the control of Congress. Do you suppose, Mr. Speaker, that your ancestors or mine, when they assented to this constitution, ever dreamed of the scene which is now before us? that you should be listening and I debating the propriety of Congress shutting out from its consideration the question of African slavery? From day to day, for the last six weeks, has this question raised its head in this Hall, bringing its designed and necessary effects of discontent, contention, and danger. We are reaping the harvest of our unconstitutional action, by entertaining this subject in the collisions and strifes it has engendered; and which, if continued, must inevitably end in a dissolution of the Union. I am not amongst those who believe that by the twenty-first rule, or any rule of proceeding in Congress, this tendency of things can be easily arrested. Fanaticism of any kind, when it stirs men's souls, is not easily allayed: especially a fanaticism which appeals for support, however falsely, to religion and the love of liberty —the two most powerful principles which can actuate the human heart. One thing is sure: conceding and yielding to it will not satisfy it, if experience and the nature of all passions can teach anything. Wherever this spirit has been promptly met, (as in New Hampshire,) it has been arrested; but wherever it has been tampered and compromised with, (as in Massachusetts,) it has gone on, until it has brought forth its legitimate fruit of proposing a dissolution of the Union, in the shape of the resolutions she has lately submitted to Congress. And it will go on, sir, with increased fury, if permitted to kindle and burn in this hall. The South will not aid it, and will stand clear of the consequences. They are the assailed party—unconstitutionally, insultingly assailed; and if my counsel could have prevailed, or could now prevail, members from the South would withdraw from any participation in legislation on this subject, and neither speak, vote, nor

act, in any manner whatever, concerning it. They would let those who introduce it here take all the responsibilities of legislative action on the subject. Instead of growing stronger, we are growing weaker, by the abandonment of former friends; and there is something, in my mind, degrading in the spectacle of seeking, by our action, protection against aggression which it is outrage to offer. The South is arraigned to answer for institutions which belong to her alone, and no power on earth has the right to question. Why should she answer to the insolence and wrong which arraign her? Have her patience and forbearance brought sympathy or support?

For six years this course of aggression has been going on, gathering strength in the North, and gaining foothold on this floor; and where it will end, the great Ruler of Events alone can tell. But in this state of things, I cannot imitate the example of those who have dealt so elaborately in professions of attachment to the Union. My sincerity and truthfulness might both justly be suspected; for it is not the nature of insult and oppression to produce attachment and admiration. The South speaks not. Her people are mute at these transactions; but they are not indifferent.

The agitations at the North against her institutions by their people and State legislatures, gathering in strength, and increasing in boldness, setting aside the constitution, and endangering the Union itself—are awakening a correspondent spirit in the South, of defiance and discontent. Sir, I doubt not that gentleman have truly expressed their opinions in all they have said of the attachment of the people of the North to the Union. I may doubt the correctness of their information, but I do not doubt their sincerity. It would be trifling with the subject—it would be inconsistent with that frankness which should characterize the relations of members on this floor, if I did not declare, that in consequence of the proceedings of fanatics in and out of Congress, there is in the South a deep and growing disaffection to the Union. Instead of enjoying equal rights in this Confederacy, they see the taxing power of the government wielded for the aggrandizement of one portion of the Union, at the expense of the rest. Instead of protection and sympathy between the members of the Union, they see their institutions wantonly assailed, their peace endangered, and their personal, social, and political characteristics aspersed, belied, and denounced. And these evils of their condition have increased, are increasing, and, I fear, are destined to go on. Events are in the hands of none; but our course of duty is under the control of all. The South will remain as she has always been, on the defensive—usurping, violating, the rights of no portion of the Union; but ever prepared to maintain her own. Her destiny is in her own hands—above the control (if true to herself) of men here, or States elsewhere. She must not look to the power or sympathy of others for support or aid. Self-protection will be her only protection; and, strong in her own resources, she has but to extend them with vigilance, energy, and courage, and, in the Union or out of the Union, she can and will be free.

## SPEECH OF MR. LUMPKIN,

### OF GEORGIA,

*In the House of Representatives, February 10, 1844.—*
On the report of the Committee of Elections.

The report and resolutions of the majority of the Committee of Elections being under consideration, and the question pending being the adoption of the following resolutions, to wit:

*Resolved,* That the 2d section of "An act for the apportionment of representatives among the several States according to the sixth census," approved June 25, 1842, is not a law made in pursuance of the constitution of the United States, and valid, operative, and binding upon the States.

*Resolved,* That the members of the House (except the two contested cases from Virginia, upon which no opinion is hereby expressed) have been elected in conformity with the constitution and laws, and are entitled to their seats in this House.

MR. LUMPKIN rose and addressed the House as follows:

MR. SPEAKER: Occupying the position that I do as a representative of the people of one of those States whose constitutional right to representation has been denied by the report of the minority of the Committee of Elections, and by honorable members of this House in the progress of

Feb. 1844.     APPENDIX TO THE CONGRESSIONAL GLOBE.     179

28TH CONG.....1ST SESS.     *Abolition Petitions—Mr. C. Johnson.*     H. OF REPS.

selves a reputation more lasting than the proud pillars of this lofty temple, or any other monument of our national greatness.

But, Mr. Speaker, I cannot forbear to call the attention of the House to the views of Mr. Madison, as the report of the minority of the committee, and my honorable colleague, [Mr. STEPHENS,] and many other honorable gentlemen on the opposite side of this House have relied with almost exulting confidence on his authority alone, to support their views and position, as the highest and most unimpeached evidence of the meaning and intention of this clause of the constitution, as derived from the cotemporaneous exposition of that instrument. Two opinions of Mr. Madison have been relied on as sustaining the position of honorable gentlemen on the opposite side of this question in this discussion. One was his opinion as expressed in the convention that formed the federal constitution, and may be found on page 1280, vol. 3, of the Madison papers; and the other the speech delivered in the convention of the State of Virginia, called for the purpose of ratifying the federal constitution. And, sir, permit me to say that the opinions thus expressed, and upon which honorable gentlemen rely with so much confidence, I think, properly weighed and examined, so far from controverting my position, actually goes far to establish conclusively the position I have assumed, and which are now under our immediate attention. But Mr. Madison says:

"The necessity of a general government supposes that the State legislatures will sometimes fail or refuse to consult the common interest at the expense of their local convenience and prejudices. The policy of referring the appointment of the House of Representatives to the people, and not to the legislatures of the States, supposes that the result will be somewhat influenced by the mode. This view of the question seems to decide that the legislatures of the States ought not to have the uncontrolled right of regulating the times, places, and manner of holding elections. These were words of great latitude. It was impossible to foresee all the abuses that might be made of the discretionary power," &c. &c.

The obvious meaning of Mr. Madison, as received from this extract, was, that Congress should have the power conferred to be used and exercised in case of an actual paramount necessity; and his whole argument is based upon the supposition that he never concealed, but openly declared that abuses would exist in the exercise of this power by the State legislature, which it would be necessary should be corrected and controlled by this supervisory power in Congress, and which amounted to nothing more nor less than the often-repeated argument that it was necessary to produce uniformity, and to preserve unimpaired the existence of the national government. But, sir, by reference to Elliott's Debates of the Virginia convention, I will read a short extract, and I will state to the House that the whole speech made on this occasion, taken together, does not mean more or less than what is contained in this short sentiment. "It was found impossible to fix the time, place, and manner of the election of representatives in the constitution. It was found necessary to leave the regulation of these, in the first place, to the State governments, as being best acquainted with the situation of the people, subject to the control of the general government, in order to enable it to produce uniformity, *and prevent its own dissolution.*" But, sir, is it contended that such an abuse has been made of this power by the State legislatures as was contemplated by Mr. Madison would justify the exercise of this controlling power over the subject by the Congress of the United States? It will not be pretended by any in open and fair argument before the people of this country? But did the want of uniformity in the manner of holding elections, justify the attempt that has been recently made by Congress to exercise a supervisory control, with a view to elect members to this House throughout the several States of this Union by separate districts? Has not greater inequality existed, from the commencement of our government up to this present time—a period of more than fifty years—without any attempt to exercise this control? Sir, it is idle to talk of its necessity to produce uniformity in electing members to this House by separate congressional districts. But, sir, I will now quote from two commentators of our own time, on this clause of the constitution; and I feel confident, in doing so, that their opinions will be received with respect, amounting almost to venera-

tion, by those who have opposed the views which I have advanced in the course of this discussion. I read, sir, from Mr. Justice Story's Commentaries on the Constitution, vol. 2, page 287. "The constitution gives to the State legislatures the power to regulate the time, place, and manner of holding elections; and this will be so desirable a boon in their possession, on account of their ability to adapt the regulation, from time to time, to the peculiar, local, or political convenience of the States, that its representatives in Congress will not be brought to assent to any general system by Congress, *unless from an extreme necessity, or a very urgent exigency.* Indeed, the danger rather is, that when such necessity or exigency naturally arises, the measure will be postponed and perhaps defeated, *by the unpopularity of the exercise of the power.* All the States will, under common circumstances, have a local interest and pride in preventing any interference by Congress. And it is incredible that this influence should not be felt as well in the Senate as in the House. It is not too much, therefore, to presume that it will not be resorted to by Congress until there has been some *extraordinary abuse* or *danger* in leaving it to the discretion of the States exclusively." The next modern commentator I shall quote, is that able and distinguished jurist, Chancellor Kent, whose opinion, concurring as it does with that of Mr. Justice Story, which I have just read, presents a weight of authority that cannot and will not be disregarded by this high paramount and sole judicial tribunal, whose duty it is to determine this grave and important question. I read, sir, from vol. 1, page 232, Kent's Commentaries on American law. He says: "The legislature of each State prescribes the times, places, and manner of holding elections, subject, however, to the control and interference of Congress, which is permitted them for their own preservation, but which, it is to be presumed, they never will be disposed to exercise, except when any State shall neglect or refuse to make adequate provision for the purposes." In conclusion, sir, permit me to remark, that one great leading and controlling idea pervades all the authority that I have referred to, from the framers of the constitution, at its very origin, down to this discussion on the question now pending; and it is that this supervisory power over this subject is permitted to Congress for the purpose of preventing the dissolution of the government, arising from a neglect, refusal, or inability, on the part of the State legislatures, to provide representatives in the Congress of the United States. Now, sir, suppose that not only Georgia, Mississippi, Missouri, and New Hampshire, were without laws providing for the election of members to this Congress, but that a sufficient number of the States of this Union, constituting a majority of the House of Representatives, when taken together, should be in the same situation, and with the same disposition to maintain their constitutional rights inviolate by refusing to execute the mandatory order of the Congress of the United States: what would be the result? If the position of honorable gentlemen on the opposite side of this House were true, and members of this House could not constitutionally and legally sit here as representatives, until the States should obey the mandatory clause of the late apportionment act, this most extraordinary state of things would be presented to the world—that an American Congress had passed an act, under power granted in the federal constitution, mainly, if not entirely, to enable the government to perpetuate its own existence, independent of the State legislatures, which would, under such circumstances have produced a dissolution of the government. Sir, I can take no view of this question, that does not satisfy me fully that the second section of the apportionment law of the last Congress is invalid, inoperative, and void, and must yield to the State laws of Georgia, Mississippi, Missouri, and New Hampshire; and that their representatives on this floor should be fully admitted to all the privileges and rights of representatives duly elected as members of this House.

---

## REMARKS OF MR. C. JOHNSON,

### OF TENNESSEE.

*In the House of Representatives, on the 27th February, 1844.—On the amendment offered by him proposing to adopt the rules of the last Congress, and the Atherton resolution, in lieu of the 21st rule, as a substitute for the report of the committee, and the amendment.*

Mr. JOHNSON said he was desirous of calling the attention of the House, and particularly of the

democratic portion of it, to the position on which the rules of the House were placed by the report of the committee and the amendment now pending; because he considered the whole business of the session dependent in a great degree upon their proper adjustment. The report of the committee (made by Mr. ADAMS) omitted almost every rule that the experience of the House had found necessary to facilitate the transaction of its business; and, if adopted, would place the majority of the House, bound hand and foot, under the control of the minority, unless two-thirds of the House could be found to suspend them. The hour rule had been omitted; the majority rule likewise; as well as the rule authorizing petitions to be filed with the Clerk and sent to the committees; and, worse than all, the 21st rule had been left out of this new code. The amendment of the gentleman from Virginia [Mr. DROMGOOLE] had been laid on the tables of members this morning, and he had not had an opportunity of carefully examining it; so far as he had done so, he approved of them generally, but regretted to find the hour rule and the rule in relation to petitions wholly omitted also. The 21st rule, though slightly altered, was substantially retained. That some such restrictions upon debate and the power of controlling the action of the House by a majority, in times of high party excitement, were indispensable to the transaction of the public business, he entertained not a doubt; without them, the former rules would be converted into engines for delaying or defeating every important measure. The best argument upon the subject would be a statement of an occurrence that he witnessed upon this floor a few years since, before the adoption of the hour rule.

An important measure had been long pending before the House, and it was determined to pass it on that day by "*sitting out the quastim,*" as it is called—that is, by members occupying their seats until the debate was over. A gentleman from New York, now in his eye, [Mr. BARNARD,] obtained the floor about night, (Mr. BARNARD said about 10 o'clock,) and expressed a wish further to debate the question, and complained that he was not well enough to proceed that night, and moved an adjournment. It was refused: he commenced his speech. Many members retired, as he supposed, to get their suppers, preparatory to a night session. The gentleman from New York was unwilling to address so thin a House, and yielded the floor for a motion to adjourn. No quorum was present. A call of the House followed. And thus the balance of the night was occupied in listening occasionally to his speech, and on motions to adjourn, or calls of the House, upon the yeas and nays. After sunrise the next morning the honorable member's health was sufficiently restored to go on with and finish his speech. He recollected many other instances, (which he need not particularize,) where the floor had been occupied for eight or ten hours, evidently with a view of defeating or delaying the action of the House.

He appealed to the members to know if they were prepared, by a surrender of this rule, (first adopted and acted on by the whigs, and of course they cannot complain of it,) to place themselves so much in the power of a minority, and to make the passage of every important measure depend upon the health and strength of the majority to remain in their seats, as long as the whig orators could find lungs to talk. This objection applied equally to the report of the committee, and the amendment of his friend from Virginia, and one which he would with great reluctance give up. He commented upon the importance of the other rules, omitted in the report, and particularly the majority rule, and the absurdity and folly of the majority of the House, responsible to the country for the transaction of the public business, so fixing the rules of the House as to place themselves under the control of the minority, as to the time and mode of transacting the public business. He showed that, by the rules, as reported by Mr. ADAMS, every restriction on debate was removed; it was allowed upon the presentment and reference of petitions or memorials to a committee—upon the report—upon the bill in Committee of the Whole, until the majority could break down the minority by sitting and listening; and even after the bill was reported to the House, the new rule provided that "the bill shall again be subject *to be debated and amended by clauses before a question to engross it be taken,*" substantially repealing the previous question upon the engrossment—and then again open to debate upon its passage; and even after its passage,

# APPENDIX TO THE CONGRESSIONAL GLOBE.

180        Feb. 1844.

28TH CONG.....1ST SESS.     *Abolition Petitions—Mr. C. Johnson.*     H. OF REPS.

"*it shall be in order for any member to move for the reconsideration thereof on the same day,*" and thus again opening the whole question to debate to any one, even those *voting in the minority.* With such rules, if adopted, he saw no means of passing any bill except such as the opposition might permit. Let the restrictions on debate be abolished, as proposed, and the present Congress would return to their constituents late in the summer, as much disgraced for their neglect of the public business, for doing nothing, as the whig Congress did for what they had done.

There were still other difficulties. The new code of rules, reported by the gentleman from Massachusetts, numbered one hundred and two, and the substitute, proposed by the gentleman from Virginia, numbered one hundred and eight; and many of these rules were susceptible of subdivisions. Let the previous question be called, as it always is, upon important questions; the debate stopped: a division of the question might be called on each rule and each subdivision, and yeas and nays on each. In what condition would the democratic party be placed? Propositions before the House, under the previous question, upon which the yeas and nays might be called by one-fifth for more than one hundred times, occupying ten or twelve days, and at a period of the session when we are actually talking of fixing the day of adjournment, and but little of the public business as yet completed. He would, for these reasons, be unwilling to place himself and political friends in such a dilemma, even if the amendments of his friend from Virginia were unexceptionable.

The amendment he proposed was designed to avoid these inconveniences; and, if adopted, would enable us to have rules at once by which the public business could be speedily transacted. Many of the rules of the last Congress he did not approve, and thought it probable many of them would be improved by the amendments of the gentleman from Virginia; yet it was better, in his judgment, to take them, with all their imperfections, than to run the hazard of being harassed and perplexed for weeks at this period of the session by a struggle to get a new code.

He was aware that the great difficulty of settling the rules at the present session arose from hostility on the one side to the 21st rule, and an earnest desire for its adoption on the other, as was evidenced by the debate. That rule had been the principal subject—the others had been scarcely alluded to. He had been here from the origin of the enactment in relation to these petitions, and never before opened his lips in relation to them; and did not now intend to trouble the House with a speech on the right of petition, or on their reception.

For some years after he was a member, these petitions were received and referred to committees, and often debated without attracting attention. It was then believed that the best mode of quieting excitement in the North was to adopt that course; and with that view the celebrated report of Mr. Pinckney was made, concluding with resolutions which were sanctioned by the House with great unanimity, denying the authority of Congress to legislate on the subject. So far from this course having the effect desired, these petitions poured in upon the House in greater numbers than ever; and it became necessary to adopt some rule or order in relation to them, to enable the House to get on with its usual and necessary business. The Patton resolution followed; then the Atherton resolution; and finally the rule which, he believed, was adopted at the instance of a member from Maryland, (W. Cost Johnson,) not now a member of this House. For all these resolutions and rules he had voted, as the best means of enabling the House to do the public business, by suppressing debate upon an exciting subject, over which the House had no jurisdiction. He at no time attached so much importance to the right of petition as northern gentlemen seemed to do. In this country, where the people had a *right to command,* and it was the duty of the public servants to *obey,* the right of *humbly petitioning* their *public servants* to do what *they wished* was of no value *to them;* nor did he attach more importance to the question made on the opposite side as to the reception of these petitions. If Congress refused to receive them, it was a decision against the prayer of the petitioners as much as if they had been debated a month. If Congress received them, and laid them on the table, the same purpose was answered. The debate was what he objected to, not only on account of the delay of the public business, but because of the real danger that might arise in the South from their circulation

among the colored people. He said that he would be content with any rule which prohibited debate here.

But how this rule has been heretofore adopted, is now likely to be lost, were questions to which he wished to direct the attention of the House. If he recollected right, (and he thought he could not be mistaken,) in every instance the resolution or rule had been adopted by the union of both parties in the South, aided by the votes of many northern democrats. Both parties in the South have, before this time, regarded some such rule of vital importance to their interests, and, with an occasional exception, have been united upon this floor; and he believed both parties, at all times, looked to the northern democrats for support. He did not believe that either ever expected their adoption by northern whig votes. It was immaterial which party had the ascendency upon this floor; upon this subject we acted together, and saved the rule.

It could not have escaped the observation of any one that these questions were made and kept up for years, to have an influence upon the party politics of the country, rather than from considerations connected with the public good. It has been always known, that upon these questions of the right of petition and the reception of petitions, the northern democrats had been divided, and were so now—a portion of them agreeing with the northern whigs, that the right of petition upon this and all other subjects was secured by the constitution, whilst another portion of them agreed with the South, that there was no constitutional obligation to receive petitions upon subjects over which Congress had no control. In this state of the question, a war was kept up for years between the abolition whigs of the North and the southern whigs, and questions were skilfully prepared, to embarrass that portion of the northern democracy who entertained scruples upon these subjects. It was seen, that if the democrats in certain portions of the North voted for the rule, they would be subjected to the fury of the abolitionists, and be probably defeated, and that whigery would be the gainer; if they voted against the rule, then their great leader in the North was to be identified with them and their course, in the minds of the southern people, and prejudices aroused against him, whereby whigery would still be benefited. Yet, amidst all these conflicts, the South stood together, and the rule was maintained by the aid of a portion of the northern democrats. The effect of this war upon them has been, it is understood, greatly to increase the abolition vote in the North, and the loss of many who always acted with the South. If the southern whigs had gained any other advantage than the loss of a few democrats who had acted with them on this subject, he was not aware of it.

At the commencement of the present session of Congress, on the 4th of December, the same question was made, upon the motion of the distinguished member from Massachusetts; and upon it at that time, so far as the votes were given, we were united, with the exception of two votes—one from Kentucky, and one from North Carolina. The rule was retained temporarily, by a vote of 95 to 91. It was obvious to every one, who noted the vote and the absentees, that we were in great danger of losing the rule.

The subject was then referred to a select committee; and the report of the committee made by the distinguished member from Massachusetts is the result of their labors. This became the subject of debate in the morning hour, and has so continued to this time. On the 9th of January, a democrat from Indiana, [Mr. BROWN,] moved to lay the whole subject on the table. If this motion had succeeded, the effect would have been to retain the rules as adopted on the 4th of December, and of course the 21st rule. This vote was lost, yeas 76, nays 108. Upon this question the whig votes from the South had increased from two to seven against the motion—four from Kentucky, two from Tennessee, and one from North Carolina. This vote scarcely left a hope of ever getting the 21st rule adopted as one of the rules of the House; the only hope that remained, was founded upon the continuance of the debate in the morning hour, until the elections in Maryland and Georgia should have taken place, which we confidently expected would have added eight votes to our strength upon this question, which ever party prevailed.

The debate was continued; the elections were over; the members elect were whigs, and most of them in their seats; the honorable member from Virginia [Mr. STEENROD] seized the first opportunity again

to move to lay the *report on the table*—the best chance, if not the only means of saving the 21st rule. If the report had been laid on the table, the resolution of the 4th December continued the rules and orders of the last Congress in force until a select committee should be appointed, and their "*report finally disposed of*:" laying *on the table* did not *finally dispose of* it, but placed it, in a position that required two-thirds of the House, under the rules, again to take it up—which never could be obtained.

Here, then, was presented a fair opportunity to those desirous of preserving the 21st rule. All the additional strength we expected from Maryland and Georgia had arrived; the vote was taken and lost—ayes 82, noes 112. To our astonishment and surprise, only six whig members representing slaveholding States were found voting with us—two from Kentucky, two from Georgia, one from Alabama, and one from Tennessee.

And there were found voting against us—

Three whigs from Tennessee.

Three whigs from Kentucky.

Four whigs from Maryland.

Four whigs from North Carolina.

Two from Virginia.

[Mr. WHITE here asked if there was no democrat from Virginia.

Mr. JOHNSON admitted that there was one—the author of the amendment to the report.]

Mr. JOHNSON continued. And he regretted to find his friend from Georgia who sat near him, [Mr. BLACK,] as also one [Mr. HOLMES] from the chivalrous State of South Carolina, which took so deep an interest in the settlement of this question, voting against us.

[Several members asked for an opportunity of explaining their votes.

Mr. J. declined yielding a portion of his hour unless it was for the correction of any error he may have fallen into as to the facts.]

Mr. JOHNSON continued. He was aware that many reasons might, and no doubt would be assigned for the vote against laying on the table—reasons, no doubt, esteemed of more importance by those giving the votes, than the adoption of the 21st rule, although that rule had been the main, if not the only, subject of debate. With the reasons or motives of those members so voting, he had nothing to do; he spoke of the facts and the consequences arising from them.

It was certain, if the eighteen members voting against the motion had voted for it, that it would have prevailed.

It is equally certain, if it had prevailed, that the rules of the last Congress, including the 21st rule, as adopted on the 4th of December, would have been the law of this House.

There was no doubt that only six whig members, representing slaveholding States, had voted with us.

The presidential election is again coming on—the war is again renewed—the same issues are again presented, debated and urged with as much zeal as formerly. It is the hope of gentlemen to have northern democrats killed off, if they dare vote with us, and whigs returned in their places? or is it hoped, if they vote against us, that their great leader in the North may be again assailed, and the prejudices of the southern people aroused against him, because a portion of his friends act with the whigs upon this subject! Suppose the same rule applied to our opponents and their distinguished champion held responsible for the votes of his friends on this floor: all his friends in the North, with scarcely an exception have ever been against us on this question, and but six of them in the South were found on Mr. Steenrod's motion to lend us a helping hand.

It is now certain, since we have lost the opportunity of securing it, on the proposition made by his friend from Virginia, [Mr. STEENROD,] that the 21st rule was gone. When he called upon his northern friends, who had so nobly sustained us for years upon this question, deemed of so much importance to the southern interests, again to do so,—the reply was, why should we sustain a rule so much questioned at the North, when your southern whigs, representing that peculiar interest, refuse to do so? He confessed that the question put to him was a difficult one to answer.

But the House must adopt some rules, and he hoped they would be such as to enable us to do the business of the country.

The 21st rule having been thus lost, he appealed to his friends in the North as well as the South to unite upon his amendment, which secured the rules of the last Congress, which would enable them to

240 APPENDIX TO THE CONGRESSIONAL GLOBE. Feb. 1844.

28TH CONG.. .1ST SESS. _Abolition Petitions—Mr. Campbell._ H. of Reps.

of the earth, but least of all from England. I will, upon this floor—in this hall—candidly avow, that if, in the course of events, we must have war, let it be with England, our ancient and inveterate enemy. I think we could strike a harder blow, and with more hearty good-will. We could encourage each other with the recital of the many wrongs and injuries which we have received at her hands, in peace and in war, in youth and in manhood. Yes, sir; if we are to have war, let it be with England; she is a foe worthy of our arms.

Whether this government will assist and encourage her citizens, or not, in the settlement of this territory, they will do it—your power cannot check it. You might as well attempt to turn the waters of the Missouri river back upon its sources in the Rocky mountains, as to turn back the flood of population from the shores of the Pacific ocean; the Alleghanies may be piled upon the Rocky mountains, and our people will scale them. The march of empire is westward; nothing will, nothing can check it!

Unless this government shall take some decisive step very soon, a contest between American citizens and British subjects will be inevitable. The germs of a collision already exist, and it requires but a little more to bring about a conflict. The first scalp that shall be taken; the first drop of blood that is shed, will bring about that very war which is so much dreaded.

## SPEECH OF MR. CAMPBELL,
### OF SOUTH CAROLINA.

_In the House of Representatives, February 17, 1844.—On the right of petition._

MR. ADAMS'S report from the Select Committee on revising the rules of the House having been taken up, as the orders of the day for the morning hour, and the question being on the motion of Mr. BLACK, of Georgia, to amend a motion to recommit the report, by instructing the committee to reinsert the following rule: "No petition, memorial, resolution, or other paper, praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave trade between the States or Territories of the United States in which it now exists, shall be received by this House, or entertained in any way whatever."

Mr. CAMPBELL addressed the House as follows:

Mr. SPEAKER: Several gentlemen who have spoken in opposition to the instructions under consideration, and particularly the gentleman from Massachusetts, [Mr. WINTHROP,] have displayed much parliamentary learning in endeavoring to maintain their position; but it has fared with the gentleman and his friends as it did with the object of Hudibras's satire—

"Whose gun, when shot at duck or plover,
Flew back, and knocked the owner over."

Indeed, so directly in point are some of the examples referred to by the gentleman, that I am almost disposed to think that we have mistaken his true position; and that instead of being an enemy to the 25th rule, he is a friend in disguise. Here Mr. C. read from Mr. WINTHROP's speech two rules quoted from Hatsell—one of them declaring that the British House of Commons "would receive no petitions against a bill, actually pending, for imposing taxes or duties;" the other, "that they would receive no petitions for grants or appropriations of money, relating to the public service, not recommended by the Crown." These two rules, and the practice under them, go as far as any precedents of the British House of Commons can go, to establish the fact that all legislative bodies have a right to regulate their proceedings upon petitions, as well as upon other subjects; and may properly, in anticipation of the presentation of vexatious petitions, upon which they are determined not to legislate, adopt rules refusing to receive them.

But even if the precedents quoted by the gentleman tended to sustain his position, (which they do not,) I would, confining myself to a period the incidents of which are still fresh in the memory of every gentleman on this floor, appeal from the high authority to which he has referred, to authority still higher; from the practice of the British House of Commons, to the practice of the American House of Representatives. And, so far as the argument is concerned, I will appeal from the opinions now expressed, to the opinions of the gentleman and his

friends, as solemnly expressed, by their recorded votes, during the first session of the last Congress.

Mr. C. having the journals before him, here referred to the Patton resolution, the result of a conference of southern gentlemen, adopted at the second session of the 25th Congress; to the Atherton resolutions, the result of a meeting of democratic members, adopted at the third session of the same Congress; to the celebrated 21st (now the 25th) rule, adopted at the first session of the 26th Congress, and re-adopted at every session since then, except at the first session of the last Congress, when it was superseded by a rule much more comprehensive, to which he intended now to refer. In the House of Representatives of the 27th, or last Congress, that party, the members of which in the non-slaveholding States have ever vaunted themselves the defenders and champions of the right of petition, held a decided majority; and yet, almost at the very commencement of the first session of that Congress, _a rule was adopted by an exclusive whig vote, which prohibited the reception of all petitions, except upon subjects referred to in the President's message, or upon the subject of bankruptcy._ This rule went far, very far beyond the rule now under consideration. By it, not only were abolition petitions, but petitions upon a great variety of subjects over which Congress has acknowledged jurisdiction, refused to be received. This rule was opposed by every democrat, and voted for by every member of the whig party then present, except the gentleman from Massachusetts, [Mr. ADAMS.] It was voted for by every gentleman who has preceded me on the opposite side of this question, and who was then a member of Congress.

Having alluded to these general rules, I will now refer to the action of the House upon a few single petitions; and, in doing so, it is not my intention to recall unpleasant recollections, but to support my position by examples. During the second session of the last Congress, the gentleman from Massachusetts [Mr. ADAMS] presented a petition, which the House not only refused to receive, by a majority of 166 to 40, but a resolution was immediately introduced to censure him.

"As chieftain, when the warder calls
To arms, the foemen storm the walls"—

the gentleman sprang to his defence. But, in the long and elaborate defence upon which he entered, he, perhaps, for the first time in his life, more resembled the stag, than the lion at bay. Upon the frequent occasions on which he yielded the floor, in the course of his defence, for motions to lay the subject on the table, and thus to get rid of it by an indirect vote, he appeared to me to be anxiously seeking for a covert where he could find refuge from his pursuers; and well might he do so; for the avengers of the insulted dignity of the House, led on by a Gilmer and a Marshall, were behind him. I voted against every motion to lay the subject on the table, not that I really desired that a vote of censure should be finally passed upon the gentleman, but that the subject might be kept before the country until the attention of the whole people should be directed to the dangerous and criminal extent to which the pretended right of petition had been carried.

I do not charge intentional impropriety; but the very fact that a gentleman of high standing and reputation could be induced to believe that it was his duty to present, and move to refer, so nefarious a petition, affords the strongest evidence of the necessity of a rule for their exclusion.

Upon the question of reception being raised a few days afterwards on a similar petition, presented by the gentleman from Ohio, [Mr. GIDDINGS,] who seems to have an aptitude in following bad examples, the affirmative vote was only 26; and since the commencement of the present session—indeed within the last four weeks—this House has refused, in at least half a dozen instances, to receive single petitions.

Now, what right had we to refuse to receive either one or all these petitions, that we have not to refuse to receive the petitions embraced within the provisions of the 25th rule? It may be said that two or three of these petitions prayed for a dissolution of the Union. It is true they did, but in doing so, they only prayed for the accomplishment, by peaceful means, of the same atrocious object to which the petitions excluded by the 25th rule directly tend, through scenes of contention and blood.

I hope that those gentlemen from the non-slaveholding States, who are still disposed to stand up in defence of the compromises of the constitution, and

in defence of the 25th rule, will neither forget the comprehensive whig rule of the 1st session of the 27th Congress, to which I have referred, nor the votes upon the reception of these petitions, in several of which, all parties united by overwhelming majorities to enter up a record upon our journals, declaring, in effect, that the 25th rule is not, in their opinion, unconstitutional. If we have a right to refuse to receive a single petition, we have, on the same principle, a right to adopt a rule refusing to receive a class of petitions all relating to the same subject.

I will now refer to a vote by which, on my motion, acting as the organ of one of the standing committees of this House, a petition was, a few weeks ago, ordered by a large majority to be returned to the gentleman who had presented it, on the ground "that it was of a class of cases embraced within the prohibitions of the 25th rule." This vote was not a test of the expediency, but it was a very decisive test of the constitutionality of that rule; and no gentleman who supported the motion, can now properly plead, in bar of his vote for the rule, its want of constitutionality. I invite the attention of gentlemen to this point, because, much to my surprise, one or two who voted to return the petition, for the reason stated, have argued, in the course of this debate, that the rule was unconstitutional. The position is not one of technicality, but goes to the merits of the case. It is this: The constitution being of paramount obligation, all rules in violation of it are null and void; and no gentleman can vote to enforce a rule which he believes to be unconstitutional, without violating the oath which he took on his first introduction into this House to support that instrument.

I am unwilling to believe, notwithstanding the unfavorable appearances exhibited in the early part of this debate, that gentlemen who have thus, in effect, acknowledged the constitutionality of the 25th rule, will abandon the position so long and so successfully maintained, and, in the hour of victory, acknowledge that their opponents were right, and that they were wrong. Such a course would be a stigma upon our illustrious predecessors of the democratic party. It would be treason to the party itself. I will not say what would be the probable effect of such a course upon political parties at the South; much less will I attempt to say what would be its effect at the North.

If there is one non-slaveholding State in which the democracy have been more distinguished than in any other for their support of this and kindred rules, it is the State of New Hampshire; and although with them it has been my fortune recently to differ upon an important subject, I honor them for their unselfish devotion to principle, and feel proud that they are my countrymen. There, indeed, the democracy have stood erect. There, if I may be allowed a simile, I will say that the democracy of the North, like the live oak of the South, "regardless of the prevailing winds, has shot out its branches in all directions, offering no weather-gage to the storm, and refusing to bend to its influence." Although almost the birth-place of abolition, the effect has been that the noxious weed has been almost entirely exterminated in her granite soil. I ask the gentleman from that State, who sits before me, if the democratic party of New Hampshire have not gained ground by the manly, patriotic course which they have pursued upon this subject? [Mr. BURKE, the gentleman appealed to, answered in the affirmative.]

I will not say to the democracy of the other non-slaveholding States, Do likewise, and your conduct will be rewarded with similar success. I am not sufficiently acquainted with the local circumstances by which they are surrounded, to presume to advise them; and if I was, my judgment would be incompetent to the task. But leaving all other considerations out of view, the people of this country have the right to demand of the party in power, that the business of the session shall not be retarded, and perpetually interfered with by the agitation of a subject on which it is admitted, on all hands, that we are determined not to legislate.

It is too late, Mr. Speaker, to discuss the policy of the course adopted by our predecessors, and followed by ourselves, in relation to the reception of abolition petitions. Whether originally wise or not, a retreat from the position assumed upon this subject would be regarded by the abolitionists as an evidence that their principles were extending on this floor, and encourage them to persevere in their wild attempts against the peace of the South, and the integrity of the Union. On the other hand, if this

258     APPENDIX TO THE CONGRESSIONAL GLOBE.     Jan. 1844.

28th Cong.....1st Sess.     *Abolition Petitions—Mr. Stiles.*     H. of Reps.

er heard that this act of 1792, under which all our presidential elections have been held, except the first, was unconstitutional, or invalid, because it did not cover the whole ground, or because it required the interposition of State legislation to carry it into execution?

Again, sir: the second section of the same act directs that "the electors shall meet and give their votes on the said first Wednesday in December, at such place in each State as shall be directed by the legislature thereof." Here is another law that requires State legislation to enforce it. Has this section ever been considered by any one unconstitutional? Has the act of 1792 ever been denounced as containing a *mandamus* upon the States? On the contrary, it has been acquiesced in and obeyed by all the States of this Union for more than fifty years, without a murmur—no one dreaming, during that whole period, that the rights of the States were at all infringed, or that Congress had exercised anything but a constitutional power in enacting it; and yet the authority to pass such a law is by no means so express as in the clause conferring the power to prescribe the manner of holding elections for representatives. The words are, that "Congress may determine the time of choosing the electors." But Congress did not determine the time; it determined only the limits of time, and required the States to determine on some day within such limits.

And yet, the men who have illustrated and adorned our history from 1792 to the present time, never imagined that there was anything wrong in this, or that the act was invalid because it required State legislation. Such discoveries were reserved for the more exalted wisdom and patriotism of the present day!

But how do gentlemen dispose of the power to "alter" the regulations made by the State legislatures? "The Congress may, at any time, by law, make or alter such regulations." Is it to be maintained that, if Congress "alters" any of the State regulations, we must alter them all? On the contrary, the gentleman from New York [Mr. Beardsley] admits that any alteration by Congress, which, taken in connexion with the remaining State regulations, makes a system under which elections may be held, is good and valid. Here, let it be remarked, is a concession that the legislative action of the general and State governments are not always so antagonistic as wholly to forbid coalescence. We have the power to "alter" clearly and expressly given. We pass a law providing that elections shall be held in districts; wherever, in any of the States of the Union, the general-ticket system has been adopted, and is in force at the time of the passage of such act, the same becomes altered by the general law. We prescribe a mode different from that which prevails in the States. Our law, if a law at all, is the supreme law. Wherever the State regulation is in conflict with it, the same therefore becomes altered or repealed to the extent of such conflict.

Suppose, however, that I am wrong in all this; let it be conceded for the moment that, whenever Congress shall undertake to prescribe the manner in which elections shall be held, we must provide in our law for the whole manner; and that when we undertake to "alter" State regulations, we must provide a complete system, in substitution for that which is altered, so as not to leave in either case any necessity for ancillary legislation by the State governments: what follows then? If this were even so, would it follow that the act of 1842 is unconstitutional and invalid? Certainly not. If completeness of legislation on any given subject be the test of its validity, is the legislature bound to furnish this entirety of action, by providing every principle, and rule, and penalty, at the same time, and in the same law? On the contrary, we all know that it is the most usual course of legislation, especially on important subjects, to prescribe general principles in one act, and to carry out the details in other and subsequent acts. In this case it was especially proper to follow that course. Congress was about to legislate upon a new subject. It did not possess the necessary information to enable it, at the time of the passage of the law, to provide the details, and supply all the machinery to carry it into effect. The formation of the districts could be more conveniently done, and perhaps more satisfactorily to the people, by the State legislatures, having all the necessary local information for that purpose, than by Congress. It was certainly more courteous to the States to announce the principle merely in the first instance, and give them at least the option to conform their action to it, and form the districts themselves, than

for Congress to have gone on and completed the whole system at once, by forming the districts, and appointing federal officers to hold the elections. It was more proper in every point of view. If the State legislatures should conform to the principle, and prescribe the necessary regulations for holding the elections under it, so much the better. If they refused to do so, why, then they could not complain of the want of opportunity to have done it themselves; and, in the mean time, Congress could be better prepared with the necessary information to carry out the details of the law.

The act does not command the States to legislate. It prescribes a principle of legislation as to this subject. If the States do legislate in conformity to that principle, well and good. If they refuse to do so, we can prescribe the rules and regulations ourselves to carry out the principle. Well, four of the States refuse. Suppose, now, the present Congress should take up the subject, and proceed to form the districts and complete the law. I know full well that the majority now in this House will do no such thing. But that does not affect the argument. They have the power to do it if they choose to exercise it. Suppose, then, you should do this: why, the report of the committee and the argument on all sides admit that, in that case, legislation would be complete, and the law would be binding. The gentleman from Illinois [Mr. Douglass] is too good a lawyer not to know that the two acts upon the same subject, though passed at different times, would be taken in *pari materia*, and construed as one statute. The whole of it would then be valid and operative, as his own argument concedes, and as his professional knowledge forces him to admit.

Well, now, can a law be utterly null and void, to which such an act of supplemental legislation can give vitality and force? If the second section of the apportionment act be a dead letter, as gentlemen contend, can any subsequent action of Congress breathe into it the breath of life? Can a thing which never had a living soul become animate by engrafting upon its trunk a sound and healthy limb?

The fact that additional legislation would make this a law of force, proves that it is good as far as it goes. It is only incomplete. It lacks finality. But if it is good as far as it goes, it is not null and void. If it is not null and void, it must be observed.

The apportionment act announces a principle which is to govern future elections. It was competent for Congress either to announce the principle, and provide the particular regulations to enforce it, all in one act, or to furnish the principle and the details in separate acts. Now, whether there has been either State or federal legislation to carry out this general law, or not, there stands the law itself, good and valid, as far as it goes. It is a thing of life, as we have seen. How, then, is it to be avoided?

There is no way, Mr. Speaker, by which we can escape from its restraining force, except by the way of direct nullification. We may shut our eyes and stumble blindfold over the law, crushing it as we pass; but it does seem to me that no one, with even one eye open, can fail to perceive the obstacle which lies in his path, and the mischief of precipitating himself over it.

We are asked if we are willing to eject the entire delegations of four sovereign States from this hall? If these States have not representatives here legally entitled to remain as members of the body, whose fault is it? That of the States who have sent them here, by elections held in direct violation of the supreme law of the land. They had the opportunity, as the other twenty-two States had, of conforming their own legislation to this law, and of sending members here duly qualified to participate in the business of the national assembly. They have refused to improve this opportunity, and they come here asking us to nullify the law, rather than put them to the inconvenience of a legal and proper election.

Sir, we have heard much in this discussion of State rights and State sovereignty. I will go as far as he who goes farthest in the preservation of all the rights which pertain to the States; but, at the same time, I will not forbid to the general government the exercise of a power which I find expressly granted by the constitution. In exercising a part only of this power over elections, and inviting the States to exercise the residue, the general government has shown that spirit of forbearance and courtesy towards the State governments which I trust will always characterize its legislation. We are told, that if the general government undertook to enact a law

at all altering the manner of holding and conducting the elections, it was its duty to make the law complete; and that it is an insult to the States, offensive to their pride, and invasive of their sovereignty, to call upon them in aid of such imperfect legislation. We l, now, suppose, sir, instead of the partial provisions of the act of 1842, and in lieu of the courteous invitation held out by that law to the agency of the State authorities to carry it out, Congress had made a complete system of its own; had gone on by its own act to form the districts, and to require the marshals and deputy marshals of the United States courts to hold the elections; to swarm over the land, armed, as they would be, to persuade or intimidate our people to vote in conformity to the wishes or dictates of the appointing power: who can fail to perceive, in the distance, the fearful results of such a system? Who can refuse to admit that, in such a case, we should have had infinitely stronger cause to complain of mandamus acts? Then, indeed, sir, we might have feared for the rights of the States, and then should we have had reason to deplore and lament the discovery of such potent means of attack upon the the purity of the elective franchise.

But, Mr. Speaker, I must close these remarks. have already trespassed too far upon the strength of returning health. I could not, however, resist the impulse I have felt to raise a voice, however feeble, of protest and of warning against the action about to be had by the House upon a solemn and binding law, wrong in principle, mischievous in example, and fatal in consequences, as I believe such action to be.

---

## SPEECH OF MR. STILES,
### OF GEORGIA.

*In the House of Representatives, January 28 and 30,* 1844—On the motion of Mr. Black, of Georgia, to amend the motion of Mr. Dromgoole, of Virginia, to recommit the report of the Select Committee on the Rules, by instructing them to report to the House the following rule, (the 25th) viz:

"No petition, memorial, resolution, or other paper praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave trade between the States or Territories of the United States in which it now exists, shall be received by the House, or entertained in any way whatever.

January 28.

Mr. STILES having obtained the floor, spoke as follows:

Mr. Speaker: Of all the evils which beset our government, of all the dangers which threaten our Union, not one can be found, more speedy in its operation, sure in its consequences, or fatal in its results, than foreign interference with the domestic institutions of the South. Other divisions between the citizens of this wide-spread republic, which constitute the groundwork of opposing parties, and whose violence at times seems almost to hazard the existence of the country, are but honest differences of construction as to to the powers of the government. This variety of opinion is but consistent with the variety of interest, education, and habit, by which we are distinguished. It is wholesome, because it is a difference based in reason, having for its common object the support of the constitution; for its end, the preservation of the liberties of the country. But far different are such divisions, from that which separates the true lover of his country from that band of deluded fanatics, whose only reason is that "the end will justify the means," and which end is the desolation of the fairest regions of the earth, the destruction of the most perfect system of social and political happiness which has ever existed.

The danger is not only great, but it is increasing. The spirit of abolition has advanced, and is advancing. It increases by opposition; it triumphs by defeat. Scarcely ten years ago, and the few obscure enthusiasts of the North, who advocated the abolition of slavery at the South, excited but the derision and contempt of the whole country. Abolition was deemed by the enlightened and reflecting citizen but an insignificant and sickly flame; that, if it sprung from our own soil, it was but the "*ignis fatuus*" which would expire when the gas which gave it birth had been consumed; or, if dropped by some foreign hand, either by accident or design, that there was no combustible matter within its reach, and that it must be extinguished by the first breath which swept over it. But time has proven

Jan. 1844.     APPENDIX TO THE CONGRESSIONAL GLOBE.     259

28th Cong.....1st Sess.     *Abolition Petitions—Mr. Stiles.*     H. of Reps.

the fallacy of these calculations. The spark which dropped fell amidst inflammable materials; and the breath which it was supposed would extinguish, only enkindled the flame. It has shot with terrific rapidity through the land. Stopped neither by patriotism, principle, or party, it is now causing the very elements of our constitution to "melt with fervent heat;" and will, if not arrested by us in this hall, prove to our country its "last great conflagration."

The question now before the House, which involves this important subject, is, in substance, the retention or rejection of the 25th rule, providing for the exclusion of abolition petitions. Being in favor of retaining the rule, I shall consider, with the limited opportunity that the hour rule allows, the objections to such a course. Those objections consist, as the opponents of the rule contend, in its being a violation of the constitution, and an abridgment of the right of petition. What part of the constitution does it violate, and upon what part do the opponents of the rule rest? I am answered, the first amendment. And what does the first amendment prescribe? That "Congress shall make no law abridging the right of the people peaceably to assemble, and to petition the government for a redress of grievances." To analyze the clause: first, Congress shall make no law. Congress has made no law; this is but one branch of the government, and it can make no law. Congress does not propose to make a law. But it has been said that the rule accomplishes the same object—it abridges the right of petition; it violates the spirit and intent of the constitution. The letter of the constitution, it cannot be denied, is not violated by the rule; and before it can be violated, some law, some legislative enactment to that effect must be passed by Congress. But the spirit and intent of of the constitution: let us look to that. To discover this, we must refer to its history. What is the history of the first amendment, and from whence was it derived? This point having been fully discussed, and the acts relative to the subject read by the gentleman from South Carolina, [Mr. Rhett,] and subsequently by the member from Alabama, [Mr. Belser,] I may here be permitted to be brief, and to content myself with stating simply the conclusions to which history irresistibly leads. Not to go father back in point of time, it is sufficient to state that in the thirteenth year of the reign of Charles II, an act of Parliament was passed abridging the right of the people peaceably to assemble and petition for a redress of grievances. This act created great and universal dissatisfaction among the people, in prohibiting them from assembling, preventing their petitioning, and punishing with incarceration all who attempted its infringement. The oppressive operation of the riot acts being sensibly felt in this country about the time of the formation of the constitution, and the obnoxious statute of Charles II being still of force here, led to the adoption of the first amendment of the constitution.

"*It was the right of the people to assemble and petition*" which they held most sacred, and to the invasion of which they seemed most strongly opposed. It was this subject, and not the reception of petitions, that elicited the thrilling eloquence of Fox to which the gentleman from North Carolina alluded. It was his opposition to "the proclamations of 1795" against seditious meetings. It was because the liberty to assemble was considered the more important right, that Fox contended for it, instead of for the reception of petitions; and not for the reason stated, that the "proposition to receive petitions was never at that time disputed." Let me tell that honorable gentleman, and also the member from New York, [Mr. Beardsley,] who stated that Parliament never rejected petitions, that the "proposition was at that time never disputed" that Parliament possessed of, and exercised fully the right of receiving or rejecting petitions at pleasure.

But the gentleman from Massachusetts, [Mr. Winthrop,] not content with mere assertion, has endeavored to sustain the position by reference to authority.

But although assertion, in matters of law or precedent, is the feeblest and most unsatisfactory aid which can be invoked, yet, from the result of his effort, it is but too perceptible that those who preceded him, and who relied upon assertion alone, pursued at least the more politic and prudent course.

After a laborious search (I have no doubt) through Hatsell's work upon parliamentary precedents, he has succeeded in discovering a single sentence which seemed to sustain his point; and it is not surprising

that he should have grasped at it with the avidity which he manifested, and to have desired for it the enviable distinction of a golden inscription upon upon the pillars of this hall. This sentence, the mere dictum of the author, is in opposition to the practice of Parliament, as manifested in almost every page of the work, and contradicted even by the sentences which immediately precede and immediately follow it. (Mr. S. here read the passage relied on by the gentleman from Massachusetts, and the ones immediately before and after it.)

By the preceding sentence, then, the "practice of refusing petitions" is clearly acknowledged; whilst, by the subsequent one, the "declining to receive a petition" is "not considered as a hardship."

From a hasty examination of the work introduced by the gentleman from Massachusetts himself, (and as to the merits of which I will not dissent from the high eulogium he has pronounced upon it,) I find a continued practice of rejecting petitions not confined to the period referred to by that gentleman—1668; but extending from that time down to 1795, commencing Hatsell, p. 166, as follows:

"9th April, 1894, petition against duties on tonnage rejected.

"28th April, 1698, petition against duties on pit coal rejected.

"29th and 30th June, 1698, petition against duties on Scotch linens and whale fins rejected.

"5th January, 1703, petition against duties on malt liquor rejected.

"21st December, 1706, *Resolved*, That the house will receive no petition for any sum relating to the public service but what is recommended by the crown.

"11th June, 1713, this is declared to be a standing order of the house.

"23d April, 1713, *Resolved*, That the house will receive no petition for compounding debts, &c.

"25th March, 1715, this is declared the standing order of the house.

"8th March, 1732, a petition being offered against a bill depending for securing the trade of the sugar colonies, it was refused to be brought up. A motion was then made that a committee be appointed to search precedents in relation to the receiving, or not receiving, petitions against the imposing of duties; and the question being put, it passed in the negative.

"28th January, 1760, a petition against duties on malt liquor being offered, on motion 'that it be brought up,' it passed in the negative, *nem. con.*

"15th February, 1765, a petition from Virginia, Connecticut, and Carolina, against the bill imposing a stamp duty in America being offered, upon question of its 'being brought up,' it passed in the negative.

"On the 1st July, 1789, a petition of newsmen against a bill for granting additional stamp duties on newspapers, being offered, it was passed in the negative.

"On the 4th of March, 1789, a petition of certain importers and dealers in foreign wines, praying against an augmentation of duties, on motion 'that the petition be brought up,' it passed in the negative, *nem. con.*"

I am authorized, then, in stating, that Parliament was not only in the practice of rejecting petitions, but, by resolution, of excluding whole classes of them; and that, too, upon the matter of taxation—of all others the most important to the subject, and one upon which the right of petition should be held most sacred.

The course proposed to be pursued by the opponents of the rule, viz: that of receiving all petitions, is not sustained by parliamentary practice; but as we are referred by the gentleman from New York, [Mr. B.] "for instruction to England"—(instruction in humanity and liberty, I suppose,)—let us look beyond the acts to the motives of Parliament. Let us see how the reasoning of the opponents of this rule corresponds with that of Parliament in the rejection of petitions.

Hatsell, page 206, after laying down the rule by which petitions were rejected, states: "The principle upon which this rule was adopted appears to be this: that a tax extending, in its effect, over every part of the kingdom, and more or less affecting every individual, and in its nature necessarily and intentionally imposing a burden upon the people, it can answer no end or purpose whatever, for any set of petitioners to state these consequences as a grievance to the House." Now, how do the opponents of this rule reason? An institution (slavery) "extending in its effect" not beyond the slaveholding States, "affecting" no one out of those limits, and

in its nature "imposing" *no* "burdens upon the people," yet it *may* "answer" an "end" and a "purpose" for "a set of petitioners to state" the institution "as a grievance to the House." Again, in the next sentence, "the House of Commons, before they come to a resolution which imposes a tax, cannot but know that it may sensibly affect the commerce or manufacture on which the duty is laid; but they cannot permit the inconvenience that may possibly be brought upon a particular branch of trade, to weigh with them when put in the balance with those advantages which are intended to result to the whole, and which the public necessities of the state demand from them." How, in this regard, do the advocates of reception reason here? That Congress cannot but know that slavery, which does *not* "sensibly affect commerce or manufactures," nor impair *any* "particular branch of trade," yet *will* permit the fanaticism which alone opposes it "to weigh with them, when put in the balance with those *advantages which are intended to result to the whole, and which the public necessities of the state demand of them.*"

In other words, the opponents of this rule reason that, in England, although the petitioners are burdened with taxation even to poverty and want, *their petitions must be rejected*; while in America, where petitioners are burdened with nothing but their own sickly sensibilities, their *petitions must be received*, notwithstanding they pray for the destruction of a constitution from which they derive unparalleled liberty and happiness. And what is still more strange, the rejection of the former (according to the position of the gentleman from Massachusetts) is no infringement of the right of petition, while a rejection of the latter is a total annihilation of this great "inherent and inalienable right."

The most objectionable feature of this "odious rule," (as he is pleased to term it,) the gentleman from Massachusetts thinks, is that which undertakes "to prescribe the subjects upon which the people may or may not petition." This feature he denounces as being "at war with the constitution, and in opposition to all parliamentary rule."

The rule contended for only prescribes that petitions aimed against the constitution shall not be received. That such a feature is not at war with the constitution, I will soon attempt to show; but at present, while upon parliamentary practice, I would inquire whether such a feature, even to the extent for which the gentleman contends, is "in opposition to all parliamentary rule." Not to proceed farther, the very parliamentary rule to which I have had occasion to refer provides that *petitions against duties shall not be received*. Now, I ask the gentleman from Massachusetts whether that is not an undertaking, on the part of Parliament, "to prescribe the subject upon which the people may or may not petition."

[Here the Speaker announced that the morning hour had expired.]

### JANUARY 30.

The report of the Select Committee on the Rules again coming up—

Mr. STILES resumed and concluded his remarks, as follows:

When I last addressed the House, before concluding, I had shown, by reference to Hatsell's parliamentary Precedents that petitions against taxes were rejected by Parliament. Now, sir, as we are referred to England for the rule of our conduct, upon what principle was it that petitions against taxes were always rejected in England? It was that taxes were necessary for the support of government. But I ask, sir, if nothing besides taxes are necessary for the support of government? Are not national faith and national honor necessary for the support of government? Can any government in the world last a moment without them? Can dollars and cents be placed in the scale against faith and honor? Are not the faith and honor of the nation pledged upon the subject of slavery? Would the slaveholding States ever have entered the Union—would our southern fathers ever have signed the constitution, unless their rights had been secured by that instrument? Will not that Union be dissolved, whenever the government shall, instead of protecting, plunder them of their property? Yes, sir, slavery and the constitution have flourished together; their existence is the same, and inseparable; and if folly and madness shall destroy the one, the other will follow it to the tomb. But to return to the argument from which I have deviated, to reply to the gentleman from Massachusetts. Parliament, I have shown, were in

260    APPENDIX TO THE CONGRESSIONAL GLOBE.    Jan. 1844.

28TH CONG.....1ST SESS.    *Abolition Petitions—Mr. Stiles.*    H. OF REPS.

the constant practice of rejecting petitions. The intelligent framers of the constitution were familiar with this fact; and in guarding our country against the evils of such legislation as the riot acts, in protecting the great right of petition, their omission to provide that petitions should be received, is evidence irresistible and conclusive, that the reception of petitions was never intended to be embraced in the amendment, or comprehended under the right of petition. According to the letter of the constitution, this rule is not a violation of that instrument, because no law is passed or contemplated. According to its spirit, it is not violated, because the object of the amendment was simply to prevent the passage of such acts as those of George 1st, and Charles 2d; and because the practice of rejecting petitions was common in England, familiar to the authors of the amendment, and not provided against by them. It is not a violation of the constitution, then. Is it a violation of the right of petition? But, instead of searching the constitution, in order to ascertain what are the rights of petition, strange to tell, we must, as the gentleman from New York says, throw the constitution aside, and go back to England, to the British Parliament, to the bill of rights, which grew out of the revolution of 1688. A citizen of America, the freest country in the world, (as the gentleman from North Carolina observed,) run away from his own country, and flee to England for his freedom! I leave the gentleman from New York to reconcile himself with the gentleman from North Carolina, his associate in feeling on this subject. I leave him to explain to that member how it is that a citizen of the freest country in the world can throw aside the constitution of his country, and seek a cover for his rights, a shelter for his liberties, behind the acts of a British Parliament.

But why should we go back for instruction to England? as the gentleman from New York said. Is there any analogy between either the government or the people of England and our own? In England all power is in the government. Here it is in the people. There the Parliament, humanly speaking, is omnipotent. Here, our Congress is limited in its powers to a few specified subjects, marked out and defined by a written constitution. In Great Britain, the sovereign holds his office independent of the people; and so do the members of the House of Lords. If arbitrary and unjust laws are instituted by the government, the people, however unanimous against them, have no remedy but in an humble petition for their abolition. Here the members of the government are directly responsible to the people, hold their officers subject to the popular will, and, if unfaithful to their trusts, they are turned out, and more faithful servants chosen in their places. It results, therefore, that whilst, in monarchical governments, the right to petition the rulers is the highest, or ultimate right of the subject in securing him from molestation at the hands of his government, here the right dwindles into comparative insignificance; being only a right to petition our own servants to do that which we may command them to do, or discharge them for not doing. In short, in England the people are *listened to only* when they speak in the humble tone of *petition.* In America they *will be heard,* through the authoritative voice of *instruction.*

What does this right of petition embrace? What would they have? The right peaceably to assemble. Do we propose to disturb that right? No. The right to prepare a petition. Do we propose to prevent them? No. The right to present that petition to this body. Do we oppose that right? No, sir, the question has not been fairly met. Gentlemen argue as though we denied the right of petition. We make no such denial. We are as warm advocates of the right of petition as any persons on this floor. We know the importance of that right, and would not touch it. We are willing that gentlemen shall exercise the right to as full an extent, at least, as it is enjoyed in England, (for that seems to be the summit of their ambition;) but we come to issue with them as to the limits and extent of that right. What are the limits and extent of that right? There must be some point at which the right of petition ends, and that of legislating by this body commences. Where does the right of petition end? Just where that of legislation commences. Legislation cannot go back and interfere with petition; nor can petition extend forward and interfere with legislation. The right of legislation commences the moment the House is informed of the petition. If they have a right to go one step farther, and say we shall re-

ceive, they have just as much right to say we shall refer, and we shall grant. The action of the House —the right of legislation—commences with the presentation of the petition; and the refusal to accept is no interference with that right. We do not propose to interfere with their assembling; we do not dictate the manner in which they shall prepare a petition, or how they should present it to this body. But, when they have assembled; when they have prepared the petition; when they have presented it to this House, when, in short, their right has been fully exercised and completely exhausted,—then it is that our right commences: and, as we have not interfered with them, we should not permit them to interfere with us, to usurp the legislative powers fo the country, and dictate to us the mode and manner in which our duties shall be performed.

But, (says the gentleman from North Carolina,) the petition should be received, "in order to know what it is the petitioners want." We undertake, (says the member from Maine,) by the refusal of the petition, "to prejudge the case," and "condemn them unheard."

Here is another step where gentlemen reason unfairly. They assume, as a starting point upon which to found an argument, that we have never seen, read, or heard the petition. Now, sir, if this be reasoning, gentlemen have forgotten the very first rule in logic. They have failed to prove their premises. Is it true, in point of fact, that we are unacquainted with the objects of the petition? Is there a member here who can rise in his place and say that he does "not know what the petitioners want?" Have they not been presented beyond number for years past? Has not Congress heard, considered, discussed, and determined, that they cannot entertain jurisdiction of the subject? And yet it impairs the great right of petition, it treats the applicant disrespectfully, for Congress, by this rule, to assert that they have heard and determined that they have no jurisdiction over the subject. Will gentlemen inform me upon what principles such an answer— the judgment of the House as to its jurisdiction (for that is the whole sum and substance of the rule)— can be construed into disrespect towards the petitioners?

Let gentlemen consider such conduct, if it had occurred in private instead of public life. An individual presents you with a petition to-day, and you inform him that you have no power to grant his prayer; to-morrow he renews his application, and receives the same answer; but, not satisfied with refusal after refusal, he continues to harass you with his applications, until, at length, worn out by his importunities, you adopt a rule that you will not, in future, receive his applications; will any one, the most fastidious, say that the adoption of such a rule is treating the petitioner with disrespect? But step above the walks of private life, and enter the places of power: and is the principle of action changed? Visit your courts of law: you find a plaintiff has brought an action for an amount, or of a nature, beyond or out of the jurisdiction of the court. A plea is filed: what is the reply of the judge? The court has no jurisdiction of the case. Has such an answer ever been considered as disrespectful? Go still higher: enter the courts of chancery. A complainant has filed a bill which, taking every word of it to be true, presents no case for relief; a demurrer is offered by the defendant, which, admitting all that the bill alleges, denies his right to come into court; and the chancellor sustaining the demurrer, dismisses the complainant without proof or inquiry. Has such a course ever been deemed as wanting in respect? and is the legislative power of the country to be stripped of a like authority? This rule is in the nature of a simple plea to the jurisdiction or demurrer in chancery; and can no more be coupled with disrespect than either of those modes of judicial proceeding.

But "we prejudge the case." "We condemn them unheard." What do gentlemen mean? Am I to understand that the petitions have never been read? They have been read over and over again, whilst before the question of reception is put, the petition can always be read upon the call of any member of the House. Is it meant, by not being heard, that these petitions have never been discussed? They have been discussed in this hall to the fullest extent for weeks, and even months, whilst the question of reception not only admit discussion, but admits it in the most ample manner.

Gentlemen argue as though we had no right, for any cause, or under any circumstances, to reject a petition. Is the right illimitable? Are there no

bounds to its exercise? If so, we might as well stop business. If the undefinable grievances of every man, woman, and child—white, black, or particolored, throughout our widely extended country, whose digestive organs may have become impaired, and who has therefore "the thousand ills that flesh is heir to," to complain of; if the conceits of every fanatic or fool, when embodied in the form of a petition, are entitled, on that account alone, to consideration and respect—we might devote our whole time of legislation to petitions alone; we might remain here from one year's end to another; we might sit from morn to night, and night to morn, and our labors would never know an end. The right illimitable? Is every petition, however disrespectful to this body, to be received? Is there any one who, in his zeal for the freedom of petition, goes that far? I presume not. There is, then, some limit to that right. We have the power to reject; the right to refuse is conceded. And is not this rejection an abridgment of the great right of petition? Oh no! And why? Because it would be an interference with the dignity of our honorable selves, and be perhaps an interruption of the business of this House. This great inherent and inalienable right cannot stand, then, when brought into contact with our dignity or our business. These are to be rejected; but all others are to be received. These petitions may be as disrespectful as their authors please, to our constituents or our States; but so as they do not touch our noble selves, they are to be received. They may treat with contempt the constitution of the country, and trample on its chartered rights; but so as they do not impede our business here, they are to be received. From whence did we obtain our dignity? Are we in a monarchical government, and was it born with us? No, sir. It was derived from the people; yet we would reject a petition here, disrespectful to ourselves, who are the *servants;* but receive one insulting to, and defamatory of, the people, who are the *masters.* Whence do we derive our powers of legislation? From the constitution; and we would reject a petition impeding our legislation, and yet receive one violative of the constitution, from whence all our powers of legislation are derived, and upon which the welfare of the country depends. The right illimitable? Then where the necessity of that rule of this House which makes it incumbent on the introducer to give a statement of the contents of the petition? Where the necessity of a statement, unless its object be to determine whether or not Congress has jurisdiction over the subject. If there be no discretion, where the necessity of that other rule which requires the question of reception to be put. Where the necessity of a question at all, if we are prohibited from voting, or answering in the negative.

The right of petition involves two considerations: 1st. The right of the citizen aggrieved to petition: 2d. The power of the government over the subject of the petition.

1. Then the citizen must be *aggrieved,* before he can petition.

The only petitions excluded by this rule are those upon the subject of slavery. Is a majority of this House prepared to pronounce slavery a grievance? Can an institution recognised and secured by the constitution be a grievance? Are they prepared to pronounce the constitution (for it is the constitution) a grievance? Was it the intention of the constitution to entail grievances on the people? The same constitution which guaranties the right of petition guaranties the existence of slavery. Both rights are equally secured by the same high authority. Can one portion of the constitution be used to destroy another? Could the framers of the constitution have been guilty of such an absurdity as to have given the people a right to petition against the instrument which they had formed for their welfare and happiness? Can they be chargeable with the folly of creating and sanctioning a grievance, when they have conferred the right of petitioning against such evils? In short, can anything in the constitution be considered such a grievance as the people are allowed to petition against? No, sir: by no sane and unprejudiced man can the existence of slavery be considered a grievance in the contemplation of the constitution.

But again. *Whose* grievances does the constitution contemplate should be the subject of petition? Certainly those of the petitioners—the grievances of the petitioners *themselves,* and not those of any other body or person. Will any gentleman on this floor attempt to show how slavery at the South is a grievance to the people of the North. How can

Jan. 1844.  APPENDIX TO THE CONGRESSIONAL GLOBE.  261

28th Cong.....1st Sess.  *Abolition Petitions—Mr. Stiles.*  H. of Reps.

hey ask us to consider as a grievance that which those who are alone concerned neither know nor acknowledge? There are those, doubtless, at the North, if not in this hall, who look upon slavery in the abstract as an evil; but is it therefore a grievance? I call upon any constitutional lawyer on this floor, and more especially the strict constructionist, to say that it is such a grievance as was contemplated by the authors of the 1st amendment of the constitution,

2. The power of the government over the subject of the petition.

What is the object which petitioners profess to have in view in the presentation of petitions? What is the *end* to be attained, and upon which Congress can alone recognise their right of application? *It is redress.* And a grievance which Congress has no right to redress, they have no right to petition against; because grievances which Congress *can* redress are the grievances, and the only grievances, contemplated in the amendment.

Now, if there is a single constitutional principle which, more than any other, may be considered as settled beyond the possibilty of dispute, it is that the institution of slavery is municipal, not national. It belongs exclusively to the States, and can only be effected by State legislation.

This domestic institution of the South with her; secured by the compact which makes us one people; and he who looks upon it as a grievance is an enemy to the constitution, and opposed to the peace and prosperity of our common country.

I have thus attempted to show that slavery is not a grievance. If it were a grievance at all, it is not one affecting the people of the North; and that, if it were a grievance affecting the people of the North, it is not one which can be redressed by the government; and therefore no one has a constitutional right to petition for its abolition. A petition to any person or authority presupposes the power of relief. A right of petition cannot exist where there is no duty to hear the complaint; and the duty to hear cannot exist without a commensurate power to redress. There is, then, no duty to receive a petition upon which Congress has indisputably no power to act; and the refusal to receive such petition cannot be tortured into a violation of the right to send it, which never existed.

Many points have been made on this question which I could have desired an opportunity to have met, but which, under the operation of the hour rule, I am reluctantly constrained to omit. Were it not for this abridgment of my great inherent and inalienable right, "freedom of speech" and of debate, I should have made it my duty to have replied to every suggestion which has been advanced; for there is not one, which I have heard, which could not, in my opinion, have been easily and triumphantly answered. But although deprived of this great right, I shall not, like some gentlemen on this floor, flee to England for my right, or, like others, speak of dissolving the Union. I will not even waste my important time in the indulgence of complaint, but with all possible despatch proceed to answer such as I conceive the most important suggestions.

It is said on this floor, "let the petitions be received, and they will vote with us for their rejection immediately after reception." To such I say, there is one point in which we agree; and that the most important of the whole matter. It is in the refusal or denial of the prayer of the petition. Reception is all that divides us. But I ask, does not reception carry with it jurisdiction over the subject-matter of the petition? Does not reception carry the implication, inevitably, that the petition may or may not be granted? Reception either carries the implication, or it does not. The proposition must be answered affirmatively or negatively. If it be answered affirmatively, if the reception carries jurisdiction over the subject of slavery, if it carries the implication that the prayer for its abolition may or may not be granted, are they willing to stand forth as the advocates of reception? Clearly not; because, in the outset, they agree that the prayer could not be granted, because, if Congress *would*, she *has not* the power to grant it. If, then, reception carries jurisdiction, they are opposed to it. If, on the other hand, the proposition be answered negatively, if reception does not carry jurisdiction and the implication that the prayer may or may not be granted, where is the use of it? Where the difference between reception, and instant rejection after it is received? What is to be gained by reception? Is it any advantage to

the petitioner that his prayer is rejected immediately *after*, instead of immediately *before*, reception. How does the simple, naked vote of reception benefit him? The prayer of a petition is its vital part; take away the prayer, and you deprive it of all vitality—make it a dead letter. If, therefore, we reject the prayer, do we not reject the petition? The distinction is too refined and abstract for a question of such universal and vital importance. It is but a dispute about terms, and wholly overlooks the substance. It is at first and at last a rejection of the prayer of the petition; but a refusal of the petition is a rejection in a mode to save time and money, put an end to such applications, and prevent discussions dangerous to the Union.

The gentleman from New York has admitted that when petitions asked Congress to interfere between master and slave in the States, they stood on ground prohibited by the constitution; but went on to argue that petitions should be received when they asked an abolition of slavery in the District, because "Congress had full power to abolish slavery in the District of Columbia." "They may pay the master or not, but they can take the slave compulsorily from him." I have not the time, if I possessed the inclination, to argue this point. It does not necessarily arise in meeting the question upon which gentlemen have laid most stress in the debate—viz: an abridgment of the petition: but, as the opinion is asserted with so much confidence, and in such wild terms, I will throw out a few difficulties in the way, which have occurred to my mind, and which I think are calculated to stagger any reflecting man. "Congress may pay the master or not, but it can take compulsorily the slave from him;" and the only authority for this sweeping and despotic declaration is simply that clause which gives to Congress "*exclusive* legislation" over the District. Sir, did the cessions by Virginia and Maryland of portions of their respective territory to Congress to constitute the District, remove the inhabitants of those portions beyond the guaranties of the constitution? Clearly not. How, then, does the gentleman propose to get rid of that portion of the 5th amendment of the constitution, which provides that "no person shall be deprived of life, liberty, or *property*, without due process of *law;* and that private property shall not be taken for *public use without due compensation?*" That the legislation of this hall is not a "process of law" will not be disputed, and it is equally clear that slaves are "property;" they are recognised as property by the constitution, claimed as property by our treaties with foreign powers, and considered as property by our acts of legislation. Again "private property shall not be taken (except) for public use." It would be somewhat difficult, I apprehend, to establish that the emancipation of the slaves of this District would be for the "public use," and benefit; and should they be so considered, could they be taken "compulsorily" from the master "with or without paying" him, as the gentleman from New York says? No, sir, not "without due compensation." And when the member has disposed of these difficulties, under what clause of the constitution will he derive funds to be appropriated to such an object? We are told that "Congress has exclusive legislation over" the "District;" but does "*exclusive*" mean unlimited—"*absolute?*" as the gentleman from Massachusetts, [Mr. Hudson] says? From what dictionary or other source did he learn that "*exclusive*" meant "*absolute?*" And yet it must not only signify absolute, but also despotic power, or the position of the gentleman from New York falls to the ground. But how will any reasonable man (not to take a constitutional lawyer) construe that clause? It means, and can be made to signify nothing more than a grant of legislative power over the District to the exclusion, "in all cases whatsoever," of any concurrent jurisdiction. If this most palpable construction needed support, the history of the clause would amply furnish it. That clause of the 8th section of the 1st article was not comprised in the original draft of the constitution, but it was afterwards supplied, when its necessity became apparent, from the circumstances which occurred during the latter part of the revolutionary war, when the proceedings of Congress were disturbed by a turbulent mob, which the police of Philadelphia being unable to subdue, compelled that body to remove its sittings to Trenton, New Jersey. That power was conferred for the single purpose of enabling Congress to protect its members from insult and violence, and to conduct, without interruption, the deliberations of this country. From whence did Congress derive its powers of legislation over this District? From

the constitution, together with the "cessions of particular States." Could the cessions of territory by particular States have enlarged the powers of Congress under the constitution? Surely not. How then can she now presume to abolish slavery? The power of Congress over the subject of slavery is fixed by the constitution. It has no power whatever over the subject, and cannot touch it, whether the slave be found upon the soil of a State, or that of the District of Columbia. From what States was the "ten miles square," which now constitutes the "seat of government," derived? Virginia and Maryland. It is a self-evident proposition, as well as an established principle of law, that a grantee can acquire no more power than a grantor could convey. The States of Virginia and Maryland themselves, it cannot be disputed, could not have liberated, without the consent of their owners, the slaves of this District, when the territory was parts of their respective States. And how then can Congress, deriving her power from them, claim or exercise more power than the States which ceded the territory ever possessed? But those States, unwilling to rely upon the general principle just alluded to, and apprehending the very danger which now threatens the rights of the inhabitants of this District, prudently inserted in their acts of cession the following limit to the exercise of power by Congress over the District:

"*Provided*, That nothing herein contained shall be construed to vest in the United States any right of property in the soil, or to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States."

But there are other principles which should govern legislators in this matter—principles of higher authority and obligation than even those of the law and constitution. I mean the great principles of justice and moral right.

Would the States of Virginia and Maryland ever have consented to relinquish portions of their territory for such purposes as those for which gentlemen now contend? Would the independent citizens of "free and independent States" ever have agreed to have exchanged a legislation over their personal rights, by representatives chosen by, and responsible to them, for the exclusive legislation of a Congress irresponsible to them, if they had supposed that such jurisdiction was to be unlimited, "*absolute*," and liable to be directed by the petitions of others, who had neither a common residence nor a common interest with them? Does any one believe that, if the federal government had intimated an intention to abolish slavery in the District, the States of Virginia and Maryland would ever have ceded their territory? And is not such an attempt now in bad faith, against the spirit of the compact, and a gross violation of the understanding which must have subsisted between the parties to the cession? But, if I were disposed to argue this point, I should need nothing more than the admission of the gentleman from New York, that "Congress cannot interfere with slavery in the States." Will not the abolition of slavery in this District be an interference with slavery in the States? Not to take into consideration the real object which the abolitionists have in view, in their designs upon this District, as but an entering-wedge for the abolition of slavery throughout the States, as but the commencement of an enterprise which will terminate only with entire emancipation,—not, I say, to consider these objects, will it not "interfere with slavery in the States" to abolish here? Will it not inevitably produce discontent and rebellion among the blacks of the neighboring States, and make this District a den of fugitive slaves? Yes, sir, the truth cannot be suppressed, that if slavery is touched here, a blow will be struck which will be felt throughout the length and breadth of the slave-holding States.

These suggestions, thrown out for the consideration of others, are but some of the difficulties which have presented themselves to my mind, in the way of any exercise of power over the subject of slavery in this District; and I humbly ask that, if they are not of sufficient weight to convince us of our want of power over the subject, whether they are not calculated at least to create doubts as to its possession? And what, under such circumstances, has been held the safe and unerring guide for the conduct of the legislator? It is, that if there be doubt as to the power, it should not be exercised. *Quod dubitas ne feceris.* What you doubt, that you may not do. The possession of power should be untrammelled by a single doubt, or you should not attempt its exercise.

262 APPENDIX TO THE CONGRESSIONAL GLOBE. March, 1844.

28TH CONG.....1ST SESS.      *Rhode Island Memorial—Mr. Kennedy.*      H. of Reps.

But (says the member from Maine, and it is reiterated by the gentleman from New York and others) separate the right of petition from abolition, and "see how we will come up to the mark; how we will sustain our obligations to the Union." Sir, the right of petition and abolition ought never to have been blended. To connect them is a mere trick—an artful scheme to excite the sympathies and delude the judgments of this legislative body. And who, pray, are the authors of this base trick? Who the projectors of this artful scheme. Who connected the right of petition with abolition? Are we at the South, the slaveholding community, subject to the charge? It will not be pretended. It will not be presumed for a moment that we would throw any obstacles in the way, and create interference with the maintenance of our just and constitutional rights. Are our friends of the North, the anti-abolitionists, chargeable? Surely not. They deprecate the difficulty; they pray deliverance from the embarrassment; and we have no reason to question their sincerity. If neither the South nor those opposed to abolition in the North, are the authors of this scheme, who are? There is but one other party in the country upon this subject, and it results inevitably that they are its authors—viz: the abolitionists themselves. I appeal to our intelligent and reflecting friends from the North—I put it to them, whether they will suffer themselves to be thus entrapped; caught in the snare set for them by these fanatics; deluded by this miserable subterfuge, the pitiful cry of the violation of the right of petition. But it has already been hinted, and I may be answered, that though this may be but a trick, yet the abolitionists have so fully succeeded in poisoning the minds of our constituents, so thoroughly and extensively have they persuaded them that the non-reception of their petitions is a violation of their unalienable rights, that unless we carry out their views, the relation between us, of representative and constituents, will be dissolved. Sir, such a suggestion scarcely deserves a passing notice. Any man who legislates here with a view to get back into this hall, will of course not be guided by reason. Such a member is unworthy of his station, because he legislates for himself, and not for his country. Their constituents think the right of petition abridged, when we are daily receiving petitions without objection, over which Congress has jurisdiction, and reject only those over which Congress has no control. Cannot they understand the difference between the abuse and use of an important right? The same amendment which guaranties the right of petition, guaranties also freedom of speech and of the press; and because those rights are secured, is there therefore no such thing as slander or libel? If their constituents cannot now be brought to understand the difference between a proper and an improper petition, upon a subject of which Congress has cognizance, and one where it has no jurisdiction, how is it proposed to make them understand the difference between the rejection of a petition and the rejection of the prayer of a petition? How can they be made to comprehend how it is that a petition is of so much consequence as to be received, and is yet, at the same time, of so little consequence as to be rejected? I trust that our friends of the North will not suffer themselves to be alarmed by the delusive cry of a "false issue" being made, or be deterred from pursuing their true course for fear of consequences which do not and ought not legitimately to follow.

The gentleman from North Carolina has attempted to illustrate this matter of "false position," by a "simile of a battle." Let me tell the gentleman that he has himself assumed, in the outset, "false positions;" and, in some cases, false characters for his parties in that battle. He represents a general to have taken a position with his own troops behind a secure breastwork; but has stationed his allies on exposed ground, where they are rapidly falling by the enemy's fire. The secure breastwork is the constitution, I suppose. But where, I ask, are the allies—where the exposed ground? Who are the contending parties in this engagement? The enemies and the friends of the constitution? The gentleman can make no other answer. Who are the enemies? Of course the abolitionists. Who are the friends of the constitution? The anti-abolitionists. Where, then, are the allies? Are the anti-abolitionists of the North any less the enlisted soldiers and interested defenders of the constitution, than we at the South? Surely not. Where he exposed ground? We are behind the breastwork, (as the gentleman considers the constitution.)

Have we pushed our friends of the North beyond that constitution? or are they beyond, and in any exposed situation? No, sir; we both stand together upon the same ground—the battlements of the constitution. The enemy—the abolitionists—are alone without; they are striving to enter the citadel, slavery is the weak point in the fortress. It is there they design a breach. We have there constructed a barrier: that barrier is the rule. Whilst that remains, the fortress stands. When it is gone, the fortress falls. That barrier can be removed only by some one within. The fortress can be taken, the citadel lost, only by treachery in the camp. I will pursue the simile no farther. But let me tell the member from North Carolina, that if this rule is lost, from the relation in which he stands to, and the part which he has borne in this transaction, he may go home to his constituents, and to his grave, covered with the unenviable immortality of having betrayed the interest of the South, in having surrendered the constitution of his country.

I hoped to have had time to have commented upon the motives of these abolitionists. But whatever they are—whether to destroy the institution of slavery, or, by their petitions, only to annoy and insult the South—will not the rejection of this rule by the House be to them a triumph? No one can dispute the point. Are not the abolitionists the enemies of the country? No one will deny the assertion. Are our friends in the North willing to contribute to accomplish the triumph of the enemies of the country; and especially when their victory would be over the constitution of the land, the liberties of the people? Sir, let me tell gentlemen of the North that on this subject there is no neutral ground. There are but two parties in this contest—the friends and the foes of the constitution. They must take sides with one or the other; and wherever their influence settles, victory must perch upon that banner. The whole responsibility is with the North. Let them not shrink from their high destiny; let them glory in the occasion; let them meet it like men; let them do their duty, and leave consequences to take care of themselves.

Sir, will gentlemen hesitate? Is this a time for hesitation, when the government is agitated to its very centre? Is this a time to cavil about terms, when the foundations of the nation are shaken? Is this a time to make hair-breadth distinctions about the extent of rights, when our very days seem numbered? I tell gentlemen of the North, the South is in danger; and will they hesitate? Was such the conduct of the South when the North was in danger—not from a feeble band of fanatics, but from the most powerful nation of the world? Sixty-eight years ago, when the report of the musketry at Lexington gave token of the danger of our brethren of the North, a cargo of powder was captured off Savannah, by Georgia enterprise and Georgia valor. Was that ammunition, at the time so scarce in the country, retained at home to await the arrival of the enemy on our own shores, and to defend our own firesides? No sir; I am proud to say, that with that disinterested patriotism which has ever characterized the South, it was immediately shipped to Boston, and it arrived in time to thunder from the heights of Bunker's hill defiance to oppression.

And in our late war, waged for "free trade and sailors' rights," did the South stop to inquire whether the owners of the ships, or the impressed seamen, were natives of a southern latitude? No; it was enough for them to know that the flag which had been dishonored, was the American flag; that the seaman who had been oppressed was an American citizen; and they were at their posts, and ready to lose their last life drop for the protection of the one and the defence of the other.

Sir, the people of the South love the Union. They venerate the constitution as the bond of that Union, and will be the last to engage in its infractions. But they love the constitution as *it is*; as it was construed by those who made it; as it has been approved by near half a century's successive legislation—sufficient for all the purposes of our government, and all the glory of our country. But now, if the North, regardless of the claims of the South, will suffer that instrument violated—if the constitution, like the right of petition, is of so much consequence as to be preserved when for their gratification, and, at the same time, of so little consequence as to be violated when for our destruction,—if the constitution is to be thus mutilated, depend upon it the South will not respect its mere fragments, scattered in the struggle of other States to

overthrow her institutions. If that hour should come, (which God in his mercy avert!) she will hesitate not to appeal from the cancelled obligations of a once-venerated constitution, to her own "inherent and inalienable" right of self-protection.

---

## SPEECH OF MR. KENNEDY,

### OF INDIANA,

*In the House of Representatives, March 13, 1844*—On the resolution authorizing the committee on the Rhode Island controversy to send for persons and papers.

Mr. KENNEDY addressed the House as follows:

Mr. SPEAKER: It is not my purpose to bring a railing accusation against the people or authorities, whether *de facto or de jure*, of the State of Rhode Island; but it is my privilege and my duty to speak with the freedom on this great question, that the magnitude of the principles involved, and the dignity of my position as a member of Congress, demands.

This is a question that strikes deep, and stirs the very foundations of many of the most cherished and inalienable rights of man. It is no less a question than whether the great fundamental doctrines of our declaration of independence are true or false—whether all just governments have their foundations in the consent of the government—or whether the people are mere chattels, to be made freemen or slaves, at the mere whim and caprice of those who have usurped the authority to dictate laws, without their consent, by which they are to be bound, until their usurpers, in the plenitude of their power, condescend to alter or amend them? Sir, when such questions as these are before an American Congress, he who blinks or slurs them over with honeyed words, and hasty action, is a traitor to mankind—is a degenerate scion of those noble sires who periled their lives to plant these principles at the foundations of our glorious institutions, which, by the care of the patriot and the blessing of Heaven, are destined to grow and spread, until they cover the earth as the "waters do the face of the great deep."

In the discussion of this question, then, I shall not use mealy-mouthed expressions; but shall speak my mind plainly, using such language as, in the presence of God and my country, I feel bound to do. It shall be my object, however, to avoid such expressions as may carry offence to the most sensitive ear.

The direct question before the House now is, whether the committee shall be discharged from the further consideration of the memorial. This motion is urged on the ground, first, that Congress has no jurisdiction in the matter; and secondly, whether, admitting the jurisdiction, it is expedient to act. As to this first objection, I must be permitted to say, I am utterly astonished at it, coming from the quarter that it does. What do those objectors do with the great original, unrestricted right of petition, for which they have heretofore so manfully contended? Or do they intend, by denying the reception and consideration of this petition, to admit to the world that they have been uncandid in their claims of the right of petition? Sir, petitions have been presented by these men, praying the abolition of slavery in and out of this District, signed by whites and blacks; petitions praying divorces; praying Congress to establish the true religion, and adopt, by enactment, the laws of God. All these petitions are claimed to be in the power of the House to receive and act upon; because, to refuse them, would violate the great fundamental right of petition. But, strange to tell, when a petition of the people of one of the States of this Union, praying Congress to interfere and prevent the army and navy—the powder and ball of this government, from being used to prevent their quietly forming "a republican form of government"—the which the constitution guaranties to every State in this Union,—then these vaunted champions of the right of petition object, for want of jurisdiction. What! do we want jurisdiction to inquire into the use made by the executive of the military power? If a sovereign State is invaded, may we not inquire why the hostile proceeding, and hold the President responsible for his conduct? Sir, in view of these things, who can doubt that there are those who are hypocritically clothing themselves with this right of petition, to conceal their treacherous mining under the very walls of republican liberty.

Whence comes this petition? and what does it declare? It comes from a highly respectable portion

290       APPENDIX TO THE CONGRESSIONAL GLOBE.       Jan. 1844.

28TH CONG.....1ST SESS.       *Abolition Petitions—Mr. Winthrop.*       H. of Reps.

And now, Mr. Chairman, I will only say that, in every aspect you may please to view it, the foreign commerce of the Cuyahoga district is far more entitled to the protection of this government than is the district represented by the gentleman from Virginia. And, sir, what has been the past action of Congress in regard to these districts? Why, sir, we have expended in front of Norfolk more than one million seven hundred thousand dollars, while at Cleveland, so far as I can learn, we have expended about one hundred thousand dollars.

It is not my intention to cultivate a feeling in favor of local interests or of local jealousy; but I ask, is this justice? Do you deal impartially with us? Are the favors of this government meted out with an even hand? Do gentlemen believe that the people of the West will continue silent under such flagrant partiality?

But some gentlemen appear to suppose there is scarcely any other State demanding attention or holding claims upon government than "Old Virginia." Why, Mr. Chairman, Ohio contains an agricultural people; our commerce is regarded as of secondary importance; yet, sir, in 1842, we built forty-nine vessels of the aggregate capacity of seven thousand nine hundred and four tons, while Virginia built twelve vessels of the aggregate capacity of 889 tons, being less than one-eighth part of the amount built by Ohio. I would make no invidious comparisons, but I may be pardoned for saying that, from the documents before us, it appears that during the year alluded to, Ohio built more tons of shipping than Virginia, South Carolina, Georgia, Florida, Mississippi, Alabama, Louisiana, Arkansas, Missouri, and Tennessee. Yet, sir, our whole State has received at the hands of this government for harbor purposes less than one-fourth part the money that has been expended at Norfolk alone, and about one-eighth as much as the Delaware breakwater has cost the nation. I desire it to be understood that I find no fault with what has been done for our Atlantic commerce; I complain of what has not been done for our lake harbors. The gentleman from Virginia talks of strict construction. I complain that his construction is too strict; it confines the appropriations too strictly to the "Old Dominion." I contend for such a latitude of construction as will extend our protection to the whole foreign commerce, at least. The "straight jacket" in which he speaks is altogether too straight for our interests; it binds the conscience of the wearer too tightly, I fear, to permit him to be just. I repeat, that we ask nothing for ourselves but what we are willing to grant to others. Beyond this we are not prepared to go. We would be just to ourselves as well as to others; and we feel as free to demand justice to the commerce of the lakes, as we are to grant it to the Atlantic. We were sent here to maintain the rights of our people, and not to yield them up; in the spirit of kindness and liberality to urge upon the consideration of this body that justice which is so obviously our due.

But, sir, I desire the attention of the committee to some few other facts, which may, perhaps, have some bearing upon the claims which we of the West desire to press upon the attention of gentlemen. During the year ending in the 1st day of October, 1842, there cleared from the ports of the United States, for Canada, one thousand three hundred and forty vessels, whose aggregate capacity amounted to 229,009 tons; on board of which were employed seventeen thousand eight hundred and eighty-eight men and boys. During the same period there cleared from our Atlantic ports for Great Britain, Ireland, and Scotland, two hundred and eighty-seven vessels, whose aggregate capacity amounted to one hundred and fifty thousand eight hundred and fifty-seven tons; on board of which were employed five thousand nine hundred and eighty-five men and boys. I mention these facts for the purpose of showing the comparison between the whole foreign commerce on our lakes and our whole Atlantic commerce with the United Kingdom of Great Britain, Ireland, and Scotland; and I will add that, during the period alluded to, there were cleared from the United States for the foreign ports of the whole world, 4,529 vessels, whose aggregate capacity amounted to 740,497 tons, and were navigated by 43,377 men and boys. Thus it appears that about two-fifths of all vessels that cleared from the United States during the year mentioned, for all foreign countries, were upon our lakes; and that our tonnage, and the hands employed in its navigation, bore about the same proportion to those engaged in our foreign commerce with the whole world; and yet, sir, is this commerce to be characterized as internal, and of no national importance? Are the vast interests connected with this commerce to be disregarded by us? Are the lives of the sailors upon those lakes entitled to no attention? I feel authorized in saying, that the time has arrived when the cry of "local interests," "internal improvements," and of "strict construction," in regard to our lake commerce, will no longer satisfy the members of either political party. They will no longer see their vessels wrecked; their property destroyed; their commerce ruined; their sailors drowned, for the purpose of gaining political partisan advantages. They demand of their servants here attention to these subjects, and no slight excuse will satisfy the people for future neglect.

There is, however, an evil connected with these appropriations that originates further back than the proposed reference to a committee. It is in the estimates made by the various departments and different bureaus. I refer particularly to the estimates for harbor improvements, for fortifications, and for the navy. Thus the whole estimates made by the topographical bureau for the lakes, rivers, and Atlantic, amounts to about $800,000; while those made out by the engineer department for fortifications are $1,400,000. This I regard as wrong. I regard the protection of the lives of our sailors and passengers to be vastly more important than the piling up earth and stone on various parts of the Atlantic coast, there to remain as so many monuments of our want of foresight, and to be visited in coming time as the curious remains of a dark and ignorant age.

These estimates for fortifications are twice as large as they should have been, while those for the improvement of our lake harbors are as much below what they should have been as the others are too high. Our harbors are of present and of constant use. They preserve our property, and protect the lives of our people now in existence. Our money expended on them returns its equivalent as soon as it is paid out. Not so with our fortifications. They can be of no

earthly use until our country shall become involved in war, which no one apprehends will take place during the present generation. Nor will they be of any possible use even in case of war, unless it be a war with the enemy who will invade our territory, which no man can apprehend. But should we become involved in a war with such an enemy, I doubt whether he would be likely to march his men within reach of the cannon in our forts, while he has the use of steam to land them at any point he may select. Yet we continue to expend millions of money to build forts as though we expected war, and that; too, with a nation who would dare to invade our territory, and at the same time possess the folly to march up before our cannon for the purpose of being shot. Sir, with less than a fifth-part of our present population, without arms, or the skill to make them, without ammunition, without an army, without a navy, without money, and without forts, we defended ourselves against the most powerful nation of the earth. But now, sir, in a time of peace, with no prospect of war with any nation, we pay out our money for forts and neglect our harbors, under the plea of being prepared for war.

I feel proud in repeating what I have heretofore said, that on our Ohio coast, embracing a distance of two hundred and fifty miles, we have never had a fort. In case of war with England, that coast would be more exposed than the same extent upon the Atlantic. Yet, sir, I would oppose any appropriation for fortifications in our State. I should regard money expended in fortifications there as money thrown away; they would be regarded as monuments of the cowardice and the folly of our people. Should we unfortunately become involved in a war with Great Britain, I feel that the people of our gallant State possess the patriotism and courage to defend our territory against any force that can be brought against us. Give us harbors to protect our property, and seamen in time of peace, and we will protect our soil in time of war.

As to this expenditure for fortifications, I have heretofore, in a former Congress, expressed my views. I repeat that they belong to the warfare of a by-gone age. They were fitted to the science of war as it existed prior to the discovery of steam, to the invention of railroads, and that vast improvement in the sciences and arts that ha given character to the age in which the live. But the day of their utility has passed, never more to return. They are hereafter to be regarded in the same light that we now look upon ancient citadels and baronial castles. Yet, sir, we adhere to this exploded system, and continue to appropriate our money to purchase sites for new fortifications, to carry on and complete those already begun, and to equip, arm and man those completed; as though we regarded them important to our national safety; while all the rest of the world look upon them as they do upon the armor used, or the coats of mail worn, in the thirteenth century.

But, sir, while the estimates for harbor purposes in the whole nation, as before remarked, amount only to $800,000, the amount of estimates for the navy are nearly $9,000,000. I regard this disproportion between the Lakes and the Atlantic as unjust in the extreme. Indeed, its injustice is so palpable that forbearance on the part of our western people ceases to be a virtue. Duty compels to open, frank, and determined opposition to such flagrant disregard of our interests. I submit to our eastern friends, whether justice to our people, or justice to ourselves, as representatives, will permit us to vote for appropriations so obviously unjust. Why, sir, I think I may safely say, that for the past five years, Ohio has paid one-twelfth part of all our public revenue; that one-twelfth of all the moneys appropriated for the navy and fortifications is drawn from the pockets of the people of our State. During this five years, our lake commerce has been totally neglected, while we have paid for the protection of the Atlantic commerce, and Atlantic fortifications, more than three millions of dollars—or more than seven times as much as we have received at the hands of this government, since our admission as a State into the federal Union. It is now proposed to expend, during the coming fiscal year, for the navy, for fortifications, and for harbors, say $11,000,000. More than $900,000 of this must come from the people of Ohio; and what proportion of this money is to be expended for the protection of Ohio commerce? Why, it is proposed to expend on the harbor at Cleveland $20,000. Besides this, there is to be sixty thousand dollars applied to all the other harbors on the lakes, to keep them in repair. What proportion will be expended in Ohio is uncertain, but I will estimate it at $30,000—making $60,000 to be returned to our people out of the $900,000 by them paid for those purposes. It is thus made evident that we pay for these purposes fifteen dollars to the federal government for each dollar proposed to be expended on our coast. But this is not the worst state of facts; for we have paid nearly the $900,000 for these purposes during five years past, but have not received one dollar in return for the improvement of our harbors. Yes, sir, during that period, we have paid our money to aid in building those magnificent ships now floating upon the Atlantic, to fit them out in princely style, and to send them to all parts of the world, to attract the attention, and to be admired by the subjects of foreign governments: while Congress has disregarded our rights and our interests, and permitted our lake shores to be strewn with the wrecks of our ships and the bodies of our seamen. Sir, shall this state of things continue another year? How long shall our people be compelled to witness the destruction of their property, the ruin of their fellow-citizens, and this vast annual sacrifice of life, while their money is drawn from them to support a splendid navy, to maintain an idle army, and to erect useless fortifications? I hope, sir, that the subject may be referred to the Committee on Commerce, who I believe well qualified to answer these interrogatories in a proper manner.

I fully concur with my colleague [Mr. Tilden] as to the committee to whom the subject should be referred.

---

### SPEECH OF MR. WINTHROP,
OF MASSACHUSETTS.

*In the House of Representatives, January 23, 1844.*

Mr. Adams's report from the select committee on revising the rules of the House having been taken up, as the orders of the day for the morning hour,

and the question being on the motion of Mr. BLACK of Georgia, to amend a motion to recommit the report, by instructing the committee to reinsert the following rule: "No petition, memorial, resolution, or other paper, praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave trade between the States or Territories of the United States in which it now exists, shall be received by this House, or entertained in any way whatever:"

Mr. WINTHROP said that it seemed to have been the fortune of the House to be employed, during no inconsiderable part of the time since the present session commenced, in discussing what they called first principles. For eight or ten days, not long since gone by, we were occupied with the consideration of that great writ of personal liberty, the habeas corpus. And, in the course of that discussion, doctrines were advanced, in some quarters of the House, to his mind not a little strange and startling, and upon which he desired at the time to have made some comments. But, in common with many other gentlemen better entitled to a hearing, he had attempted in vain to obtain the floor for that purpose. We had now been engaged, during the morning hour of many days, in a debate on a second great principle of civil liberty—the right of petition. And upon this subject opinions have been expressed, and positions maintained, which, in his judgment, were even more extraordinary and more startling, and from which he was glad of an opportunity to declare his utter dissent.

The idea (said Mr. W.) that the right of petition does not imply the right of having a petition received! the doctrine that the right of the people to apply to the government for redress of grievances does not involve any obligation on the part of the government to heed, or even hear, that application! the position which has been seriously maintained here, that all that was ever intended by the right of petition, was the right of individuals or of assemblies to prepare and sign a paper, setting forth the grievances under which they are suffering, and the redress which they seek; and that it was no part of that intention to secure to that paper any consideration or entertainment whatever from those to whom it is addressed!—why, sir, these doctrines seem to me about as reasonable as it would be to contend, that the privilege of the writ of habeas corpus implies no obligation on the part of the officer to whom it is directed to regard or obey the writ, and no duty on the part of the government to execute or enforce it; but is only designed to secure to an imprisoned citizen the satisfaction of having the writ itself, duly signed and attested, to amuse himself with in his solitary confinement; to meditate upon by day, or to put under his pillow to dream upon by night. They seem to me about as reasonable as it would be to maintain, that the freedom of the press extends only to the freedom of the mechanical enginery of the press; that it was only intended to secure the rights of individual printers to compose, set up, and strike off, such matter as might be agreeable to them; but that it does not reach to the privilege of publishing or circulating that matter after it is stricken off! In a word, Mr. Speaker, if the right of petition is really nothing more than it has been represented to be by some of the honorable members who have preceded me in this debate, it is, in my judgment, as poor a pretence, as miserable a mockery, as empty and unmeaning and worthless an abstraction, as was ever dignified by a swelling name or a high-sounding title; and the sooner it is expunged from the roll of civil liberty—the sooner it ceases to hold out to the ear a promise only to be broken to the hope—the sooner will the people understand what rights they really do possess.

But, sir, I desire to proceed with this subject a more methodically, and to notice with something more of precision and exactness the arguments which have been adduced in favor of the doctrines.

The question before the House is, whether the rule, which has obtained a most odious notoriety, in many quarters of the country, under the name of the 21st rule, and which has lost nothing of its offensiveness by recently assuming the *alias* of the 23d rule, shall remain as one of the permanent rules and orders of the present Congress. This is the question plainly presented in the instructions which have been moved by the honorable member from Georgia, [Mr. BLACK;] and this is the question no less plainly involved in the simple motion to recommit the report. And what is this rule? It is a rule providing that no petitions, resolutions, memorials,

Jan. 1844.  APPENDIX TO THE CONGRESSIONAL GLOBE.  291

28TH CONG.....1ST SESS.  *Abolition Petitions—Mr. Winthrop.*  H. OF REPS.

or other papers, on certain "enumerated subjects, shall be received by this House, or entertained in any way whatever. Now, sir, I care not what those enumerated subjects are. I hold it entirely unimportant to this argument to state them. Whatever they may be, the principle of the rule is, in my judgment, the same. If this House may declare to-day that it will receive no petitions on one class of subjects, it may to-morrow declare that it will receive no petitions on another class of subjects; and, on the third day, it may refuse to receive any petitions at all. The real inquiry is, have we a right to prescribe to those who have sent us here on what particular subjects their prayers shall be heard in these halls? Is it within our prerogative to say to the people of the United States: "Gentlemen, you may assemble together in what numbers you please, to consult upon what you may choose to consider your grievances; you may sign your petitions individually or collectively; you may adopt resolutions in your primary meetings or in your legislative assemblies; but if those petitions or resolutions contain any allusion to this, that, or the other topic, we will not receive them, or entertain them in any way whatever?"

Sir, I utterly deny the existence of any such right on our part. I hold it to be inconsistent with the relations we sustain to our constituents. I hold it to be unwarranted by any thing, either in the reason or the history of parliamentary proceedings. I hold it to be in direct conflict with the spirit and intent of express provisions of the constitution. And I hold it, also, to be subversive of original, inherent, and inalienable rights of the people.

The honorable member from Tennessee [Mr. A. V. BROWN,] in justifying this rule, a few mornings ago, drew an analogy from the relations of parent and child; and, in the application of this analogy, this House was made to play the part of a parent, and the people were left to sustain the character of the child. It was a good illustration, sir, of the sort of reasoning by which this rule must be defended, if it is defended at all. But this House does not stand in *loco parentis* to the people of the United States. We are not their parents, masters, or guardians. We are sent here to ascertain their wishes; to carry out their will; to do their work. And for us to undertake to limit their liberty to address us, or abridge their privilege of being heard here, on any subjects on which they may choose to be heard, is to reverse entirely our relative positions. It is the representative instructing the constituent; the agent prescribing terms to his principal; the servant imposing conditions on the master!

I shall be told that individual petitioners are not the people; and that the rights of the signers of petitions, few or many, are not to be confounded with the rights of the people at large. There would be some fitness and some force in this suggestion, if we were considering the reception of a single petition, or of any ascertained number of petitions. But where is the limit to this rule? Where is the limit to the principle of this rule? Why, sir, this rule excludes, practically and daily, thousands and hundreds of thousand of petitioners. It denies a hearing, practically and daily, to whole States—sovereign States—speaking through the resolutions of their legislatures. The journals, I think, will show that the resolutions of four or five States have been thrust back into the faces of their representatives on this floor, in a single hour of a single morning. And if as many States as were arrayed here the other day on the subject of General Jackson's fine, (seventeen I think,) could come to a common opinion on any point connected with any of the subjects enumerated in this rule—nay, if all the States in the Union, or all the people of all the States could come, as they ought to come, and as I believe one day or other they will come, to the conclusion, that whatever may be done with the institution of slavery in the District of Columbia, the slave trade here shall be no more tolerated, but that this metropolis of the American republic shall be purged from the pollution of an inhuman and abominable traffic—this rule is broad enough, and general enough, to deny a hearing to them all! In principle, then, this rule goes the full length of asserting the right of this House, to say to the people, to the whole people of the Union, "Come one, come all, we will not hear you."

But, says the gentleman from South Carolina, [Mr. RHETT,] have we not a plenary power, under the constitution, "to determine our own rules of proceeding?" Yes, sir, we have that power, and there is no appeal from our determination as to those rules. But power is one thing, and right is another.

We have the power to do many things in this House which we have yet no manner of right to do. We are the final judges of the elections and returns of our own members. And if a majority in this House, in its wilfulness or its wantonness, should see fit to give the seat in a contested election to a candidate clearly in a minority, or to admit to a right of membership on this floor persons under twenty-five years of age, or who have resided less than seven years in the United States, or persons who do not possess any other of the constitutional or legal qualifications of members, (and something of this sort has been done, as I think, at this very session,) there is no power elsewhere to revise or reverse our decision. We have the power, also, to adopt a rule of proceeding by which the yeas and nays shall not be recorded on a call of one-fifth of the members present, or shall not be recorded at all; and, indeed, a majority of this House almost went this length at the outset of the session, in excluding from the records a full and intelligible statement of the question on which the yeas and nays were demanded. We have the power, too, to express or expunge from our journals any proceedings which we may not fancy to have the people find recorded there; and this proceeding, again, is not entirely unknown to this Capitol, or even to this House during the present session. But who can assert that we have any right to resort to such measures, in defiance of express provisions of the constitution? Sir, it is plain that this power to determine the rules of our own proceeding must be held in subordination to other provisions in the constitution, and must be exercised also with a due regard to the rights, the reserved or inherent rights of the people. Our power over our own rules of proceeding is, indeed, an irresponsible power. But this consideration should only make us the more anxious to ascertain what is its rightful and constitutional limit, and the more careful to keep ourselves strictly within that limit.

It is contended, however, by the advocates of this rule, that it is not inconsistent with any provision in the constitution, nor with any right of the people. The 1st article of the amendments to the constitution, it is said, provides only that "Congress shall make no law abridging the right of the people to petition the government for a redress of grievances;" and this rule is not a law. Sir, this is sticking to the bark of the constitution with a witness to it! Can it be seriously pretended that it is consistent with the spirit and intent of this clause, that one branch of Congress should effect, by a mere rule of proceeding, what both branches are prohibited from effecting by solemn statute? If the Senate and the House of Representatives and the President combined, can pass no law abridging the right of the people to petition the government, is it not, *a fortiori,* incompetent for this House alone to abride that right? But I deny the propriety of this literal interpretation of the word "law" in the article in question. The 1st article of amendment, as it originally passed the House of Representatives in 1789, did not contain that word. Its phraseology was—"the right of the people to apply to the government for redress of grievances shall not be infringed." This is the real gist of the provision. The Senate, in incorporating some additional matter into the same article, found it necessary to change the construction of the sentence. But it was a change of construction only; and there is not the slightest ground for the idea that any change of the sense or substance was intended.

Why, sir, this article of amendment, with many others, was adopted, as is well known, on the recommendation of a number of the State conventions, by which the constitution was originally ratified. And in what terms did those State conventions recommend it? In what terms did your own State of Virginia propose its adoption? "Every freeman has a right to petition, or apply to the legislature for the redress of grievances." This was the language of Virginia in 1789; and it was well said of it by Judge Tucker, in his appendix to Blackstone, that "it was the language of a free people asserting their rights," while the language of the constitution, he adds, "savors of that style of condescension in which favors are supposed to be granted."

But we are told by the gentleman from South Carolina, [Mr. RHETT,] and again by the gentleman from Alabama, [Mr. BELSER,] that this article was adopted in contemplation of a particular mode of abridging the right of petition; that it had reference to certain old English riot laws, which prohibited the people from assembling in tumultuous masses to

petition the government. Admit all that the gentlemen have said on this point. Admit that the language of this article was derived from the English bill of rights, and was originally aimed at some particular restraint upon the right in question. What then? Is there anything in the article which confines its application, now and at all times to come, to the particular mode of abridgment which first gave occasion to it? Sir, the phraseology of the article is comprehensive and general. It declares that the right of petition shall not be abridged by Congress; not that it shall not be abridged in one way or in another way, but that it shall not be abridged at all. Gentlemen might as well contend that the general statute of murder was only designed to prevent and punish those kinds of homicide which were in vogue when the statute was passed, as to contend that this article of the constitution was only intended to prohibit those modes of abridging the right of petition which were contemplated at the time of its adoption. Upon this principle, if any ingenious villain could only discover some new mode of putting an end to human life, it would be "killing—no murder!" Such a principle would make a farce of all legislation.

But the honorable member from Alabama [Mr. BELSER] has discovered sundry instances in which the British House of Commons have refused to receive petitions, and have even passed rules for refusing to receive them; and upon this discovery he has founded what he seemed to consider a most triumphant argument in favor of the constitutionality of the rule of this House. The argument, as I understand it, is this: that the refusal to receive petitions at discretion was a well-known practice of the British Parliament before the adoption of our constitution; that the framers of the constitution must have understood and contemplated that practice; and that therefore, in default of any express allusion to it, there is no reason for imagining that it was intended to be reached or remedied by the article of amendment in question.

Now, sir, I disagree to this argument altogether. I deny the correctness both of the premises and of the conclusion. I maintain, in precise opposition to it, that, in the first place, the right to present petitions to the government, including the right to have these petitions received, was an old, original, inherent right of the people of Great Britain, acknowledged and allowed from a time whereof the memory of man runneth not to the contrary. I maintain, in the second place, that the framers of our constitution understood and appreciated this inherent. I maintain, in the third place, that the refusal to receive petitions in certain cases, in the British House of Commons, was an exception to the general principles and general practice of that body, arising out of circumstances peculiar to those cases, and furnishing no justification for the rule which is under consideration here. And I maintain, in the fourth place, that there is abundant reason for the assurance, that the framers of the constitution would have been the last persons in the world to sanction such refusals, or to consider them as in any degree furnishing precedents for us to follow. I am aware, sir, that it is not often easy to prove the affirmative of propositions of this kind. But if the House will bear with me a few moments, I think I can show them, at least, that I do not speak without book.

And here, Mr. Speaker, if I had a whole morning before me, instead of the rapidly flying remnant of a little hour, I might bring to the remembrance of gentlemen not a few passages of English history a most interesting and instructive character. I might go back to those great conflicts for civil liberty in the Old World, two centuries ago, by which our fathers were exercised and instructed for its establishment of the New. I might refer to days, on which thousands and tens of thousands of citizens were seen going up to Parliament, *en masse,* to present their petitions for redress; days when the constituents of the immortal John Hampden were seen riding up from Buckinghamshire, each one with a copy of a famous protest which they had adopted in his hatband, to petition against ship money, and to demand the release from imprisonment of their gallant and glorious representative; days when fifteen thousand women, headed by the wife of an honest brewer, were seen wending their way with a petition to the very doors of the House of Commons; and those doors were thrown open to receive them! And what was the moral of those scenes? Sir, in those days the champions of the popular cause relied greatly on the exercise of this right of petition to strengthen them in their struggles against the en-

292     APPENDIX TO THE CONGRESSIONAL GLOBE.     Jan. 1844.

28TH CONG.....1ST SESS.     *Abolition Petitions—Mr. Winthrop.*     H. OF REPS.

croachments and exactions of the Crown. Petitions to the Parliament and petitions to the King were then among the most important instruments of the popular movement. There was even a time when the friends of freedom assumed the party name of "petitioners," and when the friends of prerogative and power, were known by the name of "abhorrers"—abhorrers of petitions! And these names of petitioners and abhorrers were as common and as general as whig and tory afterwards were, and designated respectively the same party divisions. And there is one little anecdote of those days, which I cannot forbear reciting with greater exactness. It is the anecdote of a man, whose real name is not recorded in the pages of history, but who gave a name to himself which will not soon be forgotten—a man who seems to have foreshadowed something of the indomitable spirit on the subject of the right of petition, which has been so often manifested on this floor by my honored and venerable colleague, [Mr. ADAMS,]—a man who went in person into the very presence of King Charles I, and presented him with a petition, complaining of some act of oppression, and demanding redress. "How dare you," said the King, "present me such petition?" "May it please your Majesty," said the man, "my name is DARE." He was rewarded for his boldness, not as my venerable colleague was on a well-remembered occasion, by a resolution of censure or impeachment, (*telum imbelle, sine ictu!*) but by a heavy fine and a long-continued imprisonment. If I remember right, sir, the first child born in the Jamestown colony was christened "*Virginia Dare*," and perhaps the name was in honor of this stout and sturdy old upholder of the right of petition! This supposition, however, would involve a slight anachronism, I fear, and must therefore be abandoned. I fear still more that most of the *Dare* family of Virginia of the present day would be disposed to renounce and disown such a namesake.

But these historical reminiscences, pertinent as they are, do not come near enough to the point, to answer the purpose of my argument; and I proceed to cite a case which will more clearly sustain the exact positions I have laid down.

In the year 1668, one Thomas Skinner presented a petition to the British House of Lords, complaining of certain oppressive acts of the East India company. These acts were properly cognizable, it would seem, by the ordinary courts of law. But the lords, notwithstanding, determined to assume jurisdiction, and decide upon them for themselves. The East India company thereupon presented a petition to the House of Commons, complaining of the House of Lords, and denying their right to proceed in the premises. The lords immediately took umbrage at this petition, as libellous and scandalous—as a breach of their privilege and an encroachment upon their prerogative, and proceeded to punish Sir Samuel Bernardiston and other members of the company by fine and imprisonment. A long and angry dispute forthwith arose between the two branches of Parliament on this particular point: how far petitions which were presented in the House of Commons could be taken notice of in the House of Lords, or elsewhere; and, in the course of this dispute, the right of petition generally underwent a strict and thorough investigation. Elaborate reports were made on both sides, and sundry resolutions were adopted. I find no detailed record of the reports, but among the resolutions adopted by the Commons were the following:

That it is an inherent right of every commoner of England to prepare and present petitions to the House of Commons, in case of grievances; and of the House of Commons to receive the same.

It hath been always, time out of mind, the constant and uncontroverted usage and custom of the House of Commons to have petitions presented to them from commoners, in case of grievance, public or private; in evidence whereof, it is one of the first works that is done by the House of Commons to appoint a grand committee to receive petitions and informations of grievances.

In case men should be punishable in other courts for preparing and presenting petitions for redress of grievances to the House of Commons, it may discourage and deter his Majesty's subjects from seeking redress of their grievances, and by that means frustrate the main and principal end for which Parliaments were ordained.

Sir, what fuller evidence could be given—what stronger testimony adduced—of the importance which was attached in those early days to this inherent right of petition, or of the inviolable sanctity which belonged to it? What significance there is in the fact here stated, that "it is one of the first works that is done by the House of Commons, to appoint a grand committee to receive petitions and informa-

tions of grievances!" What an emphasis in the idea that "it may discourage and deter his Majesty's subjects from seeking redress of their grievances, and by that means frustrate the main and principal end for which parliaments were ordained!" I imagine that no gentleman will desire further evidence as to the first proposition which I undertook to establish.

But where is the evidence that our fathers regarded this right of petition in the same light? Why, sir, it so happens that in the Congress of 1789, by which the amendments to the constitution were agreed upon, this first article of amendment, which is in controversy in this debate, was the subject of some discussion. The adoption of it was opposed by some of the members of that Congress. But on what ground was it opposed? Was it on the idea which has been held out in this debate, that it would be unbecoming in a free and sovereign people to present themselves in the attitude of petitioners to this House? Was it on the ground that the right of petition was not an American right, as was suggested by a gentleman from Pennsylvania, I think, during the last Congress? No. Our fathers of that day were fresh from the great conflicts and controversies of the revolution, and they understood what American rights were too well to broach such an idea as that. It was opposed on the ground that the right of petition already existed, and needed no new assertion. It was said that it was "a self-evident, inalienable right, which the people possessed." It was said that "it would never be called in question." While, on the other hand, it was contended by the advocates of the amendment, that although it was an "inherent, existing right," it would be well, from its very value, to give it the additional force and solemnity of a constitutional sanction.

The committee who framed this report (said Mr. BENSON) proceeded on the principle that these rights belonged to the people. They conceived them to be inherent, and all that they meant to provide against was their being infringed by the government.

Need I add anything more, sir, on the second proposition which I undertook to maintain?

Let me hasten, then, to the principle of reception, and to those instances of refusal to receive, which have been cited by the honorable member from Alabama.

And first let me bring to the notice of the House a fact of no little significance upon this point of my argument, which I find in the history of the East India company case, already referred to. Among the other resolutions reported to the House of Commons on that occasion, was one in these words:

That it is the undoubted right and privilege of the House of Commons to judge and determine touching the nature and matter of such petitions, how far they are fit or unfit to be received.

I can imagine, Mr. Speaker, the triumphant tone in which this resolution would have been introduced to the notice of the House, had it fallen under the eye of any one of the advocates of the rule under debate. I confess that, at first, I was not a little perplexed by it myself. True, it was open to the remark, that it was reported in the spirit of a protest against the assumption of the House of Lords; and the other resolutions by which it was preceded and followed gave ample reason for believing that it was only designed to deny the right of any body but themselves to judge as to petitions presented to the Commons, how far they were fit or unfit to be received. Still, the language of the resolution, as I have read it, is certainly not quite consistent with the doctrines I have undertaken to establish; and I plainly perceive the satisfaction with which it has been heard in some quarters of the House. But what will gentlemen say when they learn that, before this resolution was adopted, the word "received" was stricken out, upon formal motion, and the word "retained" inserted in its place! This, sir, is the fact. Here is record of it.* And no better proof could be furnished than is found in this deliberate change of phraseology, that those who made it were unwilling, after asserting so emphatically the inherent right of every commoner of England to present petitions, to abridge and even annihilate that right in the next breath, by arrogating to themselves an unlimited right of judgment, how far these petitions were fit or unfit to be received. They claimed only the right to judge how far they were fit to be retained; and to retain, I need not say, *ex vi termini*, implies reception.

But how is it with the examples which have been

cited of a direct refusal to receive in the later days, and with the standing rules of the House of Commons under which these examples have occurred?

It is true, sir, that two rules of this character have been adopted by that body more than a century ago. One of them to the effect, "that they would receive no petitions against a bill, actually pending, for imposing taxes or duties." The other, "that they would receive no petitions for grants or appropriations of money relating to public service, not recommended by the Crown." Now, these are the only rules of the kind which have ever been known to the parliamentary proceedings of England; and all the cases in which petitions, respectful in their terms, have been refused a reception, are found to be ranged under the authority of these two rules. And how am I to substantiate my position, that these rules are exceptions to the general principles and general practice of Parliament, and furnish no justification of the rule of this House? I shall summon to my aid, for this purpose, the great authority upon all questions of parliamentary proceeding, Mr. Hatsell; from whose well-known work Mr. Jefferson compiled his Manual, and to whom the highest acknowledgments are paid in the preface to that Manual. Let Mr. Hatsell explain these rules, and the reasons of them, in his own words, and then let us hear what he has to say in addition:

We see from the foregoing instances, particularly from the precedents which are cited, and read on the 10th of April, 1733, that very soon after the revolution, the House found it necessary to establish a rule, "that they would not receive any petition against a bill, then pending, for imposing a tax or duty." The principle upon which this rule was adopted appears to be this: that a tax generally extending in its effect over every part of the kingdom; and more or less affecting every individual, and in its nature necessarily and intentionally imposing a burden upon the people, it can answer no end or purpose whatever for any set of petitioners to state these consequences as a grievance to the House. The House of Commons, before they come to a resolution which imposes a tax, cannot but know that it may very sensibly affect the commerce or manufacture upon which the duty is laid; but they cannot permit the inconvenience that may possibly be brought upon a particular branch of trade to weigh with them, when put in the balance with those advantages which are intended to result to the whole, and which the public necessities of the State demand from them. For these reasons it has been thought better, and more candid to the persons petitioning, at once to refuse receiving their petition, rather than, by receiving it, to give countenance to the application, and to mislead the petitioners into an idea, that, in consequence of their petition, the House of Commons would desist from the tax imposed, and impose another, which, though it might be less felt by that branch of trade, might be more oppressive to some other branch.

Upon an accurate examination of the numerous precedents cited on the 10th April, 1733, (in favor of the doctrine which was then laid down by Mr. Sandys, and those who supported the petition of the city of London,) out of seventy-nine cases which were then produced and read, it will be found that there are but three which apply to this question. The first of these is the petition against a bill for imposing a duty of 10 per cent. *ad valorem* upon the woollen manufacture in the year 1696-7. The resolution of the Committee of Ways and Means upon this point brought such a cloud of petitions from all parts of the kingdom—not only from those who were immediately concerned in the woollen trade; but from others who thought they might be ultimately affected by it—that it was thought advisable not even to present the bill. And, in the very next session, in April and June, 1698, the House, having felt the inconveniency resulting from admitting these petitions, peremptorily refused to receive the petitions which were then offered against the taxes at that time depending.

In the following notes to this passage, the rule is still further explained:

What Mr. Winnington afterwards said in the debate upon the petition against the bill relating to the trade of the sugar colonies, proved true upon this occasion. "If we were to receive all petitions against bills that are brought in for the laying on of any new duties, there would be such multitudes of them against every such bill, that the nation might be undone for the want of an immediate supply for the public use, whilst we are sitting to hear frivolous petitions against bills brought in for granting that supply." Commons Debates, vol. vii, p. 310. This reasoning does not apply to the receiving petitions which desire the repeal or alteration of taxes imposed in any former session; no public service is delayed by receiving and considering such petitions; nor can the time of the House be employed more properly than in endeavoring to lighten the burdens which have been necessarily imposed upon the people, by introducing such regulations, in the manner of collecting the taxes, as experience shall point out; or even by repealing taxes, in instances where no regulation can make them fit to be continued.

And now let us hear Mr. Hatsell's account of the second of these rules:

The great number of petitions that were presented to the House of Commons, at the commencement of the session which began in October, 1705, from persons either claiming an arrear of pay as officers, or making some other demand upon the public, made it necessary for the House to put some restriction upon these applications; which, their being often promoted by members who were friends to the parties, and carrying with them the appearance of

*See note at the end.

Jan. 1844.

APPENDIX TO THE CONGRESSIONAL GLOBE.

293

28TH CONG.....1ST SESS.

*Abolition Petitions—Mr. Winthrop.*

H. of Reps.

justice or of charity, induced the rest of the House to wish well to, or at most to be indifferent to their success; and by this means large sums were granted to private persons, improvidently, and sometimes without sufficient grounds. Very early, therefore, in the next session, on the 11th of December, 1706, before any petitions of this sort could be again offered, the House came to a resolution, "that they would receive no petition for any sum of money relating to public service, but what is recommended from the Crown." This resolution not being at that time made a standing order, had no effect beyond the session in which it was passed, so that soon after the same practice returned again; and (the same mischiefs resulting from it) the House, upon the 11th of June, 1713, ordered the resolution of the 11th of December to be read, and declared it to be a standing order of the House. From this time, whenever any petition which desires relief by public money is offered, or any motion is made to this purpose, before the Speaker puts the question for bringing up the petition, it has been the practice, in conformity to this order, that the recommendation of the crown should be signified by some member authorized so to do; and if the Chancellor of the Exchequer, or person usually authorized by the crown, declines to signify this recommendation, the House cannot properly receive the petition. It has sometimes happened that the Chancellor of the Exchequer has, from motives of humanity, and in order not to preclude the House from taking a petition under their consideration, given the recommendation of the crown, in cases of which, even at the time, he acknowledged his disapprobation. This conduct, from whatever motives it may proceed, is not to be approved of. It destroys the meaning and spirit of the order, and reduces it to a mere form. The resolution of the 11th of December has no other intention than to transfer the responsibility of receiving or refusing the petition from the House to the ministers of the crown. Unless, therefore, the ministers will do their duty, by examining into the nature of the claim, and the propriety of granting any relief; and if they find the application unfounded, will have the courage to inform the House of the result of their opinion, it would be better that the standing order should be repealed, and that the House should be left to act in these, as in other circumstances, without restraint or control.

It will be perceived, sir, from these passages, that neither of these rules of the British Parliament goes the length of the rule of this House. Neither of them provides that petitions of a certain class shall not be received at any time, or under any circumstances, or be entertained in any way whatever. The first declares only that petitions against a tax bill shall not be received while that bill is actually pending; and this, on the ground that the nation might be undone for want of an immediate supply for the public service, which Parliament was occupied in hearing the petitions against some particular mode of raising that supply. And it is expressly admitted that petitions for the repeal or alteration of these same taxes may subsequently be received. The second of these rules stops equally short of an entire exclusion of a certain class of petitions. Its whole intention and operation is to throw upon the ministry the responsibility of all appropriations of public money. It substantially refers all the petitions to which it relates to the advisers of the crown, (themselves members of Parliament,) and makes them a committee to receive and consider them. And it expressly provides that, with their endorsement, these very petitions shall be received and considered by the House. What sort of analogy is there between rules like these, and a rule which declares that petitions on certain enumerated topics shall not be received at any time, or under any circumstances, or be entertained in any way whatever?

But what does Mr. Hatsell say further on the subject of these rules?

The House (he says in commenting on one of them) ought to be particularly cautious not to be over-rigid in extending this rule beyond what the practice of their ancestors in former times can justify them in. To receive, and hear, and consider the petitions of their fellow-subjects, when presented decently and containing no matter intentionally offensive to the House, is a duty incumbent upon them, antecedent to all rules and orders that may have been instituted for their own convenience. Justice and the laws of the country demand it from them.

Here, Mr. Speaker, is laid down, in the clearest and noblest phraseology, in words which, after the principles that have so often been advanced and the practice which has so long prevailed here, ought to be emblazoned in letters of gold upon every column in this hall, and to be suspended on a scroll of silver from the very beak of the eagle above your head—the true parliamentary and constitutional doctrine on the subject of petitions.

But, before enlarging upon this idea, I must say a few words in defence of the fourth proposition which I promised to prove, viz: that there is abundant reason for believing that the framers of our constitution would have been the last persons to acquiesce in the exceptions to this doctrine which are contained in the two special rules which have just been cited. Why, is it forgotten that our fathers had some experience of their own on this subject of the reception of petitions? Is it forgotten that the declaration of independence itself, after reciting the various

oppressions to which the American colonies had been subjected, goes on to state, that "in every stage of these oppressions, we have petitioned for redress in the most humble terms: our repeated petitions have been answered by repeated injury!" Is it forgotten that Patrick Henry of Virginia, in that celebrated speech which is at the tongue's end of every schoolboy in the Union, and in which he comes to the stern and startling conclusion, "we must fight," presents it as the very climax of his description of the unbearable grievances of that day, "we have petitioned, we have remonstrated, we have supplicated: our petitions have been slighted, our remonstrances disregarded, and we have been spurned with contempt from the foot of the throne?" It is an historical fact that the petitions of our fathers were refused a reception in the British Parliament. And on what ground were they refused? Upon what principle were they denied a hearing, or any entertainment whatever? Sir, it was in conformity with these very precedents which have been cited here so triumphantly! It was under these very rules which are appealed to so confidently in justification of our rule! Here is the record of the fact:

18. On the 15th of February, 1765, a petition of Mr Montague, agent for Virginia, and a petition from Connecticut, and another from the inhabitants of Carolina, against the bill then depending, for imposing a stamp duty in America, being offered, upon the question for bringing them up, it passed in the negative.

And now, will any gentleman undertake to maintain that the framers of the constitution intended to give their assent to principles under which their own petitions against the stamp act were refused a reception? Will any gentleman rely on these precedents, while the words of Patrick Henry and the language of the declaration are still fresh in his memory? No, sir, I am sure I need not urge this point further.

Let me recur, then, for a moment, to the admirable exposition of Mr. Hatsell: "To receive, and hear, and consider the petitions of their fellow-subjects, when presented decently, and containing no matter intentionally offensive to the House, is a duty incumbent upon them, antecedent to all rules and orders that may have been instituted for their own convenience. Justice and the laws of our country demand it of them." This sentence, I repeat, contains, in the noblest terms, the true constitutional and parliamentary principle. It embraces the whole rule and the only rule; the whole exception and the only exception to the rule—the rule being that petitions shall be received, heard, and considered; and the exception relating exclusively to such as are not decently presented, or such as contain matter intentionally offensive to the House.

[Mr. WINTHROP was here interrupted by the expiration of the morning hour, and the subject was laid over until the following day.]

**JANUARY 24, 1844.**

The orders of the day having been called for by Mr. ADAMS, Mr. WINTHROP proceeded with his remarks:

He said that when he was cut off yesterday, he was proceeding to make some comments on the golden rule which had been laid down on the subject of petitions by Mr. Hatsell, who, by all acknowledgment, was the highest authority on the subject of parliamentary principles and parliamentary precedents; and who had been styled by Mr. Jefferson "the pre-eminent authority" on such matters. It will be observed (said Mr. W.) that this rule contains no sanction for the doctrine which has so often been advanced here, that petitions are not to be received, because there may seem to be no authority to grant the prayer of them. And where, let me ask, where would such a doctrine lead us in these days and in this country? Where would it lead us in this House, and at this very moment? Why, sir, there is an undoubted majority of this body, who hold that Congress have no constitutional authority to establish a national bank; no constitutional authority to carry on a system of internal improvements; no constitutional authority to distribute among the States the proceeds of the public lands. I am by no means sure that there is a majority here who would dare to assert, in positive terms, the power of Congress to protect American labor. We all know that, in the changes of parties and of party opinions in this country, this constitution of ours is one thing to-day and another thing to-morrow; a straight-jacket (as an honorable member from Virginia has termed it) to one set of men, and a charter wide withal as the wind to another set of men. Some of us maintain that the power of Congress over slavery in the District of Columbia is as clear and unqualified as its power to regulate commerce or to support a navy. Others

hold, on the contrary, that an exclusive jurisdiction in all cases whatsoever does not extend to the case of slavery. In the mean time, some are of opinion that there is a power in this government to annex Texas to the Union; while others (and myself among the number) maintain, that such an annexation would be a plain and palpable violation of the constitution, and an utter annihilation of what little there is left, on our side at least, of the old original compromises on which that constitution was adopted. Where, I repeat, would the doctrine end, that petitions are not to be received, if they ask for anything which an existing majority may deem it unconstitutional to grant? It is plain that the power to grant the prayer of a petition is a question to be considered, and the petition must be received and heard in order that this question may be considered. It is always, let me add, in the power of Congress to propose amendments to the constitution. Perhaps the consideration of a petition may lead to such propositions. Perhaps this may be the very design and object of the petitioners. This idea alone is an ample answer to the suggestion, that a supposed or even a real want of power to grant them, is ground enough for a summary refusal to receive petitions.

But this golden rule of Mr. Hatsell's, it will be perceived, does not stop short at the reception of petitions. It declares it to be a duty incumbent on us, antecedent to all rules and orders for our own convenience, to hear and consider them. And, for myself, I do not desire to have the rule of this House changed at all, if it be not changed so as to meet and embrace this whole principle. As to receiving petitions for the purpose of laying them instantly on the table, it is a mere evasion of the principle, and a mere mockery of the parties. The original excitement on this subject sprang up under such a rule as that would be; and a return to it would do nothing, nothing whatever, to allay that excitement. In this one point, therefore, I agree with the honorable member from Alabama: let us have the present rule or none. I would only reverse the order of the alternatives, and say, let us have no rule, or let this rule stand as it is.

But, says the gentleman from South Carolina, [Mr. RHETT,] where does this duty to consider a petition terminate? How much consideration do you claim? If you demand to have your petitions received, and heard, and considered, why not to have them referred? why not to have them reported on? why not to have them granted? Now, sir, I readily admit that it is difficult to lay down, in advance, the precise line of demarcation between the right of petition and the right of legislation; to say exactly where the one ends and the other begins; or to fix the precise measure of consideration which will fulfil the one, without infringing on the other. But this difficulty does not prevent our confounding the plainest and most obvious distinctions. It was well said by Mr. Burke, in one of his speeches or essays, that, "though no man can draw a stroke between the confines of night and day, yet darkness and light are, upon the whole, tolerably distinguishable." So, here, though it may puzzle us to put down in black and white the exact boundary line between the right of the petitioner and the right of the legislator, yet the consideration of a prayer, and the granting of a prayer, are, "upon the whole, tolerably distinguishable." Indeed, there is no degree, no gradation, no middle term, between the two ideas. But why—why all this metaphysical subtlety as to a certain class of petitions? You do not refuse to receive other petitions, lest you should be ensnared into some unavoidable obligation to grant them. Heaven knows that there are adverse reports enough made and adopted in this House, in reference to petitions which we uniformly receive and consider. Petitions for pensions; petitions for the allowance of the most just claims; petitions for the payment of the most undeniable debts; why, sir, we make no bones of despatching a hundred of them in a morning, on a private bill day. Whence, then, all this anxiety and alarm, lest the reception of the petitions enumerated in the rule under debate should precipitate us upon some irresistible necessity to grant their prayer?

Mr. Speaker, we ask for these petitions only that you will treat them as you treat other petitions. We set up for them no absurd or extravagant pretensions. We claim for them no exclusive or engrossing attention. We desire only that you will adopt no proscriptive and passionate course in regard to them. We demand only that you will allow them to go through the same orderly round of reception, reference, and

report, with all other petitions. When they have gone through that round, they will be just as much under your own control as they were before they entered on it.

I heartily hope, sir, this course is now about to be adopted. I hope it is an advocate of the right of petition. I hope it as a northern man with northern principles, if you please to term me so. But I hope it not less as an American citizen with American principles; as a friend to the constitution and the Union; as one who is as little disposed to interfere with any rights of other States, as to surrender any rights of his own State; as one who, though he may see provisions of the constitution which are odious in principle and unjust in practice—provisions which he would gladly have had omitted at the outset, and gladly see altered now, if you please to alteration were practicable,—is yet willing to stand by our constitution as it is, our Union as it is, our territory as it is! I do honestly believe that the course of this House in relation to these petitions has done more than all other causes combined to bring the constitution into disregard, and the Union into danger. Other causes have indeed co-operated with this cause. Your arbitrary and oppressive State laws for imprisoning our free colored seamen in the southern ports; your abhorrent proposals to annex Texas to the Union, in violation of the compromises of the constitution—yes, sir, of those very compromises on which Adams and Hancock met Jefferson and Madison, (to use language which was employed in casting reproach upon the resolutions of Massachusetts which were recently presented here)—these laws and these proposals have unquestionably co-operated of late with the denial of the right of petition in exciting in some quarters a spirit of discontent with our existing system. But this rule of the House has been the original spring of the whole feeling. And to what advantage on the part of those by whom it was devised? Have southern institutions been any safer since its establishment? Have the enemies to those institutions been rendered any less ardent or less active by it? Has agitation on the subject of slavery in this hall been repressed or allayed by it? Have these petitions and resolutions been diminished in number under its operation and influence? No, sir; the very reverse, the precise opposite of all this, has been the result. The attempt of this House to suppress and silence all utterance on the subject of slavery in this hall, has terminated as did the attempt of one of the Kings of ancient Judah to suppress the warnings of the prophet of God. The prophet, we are told, took another roll, and wrote on it all the words which the king had burned in the fire, and "there were added besides unto them many like words." And this always has been, and always will be, the brief history of every effort to silence free inquiry and stifle free discussion. I thank Heaven that it is so. It is this inherent and inextinguishable elasticity of opinion, of conscience, of inquiry, which, like the great agent of modern art, gains only new force, fresh vigor, redoubled powers of progress and propulsion, by every degree of compression and restraint: it is this, to which the world owes all the liberty it has yet acquired, and to which it will owe all that is yet in store for it. Well did John Milton exclaim, in his noble defence of unlicensed printing, "Give me the liberty to know, to utter, and to argue freely, above all liberties;" for, in securing that, we secure the all-sufficient instrument for achieving all other liberties.

[Mr. Winthrop's hour here expired.]

### NOTE.

The proceedings of the House of Commons in the case of Skinner and the East India company, as they stood upon the journals before they were expunged by the order of the King, are inserted, as follows, in the appendix to the 3d volume of Hatsell's Precedents, (London edition, 1818.)

Die Sabbati, 4 Decembris, 1669.

The House, then, according to former order, resumed the debate of the matter concerning trials and privileges in Parliament.

The House of Commons being informed that Sir Samuel Bernardiston, a commoner of England, has been called before the House of Lords, and hath had a judgment passed upon him, and a fine imposed, and a record made thereof in the Exchequer, mentioning the fine to be paid:

*Resolved, &c.,* That a conference be desired of the lords upon the matter aforesaid, and other proceedings relating thereunto; and, also, upon the proceedings concerning Thomas Skinner and the East India company.

*Resolved, &c.,* That a committee be appointed to prepare and draw up reasons, to be insisted upon at the conference to be had with the lords touching the matter aforesaid, viz: Mr. Solicitor General; Mr. Sergeant Maynard, &c.; and the

special care of this matter is recommended to Mr. Solicitor General, Sir Robert Howard, and Sir Thomas Lee.

Die Martis, 7 Decembris, 1669.

*Ordered,* That the report of Sir Robert Howard, from the committee appointed to prepare reasons to be used at the conference with the lords, be heard this day, next after the report from the Committee of Elections.

Sir Robert Howard reports from the committee appointed to prepare and bring in reasons to be insisted upon at the conference to be had with the lords, in the matter relating to the East India company and Skinner and Sir Samuel Bernardiston, that the committee had met according to the commands of the House, and had taken deliberate consideration of the whole matter; but found they were disabled to prepare reasons without a ground work of some particular heads agreed by the House, to the justification whereof the reasons might be applied; and that the committee had prepared some heads, drawn up into five several resolves, which he read in his place, and tendered to the House for their approbation; and the same being again read, are as followeth, viz:

1. That it is an inherent right of every commoner of England, to prepare and present petitions to the House of Commons, in case of grievance, and the House of Commons to receive the same.

2. That it is the undoubted right and privilege of the House of Commons to judge and determine, touching the nature and matter of such petitions, how far they are fit or unfit to be received.

3. That no court whatsoever hath power to judge or censure any petition prepared for or presented to the House of Commons, and received by them, unless transmitted from thence, or the matter complained of by them.

4. Whereas a petition by the governor and company of merchants trading to East India, was presented to the House of Commons by Sir Samuel Bernardiston and others, complaining of grievances therein; which the lords have censured under the notion of a scandalous paper or libel; that the said censure and proceedings of the lords against the said Sir Samuel Bernardiston are contrary to, and in subversion of, the rights and privileges of the House of Commons, and liberties of the Commons of England.

5. That the continuance upon record of the judgment given by the Lords, and complained of by the House of Commons, in the last session of this Parliament, in the case of Thomas Skinner and the East India company, is prejudicial to the rights of the commoners of England.

*Ordered,* That the report delivered in by Sir Robert Howard be taken into consideration the first business to-morrow morning.

Die Mercurii, 8 Decembris, 1669.

The House then resumed the consideration of the report of Sir Robert Howard, of the heads and proposals brought in from the committee appointed to draw up reasons to be insisted on at the conference to be had with the lords in the matter concerning the East India company and Skinner and Sir Samuel Bernardiston.

The first head was twice read; and, with the addition of the word "of," upon the question, agreed to.

The second head was read twice; and, with the alteration of the word "retain" for "receive," upon the question, agreed.

The third proposition was twice read, and some amendments made thereto.

The question being put, to agree to this proposition—
The House divided.
The noes went out.
Tellers:
Mr. Morice,  } For the yeas, 109.
Mr. Steward,
Sir J. Talbot,  } For the noes, 73.
Colonel Reames,
And so it was resolved in the affirmative.

The fourth proposition was twice read; and the words "under the notion of" omitted, and the word "as" inserted in the stead of it; and the proposition thus amended, upon the question, agreed.

The fifth proposition was read twice, and, upon the question, agreed.

1. That it is an inherent right of every commoner of England to prepare and present petitions to the House of Commons, in case of grievance, and of the House of Commons to receive the same.

2. That it is the undoubted right and privilege of the House of Commons to judge and determine, touching the nature and matter of such petitions, how far they are fit or unfit to be retained.

3. That no court whatsoever hath power to judge or censure any petition prepared for, or presented to and received by, the House of Commons, unless transmitted from thence, or the matter is complained of by them.

4. That whereas a petition by the governor and company of merchants trading to the East Indies, was presented to the House of Commons by Sir Samuel Bernardiston and others, complaining of grievance therein; which the lords have censured as a scandalous paper or libel; the said censure and proceedings of the lords against the said Sir Samuel Bernardiston are contrary to, and in subversion of, the rights and privileges of the House of Commons, and liberties of the Commons of England.

5. That the continuance upon record of the judgment given by the lords, and complained of by the House of Commons, in the last session of this Parliament, in the case of Thomas Skinner and the East India company, is prejudicial to the rights of the Commons of England.

*Resolved,* That the committee formally appointed to draw up reasons to be used at the conference with the lords, be revived, and do sit this afternoon, and prepare reasons and arguments to justify the propositions agreed to, and prepare and propose what is fit to be offered or desired of the lords; and that these members following be added to said committee, viz: Sir Walter Gouge, Mr. Seymour, &c.

Die Veneris, 10 Decembris, 1669.

Sir Robert Howard reports from the committee to which it was referred, to prepare and draw up reasons to be used

at the conference with the Lords, in the matter of the East India company and Skinner and Sir Samuel Bernardiston, to justify the resolves of this House; and also two propositions thereupon to be made to the Lords, which he read, and after delivered the same in at the clerk's table; and the same being twice read, and with some amendment, upon the question, agreed, are as followeth:

To the first, second, and third, depending on one another:

1. It hath been always, time out of mind, the constant and uncontroverted usage and custom of the House of Commons to have petitions presented to them from commoners, in case of grievance, public or private: in evidence whereof, it is one of the first works that is done by the House of Commons to appoint a grand committee to receive petitions and informations of grievances.

2. That in no age that we can find, ever any person, who presented any grievance, by way of petition, to the House of Commons, which was received by them, was ever censured by the lords without complaint of the commons.

3. That no suitors for justice, in any inferior court whatsoever, in law or equity, exhibiting their complaint in any matters proper to be proceeded upon in that court, are therefore punishable criminally, though untrue, or suable by way of action in any other court whatsoever; but are only subject to a moderate fine or amercement by that court: unless in some cases specially provided for by act of Parliament—as appeals, or the like.

4. In case men should be punishable in other courts for preparing and presenting petitions for redress of grievances, to the House of Commons, it may discourage and deter his Majesty's subjects from seeking redress of their grievances, and by that means frustrate the main and principal end for which Parliaments were ordained.

To the fourth proposition:

1. That no petition, nor any other matter depending in the House of Commons, can be taken notice of by the lords without breach of privilege, unless communicated by the House of Commons.

2. Upon conclusion of the four first propositions, it is further to be alleged that the House of Peers (as well as all other courts) are, in all their judicial proceedings, to be guided and limited by law; and if they should give a wrong sentence, contrary to law, and the party grieved might not seek redress thereof in full Parliament, and to that end repair to the House of Commons, who are part of the legislative power, that either they may interpose with their lordships for the reversal of such sentence, or prepare a bill for that purpose, and for the preventing the like grievance for the time to come, the consequence thereof would plainly be, both that their lordships' judicature would be boundless, and above law, and that the party grieved should be without remedy.

As to the fifth proposition: The committee refer to the former reasons offered against the judgment of the lords against the East India Company, in the last session of Parliament.

### SPEECH OF MR. BATES,
#### OF MASSACHUSETTS,

*In Senate, February 21, 1844—On the protective system.*

Mr. President: It has become necessary that I should address the Senate upon the subject of the protective system; and I may as well do it upon this occasion as upon any other, as my purpose is to present the system to the Senate and to the country in the light in which I view it, and to obviate some objections which have been urged against it; But as Massachusetts has received particular attention from one senator and another, [Messrs. McDuffie and Woodbury,] it would be deemed a discourtesy in me if I did not, in her behalf, at least make my poor respects to them, which may better be done now than at a more advanced stage of the debate.

The senator from New Hampshire [Mr. Woodbury] could not conclude his elaborate, and, I must be permitted to say, very deceptive and delusive speech, (although unintentionally, (without a formal warning to the Senate, obviously designed as a reproof to the legislature and people of Massachusetts. I have pleasure in assuring the honorable senator it will have all the effect upon them it deserves to have. The senator took occasion to announce to the Senate—not in very good taste, as I thought—that "the people of New Hampshire are patriotic, energetic, and enterprising; and that they shed their blood in defence of the country during the late war." To this, as a matter of fact, I have nothing to say, other than that it has no connexion with the subject before the Senate. But if the senator intended thereby an implication, that the people of Massachusetts did not shed their blood in defence of the country, then I have to inform the Senate, that while New Hampshire, numbering each of her soldiers by the times he was called into service, furnished of militia during the war, less than five thousand men: Massachusetts furnished, computed by the same rule, more than thirty-eight thousand. Massachusetts defended a seabord of six hundred miles exposure, menaced at every point, and assailed at every assailable point, while New Hampshire defended a seabord of only ten or fifteen miles in extent, and

Feb. 1844. APPENDIX TO THE CONGRESSIONAL GLOBE. 315

28TH CONG.....1ST SESS. *Abolition Petitions—Mr. Rogers.* H. of Reps.

make the districts, and that the States can do nothing in aid of the execution of the act of Congress—is in derogation of the power of the States; it wrests from them a power of the greatest importance—the regulating and carrying on the elections, in which the people feel the deepest concern—and throws over into the hands of the general government an almost infinite amount of power and patronage. Do getlemen really intend to add to the power, the patronage, and influence of the federal government at the expense of the State governments? Are they in favor of such a construction? Mr. VINTON said he was for that construction which was most favorable to the States. He did not wish to see Congress making districts, and sending federal officers all over the country to superintend the people at the ballot-boxes. Was there any necessity for such a construction? Was it convenient, or would it be satisfactory to the people? That there was no necessity for this construction, is proved by the fact that most of the States have gone on and made the single districts according to the law of Congress. Cannot the States make their own congressional districts better than it can be done here? Would not the people prefer to do their voting under the superintendence of their own State officers, as they always have done, rather than under federal officers? Will not the old mode of voting under the care of the State officers be most satisfactory to the people, as well as less expensive? To all these questions, and many more of like character that might be put, there can be but one answer. And what advantage would result from throwing this whole business into the hands of the federal government? He said he had heard none pointed out or attempted to be shown. But we are met with the answer to all this, that if Congress undertake to do a piece of work, it must do the whole of it—that the States have no power to finish any part of what Congress has begun. Now, Mr. Speaker, there is not a plough-boy in the country that would not dispute this proposition with you, and put you down upon it. Suppose, sir, a farmer's boy were to begin to plough a field, and go away at night leaving a part undone, and the next morning another lad were to come to finish the work, and you were to meet him at the gate, and tell him that he must not go in there, that it was a great law in ploughing that whoever began to plough a field, he, and he alone, could finish that particular field; that, if he did not do it, the work must remain forever undone; that no one else could touch it or finish it. Now, sir, what do you think this plough-boy would do? Why, sir, he would drive into the field in spite of your law and logic, and tell you that he couldn't be humbugged in that way.

Now, Mr. Speaker, it is just as easy for the States to begin where Congress left off, and go on and lay out the districts, as it would be for one plough-boy to begin where the other left off. But it is asserted, in the face of this plain state of the fact, that the State have no right to go on and finish what Congress began, and left for them to finish. And it is further asserted, that, as the law cannot be carried into effect without the districts are made, therefore what has been done by Congress is unconstitutional, inoperative, and void.

And here Mr. VINTON said he would give notice that he should call for a division of the question, so as to get a distinct vote on that part of the resolution reported by the committee, which declares this act of Congress to be unconstitutional. He wanted to see if the House would come up to that question. The law might be inoperative or void for other reasons, but unconstitutional it certainly was not. But, said Mr. V. let us look a little into this assumption, that because this law is imperfect, because it cannot be carried into execution without further legislation, therefore it is void. What judge ever decided, what lawyer ever heard or read of such a doctrine? If a law be imperfect, it is a good reason why it should be amended. But, he repeated, that the idea that, because a statute required further legislation to carry it into execution, it was therefore void, was a doctrine that never was heard of before.

Mr. V. said, by way of testing it, he would suppose the law of primogeniture to be still in force in this District, and Congress were to pass a law in these words, viz: "that henceforth the estate of intestates should descend to the issue of the intestate, lawfully begotten, share and share alike." Now, sir, a law couched in these words would contain no provision for its execution; and will any one say it

would be less a law on that account, or because there might not be in the District such a thing as a court, or a practice act, to carry it into effect? Again, he said, he would suppose that Congress were now, at this session, to pass an act declaring "that henceforth the revenues of the United States should be exclusively derived from a capitation tax, to be assessed on the people according to the last census of the United States:" such a law could not be executed without further legislation fixing the amount amount to be assessed on each person, and providing for the assessment and collection by officers appointed for the purpose. And yet, if Congress were to adjourn without passing these supplemental laws, what would this law do? It would repeal your laws laying duties on imports; it would stop the sale of your public lands, and lay the government by the heels. You may say that you cannot imagine suck wickedness. True, it would be acting very bad; almost as wicked as it is for us to trample down this law, with this difference, that, in that case we should not violate the constitution or our oath of office.

Mr. VINTON said he would further imagine that, after this law was passed, the President should direct the collector of the port of New York to go on and collect duties on imported goods, and his collector were sued, as he surely would be, and brought into the Supreme Court of the United States, and were there to defend himself under the plea that the capitation act was imperfect; that it could not be executed without further legislation; that, therefore, it was unconstitutional, inoperative, and void. How long, Mr. Speaker, do you think that plea would stand the test in that court? The truth was, said Mr. V., that the mode adopted by Congress, in making the law in question, was no unusual thing in legislation. Indeed, in well-digested codes of law, it was usual to find the great rules and principles for the security and preservation of life, liberty, and property, embodied by themselves in the most general and comprehensive form; while those laws which provide for their administration and execution are found in other and appropriate parts of their code. It often happens that these administrative laws are imperfect, rendering it necessary to pass statute after statute, all having for their object to carry into effect some great principle; and all these laws, taken together, are regarded as one law, no matter what the distance of time intervening between the enactment of the several statutes. The plain result, then, of the whole argument is this, that the act of Congress, as the supreme and supervisory law, repealed so much and no more of the State laws, regulating elections, as came in conflict with it. While at the same time, as it should and ought to have done, it left to the States the business of making the districts to suit themselves, which the constitution makes it their bounden duty to go on and do. In all those States which then had, or now have, the single district system, it is what in law is denominated a restraining act, and, as such, operative upon them. And, indeed, (said Mr. V.,) if, when this act was passed, every State in the Union had had the single district-system in force, it would still, in his opinion, have been a very proper restraining law to prevent any one State from breaking in upon this uniformity. How is it possible, in this view of the matter, to vote that part of the committee's resolution which declares this act to be inoperative? It is, past all controversy, a constitutional, valid, and operative law. Four States have omitted to discharge the duty required of them by the constitution. What then is to be done? It is an implied and moral duty of every government to see that its laws are executed. By the omission of these States to act, the case has arisen (which was anticipated and mentioned in the convention which formed the constitution) when it has become the duty of Congress to act. Congress can pursue either of two courses; it can repeal the act in question, or it can do that which it has now become its duty—go on and lay off the districts, and provide for the elections in those States. But it cannot be repudiated, trodden down and trampled upon; if it be, it will still be a law, and will surely rise up in judgment against you.

The majority in this House cannot seriously doubt the constitutionality and validity of this act of Congress. They are now forced to decide whether they will uphold the law and the constitution, or make a sacrifice of both on the altar of party. Knowing that the decision of this question either way could not affect that majority, or its power over the House, he had, before coming here, suffered himself to indulge the belief that the law and the constitution would be vindicated and upheld; that, where there was nothing to lose, the love of the constitution and of the law would prevail over the love of party; but it was now but too evident that the power of party was too strong for the authority of the law. He would, notwithstanding, invoke gentlemen to pause before they act; to ponder and reflect upon the consequences of what they are about to do; to remember that the law is the birthright of the people of this country; that by it, and it alone, they hold and enjoy all that is dear to them—their lives, their liberty, and their property; that it is the shield of the poor against oppression, and of the rich against violence and plunder; that, in this country, and under a government like ours, the law is the last refuge, friend, and protector of all; that the American people have no other guaranty but in a sacred regard for the law, and a willing obedience to its commands for life, liberty, property, religion, public order, and, above all, for that sense of security and safety without which all these, except religion, are valueless; and without it even religion itself may be trodden down. In some countries all these seek shelter and protection under the sword in the hands of despotism, while all are at its mercy. It is the law that has made us, as a people, all that we are; and upon it depends the accomplishment of that glorious destiny which is before us. It is to the law or to the sword that all nations must look for protection; and as you weaken the law you strengthen the power of the sword. It has ever been our proudest boast that ours is a land of freedom, because it is a land of law. What was it that, throughout all Christendom, gave character, credit, confidence, honor, and respect to the American name and the American people? It was because the world believed us to be a law-loving, law-abiding, and law-obeying people; and it is because a portion, and a very small portion, of the States of this Union, have set the example of repudiating their laws, that the world has lost confidence in us all; and, from the very pinnacle of honor, we find ourselves as a people suddenly cast down to the lowest depths of disgrace throughout the civilized world. It is for this that the American citizen is shunned and suspected wherever he goes. As yet the American Congress is free from the taint and the reproach of repudiation. But the vigilant eye of the world, whose scrutiny we have awakened, is fixed upon us. It will mark well what we do on a question of such magnitude and moment as this. The honor of the nation is now in our hands, and hangs on our decision.

Mr. Speaker, many reproachful things have been said of the party that now has the majority in this House. They have been called repudiators, levellers, destructionists, disorganizers, the jacobin party of 1789. A golden opportunity is now presented for you to vindicate yourselves from all these reproaches; to put yourselves in the front rank of those who love the law, and uphold the constitution. You have the precious opportunity to do all this without impairing your power or your majority in this House. Will you not, then, do it for the sake of your party, and still more for the sake of the country, as the guardians of its liberty at home, and of its character, its honor, and its fame abroad? But if you will repudiate the law, and trample the constitution under foot, you have the power to do it, and we have not the power to prevent you. But we can and we will appeal to an honest and indignant people, who will shortly bring you to trial—who will, for themselves and for their country's sake, vindicate the law, uphold the constitution, retrieve the character, the honor, and the name of the nation, by pronouncing judgment of repudiation against you for this guilty deed.

---

## SPEECH OF MR. CHARLES ROGERS,
### OF NEW YORK,
*In the House of Representatives, February 23, 1844—*
On the right of petition.

The pending question being on the motion of Mr. DROMGOOLE to recommit the report of the Select Committee on the Rules, with instructions, proposed by Mr. BLACK, of Georgia, to restore the 21st rule—

Mr. ROGERS rose and said:

Mr. SPEAKER: I propose, with all sincerity and frankness, to give my views to the House on this subject. There is no question which has excited more interest at the North, and particularly among

316          APPENDIX TO THE CONGRESSIONAL GLOBE.          Feb. 1844.

28TH CONG.....1ST SESS.          *Abolition Petitions—Mr. Rogers.*          H. of Reps.

my constituents, than this very one of the right of petition. The 21st rule, from its first adoption, has found no favor with us of New York. Why, sir, you may travel through the whole length and breadth of the State, and you will hardly find one man in ten who will attempt to justify it. Deep and sincere is the opposition to it, and for good and sufficient cause. When the incipient efforts were made here to abridge the right of petition, the abolition party, as such, was hardly known among us. There were, to be sure, scattered abolitionists, and abortive efforts were occasionally made to mould the raw materials of abolitionism into something like political organization. Indeed, the question of political action was long mooted and undecided by them; there was great variety and difference of opinion on that subject, until the adoption of this rule, or some of its kindred measures of restriction, when, immediately seizing and occupying the vantage ground thus furnished, they commenced a regular political movement, and inscribed on their banners—Liberty, and the Right of Petition: a conjunction of terms, Mr. Speaker, well calculated to touch the popular mind, and stir the wide ocean of popular sentiment to its lowest depths. What has been the result? Look at New York, where, a few years ago, they scarcely had an array of political strength of sufficient amount to be considered respectable even among the scatterings. So in Massachusetts; so in Connecticut; so in Vermont; so in Ohio. How is it now? They hold the balance of power in all these States; and, from a scattered, disjointed and fragmentary condition, they have arrived to a position where power and influence beget respect. And I have sometimes thought that I have noticed, even on the part of the democracy, since abolitionism has arisen from her low estate, a disposition now and then, when hard pressed, to woo and win her.

Now, sir, I am of the opinion—honestly and sincerely of the opinion—that the very aliment of subsistence, that the very life-blood which has given vitality and vigor to this party, have been drawn from this celebrated 21st rule. There is a principle deeply planted in the human heart, as old as human nature itself, that revolts at persecution and oppression, and gathers strength from opposition. The very worm will turn on the foot that spurns it, and man, with all his glorious faculties and capabilities,—can he do less, will he do less, than the worm that licks the dust? The history of the world shows that no cause, honestly entertained and supported, was ever demolished by such weapons; on the contrary, such warfare has always led the oppressed to ultimate and complete triumph. The blood of the martyrs was the seed of the church, and from the dungeon, the scaffold, and the stake, that precious seed has gone forth "on the wings of mighty winds" to all corners of the world. The foot-prints of Christianity are lovely on the mountain top, and gladden the valleys; for they mark with unerring certainty all round the globe, in lines of light, the march of mind and the extent of civilization.

To what else, sir, than the principle I am speaking of, do we owe that splendid conception of the genius of Wier that now ornaments and adorns your rotundo?* It was this that gave to the world the story, the moral, and the poetry of the Mayflower, and of the rock of Plymouth. To what but this do we owe our revolutionary struggle, and our separate independent existence as a nation? There were, to be sure, giants in those days—intellectual giants; but it needed the oppression and despotism of the mother country to arouse their slumbering energies, and explore all the hidden depths of their nature. Then it was they sprang, like Minerva fully armed, from the forehead of the revolution, disciplined and prepared for the mighty conflict; and through that long spasm of "agony pure"—of unequalled suffering, and of unequalled renown—their course was upward and onward, to a merited and world-conceded immortality. The country never saw before, it has never seen since, it never will see again, anything of mortal mould to compare with the men of the revolution. Take that Congress which gave to the world the declaration of independence, and I challenge the annals of mankind—all of ancient and modern story—to produce a deliberative body that ever contained an equal amount of the moral and intellectual greatness which distinguished that illustrious Congress. It occupies the records of history without a parallel. It stands like a beacon-light on some mighty headland, to guide, instruct, and awe the world.

*The picture of the embarkation of the Pilgrim Fathers.

Now, sir, I do not propose to compare abolitionism with the cause of the revolution, or its advocates with the men of the revolution; but I do say, that human nature is essentially the same in every age and country, and that similar causes are apt produce similar effects; and that despotism and oppression here, can never palsy the popular will, but must always strengthen, invigorate, and consecrate it. Let us look at this subject in a plain, practical, and common-sense manner. What do we mean by the right of petition? We mean the right to ask, to solicit, to pray for a redress of grievances from a power capable of affording it; the right to approach the constituted authorities of the country, and ask, in a peaceable, orderly, and constitutional manner, to be relieved from injustice, wrong, and evils that are too grievous to be borne.

Well, what is the 21st rule? It is as follows:

"No petition, memorial, resolution, or other paper, praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave trade between the States or Territories of the United States in which it now exists, shall be received by this House, or entertained in any way whatever."

Is there any man here who supposes that he can make the people believe that this rule is harmless, and contains no abridgment, no infringement of the right of petition? I undertake to say that I know, and am thoroughly acquainted with public opinion in my quarter of the country. I know the people well, for I am one of them, and when at home, my daily intercourse is with the farmer, the mechanic, and the sons of honest labor; and I have found many a farmer at his plough-tail, and mechanic in his workshop, whose intelligence and intellect would do no discredit to this hall. What do such men think? What do the masses think, and say, and require, in relation to this rule? They think and say it is a violation of the right of petition, in the worst spirit of despotism; and they demand its utter and entire abrogation. And there is no magician in this land potent enough to lay the perturbed spirit of abolitionism until that is done.

Some gentlemen, with very great acuteness of mind and of logic, have undertaken to show that the right of petition is not violated in the least, because a member is permitted to rise in his place and state briefly the contents of a petition. Then, say they, the right of petition is at an end—it has performed its function, and accomplished its office, and has expired—and the law-making power immediately commences its province, and thus legislation is legitimately carried out. This abstraction is too refined and intangible for the comprehension of the people—the very subtlety of the thing is the death of it. It is easy enough to obscure, to perplex, and confuse an argument, and drive it out beyond soundings; but it requires a sound intellect, and the staple of common sense, to make a convincing one. I have no hesitation in saying that the best dialectician in this House cannot make this particular one plain, or even comprehensible. It is a transcendentalism that would figure well in the metaphysics of Germany, or in the mystic elaborations of the mind of Thomas Carlyle; but it is utterly thrown away on the popular mind, for it is unworthy of it.

The question has been frequently asked, What shall be done with these petitions? I answer, receive them, refer them, consider them, and report upon them; the very idea of petition necessarily implies audience and consideration; and if you can assign any good reason for refusing the prayer of them, that will have more influence in allaying the abolition excitement than all the barriers that inventive despotism ever erected in the path of free inquiry.

The only argument that I have heard, which has any plausibility in it for the rejection of petition, is this—that when the prayer of a petition is plainly and palpably, on the face of it, unconstitutional, then it is our duty to reject it, without reception—for, reception and consideration could add nothing to our convictions on the subject; as, for example, when a petition asked for the establishment of a national church, or an order of nobility, or a regal government. Without expressing any opinion on this point, I deny its applicability to the matter under discussion. These petitions under consideration relate mainly to the abolition of slavery in the District of Columbia, which I affirm to be clearly within the constitutional competency of Congress. And to this point I will now direct my attention, and invite the candid consideration of the House.

The grant of power on this subject is contained in section 8 of the constitution, and is as follows:

The Congress shall have power to exercise exclusive legislation in all cases whatsoever over such district (not exceeding ten miles square) as may, by cession of particular States, and the acceptance of Congress, become the seat of the government of the United States.

Can there be a more comprehensive grant of power? In all cases whatsoever! It is without restriction or limitation, and the English language can embody nothing more complete and absolute. So thought the framers of the constitution, and there is no safer method to arrive at a correct understanding of that instrument, than by taking the contemporaneous and concurrent testimony of its authors, and of the early interpretation stamped upon it by the first and best men of the country, when submitted to their consideration for adoption.

Mr. Madison, speaking in No. 43 of the Federalist of this particular grant of power, says:

The indispensable necessity of complete authority at the seat of government, carries its own evidence with it. It is a power exercised by every legislature of the Union, and I might say of the world, by virtue of its general supremacy.

The debates in the Virginia convention of 1788, called for the purpose of deliberating of the constitution, are instructive on this subject. The clause under consideration was admitted on all hands to contain an exclusive and untrammeled grant of power. Mr. George Mason, a distinguished member of the convention, thought—

There were few clauses in the constitution so dangerous as that which gave Congress exclusive power of legislation within ten miles square. Implication, (he observed,) was capable of any extension, and would probably be extended to augment the congressional powers. But here there was no need of implication. This clause gave them an unlimited authority, in every possible case, within that district.

The celebrated Patrick Henry speaks of this clause as giving "unlimited powers," unbounded powers," "illimitable authority," &c.

Mr. Madison, in reply to Mr. Henry, asks:

Was there ever a legislature in existence that held their sessions at a place where they had not jurisdiction?

And goes on generally to maintain the importance and necessity of this grant of exclusive power.

In the next place, let us inquire if slavery is a proper subject for the exercise of this power—if it is legitimately within the province of legislation. And on this point I will cite an authority which ought to have great weight with southern gentlemen—it is the opinion of the father of his country—of George Washington. In a letter addressed to Robert Morris, dated Mount Vernon, April 12, 1786, among other things, he says:

I hope it will not be conceived, from these observations, that it is my wish to hold the unhappy people who are the subject of this letter, in slavery. I can only say that there is not a man living who wishes more sincerely than I do, to see a plan adopted for the abolition of it; but there is only one proper and effectual mode by which it can be accomplished, and that is by legislative authority; and this, as far as my suffrage will go, shall never be wanting.

In writing to Mr. John F. Mercer on this subject, General Washington said:

I never mean, unless some particular circumstances should compel me to, to possess another slave by purchase, it being among my first wishes to see some plan adopted by which slavery in this country may be abolished by law.—Sept. 9, 1786.

I have another fact on this point, and a conclusive precedent in this House. On the 9th January, 1829, the House of Representatives, on motion of Mr. Miner of Pennsylvania, adopted the following resolution:

*Resolved,* That the Committee for the District of Columbia be instructed to inquire into the expediency of providing by law for the gradual abolition of slavery in the District, in such manner, that the interest of no individual shall be injured thereby.

This resolution was adopted by a vote of 114 to 66.

Again, the journals show a long list of petitions on this very subject, presented heretofore by gentlemen of the southern delegations in Congress, thus admitting the right of Congress to legislate on the subject.

In this connexion, Mr. Speaker, allow me to read the celebrated letter of Thomas Jefferson, the great apostle of democracy, on the question of slavery, addressed to Dr. Price, of London, who had written a pamphlet on that subject:

PARIS, August 7, 1785.

SIR: Your favor of July the 2d came duly to hand. The concern you therein express as to the effect of your pamphlet in America, induces me to trouble you with some observations on that subject.

From my acquaintance with that country, I think I am able to judge, with some degree of certainty, of the manner in which it will have been received. Southward of the Chesapeake, it will find but few readers concurring with it

Feb. 1844.  APPENDIX TO THE CONGRESSIONAL GLOBE.  817

28TH CONG.....1ST SESS.  *Abolition Petitions—Mr. Rogers.*  H. OF REPS.

in sentiment, on the subject of slavery. From the mouth to the head of the Chesapeake, the bulk of the people will approve it in theory; and it will find a respectable minority ready to adopt it in practice—a minority which, for weight and worth of character, preponderates against the greater number, who have not the courage to divest their families of a property which, however, keeps their consciences unquiet. Northward of the Chesapeake, you may find here and there an opponent to your doctrine, as you may find here and there a robber and murderer, but in no greater number. In that part of America, there being but few slaves, they can easily disencumber themselves of them; and emancipation is put into such a train, that in a few years there will be no slaves northward of Maryland. In Maryland, I do not find such a disposition to begin the redress of this enormity as in Virginia. This is the next State to which we may turn our eyes for the interesting spectacle of justice in conflict with avarice and oppression—a conflict wherein the sacred side is gaining daily recruits from the influx into office of young men grown and growing up. These have sucked in the principles of liberty, as it were, with their mother's milk, and it is to them I look with anxiety to turn the fate of this question. Be not therefore discouraged. What you have written will do you a great deal of good, and could you still trouble yourself with our welfare, no man is more able to give aid to the laboring side. The college of William and Mary, in Williamsburg, since the re-modelling of its plan, is the place where are collected together all the young men of Virginia, under preparation for public life. They are there under the direction (most of them) of a Mr. Wythe, one of the most virtuous of characters, and whose sentiments on the subject of slavery are unequivocal. I am satisfied, if you could resolve to address an exhortation to those young men, with all that eloquence of which you are master, that its influence on the future decision of this important question would be great, perhaps decisive. Thus you see, that, so far from thinking you have cause to repent of what you have done, I wish you to do more, and wish it, on an assurance of its effect. The information I have received from America, of the reception of your pamphlet in the different States, agrees with the expectations I had formed.

I pray you be assured of the sincerity of esteem and respect with which I have the honor to be, sir, your most obedient humble servant,

TH. JEFFERSON.

Well, sir, is there anything in the grants of cession to limit this power? Let us look. Take the act of cession from the State of Virginia, and I understand the Maryland act, as finally adopted, is similar to it.

SEC. 2. *Be it therefore enacted by the General Assembly*, That a tract of country, not exceeding ten miles square, or any lesser quantity, to be located within the limits of this State, and in any part thereof as Congress may by law direct, shall be, and the same is hereby, forever ceded and relinquished to the Congress and government of the United States, in full and absolute right, and exclusive jurisdiction, as well of soil as of persons residing or to reside thereon, pursuant to the tenor and effect of the eighth section of the first article of the constitution of the government of the United States.

SEC. 3. *Provided*, That nothing herein contained shall be construed to vest in the United States any right of property in the soil, or to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States.

SEC. 4. *And provided, also*, That the jurisdiction of the laws of this Commonwealth over the persons and property of individuals residing within the limits of the cession aforesaid, shall not cease or determine until Congress, having accepted the said cession, shall, by law, provide for the government thereof, under their jurisdiction, in manner provided by the article of the constitution before recited.

By an act approved February 27, 1801, and in the first section of said act, Congress provided for the continuation of slavery in this District, as follows:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the laws of the State of Virginia, as they now exist, shall be and continue in force in that part of the District of Columbia which was ceded by the said State to the United States, and by them accepted for the permanent seat of government; and that the laws of the State of Maryland, as they now exist, shall be and continue in force in that part of the said District which was ceded by that State to the United States, and by them accepted as aforesaid.

In this little section is compressed all the authority for the continuance of slavery in this District. And will any one deny that, at the time of its adoption, Congress had the same power to abolish it, that it had to continue it in existence? It is apparent there is no limitation on this subject in the grants of cession, and that the authority of Congress is as absolute and unquestionable on this subject, as that of the State legislatures within our own limits; and any other doctrine is unsound, and of latter-day origin, and has no ground of principle to stand upon.

But, sir, I have another authority on this subject; which, in my mind, is a *clincher*, and ought certainly to be conclusive with a majority of this House. It is the opinion of a distinguished leader of the democracy, under whose banner they are now rallying, as I verily believe, to most assured defeat. It is the opinion of Martin Van Buren. Hear him.

On the 23d of February, 1836, a committee of citizens of North Carolina addressed to Mr. Van Buren the following interrogatory, to which they requested an explicit answer:

Do you, or do you not, believe that Congress has the con-

stitutional power to interfere with or abolish slavery in the District of Columbia?

A very plain question, Mr. Speaker, and susceptible of a very short answer; but the distinguished epistolary writer to whom it was addressed, with his usual circumlocution and periphrasis, covers three columns of the newspaper press in reply. After wading through the same, I find the only point is contained in the following paragraph:

These views, thus expressed and sanctioned by myself, appear to me to cover the whole ground, save the abstract question to which you have been pleased to call my attention; and I cheerfully embrace the opportunity you have felt it your duty to afford me, to explain fully myself on that also. As anxious as you can possibly be, to arrest all agitation upon this disturbing subject, I have considered the question you have propounded to me, with a sincere desire to arrive at the conclusion, that the subject, in respect to the District of Columbia, can be safely placed on the same ground on which it stands in regard to the States, viz: the want of constitutional power in Congress to interfere in the matter. I owe it, however, to candor, to say to you, that I have not been able to satisfy myself that the grant to Congress, in the constitution, of the power of exclusive legislation in all cases whatsoever, over the federal district, does not confer on that body the same authority over the subject that would otherwise have been possessed by the States of Maryland and Virginia; or that Congress might not, in virtue thereof, take such steps upon the subject in this District, as those States might themselves take within their own limits, and consistently with their rights of sovereignty. Thus viewing the matter, I would not, from the lights now before me, feel myself safe in pronouncing that Congress does not possess the power of interfering with, or abolishing slavery in the District of Columbia.

When we consider, Mr. Speaker, the natural inclination and tendency of this man's mind to non-committalism, and that his usual style of communicating with the public is involved, obscure, and ambiguous, this certainly is the best specimen of directness, as it most assuredly is of soundness and truth, that can be found in the political essays of the "northern man with southern principles."

In reply to a remark of Mr. CAVE JOHNSON, of Tennessee—

Mr. ROGERS said, he admitted that Mr. Van Buren was against the expediency of the thing, and, notwithstanding he acknowledged the power, he was opposed to the exercise of it. He was merely referring to his opinions on the constitutional point.

Mr. PAYNE, of Alabama, desired an opportunity to make a remark.

Mr. ROGERS declined to yield the floor, and continued: I have another authority to cite, in reply to the gentleman from Alabama, [Mr. DELLET,] who yesterday made a very able and eloquent speech on the other side, and then I shall have done with my authorities. The gentleman quoted, with an air of great triumph and satisfaction, the following passage from a speech of Mr. Madison in the Virginia convention, and applied it to the District of Columbia:

I was struck with surprise when I heard him (Mr. Henry) express himself alarmed with respect to the emancipation of slaves. Let me ask, if they should even attempt it, if it will not be a usurpation of power? There is no power to warrant it in that paper. If there be, I know it not. But why should it be done? Says the honorable gentleman, for the general welfare; it will infuse strength into our system. Can any member of this committee suppose that it will increase our strength? Can any one believe that the American councils will come into a measure which will strip them of their property, discourage and alienate the affections of five-thirteenths of the Union? Why was nothing of this sort aimed at before? I believe such an idea never entered into any American breast, nor do I believe it ever will, unless it will enter into the heads of those gentlemen who substitute unsupported suspicions to reasons.

Now, sir, if we turn to the speech of Mr. Henry, to which the particular point to which the above was a reply, we shall see at a glance that no allusion was made to slavery in this District, (as indeed there could not be, for the District was not then in existence, and no one could tell where it would be located, whether north or south,) but the whole subject of slavery spoken of, was slavery in the States, and no where else; and on that subject there is no difference of opinion at the North or the South; for the most zealous and determined abolitionist north of Mason and Dixon's line never supposed that Congress had any authority to abolish or interfere with slavery in the States.

The speech of Mr. Henry was on the resolution of ratification proposed by Mr. Wythe. The following are extracts from it:

Among ten thousand implied powers which they may assume, they (the Congress) may, if we be engaged in a war, liberate every one of your slaves, if they please.

Again:

If you give power to the general government to provide for the general defence, the means must be commensurate to the end. All the means in the possession of the people must be given to the government, which is intrusted with the public defence. In this State there are

two hundred and thirty-six thousand blacks, and there are many in several other States. But there are few or none in the northern States; and yet, if the northern States shall be of opinion that our numbers are numberless, they may call forth every national resource. May Congress not say that every black man must fight? Did we not see a little of this last war? We were not so hard pushed as to make emancipation general; but acts of assembly passed that every slave who would go to the army should be free. Another thing will contribute to bring this event about: slavery is detested; we feel its fatal effects; we deplore it with all the pity of humanity.

And again:

Let me not dwell on this subject. I will only add that this, as well as every other property of the people of Virginia, is in jeopardy, and put in the hands of those who have no similarity of situation with us. This is a local matter, and I can see no propriety in subjecting it to Congress.

These extracts, in my judgment, are conclusive on this point, and need no comment.

The gentleman from Mississippi, (Mr. HAMMETT,) the other day, in speaking on this subject, saw fit to allude to New York, and with a sneer to Governor Seward. The gentleman probably understands the politics of his own State, and the reputation of her great men, much better than he does the affairs of New York, and the character of her distinguished citizens. It is a fact notorious to almost everybody but the member from Mississippi, that Governor Seward, on his first nomination for the gubernatorial chair, was addressed by the abolitionists on the subject of the different articles of their creed, and that he returned an answer of general dissent to the prominent points of their political faith. It is true, his administration gave satisfaction in many respects to the abolition party, as I have no doubt it did to a large majority of the people of the State; and that its wisdom and true statesmanship will hereafter be acknowledged through all time, in the enduring records of history.

Who is Wm. H. Seward, sir? The very soul of honor. A man formed in the prodigality of nature; with all the affluence of mind and virtue sown broadcast into his composition. His life was never soiled with impurity, or his character sullied by the breath of reproach; he is not only pure, but, like Cæsar's wife, he is above and beyond suspicion. He never trod the devious path of shuffling expediency and low ambition; and the popularity which has followed him to his retirement, is like that spoken of by Lord Mansfield, which follows great and glorious deeds, but is not sought after. In the freshness of his youth he planted himself in western New York, among a population distinguished for their discrimination, intelligence, and enterprise; unaided and alone he established himself there; and by the force of his intellect, the energy of his character, and the clustering virtues that adorned it, he arose to eminence and distinction, and at the early age of thirty-seven was elected governor of the empire State. At the expiration of his first term he was again elected, and at the conclusion of his official labors, voluntarily retired from the public service. Of his administration this is not the time or place to speak. Let it suffice to say, that the line of policy, originated in our State by one of the master spirits of the age, and of whom New York is so justly proud, (the immortal Clinton,) found in Governor Seward a firm friend and unswerving advocate; and there are no two names in our domestic annals more highly enthroned in the affections of our people, or graven deeper on the monuments of our prosperity. Sneer at William H. Seward! Why, sir, as Tristram Burgess once said on this floor, "there is more wisdom in his political little fingers, than in the whole loins of the men who assail him." He belongs to the true nobility—the nobility of nature; to the only peerage recognised in this land—the peerage of intellect, adorned by the heraldry of virtue. And were New York now called upon, like the mother of the Gracchi, to present her jewels, the name of William H. Seward would be one of the brightest gems that would glitter in the diadem of her greatness.

Where does this sneering, this taunting come from? From Mississippi! With all due deference to the gentleman representing Mississippi on this floor, I must be allowed to say that, in my humble opinion, Mississippi is the very last State in this Union which should attempt to sit in judgment on the character of her sister States. The gentleman thinks abolitionism pregnant with mischief, and black with dishonor. What does he think of repudiation? Sir, war, pestilence, and famine may be endured—any other evil but this; for there is a recuperative energy in this country to restore, to renew, to revive and resuscitate; but where is the medi-

318     APPENDIX TO THE CONGRESSIONAL GLOBE.     March, 1844.

28TH CONG.....1ST SESS.     *Oregon Territory—Mr. Winthrop.*     H. OF REPS.

cine that shall heal the broken honor of the country? Who shall wipe from her brow the damning leprosy of violated pledges and blighted and blasted faith? Where is the arm long enough, or strong enough, to "pluck up drowned honor by the locks," from this deep abyss of infamy? When the obligations of a government become "false as dicers' oaths," then, amid the scorn and jeers of the world, it voluntary sinks to that depth of degradation from which there is not even the hope of a resurrection. It is moral and political death: the great, the unforgotten, and unforgiven public sin! And, unlike the beautiful sentiment of Lawrence Sterne, there exists in Heaven's chancery no recording angel to drop a tear of pity on it, and blot it out forever.

Mr. THOMPSON, of Mississippi, wished, before the gentleman left that part of the subject, to be permitted to make an explanation in reply.

Mr. ROGERS declined to give way, as his hour had nearly expired; and observed, that he had made no allusion to the gentleman, and that his observations on repudiation were general, and not particular, in their application.

I had intended, sir, to notice the extraordinary speech of the gentleman from South Carolina, [Mr. BURT,] but my time will not permit me to do so now, and I pass on.

Mr. Speaker, in the course of this debate, reference has been made, often and long, to foreign practice and foreign precedents; as if the despotism of the old world, crushing with its iron heel the rights of man, and trampling them in the dust, could have any controlling weight here in a Congress of American freemen. Why, sir, neither time nor precedent can sanctify error. You may throw the snow-flakes on its brow, but it is only hoary-headed error still.

I claim that the right of petition is a great, original, inherent, and indefeasible right; that it exists independent of crown grants, or parliamentary indulgences, or constitutional provisions; that it attaches to human nature as such, and is eternal and indestructible. It is written on the heart of man by the finger of his Maker; it is incorporated with all the bounding pulses of his existence—it is coeval and coextensive with the race. From the dawn of creation, when the morning stars sang together, and the sons of God shouted for joy, it has been the heritage of man—a legacy from his God—and it will endure as his rightful possession and inheritance until "the crack of doom." You have no more authority to abridge, or mutilate, or destroy this right, than you have to abridge, or limit, or shackle, the orisons which the contrite heart offers up to Heaven.

The constitution, therefore, instead of looking at the riot acts of England, and the despotism of the house of Stuart, looked to original, immutable, and eternal principles, and but declared, reaffirmed, and reasserted a well known and pre-existent truth—a truth familiar to all men, and to none more so than to the framers of the constitution. I come to the conclusion, therefore, that this 21st rule not only violates the constitution, but is in hostility to those great and fundamental principles upon which all constitutions and all rightful governments repose.

I think I have heard, Mr. Speaker, in the progress of this debate, something said about a dissolution of the Union—something about a calculation of the value of the Union. Now, sir, no man venerates this Union more than I do—no man cherishes for it a deeper affection. I regard it as freighted with the hopes of humanity—as the last mighty stake in this wide world in the great experiment of self-government. Other experiments have failed—other republics have perished from the face of the earth. They lie like awful wrecks along the solitude of time, and have "clattered down the steeps of night forever."

The eyes of the nations are upon us, with unwinking and intense solicitude; and the oppressed and down-trodden of every land are stretching to us their eager arms with hope and confidence. If we fail, "chaos has come again;" and from the ransomed thrones of despotism shouts of malignant joy will startle the world, like the "earthquake voice of victory." Yet, notwithstanding this, and more than this, I agree with the gentleman from South Carolina, [Mr. RHETT,] that there may be evils of greater magnitude, and more intolerable than even a dissolution of this Union. I regard freedom of thought and freedom of discussion—the liberty of the press and the liberty of speech—and a free, untrammeled exercise of the right of petition, as guarantied, accredited, and secured by letters-patent from high

heaven. And sooner than surrender these invaluable rights, and submit to have an atmosphere of repulsion thrown around this Capitol, and be obliged to approach it with "bated breath," and "bend the supple hinges of the knee, that thrift might follow fawning"—sooner than submit to such degradation—sooner than have the people submit to it—"I'd whistle" this Union "down the tide of time," and give its fragments to the winds.

## SPEECH OF MR. WINTHROP,

### OF MASSACHUSETTS,

*In the House of Representatives, March 18, 1844—On the Oregon question.*

The House having resolved itself into a Committee of the Whole on the state of the Union, and having proceeded to the consideration of the report of the Committee on Foreign Affairs, declaring it to be inexpedient to act at this time on a resolution introduced by Mr. Owen of Indiana, to request the President of the United States to give due notice of twelve months to the British government for terminating the convention for the joint occupation of the Oregon Territory; and the chairman of the Committee on Foreign Affairs [Mr. C. J. INGERSOLL of Pennsylvania] having spoken in opposition to the report—

Mr. WINTHROP addressed the committee nearly as follows:

I have no purpose, Mr. Chairman, of attempting a detailed reply to the honorable gentleman who has just taken his seat. I was greatly in hopes that another member of this House, and I will add, another member of the Massachusetts delegation, who has so often instructed and delighted us on these questions of foreign controversy, [Mr. ADAMS,] would have taken the floor for this purpose. I would gladly yield it to him, or, indeed, to any one else who is disposed for it, feeling, as I deeply do, the want of greater preparation and longer reflection for doing justice to the occasion. I am unwilling, however, that the speech which has just been delivered should pass off without some notice. I fear, too, that, if I yield to the kind suggestion of a friend near me, and ask a postponement of the debate, I may lose an opportunity altogether. Recent proceedings in this house afford me very little encouragement to try such an experiment. On more than one occasion, questions of the highest interest and importance seem to have been brought up unexpectedly, as this has been, for the purpose of allowing some member of the majority of the House to deliver an elaborate exposition of his views, and then to have been shuffled off again by the previous question, or by a motion to lay on the table, before any member of the minority could open his lips in reply. I proceed, therefore, to make the best of the opportunity which is now secured to me.

And, in the first place, let me say a word in regard to the sectional character which has been given to this subject. It has been often said that the question about Oregon is a western question; and a disposition has been manifested to charge hostility to western interests and western rights upon all who are not ready to draw the sword, without further delay, in defence of this territory. I deny this position altogether. It is a national question. It is a question for the whole country. The North has as much interest in it as the West, and as much right to be heard upon it: indeed, there are some views in which it is more a northern than a western question. I cannot forget that the American claim to Oregon, so far as it rests upon discovery, dates back to Massachusetts adventure and Boston enterprise. It was a Boston ship which gave its name to the Columbia river. It was Captain Robert Gray, of Boston, who first discovered that river. It was the Hancock and the Adams of Massachusetts—the proscribed patriots of the revolution—whose names were inscribed on those remote capes. And if we turn from the early history of Oregon to its present importance, and to the immediate interests which are involved in its possession, the North will be found no less prominently concerned in the question. The great present value of this Territory has relation to the commerce and navigation of the Pacific ocean. The whale fishery of this country requires safe stations and harbors on the Northwest coast. And by what part of the nation is this fishery carried on? Why, sir, the State of Massachusetts owns nine-tenths of all the whale ships of the United States. The single town of New Bedford (the residence of my hon-

orable friend Mr. GRINNELL) sends out 92,000, out of a little more than 130,000, tons of the American shipping employed in this business; and three other towns in the same district employ 31,170 tons of the remainder. So far, then, as the whaling interest is to be regarded, the Oregon question is emphatically a Massachusetts question. I feel bound to add, however, that the whole coast of Oregon can hardly furnish one really good harbor. South of the forty-ninth degree of latitude, (a boundary which we have once offered to compromise upon,) there is not one which a ship can get safely into, or out of, during three-quarters of the year. The harbor of San Francisco, in northern California, would be worth the whole Territory of Oregon to the whaling fleet of the nation.

A mere western interest! Sir, I doubt whether the West has a particle of real interest in the possession of Oregon. It may have an interest—a momentary, seeming, delusive interest—in a war for Oregon. Doubtless, the western States might reap a rich harvest of spoils in the prosecution of such a war. Doubtless, there would be fat contracts of all sorts growing out of such a contest, which would enure to their peculiar advantage. Doubtless, the characteristic spirit of the western people—that spirit of restless adventure, and roving enterprise, and daring conflict, which the honorable gentleman has just eulogized—would find ample room and verge enough for its indulgence, even to satiety, in such a campaign. Whether that spirit, indomitable as it is in any ordinary encounter, would not be not be found stumbling upon the dark mountains, or fainting in the dreary valleys, or quenched beneath the perpetual snows which nature has opposed to the passage to this disputed territory, remains to be seen. A march to Oregon, I am inclined to believe, would take the courage out of not a few who now believe themselves incapable of fatigue or fear. But suppose the war were over, successfully over, and Oregon ours: what interest, let me ask—what real, substantial, permanent interest—would the West have in its possession? Are our western brethren straightened for elbow-room, or likely to be for a thousand years? Have they not too much land for their own advantage already? I verily believe that, if land were only half as abundant and half as cheap as it is, the prosperity of the West would be doubled. As an eastern representative, I would never submit a proposition to raise the price of the public lands; such a proposition would would be misconstrued and perverted. But if I were a western man, I would ask nothing sooner, I would desire nothing more earnestly of this government than to double the price of these lands. It would put money in the pocket of every western farmer, and in the coffers of every western State. Sale for the purpose of settlement would not be checked; speculation only would be restrained. The average income of the nation would be as great as now; the ultimate receipts far greater; and all parties would be benefited in the end. The West has no interest, the country has no interest, in extending our territorial possessions. This Union of ours must have limits, and it was well said by Mr. Senator Benton in 1825, that westward "the ridge of the Rocky mountains may be named, without offence, as presenting a convenient, natural, and everlasting boundary. Along the back of this ridge the western limit of this republic should be drawn, and the statue of the fabled god, Terminus, should be raised upon its highest peak, never to be thrown down."

The Oregon question, however, Mr. Chairman, as now presented to us, is not a question of interest, but of right; not a question as to the ultimate reach of our federal union, but as to the existing extent of our territorial title. Upon this point I shall say little. An argument to this House in favor of our title to Oregon, would be words thrown away. If any man can can convince the British government that the territory is ours, his labor will be well employed, and the sooner he sets about it the better. But we are convinced already. For myself, certainly, I believe that we have a good title to the whole twelve degrees of latitude. I believe it, not merely because it is the part of patriotism to believe one's own country in the right, but because I am unable to resist the conclusions to that effect, to which an examination of the evidence and the authorities have brought me. In saying this, however, I would by no means be understood to concur in the idea which has recently been advanced in some quarters, that our title is of such a character that we are authorized to decline all negotiation on the subject. Why, sir, with what face

Feb, 1844. APPENDIX TO THE CONGRESSIONAL GLOBE. 591

28TH CONG.....1ST SESS. *Abolition Petitions—Mr. Severance.* H. OF REPS.

plunge the country into a war with Mexico? Is it in the cause of liberty, of civilization, or of national honor, that he summons us to the field of conflict? No, sir. It is to be a contest for territorial aggrandizement. The acquisition of Texas is the prize which is presented to stimulate the zeal and tempt the cupidity of our people. Do the President and his advisers seriously believe that the country is prepared to encounter the calamities of war to secure the incorporation of Texas into the Union? It is time they were undeceived. So far from desiring Texas at the expense of a war, a majority of our countrymen will forbid the annexation, even though it were attainable by peaceful measures with the universal consent of nations.

I am not disposed, on this occasion, to enter upon a broad field of discussion, in regard to the general question of annexation, or the extraordinary measures pursued by the President to bring Texas into the Union. That subject is now under deliberation in the other House of Congress, to which it appropriately belongs as a co-ordinate branch of the treaty-making power. I had indulged a hope that the final action of the Senate would place the question at rest, and that it would not become a theme of debate on this floor. But in justice to those whose confidence has placed me here, as the representative of their sentiments, I feel constrained to notice some extraordinary doctrines and avowals which we have heard in this debate from the honorable gentleman from South Carolina, [Mr. HOLMES.] In the first place, he gravely contends that this government is under a constitutional obligation to protect the institution of slavery in the southern States, and then insists that we are bound to secure the annexation of Texas, *because* it is necessary to the support and perpetuation of slavery in the States! I must confess that this pretension sounds strangely in my ears. Sir, I am no abolitionist. I have never regarded the extreme measures and the system of agitation pursued by that misguided sect, with favor or approbation. I revere the constitution and the Union, as the noblest creation of human wisdom and patriotism which the world has seen; and that both may be of perpetual duration, is the warmest aspiration of my heart. I would cherish the harmony of the Union, as an object too sacred to be menaced by the baleful spirit of faction or sectional discontent. We are one country and one people, bound together in a common destiny by all that is glorious in our recollections of the past, by all that is precious in our hopes of the future. By our union we gained liberty and independence—by our union we must preserve them. In my devotion to the Union, I know no geographical boundaries or distinctions. I desire to see the protection and the blessings of our constitution dispensed in a spirit of equal justice to every portion of our common country—to the North and the South, the East and the West. That sacred charter was formed in a spirit of harmony, concession, and patriotism; and I wish to see it administered in a similar spirit, under the same ennobling influences of conciliation and self-denial.

At the formation of the Union slavery existed in most of the States, and chiefly in the southern portions of the confederacy. The complete control of this institution was left in the States where it prevailed, and to those States an undue representation was conceded by reason of their slave population. By the subsequent acquisition of Louisiana, a vast extension was given to the slave territory, and of this we do not complain. In common with the great body of the northern people, I am prepared to abide by the compromises and guaranties of the constitution, and to fulfil its obligations with scrupulous justice and fidelity. But more than this is now required. It is not enough that an unequal representation is allowed to the slave States, and that they remain in the full enjoyment and regulation of their domestic institutions. We are called upon not only to maintain it in the States of the Union, but to exert the powers of the federal government to propagate slavery in foreign parts, and avert the possibility that a neighboring nation may discard slavery and become free.

To enforce the appeal, it is contended that the protection and extension of slavery is one of the paramount obligations of the government under the constitution. The pretension that we are bound to admit new nations to the confederacy, for no purpose but to perpetuate slavery under the shield of federal protection, is a proposition so monstrous, so repugnant to the spirit of the constitution and the enlightened sentiment of the country, I am at a loss

for terms of fitting emphasis to characterize the boldness of the avowal. So far from admitting the duty, I utterly deny the power of the federal government to enlarge its borders by the admission of neighboring nations, for the object of extending slavery or any other sectional interest, without the consent of each State of the confederacy, constitutionally expressed. If the doctrine had been advanced in the early days of the constitution, while its framers were engaged in the administration of the powers which it created, it would have been received with a sensation of astonishment which has hardly been manifested here, under the peculiar influences that now surround the Capitol.

Another ground has been assumed by the gentleman from South Carolina, as well as other speakers and writers on annexation, upon which I must beg leave to detain the committee for a moment. He asserts that the admission of Texas to the Union is a necessary measure for the defence of the country from foreign invasion! Is it really credible that we are able to defend our present territory only by a further extension of our borders? It appears to be forgotten that the thirteen colonies, with less than three millions of people, maintained a successful resistance against the arms of England, the most formidable power of the globe, during the seven years of our revolution. They proved themselves equal to the struggle, and were able, under the blessing of God, to achieve our independence. But it seems that the twenty-six States of our confederacy, with nearly twenty millions of people, whose past progress in wealth, improvements, and the multiplication of resources for peace and war, surpasses all example in the history of nations, are insufficient to defend themselves from foreign aggression, without the addition of Texas to the Union. Sir, I deny the position in all its length and breadth. For the honor of the American name I deny it. I trust we have inherited some share of the virtues and spirit of our ancestors. When our country is assailed or invaded, it will be found that the true strength and defence of the nation consists, not in boundless extent of territory, but in the valor and patriotism of our people. We have nothing to fear from hostile nations. In a righteous and honorable cause, appealing to the spirit and just pride of the nation, we may defy the world in arms.

Even if the acquisition of Texas by honorable means were an object of national desire, it would afford no ground for the justification of the executive in the employment of military force, independent of constitutional sanction or authority. To tolerate so flagrant an act of usurpation, without an expression of condemnation or censure, is to admit a precedent which may ultimately lead to the subversion of our government and the destruction of our free institutions. It is the tendency of executive power to attract and gradually concentrate within itself the powers belonging to the co-ordinate branches and departments of government; and we owe it to ourselves and the country to resist every encroachment at the threshold. If the high prerogative of placing the nation at war is to be abstracted from Congress, and added to the over-shadowing authority of the chief magistrate, it is idle for the people to send their representatives here. I indulge no serious apprehensions that our present executive will enact the part of a Cæsar or a Cromwell, but if his bold assumption of powers in disregard of the constitution shall ripen into usage, and acquire the force of precedent, at some future period of our history, when the first office shall be occupied by a successful chieftain whose capacity is equal to his ambition, or some popular leader of iron nerve and daring will, sustained by a triumphant party, it will be found an easy conquest to prostrate the forms of constitutional government and trample upon the most sacred rights of the people.

The proposed check upon the expenditure of the navy appropriation, cannot, I apprehend, be met by any serious objection. If we are to remain at peace, and the executive proceeds according to the usual course of lawful expenditure, he cannot require more than half the amount within the first half of the fiscal year, and the provision will be harmless. If he intends to persist in rash measures of hostility, designed to involve the country in unjustifiable war with a friendly neighbor, it is our duty to interpose an effectual obstacle to his progress, instead of furnishing means for the consummation of his mad and mischievous schemes. The question of war belongs to the representatives of the people, and when they shall find cause for a declaration of hos-

tility, it will be their duty to provide for its prosecution.

In offering an amendment intended to restrict the executive to the ordinary expenditure during the recess of Congress, I am actuated by no desire to weaken our navy or impair its efficiency. I would not detract from the proud honors and bright renown which it has won for itself, or the unfading glory which it has shed upon our national character. The brightest pages of our annals record the services and exploits of the brave men of our navy. They have carried our flag to every sea, and their gallantry in the hour of peril deserves the gratitude and liberality of the country. I stand ready to sustain all measures which may be necessary to the vigor and usefulness of this branch of the national defence.

### SPEECH OF MR. SEVERANCE,

OF MAINE.

*In the House of Representatives, February 16, 1844.—On the right of petition.*

The question being on the motion of Mr. BLACK, of Georgia, to amend the motion of Mr. DROMGOOLE, of Virginia, to recommit the report of the select committee on the rules, with instructions to report to the House the following, viz:

"No petition, memorial, resolution, or other paper, praying the abolition of slavery in the District of Columbia, or any State or Territory, or the slave trade between the States or Territories of the United States in which it now exists, shall be received by the House, or entertained in any way whatever."

Mr. SEVERANCE rose and said:

Mr. SPEAKER: I do not propose to discuss the importance, the history, or the origin, of the right of petition—others have, perhaps, sufficiently occupied that ground; nor shall I take up much time in refuting the ingenious arguments which have been offered, to prove that the right of petition is fully recognised and sufficiently regarded, by merely permitting a member of the House to present a petition in this place. Here is the rule which it is proposed to continue in force.

(Mr. S. read it as above.)

Now it will surely not be denied, that the right of petition upon the four subjects embraced in this rule is set at naught in express terms. Petitions on these subjects are not to be received or considered in any manner whatever. And why not? Why are they selected for condemnation and rejection? Surely they are not frivolous or unimportant. No, indeed; the sensation they create here and elsewhere shows that they are, as they ought to be, regarded as of the deepest import. Why, then, is a distinction drawn between them and other petitions? Is it that Congress ought not to grant their prayer? Sir, this is no valid reason. Other petitions that ought not to be granted are received every day, and referred to committees, which report for or against them. We are not to prejudge them before investigation, but decide upon their merits after a patient hearing. The right of petition is a mere mockery, if it does not go to this extent; and those Southern gentlemen are entirely in the right, who say that the mere reception of petitions, and laying them on the table without further action, will never satisfy the petitioners. Sir, it will not, and ought not. Nothing will satisfy them, or satisfy the country, but to have these petitions treated like all other petitions. But, it is said, they ask for legislative action which would be unconstitutional, and therefore we ought to notify the people beforehand that petitions on certain subjects will not be received. This pretence constitutes the only reason I have ever heard, having the least degree of plausibility, for the adoption of this offensive rule. Is it valid? I think I can show that it is not valid; but is utterly groundless as to three out of four of the classes of petitions embraced in the rule; and as to the fourth, (that relating to slavery in the States,) there is no necessity for any such rule, for such petitions are not sent here. Petitions of this sort appear to be included in the rule, only to put the other three classes of petitions in bad company, and for no other purpose whatever. No such petitions being sent here, there can be no necessity for a rule to exclude them. And how is it with the other three? Sir, I contend that Congress has the power to abolish slavery in this District, and the slave trade, domestic or foreign, upon the high seas. The foreign has been prohibited, and Congress has legislated already upon the domestic slave trade, so far as to inflict penalties upon it in vessels under forty tons. Congress, then, having the power to legislate upon these subjects, abuses its authority by refusing to receive petitions for such legislative action. Congress has also paramount and local jurisdiction in the Territories.

To my mind, the gentleman from New York, [Mr. BEARDSLEY,] and the gentleman from Massachusetts, [Mr. HUDSON,] demonstrated the constitutional power of Congress to abolish slavery in the District of Columbia. But the gentleman from Mississippi, [Mr. HAMMET,] who preceded me, denies that either Congress or the States have any power to abolish slavery any where. Let us see how this is. Among the enumerated powers of Congress, in the eighth section of the first article of the constitution of the United States, is the following:

"To exercise exclusive legislation in all cases whatsoever over such district, not exceeding ten miles square, as may, by the cession of particular States, and the acceptance of Congress, become the seat of government of the United States."

Virginia and Maryland made the cessions, and Congress accepted them. If they were not in conformity to the foregoing provision of the constitution, they were invalid; but they did so conform, without and reservation whatever. Here is the language of the Virginia deed of cession. The tract of country now the county of Alexandria is "forever

592     APPENDIX TO THE CONGRESSIONAL GLOBE.     May, 1844.

28TH CONG.....1ST SESS.     *Abolition Petitions—Mr. Severance.*     H. of Reps.

ceded and relinquished to the Congress and government of the United States, in full and absolute right and jurisdiction, as well of soil as of persons residing, or to reside, thereon." "Provided, that nothing herein contained shall be construed to vest in the United States any right of property in the soil, or to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States.

The proviso was intended to exonerate Virginia from any obligation to convey to the United States the right of property in the soil which was owned by individuals—a proviso which, I presume, could only be regarded as necessary, because the words right of "soil" had been used in the deed of cession. But the "absolute right of jurisdiction, as well of soil as of persons residing," &c., did not mean right of property in individuals, or of individuals. It did not mean to convey the property of individuals to the United States, or to withhold any authority which the State of Virginia possessed. Hence the argument of Messrs. Wise and Chapman, from the minority of the committee on the rules, that Virginia withheld the right of property in slaves or persons, can have no weight. The grammatical language of the proviso does not warrant it, nor does the language of the constitution permit any such reservation on the part of Virginia.

Nor was there any misunderstanding about the matter at the time. Objections were made in the Virginia convention that Congress might abolish slavery, and Mr. Madison explained the necessity for giving Congress exclusive legislation. A conflict of authority, or divided sovereignty, would have led to confusion. There was no oversight on this point; the subject of slavery was more fully, and far more freely, if not more rationally, discussed then than it is now. The whole legislative authority, the law-making power, the absolute jurisdiction, was conveyed by Maryland and Virginia to the United States.

The gentleman from Mississippi, however, says that neither Maryland nor Virginia had the right to abolish slavery at the time of the deeds of cession, and therefore could not convey such right to the United States. He says the constitutions of those States forbid them from taking private property for public uses, and that slaves being private property, the legislatures of those States could not then, and cannot now, abolish slavery. Let us see. Here is the constitution of Virginia, as it was then and is now. I will read what relates to this matter; it is the sixth paragraph of the declaration of rights:

"6. That electors of members, to serve as representatives of the people, ought to be free, and that all men having sufficient evidence of permanent common interest with, and attachment to, the community, have the right of suffrage, and cannot be taxed or deprived of their property for public uses, without their own consent, or that of their representatives so elected, nor bound by any law to which they have not, in like manner, assented, for the public good."

Now, admitting slaves to be property by the constitution and laws of Virginia, still here is a positive authority conferred on the legislative power to take the private property of individuals, in taxes or otherwise, "for the public good." So much for Virginia. Now we will look at the Maryland constitution. Paragraph 21st of the bill of rights reads thus:

"21. That no freeman ought to be taken, or imprisoned, or disseized of his freehold, liberties, or privileges, or out-lawed, or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers, or by the law of the land."

That is, by judicial process, or by the legislative authority. The sovereign power of the State can take his property from him, if necessary to the public good.

What, then, becomes of the pretence, that the legislative power of a State cannot abolish slavery? Sir, I deny that abolishing slavery is taking "private property for public uses." The term public supposes its continuance as property, and its seizure by the government or its agents, and conversion to a public use as property. Emancipation is not converting private property to a public use. It is only restoring a human being to his natural rights in the community. He ceases to be property; he is not taken; he is emancipated—permitted to take himself, and have the use of his own flesh and blood, his bones and sinews, and his wits, if he has any. His person is his own, and not another man's. He is restored to his natural rights by the law; rights of which he had been unjustly deprived by the law. Will it be contended, in this boasted free country, that the law can enslave him, but cannot liberate him? In liberating him, the government, instead of taking "private property for public uses," only exercises one of the most important functions for which it was instituted—that of protecting the weak against the rapacity of the strong, and securing the equal rights of all; it only takes one great step in the progress of civilization, by substituting just and equal laws for those which are unjust, oppressive and barbarous. By what tenure is any man held as a slave? It is by the force of law, or by the violent exercise of lawless power. In our country slavery exists by the force of the local law; certainly not by any natural right which is above and beyond the law, for the natural rights of men are all alike. A distinguished statesman has said, "that is property which the law makes property." This is true, undoubtedly. But whether a law that makes one man the property of another is a just law, is quite another question. I think it is not just; but whatever excuses may be made for the continuance of such law in some States, from the circumstances of the case, I see not a particle of reason to doubt that every State has full power to repeal such laws, and to provide compensation to owners of slaves or not, as the legislative power shall see fit. I know that in three or four States their constitutions prohibit the passage of laws to emancipate the slaves, unless by making compensation to the masters. But the people of those States can alter their constitutions if they please. They have the power in their own hands, and Congress has the same power wherever it has exclusive jurisdiction. Slavery exists in this District by the law of 1801, by which the laws of Maryland and Virginia were re-enacted and continued in force. Can we not repeal those laws, and modify them? What! will it be contended in this House, and by those who yesterday voted to nullify a law of Congress, without asking the concurrence of the Senate or the approval of the Presi-

dent,* that the two Houses and the President, together, cannot repeal a law of Congress?

The gentleman from North Carolina, [Mr. SAUNDERS,] the other day, quoted the 5th article of the amendments to the constitution of the United States. This he considered as a guaranty for the existence of slavery, and a prohibition of the abolition of slavery by the States. Not finding any such authority in the original constitution, he fell upon the 5th article of the amendments. Here it is:

"ART. 5. No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval force, or in the militia, when in actual service, in time of war or public danger; nor shall any person be subject to the same offence, or be twice put in jeopardy of life or limb; nor shall be compelled, in any criminal case, to be a witness against himself; nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."

This amendment appears to have originated in the Virginia convention, in 1788, at the time when it was convened to ratify the constitution of the United States, which had been agreed upon by the national convention, held in Philadelphia in 1787. The amendment, on the face of it, shows that it was designed to prevent any abuses in the administration of the government of the United States, or any encroachments on the rights or liberties of the people of the States; it is not a limitation of State authority, but of federal authority. It was so intended by Virginia, and so understood by other States, when they agreed to it. The idea was not then suggested, in any part of the country, North or South, that it contained a prohibition against the abolition of slavery by the States. Had it been so regarded at the North, the amendment would not have been agreed to, and it could never have become a part of the constitution. Nor is this all; Virginia herself would have been the last State to propose to confer any such power on the general government, for the great men of Virginia of that day—Washington, Jefferson, Madison, and others—contemplated the future abolition of slavery in that ancient Commonwealth, as well as in other States. In the same Virginia convention to which I have just alluded, Patrick Henry said "slavery is detested; we feel its fatal effects; we deplore it with all the pity of humanity." Yet, he was opposed to giving Congress any power to abolish it, and he opposed the adoption of the constitution, among other reasons, because he thought the first clause of sec. 8, art. 1, giving Congress the power "to provide for the common defence and general welfare," did confer upon Congress the power, in time of war or insurrection, to use all the means of defence, by liberating the slaves and placing arms in their hands whenever the general government should think it necessary to exercise such power; and he mentioned the fact that acts of the assembly of Virginia had been passed promising freedom to every slave who should join the army. I apprehend that such acts were not very extensively promulgated among the slave population; but however that may have been, there is nothing in the history of this 5th amendment to show that it was designed to be applied to slaves in any way. If it was, how happens it that the northern States did subsequently go on to abolish slavery without a word of objection, or the remotest allusion, that I ever heard of, to the 5th article of the amendments? Are their acts of emancipation all unconstitutional? Can the ancient masters of Pennsylvania and other northern States recover their slaves by carrying their case to the Supreme Court of the United States? If they can, why don't they do it?

Sir, if the 5th article of the amendments was designed to be applied to slavery at all, let us see if it does not contain rather too much authority for the purpose of the gentleman from North Carolina. In the very same sentence in which it says "no person shall be deprived of his property," &c., it also says, "no person shall be deprived of his liberty without due process of law," i. e. all the forms of judicial trial. Now what is the meaning of the word person in the constitution of the United States? It is the very word, and the only term, by which slaves are alluded to in the constitution. They are alluded to only in three provisions of the constitution, and are there spoken of as "persons." Shall we, therefore, infer that the constitution prohibits slavery in the States? I submit that this construction is more plausible than his; but I contend that the 5th article of the amendments was not intended to have any application to slavery. Nay, more: if the words "private property," in that amendment, were intended to be applied to slave property, there would still be no difficulty in the case; for it is a well-settled principle in the Supreme Court of the United States, that each State can determine for itself whether human beings shall be property or not. If not, then how can either the general or State governments take them as private poverty for public use?

That this is settled I will proceed to prove. The gentleman from Mississippi referred to a decision of Judge McLean in the circuit court of the United States, last summer, which, he said, established the principle that slaves were property, and could not be set free by any State. He, no doubt, alluded to the case of Van Zandt, who was fined $1,200 for assisting a slave to escape from his master. That was under the law of Congress of 1793, and settled no such principle as the gentleman from Mississippi contended for. That case has been appealed to the Supreme Court here in Washington, and is still pending. The gentleman from Mississippi also referred to the case of Prigg vs. Pennsylvania to establish his position. The case is reported in 16th Peters, and I have it before me. Though I am no lawyer, I will endeavor to correct the gentleman by reading him a passage from the opinion of Judge McLean—the very judge he has quoted himself, and one of the very cases he has referred to.

Judge McLean said, in his opinion on the celebrated case Prigg vs. Pennsylvania—(a case to which, by the way, we may have occasion to refer when other matters come up)—

"The slave, as a sensible and human being, is subject to the local authority, into whatever jurisdiction he may go. He is answerable, under the laws, for his acts, and he may claim their protection. The State may protect him against all the world, except the claim of his master. Should any one commit lawless violence on the slave, the offender may

*The law requiring the election of representatives in Congress to be by single districts.

be unquestionably punished; and should the slave commit murder, he may be detained and punished for it by the State, in disregard of the claim of the master. Being within the jurisdiction of a State, a slave bears a very different relation to it from that of mere property."

There is another case, from which the gentleman from Mississippi did not quote, though it is full of authority direct to the point, and should be familiar to him. I allude to the case of Groves vs. Slaughter, 15th Peters.

The constitution of the State of Mississippi, adopted in 1832, contained a provision prohibiting the importation of slaves into that State, "as merchandise, or for sale," from other States, after the 1st May, 1833; but no law passed under this constitution providing penalties, &c. In 1836, Robert Slaughter, a trader in slaves, carried a lot of them into Mississippi. They were purchased at Natchez by John W. Brown, on credit, who gave his notes for them, endorsed as security by Moses Groves and James Graham. The notes were not paid, and Groves was sued in the circuit court of the eastern district of Louisiana. He contended that the notes were not collectable, because the contract was in violation of the constitution of Mississippi. The circuit court of Louisiana gave judgment against Groves, on the ground that a legislative enactment was necessary to make the Mississippi constitution operative. Groves appealed to the Supreme Court of the United States, where Slaughter made a new argument, that, as the constitution of the United States authorized Congress to regulate commerce among the several States, and as slaves were property, or articles of commerce, the State of Mississippi could not prohibit their introduction from other States. The case was argued January term, 1841; Mr. Clay and Mr. Webster arguing for Slaughter, Mr. Jones and Mr. Walker (senator from Mississippi) for Groves. The decision of the circuit court was confirmed by a majority of the Supreme Court, viz: "that the prohibition of the constitution of Mississippi did not invalidate the contract; but that an act of the legislature of the State was required to carry it into effect;" and no such law was passed till 1837, which was after the slaves were imported and sold. Judges Story, Thompson, Wayne, and McKinley, concurred with the majority of the court, in the opinion that the provision of the constitution of the United States, which gives the regulation of commerce to Congress, did not interfere with the provision of the constitution of Mississippi, which relates to the introduction of slaves as merchandise, or for sale. Judges Taney, McLean, and Baldwin, gave separate opinions, differing on certain points, which I have not time to notice. In Judge McLean's opinion I find the following remark:

"The constitution treats slaves as persons, &c. In the second section of the first article, which apportions representatives and direct taxes among the States, it provides—'the numbers shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons.' And again, in the 3d section of the fourth article, it is declared that 'no person held to service or labor in one State under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due.'"

"By the laws of certain slave States," continues the judge, "slaves are treated as property; and the constitution of Mississippi prohibits their being brought into that State by citizens of other States, for sale, or as merchandise. Merchandise is a comprehensive term, and may include every article of traffic, whether foreign or domestic, which is properly embraced by a commercial regulation. But if slaves are considered in some of the States as merchandise, that cannot divest them of the leading and controlling quality of persons, by which they are designated in the constitution. The character of property is given them by the local law. This law is respected, and all rights under it are protected by the federal authorities; but the constitution acts upon slaves as persons, and not as property."

Judge Baldwin dissented from the majority of the court. He said, among other things:

"Slaves, then, being articles of commerce with foreign nations until 1808, and until their importation was prohibited by Congress, they were also articles of commerce among the several States which recognised them as property, capable of being transferred from hand to hand as chattels. Whether they should be so held or not, or what should be the extent of the right of property in the owner of a slave, depended on the law of each State; that was, and is, a subject on which no power is granted by the constitution to Congress; consequently, none can be exercised, directly or indirectly. It is a matter of internal police, over which the States have reserved the entire control; they, and they alone, can declare what is property, capable of ownership, absolute or qualified; they may continue or abolish slavery at their pleasure, as was done before, and has been done since, the constitution, which leaves this subject untouched and intangible, except by the States. As each State has plenary power to legislate on this subject, its laws are the test of what is property," &c.

If anything more than this is wanted by the gentleman from Mississippi, we have it in the argument of his own senator on this same case. Mr. Walker contends, page 50:

"A certain number of negroes are now slaves in Mississippi, and articles of merchandise, by virtue of State laws and State power, within her limits. Now, it is conceded that the State may declare all these not to be slaves, or not to be merchandise, within her limits; yet it is contended [on the other side] she may not make the same declaration as to the negroes of other States when introduced into the State.

"A State may, it is conceded, [and it was conceded by all the judges and counsel, establish or abolish slavery within her limits; she may do it immediately, or gradually and prospectively; she may confine slavery to the slaves then born and living in the State, or to them and their descendants, or to those slaves in the State and those introduced by emigrants, and not for sale, or to those introduced within a certain date," &c.

Again he said:

"We say the character of merchandise, or property, is attached to negroes not by any grant of power in the con-

95

652
APPENDIX TO THE CONGRESSIONAL GLOBE.
Feb. 1844.

28TH CONG.....1ST SESS.
Abolition Petitions—Mr. Giddings.
H. of Reps.

penditure—that which was to profit directly by it. But here, there is another and more powerful one, united and acting in concert with it—that which is to profit indirectly by the expenditure—the tariff interest. The representatives of that interest invariably vote in favor of every proposition to expend money, without any reference to the purposes to which it is to be applied—their object being simply to make a higher tariff necessary, by which they so extensively profit, to the detriment of every other pursuit in the land. This system, in the States, under the much less unfavorable circumstances to which I have briefly adverted, led in every instance to extravagance, improvidence, enormous debt and taxation—in many instances to bankruptcy and repudiation. Here, it will end much worse; for, in addition to other evils, it will lead to a frightful increase of executive patronage. Our great shield is the constitution; and one of the most efficient means of securing its protection is the veto, which has been already five times applied. This brings me to the remarks of the gentleman from Massachusetts against that feature of the constitution which is a leading object of whig attack, and the destruction of which seems to be one of their most cherished purposes.

The gentleman from Massachusetts, [Mr. ADAMS,] has characterized the veto power as "anti-democratic and anti-republican in its nature." In one sense, the veto power is "anti-democratic"—in the sense in which the constitution itself is "anti-democratic;" but he denied it is so in any other. The constitution is anti-democratic, as it withdraws every case as it arises, from the power of the arbitrary discretion of a mere numerical majority, and subjects it to inflexible rules, prescribed in advance, before the occasion had arisen when justice and reason had fair play, and right and wrong were judged of in the abstract. But so far from the veto power being anti-democratic in any other sense, its direct tendency was to sustain popular supremacy. This is apparent when we analyze its character. The veto does nothing affirmatively; its whole operation is negative. It enacts nothing; all it can do in any case is to prevent, for a time, legislation; and it can only prevent it until the people have been consulted as to its propriety. All the veto does, to speak in military phraseology, is to enable the President, when he believes the Congress to be moving in a wrong direction, to command a "halt," until the people are heard from. Or, to change the figure, all it is, is a power in the President, upon a doubtful question, when he believes the popular will has been violated, to grant "an appeal" from the representatives of the people to the people themselves. And how long can the trial of this appeal be delayed? The President comes into office on the 4th of March. The Congress assembles on the first Monday in December thereafter. It is known that very few laws of any kind are passed until near the end of the session. Look at the state of our business here at this time—only a few laws have yet passed. About this time of the year is as soon as a veto can ever be applied, when there is no extra session of Congress. In the succeeding four months the great body of the congressional elections in the States comes on. In the spring they are completed. In a little more than two years, after the earliest ordinary legislation of Congress subsequent to the inauguration of the President, the measures of his administration are brought directly before the people in the congressional election. In the first place, if the President should veto a law demanded by the country, and a majority sufficient should not be found in Congress to overrule his veto, the people would take care, at the elections to come on so soon thereafter, to return a majority that would. And in practice a bare majority would be sufficient for that purpose; for no President ever has vetoed, or probably ever will veto, a law passed by two successive Congresses. But, besides this, in a short time, the subject would come before the people in the presidential election; and, if the course of the President was disapproved, they would elect a successor who would take a different one. At the farthest, I have shown (said Mr. B.) that this appeal from the Congress to the people will be tried, in a little less than two years; but in practice it will generally be tried much sooner. The President, and the first Congress which convenes after his election, are elected about the same time. Almost invariably there is a concurrence of opinion between them. It has been found, consequently, that few laws passed by the first Congress are vetoed: it is those of the second which have usually

met that fate—in which case, the appeal to the people is immediate. The case of President Tyler is an exception; but that, in every respect, is an extraordinary one. In the first place, he was not elected President, but came into that office in consequence of a melancholy dispensation of Providence; but principally, as we all know, that, in the presidential election of 1840, there was no common declaration of principles by the whig party for the public judgment. He did not say this to make a party accusation: it was what all candid persons would admit to be true; and he referred to it only to show that Mr. Tyler's case was no refutation of the position he had taken.

Mr. B. said he had shown that, in the case of a veto by the President, in a short time the propriety of it would come directly before the people, whose decision would be final. In the mean time, was it possible that the well-being of the country would suffer? Whenever a bill is presented to the President for his approval, the question which he has to decide is between the old laws and the new—between the laws as they were, and as the Congress would have them to be. And when the President withheld his approval, all he did was to leave things in their own condition. In a case of such doubt as to impel the President to interpose his negative, and where two-thirds of Congress could not be found to overrule it, was it probable that that the country could suffer? Sir, (said Mr. B.,) I hope our system of laws is not so imperfect, that an eternal tinkering of them is necessary to prevent the public interests from injury. I am not one of those who think a frequent change of laws expedient and wholesome. Nor do I think too great facility should be afforded to effect it. Wisdom and stability ought to be the leading characteristic of every system. And the latter is almost as important as the former. Indeed I might say no system would be wise, or suit any country, which was perpetually fluctuating.

Mr. Speaker, the veto is strictly a conservative feature of the constitution, and the country can never be in danger of suffering from it. There is no motive which usually actuates human conduct, that will impel a President to interpose arbitrarily his veto. It is no pleasant thing for a President to bring himself into collision with Congress; and he never will do it unless compelled by the most imperative sense of duty. He never will do it unless he has the fullest evidence that the popular will has been set at defiance by Congress. We would all come to this conclusion, as the framers of the constitution did, from our knowledge of human nature. But we are confirmed it by the history of the country. There is no instance where a veto of a single President had not been sustained by the people. And every one of them, from Washington to Tyler, with the exception of the Adamses and Mr. Van Buren, applied it. But it may be said public opinion on those occasions had been controled by the patronage of the executive. In reply, I insist that Congress, from its greater number, from the franking privilege, and its more intimate association with the people, has greater influence over public opinion than the patronage of the executive. But if the President has so much patronage as to be enabled to mould public opinion to his will, against the influence of Congress, it is not because it grows legitimately out of our system. No; but it is in consequence of a system of measures—of which this very internal improvement system is one—themselves a violation of the constitution, and only justified by a most latitudinous construction of that instrument. The remedy is, not an abolition of the veto, but a return to a republican construction of that constitution—confine the government to its legitimate duties, and restore that simplicity which is its great beauty. Do this, and the President will possess no patronage which any one need fear; for I say, without the fear of error, that the President possesses but little patronage of a dangerous character, which does not owe its origin to laws passed by Congress in violation of the constitution.

But it may be said that, even in the view I take of the subject, no injury will result from the abolition of the veto, as, if Congress passes a law not approved by the people, they will change their representatives, and demand its repeal. But there are a class of laws which carry within themselves the seeds of their own perpetuation. There are others which may do a vast deal of mischief before a repeal could be effected; and there are still others which we are told are irrepealable. For instance: In the case of charters of incorporation, the power to grant which was expressly refused by the con-

vention which framed the constitution, but which Congress has usurped. In them, the Supreme Court says, after the corporations have acquired vested rights, Congress cannot interfere.

But (said Mr. B.) I will not, at this late period of the session, detain the House with a full discussion of the veto power; although, if time permitted, this would be a very fit occasion to do so; for the movement of the gentleman from Massachusetts is a part of that continual war upon the veto power which has been waged by the whig party ever since it was found to be one of the greatest obstacles to the accomplishment of their unconstitutional purposes. But for it, most of their measures would now be irrevocably fixed upon the country; and among them, the internal improvement system, with all its blighting and corrupting tendencies, which has invoked five successive vetoes. The object of the gentleman is to facilitate the reversal of the veto, while the country is yet unprepared for the whig purpose of abolishing it altogether; for such is their purpose. Mr. Clay's proposition, made in the Senate in 1842, amounts to that. It is to enable a majority of all the members to pass a bill, notwithstanding the President's veto. I say that amounts to an entire abolition; for, after Congress has once passed a law, and the President has vetoed it, and it is returned to them, they will invariably pass it again in vengeance. This every one will admit who is at all conversant with the history of Congress, or of the impulses which regulate human conduct.

Sir, the doctrine has been openly avowed, with the approbation of the whig party, that, when Congress has once passed a law, and it is returned by the President, it is their duty to pass it again, with the view of sustaining legislative independence, and of resisting executive dictation.[*] But even this modified proposition was designed by its great advocate (the whig candidate for the presidency) as only an entering wedge, to be followed up by its entire abolition.[†]

Nor (said Mr. B.) will I be betrayed into a defence of the President against the attacks which have been made upon him. The time has not arrived when he can have justice done him; but it will come. When the passions of the present hour have passed away, and reason has resumed her empire, he will be esteemed one of the boldest of the defenders of the constitution; and his memory will be cherished with gratitude for much he has done, when many of those who revile him will be forgotten, or only remembered to have execrations heaped upon their names.

[*] By Mr. ARCHER, of Virginia, in 1842.

[†] In his speech in the Senate of the United States on the 24th of January, 1842, Mr. Clay said:

"There was one concluding remark on the amendment at present before the Senate with which he would close what he had now to say. Although he admitted that the principles he had laid down would, *if carried fairly out, lead to the abolition of the veto altogether,* as inconsistent with the fundamental axiom of free government, yet he was of opinion that this, like other reforms, should be introduced slowly and with circumspection, without suddenly rushing from one extreme to another. Before the power should be *utterly* abolished, he deemed it prudent that an experiment should be made in a modified form; and instead of requiring a majority of two-thirds of both Houses to supersede the veto of the President, he thought it sufficient to require a majority of the whole number of members elected."

## SPEECH OF MR. GIDDINGS,

### OF OHIO.

*In the House of Representatives, February 13, 1844—* Upon adopting the rule of the House excluding petitions in relation to slavery.

Mr. GIDDINGS remarked: That if we were to judge of the importance of the subject under discussion, by the talent and zeal elicited during the debate, we should surely regard it as a matter of the highest consequence. Indeed, some gentlemen have declared that it involves the permanency of our federal Union. In this opinion I fully concur. I do not believe it possible to continue this rule, and preserve the Union for any great length of time. Yet I have been highly gratified in witnessing the candid and dispassionate manner in which the debate has been thus far conducted. Gentlemen have participated in the discussion with that forbearance and kindness becoming statesmen engaged in the examination of matters of high interest to their constituents and to their country. The subject of slavery has been examined in the spirit of candor, and gentlemen have treated each other with the same toleration that is exhibited on other occasions. I re-

Feb. 1844.   APPENDIX TO THE CONGRESSIONAL GLOBE.   653

28TH CONG.....1ST SESS.   *Abolition Petitions—Mr. Giddings.*   H. of Reps.

joice that the time has finally arrived when we can meet in this hall, and compare our views, and examine the rights of different sections of the country in regard to slavery, without excitement, and in a manner becoming those who feel their responsibility to the public. This change of feeling I regard as creditable to the members, and auspicious to the country. I am not ignorant that all discussion in regard to slavery is unpleasant to a portion of the members. I am also aware that some gentlemen harbor towards me feelings of unkindness, in consequence of the position which I have hitherto occupied on this question. But should gentlemen who follow me in this debate forget the decorum which is due to the dignity of this body, it shall not arise from any example of mine. I intend to speak forth my own sentiments freely, but I hope to do so without personal allusions, and without personal offence. In the discharge of our legislative duties, we have reached that point at which we unfortunately find ourselves divided in opinions upon an important subject. The adoption or rejection of the former rule of this House, by which the great mass of petitions concerning slavery have been heretofore rejected, is soon to be determined. I will not now classify these petitions, but will notice them more particularly hereafter. They have been characterized by those who have preceded me as abolition petitions; but what those gentlemen understand by the term "abolition," we have yet to learn, for they have not informed us. It is undoubtedly understood by some to mean the abolition of slavery in the States; by others, to refer to the abolition of slavery in the District of Columbia; by others it is understood to refer to the coastwise slave trade; by others to the separation of the people of the free States from the support of slavery. Indeed, petitions for the repeal of any of the laws now in force within the District of Columbia, relating to slavery, petitions to prohibit officers of the federal government from the capture of fugitive slaves, or against appropriating the national treasure to the support of slavery or the slave trade, and many others, are denominated "abolition petitions," and are not suffered to be read, referred, or reported upon. The objections to them are, that they interfere with the rights of the people of the slaveholding States; yet no gentleman has attempted to set forth or define the rights which he considers as encroached upon by these petitions. Here all our difficulties arise. Let us once clearly determine the rights of the several States in respect to slavery, and it will then be easy to say whether such right is sought to be encroached upon by any particular petition. These rights of the States in regard to slavery were fixed by the constitution, and we must resort to that instrument, to the debates in the convention that framed it, and to contemporaneous history, in order to ascertain precisely the character of those rights. Prior to the formation of our federal constitution, each State possessed and exercised supreme and unlimited control over the institution of slavery within its own territory. Virginia, in obedience to the will of her people, upheld and continued it. Massachusetts, in the exercise of her supreme power, emancipated her slaves. In the exercise of this act of her sovereign power, she took counsel from none of her sister States; she acted in obedience to the will of her people, and set an example which was soon after followed by six of the other original States. The example was well calculated to exert an influence upon the institution of slavery throughout the Union. Yet whatever may have been the effect upon the slaves of the other States, they could interpose no objection to the proceeding of their patriotic sister, for the reason that she was as independent of them on this subject as she was of any foreign power.

When the convention that framed the constitution assembled, the delegates brought with them the same diversity of sentiment that exists among us to-day. One portion were hostile to slavery, and another portion were in favor of its continuance. There was, therefore, but one mode of disposing of the question. That was to leave it precisely as it was, and to let it remain with each of the several States. Each State, therefore, retained its whole and entire power over that institution. They surrendered no portion of that power to the federal government. I desire to be understood distinctly on this part of the subject. I am anxious to ascertain, if possible, the precise point of disagreement between us. I am anxious to develop the exact issue on which we are contending; to let the country know definitely what is claimed by the South,

and denied by the North; and what is claimed by the North, and denied by the South.

I therefore lay it down as one of the principles on which our federal constitution was based, that each of the several States should retain to themselves and their people, the entire power over slavery which they had previously enjoyed. In saying this, it is not my intention to deny the doctrine advanced by the venerable member from Massachusetts, [Mr. ADAMS,] "that in case of war, when the existence of our government is threatened, we may then avail ourselves of that right of self-preservation which is based upon the law of nature;" and, if necessary to the public safety, may release any portion, or all, of the slaves in any or all of the States. It is a power which lies behind all constitutional provisions, and is consequent upon a state of war only, but has no application in time of peace. It is, I believe, well understood by military men; it was practised by General Jackson, General Gaines, and General Jesup, and I believe by General Scott, while commanding our armies in the South. They did not hesitate to sever the relation of master and slave, whenever they believed the public good demanded it. In doing that, they merely exercised that power which is always attendant upon a state of war, and which is denied by few, if any. It therefore forms no exception to the doctrine which I have asserted, that each of the several States now holds and enjoys the same power over slavery, within its own territory, that it enjoyed under the old confederation; that Virginia, and each of the slave States, now holds her slaves as independently of the other States and of the federal government, as she does of Mexico, or of other foreign powers; that the Congress of the United States possesses no more right than the Parliament of Great Britain has to interfere with that institution in Virginia, or any other slave State. On this point, I think southern men will agree with me. Indeed, I understand this to be the doctrine for which they contend, and on which, so far as I am acquainted with the views entertained by northern men, there is an entire concurrence of opinion.

We will now examine the other branch of the proposition, and ascertain whether there be the same unanimity of views among us as exists in regard to the rights of the slave States.

I stated that each of the several States retains its entire power over the institution of slavery, that it possessed under the old confederation. It therefore follows that Massachusetts and the free States have the same supreme and unqualified right to be wholly exempt from the support of slavery, that they enjoyed under the old confederation; and that Congress possesses no more power than does the Parliament of Great Britain, to involve them in the expense, the odium, or the guilt of that institution. That this right of the people of the free States to enjoy their liberty, free from all participation in the crime of slavery, is as supreme and unlimited as is the right of the slave States to continue and enjoy it. I wish to call the particular attention of those who follow me in this debate, to this right of the free States, for it is on this point that we differ. If there be any issue between us, it must be founded on this particular doctrine. I therefore most respectfully ask southern gentlemen to meet me on this point. If they admit the correctness of my doctrine, let them say so; if they deny it, let them declare such denial in a plain and direct manner. It is surely time that we should know and understand distinctly the cause of our controversy; that we should bring forth the well defined subject-matter in dispute; and place it conspicuously before the country, in order that the people may understand and judge concerning it. In the spirit of kindness I request them to keep no longer at a distance from the point in issue; that they will no longer deal in vague generalities; that they will lay aside all declamation; that they will cease to denounce abolition, and meet the matters in controversy by fair argument and dispassionate reason. It is unbecoming us as statesmen to occupy our time here contending before the nation for years, without being able to lay our finger upon the precise point in controversy. In doing this, we exhibit an evident fear of approaching the principle on which we are contending. I have for six years sat in this hall, and listened to eloquent denunciations of abolition. But in that whole time, I have never heard one of those gentlemen define what he understood by that term. I have heard the dissolution of the Union threatened, and all the horrors of civil war depicted in fervent and glowing elorors of civil war depicted in fervent and glowing eloquence; but no one has condescended to inform us

of the precise cause which is to sever the Union, and to create a civil war.

Now, Mr. Speaker, if we do not possess the moral courage to examine minutely and particularly the cause of contention, I feel that it is our duty to retire from this hall, and to give place to those who will not fear to meet these questions upon their true merits. I, sir, am regarded as an abolitionist. I have no more objection to the term than Washington or Jefferson or Franklin had. I care not what name gentlemen attach to me, provided they do not misrepresent my principles. Of these I prefer to be my own exponent; and I repeat that, whatever issue I take with southern gentlemen is based entirely upon this plain and obvious doctrine of the federal constitution—that this government possesses no power whatever to involve the people of the free States in the support of slavery. Here, sir, I take my stand, where I have always stood since I entered this hall. For this doctrine I shall continue to contend, until convinced that it is erroneous. I am not to be driven from it by the cry of abolition; for if it be abolition, then am I an abolitionist. Neither am I to be frightened from this position by the cry of fanaticism; for if this doctrine be fanaticism, then am I a fanatic. This is the doctrine which I have maintained in public addresses, and in private conversation, in my writings, and in my oral communications on this floor, and among my constituents. I go not a hair's breadth beyond it, nor do I stop a hair's short of it. In this respect, I believe I may say that, the great mass of those called abolitionists agree with me. It is true that they are much misunderstood and much misrepresented; but I know of none who advocate any encroachment upon the constitutional rights of the slave States. It is true that they, and nearly all of our northern people, hold slavery in abhorrence. They will on all occasions exert their moral influence against oppression in all its forms. They regard that a moral duty, and so do I; and whether I am in this hall or elsewhere, I can never cease to exert my moral influence against slavery, wherever that influence may extend. But, sir, that moral duty teaches me obedience to the constitution which I am sworn to support; and while the constitution remains unchanged, I cannot, either here or elsewhere, exert my influence to violate it. Nor do the abolitionists ask or expect such an exercise of the powers intrusted to us. But they and the whigs, and the great mass of those within my district called democrats, demand and expect of us a firm and decided resistance of all attempts to encroach upon their rights, by involving them in the support of an institution which they hold in execration. I am, however, aware, that a large portion of our people, both North and South, have been unconscious of the extent to which people of the free States have been involved in the support of slavery. The discussion of all subjects connected with that institution has for many years been suppressed, both in this hall and among the people. During these years of silence, this government has usurped to itself powers never delegated to it by the constitution. Southern men have pressed the claims of slavery upon Congress, and northern men have quietly and without resistance permitted the government to become the patron of slavery, and the people of the free States to be made the instrument of its support. For many years the treaty-making power has been in the habit of embracing, in almost all our treaties with the southern and southwestern Indians, a stipulation that they should surrender up, and, in some instances, that they should be vigilant in arresting and delivering up such fugitive slaves as should seek an asylum among them. For these and other stipulations, the money of the nation, drawn from the people of the free States, has been paid in sums that would astonish northern men if they fully understood the facts. For the purpose of enabling the owners of southern slaves to regain their runaway negroes, we waged a bloody and expensive war with the Indians of Florida, in which we expended more than forty millions of dollars, mostly drawn from the people of the free States. At the last session of Congress, we sat here, at an expense of thousands of dollars per day, legislating for the benefit of slave traders. We spent our time, and the money of the people, to enable slave dealers to carry out their speculations in human flesh; thus, sir, violating the constitution, and the constitutional rights of our people. They have sent their petitions to us, couched in the most respectful language, asking that they may no longer be subjected to these abuses. And what has been our reply? Why, sir, we have

# 654

# APPENDIX TO THE CONGRESSIONAL GLOBE.

## Feb: 1844.

28TH CONG.....1ST SESS.

*Abolition Petitions—Mr. Giddings.*

H. OF REPS.

thrown the petitions back into their faces, and denounced them as abolition petitions, and the signers as fanatics. Yet, Mr. Speaker, no man has been found willing to come forward and meet the subject upon its merits. No member here, of any party, either whig or democrat, from the North or from the South, would hazard his reputation by saying that we possess the power thus to apply the funds of government to these base purposes. Nor has any man been found who would take issue with the petitioners, and say to them, and to the country, that they were bound thus to contribute their wealth to the support of southern slavery; but we have constantly heard the same answer that is now urged against receiving these petitions. That answer, and the only answer yet adduced, is the cry of "abolition!" "fanaticism!" "interference with southern rights!" "Hartford convention!" and "dissolution of the Union!" I may be permitted to assure gentlemen that, generally speaking, the people of the North know their rights, and that such answers to their petitions will not satisfy or silence them. If there be any better answer, it should be brought forward; and gentlemen do themselves and their cause injustice by neglecting to bring it forward. But if there be no other answer—if gentlemen who seek the adoption of this rule, and who have preceded me in this debate, and those who shall follow me, are unable to find any other objections to these petitions than such as I have referred to,—I then ask them if they do themselves justice, on a subject of such grave importance, by opposing these plain and obvious truths by mere declamation.

In 1816, a large number of fugitive slaves had collected within the territory of Florida, then subject to the Spanish crown. They settled upon the Appalachicola river, erected their cabins, planted their grounds, and, with their wives and their little ones, were enjoying that liberty which the people of the North prize so highly. They also erected a fort to protect them. General Jackson, at that time commanding the southern army, issued his orders to General Gaines to send a force "to break up their settlement and to return them to their owners." A gun-boat was sent up the river to execute this design. She opened a fire of hot shot upon the fort, by which the magazine was exploded, and two hundred and seventy men, women, and children were instantaneously murdered, for no other crime than a love of that liberty to which they were as justly entitled as we are. This act was committed by our servants, acting in our name, and paid with our funds. Their blood rests on the people of this nation. It was as much the act of the North as of the South. Nor was this all. During the 25th Congress, a law was passed giving more than five thousand dollars to the officers and men who committed this wholesale murder, and set such a bloody example before other slaves who were panting for freedom. Our people have petitioned against further acts of this kind; and shall we reject their requests? During the war in Florida, our officers and men were not only engaged in searching out and capturing fugitive slaves, but, if official documents are to be credited, bloodhounds were procured to aid in that execrable work. Indeed, if the intelligence which we see in the public press be worthy of credit, officers and men employed in our land, naval and revenue service, have, within a few months past, put forth their efforts to re-capture persons fleeing from southern bondage to a land of liberty. These facts are regarded by our people of the North as derogatory to our national character; they hold that our federal constitution was formed to perpetuate liberty, and not for the support of slavery. They regard these prostitutions of our national power as directly involving them in the support of slavery; and they send their petitions here, praying that these abuses may cease. These respectful petitions, addressed to their servants here, are scouted from this hall and treated with contempt; and the same cry of "abolition," &c., is raised against them as against the class to which I heretofore referred. Yet no man has been found willing to stand before the nation and boldly assert the right of this government thus to involve the people of the free States in these outrages upon the rights of man, or that we have the constitutional power to involve them in this war against human nature.

The influence of this nation has been put forth on repeated occasions to oppose the progress of civil liberty. Our commissioners at the Congress of Panama were instructed to oppose all plans of emancipation in Cuba. Our government also exerted its influence with the crown of Spain for the

same object, in order that southern people may hold their slaves more securely.

When slave-dealers, with their cargoes of human beings, have been shipwrecked near the British islands, in the West Indies, and the slaves have regained their liberty by being accidentally thrown upon free soil, our President has condescended to act as the agent and solicitor of such traders in human flesh, and, in the name of the people of this nation, to demand of the British government a compensation, in dollars and cents, for the liberty thus gained by his fellow men; and when the money was obtained, he has paid it over to breeders of slaves and to dealers in mankind.

Such an interest has our executive taken in this slave trade, that when the persons on board the slave ship Creole, looking forward to the deep degradation that awaited them in a southern slave market, and inspired with that love of liberty which the God of nature has implanted in the breast of every man, arose upon their oppressors, asserted and maintained their rights, to which, as members of the human family, they were entitled, he demanded of the British crown their value in dollars and cents, as a compensation to men who would have been hanged, under our own laws, had they followed the same vocation on the shores of Africa. All these acts of the government were plain and obvious violations of our constitution. They were acts unauthorized by any constitutional provision. They involved the people of the free States in the support of an institution which they abhor. Our people feel themselves dishonored by them, and have, therefore, sent numerous petitions, praying us to separate this government from all further participation in this unconstitutional support of slavery. These petitions were numerously signed by men of high respectability, of intelligence and moral worth. And what answers have we returned to their reasonable requests? Why, sir, we have spurned them from us, and have slammed our doors in the faces of those from whom we hold our seats, and whose servants we are. But we have not possessed the moral courage to say to them, that we have the constitutional power thus to involve them in the inexpiable guilt of those acts to which I have referred. No, sir, we dare not attempt to justify ourselves by argument. We shudder at the thought of appealing to reason, for that is hostile to crime. We dare not rest our justification upon the force of truth, for that would condemn us. Discussion would be equivalent to conviction. We have, therefore, refused to speak upon the subject matter of the petitions. We have shielded ourselves behind this rule, which prohibits their being read to us, and then attempted to justify the rule by denouncing all "interference with southern property," and declaiming against "incendiary petitions." It is a most extraordinary fact, that no gentleman who has spoken in favor of this rule has condescended to enter upon an argument to refute the propriety or duty of granting the prayer of one of the several classes of petitions to which I have referred; and I predict that no one who comes after me will attempt a task so difficult. They will condemn all these petitions in general terms and in mass, but they will not discuss the constitutionality of any one in particular. Such discussion would lead to an examination of principles—a result from which they start back with horror. I repeat, that those gentlemen who denounce abolition so loudly and eloquently, can neither be flattered nor provoked to meet us upon any moral, political or constitutional question in regard to slavery, or which is embraced in any class of these petitions.

I will now proceed to the consideration of another numerous class of petitions, all of which are sought to be excluded by the adoption of this rule. They all relate to slavery within this District; some of them pray for the modification, and some for the abolition of the slave trade here; others for the repeal of some one or more of the old laws of Maryland and Virginia that have been re-enacted by Congress, and which are now in force within the District of Columbia; others for the repeal of all laws now in force here which support slavery; and others for the abolition of slavery generally within this District. If the rule be adopted, all these petitions are to be excluded from being received or read by the House.

We have listened to long and labored arguments, brought forward to show that we ought not to receive these petitions. The first which I will notice is that of the gentleman from South Carolina, [Mr. RHETT,] who took it upon himself to say that the petitioners were not seeking the objects prayed for,

but sent their petitions here in order to affect slavery in the States. I am acquainted with many of the petitioners, and know them to be men of intelligence; and, in point of character and respectability, they would not suffer by a comparison with the gentleman himself. I believe them incapable of saying one thing and meaning another; and I regard the imputation as unfounded and altogether gratuitous. Other members urge that Congress possesses no constitutional power to abolish slavery in this District, and therefore these petitions ought not to be received. If the proposition were correct, that Congress has not the power to abolish slavery within this District, I should nevertheless regard it as our duty to receive their petitions, and to treat them respectfully, and to return civil answers to those who send them to us. They are sincere in their belief concerning our powers, and they approach us in the most respectful language; and shall we throw back the petitions to them, and insult them by a contemptuous silence? If we differ from them in opinion, it would be more in accordance with my views of propriety to receive the petitions, refer them, and let a respectful report be made, showing the error into which the petitioners have fallen concerning our powers. This government is founded upon the will of the people; and when they become dissatisfied with it, they have the power to change or alter it, or the agents employed to carry it on. It is, therefore, important that every cause of discontent should be removed from the public mind.

Other gentlemen appear to think that the petitioners rest their demands merely upon the reception of their petitions; and that if we receive them, and lay them on the table without further notice, it will satisfy the signers. I will assure gentlemen who adopt these views, that they mistake the sentiments of those who thus demand our attention. They deal in no technicalities. They regard us as their servants, sent here to do their business and carry out their wishes; and if we differ with them in respect to our powers, or in our views of policy, they expect us to say so frankly, and in a respectful manner to point out the constitutional principles or the policy which forbids a compliance with their requests. They are competent to weigh and judge of the reasons which guide our action. They regard truth as omnipotent, and are willing to bow to its dictates. They feel that error alone seeks obscurity, and attempts to hide itself behind the silence of mock dignity. If, therefore, we attempt to dispose of these petitions, by laying them silently on the table, and refuse to assign our reasons for the act, it will become their duty to dismiss us, and to send agents here who possess the moral courage to set forth the reasons on which they act.

But, Mr. Speaker, I am desirous of meeting the great and principal issue which gentlemen have tendered us on this part of the subject. If the existence of slavery in this District be constitutional—if it have any legal existence within this ten miles square—it must be by force of our laws. I have no hesitation in saying that if slavery has a legal existence here, we then have the same power over it that we have over the subject of crimes, the collection of debts, or any other municipal regulation.

I regard it as a perfectly clear proposition—one that is not to be doubted or denied—that slavery is entirely the creature of municipal law. It is unknown to natural law, and can only exist in direct violation of it. In Ohio, our people go where they please, for the reason that no municipal law forbids the exercise of their natural right of locomotion. If the colored man, or the white man, be assailed there, he may defend his person and his life, because there is no law against it. So with a portion of the people in this District. A portion even of the colored people here possess these natural rights of self-defence, and of going from place to place at the dictation of their own will. Not so with the five thousand slaves who are held in bondage here. They possess neither of those rights; and why not? Because the municipal law has forbidden them to exercise those rights which God bestowed upon them.

At a very early period, the statute laws of Virginia, and I believe of Maryland also, authorized their people to bring to those States "HEATHENS," either by land or water, and to hold them as servants for life. This I believe to be the origin of slavery in those States. But, under the moral code of that day, it seems that when a servant became converted and was baptized, he regained his freedom. With these inducements, conversions were

Feb. 1844.        APPENDIX TO THE CONGRESSIONAL GLOBE.        655

28TH CONG.....1ST SESS.        *Abolition Petitions—Mr. Giddings.*        H. OF REPS.

easy, but holding of slaves was difficult. The legislature, therefore, interposed, and passed a law declaring that "baptism" should not release the slave from service. It was soon found that these servants or slaves possessed a disposition to go from place to place, at the dictation of their own desires. This propensity rendered them useless to their masters. The legislature, therefore, passed a law, authorizing any constable or other person to arrest any slave found away from his master's plantation without a passport, and to return him to his master. This, of itself, did not appear to answer the purpose, and the constable or other person making the arrest, was authorized to flog the servant, and to pass him over to the nearest constable, who should also flog him, and pass him over the next, until he reached his master, who was bound to pay a certain quantity of tobacco for the arrest, and for whipping the slave. But it was found that the slave would often run from those who attempted to arrest him, and would resist, with his physical powers, those who laid hands upon him. It therefore became necessary further to curtail the rights of the slave, and a statute law was then passed, and is now in force within this District, authorizing the constable, or other person who should attempt to arrest such slave, to shoot or kill him, if he ran from such officer or other person, or if he resisted them after his arrest. A subsequent statute forbade the slave to raise his hand in opposition to any white man, even in defence of his life. The natural rights of the slave were thus taken from him, one after another, until he was by statute law reduced to his present degraded condition. These laws, however, gave to the master, and those who were not slaves, powers over their servants which were new and unheard of. As I shave shown, they authorized the master and others to whip, and scourge, and torture the slave, and under certain circumstances to shoot and murder him. These powers of the master were based entirely upon statute law, and the disabilities of the slave were established by the same authority.

Now, I think few men will deny that the legislature of Virginia or of Maryland had full and ample power to change, modify or repeal any or all these statutes at the pleasure of their legislature. This point admits of no doubt or argument. It is equally plain that the repeal of any one or more of these acts of the legislature would, to a certain extent, be a modification of slavery, and that the repeal of all of these laws would be a total abolition of that institution.

Notwithstanding the apparent correctness of these propositions, some gentlemen deny that the legislature of Virginia possessed the power to abolish slavery in her territory. They will not deny her power to repeal her own laws. This proposition is so plain that they will shrink from a denial of it. They leave that point untouched, and proceed to say that her legislature cannot abolish slavery within her territory. Now, sir, all that abolitionists ask, and all that the slaves of that State will ask, is the repeal of those laws. Let them be repealed, and we will no longer contend about abstractions, but we will let slavery take care of itself.

But gentlemen urge, that the "master has a vested right of property in the slave." I wish some one of those eloquent members who have so often repeated this declaration, had condescended to inform us from whence the master derives his title to his slave? I ask from whence is this "vested right" derived? Biblical history informs us, that "God gave to man dominion over the fish of the sea, and over the fowls of the air, and over the cattle, and over all the earth, and over every creeping thing that creepeth upon the earth." These are property, and we derive our title from Him who created them. But I have yet to learn that any man holds title to his fellow man from that high source. Where then does he obtain his title? Why, sir, he hold it entirely from statute law—from the laws that authorize the master to whip and shoot his slave, and which take from the slave his natural rights of self defence and of locomotion. Repeal those laws, and these vested rights would become divested. Let the legislature take from the hands of the slave the cords with which they have bound him, and he will stand forth a freeman. He will then possess as much right of property in his master as his master will in him; or rather, neither will possess any right to, or power over, the other.

Let us throw as much obscurity as we can around

this subject, it will remain perfectly clear to every intelligent mind, that this right of property and the whole power of the master over his slave is derived from statute law, which may be repealed at the pleasure of the legislature. The slaves are as much one class of human society as the masters are. The municipal laws have degraded them, and elevated the masters to power. The same laws have given power to the master, and have forbidden the slave to exercise his natural rights. But these laws are at all times subject to the legislative power, and may be changed, modified, or repealed at pleasure. This was the situation of slavery within the District of Columbia, while it belonged to the States of Virginia and Maryland.

In the year 1788-9, those States, by their separate deeds of cession, surrendered their powers over the territory now composing this District, to the United States. The general government was fully authorized to take possession of it under a particular provision of the constitution; and in pursuance of that power accepted the grant, and by act of Congress, approved February 27th, 1801, provided for its government. When Congress once spread its jurisdiction over this District, and passed laws for its government, the laws of Maryland and of Virginia ceased of course to have further force or effect here. This proposition is too plain to require illustration. From that instant the power and laws of Virgina and Maryland ceased, and those of Congress took effect, and from that day to this, have had exclusive force and effect over the District and persons therein. But what may have misled a casual observer is, that the laws then in force within the States were re-enacted, and thereby made the laws of Congress; so that the people within the District, on each side of the river, continued to be governed by the same municipal laws that had previously been in force there. Those laws to which I have referred as forming the basis of the master's power over his slave, and which render the slave liable to be shot, and which took from him the right of self-defence, were adoped by, and became the laws of Congress. The same remark applies to all other municipal laws then in force here—whether they had relation to the punishment of crimes, to the collection of debts, or to any of the relations which men hold to society. I desire to be understood as stating the case most strongly in favor of our opponents. For my own part, I deny the power of Congress to adopt, continue, or to uphold slavery here or anywhere else. The objects of the constitution were "to secure liberty," and not to promote or sustain slavery. If we had the constitutional power to sustain slavery, we had the poper to create it. If we had the power to create it, we possessed power to say what class of people should be slaves, and what class should be masters. Yet I think no man will urge that we possessed the power to enslave the white people who resided here. But I have no time to argue that point. The most favorable view for our opponents is to say, that the District then presented a political blank, on which we possessed the power to affix the dark character of slavery, or the more congenial one of liberty and freedom.

In pursuance of this power, Congress passed the act approved 27th February, 1801, which re-enacts the laws of Maryland and Virginia then in force in those States, and constitutes them acts of Congress. The laws of Virginia were to have force and effect within that part of the District ceded by Virginia, and those of Maryland to have force and effect within that portion of the District which was ceded by that State. By this law, all those acts to which I have alluded became "acts of Congress;" and we now possess the same power to alter or repeal any or all of them, that the State of Maryland or Virginia possessed prior to the cession. We may modify slavery by repealing the act authorizing persons to arrest slaves; or that which authorizes any person to shoot a slave who will not surrender when ordered, or that which forbids him the right of defending himself; or we may repeal all of them, and thereby abolish slavery altogether. If any gentleman will deny this doctrine, I would feel under deep obligations to him if he would point us to the particular law which we have not power to repeal or amend at our pleasure. But no man, I think, will be found willing to attempt that task. Our Judiciary Committee have lately reported a bill for the repeal of some of those laws, and from the reports, both of the majority and minority, some of whom are slaveholders, it would appear that the power of Congress to repeal

any of those laws was not doubted by a single member. This view was also taken by Attorney General Butler, in his official opinions; and, so far as I am informed, by every man who has investigated the subject.

Thus, Mr. Speaker, I think that no man who will examine this question dispassionately, can for a moment doubt the power of Congress to modify or repeal all those laws, precisely as they have power to repeal their own laws upon any other subject; and the whole question becomes one of expediency, and not of constitutional power. But the repeal of those laws is objected to, on the ground that the abolition of slavery here will be likely to affect that institution in the adjoining States. That objection I regard as a strong argument in favor of its immediate extirpation from the District. I deny that we are under the least conceivable obligation to continue slavery here, in order that it may be prolonged in the States. The constitution has imposed no such duty upon Congress, or upon the people of the free States. We say to southern gentlemen, take care of your own slaves. The institution belongs not to us. We have no concern in that matter. That interest belongs to you exclusively. It was never brought into the political copartnership. We will have nothing to do with it, except to use our constitutional efforts to eradicate it from the face of the earth. We hold it in deep abhorrence, and we deny the right of Congress to involve the people of the free States in its expense, its turpitude, or its odium. Our motto is, "hands off!" Leave us to enjoy our liberty. We will not be contaminated with slavery to any extent. We will wash our hands of it. We will separate ourselves from it, and make plain the line of demarcation between our people and that institution. We will purify ourselves from its corruptions and its crimes, and leave it where the constitution left it, confined strictly to the States in which it exists.

Mr. RAYNER, of North Carolina, said he desired to interrupt the gentleman from Ohio, in order to propound a question to him.

Mr. GIDDINGS. Certainly.

Mr. RAYNER. I wish to inquire whether the gentleman believes the decalogue to be of Divine origin?

Mr. GIDDINGS. I do, but I would not if it sanctioned slavery.

Mr. RAYNER. The tenth commandment says, "Thou shalt not covet thy neighbor's man servant nor his maid servant." What does the gentleman understand by that?

Mr. GIDDINGS. I have servants at home, hired servants, not slaves. I hope the gentleman does not covet them, and God forbid that I should covet his slaves.

But, Mr. Speaker, I have shown that slavery exists in this District by virtue of the act of Congress to which I have referred. That law was passed by the aid of northern as well as southern votes. For its existence, and for its continuance, the people of the free States, and their representatives, are responsible, as well as those of the slave States. It is our law that upholds and sustains slavery here. It is our law that authorizes the master, within this city, to scourge and torture his fellow man, until he shall become the pliant instrument of his own will. It is our law that forbids the slave to raise his hand in self-defence. It is our law that authorizes any constable or other person to shoot him, if he attempts to flee from the cruelty and oppression which now surround him. These are our laws; and we, sir, the representatives of the free States, boasting of our love of liberty, of our hatred of oppression, of our exalted devotion to the rights of man, year after year sit in his hall, and refuse to repeal these barbarous laws of our own enacting, or even to suffer our constituents respectfully to request us to relieve them from the load of moral guilt which Congress has brought upon them. And the question now is, shall we continue contemptuously to spurn their petitions from us?

I am aware that gentlemen are constantly menacing us with a dissolution of the Union, if we agitate this subject. I answer, we will not cease to assert our constitutional rights to be exempt from slavery, on account of these threats. Release us from this unconstitutional support of that institution, and of course we shall then have no cause to agitate or discuss slavery in this hall. But while you take from us our money to support slavery; while you dishonor us by making us the supporters of the coastwise slave trade; while we are involved in the crime of slavery in this District, we shall not be

frightened into a silent submission to these violations of the constitution, by threats to dissolve the Union. The Union was formed upon the basis of the constitution; it can only be preserved by maintaining the constitution. If, sir, the rights of the North, under the federal compact, are to be violated and trampled upon; if we are to involve ourselves in the blood-stained guilt of slavery—to be disgraced before the civilized world, by supporting the slave trade as the condition, and the only condition on which the Union can be preserved—then, sir, we shall not hesitate in our choice. Our southern friends may hold their bondmen in subjection, but they must not enslave the freemen of the North.

If slaves are to be held within this District, they must be held without our aid. If the master here continues to tyrannize over his fellow man; if he continues to hold his brother in subjection, by the torture of the whip and scourge; if he shoots him for refusing to surrender at his command, or if he take his life for defending himself, he must commit these crimes without the aid or sanction of the people whom I represent. Neither our moral nor political power will be prostituted to the support of such a warfare upon mankind. In saying this, I do not allude to the abolitionists particularly. I refer to the feelings and sentiments of our whigs, our democrats, and our liberty men. I refer to the sentiment of the great mass of northern men, of all parties, denominations, and classes. They generally concur in the wish and determination to separate themselves from the corruption and disgrace of these laws of a darker and comparatively barbarous rage. There is a tide in public sentiment now rolling on, which will inevitably sweep these laws from existence. That tide is going forward with resistless force. Demagogues, politicians, and political partisans are unable to stop or even check it in its course. Its progress is visible to the most careless observer. Each week bears witness to its increasing power. The changes in this hall are such as to silence the most sceptical. Nor can political feelings or prejudices drive from our breasts the feelings of humanity and patriotism. The great apostle of southern slavery may thunder forth his bulls of excommunication against his political friends; he may pronounce his political anathemas against those who act in favor of the constitution and of humanity; but his denunciations will prove as useless as they are harmless. His political friends in this hall will never consent to continue the traffic in mankind, which is now carried on in this District; for, if we may credit the reports of the day, there have been more than five thousand men, women, and children sold and transported from this District to southern slave markets, within the year past; and that, too, by virtue of our laws, passed by Congress, and which we refuse to repeal. Yes, sir, you may look from those windows, and view the principal slave prison in the midst of this city of boasted freedom. There, sir, within its gloomy walls are now sighing and groaning the victims doomed under our law to the slave markets of the South. Who will estimate the amount of suffering and wo that exist within its hated cells? Count there the mothers torn from their children; the sisters violently separated from their brothers and parents by the execrable dealers in human flesh; the children forcibly taken from their parents, and herded together, waiting for the sailing of the slave ship to convey them to their gloomy destinies upon the rice, cotton, and sugar plantations of the South—and then say whether we will receive petitions to stop this accursed traffic. This is all done under the protection of our laws. For the continuance of those laws, we who now sit in this hall are responsible. We refuse to repeal them; we refuse to receive petitions praying their repeal; we refuse to permit a bill to be introduced for that purpose; we refuse to discuss the propriety of their repeal; and will any man pretend that we are not morally responsible to God and our country for these hated crimes, committed by our aid? Sir, our hands are now dripping with the blood of slaves; and shall we sit here coolly debating the question, whether we will continue to stain them with the blood of these people? Let me say to every member of this House, whether he come from the North or from the South, that he who refuses to receive these petitions; he who refuses to discuss this subject; he who refuses to repeal these acts of Congress, will be held responsible to the country, to posterity, and to God, for the crimes committed under the protection of these laws. [Here Mr. G.'s hour expired.]

## SPEECH OF MR. RHETT,

### OF SOUTH CAROLINA.

*In the House of Representatives, May 7, 1844.*—On the bill introduced by the Committee of Ways and Means, providing for a modification of the existing tariff.

MR. CHAIRMAN: The gentleman from Vermont, [Mr. MARSH,] in discussing the principles of the bill before you, treated with ridicule and contempt all objections arising from the constitution. Constitutional scruples, he said, were exceedingly innocent in their effects. No one had ever entered penitentiaries, mad-houses, or had died, from their influences. He had never perceived that the constitution was an impediment to any policy; but whatever men desired in legislation, they always found to be constitutional. Such opinions are undoubtedly in perfect congeniality with the policy of those with whom he acts. The constitution is, indeed, with them, nothing. It does not raise—it never has raised, any obstacle to their schemes of appropriation and plunder; and, so far as they are concerned, it is simply an instrument of power, to be used with a single eye to their selfish and sectional aggrandizement. But has it not occurred to the gentleman, that if his view of the practical administration of the government be correct, we are living under a despotism? The constitution is nothing but a series of limitations on power. If these limitations are no limitations in practice, then the government is without limitations on its powers. And what is a government, without limitations on its powers, but a despotism? Despotism is unrestrained power—nothing else. So thus, by the open boast and acknowledgment of the advocates of a protective tariff, this government is a despotism, the constitution exists in vain, and the tariff question before you involves a simple strife of power between those who are to receive, through the taxes, and those who are to pay them. This is precisely the result which those who are opposed to the protective policy always predicted would be produced, through its pernicious tendencies. The strained inferences and constructions, by which alone its constitutionality could be supported, when applied to other subjects of the constitution, would be fatal to any limitations on its powers, and would, therefore, justify any violation which the avarice or ambition of a majority might require. Our argument is now proved in the profligate sneers and declarations of the gentleman from Vermont, as it had long since been proved by the whole scope of the northern policy he advocates. With the absence of all "constitutional scruples," the constitution is gone; and with it goes all liberty. Can he tell when and where, with our race, any strife for liberty ever arose without "constitutional scruples?" What brought the first Charles to the block? What led to the revolution of 1688? What occasioned our own revolution, but "constitutional scruples?" In his own State, at Bennington, at Saratoga, at Yorktown, on every battle field, wet with the blood of our revolutionary fathers—what made their cause and their glory? "Constitutional scruples" to unconstitutional taxation—the very subject matter now at issue in this debate. The British Parliament claimed to be omnipotent over the colonies, in laying duties on their imports—as Congress now claims to be omnipotent over the States. Our fathers saw that such a pretension put their property at the mercy of a majority in Parliament, as we now see that the same pretension puts our property at the mercy of a majority in Congress. They took up the "constitutional scruple." They fought for it; by thousands they died for it; and, that they may not have fought and died in vain, they framed the constitution under which we live, carefully limiting the powers of the government it establishes to a few specified objects, that neither their liberties nor property might be endangered by its administration. The purse and the sword, armies and navies, they gave; but these were for our foreign foes. The only security they ordained for its internal administration, in integrity and truthfulness, was the oath the constitution prescribes shall be taken by all who administer it. The gentleman from Vermont has taken this oath, yet he has never seen or known the influence of constitutional scruples. Let him sneer and make merry in the profligacy of his corrupt policy; but we will still hold up the constitution as long as it endures, even in name. It is not oppression merely that we resist, but *unconstitutional* oppression. It is not the millions exacted from us, but the right violated in their exaction, that we oppose. It is for great principles of liberty, constitutional liberty—not money merely, we contend. And even when demonstrating the injustice of the protective policy, we aim at proving its unconstitutionality; because we go for our rights, not for revolution. The constitution being made by all the States, for the common protection and benefit of all, cannot sanction oppressive privileges, or legislative robbery, for the benefit of a part. Our "constitutional scruples" forbid such a policy, and demand its overthrow.

But gentlemen have endeavored to show that the protective policy is not unjust at all; and therefore constitutional. As it is certain that higher taxes are exacted from the citizen on account of it, that his property is taken from him to sustain it, they can hardly stop at a negative point. They admit its protective influence; but they contend that that influence is beneficial, because it cheapens goods to the consumer. This is, at least, a new, if not a good position; but it is so inconsistent with their own doctrines, and so false in itself, that we must suppose argument to be abandoned, and the more convenient method of fabricating facts and figures is now their instrument to sustain their flagitious policy.

The protective policy cheapens goods! and yet, in their very next breath, after some thirty years of protection, they declare to us that, without the continuance of the present protective tariff, the highest and most comprehensive that has ever been put upon the country, all the manufacturers of the Union will be ruined. A thirty per cent tariff will be their desolation! To support this wretched fallacy, which would disgrace the debating club of a country schoolhouse, the Committee on Manufactures of the present Congress have gravely put forth in their report several tables. These tables show that many articles of manufacture at the present are now cheaper than they were five or ten years ago. Every one knows that this must be the case in every manufacturing nation in Christendom, from the introduction of steam, and the improvements in machinery daily going on. But why did not the committee, if they intended to show the truth, run a parallel column showing the prices abroad? The reason is obvious. This would have blown up all their tables; for it would have shown that, although prices had fallen in the United States, from causes common to manufactures everywhere, they had fallen still lower in foreign nations; and that, after thirty years' monopoly of the domestic market, the prices of manufactured goods were still, as compared with the foreign production, as high, if not far higher, than they ever were; and, consequently, that the same tribute was exacted from the American consumers to support them. But to show that this new doctrine of the effect of a protective tariff to cheapen goods is untrue, and that its advocates know it to be untrue, we have only to turn to the report itself, and read its reasons for laying duties for protection. "The two great items," says the report, "which go into productions of all kind, are capital and labor; and in both of these the foreigner has a manifest advantage over our citizens. In England and on the continent, capital is worth only three or four per cent., while in this country it is worth from six to eight. European labor costs from 5s to 9s *per week*, including board; while in this country labor costs nearly that *per day*. Under these circumstances, *how can the American manufacturers compete with those of Europe?* We want protective duties mainly to counteract the influence of cheap capital and cheap labor." Here the whole matter is disclosed; and we have only to meet these sophisters with their own question, to show the falsity of their assertion that their policy enables them to undersell the foreign manufacturer: "under these circumstances, how can the American manufacturer compete with those of Europe?" It is impossible, by their own showing and acknowledgement, so long as the prices of capital and labor, which constitute the price of all commodities, remain unequal—it is impossible, unless counteracted by other advantages, which have nothing to do with this policy, that the American manufacturer can sell his goods as cheap as the foreign producer; and all assertions and pretensions to the contrary are blushless falsehoods. The American planter and farmer, in spite of the cheaper capital and labor of Europe, can undersell the foreign producer not only in our markets, but in those of Europe. They must, therefore, expect no aid from government; and the government can give them none, to secure to them the domestic market by duties on importations. Protection, in spite of the professions of its advocates, with them, can never be

Feb. 1844. APPENDIX TO THE CONGRESSIONAL GLOBE. 503

28TH CONG.....1ST SESS. *Abolition Petitions—Mr. Severance.* H. of Reps.

stitution of the United States, but by virtue of the positive law of the States in which they are found; and with these States alone rests the power to legislate over the whole subject, and to give to them or take from them—either from the whole or any part or number of them—those already there, or those that may be introduced thereafter—in whole or in part, the character of merchandise or property, at their pleasure; and over all which State regulation Congress has not the slightest power whatever."

What, then, becomes of the argument of the gentleman from Mississippi, that a State cannot abolish slavery, or that of the gentleman from North Carolina, that the 5th article of the amendments of the United States constitution is a prohibition upon the States? Have they a particle of ground on which to stand?

The gentleman from Mississippi said it was not in the power of Congress, he thanked God, nor of the abolitionists of England or of this country, to take his private property from him. Sir, it may not be in the power of the abolitionists of England, unless by force, and it certainly is not within the constitutional power of Congress; but the people of Mississippi can do it, should they happen to become abolitionists. I know the constitution of Mississippi says it shall not be done, without providing compensation; but the people of Mississippi can alter their constitution.

The gentleman from Mississippi has enlarged somewhat on certain statistics of the last census, from which it seems to be inferred that a large portion of the black population go crazy as soon as they are set free, and that the only way to preserve their intellectual vigor and usefulness, in the mental world, is to keep them in a state of servitude. This is a notable discovery, and has always been laid before the world in a southern review. But, unfortunately for the theory which has been so carefully elaborated, it is all founded in error; it has all resulted from misplacing a few small columns of figures in the census of 1840. The error has been exposed for months, and it is rather a matter of surprise that the gentleman from Mississippi, as well as the senator [WALKER] from that State, who has lately published a pamphlet in favor of the admission of Texas into the Union, should have overlooked this refutation of the theory, and the correction of the error on which it is founded. In Maine, where I really never saw an insane colored man, the gentleman says, that one in fourteen are insane or idiots. I will show you a specimen of the mistakes which prevail. These errors were originally pointed out in the Boston Daily Advertiser, some time last summer, and have since been noticed in various publications. Here are six towns in Maine, which are thus entered on the census of 1840:

| Towns. | Total colored inhab. | Colored insane. |
|---|---|---|
| Limerick | 0 | 4 |
| Lymington | 1 | 2 |
| Scarboro' | 0 | 6 |
| Poland | 0 | 2 |
| Dixfield | 0 | 4 |
| Calais | 0 | 1 |
| Total | 1 | 19 |

It is easy to get a large per centage of colored insane and idiots by making nineteen insane and idiots out of one who is probably sane.

That a cold climate is not as congenial as a warm one to a race of people who originated within the tropics, and under the burning sun and perpetual summer of Africa, I am not disposed to deny; nor that, among all races of men, there is more proneness to insanity, where the mind is powerfully exerted, than there is in the stupid condition of the slave, where intellect is never cultivated or encouraged. The argument has been used here and elsewhere, that emancipation, in the southern States, would result in deluging the North with manumitted slaves—a great error, as I conceive. The entire current of colored emigration would always set strongly to the South, as that of the whole population of New England does to the West, but for the existence of slavery in the South. This it is which turns that current of emigration against its natural course. But for this we should see no African colonists in the cold regions of Canada. They fly to an ungenial climate to avoid slavery, and the oppression of their race, where it exists.

The gentleman from Mississippi also quoted some authority to show that there was a much larger proportion of convicts in Philadelphia among the black population than among the white, especially for petty offences. It may be that a large proportion of white offenders escape punishment, while the poor negroes are selected for examples. There are, however, ample reasons, in the circumstances in which the colored population are placed, the position they occupy in society, and the prejudice against color, which serve to degrade them and take away the ordinary motives of emulation and ambition which stimulate all not marked by their color, to account for a greater disregard of the requirements of government. The serfs of Russia, though white, are said to be all liars and thieves. But this, I think, is the account their masters give of them, and they offer it as a reason for refusing to emancipate them.

The gentleman from Mississippi also told us of the happiness and innocence of the slaves of his State. He said "scarcely a farmer in Mississippi ever locked his door; they knew not the use of locks there; their pantries and their granaries were never locked, or, if locked at all, it was in the neighborhood of some petty town chiefly settled by Yankees."

Sir, I am glad to hear there is so much honesty, so much confidence and Arcadian simplicity among the yeomanry of Mississippi. I am happy to believe, and I thank God it is so, that the same honesty and confidence generally prevail in all parts of the United States in the rural districts. I have seen it myself. And I am not quite prepared to admit the superior morality of Mississippi over Yankee land. It is true we have had some men among us of doubtful morality. Occasionally, they have fled to the South; some to evade the payment of their debts, and come to avoid the penalty of their crimes. It is not impossible that some of them, particularly the former, may have taken up their residence in some of the "petty towns" of Mississippi. No doubt we still have some such among us; but we can safely say, I think, that we have a

large majority of honest men in all our eastern States, a majority, which no man believes can ever be changed, who not only are willing to pay their individual debts, but are willing to be taxed to pay the debts of the State which their legal representatives have contracted. In Mississippi, I am sorry to say, the majority is the other way. Sir, in Maine, our State credit is so good that our treasurer is now paying a premium of two and a half per cent., on our own State six per cent. stock which has only a year to run. He cannot get it of the holders on lower terms. Is the stock of Mississippi above par? Sir, I hope, if the government of that State is in the hands of the fugitive Yankees, in the "petty towns," that the honest people of the hamlets, who never lock their doors, will take the government of the State into their own hands and redeem its credit, until it shall be, as free from dishonor as the States of New England, all of whose stocks, that have any, are above par, notwithstanding the dark shade thrown upon American credit generally by the conduct of some of the States of this Union.

The gentleman made himself quite merry upon another matter. He told us that the ladies of Rehoboth, Massachusetts, had petitioned to have the law repealed which prohibited intermarriages between blacks and whites, and that it had been repealed. This is true. It was repealed. And why should it not? Is there any law of that kind in Mississippi? I believe not, and probably not in any southern State. Will it be said that such a law is necessary in Massachusetts, and not at the South? Is such a law there as superfluous as a law against parricide among the ancient Romans, because the crime was never heard of? Then how comes it, I would like to know, that we every where see such a mixing of races, and so many shades of color every where at the South—

[Mr. CAMPBELL, of South Carolina, (in his seat,) said: "Have you seen it everywhere at the South? Where have you seen it?"]

Mr. SEVERANCE. I see it here in this District. I have not been in all the southern States, but have seen quite a variety of colors wherever I have been. There is no doubt of the fact. Is it the effect of climate? The gentleman from Ohio [Mr. DUNCAN] told us, the other day, that it was three hundred years since the negro had been taken from his native climate and carried into the temperate zones, and in all that time his skin was as black, and his other peculiarities the same as ever. Sir, this does not accord with my observation. I see a great change going on, not, however, affecting all individuals alike. Some retain their original conformation and color, but others have become almost white. I suppose it cannot be by amalgamation, for some gentlemen have a great abhorrence of that. It must be the effect of climate, for the instance is rare, indeed, that the child is of darker hue than its mother.

There was another remark of the gentleman from Mississippi which struck me as worthy of notice. Speaking of the South, he said:

"Deny to them justice in the protection of their property, or in relieving them from unjust taxation, and there was another quarter that would feel their weakness. If this Congress rose without doing them justice, *they would see the day when they would rue it.* He called upon the democratic portion of this Congress to open their eyes and act upon this subject."

Well, now, here is something quite serious threatened. What is to be the penalty of all these neglects and omissions? Who is to "rue it"? Not the whigs, I suppose, for the warning seems to altogether directed to the "democratic portion of this Congress" from the North; and the meaning of it, I suppose, is, that if the northern friends of the Sage of Lindenwald do not vote to cut down the tariff, and do not vote to retain the 21st rule, he cannot have the vote of the South.

Mr. HAMMET. I did say anything about the Sage of Lindenwald.

The SPEAKER. Does the gentleman from Maine yield the floor?

Mr. SEVERANCE. I do not. I want all my hour. Of course he did not mention the sage, but what else did he mean? We shall see if these warnings are heeded. The country will see.

The gentleman from Mississippi, and other gentlemen from the South, have repeatedly called upon the "northern democracy" to stand by the South in the protection of her institutions. No calls are made upon the whigs of the North. Now, sir, I do not assume to answer for them, but for one, while I declare my opposition to slavery, and desire to see the end of it, I avow the belief that the most dangerous form of abolition is to be found in the avowed principles of this northern democracy, if there is any consistency and sincerity in these principles. The whigs are all "law and order" men; they are not opposed to reform; not opposed to the correction of abuses; not opposed to the advancement of the principles of human liberty and equality; but they wish to advance safely and cautiously, holding on to what they have till they get something better; not madly and blindly plunging headlong into the wildest anarchy. How is it with this northern democracy, whose aid is now courted? Possibly enough of them may now be induced, by temporary advantage, to sacrifice the right of petition; but gentlemen from the South will find them dangerous allies, if they bring their principles with them. These have been practically illustrated in the case of the Rhode Island controversy. Acting upon this subject, the legislature of Maine, in 1842, adopted a report, from which I will read an extract:

"We understand that the action of a majority of all the people, without appeal to or interference by the constituted authorities, is alone sufficient to abolish and institute governments; that as constitutions are above the authorities and the laws, so are the people above all constitutions."

The next year, March, 1843, resolutions were adopted, by a strictly party vote, in the House, on the last night of the session, declaring that a majority of the people have a right to assemble at any time, and, in any way they think proper, change the form of government. Under this doctrine, without the consent of the existing authorities—without any previous constitutional or legislative action—without any provision to prevent frauds—without any regard to existing laws defining what portion of the people shall vote; and, on their own declaration that they have a majority of the peo-

ple, they may proceed to make a new constitution and organize a new government, taking possession of the public treasury and public property by force, if necessary. This has been attempted in Rhode Island; and the legislature of Maine, the legislature of New Hampshire, and divers other legislatures in which the same party were in power, took the same ground. Mr. Van Buren himself did not think it beneath him to give a very encouraging response to a letter from the Rhode Island insurgents, and to give his countenance to this new mode of altering State constitutions—a mode which, if applied to the United States constitution, might facilitate the alteration proposed by the Massachusetts legislature, as it would save the indispensable necessity of obtaining the votes of three-fourths of the States; for a bare majority of any sort of people, of the whole Union, would be sufficient.

Politicians of this stamp, on whose aid southern gentlemen are now relying, are constantly denouncing the whigs as the aristocracy, and seeking to excite the prejudices of the poor against the rich as their natural enemies. How will this answer in the South?

Who are the aristocracy there, and who are the democracy? Surely the aristocracy must be those who not only own the land, but the laborers on the land; while the poor, the democracy, though the most numerous, own neither land nor laborers, and being in a region where labor does not hold its just rank, they may become politicians, and adopt the Rhode Island mode of changing their government. Suppose they should do so—declare the existing government at an end, and resort to force to maintain the new one: they would, of course, summon all the means in their power. What these would be, in a desperate struggle, I hardly need indicate. It is obvious that the relations of master and slave could not long continue undisturbed in such a conflict, unless the freemen of the North came to the support of the old or the new government.

Slavery throughout all the Spanish American States was ended either in the war for independence, or the civil commotions which followed. Morillo, the Spanish general, set the example in Venezuela, by offering liberty to all the slaves who would join the royal forces. The patriots made the same offer in self-defence. The example was followed elsewhere, and the last vestige of personal slavery on the southern continent, Brazil excepted, has, I believe, recently been ended, in the war between the Argentines and the inhabitants of Uruguay.

These are not examples for us. Let us rather look to peaceful legislation—to the civilization of the age—to the onward progress of liberal opinions, and of prompt, conscientious action on the principles of justice and humanity. Sir, I think I have shown that Congress has the power to abolish slavery in the District, and I have no hesitation in avowing my opinion, that it is the duty of Congress to do so. The difficulty certainly cannot be insurmountable, when we consider that there are less than 4,700 slaves in the District, in a population of 64,000—a population, I would fain believe, to a great extent, already favorably disposed to the object, if we may judge by presentments of grand juries, in times past, against the domestic slave trade, and the fact that, in 1828, a petition for the suppression of that trade by Congress was signed by one thousand inhabitants of the District. Fortified, too, as we are, in the action of the legislature of Pennsylvania, in 1828, the assembly of New York in 1829, the legislature of Massachusetts in 1837, and since; the legislature of Vermont at divers times, and the house of representatives of Maine, in 1838—all passing resolves that slavery ought to be abolished in the District of Columbia, the seat of the federal government, the proposition cannot be regarded as either new or unreasonable. Nor is it anything of which the southern people have any right to complain, more than they have of the abolition of slavery of Pennsylvania. The example can be no otherwise dangerous to them than it would show vividly before their eyes, here in the capital of the nation, the vast difference between the impulsive energy of a free community and the paralyzing influence of slavery.

The District could be made one of the most flourishing communities in the whole Union. Now the three cities derive almost all their importance from their position at and near the seat of government. Their commerce is small, their manufactures less; yet the capacity of both is great. The Potomac, at Georgetown, affords a better water power than the Merrimac, at Lowell. Subsistence is cheaper here than there: a magnificent river below, a fertile country above, abounding in coal and iron. The mountains of Virginia are near, which might be covered with flocks of sheep, all together affording every facility for manufactures of wool, cotton, and iron, almost without limit. All that is wanting is an investment of northern or European capital, and an opportunity for the labor of artisans of every sort from Europe and the North; for enterprising men and ingenious mechanics. These will not come here where labor is regarded as servile. The northern mechanic will not set himself on a level with a slave. He will choose rather to go to the West, or stay at the North. But, abolish slavery, and keep up the American system, and all the springs of industry will be put in motion here, in the very centre and heart of the republic, imparting, by its strong pulsations, life and vigor to the farthest extremity of the Union, and securing, for untold ages, the permanent establishment of the seat of government, in the chosen city of the Father of his Country.

Surely the southern States will not be so unreasonable as to insist that we must uphold slavery here to keep them in countenance, and that we must not abolish it here till every southern State has done it; that the seat of government of this great and free republic must be the last refuge of slavery after it has been abolished by all the monarchies of Europe, and even by the pirates of Barbary. We have delayed it too long already; much longer than the patriots of the revolution contemplated, even those of the South. Let us take the matter into serious consideration. The people of the Union are doing so; and if we are laggard in our duty, other men will take our places.

The gentleman from South Carolina [Mr. HOLMES] told us, when the discussion upon this subject began, that the wave of northern abolition was rolling in upon the South, and threatened her institutions with destruction; and the gentleman from Virginia, [Mr. WISE,] when he affected to give up the contest in this House, said the South had been

dwarfed by the census, and no longer controlled the political destinies of the country. Sir, it is true that the South has been comparatively dwarfed by the census of 1840, and will be still more dwarfed by the census of 1850, though she may possibly retain, for a while, her ascendency, or equal numbers, in the Senate, by extending the dwarfing process over a greater extent of territory to be acquired in the southwest. But even if this be done, as I trust it will not be, the wave of free northern and of European population will press onward, and preponderate more heavily at each decennial term.

Sir, there is said to be a law in physics, that every tenth wave, as it rolls in upon the ocean shore, comes higher and heavier than either of the nine preceding. Whether this really be a law of the elements or not, it is certainly true of our political statistics. Every tenth wave, now that the limits of slavery have been reached on the southwest, will press heavier and stronger on the federal numbers of that institution. No cunning or artifice can evade this law of natural increase. The free yeomanry and artisans of the North, who get their living by their labor, will not migrate to the regions of slavery. Hence the great current of their emigration keeps northward of Mason and Dixon's line, and continues northward of the Ohio river. The South will continue to be dwarfed by a sparse population, thinly spread over a wretchedly cultivated soil, without arts or manufactures, while the industry of the country is confined to the unwilling labor of slaves. What has given the "Great West" such an almost miraculous increase? We may look to the ordinance of 1787 for the grand secret. That prohibited slavery in all the vast and fertile territory northwest of the Ohio, obtained from Virginia. One single State, since made from that territory, has now twenty-one representatives on this floor, while Virginia herself, larger in territory, has only fifteen. Illinois, a State of but yesterday, has seven representatives, as many as South Carolina, one of the old thirteen. There is but one way in which the South can rightfully renew her growth, and swell her numbers on this floor; and that is by putting the whole of her population in a condition to be counted, instead of three-fifths of a certain part of it.

Gentlemen tell us that we of the North have no interest in the question of slavery. Not so. We have a deep interest in all that concerns the welfare and the character of the republic, of which we form a component part. No interest! Has not this nation, within a few years, expended nearly forty millions of dollars in a war with the Seminole Indians, originating in a quarrel about some runaway slaves? Have we not been threatened with a war with the greatest maritime power in the world, to recover payment for fugitive slaves escaped into the Bahamas? Has not our late Secretary of the Navy, (Mr. Upshur,) in contemplation of this war, and of the defence of our peculiar institutions, recommended an increase of our navy, which would have involved an annual expense of more than thirty millions of dollars for the navy alone? Are we not now threatened with a general war with Mexico and England, involved in a struggle to acquire territory upon which to extend slavery where the Mexicans had abolished it? Are not our free citizens imprisoned for no crime but their color? Are we not liable to be called into the field by the President of the United States, to suppress servile insurrections? Have not our mails been rifled, and our private correspondence been exposed? Have not these, and other injuries and liabilities to which we have been subjected, caused the formation of a new political party in the North, which proposes to array the entire North against the South, at the polls, on the single question of slavery alone—denying to every slaveholder any participation in the government of the country, so far as this party has the power to prevent it, and driving from public trust in the free States every man, from the highest to the lowest station, who does not adopt these proscriptive principles? Sir, I belong to no such party—I never can. It is a mistaken means to redress real grievances. It is conceived in the same spirit which has too much animated the South in grasping for undue political ascendency, and over-jealous watchfulness over her precarious, vulnerable, and "peculiar" institution. I am ready to carry out the principles of the constitution, as agreed to by our revolutionary fathers. They compromised this matter of slavery; and I am willing to abide by their agreement on the part of the North, while I will insist that its letter and spirit shall not be violated on the part of the South. When we can no longer endure a connection with slaveholding States, we will dissolve it peaceably; but while it exists, we will not ask a monopoly of office and political power which we should never submit to ourselves. We must not refuse to vote for a southern man for President, or any other office, merely because he is a southern man and a slaveholder. Such political action would separate us like two hostile clans, living on different sides of a river or mountain. We could never meet but in fierce array, battling like Scot and Southron in past centuries on either side the Tweed. No, sir. We will adhere to the Union, trusting that, in the progress of civil liberty and the benign spirit of our religion, our friends of the South, who have the power to do so, will remove the great disturbing cause.

But I now tell this House that agitation upon this subject can never cease here while slavery exists under the authority of the federal Government. There is no provision of the constitution which confers upon Congress the authority to pass any law which shall make one man the slave of another. There was no such compromise in the constitution as this; and the American people ought not, and I trust will not, long permit any such laws to exist by their authority. Their entire repeal is the ultimate point of political agitation in the free States. Agitation cannot, in this age of the world, and while it is pervading other countries, stop short of this. Repeal all such laws—absolve this federal government from all responsibility for the existence of slavery—and no more petitions will be received here. Agitation, if it continues, will be transferred to the legislatures of the States where slavery exists. No doubt it will still be a subject of popular discussion in all communities; but there will be no foundation or excuse for political action in Congress or the free States. Unless this is done, no man can foretel the consequences; the cloud, now seen in the distant horizon, no bigger than a man's hand, may overspread all the heavens in its gathering blackness, till the elements are stirred in their wrath, and the forked lightnings descend upon this Capitol, dashing our long-cherished Union into fragments which cannot again be re-united. True, it may be said, such a party as has been described can never be very numerous in any State. So I believe, unless it thrives by the greater folly of other parties. But the friends of emancipation will not be confined to any such party. If they persevere, they will soon learn enough political wisdom to throw their weight where it will be felt, giving their votes to the candidates of other parties most favorable to their views, and carrying their points against slavery precisely as some of its advocates seem to propose to retain the gag rule, and effect the destruction of the protecting policy, by giving their presidential votes in a certain quarter, instead of setting up a candidate of their own in opposition without a chance of electing him.

Let no man say our constitution guaranties slavery. It does not. The only provisions relating to it are—article 1, section 1, which provides that—

"Representatives and direct taxes shall be apportioned among the several States, &c., according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons."

This was the first compromise. It recognises the existence of persons in the States other than freemen, and provides a way in which they shall be counted in federal representation, but confers no power on the federal constitution, except upon this precise and specific point. It was a compromise of the dispute whether they should all be counted or none of them.

The next compromise was first clause of section 9, which prohibited Congress from abolishing the slave trade before 1808. Surely this was no guaranty of slavery, but a tacit admission of the power of Congress to abolish slavery everywhere out of the local jurisdiction of the States.

The only other provision of the constitution relating to slavery at all, is the latter clause of section 2, article 4, which provides that—

"No person held to service or labor in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor," &c.

It is a prohibition upon the States against any one of them extending the protection of its own laws, or the privileges of a freeman, to a person, "held to service or labor," escaping from such service in another State. This is no guaranty of slavery. It does not say slavery shall exist, or shall not, anywhere, but that the States shall not set each others' slaves free when escaping into their limits.

So much for the compromises of the constitution relating to slavery. They are these three, and we must abide by them—giving to them, however, the strictest possible construction, where they are to be construed against human liberty. But we are under no obligation to refrain from attempting to alter these provisions. The facility of procuring any alteration is sufficiently great to protect the South. Why should gentlemen be so much agitated at this reception and reference of the resolutions of Massachusetts? They propose no violence; they do not assert that a majority of the whole people can change the constitution of the Union in any way they see fit; but they propose to submit the question, whether any alteration shall be made in the mode prescribed by the constitution itself. Do gentlemen here fear that one-half the slaveholding States will give up the three-fifths representation? Do they apprehend that these States will extend to the constitution of the Union precisely the same principles which they put in practice among themselves in their own State representation? In apportioning their assigned number of representatives in Congress in districts of their several States, and in fixing the basis of representation in their several legislatures, only one single southern State has adopted the basis of three-fifths of the slave numbers, and that State is Georgia. She alone adopts the rule of federal numbers. In Delaware, Maryland, Virginia, North Carolina, and South Carolina, the number of representatives and senators, to which each county or district is entitled, is arbitrarily fixed in their constitutions,—with what reference to slave population, I am not able to say. In Kentucky, the basis of representation is on the number of "qualified electors;" in Tennessee, the number of "taxable inhabitants;" in Louisiana, for representatives, "qualified electors"—senatorial districts arbitrarily fixed; in Mississippi, "free white inhabitants;" Alabama, "white inhabitants;" Missouri, "free white male inhabitants;"—

[Here Mr. SEVERANCE was stopped by the expiration of his hour.]

---

## SPEECH OF MR. COBB,
### OF GEORGIA.

*In the House of Representatives, May 3, 1844—On the tariff bill.*

Mr. CHAIRMAN: I have watched the progress of this discussion with peculiar interest. The importance of the subject, as manifested by the deep feeling which its agitation has never failed to excite in the public mind; the various and conflicting interests of the different sections of our wide-spread and diversified country, which must be necessarily affected, to a greater or less extent, by any legislation on the subject; and, above all, the vital importance attributed to it by the people of that particular section of the country whose interest has been in part intrusted to my keeping by a confiding constituency,—have summoned to the investigation of this intricate and perplexing question all the ability and energy of which I may be master. Under these circumstances, I could not be expected to have remained an inattentive listener. Nor has this debate, to me, been an unprofitable one. Apart from the general fund of information which the research and labor of different gentlemen have furnished for our instruction and improvement, I have been enabled to gather from the course of argument pursued by the most of those to whom I am opposed, an insight into the plan of operation, by which their objects are proposed to be accomplished, and the ultimate benefits which they fondly promise themselves, should their present efforts be crowned with success. And I trust that these facts, to which I am about to direct your attention for a moment, have not failed to arrest the observation of every representative from the South upon this floor and to excite within their bosoms a renewed zeal and strengthened determination to resist, to the utmost of their powers, the organized effort now being made to fasten forever upon our institutions a system of legislation so utterly ruinous and destructive of the best interests of the country. And, sir, if there be any here who have been induced, for a time, to falter in their course, to withdraw from the battle-ground so long and gallantly occupied by our predecessors, of all political parties, let me ask them, in the name of our common constituency, to pause and reflect upon the developments of the times, before they yield, without an effort, this auspicious moment of redressing the grievances inflicted upon our people by the unjust, partial, and inexcusable legislation of 1842.

No one could have failed to observe, at an early stage in the present session of Congress, the evident anxiety manifested by the peculiar representatives of eastern and northern interests, to court the favor and obtain the co-operation of the great and growing West, in furtherance of the views and policies which principle and interest alike urge them to forward and prosper. It was evidenced in every movement that was made, and was prominently conspicuous in all the speeches of those members who had occasion to address the House upon certain collateral questions which were sprung upon us at an earlier period of our deliberations. And now, sir, since this bill has been under consideration, the scheme has been so fully and freely developed, that no one, unless he be wilfully blind, can fail to see and comprehend it. The northern manufacturer, conscious of his inability to sustain, alone, a system of legislation which has for its object the levying of contributions upon the great mass of the people for the benefit of a few, feels the necessity of holding out some inducements to other interest, with whom he may combine to effect purposes, as he alleges, equally beneficial to each; and it is in the farming interest of the West—the growers of wheat and other bread-stuffs—that he finds that interest; and in the spirit, in part, of pretended good feeling and liberality, he tenders to them an equal participation in the benefits of his exclusive policy. The great advantage, says the manufacturer, which we promise ourselves from a protective tariff, is the increased consumption of our fabrics among our own people; a home market will be afforded, where we will be enabled to dispose of all the works of our labor as soon as we can drive from our shores similar articles of foreign manufacture. Aid us in bringing about this result, and we, in return for the good favor thus shown to us, will afford you also with a home market for your agricultural products. The increased number of consumers of your bread-stuffs, consequent upon the increasing prosperity of our manufactures, will open up to you a market which will set at rest all your anxieties and speculations about the foreign consumption of your products.

Fortunately for the country, however, the West is unwilling to rely too implicitly upon this captivating but deceptive picture which is thus presented to her view; and on a more minute and critical examination of the subject, in all its bearings and effects, her hardy sons are fast uniting with us in opposition to this most unjust and oppressive measure; and I doubt not that, in a very few years, that whole people will co-operate with the same unanimity which once characterized the people of the South on this very question, and will, as one man, indignantly dash the proffered poison from their lips.

But, sir, my object in alluding to this branch of the subject was not to direct an argument to the people of the West, and to enlighten them upon the course which interest and duty required them to pursue. That duty has been more ably and eloquently performed by her own worthy representatives who have preceded me in the debate. My purpose is, to call the attention of southern repre-

[THE FOLLOWING TWO PAGES ARE THE COVER PAGE AND THE 4TH PAGE (5TH IN THE PDF) OF THE NORTH CAROLINA STATE ARCHIVES] THE PRACTICE OF PETITION IS DESCRIBED AS THE COURTS BEING SEATED WITH THE ADMINISTRATIVE DUTY OF ACCEPTING THE PETITIONS OF CITIZENS (WHERE THE COSTS ASSOCIATED ARE UNKNOWN) BUT IT IS GENERALLY BELIEVED THE COURTS ACCEPTED PETITIONS AS A SECONDARY OR PRIMARY RECORDING FUNCTION OF THE PETITIONS OF CITIZENS OF N.C. TO ENSURE CITIZENS OF AREAS WITHOUT ACCESS TO A REPRESENTATIVE OR MONEY TO SEND A PETITION TO THE CAPITOL OR REPRESANATIVE AND THEN TO PURCHASE THE PAPERS SHOWING THE PETITION FILING WERE STILL AFFORDED THE RIGHT TO PETITION. THE EXACT CITING ON PAGE 4 IS [BRACKETED]: **How Were Petitions Submitted?**

To submit a petition, the petitioner first had to write the document. They could do this by themselves or with the help of a friend, relative, or clerk. This is why many petitions have multiple names on them, even if the request only has to do with one person. Both during and after the American Revolution, it became increasingly common for men to submit group petitions, which were generally intended to indicate widespread support for a desired policy change. Women were more likely to submit individual petitions, usually seeking to solve the problem of an individual. [[After the petitioner(s) wrote their petition, they presented it to their county court. If the justices of the county court certified the petition, it was then forwarded to the county's legislative representative, who would present it to the General Assembly. After a petition was first read to the General Assembly, it would be remanded to a committee that would be responsible for considering it further. This committee would later report back to the General Assembly, and the General Assembly would either grant or reject the petition based on the committee's recommendations. ]]

103

THIS WAS THE GENERAL PRACTICE OF NOT ONLY N.C. BUT ALSO VIRGINIA (UNCONFIREMED DUE TO THE VAST VOLUME OF PETITIONS AND THE GENERAL ADMINISTRATIVE PRACTICE OF THE COURTS NOT BEING A LEGISLATIVE ACT BUT ONE OF THE COURTS) MASSACHUTTES IS ALSO BEILIEVED TO HAVED PRACTICED, AND THE COLONIES ALSO BELIEVED TO HAVE TRANSFERED PETITIONS BETWEEN BRANCHES AND ENTITIES (PAST RESEARCH HAS BEEN LOST, DUE TO COMPUTER HACKER ISSUES AND NOT BEING SAVED OR REVIEWED FOR THE EXPLICIT PURPOUSES OF PROVING THE PRACTICE).

THIS DUPLICATIVE RECORDING AND ADMINISTERIAL PRACTICE, OTHER STATES ARE UNKNOWN, BUT THIS IS SIMPLY TO SHOW THE STATES COMPRISING THE UNION THAT AGREED TO AND RATIFIED THE CONSTITUTION RESPECTED THE PETITION RIGHT IN THE ADMINISTRATIVE DUTY AND WHERE THE CONGRESS HAS CLEARLY DEVIATED FROM THE CONSTITUTIONALLY MANDATED PRACTICE OF RECORDING, THE DUTY MUST BE ACCEPTED BY THE COURTS UNTILL THEY HAVE CORRECTED THE FAULT OF THE CONGRESS IN RECORDING DUTY AND AS ADDITIONALLY ITS OWN DUTY OF RECORDING GRIVANCES AGAINST THE COURTS PRACTICES, RULES AND PRECEDENT, SUCH AS IS THE SUBSTANCE OF THE PETITION I SUBMITTED.

TO DO OTHERWISE WOULD BE AN ACT OF ABRIDGMENT BY THE COURTS IN FURTHERANCE OF TYRANICAL ACTS (BE THEY OF IGNORACE OR INTENTIONAL FEARS AND SELFISH REASONS AND PRIORITIES AN AFFRONT TO THE CONSTITUTIONAL RIGHTS OF AMERICANS) THAT SUBVERT THE CONTROL OF GOVERNMENT OF THE PEOPLE WHO MUST HAVE RECORDATION TO ALTER AND ABOLISH GOVERNMENT AND REMOVE THOSE WHO CANT OR REFUSE TO UPOHLD CONSTITUTIONAL PRINCIPLES THAT THIS IS A PEOPLES GOVERNMENT DESPITE THE USURPATION OF POWER THAT RECORDATION FACILITATES FOR THE TWO PARTIES AND ANY SEATED OFFICIALS WHOS FAILURES TO RECORD GRIVANCES FACILITATES IN HIDING THE COMPLAINTS OF THE PEOPLE FOR THEIR CONVIENIENCES AND BENIFIT.

# General Assembly Session Records, 1777-1789: A Guide to the Records of Marginalized Communities

Published May 2024
Written by Hannah Nicholson
Edited by Alexandra Dowrey and Josh Hager



AMERICA 250 NC

STATE ARCHIVES of NORTH CAROLINA



*Additional notes:*

Today, a **memorial** is "the method by which the legislature addresses or petitions Congress and other governments or governmental agencies." However, historically, a memorial was a written statement of facts that accompanied a petition.

Today, a **select committee** is "a committee established by the Speaker of the House, the President Pro Tempore of the Senate, or by an adopted resolution of either Chamber for a particular issue. This committee may be established as a single chamber committee or as a joint committee. The powers and duties for the committee are set forth by the establishing authority and the membership is appointed by the Speaker of the House and/or the President Pro tempore of the Senate." However, until 1868, the highest-ranking official in the Senate was known as the Speaker of the Senate.

## How Were Petitions Submitted?

To submit a petition, the petitioner first had to write the document. They could do this by themselves or with the help of a friend, relative, or clerk. This is why many petitions have multiple names on them, even if the request only has to do with one person. Both during and after the American Revolution, it became increasingly common for men to submit group petitions, which were generally intended to indicate widespread support for a desired policy change. Women were more likely to submit individual petitions, usually seeking to solve the problem of an individual.

After the petitioner(s) wrote their petition, they presented it to their county court. If the justices of the county court certified the petition, it was then forwarded to the county's legislative representative, who would present it to the General Assembly. After a petition was first read to the General Assembly, it would be remanded to a committee that would be responsible for considering it further. This committee would later report back to the General Assembly, and the General Assembly would either grant or reject the petition based on the committee's recommendations.

106

There may be flaws in my legal arguments, instances misconstruing. what is clear and undeniable is...

The reasoning is simple and the history is in favor of public government accountability because without it the barons would have had no way to incite violence against the tyrannical royals who oppressed them and the people. That is how the rights of petition were won, Its how this nation was created, when a goddamn tyrant professed their acts as just and the reasoning of men prevailed in the reduction of his being. But public recordation existed before then.

To show you this right of principle exists so simply stated that it has been usurped. I tried to identify why the USA as a republican democracy demands a right to redress grievances, (and a petition right), I looked to why law exists, I understand civility and society as the creation and adherence to compacts of agreements of law between people. Without an agreement separation results from incongruent beliefs of momentary idealisms and priorities that are dispelled by thorough review, The later recognized inconsistency creating unresolved conflict and the whole is lessened from the division. That is the root I could profess in the time alloted.

I considered why America a government of the people would demand a system of review and oversight of its government, that is simple and professed in the argument. What practices of government are necessary for a government of the people to be controlled by the people? All that create accountability, that is transparency. Without proof or evidence inquisitions into the actions and inactions of government cannot occur, it is absolutely (nearly) impossible to alter the law and the servant; If there is no record of their merits or faults, then the potential for correction is hindered or prevented.

But as important as accountability to facilitate instruction and control of government, is the question why is a person entitled to redressing and remedy under constitutional law of this nation. Civility, The idea that if the community does not uphold the values and ethics its believes to be necessary to facilitate communal interactions, people will revert to a state of

lawlessness, and seek only their own desires, (even if those desires are to lead the people in the idealisms of the person who is seeking comforts. An assertion of intelligence increasing numbers). I find this is the most based reason for laws, civility to increase the likelihood of comforts.

So what purpose does remedy of grievances serve, The increased civility results in wellbeing and productivity. How is remedy of grievances most simply achieved, by public recordation that allows the people to review the amount and type of grievances citizens of their community have and decide on the merits (it is impossible for a person to know every person of this nation, but it is not impossible for them to see statistics and reasonings restated in the grievances the people have and review them as they see accordingly).

The same reasoning applies to government, if it can not hire adequate staffers or employee volunteers, it can not address the matters. This is the horrendous violation that has occurred, in a nation that professed "our grievances go unheard and unremedied and we are met with injury for stating so".

The descendants now ignore petitions of grievances, remedy requests and improvement ideas. Not only are petitions ignored by the government the absence of reply the denial, the government has also stopped recording the petitions, which prevents the people from attempts to create remedies on their own accord.

The result is the deterioration of civility, This government has disabled the mechanism that facilitates remedy and removed the knowledge of the grievances and improvement requests from beyond the sight of the people so they do not know of the grievances their fellow citizens have (also) professed.

The government their by endowing themselves with the knowledge and understanding that results from knowing the hearts, minds and intents of the people. Also removing the powers this information creates from the people.

1058

This is the violation of the petition right, In doing this the government has usurped the power of the people to control this government of the people and placed it in the hands of those who retain the petitions.

This understanding that the information creates knowledge and power and the power is not abridgable not by congress, the judiciary, or executive, but unabridgable by the government without an amending of the constitution.

That is where the courts duty in facilitation exists, in a control mechanism against the other branches of government and itself (especially for federal judges who are life seated by politicians and policed by themselves) to ensure the power of the people is not subverted.

That is why the court has this duty of recordation, because even if I or another brought suit against the USA for the acts of petition clause violation by the congress, The court would still have a duty imposed by the clause to ensure that incidents of refusal to record petitions can not delay public review, remedy or assembly to reapply. That where conflict of beliefs and remedies exists, There is an immeasurable value in recordation of petitions. Where the (should be) neutral court and public have first review, especially when the petition brings matters of bias against the government powers and parties. Where a democrat in a republican district would say, the same as a republican in a democrat district... We would rather have "the people" first, receive this than a person who does not have the same ideals as us. The courts public presentment is then a mechanism of attack on or praise of the understanding and credibility of the government servants. Thats the petition clause's ultimate purpose. To say, you didn't know or care this was happening, then you may not be fit to serve, an ambush on credibility or a recordation of ability and achievements.

With complete disregard for defenses not raised and demand of a proper ruling.

Respectfully Nicholas Woodall

3/22/26

109